The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR09-160JLR |
| Plaintiff, | ) | |
| v. | ) | UNITED STATES' SENTENCING MEMORANDUM |
| WILLIAM S. POFF, | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| _____ | ) | Sentencing Date: June 14, 2010 |

The United States of America, by and through Jenny A. Durkan, United States Attorney for the Western District of Washington, Sarah Y. Vogel, Assistant United States Attorney, files this Sentencing Memorandum in anticipation of the upcoming sentencing hearing for Defendant William S. Poff, scheduled for Monday, June 14, 2010.  Defendant stands convicted, following a bench trial, of thirty criminal counts as charged in the First Superseding Indictment, including Conspiracy to Commit Bank and Wire Fraud, several substantive counts of Bank and Wire Fraud, Conspiracy to Engage in Money Laundering, and several substantive Money Laundering counts.[1]

---

[1] The remaining charges in the First Superseding Indictment naming Poff were dismissed prior to trial.  Dkt. 158.

UNITED STATES' SENTENCING MEMORANDUM - 1
*U.S. v. William S. Poff*; CR09-160JLR

United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271

# POFF'S OFFENSE CONDUCT[2]

## A.  The Fraud Conspiracy and Individual Counts of Bank and Wire Fraud

Beginning in at least April of 2005, and continuing through at least August of 2008, Defendant Poff agreed with his wife at the time, co-defendant Alexis Ikilikyan, and other co-defendants (including Micki S. Thompson, Tony Reyes, and others), to engage in a scheme to obtain loan proceeds from financial institutions and other lenders through fraud, and a scheme to launder those criminal proceeds.  In furtherance of these schemes, Poff and Alexis worked as a real estate investment team until about April of 2008, with Ikilikyan acting as the real estate agent and Poff handling the loan applications and acting as a notary.  They formed at least three businesses to facilitate their activities, all registered in Ikilikyan's name: *Fidelis Enterprises*, *US Realty & Investments*, and *US Mortgage & Investments*.  Together, Poff and Ikilikyan worked to: (1) buy and sell residential real estate (for their own residence and for investment/rental) in the name of Ikilikyan, Ikilikyan's mother (A.H.), and other straw buyers recruited for this purpose (e.g., Tim Thomson); (2) submit (or facilitate the submission of) false statements to lenders about the purchasers' qualifications, in the form of false statements in loan applications and fake supporting documentation, and forged closing documents (often notarized by Poff); (3) persuade sellers to extend private financing as part of the real estate transactions, but conceal this from the mortgage lender, and, in some instances, conceal from the seller the existence of additional mortgages on the property; (4) falsely inflate the stated contract price for many of these purchases on documents submitted to the lender and recorded with the county, in order to obtain additional funds and/or artificially increase the appraised value; (5) falsely represent to the lender that the borrower had made down-payments that either did not exist, or were funded impermissibly with the undisclosed loans, in order to obtain additional funds; (6) collaborate with Tony Reyes to sell their properties to Reyes's straw buyers, permitting them artificially to control the "market" price and other details of the

---

[2]Summarized from the evidence introduced at trial.

transaction, and then split the proceeds; and (7) siphon as much of the proceeds from the purchase and sale transactions as possible, including by diverting seller proceeds to their own control, billing for unperformed repairs through a fictitious company (e.g., *PDQ Construction*), along with being paid large commissions and fees.

The scheme was enabled by co-conspirator Micki Thompson, the escrow closing officer at Great American Escrow ("GAE"), who prepared numerous false and misleading escrow documents at the direction of Poff, Ikilikyan, and Reyes, and then transmitted those documents and loan proceeds to various parties to the transactions, including lenders, sellers and their agents, co-conspirators, and other escrow companies.

Specific details about at least eight real estate transactions involving fraud that Poff and his conspirators committed are included in the PSR, and not repeated here.

### B. The Proceeds from the Fraud Scheme

In addition to defrauding sellers and mortgage lenders, the financial investigation revealed that a large proportion of the illegally-obtained proceeds went back to Poff and Ikilikyan during their partnership. Poff, who at the time was battling with his first wife over unpaid child support, went to great lengths to keep his name out of the property transactions. In fact, whenever a property was purchased in Ikilikyan's name, Poff, as her husband, would execute a quit-claim deed specifically disclaiming any marital ownership rights to the property. Poff never purchased any property in his own name, did not put his name on the bank accounts used to facilitate the transactions, and even directed that his loan officer commission checks be made payable to Ikilikyan or to their business.

Notwithstanding these effort to separate himself from the property proceeds, Poff shared equally in the fruits of fraud scheme. During the marriage, Poff and Ikilikyan's share of the proceeds from the scheme was deposited into bank accounts held in the name of Ikilikyan or her mother, A.H. Those funds then were used by Ikilikyan and Poff to pay the expenses of the scheme (such as earnest money and down-payments on new purchases, mortgage and loan payments for existing purchases, and property upkeep), as well as to pay for Poff and Ikilikyan's shared living expenses. Bank records show that

1   these funds paid for the mortgage on Poff and Ikilikyan's personal residence, their

2   utilities and groceries, car payments for both their Mercedes and Ford F-350, gas,

3   personal expenses, restaurants and other entertainment, travel, and vacations, including a

4   trip to Hawaii with Reyes.  In addition, bank records established that funds from these

5   accounts (in the names of Ikilikyan and A.H.) also went to pay expenses specifically

6   associated with Poff, such as payments for his individually owed back child support and

7   to pay his divorce attorney.  Financial and Employment Security records reveal that Poff

8   had no other significant source of income during this time period, filed no income tax

9   returns, and kept only one separate bank account in his name with only a few hundred

10  dollars in it at a time, most of which was deposited in cash and then spent at Starbucks.

11  Between December 7, 2004, and June 30, 2009, a total of $1,782,208.26 was paid from

12  Great American Escrow to bank accounts controlled by Ikilikyan and Poff.

13         When Poff and Ikilikyan separated in mid-2008, a payment of more than half of

14  the proceeds from the sale of 7038 S. Puget Sound, Tacoma (owned only by Ikilikyan per

15  the quit-claim by Poff) was wired from GAE to Poff in Michigan at his request,

16  demonstrating that Poff continued to share the proceeds from the sales of these properties

17  despite the fact that they were not owned in his name.  Poff then used those funds to buy

18  more properties in Michigan.  Moreover, in Poff and Ikilikyan's divorce agreement, Poff

19  claimed and was granted half of the rental income generated by the properties purchased

20  in Ikilikyan and A.H.'s name as part of the fraud scheme, and continues to be entitled to

21  half of those rental proceeds (despite having no obligation to pay the mortgages).

22  *C. The Money Laundering Conspiracy and Money Laundering Counts*

23         In addition to paying living expenses, Poff and Ikilikyan used proceeds obtained

24  from fraudulently-obtained purchase loans to promote additional bank and wire fraud, by

25  putting some of the funds back into new fraudulent purchases as is described in the PSR

26  and was illustrated in the summary exhibits introduced at trial.  (*See e.g.,* Trial Exhibits

27  103, 203, 303, 403, 503, 603, 701, 715, and 803). Often, the source of the funds for a new

28  purchase was disguised in some manner to conceal its ownership or source, constituting

UNITED STATES' SENTENCING MEMORANDUM - 4
*U.S. v. William S. Poff*; CR09-160JLR

1  "concealment" money laundering as well as "promotional."  Examples of this included

2  funds falsely labeled in the HUD-1 as private loan pay-offs (e.g., the purported note

3  between A.H. and Ms. Hsu, the seller of 9488 199th Ave. S, Issaquah), payments to

4  fictitious companies for non-existent repairs (e.g., *PDQ Construction*, *Marroquin*

5  *Handyman*), or payments to a third, non-existent escrow for a fictitious new purchase.

6  Where the transactions involved more than $10,000, they also constituted "spending"

7  money laundering.

## GUIDELINES CALCULATION

9  The Presentence Report[3] ("PSR") accurately describes Poff's criminal conduct and

10  history, and correctly calculates his combined base offense level for all counts.  The PSR

11  correctly assesses the loss[4] as falling between $2,500,000 and $7,000,000, and correctly

12  adds upward adjustments for number of victims, supervisory role in the offense, and use

13  of a special skill and abuse of a position of trust.  PSR ¶¶ 60-69.  In particular, the upward

14  adjustment for supervisory role is predicated on the trial testimony of Micki Thompson,

15  who testified that she was directed as to what false statements to put in the HUD-1's by

16  Defendant Poff.  Poff also supervised A.H., and other straw buyers.  The PSR accurately

17  withholds credit for acceptance of responsibility.  PSR ¶ 71.

18  The United States concurs that the total combined offense level for all offenses is

19  33, and the Criminal History category is I, resulting in a Guidelines range of 135 to

20  168 months' imprisonment.

## STATUTORY MAXIMUM

22  The statutory maximum penalty for the fraud conspiracy is imprisonment for up to

23  30 years, a fine of up to $1,000,000, or both imprisonment and a fine, a period of

24  supervision following release from prison of up to 5 years, and a $100 special assessment.

25  18 U.S.C. § 1344.

26  The statutory maximum penalty for the money laundering conspiracy is

---

[3]Final, Revised June 7, 2010.

[4]Calculated without including any interest or fees.

1    imprisonment for up to 20 years, a fine of up to $500,000 or twice the amount of funds

2    involved in the offense, whichever is greater, a period of supervised release of up to three

3    years, and a $100 assessment.

**SENTENCING RECOMMENDATION**

5    *A.  Analysis of Statutory Factors*

6          Title 18, United States Code, Section 3553(a), provides that the court shall

7    consider several enumerated factors when determining a sentence.  With respect to the

8    nature of the offense under section 3553(a) factor one, the fraud and money laundering

9    schemes conducted by Poff, Ikilikyan, Reyes, and Thompson were serious, ongoing over

10   a period of years, and were very successful.  By conning banks and lenders into loaning

11   more money for real estate purchases than the properties were really worth, Poff and his

12   associates lined their own pockets, but set up a series of real estate "investments," that

13   were unsustainable: that is, their only hope of covering their expenses depended on the

14   endless continuation of record-breaking real estate market increases and readily available

15   credit.  Apparently, Poff and Ikilikyan convinced themselves this would be the case, and

16   they would be able to pay everyone back eventually.  The problem is that because of the

17   lies and false statements they told, and the false documentation they submitted, the

18   commercial and private lenders had no idea they were embarking on this risky

19   "investment" strategy.  Poff, alone, appreciated these nuances enough to keep his name

20   off all the paperwork.  When appreciation inevitably slowed and credit tightened, the

21   scheme collapsed, causing extensive financial losses for both private and commercial

22   lenders - much of which is still unrealized.

23         The scheme also caused significant damage to the people Poff and Ikilikyan used

24   as "straw buyers," including Timothy Thomson and J. Sanchez, who continue to struggle

25   to rid themselves of the debt taken out in their names (the proceeds of which went to

26   Ikilikyan and Poff).  Poff and Ikilikyan also managed to recruit co-conspirator Micki

27   Thompson and persuade her to break the law to facilitate their scheme, with devastating

28   consequences for her.  In all, Poff and his associates directly caused multiple foreclosures

1   and real losses to businesses, government, and private individuals of over $2,500,000.

2       With respect to section 3553(a) factor two, that is, the history and characteristics of

3   the defendant, the United States acknowledges Poff's lack of criminal history, and

4   recognizes this as a mitigating factor.  The United States is troubled, however, by his lack

5   of employment and earning history for the past ten years, following separation from the

6   US Marine Corps.  Poff's claimed "self-employment" in the real estate field, PSR ¶ 104,

7   is apparently the offense conduct described above (despite his claims, during trial, that he

8   didn't actually work in the real estate field).  Even during the past year while on Pretrial

9   release, he apparently has not sought, or at least not found, any source of income that is

10  not directly related to buying and selling houses.

11      Factors three, four, and five of section 3553(a) provide that the sentence should

12  result in just punishment while promoting respect for the law, ensuring the safety of the

13  public, and deterring similar crimes.  There is a significant need here to promote respect

14  for the law, and to deter those who would commit fraud against financial institutions and

15  private individuals.  This is particularly true when those persons are professionals

16  working in the field and are exploiting their "clients" and other parties to the transactions

17  for their own personal gain.  Moreover, given Poff's unwillingness to admit wrongdoing

18  and continued tendency to blame others for conduct he committed, he may remain a threat

19  to undertake additional fraud.  This is exacerbated by his continued buying and selling of

20  real estate, his present lack of employment, and his apparent apathy toward his financial

21  obligations.

22      With respect to factors six and seven of section 3553(a), there is no indication that

23  Poff needs special medical care or treatment.

24      Factor eight directs the Court to avoid unwarranted disparity among similarly

25  situated defendants.  In this case a peripheral co-defendant who participated in one aspect

26  of the money laundering supporting the fraud scheme, Mario Marroquin, received a

27  sentence of three years' probation, representing a significant departure for his

28  cooperation.  The United States suggests that his conduct is not comparable to Poff's.

1    The United States has recommended 51 months' imprisonment for co-defendant

2    Humberto Reyes-Rodriguez.  Co-defendants Ikilikyan and Thompson are facing expected

3    Guidelines ranges roughly the same as Reyes's, but they are likely to receive reductions

4    for substantial assistance, having testified at trial against Poff.

5    Poff, who has not accepted responsibility, is facing the longest potential sentence,

6    which the United States suggests is not an unwarranted disparity.   For example, Reyes's

7    conduct was somewhat separate from Poff's and Ikilikyan's, even though they

8    collaborated on many transactions.  As a whole, Reyes conducted lower-dollar

9    transactions than Poff and Ikilikyan, mostly buying homes in the $100,000 to $250,000

10   range (with the exception of 27419 8th Ave, which he purchased with Ikilikyan and Poff).

11   Poff and Ikilikyan, on the other hand, started in that range but progressed to loans of over

12   $1 million.  The result of this difference is a larger loss figure for Poff and Ikilikyan, as

13   compared to Reyes.  In combination with Poff's failure to accept responsibility and

14   absence of a negotiated loss range pursuant to any plea agreement, the difference in

15   potential sentences is not unwarranted.

16   Finally, with regard to sentencing factor nine, as outlined below, restitution is

17   mandatory, and a lengthy term of supervised release following prison will permit the best

18   chance of recovering any restitution.

19   In summary, the United States respectfully suggests that analysis of the several

20   statutory factors in this case supports a sentence within the advisory Guidelines range.

21   **B.  *Specific Sentencing Recommendation***

22   The United States requests that the Court impose a sentence at the low end of the

23   Guidelines range, of 135 months' imprisonment.  The United States respectfully suggests

24   that, for the reasons discussed above, this sentence is "sufficient, but not greater than

25   necessary" to comply with statutory sentencing purposes.  18 U.S.C. §§ 3553(a).

26   ## RESTITUTION

27   The Mandatory Victims Restitution Act ("MVRA") imposes mandatory restitution

28   for crimes committed by fraud or deceit.  18 U.S.C. §3663A(c)(1)(A)(ii).  The task before

1  this Court now is determining "the full amount of each victim's losses . . . without

2  consideration of the economic circumstances of the defendant."  18 U.S.C.

3  §3664(f)(1)(A).  The initial step in determining restitution is identifying the victims.  The

4  term "victim" is defined broadly to include:

> person[s] directly and proximately harmed as a result of the commission of an
> offense for which restitution may be ordered including, in the case of an offense
> that involves as an element a scheme, conspiracy, or pattern of criminal activity,
> any person directly harmed by the defendant's criminal conduct in the course of
> the scheme, conspiracy, or pattern...

8  18 U.S.C. §3663A(a)(2).  Based on this definition, the government has identified two

9  groups of victims.  The first includes the lenders and loan servicing companies presently

10  holding, or responsible for servicing, the fraudulently obtained mortgages.  The second

11  group includes individual sellers who were induced through fraud to extend private loans

12  as part of the real estate transactions.  A third group of potential victims includes the

13  straw buyers who Poff and Ikilikyan persuaded to allow their names and credit histories

14  to be used to purchase properties.  Those individuals have suffered significant, but

15  difficult to quantify, harm in the form of financial stress and ruined credit that cannot be

16  restored through an Order of restitution.

17       Attached to this Memorandum as Exhibit A is a chart summarizing known victims'

18  pecuniary losses attributable to Poff and Ikilikyan and Thompson.[5]  This chart does not

19  attempt to include the losses suffered by the third category of victims.  All of the

20  documents supporting these restitution figures have been provided to Defendant and

21  Probation.  No specific objections or challenges to these restitution figures have been

22  received to date.

23       The restitution figures included in the attached chart are derived either directly

24  from the victim's statements, or from recorded property records.  In cases where no

25  victim statement was provided but the property had been foreclosed upon, the government

---

27       [5]  The United States has agreed to apportion restitution where there is no evidence directly
linking the defendant to a transaction.  *See* 18 U.S.C. § 3664(h)("the court...may apportion liability
28  among the defendants to reflect the level of contribution to the victim's losses and economic
circumstances of each defendant").

United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271

1   subtracted the foreclosure price from the principal amount due on the mortgage (or, if that

2   was not recorded, the principal balance when the loan was obtained).  Where neither a

3   victim statement nor foreclosure records were available, no loss/restitution figure is

4   included.

5       These restitution figures  actually represent only a fraction of the likely true loss

6   amount, but in many cases it was impossible to obtain loss figures because lenders have

7   gone out of business completely and loans could not be traced.  In other cases, the

8   properties are rented and enough payments have been made that foreclosure is not yet

9   complete, meaning that the losses will not be realized until some time after sentencing.

10      As indicated on the attached chart, the Court should order that Poff pay all

11  restitution jointly and severally with Ikilikyan and Thompson, who also were responsible

12  for these losses.  The Court should order that Poff pay restitution associated with

13  27419 8th Ave SE, Des Moines, WA (Kirkdoffers) jointly and severally with Reyes,

14  Ikilikyan, and Thompson.  The United States has no information regarding Defendant's

15  ability to pay, because he failed to submit the requisite financial information for such

16  consideration.  PSR ¶ 111.

17      The Court properly should include losses to each of the victims listed on the

18  attached restitution chart, because all of these losses were caused by Poff and his co-

19  schemers as part of the same scheme to defraud.  *See United States v. Bright*,

20  353 F.3d 1114, 1120 (9th Cir. 2004) (holding that the MVRA authorizes restitution for

21  losses caused by related conduct that is part of a fraud scheme, even where the conduct

22  was alleged in charges that subsequently were dismissed).  *See also United States v.*

23  *Booth*, 309 F.3d 566, 576 (9th Cir. 2004) (restitution may be ordered for all persons

24  harmed by the entire scheme); *United States v. Grice*, 319 F.3d 1174, 1177

25  (9th Cir. 2003) (affirming restitution for losses incurred from "related but uncharged

26  conduct that is part of a mail fraud scheme").

27                    **REMAND FOLLOWING SENTENCING**

28      The Defendant should be remanded at the time of sentencing.  Once a defendant

1  has been convicted at trial, the law establishes a presumption in favor of detention.

2  *See* 18 U.S.C. § 3143(a); *see also* S.Rep. No. 225, 98th Cong., 1st Sess. 26 (1983),

3  reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3209 ("Once guilt of a crime

4  has been established in a court of law, there is no reason to favor release pending

5  imposition of sentence or appeal.").  Specifically, as relevant to this case, 18 U.S.C.

6  § 3143(a) provides that

7       the judicial officer shall order that a person who has been found guilty of an
     offense and who is awaiting imposition or execution of sentence, . . . be
8       detained, unless the judicial officer finds by clear and convincing evidence
     that the person is not likely to flee or pose a danger to the safety of any
9       other person or the community if released under section 3142(b) or (c).

10  Thus, to secure release on bail after a guilty verdict, a defendant must rebut this

11  presumption with clear and convincing evidence that he is not a risk of flight or a danger

12  to any person or the community.  *United States v. Abuhamra,* 389 F.3d 309, 319 (2d Cir.

13  2004).

14       In this case, Defendant Poff has been convicted of 30 fraud and money laundering

15  offenses.  He is facing the possibility of a lengthy term of imprisonment.  He is not

16  employed, and is residing in Michigan State where he is only minimally supervised by a

17  Pretrial Services officer who lives some distance away.  He was on bond through the trial

18  and pending sentencing.  He lacks the financial resources, however, to travel to whatever

19  destination the Bureau of Prisons designates him for surrender, making it less likely that

20  he will arrive as directed in a timely manner.

21       The United States recognizes that Defendant Poff appeared for trial as required by

22  his bond, but suggests that since that time his participation in the ongoing prosecution has

23  been extremely minimal.  For example, he has failed to comply with Probation requests to

24  prepare the Presentence Report by failing to return requests for financial information

25  (PSR ¶ 111) or for a military release (PSR ¶ 109).  Moreover, he has not expressed any

26  acceptance of responsibility or remorse for the crimes he committed, suggesting both a

27  risk of flight and a danger to the community when finally faced with the prospect of

28  surrender for service of sentence.

1    Defendant has failed to rebut the presumption favoring detention following

2  conviction with clear and convincing evidence that he is not a risk of flight or a danger to

3  any person or the community.  The United States respectfully suggests that continuation

4  of the pre-trial bond following imposition of sentence merely prolongs the inevitable, will

5  take resources that should instead be paid toward restitution, and may cause harm both to

6  the Defendant and the community.

7                          **FINES, FEES & FORFEITURE**

8    Given the restitution owing in this case, Poff is probably not able to pay a fine, but

9  he is responsible for the mandatory Special Assessment of $100 for each count.  There is

10  no forfeiture pending.

11                     DATED this 8th day of June, 2010.

12                         Respectfully submitted,

13                         JENNY A. DURKAN
                           United States Attorney
14
                            *s/ Sarah Y. Vogel*
15                         SARAH Y. VOGEL
                           Washington State Bar No. 35966
16                         Assistant United States Attorney
                           700 Stewart Street, Suite 5220
17                         Seattle, Washington 98101-1271
                           Phone:       (206) 553-2074
18                         Fax:         (206) 553-4440
                           Email: Sarah.Vogel@usdoj.gov
19

20

21

22

23

24

25

26

27

28

UNITED STATES' SENTENCING MEMORANDUM - 12
*U.S. v. William S. Poff*; CR09-160JLR

1

CERTIFICATE OF SERVICE

2

3          I hereby certify that on June 8, 2010 I electronically filed the foregoing with the Clerk

4   of the Court using the CM/ECF system which will send notification of such filing to the

5   attorney(s) of record for the defendant(s).

6

7                                        s/Karen Wolgamuth
                                         KAREN WOLGAMUTH
8                                        Paralegal
                                         United States Attorney's Office
9                                        700 Stewart Street, Suite 5220
                                         Seattle, Washington 98101-1271
10                                       Phone: (206) 553-5050
                                         FAX:   (206) 553-4440
11                                       E-mail: karen.wolgamuth@usdoj.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' SENTENCING MEMORANDUM - 13
*U.S. v. William S. Poff*; CR09-160JLR