1
2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
IN SEATTLE

3

_____

4

UNITED STATES OF AMERICA,        )
                                 )   NO. CR09-160JLR

5

                     Plaintiff,  )
                                 )

6

            vs.                  )
                                 )

7

WILLIAM S. POFF,                 )
                                 )

8

                     Defendant.  )
                                 )

9

_____

10

TRIAL

11

_____

12
13

BEFORE THE HONORABLE JAMES L. ROBART

14

March 8, 2010

15
16

APPEARANCES:

17

Sarah Vogel
Michael Scoville
Assistant United States Attorneys

18

Representing the Plaintiff

19

William S. Poff
Pro Se

20

Representing the Defendant

21

Howard Ratner
Attorney at Law

22

Standby Counsel

23
24
25

```
 1                        EXAMINATION INDEX

 2                                                         PAGE
        ADAM BURTT              DIRECT EXAMINATION          44
 3                             By Ms. Vogel:

 4

 5

 6                         EXHIBIT INDEX
        EXHIBITS ADMITTED                                  PAGE
 7       2                                                  48
         104 - 112                                          56
 8       204 - 207                                          56
         304 - 307                                          57
 9       404 - 408 & 431                                    57
         504 - 506                                          58
10       604 - 609                                          59
         702, 703 & 716                                     59
11       804 - 808                                          60
         11, 12, 22 & 236                                   61
12       7, 13 & 234                                        62
         8, 9, 10 & 235                                     62
13       900, 901 & 902                                     63
         143, 144, 145, 146, 148, 149, 150, 151 & 152      69
14       209 - 217, 237, 238, 240, 241                     73
         318, 319 & 320                                     73
15       409, 423, 424, 425, 426                           74
         521, 522 & 523                                     74
16       614, 629, 630, 631, 632 & 634                     75
         704, 706, 708, 709, 717, 718, 719, 721, 722, 723, 75
17       724 & 725
         812, 814, 817, 818, 819, 820 & 821                75
18       922, 923, 928 & 929                               76
         118 & 159                                         77
19       705                                               77
         113 - 116, 119 - 127, 128, 130 - 140 & 142        81
20       141                                               82
         208, 218 - 233                                    83
21       129 & 223                                         86
         308 - 317                                         87
22       412 - 422                                         88
         507 - 520                                         88
23       621 & 623                                         89
         720                                               91
24       809 - 811, 813                                    91
         610 - 612                                         92
25       815 & 816                                         93
         915, 920, 926, 931 & 933                          94
```

```
24, 25 & 913                                                 94
912                                                          95
3 - 6, 242, 321 & 322                                        95
161, 162, 163, 239, 243, 244, 323, 427, 525, 526,           96
646, 648, 823, 824 and 647
20                                                           97
1                                                            98
100                                                          99
200                                                         100
400                                                         101
500                                                         102
600                                                         103
700 Illustrative                                           103
800                                                        104
```

1          THE COURT:  The clerk will call this matter.

2          THE CLERK:  Case 09-160, United States versus William

3  Poff.  Counsel, please make your appearance.

4          MS. VOGEL:  Good afternoon, your Honor.  Sarah Vogel and

5  Michael Scoville on behalf of the United States.  Also present at

6  counsel table is Special Agent Adam Burtt, the case agent in this

7  case.

8          THE COURT:  Counsel, Mr. Burtt.

9          THE DEFENDANT:  Good afternoon, your Honor.  William S.

10  Poff, here by special appearance, representing myself.  And I

11  would like to object for the record, your Honor.

12          THE COURT:  Object to what?

13          THE DEFENDANT:  I happened to swing by U.S. Bankruptcy

14  Court on my way here.  According to law, it says the United

15  States is actually, in fact, a bankrupt corporation.  And I

16  checked with the trustees at the bankruptcy court.  Neither of

17  the U.S. Attorneys are actually trustees of bankruptcy court.

18  Only a trustee can speak on behalf of a bankrupt corporation,

19  neither of which they are, sir.

20          THE COURT:  All right.  Why don't we start a list, and I

21  will take that up before the day is over.

22      I must say, I always wonder when I come out here after the

23  morning break and people have been redecorating the courtroom.

24  That's probably as good a spot for that chart as any.

25      Mr. Scoville, are you doing the opening statement?

1           MR. SCOVILLE:  Yes, your Honor.

2           THE COURT:  Do you intend to make reference to that?

3           MR. SCOVILLE:  I do.  I have also handed up a smaller

4    courtesy copy for you and your clerk to refer to.

5           THE COURT:  Mr. Poff, have you had a chance to look at

6    it?

7           THE DEFENDANT:  Yes, I have.

8           THE COURT:  Do you have any objection to their using it?

9           THE DEFENDANT:  I have no objection, your Honor.

10          MR. RATNER:  For the record, Howard Ratner.  I am

11   standby counsel for Mr. Poff.

12          THE COURT:  Thank you, Mr. Ratner.  Counsel, I have a

13   series of housekeeping matters to take up with you first.  I

14   guess the easiest one to start on is the question of waiver of

15   the jury trial.

16       Mr. Poff, where we left off on this was the telephone

17   conference that we had last Friday.  In that, you indicated that

18   you wished to waive the jury.  The law has a great name for that.

19   They call it a "colloquy."  I asked you probing questions about

20   that intent, and you answered them to my satisfaction.  And I

21   indicated at that time that the one detail that remained open was

22   that Criminal Rule 23 is very specific that the defendant needs

23   to sign a written waiver.

24       In thinking about this over the weekend it occurred to me

25   that one of the issues in this is that the person who is waiving

1    the jury needs to be the same person who has been sued.  And I

2    note that Mr. Poff has been signing pleadings in this matter as

3    William hyphen Stuart comma space comma Poff.  I think that is a

4    colon.  And I don't want there to be an argument at some point in

5    the future where the contention is made that the person here in

6    court today is not the person who was sued by the government.  I

7    think that is an obligation of the United States that they are

8    satisfied that this arrangement is correct, and that the person

9    who is here is indeed the person who was indicted in this matter.

10   I am not privy to the arraignment in this matter, I am not privy

11   to any of the bookings, but I am aware of the fact that the

12   government is aware of that.  I am not sure who is fielding this

13   on behalf of the government.  It looks like all heads are turning

14   to Ms. Vogel.

15        Ms. Vogel, how is it that you are going to assure me that

16   Mr. Poff is Mr. Poff?

17             MS. VOGEL:  Aside from the evidence that we will

18   introduce during the trial, your Honor, upon defendant's arrest

19   in Michigan he waived his Rule 5 identity hearing and admitted

20   under oath that he was the person named in the indictment, and

21   was then moved here to -- the case was then moved here to the

22   Western District of Washington.

23             THE COURT:  And the person who did that is the same

24   person who is present today?

25             MS. VOGEL:  Yes, your Honor.

1          THE DEFENDANT:  I object, your Honor.

2          THE COURT:  What's that?

3          THE DEFENDANT:  I object, your Honor.

4          THE COURT:  Mr. Poff, you need to slide that microphone

5     over.  Number one, it will pick up everything you don't want it

6     to pick up.  For example, if you want to talk to Mr. Ratner, be

7     sure to press that button at the base of it, because it will

8     broadcast everything to the audience when it is on.  The second

9     thing is, it does a really bad job unless it is directly in front

10    of you and you speak distinctly.

11       What is the basis of your objection?

12         THE DEFENDANT:  Yes, I do go by William S. Poff.  My

13    name is spelled capital W, lower case i-l-l-i-a-m.  My middle

14    name is Stuart.  It is spelled capital S, lower case t-u-a-r-t.

15    My last name is Poff.  That is spelled capital P, lower case

16    o-f-f.  My name -- the appellation where it shows in here and on

17    the court documents William S. Poff is actually a juristic

18    person, an appellation that I was frauded actually into believing

19    that's what I was, such as on my driver's license, since

20    everything is capitalized.  I have since learned that this

21    appellation of my name is actually a corporate fiction or it is

22    called a vessel under Title 18.  Somehow I am compelled to

23    perform to this appellation of my name, which is technically not

24    myself.

25         THE COURT:  All right.  Let me make sure I understand.

1   Were you ever arrested in Michigan?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  And did you have a hearing before the

4   magistrate?

5              THE DEFENDANT:  Yes, sir.  The very day that I was

6   arrested I was taken to the courtroom in handcuffs.  They asked

7   me if my name was William S. Poff.  At that time, not knowing --

8   I was given basically this piece of paper with my arrest warrant,

9   my indictment, whatever it was at the time, I do not recall.  It

10  had what appeared to be my name on there.  And, yes, I did at

11  that time answer that, yes, I was William S. Poff.  What I have

12  since learned is that this appellation of my name is some sort of

13  subcorporation, some sort of legal fiction that makes me some

14  sort of person under the law, which technically I am not, your

15  Honor.

16             THE COURT:  All right.  What entity is going to be

17  waiving the jury in this?  I will get out Rule 23 and read it to

18  you if you want.  It says the defendant needs to waive the jury.

19  Are you prepared to waive the jury as William S. Poff in whatever

20  spelling you wish to put on the record?

21             THE DEFENDANT:  If I am somehow compelled to perform

22  this appellation in my name, then at that point I would have to

23  if we proceed further.  But I am objecting for the record.  And I

24  take exception to anyone referring to me as William S. Poff in

25  all capital letters, per statute, sir.

1          THE COURT:  Before I rule on that, Ms. Vogel, would you

2    like to say anything further?

3          MS. VOGEL:  No, your Honor.

4          THE COURT:  I am going to overrule that objection.  I

5    believe that William S. Poff in capital letters is simply a

6    stylistic matter.  It would be as stated in the indictment that

7    this is the person who is charged.

8          THE DEFENDANT:  I respectfully object, your Honor.

9          THE COURT:  You can save those up, sir.  Let me finish

10   mine.

11         THE DEFENDANT:  Sorry, sir.

12         THE COURT:  As I understand Mr. Poff's responses here in

13   court today, he is William S. Poff, but a different style, and I

14   guess punctuation, if I understand correctly.

15         THE DEFENDANT:  The punctuation is how it would be

16   referred to in the family bible.  That is how it is technically

17   done in a family bible, sir.  That's what the punctuation is for,

18   sir.

19         THE COURT:  Mr. Poff, have you had an opportunity to see

20   the waiver of right to jury trial that was prepared in this

21   matter?

22         THE DEFENDANT:  Yes, I have, sir.

23         THE COURT:  Are you prepared at this time to sign that?

24   I note that it does not list your name, it simply refers to you

25   as "I," and under the signature line it says "defendant."  Are

1   you prepared to execute that at this time?

2           THE DEFENDANT:  Yes, sir.  May I state for the record,

3   on the matter that you overruled, you were talking about the

4   style of my name.  I actually did research of this in the

5   Government Printing Office Style Guide of 2008.  It says vessels

6   will be printed in lower case Roman.  I would like to show for

7   the record my name in all caps is technically what is referred to

8   as a vessel, a fictional entity that I am somehow compelled to

9   perform under, which I object to.

10          THE COURT:  I think that is clearly on the record at

11  this time.  Then I would ask whoever has the original of the

12  waiver of right to jury trial to make that available to Mr. Poff.

13          MS. VOGEL:  Your Honor, I have provided the original to

14  Mr. Poff.  Before we go forward with that, the United States has

15  some concerns that arose during the hearing on Friday -- the

16  telephonic hearing on Friday, specifically with regard to the

17  question that the Court directed to standby counsel about

18  competence of the defendant to enter into the waiver.

19      Over the weekend, doing some more research on the matter, the

20  United States learned that there is a case in the Ninth Circuit

21  that specifically states if there is any question as to the

22  defendant's mental ability or competence as to the jury waiver,

23  then the Court must explore that before allowing the waiver to

24  continue.

25          THE COURT:  All right.  Mr. Ratner, what I heard you

1    say, and perhaps I didn't hear this clearly, was that you were

2    expressing an opinion that would require -- one way or the other,

3    would require an invasion of the attorney/client privilege, and

4    therefore you were declining to answer for the reason that your

5    answer would be based on information that you had obtained during

6    the time that you were serving as standby counsel, and you felt

7    that was not appropriate under the attorney/client privilege.  He

8    can have his own microphone.  Just slide it over there.

9          MR. RATNER:  That's correct, your Honor.  Since that

10   time I have re-looked at the issue.  I can tell the Court that I

11   have nothing to indicate that Mr. Poff is not legally competent

12   to stand trial in accordance with the applicable case law.

13         THE COURT:  All right.  Ms. Vogel, any further concern

14   then?

15         MS. VOGEL:  No, your Honor.

16         THE COURT:  Mr. Poff, you have the original of this.  If

17   you would sign it, please?  One of the rules is you only get to

18   come up into my space when you are invited, but you can then

19   deliver it to the clerk after you have done that.

20      What's customary, Mr. Poff, is you show it to opposing

21   counsel, and then you are welcome to bring it up.

22      As I get to say, you may approach.

23      All right.  I am going to return that to the clerk for filing

24   at this time.

25         Counsel, I believe pending before me right now is Mr. Poff's

1  motion in regards to the Speedy Trial Act.  We have taken care of

2  the jury trial issue.  I think it has now been filed and I have

3  signed the stipulation in regard to business records.  I believe

4  that those are the outstanding matters at this time.

5      Anyone else got anything else they think is on an open,

6  pending matter at this time?

7          THE DEFENDANT:  Yes, sir.  The objection I made earlier,

8  I would like to show this document that I received from a very

9  nice lady down at the bankruptcy court, Ms. Ethel.  She actually

10  gave me a printout of the trustees and bankruptcy.  I would like

11  to show that to opposing counsel and submit it into evidence.

12          THE COURT:  Why don't you hold onto it.  We are going to

13  treat that as a motion.  In effect, you are moving to dismiss.

14  You can keep that and hand it up at that time.  And I will put

15  that one on my list of matters to take up also.

16      Anything else from the government?

17          MS. VOGEL:  No, your Honor.

18          THE COURT:  Mr. Poff, is referring to you as Mr. Poff

19  fine?  I don't want to be disrespectful.

20          THE DEFENDANT:  That's fine, sir.

21          THE COURT:  That's how we will call you in this.  I

22  believe that the government is going to do a short opening

23  statement.

24          MR. SCOVILLE:  Yes, your Honor, that's correct.

25          THE COURT:  You may proceed, counsel.

1              MR. SCOVILLE:  May it please the court, Mr. Poff,

2     Mr. Ratner.  Your Honor, this case is about lies to get mortgage

3     loans, and more lies to get cash back from closing real estate

4     deals.

5              Usually when people are buying a house they have to put their

6     own money into the transaction.  They have to bring some cash to

7     the closing.  And they walk away with less cash in their pockets.

8     With the real estate deals the court is going to hear about in

9     this case, the defendant and his co-conspirators used lies to get

10    mortgage loans, and then just siphon as much cash as possible out

11    of closing real estate deals as they could, even while they were

12    buying houses, walking away with much more cash in their pockets

13    than when they had started, as well as with titles to the houses

14    they were buying.

15             A staggering amount of deception was necessary to make this

16    work.  The defendant and his co-conspirators routinely used straw

17    buyers, routinely pretending other people were buying the house,

18    when in fact the defendant and usually his wife were buying them.

19             He submitted applications to mortgage lenders that were

20    riddled with lies; lies about whether the house was going to be

21    used as a primary residence, lies about the income and employment

22    of the borrower, lies about where the down payment funds were

23    coming from.

24             On the side, the defendant and his wife would negotiate with

25    the sellers in these transactions for separate seller-carried

1    financing, but they wouldn't tell the mortgage lenders about

2    these side arrangements for seller-carried financing.  As a

3    result they were routinely able to get more than 100 percent

4    financing for the real estate deals, and then siphoned the excess

5    funds out of the closing back to themselves.

6         They worked with a crooked escrow agent to create fake

7    settlement statements, fake HUD-1s, to disguise where the money

8    was coming from and where it was going.  In all these ways they

9    were able to get huge amounts of cash back at closing, tens and

10   in some cases even hundreds of thousands of dollars from a single

11   real estate deal.

12        They used this money to live on, to take vacations to Hawaii,

13   to buy expensive guns for their collection.  They also used it to

14   make payments on the properties they were amassing in their

15   portfolio.

16        It appears that the point of the whole scheme was to hold on

17   to those properties for a couple of years, wait until the market

18   appreciated, and then flip them at a profit.  But the entire

19   scheme was a house of cards built on lies.  And when the market

20   began to decline, and when credit began to tighten, the scheme

21   fell apart.  Foreclosures resulted on almost all of the

22   properties, leaving the mortgage lenders down substantial amounts

23   of money, and also causing losses to the private sellers who

24   agreed to extend financing.

25        Your Honor, there are four things that I would like to do in

1   this opening statement.  The first is, I would like to preview

2   the charges, the 30 counts that the government is proceeding on

3   in this trial, and explain how they relate to the various real

4   estate deals they would be focusing on.  Then I would like to

5   preview the conspiracy and the members of the conspiracy.  Third,

6   I would like to describe to the court the deceptive devices that

7   were usually used in connection with the schemes of fraud.  And,

8   finally, I would like to preview with the court the categories of

9   evidence the government will be introducing to establish that the

10  defendant was a knowing participant in this scheme and

11  conspiracy.

12       So starting with the first order of business, the charges

13  that arise from the real estate deals and the loans obtained in

14  connection with them in this scheme.  The court is going to hear

15  that the defendant and his co-conspirators bought more than 20

16  properties over the course of the scheme, but the government will

17  be focusing in this trial on eight properties, eight properties

18  that we believe are representative of a scheme to defraud.  Those

19  eight properties and the real estate deals that are connected

20  with them are described in the chart that we have positioned in

21  the courtroom before the court and before the witness box.  We

22  have also handed up copies for the court, and copies to Mr. Poff

23  and Mr. Ratner.  We have marked this chart as Exhibit 1.  We

24  intend to use it during the course of the evidence.

25       This chart shows the court the various real estate deals that

1  we are going to be focusing on.  I would like to highlight a few

2  things right now.  First, all of the properties are residential

3  properties.  In the first line of the chart there are a trio of

4  duplexes in Puyallup, Washington.  All of the rest of the

5  properties are single-family homes.

6      The recorded sales prices for these properties range in value

7  from $150,000 at the low end, looking at the South Puget Sound

8  Avenue property in line 7, to $2 million at the high end, looking

9  at the Issaquah property in line 6.  All of the properties are

10  located in western Washington, mostly in King County and in

11  Pierce County.

12      In connection with almost all of the these transactions

13  conventional lender financing was obtained, sometimes both first

14  and second mortgages.  In some of the transactions the sellers

15  also agreed to extend financing on the side.

16      Finally, turning your attention to the last column of the

17  chart, that describes the counts that are associated with the

18  various real estate deals we will be focusing on.

19      In almost every single line of the chart we have at least one

20  wire fraud count, that alleges that the defendant used fraud and

21  deception in order to induce the mortgage lender to wire loan

22  proceeds in interstate commerce to the escrow company located in

23  the State of Washington.

24      Almost all of the mortgage lenders were not federally

25  insured, but in the case of the one mortgage lender in this chart

that was, National City Bank, the defendant is also charged with
bank fraud charges stemming from the same conduct of inducing the
lender fraudulently to grant the loan proceeds.

The money laundering charges are then built on top of the
fraud charges.  Those money laundering charges have to do with
following the money that the defendant and his co-conspirators
were receiving from the fraud that they were committing.

The defendant is charged with three different types of money
laundering in the counts that we are proceeding on.  Some of the
counts charge the defendant with promotional laundering, using
the proceeds of the bank and wire fraud and recycling it into
further fraudulent real estate deals.

Several of the counts charge the defendant with concealment
money laundering, conducting transactions designed to conceal
where the money was coming from and who controlled it.

Several of the counts of money laundering charge the
defendant with a third type of money laundering, money laundering
in amounts greater than $10,000, which is, if you will, a type of
strict liability money laundering.  It doesn't require proof of
intent to promote further criminal activity or intent to conceal
the source of the funds.  It simply requires proof the defendant
knew the funds came from criminal activity, and that the
defendant then engaged in a qualifying transaction involving
amounts greater than $10,000.  Those are the three types of money
laundering with which the defendant is charged.

1    Finally, your Honor, the defendant is charged in two counts

2    of conspiracy; Count 1, conspiracy to commit bank and wire fraud,

3    and Count 31, conspiracy to engage in money laundering.  These

4    conspiracy counts wrap around all of the real estate deals that

5    we will be focusing on in this trial.  They also include real

6    estate deals that we are not going to get into, the other 13, 14,

7    15 real estate deals that we will be not be focusing primarily

8    on.  That is an overview of the charges and how they fit in with

9    the real estate deals that are described in this properties and

10   counts chart.

11   Now I would like to talk about the members of the conspiracy.

12   There is another chart we have marked as Exhibit 2 that we are

13   now showing on the screen.  I have provided a courtesy copy to

14   the court and to counsel.  The first person whose picture appears

15   in the upper left of this chart is Alexis Ikilikyan.

16   Ms. Ikilikyan was the defendant's wife during the course of this

17   conspiracy.  She and the defendant were married from

18   approximately September of 2002 until the summer of 2008.

19   Ms. Ikilikyan has pleaded guilty to conspiring to commit bank and

20   wire fraud, and she has agreed to provide testimony.

21   Ms. Ikilikyan is expected to testify that she and Mr. Poff were

22   in this together.  She is expected to testify that typically she

23   would assume the role of the real estate agent on behalf of

24   herself or the straw buyers in connection with these

25   transactions.  She would go out and find the properties and then

1    deal initially with the sellers to negotiate a purchase price and

2    also negotiate seller financing, all the while consulting with

3    Mr. Poff about the details of these transactions.  She is also

4    expected to testify that she would then turn the deals over to

5    Mr. Poff who would function as the loan officer in connection

6    with the transactions.

7        Most of the bank accounts into which the money went were held

8    in Ms. Ikilikyan's name.  She also purchased some of the

9    properties in her own name.  But she is expected to testify that

10    the defendant and her shared equally in the proceeds of the

11    fraud.  They were really in this together.

12        Mr. Poff, the testimony will establish that he usually

13    functioned as the loan officer and submitted the loan

14    applications and supporting documents to the mortgage lenders in

15    connection with these deals.

16           THE COURT:  Are these driver license photographs?

17           MR. SCOVILLE:  They are.

18           THE COURT:  I think we could get a more flattering

19    photograph of Mr. Poff.

20           THE DEFENDANT:  Sir, I was just kidding with Mr. Ratner

21    about objecting to that in jest.

22           THE COURT:  Please continue, counsel.

23           MR. SCOVILLE:  So Mr. Poff, in addition to functioning

24    as a loan officer, was also a licensed notary.  In fact, he has

25    admitted that in documents he has filed with the court.  And he

1    would often notarize documents that were executed in connection

2    with these real estate deals.

3        Ms. Thompson.  Ms. Thompson was the escrow officer at Great

4    American Escrow who closed all of the real estate transactions

5    that are described in the properties and counts charged.  She has

6    also pled guilty to bank and wire fraud.  She has agreed to

7    testify.  The government expects the court will hear from her

8    about Mr. Poff's involvement in the conspiracy as well, and in

9    particular about his involvement in instructing her on what to

10   say in the HUDs that were sent to the mortgage lenders in order

11   to disguise where the money was coming from and where it was

12   going.

13       Mr. Reyes, he has also pleaded guilty to conspiring to commit

14   bank and wire fraud.  He was a loan officer with America One

15   Finance.  He was also a real estate agent.  The government

16   expects that the testimony, which may not necessarily come from

17   Mr. Reyes himself, will establish that Mr. Reyes was friends with

18   the defendant, with Ms. Ikilikyan, and in the last few

19   transactions, beginning in approximately the spring of 2007,

20   Mr. Reyes would function as the primary loan officer who would be

21   receiving documents from Ms. Ikilikyan and from Mr. Poff in

22   connection with those transactions in order to make them go

23   through.

24       The bottom row of the chart shows two people, Ms. Harutyunyan

25   and Mr. Timothy Thomson.  Mr. Harutyunyan was Mr. Poff's

1   mother-in-law at the time.  She is the mother of Ms. Ikilikyan.

2   She functioned as a straw buyer frequently in connection with the

3   real estate deals in this scheme.

4        Mr. Timothy Thomson was also a straw buyer in connection with

5   transaction number two in the chart.  He is expected to testify

6   that he received a $1,000 kickback up front for agreeing to let

7   his name and credit be used in connection with the real estate

8   deal.  He is also expected to testify about the fallout from the

9   real estate deal and what has gone wrong with it.

10       That is a preview, your Honor, of the members of the

11  conspiracy and some of the witnesses the court will be hearing

12  from in the course of the trial.  I should also note that

13  Ms. Harutyunyan is expected to testify.

14       Now, your Honor, turning to the third chart, the deceptive

15  devices chart.  This chart, your Honor, describes what we believe

16  the evidence will establish are the five primary deceptive

17  devices that were used in connection with these real estate deals

18  in order to induce the mortgage lenders to loan the money and

19  induce the sellers to go along with it.

20       As you can see from the chart, your Honor, the different

21  deceptive devices were used in different combinations in the

22  transactions.  But each of the transactions, the evidence will

23  establish, involved at least one or more of those deceptive

24  devices.

25       So let's talk about them one by one.  First, the straw

1    buyers.  I think the court is already aware of what that is.  I

2    have already talked about that.  Again, Ms. Harutyunyan is used

3    as a straw buyer in connection with the three transactions,

4    Mr. Thomson in connection with one.

5         Second, lies in the loan applications and the supporting

6    documents.  It is pretty straightforward.  The deceptive devices

7    chart indicates what some of the primary lies were.  The evidence

8    will establish lies about whether the buyer was intending to

9    occupy the property as a primary residence.  The court will hear

10   from mortgage lenders that is important to them because they view

11   loans where the property is actually going to be occupied by the

12   borrower as less risky, because a person is less likely to

13   default on a loan for the house that supplies the roof over his

14   head than he is for an investment property loan.  Also lies about

15   income and employment.  And mortgage lenders and their

16   representatives will testify to the court about how they use this

17   information and why it is material to them.

18        The third type of deceptive device, inflated sales prices.

19   This was used in connection with two of the transactions.  If the

20   court would look at the transaction described in line number 6,

21   the Issaquah property?  The evidence will establish that although

22   the sales price was recorded and communicated to the lenders as

23   $2 million, there was a side agreement negotiated between the

24   buyers and the sellers in that transaction that the real sales

25   price was $1.3 million.  And all of the excess funding that was

1   being obtained in connection with that transaction was going to

2   go back to the buyers, back in their pockets, to allow them to

3   get cash back from the closing.

4        The fourth deceptive device, undisclosed seller financing.

5   That was used in connection with four of the transactions that we

6   will be talking about in this case.  And typically in those

7   transactions, if you add up the amount of conventional mortgage

8   lender financing and the amount of seller financing, it totals

9   more than the purchase price.  It enabled the defendant and his

10  co-conspirators to siphon back the excess proceeds from the deal.

11       And the lenders will also say that they didn't know about

12  these undisclosed seller financing agreements, they weren't aware

13  there was some sort of subordinate financing or seller carryback

14  negotiated in connection with the transaction.  They will also

15  testify, if they had known about that, they wouldn't have been

16  willing to extend the mortgage funding, at least certainly not in

17  the amounts in which they extended it, because it wouldn't make

18  sense for them to be doing more than 100 percent financing on

19  these deals.

20       You will also see, your Honor, evidence that seller financing

21  was negotiated as part of these purchase and sales agreements,

22  but at the last minute in closing typically a document was

23  signed, supplied by the defendant, that purported to say that the

24  seller financing was a separate transaction, completely separate

25  from the purchase and sale.  And the evidence will establish that

1    this was a means the defendant and his co-conspirators knowingly

2    used in order to try to cover up what was going on, to try to

3    make it appear legitimate, that the lenders were not being

4    supplied with the information about the seller financing.

5         Finally, the false HUD1s.  In almost every single real estate

6    deal settlement statements were submitted by the escrow agent,

7    Vicki Thompson, to the mortgage lenders and to the sellers that

8    contained falsehoods.  They would be lacking any information

9    about the seller carrybacks.  They would talk about payments to

10   repair companies, sometimes $100,000 payments to repair companies

11   that simply didn't occur, or transfers to other escrow companies

12   that simply didn't occur.  And the evidence will establish that

13   these HUDs were doctored, and they were submitted to the lenders

14   in order to disguise where the proceeds were going.

15        The evidence will also establish that Mr. Poff submitted fake

16   checks, fake receipts, fake invoices to the escrow agent in order

17   to help her have some cover in her file in case the investigators

18   ever came knocking.

19        Those are the five principal types of deceptive devices the

20   court will see again and again throughout this case.

21        Your Honor, because the defendant never put any of the

22   properties in his own name, and never officially had a mortgage

23   brokers license, the government expects that the primary issue

24   will be not whether there was fraud in these deals but whether

25   the defendant was a knowing participant in the fraud.  There are

1    several categories of evidence that the government expects will

2    establish that the defendant was a knowing participant.

3         First, the testimony of the accomplices, Ms. Ikilikyan,

4    Ms. Thompson, Ms. Harutyunyan, they will place the defendant

5    squarely in the middle of these deals, and they will demonstrate

6    the defendant had knowledge of the fraud that was occurring.

7         Beyond the accomplice testimony, second, your Honor, you will

8    hear testimony from others involved in these transactions.  We

9    will call sellers, real estate agents, representatives from the

10   mortgage lenders and from other mortgage brokerages who will all

11   testify they met with the defendant about these transactions,

12   talked to him on the phone, received e-mails from him, received

13   documentation from him, that were submitted in connection with

14   these real estate deals.

15        Third, you will see a paper trail that will confirm the

16   defendant's involvement in these transactions, including e-mails

17   from the defendant, including closing documents notarized by the

18   defendant but containing obviously false statements.

19        And, finally, your Honor, you will see financial evidence

20   that will demonstrate that the defendant benefited directly from

21   the fraud that was occurring.  The money that he and his wife got

22   as cash back from these closings, which includes not only the

23   eight transactions we will be focusing principally on, but also

24   the other involved in the conspiracy, amounted to $1.5 million

25   over the three or four year life of the conspiracy.

1    The evidence will show that that money paid for the

2  defendant's living expenses, it paid for his trips to Hawaii, for

3  his expensive guns, and also for specific obligations he owed,

4  such as child support obligations to his first wife.

5    In summary, your Honor, the evidence will show that the

6  defendant was a knowing participant in a scheme to defraud

7  mortgage lenders and private sellers in connection with these

8  real estate deals.

9    The defendant and his co-conspirators used lies to get

10  mortgage loans, and then more lies to siphon cash from closing

11  these real estate deals, even as they were buying houses.

12    They then took the cash and laundered it in several ways,

13  including reinvesting it, recycling it through further fraudulent

14  deals.

15    At the close of the evidence, your Honor, the government will

16  ask that the court find Mr. Poff guilty on all the counts.  Thank

17  you.

18         THE COURT:  Mr. Poff.

19         THE DEFENDANT:  Can I sit here or stand at the podium,

20  sir?

21         THE COURT:  We are going to hold you to the standard of

22  the attorneys.  There is a rule in this district, normally with

23  the exception of objecting to the evidence, which can be made

24  from the table, presentations are made from the podium.

25         THE DEFENDANT:  Yes, sir.  Good afternoon, your Honor.

1    The evidence will show I am William Stuart Poff, which is

2    spelled as I had spelled it earlier, with the first letter of

3    each of my three names capitalized, the rest of the letters in

4    lower case.

5    The evidence will show that I am an American, a sovereign

6    national, whose nativity was in the Ohio Republic.  I am now a

7    native of the Michigan Republic.

8    The evidence will show I am a nonresident or that I am

9    domiciled within the District of Columbia.

10   The evidence will show I am not a vessel, that I was

11   referring to earlier, of the United States, but I am actually

12   a -- per my Christian faith, a vessel of the Holy Spirit as

13   evidenced in the word of God, which is defined as the word of

14   God, per public law 97-280.

15   The evidence will show that the fictional corporate entity

16   known as WILLIAM S. POFF, in all caps, is a fraudulent

17   contrivance of colorable law, known as statutes, which is in

18   contradiction to my First Amendment right to freedom of religion

19   in regards to any reference to any vessel.

20   The evidence will show I am not an employee, franchisee or an

21   instrumentality of the United States.

22   The evidence will show that there does not exist, absent

23   fraud, a valid contract compelling the sovereign, William Stuart

24   Poff, to perform to any of the aforementioned conditions.

25   The evidence will show there does not exist, absent fraud,

1   again, a valid maritime contract, bringing the claimed alleged

2   defendant into the special maritime and territorial jurisdiction

3   of this honorable court.

4       The evidence will show presumed admiralty jurisdiction, which

5   was rebutted, was never lawfully proven.

6       The evidence will show the true cause and nature of the

7   action brought against me was never revealed and/or disclosed,

8   and the plaintiffs are actually proceeding in fraudulent

9   concealment.

10      The evidence will show the claimed alleged defendant has been

11  claiming and objecting to the obvious fraud being perpetrated

12  against him this entire time.

13      The evidence will show none of the claimed alleged

14  defendant's briefs and filings were ever properly answered by the

15  plaintiffs.

16      The evidence will show the plaintiffs are in default, and

17  cannot prevail on any of the merits, as all my pleadings are

18  deemed true and factual by default at this time.

19      The evidence will show, since my pleadings, by default, are

20  now lawful fact, the plaintiff simply cannot prevail on any of

21  the merits.

22      The evidence will show the plaintiffs by fraudulent

23  concealment provided what is called sham answers, in violation of

24  Title 5, United States Code, 566(d) and Section 706.

25      The evidence will show many violations of due process

1  codified in Title 5, United States Code, Section 557, have been

2  violated, particularly the sham answers, per Rule 37 Alpha,

3  Federal Rules of Criminal Procedure.

4          THE COURT:  Mr. Poff, do you want to slow down one beat

5  and breathe periodically, or else our very talented court

6  reporter is not going to get a very good transcript.

7          THE DEFENDANT:  I do apologize.

8          THE COURT:  Remember to breathe every once in a while.

9          THE DEFENDANT:  I apologize.  The evidence will show I

10 was arraigned before a United States magistrate twice, which is

11 unlawful to be arraigned for a felony charge before a U.S.

12 magistrate.

13    The evidence will show both of those magistrates are guilty

14 of practicing law from the bench by entering a plea of not guilty

15 on my behalf, when I never gave anyone permission to speak on my

16 behalf.

17    The evidence will show, without any lawful authority, the

18 magistrate presiding over the December 10th, 2009 arraignment

19 proceeded after the alleged accused stated he did not understand

20 the charges being brought against him, and then arbitrarily

21 decided that he did understand the charges being brought against

22 him.

23    The evidence will show the claimed alleged defendant was

24 denied discovery, which was instrumental in the defense of his

25 case.

1    The evidence will show my rights under the Speedy Trial Act

2    were actually violated.

3    The evidence will show the U.S. government does not have

4    jurisdiction over an alleged offense committed within the state

5    zone, and not within any federal area.

6    The evidence will show that jurisdiction was never

7    emphatically proven.

8    The evidence will also show, whenever the plaintiffs claim

9    jurisdiction under the Commerce Clause of the Constitution, what

10   they actually mean, through fraudulent concealment, is a

11   condition of a maritime contract of compelled performance of an

12   undisclosed contract of sorts, which jurisdiction is extended

13   into this court -- I'm sorry, this court's admiralty jurisdiction

14   by Congress through statute.

15   The evidence will show no valid contract according to common

16   law or the UCC exists.  There exists no contract that was entered

17   into knowingly and willingly, absent fraud, by the claimed

18   alleged defendant.

19   The evidence will show any contract purporting to compel the

20   claimed alleged defendant is an unconscionable contract as

21   defined in Black's Law Dictionary.

22   The evidence will show that if there was any jurisdiction

23   existing, it was lost at the first violation of my rights of due

24   process as contemplated in Title 5, Section 706, which basically

25   states all jurisdiction ceases if any of the planks of due

1   process are violated.

2        The evidence will show that Title 28 states that there shall

3   be but one form of action, and that is a civil action.

4        The evidence will show that the Constitution provides two

5   forms of criminal jurisdiction; one being common law, and the

6   other being admiralty.

7        The evidence will show that the common law was abolished at

8   the federal level in 1938 in a famous Supreme Court case, Erie

9   Railroad versus Tompkins, 304 U.S. 64.

10       The evidence will show it is axiomatic that the only

11   jurisdiction left is the admiralty jurisdiction of this honorable

12   court, which is of a civil nature with criminal penalties.

13       The evidence will show the gold-fringed flag in the courtroom

14   is judicial notice of admiralty jurisdiction, which is properly

15   displayed in all military courtrooms per Military Manual on

16   Courts Martial.

17       The evidence will show, per 27 CFR, all crimes are

18   commercial.

19       The evidence will show the Department of Justice is attached

20   to the seat of government, is governed by statute, Title 28,

21   United States Code, Section 501, to-wit:  The Department of

22   Justice is an executive department of the United States at the

23   seat of government.

24       The evidence will show the Department of Justice and its

25   subagencies are restricted from exercising their authority

1  anywhere outside the District of Columbia, as codified in

2  Title 4, United States Code, Section 72, to-wit:  Public offices

3  at the seat of government.  All offices attached to the seat of

4  government shall be exercised in the District of Columbia, and

5  not elsewhere, except as otherwise expressly provided by law.

6      The evidence will show the investigative authority of the

7  Attorney General is exemplified in Title 28, United States Code,

8  Section 535, which in part says:  May investigate any violation

9  of Title 18 involving government officers and employees.

10     The evidence will show that since the end of my active duty

11  time in the United States Marine Corps I have not been a

12  government officer or employee.

13     The evidence will show I have not paid into Social Security

14  since my time in the military.

15     The evidence will also show I was frauded at the age of 15 or

16  16, approximately, into signing up for Social Security before the

17  lawful age of majority.

18     The evidence will show as a result of misinformation and

19  disinformation in the public fool system, that I was led to

20  believe I was a statutory United States citizen, which is fraud

21  being perpetrated upon America's youth by federally-funded public

22  schools.

23     The evidence will show I am American, a sovereign national,

24  who since leaving the military has been a native of two republic

25  states of the United States of America.

1    The evidence will show I have suffered irreparable harm in

2    this instant case.

3    The evidence will show that I am not a vessel, that I was

4    referring to earlier, your Honor, as contemplated in Title 18,

5    United States Code, Section 7, special maritime jurisdiction of

6    the United States, subsection (1).

7    The evidence will show, in regards to the aforementioned, the

8    presumed vessel was not in the admiralty or maritime jurisdiction

9    of the United States, because the presumed vessel was inside the

10   jurisdiction of a particular state, the Washington Republic.

11   The evidence will show that the claimed alleged defendant was

12   not in any area acquired by the United States by consent of the

13   legislature of that particular state, which would include a fort,

14   a magazine, an arsenal, a dockyard or other needful building.

15   The evidence will show in a now famous Supreme Court case,

16   United States v. Lopez, the Supreme Court agreed that Congress

17   possesses nothing approaching a national police power concerning

18   the aspects of criminal law.

19   The evidence will show that the United States and the United

20   States of America are not one and the same.

21   The evidence will show that the U.S. Attorney does not enjoy

22   general powers of attorney to represent the United States of

23   America, as is on the pleadings and briefs.

24   The evidence will show that the alleged infractions in Title

25   18 are against the United States, and not the United States of

America, which is willful misrepresentation and fraudulent concealment.

The evidence will show that interstate commerce, as codified in Title 18, are the territorial possession states of the federal government, and not the 50 states of the union. Some of the states that are codified, that are territories, that are defined as states of the United States would be Puerto Rico, U.S. Virgin Islands, America Samoa, etcetera.

The evidence will show there does not exist any entity known as the UNITED STATES OF AMERICA, again in all caps, that has the capacity to sue or be sued or bring a criminal prosecution against anyone who is a native of a union state.

The evidence will show, per the 2008 edition of the Government Printing Office's Style Guide, all so-called vessels are printed in all capitalized letters.

The evidence will show nowhere am I compelled to perform to such fiction except through fraud and presumption.

The evidence will show I am non-assumpsit of all adhesion contracts, which purport to transform me into a juristic person whose domicile is in the District of Columbia.

The evidence will show there is no statutory, no regulatory and no constitutional authority which grants legal standing to the United States of America to bring a criminal action before a United States District Court.

The evidence will show there is no standing or grant of

1    jurisdiction to the United States District Court, as opposed to a
2    District Court of the United States, to hear an alleged criminal
3    case against a union state native when the alleged crime was
4    committed inside the state zone and outside the federal zone.

5         The evidence will show the Constitution for the United States
6    has delegated Congress the power to punish treason,
7    counterfeiting, piracies, felonies committed on the high seas,
8    and offenses against the law of nations, and no other crimes
9    whatsoever.  It is evident William Stuart Poff has not violated
10   any of these crimes so enumerated within our Constitution.

11        The evidence will show many of the so-called financial
12   institutions were not federally insured or chartered.

13        The evidence will show the legal maxim, ex dolo malo non
14   oritur actio, out of fraud no action arises.  This honorable
15   court will not be able to sustain any conviction from the fraud
16   being perpetrated against me.

17        The evidence will show that there are no implementing
18   regulations for Title 18, United States Code, Section 7, and
19   Section 3231, which proves that jurisdiction of the United States
20   does not extend into the several states of the union.

21        The evidence will show any maritime contract in the admiralty
22   jurisdiction would have to validate debt and produce the true
23   creditor of interest, per Title 15, United States Code,
24   1692(g)(b).  In admiralty it is vital that all parties that are
25   truly involved be brought forth.

1    The evidence will show William Stuart Poff reported fraud

2    when he first learned of any fraud to the proper authorities of

3    someone in the military, which would give the claimed alleged

4    defendant protection under the Whistleblowers Protection Act.

5    The evidence will show that William Stuart Poff conducted

6    himself uprightly, obeying all law, and constantly trying to help

7    his fellow man.

8    The evidence will show that William Stuart Poff, as far as he

9    was aware at the time, was not doing anything that broke the law,

10   and was constantly being advised by legal counsel and licensed

11   professionals that everything was above board, always acting in

12   good faith, with lack of intent to defraud anyone.

13   The evidence will show that William Stuart Poff was frauded

14   and deceived by so-called alleged co-conspirators.

15   The evidence will show that William Stuart Poff's name was

16   forged on many documents, raising suspicion on all documentary

17   evidence.

18   The evidence will show William Stuart Poff was not a

19   ringleader or a mastermind of any criminal conspiracy.

20   The evidence will show that William Stuart Poff is being set

21   as the fall guy for the alleged crime in this conspiracy,

22   particularly by his ex-wife, Alexis Ikilikyan.

23   The evidence will show that William Stuart Poff's ex-wife,

24   Alexis Ikilikyan, has continued a pattern of fraud, particularly

25   absent the presence of her ex-husband.  An example would be while

1    I have been living in Michigan since the divorce.

2        The evidence will show that Alexis Ikilikyan was self

3    sufficient in the furtherance of the scheme.

4        The evidence will show that William Stuart Poff was a good

5    husband, who was ultimately cheated upon, by adultery, and

6    divorced by his ex-wife, which is indicative of someone's

7    character who would commit fraud to obtain something they

8    desired, an any-which-way, who-cares-about-who-you-harm-or-hurt

9    mentality.

10       The evidence will show that Alexis Ikilikyan was a license

11   holder to both the real estate and mortgage businesses, in

12   contradiction to her earlier testimony.

13       The evidence will show that William Stuart Poff quite

14   literally lived in a spare room used in a closet -- used as a

15   closet in a friend's house, while his ex-wife, Alexis Ikilikyan,

16   lived in an opulent, 6000-square-foot lakefront house in Auburn.

17       The evidence will show, per United States Supreme Court

18   decision in United States versus Santos, that the profits and not

19   the proceeds largely eliminates any money laundering charges.

20       The evidence will show, according to the corpus juris

21   secundum, admiralty is a unique body of law particularly

22   appropriate to the regulation and settlement of the special

23   problems arising out of sea navigation and commerce.

24       The evidence will show exclusive admiralty jurisdiction is

25   vested in the federal courts, and it may not be exercised by

1    legislative courts or any executive official.

2          The evidence will show that plaintiffs had not affirmatively

3    established their right to invoke the jurisdiction of the

4    admiralty.

5          The evidence will show the maritime cause and nature of this

6    cause is not salty enough to come into the admiralty jurisdiction

7    of this court, and are not substantially related to the

8    traditional maritime activity.

9          The evidence will show in the admiralty William Stuart Poff

10   has several rights that have been violated, and the United States

11   loses its sovereign immunity in several different ways.

12         The evidence will show equitable principles and the granting

13   of equitable relief are proper when exercising a court's

14   admiralty jurisdiction.

15         The evidence will show, again, according to the corpus juris

16   secundum, admiralty is presumed to be appropriate in any activity

17   traditionally undertaken by vessels, commercial or noncommercial.

18   This is where the fictional vessel, WILLIAM S. POFF, in all caps,

19   is the thing that was arrested by U.S. Marshals and forced and

20   compelled to appear before this honorable court.  This is fraud,

21   pure and simple.

22         The evidence will show that William Stuart Poff, if presumed

23   to be a vessel, is wearing the constitutional flag of peace on my

24   lapel, the flag of the United States of America, which is the

25   proper flag reference in Title 4, United States Code, Section 8.

1    The evidence will show that William Stuart Poff is not guilty

2    of breaking any law whatsoever.

3    In summation of my opening statement, the evidence will show

4    that William Stuart Poff can tend to be redundant at times.

5    THE COURT:  Thank you, sir.  Ladies and gentlemen,

6    customarily in trials the plaintiff gives an opening statement.

7    Most of the time the defendant gives an opening statement.  I

8    don't believe I have ever seen an instance where the court gives

9    an opening statement.  So I am about to violate that rule.  I

10   guess it is not a rule, it is more of a custom.

11   Part of this is out of respect to Mr. Poff, who has exercised

12   his absolute right to be his own counsel, over the strenuous

13   urgings of the court that is not a good idea.  But that is

14   obviously his choice.

15   Let me tell you, when we come back from our afternoon break,

16   we will begin by the government calling its first witness.  But

17   let me give you a couple of points to ponder in the meantime.  If

18   we went back to I believe it was at Runningmede in the 13th

19   century in England, we would find there was an all powerful king,

20   who was largely supported by a group of nobles.  Nobles got

21   unhappy with the king and basically decided that they wanted to

22   make a few changes.  Out of that came a document, the

23   Magna Carta, which we all studied in school, or at least we used

24   to study in school.  I think very few people appreciate that it

25   has continued as a huge influence on the American legal system,

which is in substantial part derivative of the English legal system.  In my simplified form of what part of the Magna Carta meant, it divided responsibilities that go on in this room into two parts.  The nobles have descended over the centuries to the role of the jury.  That is, they find the facts.  In this instance, we don't have a jury, and the parties have consented to the court being both the jury and the judge.

So what was the king?  Well, the king was in effect the judge.  They gave to the king the right to continue to make the law.  And descending over the centuries, that is what I do.  I don't get to make the law, but I give the law, by virtue of the statutes that are enacted by Congress.

So there are certain arguments that are made that are addressed to me in my role as the judge, which I decide on the basis of the law.  I don't hear evidence about them.  They are legal questions which I rule on.

There are other questions which clearly involve factual determinations, and those are things that appropriately are the subject of evidence.

So let me tackle first what I am going to do in my role as a judge, since they don't give me either a crown or a treasury, but rather a gavel.  I decide jurisdiction.  I look at the case law, I follow the law of the United States Supreme Court and the Ninth Circuit.  The types of arguments that have been made today about admiralty jurisdiction are ones that can be answered by looking

1  in the books and seeing if they have been accepted or not.

2      Sometimes legal arguments are made that simply are not

3  relevant to issues that are before me.  I have not asked, nor

4  would I be competent to rule on issues that are not presented in

5  the precise charges that have been brought in this matter.  So

6  while it may be of more than academic interest the age at which

7  people sign up for Social Security, it has to have something to

8  do with the charges that the government is bringing.

9      Sometimes I will look at issues and simply say, that's nice,

10  but it doesn't have anything to do with this.  For example, the

11  government printing office style manual may well have something

12  to do with official publications of the government printing

13  office, but it doesn't have anything to do with me.  And,

14  therefore, I may well not attach any significance to what the

15  government printing office style manual says.

16      There are other things that clearly are questions -- issues

17  that are questions of fact, in which, had we a jury, I would

18  permit testimony about.  Since we don't have a jury, I will hear

19  the evidence in regard to that and make legal determinations.

20      An example of that would be Mr. Poff's statement that he was

21  defrauded by the co-conspirators.  To the extent that being

22  defrauded by the co-conspirators is a defense to these charges,

23  then that is something appropriate for evidence.

24      Clearly an allegation that his signature was a forgery is a

25  question of fact, and is something that the court will hear

1   evidence in regards to.

2       In accepting that evidence I am bound by the rules of

3   evidence that speak to two situations.  One is the situation of

4   what is permissible evidence, and the second is what is the

5   character of that evidence.

6       And so, for example, conduct of someone, be it Mother Theresa

7   or Mr. Poff's ex-wife, about what they did with their life after

8   this particular set of facts was over with, may or may not have

9   any relevance to the issues before the court.  There are rules

10  that speak to the use of character evidence.  Character evidence

11  can be proven by both opinion testimony and also by conduct of

12  the people, but it is not something that is unregulated under the

13  rules of evidence.

14      The court from time to time will make decisions on those

15  issues that are presented to me in the context of legal

16  arguments, where I make decisions on the legal record.  When I do

17  so, if I have any ambiguity in my mind, I will ask for argument

18  from counsel.  I may from time to time ask, in regards to a

19  particular issue, where I can best locate it in the record.  That

20  will be the extent of the court's ruling on those matters.  And

21  once I have ruled on those issues, there will not need to be

22  further objections or the further offering of evidence in regards

23  to them.  I will simply make sure that the record is preserved

24  for both sides as to the fact that that argument was made.

25      Mr. Poff, to the extent that you would like to read this, I

1   would urge you to take a look at those cases that I was remarking

2   on on Friday, U.S. v. Marks, which is found at 550 F. 3d, 799, as

3   an example of the Ninth Circuit, who reviews my handling of

4   cases, their articulation of the distinction I have been trying

5   to explain today.

6        The other thing I would like to make clear is that, until I

7   rule on some of these legal arguments, participation in this

8   proceeding does not in any manner waive the argument.  For

9   example, the fact that there is pending a motion to dismiss for

10  violation of the Speedy Trial Act, the fact we have started the

11  trial and we have begun to hear testimony in no manner impacts

12  that.  You don't waive your argument by virtue of participation

13  in this proceeding.

14       So hopefully those remarks are more informative and will

15  allow the parties to understand how we will proceed in this

16  matter.

17       At this time the court will take its afternoon break, we will

18  come back out a little bit before 3:00, and the government should

19  be prepared to call its first witness.  We will be in recess.

20  (At this time a short break was taken.)

21            THE COURT:  Ms. Vogel, are you prepared to begin?

22            MS. VOGEL:  Yes, your Honor.

23            THE COURT:  Please call your first witness.

24            MS. VOGEL:  The United States calls Adam Burtt.

25  Whereupon,

```
1                              ADAM BURTT
2    Called as a witness, having been first duly sworn, was examined
3    and testified as follows:
4            THE CLERK:  Will you state your name for the record and
5    spell your last name?
6            THE WITNESS:  Adam Burtt, B-U-R-T-T.
7                          DIRECT EXAMINATION
8    By Ms. Vogel:
9    Q   Mr. Burtt, where are you employed?
10   A   With Immigration and Customs Enforcement, Office of
11   Investigations, here in Seattle.
12   Q   What is your title?
13   A   I am a special agent.
14   Q   How long have you been a special agent with ICE?
15   A   Since 2005.
16   Q   And what have you done -- what did you do before you joined
17   ICE?
18   A   I was an intern at what was then INS before I went to
19   college.
20   Q   Where did you go to college?
21   A   At the University of Washington.
22   Q   Did you receive a degree from the University of Washington?
23   A   I did, a Bachelor's degree in Latin American studies.
24   Q   While you were going to college, were you also in the
25   military?
```

1    A    Yes, I was in the Navy Reserve.

2    Q    And prior to being in the reserves and going to college, what

3    did you do?

4    A    I was activity duty in the Navy for four years.

5    Q    What was your job in the Navy?

6    A    I was an intelligence specialist.

7    Q    What does that mean?

8    A    Analyze and disseminate intelligence that we gather as part

9    of our reconnaissance squadron.

10   Q    How long were you in the Navy?

11   A    For four years, active duty.

12   Q    So four years in the Navy, four years Reserves while in

13   college, and since then how many years with ICE?

14   A    As a special agent, since 2005.

15   Q    What is your current assignment?

16   A    I am assigned to the human trafficking group in Seattle.

17   Q    Do you have any experience investigating mortgage fraud?

18   A    I have the experience -- the training that we received at the

19   initial law enforcement academy, and then what I have learned in

20   this case.

21   Q    What is your role in the investigation into the conduct that

22   led to the indictment of the defendant, Mr. Poff?

23   A    I am the case agent assigned by ICE.

24   Q    What does that mean?

25   A    I am the ICE representative to the investigation, and in

1  charge of the overall progression of the case.

2  Q   Have there been other agencies that have assisted in this

3  investigation?

4  A   Yes.

5  Q   And what are some of those agencies?

6  A   The Department of Licensing and the Department of Financial

7  Institutions.

8  Q   When did the investigation into the conduct resulting in the

9  charges against the defendant, Mr. Poff, begin?

10  A   In November of 2006.

11  Q   How did it begin?

12  A   It actually began as an alien smuggling investigation into

13  the conduct of Tony Reyes.

14  Q   And how did that change into a mortgage fraud and financial

15  investigation?

16  A   After financial records were obtained and analyzed, we

17  determined that we had -- that there were additional financial --

18  suspicious financial transactions occurring between Mr. Reyes and

19  other defendants in the case.  At that point we focused our

20  investigation on the financial side of the case.

21  Q   At some point did you realize you were looking at mortgage

22  fraud type of conduct?

23  A   Yes, immediately.

24  Q   And when you realized that, what did you do, seeing as you

25  are an alien smuggling investigator primarily with ICE?

1    A    I consulted other ICE agents that are more familiar with wire

2    fraud, bank fraud, along with money laundering.  I also spoke

3    with agents with the FBI who were experienced in investigating

4    mortgage fraud.  I spoke with agents from the Housing and Urban

5    Development Inspector General's Office, as well as

6    representatives from the Department of Licensing, Department of

7    Financial Institutions and mortgage professionals.

8    Q    And throughout your investigation in this case, have you

9    relied on those individuals' advice and expertise, as well as

10   your own?

11   A    Yes.

12   Q    As a result of your investigation in this particular case,

13   who were the primary people that you and your colleagues focused

14   on?

15   A    Tony Reyes, Alexis Ikilikyan, William Poff, Mario Marroquin

16   and Mickey Thompson.

17   Q    And can you please look at Exhibit 2?  Is this a compilation

18   of drivers' license photos for those individuals you mentioned,

19   as well as two other people?

20   A    Yes.

21   Q    Who are the other two people that are pictured on Exhibit 2?

22   A    Ms. Harutyunyan, which is Alexis Ikilikyan's mother, and

23   Timothy Thomson, who is a straw buyer.

24   Q    And at some point throughout the investigation have you

25   personally met every one of the people listed on Exhibit 2, such

```
1    that you are able to identify their photographs?

2    A    I have.

3              MS. VOGEL:  I would move to admit Exhibit 2, your Honor.

4              THE COURT:  Any objection?

5              THE DEFENDANT:  No objection, your Honor.

6              THE COURT:  Exhibit 2 is admitted, and may be published.

7              (2 admitted.)

8    By Ms. Vogel:

9    Q    Were there others interviewed who were arrested who were part

10   of the investigation who are not pictured on government's

11   Exhibit 2?

12   A    Yes.

13   Q    And as a result of your investigation, what business or

14   businesses did you eventually focus on?

15   A    Great American Escrow.

16   Q    What is that?

17   A    It is an escrow company located in Federal Way, Washington.

18   Q    Who owns Great American Escrow?

19   A    Christopher Benson.

20   Q    Is it still open today?

21   A    No.

22   Q    When approximately did it close?

23   A    Shortly after the warrants, which were in June of 2009.

24   Q    And if we could look at Exhibit 2, please?  Are any of those

25   individuals associated with Great American Escrow?
```

1   A   Yes.

2   Q   Who is that?

3   A   Mickey Thompson.

4   Q   What is her role with Great American Escrow?

5   A   She was the escrow officer.

6   Q   Why did you focus on Great American Escrow?

7   A   The vast majority of the transactions that we were

8   investigating at the time, Mickey Thompson was the closing

9   officer.

10  Q   Agent Burtt, can you please summarize briefly for us what

11  methods you and the other investigators used as part of your

12  investigation in this case?

13  A   Primarily we used review of documents.  We reviewed documents

14  from escrow and lender files, real estate broker and real estate

15  files, public records, to include deeds of trust, state

16  employment records.  We looked at mortgage broker records, bank

17  records, to include tax records and other financial records.  In

18  addition to that, we also interviewed a number of witnesses and

19  participants in the overall scheme, and conducted limited

20  surveillance.

21  Q   With regard to the records, how many pages of records are we

22  talking about?

23  A   Over a hundred thousand.

24  Q   Was there also a complete financial investigation conducted

25  as part of your overall investigation?

1   A   Yes.

2   Q   And who conducted that, the bulk of the financial

3   investigation?

4   A   Becky Carnell, who is assigned to the U.S. Attorney's Office.

5   Q   And have you relied upon her review of bank and financial

6   records and conclusions primarily for the financial part of this

7   case?

8   A   Yes.

9   Q   At some point in your investigation did you obtain

10  indictments?

11  A   Yes.

12  Q   And what did you do after those were obtained?

13  A   We served search warrants and arrest warrants.

14  Q   When did that happen?

15  A   On June 3rd of 2009.

16  Q   Where were the search warrants executed?

17  A   In Tacoma, Washington; Federal Way, Washington; Auburn,

18  Washington; and Seattle.

19  Q   And was one of those search warrants at the business office

20  of Great American Escrow?

21  A   Yes.

22  Q   And primarily what was seized during the search warrant at

23  Great American Escrow?

24  A   Escrow documents.

25  Q   What was your role in those search warrants?

```
 1   A    I was responsible for the overall completion of the search
 2   warrants, along with being a team leader for the search warrant
 3   at Mr. Reyes' location, as well as once the evidence was seized
 4   and returned to our evidence custodian, making sure the evidence
 5   was scanned and promptly turned over for discovery.
 6   Q    And were you also involved in the arrests on June 3rd?
 7   A    Yes.
 8   Q    Who was arrested on that day?
 9   A    Tony Reyes, Alexis Ikilikyan, William Poff, Mario Marroquin
10   and Mickey Thompson.
11   Q    And in what state were each of those people arrested?
12   A    Mickey Thompson and Tony Reyes, Alexis Ikilikyan and Mario
13   Marroquin were arrested in Washington State, and William Poff was
14   arrested in Michigan.
15   Q    In preparation for trial today, did you help to prepare this
16   table on the big chart there in front of you?
17   A    Yes.
18   Q    And is that based on your review of the available --
19   primarily the available public property records --
20   A    Yes.
21   Q    -- for those eight transactions?  I will go through what is
22   on this chart.  Not the details or the contents so much as the
23   categories.  Looking at the first column where it is numbered 1
24   through 8, is that just a line number assigned to track the
25   lines?
```

1  A    That's correct.

2  Q    The second column says "closing date and recorded price."

3  What does that information reflect and where did it come from?

4  A    It came from county deeds.  It is the closing date and the

5  amount of the sales price.

6  Q    When you say "county deeds," these are the actual recorded

7  instruments in the county where the property is located?

8  A    Yes.

9  Q    And the second column where it says "property," what is the

10  information contained in that column?

11  A    That was the individual property addresses for each

12  transaction.

13  Q    Where did you obtain that information in preparing this

14  chart?

15  A    Also from county deeds.

16  Q    Now, with respect to some of these properties on this chart,

17  is there a little bit of disagreement among various records as to

18  exactly what the address is?

19  A    Yes.

20  Q    And can you tell us what the properties involved in this

21  disagreement are?

22  A    The three duplexes listed at 72nd Avenue East have also been

23  listed with a 90th series address.  And at the time of the

24  sale --

25  Q    When you say "90th series," do you mean 90th Avenue?

1    A    Yes.

2    Q    Some avenue number in the 90s?

3    A    Yes.  At the time of the sale, the county or the city was

4    reorganizing the street addresses in that location, and there was

5    some confusion at the time of the sale on particular documents on

6    what the actual address was.

7    Q    So in your review of the recorded records and other

8    documents, do you see these written either with 72nd Avenue or

9    with 90th or some other number in the 90s as well?

10   A    Yes.

11   Q    When you did your review of the county records, how did you

12   make sure you were referring to the correct property?

13   A    I compared it with the parcel number used on the state

14   assessor's website.

15   Q    And was there a dispute among -- some sort of inconsistency

16   in the address of one of the other properties as well?

17   A    The Yelm property, transaction number 5, has also been listed

18   as on Yelm Highway Southeast, and it is just listed on different

19   documents as such.

20   Q    So sometimes it says Yelm Avenue Southwest and sometimes it

21   says Yelm Highway Southeast?

22   A    Yes.

23   Q    And, again, did you use the tax parcel number to confirm?

24   A    I did.

25   Q    Looking at the third column where it says "buyer," what

1  information is contained in that column and where did it come

2  from?

3  A    It is the listed buyer for each transaction, and it also came

4  from county deeds.

5  Q    Is that the buyer's last name?

6  A    Yes.

7  Q    And the seller?

8  A    The same.  The individual who sold the property, which is

9  also listed on the county deeds by last name.

10  Q    And the column that says "lender financing," where did that

11  information come from in your preparation of this chart?

12  A    It also came from the county deeds.

13  Q    And specifically was it those deeds of trust that were

14  recorded by those lenders?

15  A    Yes.

16  Q    And where it says "other financing," what information is

17  conveyed there, and where did it come from?

18  A    The information is any seller financing associated with the

19  transaction.

20  Q    And, again, where did that come from?

21  A    From the county deeds, the deeds of trust.

22  Q    All of the seller financing information?

23  A    The very first transaction, the three Anderson loans, those

24  we could not actually locate a deed for those seller financing

25  notes.  We did obtain copies of those documents from Evergreen

1    Escrow.

2    Q    And the final column of this chart, which we are calling

3    Exhibit 1, it says "counts in addition to the conspiracies,"

4    where did the information for that column come from?

5    A    Those counts came from the indictment.

6    Q    I want to talk for a minute about all these records that you

7    obtained and reviewed, and go through some of the categories of

8    those documents.  I will start with the public documents, Agent.

9    Generally speaking, for each of these properties on the chart,

10   what sort of public records did you obtain and review?

11   A    Statutory warranty deeds, deeds of trust, quitclaim deeds and

12   notice of trustee sale.

13   Q    And for each of those categories of documents pertaining to

14   each of our eight properties on the chart, did you obtain

15   certified copies of publicly recorded documents from the counties

16   where those properties are located?

17   A    Yes.

18   Q    What are the exhibit numbers of the certified public records,

19   and I am talking about the deeds now, that you obtained that

20   pertain to property number one on our chart?

21   A    Exhibit Numbers 104, 105, 106, 107, 108, 109, 110, 111, 112.

22   Q    What county did you obtain those records from?

23   A    They were obtained from Pierce County.

24          MS. VOGEL:  Move the admission of those exhibits, 104

25   through 112.

1              THE COURT:  Any objection?

2              THE DEFENDANT:  No objection, your Honor.

3              THE COURT:  The exhibits are admitted.

4              (104 - 112 admitted.)

5    By Ms. Vogel:

6    Q   And what certified public records -- now, again, I am talking

7    about deeds and other property records, did you obtain that

8    pertain to property number two on our chart?

9    A   Those would also be statutory warranty deeds, deeds of trust,

10   notice of trustee sale.

11   Q   What are the exhibit numbers of those exhibits?

12   A   Exhibit Number 204, 205, 206, and 207.

13   Q   And what county did you obtain those records from?

14   A   From King County.

15            MS. VOGEL:  Move the admission of Exhibits 204, 205, 206

16   and 207.

17            THE COURT:  Any objection?

18            THE DEFENDANT:  No objection, your Honor.

19            THE COURT:  They are admitted.

20            (204 - 207 admitted.)

21   By Ms. Vogel:

22   Q   Can you tell us what certified property records that you

23   obtained that relate to count -- to property number three on the

24   chart?

25   A   Statutory warranty deeds, deeds of trust, certified notice of

1    trustee sale.

2    Q    And what are those exhibit numbers, please?

3    A    Number 304, 305, 306, 307.

4         MS. VOGEL:  Move the admission of 304 through 307.

5         THE COURT:  Any objection?

6         THE DEFENDANT:  No objection, your Honor.

7         THE COURT:  They are admitted.

8         (304 - 307 admitted.)

9    By Ms. Vogel:

10   Q    What are the certified property records that you obtained

11   that pertain to property number four on our chart?

12   A    Statutory warranty deeds, deeds of trust, notice of trustee

13   sale.

14   Q    What are those exhibit numbers, please?

15   A    Numbers 404, 405, 406, 407, 408 and 431.

16        MS. VOGEL:  Move the admission of those records as

17   public documents.

18        THE COURT:  Any objection?

19        THE DEFENDANT:  No objections, your Honor.

20        THE COURT:  Those exhibits are admitted.

21        (404 - 408 & 431 admitted.)

22   By Ms. Vogel:

23   Q    Agent, what are the exhibit numbers of the certified public

24   records in the way of deeds and trusts that you obtained

25   pertaining to property number five on the chart?

1    A    Numbers 504, 505 and 506.

2    Q    And what county did you obtain those records from?

3    A    Thurston County.

4    Q    As to property six on the chart, what are the exhibit numbers

5    of the certified deeds that you obtained that relate to that

6    property?

7            THE COURT:  Counsel, are you moving the admission of

8    504?

9            MS. VOGEL:  I'm sorry, yes, your Honor, 504, 505 and

10   506.

11           THE COURT:  Any objection?

12           THE DEFENDANT:  No objection, your Honor.

13           THE COURT:  They are admitted.

14           (504 - 506 admitted.)

15   By Ms. Vogel:

16   Q    Moving to property six, Special Agent.  What are the exhibit

17   numbers for the certified deeds that you obtained pertaining to

18   that property?

19   A    Numbers 604, 605, 606, 607, 608, 609.

20   Q    And what county did those come from?

21   A    King County.

22           MS. VOGEL:  Move the admission of those exhibits.

23           THE COURT:  Any objection?

24           THE DEFENDANT:  No objections, your Honor.

25           THE COURT:  They are admitted.

1                    (604 - 609 admitted.)

2    By Ms. Vogel:

3    Q    Property number seven, Agent, did you also obtain certified

4    copies of deeds and other property documents from the county in

5    which that property was located?

6    A    Yes.

7    Q    And what are those exhibit numbers?

8    A    702, 703, 716.

9    Q    What county were those documents obtained from?

10   A    Pierce County.

11              MS. VOGEL:  Move the admission of 702, 703 and 716.

12              THE COURT:  Any objection?

13              THE DEFENDANT:  No objection.

14              THE COURT:  Admitted.

15              (702, 703 & 716 admitted.)

16   By Ms. Vogel:

17   Q    And finally, Agent, as to property number eight, did you also

18   obtain certified copies of county records for that property?

19   A    Yes.

20   Q    And what are those exhibit numbers?

21   A    804, 805, 806, 807 and 808.

22              MS. VOGEL:  Move the admission of those exhibits.

23              THE COURT:  Any objection?

24              THE DEFENDANT:  No objection, your Honor.

25              THE COURT:  Those exhibits are admitted.  Counsel,

1    before you move on, did you move the admission of Exhibit 112?

2                (804 - 808 admitted.)

3                MS. VOGEL:  According to my notes I did.

4                THE COURT:  Madam Clerk, will you confirm that?

5                MS. VOGEL:  If I didn't, I will do so now.

6                THE COURT:  I believe 104, 105, 106, 107, 108, 109, 111

7    and 112 were all moved and admitted.

8                MS. VOGEL:  I intended to move that entire series 104

9    through 112.  That would include 109, 110, 111 and 112.

10               THE COURT:  Does that coordinate with your notes,

11   Mr. Poff?

12               THE DEFENDANT:  There are no objections to it.

13               THE COURT:  They are admitted.

14   By Ms. Vogel:

15   Q    In addition to the deeds and certified county property

16   records that we have just talked about, did you also obtain

17   public -- certified public documents from various Washington

18   State public entities?

19   A    Yes.

20   Q    And, generally speaking, what type of documents were those?

21   A    Notary of affidavit, master business applications, revenue

22   records from the Department of Revenue.

23   Q    Let's start with the Washington Department of Licensing.  Did

24   you obtain certified copies of public records from the Washington

25   State Department of Licensing?

1   A   Yes.

2   Q   And can you tell us what types of documents those are?

3   A   Notary of affidavit for Mr. Poff, a master business

4   application --

5   Q   I'm sorry, "notary of affidavit"?  What do you mean?  Is that

6   an application for a notary license?

7   A   Yes.

8   Q   And what else?  I'm sorry.

9   A   Copies of master business applications.

10  Q   And what are the exhibit numbers on our list for those

11  exhibits that you obtained these certified copies?

12  A   Numbers 22, 11, 12, and 236.

13          MS. VOGEL:  Move the admission of Exhibits 11, 12, 22

14  and 236.

15          THE COURT:  Any objection?

16          THE DEFENDANT:  No objection, your Honor.

17          THE COURT:  They are admitted.

18          (11, 12, 22 & 236 admitted.)

19  By Ms. Vogel:

20  Q   Did you also obtain certified copies of public records from

21  the Washington State Department of Revenue?

22  A   Yes.

23  Q   And, generally speaking, what type of documents are those?

24  A   Revenue records for businesses.

25  Q   And what are the exhibit numbers for those records that are

1  on our exhibit list?

2  A    7, 13, and 234.

3       MS. VOGEL:  Move the admission of 7, 13, and 234 as

4  public records.

5       THE COURT:  Any objection?

6       THE DEFENDANT:  No objection, your Honor.

7       THE COURT:  7, 13 and 234 are admitted.

8       (7, 13 & 234 admitted.)

9  By Ms. Vogel:

10  Q    Did you also obtain records from the Washington Department of

11  Employment Security?

12  A    Yes.

13  Q    And were those certified public records?

14  A    Yes.

15  Q    And, generally speaking, what types of records are those?

16  A    Employment security wage reports.

17  Q    What are the exhibit numbers on our list for those documents?

18  A    Numbers 8, 9, 10 and 235.

19       MS. VOGEL:  Move the admission of Exhibits 8, 9, 10, and

20  235.

21       THE COURT:  Any objection?

22       THE DEFENDANT:  No objections, your Honor.

23       THE COURT:  8, 9, 10 and 235 are admitted.

24       (8, 9, 10 & 235 admitted.)

25  By Ms. Vogel:

1    Q    Agent Burtt, did you also obtain certified copies of records

2    from the Federal Deposit Insurance Corporation?

3    A    Yes.

4    Q    And what, generally speaking, are the types of documents that

5    you got from the FDIC?

6    A    FDIC certificates stating that the individual bank was FDIC

7    certified.

8    Q    What are the exhibit numbers for those documents?

9    A    900, 901, 902.

10            MS. VOGEL:  Move the admission of 900, 901, and 902.

11            THE COURT:  Any objection?

12            THE DEFENDANT:  No objections.

13            THE COURT:  900, 901 and 902 are admitted.

14            (900, 901 & 902 admitted.)

15   By Ms. Vogel:

16   Q    Agent, I want to direct your attention now to the various

17   business records that you obtained as part of your investigation

18   in this case.  Generally speaking, what types of businesses did

19   you obtain records from that we intend to introduce here at the

20   trial?

21   A    Lenders, escrow companies, realtor records and bank records.

22   Q    And in preparation for trial here today, did you or one of

23   your colleagues insure that we had, from the business records

24   custodian, a written certification pursuant to Federal Rule

25   902(11) for each of the business records that the government has

1   listed on the exhibit list for introduction here at trial?

2   A   Yes.

3   Q   And does that record certify that it was made at or near the

4   time of the occurrence by a person with knowledge of those

5   matters, and was kept in the course of the regularly conducted

6   activity of the business, and, third, was made in regularly

7   conducted activity as a regular practice of the company, or were

8   records received from others and kept in the regular course of

9   business, were relied upon by the company and were records of

10   which the company had a substantial interest in their accuracy?

11   A   Yes.

12   Q   Does each written certification have that language in it?

13   A   Yes.

14   Q   For example, for the records that were obtained from Great

15   American Escrow, since that is the largest batch of records we

16   will be dealing with here, what did you do personally to insure

17   that all of the Great American Escrow documents that we plan to

18   introduce here at trial were properly certified?

19   A   I met with the owner of Great American Escrow, Christopher

20   Benson, and we reviewed each file.

21   Q   And did he, after that review, submit written certifications

22   certifying that each of the documents by Bates number was a

23   record kept by Great American Escrow, as required by 902?

24   A   Yes.

25   Q   Let's start with the Great American Escrow records.  What are

1  the exhibit numbers for the certified business records obtained

2  from Great American Escrow that pertain to property number one on

3  the chart?

4  A   Numbers 143, 144, 145, 146, 148, 149, 150, 151 and 152.

5  Q   And when I say "pertaining to property number one on the

6  chart," what does that mean?

7  A   A document that either has that property address listed on it

8  or a document that was recovered or obtained from that particular

9  escrow file.

10        MS. VOGEL:  Move the admission of the exhibits just

11  recited by the agent.  Those are Exhibits 143, 144, 145, 146,

12  148, 149, 150, 151 and 152, as business records under the rule.

13        THE COURT:  Any objection?

14        THE DEFENDANT:  I am still reviewing those.  Can you say

15  those numbers again, please?

16        MS. VOGEL:  143, 144, 145, 146, 148, 149, 150, 151 and

17  152.

18        THE DEFENDANT:  One second, please.  Actually, I have a

19  question.  Can I voir dire the witness in regards to this?

20  Because some of these records were actually taken during the

21  search, and some were taken later on.

22     Is my understanding correct on that?

23        THE COURT:  I will permit that voir dire question.  Did

24  you hear the question?

25        THE WITNESS:  One more time, please.

1          THE DEFENDANT:  Yes, sir.  Now, some of these records

2     you had seized during the search warrant itself, and some of

3     these records you had actually gotten afterwards, after the

4     search warrant; is that correct, from Great American Escrow, sir?

5          THE WITNESS:  Yes.

6          THE DEFENDANT:  Is there any way of knowing which set of

7     documents was taken during the search and which ones were taken

8     afterwards?

9          THE WITNESS:  The documents are listed by Bates number.

10    Under the Bates number it will say search warrant GAE or just

11    escrow.

12         THE DEFENDANT:  Are they noted on here then?

13         THE WITNESS:  Yes.

14         THE DEFENDANT:  When you had taken these, some of these

15    were just individual documents, or was it the entire file,

16    Special Agent, on these?  How did you acquire some of these

17    documents?

18         THE WITNESS:  These documents were taken as part of a

19    file.

20         THE DEFENDANT:  Everything was part of a file and not

21    separate documents that you had taken from somewhere else within

22    the office?

23         THE WITNESS:  From my knowledge of these particular

24    Bates numbers, I do not believe any of these documents were taken

25    single handedly off a desk or another file.  I believe these were

1  all part of a particular escrow file, or a similar file that was

2  attached to that main escrow file.

3          THE DEFENDANT:  Okay.  That halfway answers my question.

4  I know when I saw the evidence the filing system at the escrow

5  wasn't stellar.

6          THE WITNESS:  That's correct.

7          THE DEFENDANT:  I guess I would have a minor issue with

8  that evidentiary issue with that, just because of knowing when

9  and where and how these documents were taken might affect the

10  outcome somewhat.

11          THE WITNESS:  The documents that are listed ---

12          THE COURT:  I don't think that was a question.  Is that

13  your objection to these?

14          THE DEFENDANT:  Yeah, that would be more my objection,

15  your Honor.

16      When you interviewed Chris Benson at Great American Escrow,

17  was he familiar with each of the files and the contents of

18  them -- all of the contents that were taken, or were these just

19  files that were under the care and custodian of Micki Thompson at

20  the time?

21          THE WITNESS:  These were files that were listed as Great

22  American Escrow files.  And when he reviewed those files, he was

23  then able to establish the authenticity of the documents we had

24  seized.

25          THE DEFENDANT:  Because these were files that Micki

1   Thompson had under her control this entire time.  He did not have

2   any knowledge of these files until you had came and did the

3   search warrant on them.  And some of them you had actually taken

4   afterwards.  I know that sounds a little bit confusing.

5       He didn't have control of these documents himself personally;

6   his employee, Micki Thompson, had control of these documents

7   under whatever system she had for filing and managing this, up

8   until you took notice of specific files that you wanted under

9   this investigation, and that's when he did his review upon these

10  documents and the files, right before he handed them over to you

11  and certified them?

12          THE WITNESS:  I cannot speak to who had control over

13  what file at Great American Escrow.  Micki Thompson was an

14  employee at Great American Escrow.  Christopher Benson was in

15  charge of Great American Escrow.

16          THE DEFENDANT:  Yes.

17          THE WITNESS:  I would say he has control.

18          MS. VOGEL:  Your Honor --

19          THE COURT:  Mr. Poff, why don't you go ahead and make

20  your objection, and I will rule on the admissibility.

21          THE DEFENDANT:  I object to some of this as a little bit

22  vague, and improper foundation on this, your Honor.

23          THE COURT:  All right.  I am going to admit them.  If I

24  understand this, which I think I do, these are coming in under

25  803(6) and 902(11), both of which require a person familiar with

1    the recordkeeping practices of the business who can identify the

2    record at issue as having been made in the ordinary course of

3    business.   That's what the certification that has been attached

4    to this that is applicable to these documents has been

5    represented to the court as attesting to, and it is coming

6    through the owner of the business.   And, therefore, I am going to

7    admit them at this time.

8            MS. VOGEL:   For the record, I would like to point out

9    these documents were part of the stipulation that was filed.

10           (143, 144, 145, 146, 148, 149, 150, 151 & 152 admitted.)

11   By Ms. Vogel:

12   Q    Since it got brought up, let's talk a little bit more about

13   how you got the documents from Great American Escrow.   Were there

14   a variety of means that you obtained the files from Great

15   American Escrow?

16   A    Yes.

17   Q    What was the first way that you got documents from Great

18   American Escrow?

19   A    Through investigation by the Department of Financial

20   Institutions.

21   Q    And how did they get the documents?

22   A    They obtained the documents from an administrative

23   investigation.

24   Q    So they actually got copies of documents directly from Great

25   American Escrow?

1    A    Yes.

2           THE COURT:  Counsel, you need to watch your leading.

3    By Ms. Vogel:

4    Q    And how did they come into your custody?

5    A    The Department of Financial Institutions provided us copies

6    of the files.

7    Q    When was that, before or after the arrests?

8    A    Before.

9    Q    At the time of the arrest did you also obtain additional

10   documents from Great American Escrow?

11   A    Yes, through search warrant.

12          THE DEFENDANT:  I would object.

13          THE COURT:  Basis?

14          THE DEFENDANT:  The basis is that the documents that

15   were obtained prior to the search warrant were not properly

16   obtained.

17          THE COURT:  She hasn't moved the admission of them.  You

18   want to wait on your objection.  If she is not moving the

19   admission of something, then you need to wait.  What you just

20   objected to was her question, and her question was a proper one.

21          THE DEFENDANT:  I apologize.  I think it was a general

22   objection, because I don't know what documents those are.  That's

23   what I was trying to establish before.  Those documents obtained

24   were not obtained through a lawful search warrant.  I would

25   object to those.

1    THE COURT:  You may continue, counsel.

2  By Ms. Vogel:

3  Q    Also at the time of the arrest, was there another method that

4  was used to obtain documents, in addition to seizing them

5  pursuant to the search warrant?

6  A    Yes, the grand jury subpoena.

7  Q    And who provided you documents in response to the grand jury

8  subpoena on behalf of Great American Escrow at the time of the

9  search warrant?

10  A    Christopher Benson.

11  Q    And following the time of the arrest, were there additional

12  grand jury subpoenas issued to Great American Escrow for

13  additional files?

14  A    Yes.

15  Q    And who provided those documents?

16  A    Christopher Benson.

17  Q    And in preparation for this case today, when did you and

18  Christopher Benson sit down and go through each document per his

19  ability to certify them?  Was it within the last month?

20  A    It would have been within the last month, closer to a month.

21  Q    And the documents that you showed him, did they come from all

22  of the sources you just described?

23  A    They did.

24  Q    What are the documents that you obtained from Great American

25  Escrow that pertained to property number two on our chart?

1   A   **Are you referring to the exhibit numbers?**

2   Q   **The exhibit numbers, yes.**

3   A   **Exhibit 209, 210, 211, 212, 213, 214, 215, 216, 217, 237,**

4   **238, 240, 241.**

5         **MS. VOGEL:  Move the admission of those exhibits as**

6   **business records.**

7         **THE COURT:  Mr. Poff, now is your time to object to the**

8   **exhibits.**

9         **THE DEFENDANT:  Yes.  The objection I brought forward**

10   **earlier --  I made a stipulation on the business records.  I was**

11   **under the assumption they were obtained via the search warrant.**

12   **I made the stipulation to expedite things along.  If those were**

13   **businesses records obtained through DFI with the administrative**

14   **means they have to gain these records, I don't think that is**

15   **something that could be lawfully placed into evidence, sir.  And**

16   **I don't know which documents that would be.**

17         **THE COURT:  Why can't they be lawfully placed into**

18   **evidence?**

19         **THE DEFENDANT:  It is my understanding they would have**

20   **to have some sort of lawful way of acquiring these documents,**

21   **other than just administrative --  I don't know the chain of**

22   **custody from Great American Escrow through DFI to the**

23   **investigator himself.  I mean, are these people here that I would**

24   **be available to interview?  That would be my only objection to**

25   **that, sir.**

1         THE COURT:  Are you asserting an objection on the basis

2 that the Department of Financial Institutions improperly seized

3 these documents?

4         THE DEFENDANT:  I don't know if they did or not, sir.

5         THE COURT:  Then I am going to overrule the objection.

6 They are admitted.

7         ( 209 - 217, 237, 238, 240, 241 admitted.)

8 By Ms. Vogel:

9 Q   Can you give us the exhibit numbers, please, Agent --

10         MR. RATNER:  Can we have those exhibit numbers again,

11 please?  209, 210, 211, 212, 213, 214, 215, 216, 217, and then I

12 got lost after that.

13         MS. VOGEL:  237, 238, 240, and 241.  Is that correct,

14 Agent?

15         THE WITNESS:  That's correct.

16 By Ms. Vogel:

17 Q   Can you please give us the exhibit numbers of the documents

18 obtained from Great American Escrow and certified by the owner of

19 that business that pertain to property three?

20 A   318, 319, 320.

21         MS. VOGEL:  Move the admission of 318, 319 and 320.

22         THE DEFENDANT:  No objection, your Honor.

23         THE COURT:  Those are admitted.

24         (318, 319 & 320 admitted.)

25 By Ms. Vogel:

Q   Can you please give us the exhibit numbers of the documents
that were obtained from Great American Escrow that pertain to
property number four and certified by the owner?

A   409, 423, 424, 425, 426.

MS. VOGEL:  Move the admission of those exhibits.

THE COURT:  Any objection?

THE DEFENDANT:  No objection, your Honor.

THE COURT:  They are admitted.

(409, 423, 424, 425, 426 admitted.)

By Ms. Vogel:

Q   Can you please give us the exhibit numbers, Agent, of the
documents obtained through Great American Escrow and certified by
the owner that pertain to property five?

A   521, 522, 523.

MS. VOGEL:  Move the admission of 521, 522 and 523.

THE DEFENDANT:  No objection, your Honor.

THE COURT:  They are admitted.

(521, 522 & 523 admitted.)

By Ms. Vogel:

Q   Can you please give us the exhibit numbers of the Great
American Escrow documents on our exhibit list, obtained and
certified, that pertain to property number six on our chart?

A   614, 629, 630, 631, 632, 634.

MS. VOGEL:  Move the admission of those exhibits.

THE DEFENDANT:  No objection, your Honor.

1          THE COURT:  They are admitted.

2              (614, 629, 630, 631, 632 & 634 admitted.)

3    By Ms. Vogel:

4    Q    Agent, can you please give us the exhibit numbers of the

5    Great American Escrow documents that you obtained and certified

6    by the owner that pertain to property number seven on our chart?

7    A    Numbers 704, 706, 708, 709, 717, 718, 719, 721, 722, 723,

8    724, and 725.

9              MS. VOGEL:  Move the admission of those exhibits.

10             THE DEFENDANT:  No objection, your Honor.

11             THE COURT:  They are admitted.

12             (704, 706, 708, 709, 717, 718, 719, 721, 722, 723, 724 &

13   725 admitted.)

14   By Ms. Vogel:

15   Q    Agent, can you give us the exhibit numbers of the Great

16   American Escrow records obtained and certified that pertain to

17   property number eight on our chart?

18   A    812, 814, 817, 818, 819, 820, 821.

19             MS. VOGEL:  Move the admission of those exhibits.

20             THE DEFENDANT:  No objection, your Honor.

21             THE COURT:  They are admitted.

22             (812, 814, 817, 818, 819, 820 & 821 admitted.)

23   By Ms. Vogel:

24   Q    And finally, Agent, can you give us the exhibit numbers of

25   the Great American Escrow documents that are on our exhibit list

1   that are listed as pertaining to some of the money laundering

2   counts?

3   A    922, 923, 928 and 929.

4   Q    And, again, were these certified with Chris Benson as being

5   business records under the rule?

6   A    They were.

7           MS. VOGEL:  Move the admission of 922, 923, 928 and 929.

8           THE DEFENDANT:  No objection, your Honor.

9           THE COURT:  They are admitted.

10          (922, 923, 928 & 929 admitted.)

11  By Ms. Vogel:

12  Q    In addition to Great American Escrow business records, did

13  you also obtain records from other escrow companies that pertain

14  to some of the transactions?

15  A    Yes.

16  Q    And what is the first of those companies?

17  A    Evergreen.

18  Q    Is that Evergreen Escrow Company?

19  A    Yes.

20  Q    And, generally speaking, what kind of documents did you

21  obtain?

22  A    Seller financing agreements.

23  Q    And did you also obtain a written certification from a

24  qualified custodian of records at Evergreen Escrow regarding

25  those documents?

1    A    Yes.

2    Q    And what are the exhibit numbers of those documents?

3    A    118 and 159.

4         MS. VOGEL:  Move the admission of 118 and 159.

5         THE DEFENDANT:  No objection, your Honor.

6         THE COURT:  Admitted.

7         (118 & 159 admitted.)

8    By Ms. Vogel:

9    Q    And was there another escrow company from whom you obtained

10   certified business records as well?

11   A    Stewart Title.

12   Q    And what is the exhibit number of that exhibit?

13   A    705.

14   Q    And did you also obtain a written 902 certification from a

15   qualified custodian at Stewart Title?

16   A    Yes.

17   Q    Generally speaking, what kind of document is that?

18   A    Closing instructions from Great American Escrow.

19        MS. VOGEL:  Move the admission of Exhibit 705.

20        THE DEFENDANT:  No objection, your Honor.

21        THE COURT:  Admitted.

22        (705 admitted.)

23   By Ms. Vogel:

24   Q    Now, Agent, I want to now ask you about lender records.

25   Specifically as to property number one on our chart, from what

1  lender did you obtain records pertaining to the loans taken out

2  for that property?

3  A    Ownit Mortgage.

4  Q    Is that Ownit Mortgage Solutions?

5  A    Yes.

6  Q    That's the full name?

7  A    Yes.

8  Q    Does Ownit Mortgage Solutions exist any longer?

9  A    No.

10  Q    From whom did you obtain the records on behalf of Ownit

11  Mortgage Solutions?

12  A    The attorney who was responsible for the files.

13  Q    Do you know what happened to Ownit?

14  A    As far as I know, they were in bankruptcy.

15  Q    And do you know what this attorney's authority was to have

16  and provide the documents?

17  A    To administer the files.

18  Q    Were they appointed by the court?

19  A    Yes.

20  Q    And having obtained those records, were you able to actually

21  track down a former employee of Ownit Mortgage Solutions in

22  person?

23  A    Yes.

24  Q    And what did you do with that --  Who is that person?

25  A    That individual is John Darcy.

Q     And do you know exactly what his position was at Ownit Mortgage Solutions?

A     He was a manager at Ownit.

Q     And in preparation for this trial, did you and Mr. Darcy sit down and review the documents that we had obtained from the attorney on behalf of the now liquidated owner?

A     Yes.

Q     And what was the outcome of that session?  Was Mr. Darcy able to certify that these were Ownit Mortgage Solution's official business records?

A     Mr. Darcy was able to certify they were official Ownit documents.

Q     And did he provide a written 902 certification?

A     Yes.

Q     Was that written 902 certification provided to the defendant?

A     Yes.

Q     What are the exhibit numbers of the Ownit Mortgage Solution business records that were obtained as part of this investigation that pertain to property number one, and for which the former supervisor/manager at Ownit Mortgage Solutions provided written certification as business records?

A     Exhibit Numbers 113, 114, 115, 116, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142.

Q     Generally speaking, what types of documents are those?

1  A   Real estate documents, HUD-1s, loan applications.

2        MS. VOGEL:  Move the admission of the exhibits just

3  recited by the defendant -- by the agent, excuse me, pursuant to

4  the business rule and the parties' earlier stipulation.

5        THE COURT:  Any objection?

6        THE DEFENDANT:  On two of them, your Honor.  141, it

7  says the source is from Countrywide; and on Number 129 it says it

8  is an e-mail, reportedly from myself.  I would object to that.

9        THE COURT:  I will sustain on the Countrywide, since I

10  haven't heard that has been the subject of this.  I would like to

11  see the certification in regards to the e-mail.  Tell me which

12  exhibit number it is.

13        MS. VOGEL:  The exhibit the defendant just mentioned, I

14  believe is Exhibit Number 129.  The certification itself is

15  downstairs.  Since we thought we had a stipulation, we didn't

16  bring everything up.  My assistant is going to get it.

17        THE COURT:  Why don't you move on, and we will deal with

18  it before close of business.

19  By Ms. Vogel:

20  Q   Agent, when you  said "141" earlier, was that in error?

21  A   No.  I'm sorry, it was.

22  Q   Was Exhibit 141 an Ownit business record?

23  A   No.

24  Q   So setting aside Exhibit 129 for a moment, and taking 141 out

25  of the mix, are the other exhibits that you just recited here the

1    business records pertaining to property number one that you

2    obtained from Ownit Mortgage Solutions?

3    A    They are.

4         THE DEFENDANT:  No objection on the other exhibits.

5         THE COURT:  With the exception of those two exhibits,

6    the remainder are admitted.

7         (113 - 116, 119 - 127, 128, 130 - 140 & 142 admitted.)

8    By Ms. Vogel:

9    Q    Also pertaining to property number one, did you obtain

10   documents from Countrywide?

11   A    Yes.

12   Q    And do you know the relationship between Countrywide and

13   Ownit as it pertains to property number one?

14   A    Countrywide obtained Ownit's loan business after Ownit

15   ceased.

16   Q    Is it your understanding that Countrywide got some of their

17   documents?

18   A    Yes.

19   Q    And what is your understanding of how that happened?

20   A    Through Ownit's bankruptcy, and then Countrywide took over

21   the loans.

22   Q    And how many documents pertaining to property number one are

23   on our exhibit list from Countrywide?

24   A    One.

25   Q    And what is the exhibit number of that document?

1    A    **141.**

2    Q    **Did you also obtain a written business certification from**

3    **Countrywide when they provided us with that file?**

4    A    **Yes.**

5    Q    **And did that written certification certify that these**

6    **documents were kept in the ordinary course of business as**

7    **required?**

8    A    **Yes.**

9         **MS. VOGEL:  Move the admission of 141.**

10        **THE DEFENDANT:  No objection.**

11        **THE COURT:   141 is now admitted.**

12        **(141 admitted.)**

13   **By Ms. Vogel:**

14   Q    **Did you also obtain records from Ownit Mortgage Solutions**

15   **that pertain to property number two?**

16   A    **Yes.**

17   Q    **And can you tell us the exhibit numbers of those documents?**

18   A    **Exhibit Numbers 208, 218, 219, 220, 221, 222, 223, 224, 225,**

19   **226, 227, 228, 229, 230, 231, 232, 233.**

20        **MS. VOGEL:  Move the admission of those exhibits as**

21   **business records.**

22        **THE DEFENDANT:  The only one I am objecting to is 223,**

23   **your Honor.**

24        **THE COURT:  The basis of the objection?**

25        **THE DEFENDANT:  I am looking at the other exhibit that I**

1   objected to as well.  This is claimed to be a purported e-mail

2   from the prosecution, claiming to be from myself, but it says in

3   the header this is actually from an e-mail account from Alexis

4   Ikilikyan.

5           THE COURT:  Counsel, why don't we establish, we will go

6   back and do this on 129 and this exhibit, where they came from

7   and if there is certification.

8       Mr. Poff, I am probably going to overrule your objection.

9   The proper way to attack this is through cross-examination, what

10  these are.  Right now they are being admitted because they are

11  coming in as a business record.  We need to establish they came

12  out of that file of that particular company, and they maintained

13  these as part of the regular course of business to meet the 803

14  standards.  Let's do that in particular with those e-mails.

15          (208, 218 - 233 admitted.)

16          THE DEFENDANT:  Thank you, sir.

17  By Ms. Vogel:

18  Q   Agent, for all of the exhibit numbers that you have listed

19  here so far as coming from Ownit Mortgage, with the exception of

20  the one that was in error, how did we obtain those documents, do

21  you know?

22  A   Through subpoena.

23  Q   And was that subpoena directed to the person you mentioned

24  earlier, the attorney of the trust?

25  A   Yes.

```
 1   Q     And how were those documents returned back to the United
 2   States government, in individual documents or in a batch?
 3   A     In a batch of documents.
 4   Q     Do you know whether those were electronic or paper?
 5   A     Those are paper documents.
 6   Q     Are you sure or do you know?
 7   A     I believe they are paper documents.
 8   Q     When you obtained the documents and you tracked down the
 9   former owner -- the former employee of Ownit Mortgage Solutions,
10   what did you do with him in order to allow him to certify those
11   documents as Ownit business records?
12   A     Reviewed the documents with him page by page.
13   Q     And did you provide him with just some of the documents or
14   the entire batch that were obtained from Ownit?
15   A     The complete files.
16   Q     And were you present when he reviewed many of those
17   documents?
18   A     Yes.
19   Q     And how long did he take, if you know, to go through those
20   documents?
21   A     The time that I spent with him was a couple of hours.
22   Q     And can you tell us, in that file of documents that we
23   obtained from Ownit, what types of documents were in there?
24   Specifically I want to know, was it just loan documents or was it
25   all kinds of correspondence that came into that file as the loan
```

1  application progressed?

2  A   Quite a few documents relating to the initial loan request,

3  and then follow-up documents requesting additional documents,

4  e-mail correspondences and other correspondences between Ownit

5  and the individual making the request.  And then as they went to

6  process the actual loan application.  And other Ownit related

7  documents related to that loan, such as verification sheets.

8  Q   And while you couldn't be expected to know who drafted the

9  various documents in the Ownit business records, was it apparent

10 to you upon your review whether all of these documents were

11 drafted by Ownit or drafted by other sources?

12 A   It appeared the documents were Ownit documents, but also

13 documents sent to them from other sources.

14 Q   What were some of those other sources, if you know?

15 A   They were e-mail correspondences and fax correspondences

16 between individuals applying for the loan and the loan

17 representatives from Ownit.

18 Q   And the two e-mails the defendant has raised an objection to

19 here, having reviewed those documents in the context of all the

20 paperwork received from Ownit, do you believe that those were

21 documents that were submitted to Ownit based on their contents as

22 part of the loan application process?

23 A   Yes.

24        THE COURT:  Counsel, may I see the certification,

25 please?

1          MS. VOGEL:  May I approach, your Honor?

2          THE COURT:  Yes.  Mr. Poff, why don't you state your

3    objection to 129 and whatever the other number is.

4          MS. VOGEL:  I believe it is 223, your Honor.

5          THE COURT:  223.  And then I will rule.

6          THE DEFENDANT:  Really my objection comes from --  It is

7    an e-mail purported to be coming from myself, but it is coming

8    from -- on the very header of the e-mail it says it is an account

9    that was shared.  Basically it says it is Haikanush Ikilikyan's

10   e-mail account.  If you are saying that is something I have to

11   rebut in cross-examination, if I am just allowing it to enter

12   into the record now as evidence coming from the lender, I have no

13   objection with that aspect of it, your Honor.

14         THE COURT:  When you cross-examine whoever it is you

15   want to cross-examine on that subject, you bring that exhibit up

16   and say what about that particular aspect of it.  Right now we

17   are establishing that it is a business record.

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  I will overrule the objection and admit

20   those two exhibits.

21         (129 & 223 admitted.)

22   By Ms. Vogel:

23   Q    Agent, from what lender did you obtain business records

24   pertaining to property number three on the chart?

25   A    Ownit Mortgage.

1    Q    Is that the same Ownit Mortgage Solutions we talked about a

2    minute ago?

3    A    Yes.

4    Q    Were you also able to obtain written business certifications

5    for those records?

6    A    Yes.

7    Q    What are the exhibit numbers for the Ownit Mortgage lender

8    records that pertain to property number three, that are on our

9    exhibit list?

10   A    308, 309, 310, 311, 312, 313, 314, 315, 316 and 317.

11             MS. VOGEL:  Move the admission of those exhibits.

12             THE DEFENDANT:  No objection, your Honor.

13             THE COURT:  They are admitted.

14             (308 - 317 admitted.)

15   By Ms. Vogel:

16   Q    From what lender did you obtain business records pertaining

17   to property number four on our chart?

18   A    Ownit Mortgage Solutions.

19   Q    Again, did you obtain the written business records

20   certification from a representative at Ownit Mortgage that would

21   cover the exhibits on our exhibit list for that property?

22   A    Yes.

23   Q    What are those exhibit numbers, please?

24   A    412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422.

25             MS. VOGEL:  Move the admission of those exhibits as

1  business records.

2          THE DEFENDANT:  No objection, your Honor.

3          THE COURT:  They are admitted.

4          (412 - 422 admitted.)

5  By Ms. Vogel:

6  Q    From what lender did you obtain business records that related

7  to the loans for property number five on our chart?

8  A    Ownit Mortgage Solutions.

9  Q    And, again, did you have the same business records

10 certification that covered these exhibits?

11 A    Yes.

12 Q    What are those exhibit numbers, please?

13 A    507, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518,

14 519 and 520.

15          MS. VOGEL:  Move the admission of those exhibits.

16          THE DEFENDANT:  No objection, your Honor.

17          THE COURT:  They are admitted.

18          (507 - 520 admitted.)

19 By Ms. Vogel:

20 Q    As to property six on the chart, Agent, from what lender or

21 lenders did you obtain records related to the loan on that

22 property?

23 A    National City Bank and Aurora Home Servicing.

24 Q    Let's talk first about Aurora Home Servicing.  If you know,

25 what is the connection between Aurora Home Servicing and the

1  lender that originally lent for the mortgage for property number

2  six?

3  A    Aurora Home Servicing took over the loan from Green Point.

4  Q    Is it your understanding that they obtained their documents

5  directly from them?

6  A    Yes.

7  Q    Did Aurora Home Servicing, when it provided documents, also

8  provide a written certification of business records pursuant to

9  Rule 902 that covers the exhibit that we are seeking to admit

10  here?

11  A    Yes.

12  Q    And what are the exhibit numbers of the documents pertaining

13  to property six that were obtained from Aurora Home Servicing?

14  A    621, 623.  That's all.

15  Q    Just those two?

16  A    Yes.

17        MS. VOGEL:  Move the admission of 621 and 623.

18        THE DEFENDANT:  No objection, your Honor.

19        THE COURT:  They are admitted.

20        (621 & 623 admitted.)

21  By Ms. Vogel:

22  Q    You said there was a second lender.  What was that?

23  A    National City Bank.

24  Q    Were you also able to obtain a written business record

25  certification from the custodian of records from National City

1    Bank that covers each of the National City Bank records listed on

2    our exhibit list?

3    A    Yes.

4    Q    And what are the exhibit numbers of the lender documents

5    pertaining to property number six that you obtained from National

6    City Bank?

7    A    615, 622, 624, 625, 626, 627, 628, 643, 644, 645.

8              MS. VOGEL:  Move the admission of those records.

9              THE DEFENDANT:  No objection, your Honor.

10             THE COURT:  They are admitted.

11             (615, 622, 624 - 628, 643 - 645 admitted.)

12   By Ms. Vogel:

13   Q    As to property number seven on our chart, did you obtain any

14   lender documents that are on our exhibit list for that property?

15   A    One document.

16   Q    And what is that exhibit number?

17   A    720.

18   Q    And from whom did you obtain that document?

19   A    Gulf Savings Bank.

20   Q    Was that document accompanied by a written certification that

21   this was a business record at Gulf Savings Bank?

22   A    Yes.

23             MS. VOGEL:  Move the admission of Exhibit 720.

24             THE DEFENDANT:  No objection, your Honor.

25             THE COURT:  720 is admitted.

```
 1              (720 admitted.)
 2   By Ms. Vogel:
 3   Q    And, finally, from what company did you obtain lender records
 4   pertaining to the loan extended to purchase property number eight
 5   on our chart?
 6   A    Just Mortgage.
 7   Q    And did you get those documents directly from Just Mortgage?
 8   A    Yes.
 9   Q    And were they accompanied by a written business record
10   certification from a custodian at Just Mortgage that these were
11   business records?
12   A    Yes.
13   Q    What are the exhibit numbers of the Just Mortgage records on
14   our exhibit list?
15   A    809, 810, 811 and 813.
16              MS. VOGEL:  Move the admission of 809, 810, 811 and 813.
17              THE DEFENDANT:  No objections, your Honor.
18              THE COURT:  They are admitted.
19              (809 - 811, 813 admitted.)
20   By Ms. Vogel:
21   Q    What real estate companies did you obtain records from that
22   also would be introduced in this process?
23   A    John L. Scott Realty and Prudential.
24   Q    Let's talk about John L. Scott first.  Did you obtain from a
25   custodian or representative of John L. Scott Real Estate a 902
```

1   certification as to all the records obtained from them?

2   A   Yes.

3   Q   And what are the exhibit numbers of those records?

4   A   610, 611, 612.

5        MS. VOGEL:  Move the admission of 610, 611 and 612.

6        THE DEFENDANT:  No objection, your Honor.  Can we go

7   back to Item Number 813?  I don't have any objection to it.  It

8   just doesn't list a source.  I would like to know the source of

9   that.

10  By Ms. Vogel:

11  Q   Agent, where did Exhibit Number 813 come from?

12  A   Just Mortgage.

13       THE DEFENDANT:  Other than that, I have no objection.

14  It just doesn't say it on the chart is all.

15       THE COURT:  There was no objection to the exhibits, so

16  those are admitted.

17       (610 - 612 admitted.)

18       MS. VOGEL:  Going back to 610, 611 and 612, I would move

19  the admission of those documents as John L. Scott business

20  records.

21       THE DEFENDANT:  No objections.

22       THE COURT:  Those were admitted.

23       MS. VOGEL:  Thank you, your Honor.

24  By Ms. Vogel:

25  Q   What other realtor or real estate agency did you obtain

1    records from?

2    A    Prudential Realty.

3    Q    And were those also accompanied by a written 902 business

4    record certification?

5    A    Yes.

6    Q    And what were the exhibit numbers and documents obtained from

7    Prudential?

8    A    815 and 816.

9         MS. VOGEL:  Move the admission of 815 and 816.

10        THE DEFENDANT:  No objection, your Honor.

11        THE COURT:  They are admitted.

12        (815 & 816 admitted.)

13   By Ms. Vogel:

14   Q    Did we cover all the lender records and all the realtor

15   records?  Did you also obtain records as part of this

16   investigation from banks?

17   A    Yes.

18   Q    Now, were all of those records, when they were provided to

19   the government, accompanied by Rule 902 certificates?

20   A    Yes.

21   Q    And have you worked with financial auditor Becky Carnell to

22   confirm that each of the documents we have obtained from the

23   banks as part of this investigation was covered by a written 902

24   business certification?

25   A    I have.

1    Q    What are the banks that you obtained records from as part of

2    this investigation that we intend to introduce in this trial?

3    A    Key Bank, Bank of America, LaSalle Bank, and then

4    J.P. Morgan Chase, formerly Washington Mutual, as well as the

5    Federal Reserve.

6    Q    Let's start with Key Bank.  What are the exhibit numbers of

7    the documents obtained -- the records obtained from Key Bank that

8    we intend -- that we have listed on our exhibit list?

9    A    915, 920, 926, 931 and 933.

10            MS. VOGEL:  Move the admission of 915, 920, 926, 931 and

11    933.

12            THE DEFENDANT:  No objections, your Honor.

13            THE COURT:  They are admitted.

14            (915, 920, 926, 931 & 933 admitted.)

15    By Ms. Vogel:

16    Q    What are the exhibit numbers of the business records obtained

17    from Bank of America and covered by the written business records

18    certifications obtained from Bank of America that are on our

19    exhibit list?

20    A    24, 25 and 913.

21            MS. VOGEL:  Move the admission of those three exhibits.

22            THE DEFENDANT:  No objections, your Honor.

23            THE COURT:  24, 25 and 913 are admitted.

24            (24, 25 & 913 admitted.)

25    By Ms. Vogel:

1    Q    What are the exhibit numbers of any exhibits from LaSalle

2    Bank that were obtained as part of this -- as certified business

3    records that are on our exhibit list?

4    A    Exhibit Number 912.

5    Q    Just the one?

6    A    Yes.

7              MS. VOGEL:  Move the admission of Exhibit 912.

8              THE DEFENDANT:  No objections, your Honor.

9              THE COURT:  912 is admitted.

10             (912 admitted.)

11   By Ms. Vogel:

12   Q    What are the exhibit numbers of the business records obtained

13   from Washington Mutual or J.P. Morgan Chase, as it is now known,

14   and accompanied by a written business record certification that

15   are on our exhibit list?

16   A    Exhibit Numbers 3, 4, 5, 6, 242, 321 and 322.

17             MS. VOGEL:  Move the admission of those exhibits.

18             THE DEFENDANT:  No objections, your Honor.

19             THE COURT:  They are admitted.

20             (3 - 6, 242, 321 & 322 admitted.)

21   By Ms. Vogel:

22   Q    Finally, what are the exhibit numbers of the business records

23   from the Federal Reserve Bank that you obtained in connection

24   with this investigation, and that were accompanied by a written

25   business record certification?

1  A    Exhibits 161, 162, 163, 239, 243, 244, 323, 427, 525, 526,

2  646, 648, 823, 824 and 647.

3           MS. VOGEL:  Move the admission of those exhibits.

4           THE COURT:  Are they covered by your stipulation as to

5  authenticity, counsel?

6           MS. VOGEL:  I'm sorry?

7           THE COURT:  Are they covered by your stipulation

8  regarding authenticity?

9           MS. VOGEL:  Yes.

10          THE COURT:  Mr. Poff, any objection?

11          THE DEFENDANT:  No objection, your Honor.

12          THE COURT:  Then they are admitted.

13          (161, 162, 163, 239, 243, 244, 323, 427, 525, 526, 646,

14  648, 823, 824 and 647 admitted.)

15 By Ms. Vogel:

16 Q    According to my notes we are down to one last business record

17 on our exhibit list; is that correct?

18 A    That's correct.

19 Q    And where was that from?

20 A    That was from a gun shop in Federal Way called Federal Way

21 Discount Guns.

22 Q    Was that also accompanied by a written certification from the

23 owner of Federal Way Discount Guns, or the manager, certifying

24 that these were records kept in the ordinary course of business?

25 A    Yes.

1   Q     What is that exhibit number?

2   A     Exhibit 20.

3              MS. VOGEL:  Move the admission of Exhibit 20.

4              THE DEFENDANT:  No objection, your Honor.

5              THE COURT:  20 is admitted.

6              (20 admitted.)

7              MS. VOGEL:  To clarify, your Honor, counsel has raised a

8   question as to whether we admitted Exhibit 423.  According to my

9   notes, we did.  His notes say we didn't.  I want to make sure.

10             THE COURT:  Madam Clerk, 423?

11             THE CLERK:  Yes.

12             THE COURT:  Yes.

13             MS. VOGEL:  Thank you.

14  By Ms. Vogel:

15  Q     Agent Burtt, based on your review of all of these records

16  that have now been admitted, and your preparation of the chart

17  here, this big chart in front of us, Exhibit 1, does all of the

18  information on this chart come from the exhibits that we have

19  admitted here today?

20  A     Yes, it does.

21             MS. VOGEL:  Move the admission of Exhibit 1, the chart.

22             THE DEFENDANT:  No objection, your Honor.

23             MS. VOGEL:  With the exception of the plea and

24  indictment.

25             THE COURT:  Mr. Poff, I will need you to move your

1    microphone closer to you.

2              THE DEFENDANT:  Is this better?

3              THE COURT:  That's great.

4              THE DEFENDANT:  No objection.

5              THE COURT:  Exhibit 1 is admitted.

6              (1 admitted.)

7    By Ms. Vogel:

8    Q    Agent, also as part of your investigation, did you obtain

9    photographs of each of the eight properties that are on

10   Exhibit 1?

11   A    Yes.

12   Q    How did you obtain those photographs?

13   A    Either by physically driving out and taking photographs or

14   through a web-based search.

15   Q    Can you look, please, at Exhibit 100?  Can you tell us what

16   that property is?

17   A    That is listed as transaction number one, the Puyallup

18   duplexes.

19   Q    Is this a photograph of one of the three duplexes listed in

20   line number one of our chart?

21   A    Yes.

22             MS. VOGEL:  Move the admission of Exhibit Number 100.

23             THE DEFENDANT:  My only stipulation on the photos was --

24   would be that all these photos should be current photos, if they

25   are to reflect their current condition.

```
 1              THE COURT:  When was the photograph taken?
 2              THE DEFENDANT:  Let me back up.  The condition when they
 3     were bought.  I apologize.
 4     By Ms. Vogel:
 5     Q   Agent, when did you take this photograph, do you know?
 6     A   This was approximately six to seven months ago.
 7              MS. VOGEL:  Move the admission of Exhibit 100.
 8              THE COURT:  I believe that Mr. Poff's objection goes to
 9     weight of the evidence, and is an appropriate topic for
10     cross-examination.  I will admit the exhibit.
11              (100 admitted.)
12     By Ms. Vogel:
13     Q   Would you look, please, at Exhibit 200?  Can you tell us what
14     address this is a photograph of?
15     A   It is 3141 350th Avenue South.
16     Q   Is that property number two on Exhibit 1, the big chart?
17     A   It is.
18     Q   And when did you take this photograph?
19     A   Approximately two and a half, three weeks ago.
20              MS. VOGEL:  Move the admission of Exhibit 200.
21              THE COURT:  Mr. Poff, same objection?
22              THE DEFENDANT:  Yeah.  I object to the sign in the
23     photo, your Honor, in addition to the other objection on the
24     other property, sir.
25              THE COURT:  All right.  Overruled.  I will admit 200.
```

```
 1          (200 admitted.)
 2          MS. VOGEL:  Your Honor, just so I am clear, I am not
 3    sure I understand the other objection.  Is that simply that the
 4    photograph was taken after --
 5          THE COURT:  That it does not -- potentially does not
 6    accurately reflect the value of the property, the status or
 7    condition of the property at the time of the
 8    acquisition/transaction.
 9          MS. VOGEL:  Did the court admit 200?
10          THE COURT:  I did.
11    By Ms. Vogel:
12    Q    Thank you.  Please look at Exhibit 300.  Agent, can you tell
13    us what property this is a photograph of?
14    A    That is 13841 Southeast 180th, line number three on the
15    chart.
16    Q    In what city?
17    A    In Renton.
18    Q    When did you take this photograph?
19    A    This is actually a web-based photograph.
20    Q    Do you know when it was taken?
21    A    I don't.
22          MS. VOGEL:  Move the admission of Exhibit 300.
23          THE DEFENDANT:  Same objection, your Honor.
24          THE COURT:  We have no idea when this photograph was
25    taken; is that correct?
```

1          THE DEFENDANT:  That's correct.

2          THE COURT:  I will sustain the objection.  Whoever

3   painted the door should be taken out and shot.

4          MS. VOGEL:  Your Honor, may I argue that?

5          THE COURT:  Go ahead.

6          MS. VOGEL:  We are simply offering these exhibits so

7   that witnesses can -- may or may not identify the property, so we

8   have a visual to go with it.  We are not making any

9   representations on the conditions of the property.

10         THE COURT:  Why don't you offer it as an illustrative

11  exhibit then, and I will permit you to use it?

12         MS. VOGEL:  Thank you, your Honor.

13  By Ms. Vogel:

14  Q   Can you look at Exhibit 400, please?  Can you tell us what is

15  the address of the house at this photograph?

16  A   20613 11th Avenue South.

17  Q   When did you take this photograph?

18  A   Two and a half, three weeks ago.

19         MS. VOGEL:  Move the admission of Exhibit 400.

20         THE DEFENDANT:  Same objection, your Honor.

21         THE COURT:  I will overrule the objection, and admit the

22  exhibit.

23         (400 admitted.)

24  By Ms. Vogel:

25  Q   Can you look at Exhibit 500, please?  Can you tell us the

1    address of the property located -- shown in this photo?

2    A    14062 Yelm Avenue Southwest in Yelm.

3    Q    Is that the property listed on line 5 of our chart?

4    A    It is.

5    Q    When was this photograph taken, if you know?

6    A    Approximately six to seven months ago.

7            MS. VOGEL:  Move the admission of Exhibit 500.

8            THE DEFENDANT:  Same objection, your Honor.

9            THE COURT:  Counsel, when did the Sopranos move out?  I

10   will overrule the objection and admit the exhibit.

11           (500 admitted.)

12   By Ms. Vogel:

13   Q    Would you look, please, at Exhibit 600?  Can you tell us the

14   address of the property shown in this photograph?

15   A    9488 199th Avenue South.

16   Q    In what city?

17   A    Issaquah.

18   Q    And is that the property listed on Count 6 of Exhibit 1?

19   A    Yes.

20   Q    How long ago was this photograph taken, if you know?

21   A    Approximately six to seven months.

22   Q    From today -- before today?

23   A    Yes.

24           MS. VOGEL:  Move the admission of Exhibit 600.

25           THE DEFENDANT:  Same objection, your Honor.

1          THE COURT:   The objection is overruled.   The exhibit is

2    admitted.

3          (600 admitted.)

4    By Ms. Vogel:

5    Q    Can you look at Exhibit 700, please?   Do you know the address

6    of the home depicted in this photograph?

7    A    703 South Puget Sound Avenue.

8    Q    In what city?

9    A    Tacoma.

10   Q    And is that the property listed on line 7 of our chart,

11   Exhibit 1?

12   A    Yes.

13   Q    And where did this photograph come from?

14   A    It was a web-based search.

15   Q    Do you know when this photograph was taken?

16   A    I do not.

17   Q    Have you driven by this property and looked at it personally?

18   A    I have not personally.   Other agents have.

19         MS. VOGEL:   Move the admission of Exhibit 700.

20         THE DEFENDANT:   Same objection as before.

21         THE COURT:   I will admit it for illustrative purposes

22   only, not as substantive evidence.

23         (700 Illustrative admitted.)

24   By Ms. Vogel:

25   Q    And can you look at Exhibit 800, please?   Can you tell us the

1   address of the home depicted in this this photograph?

2   A   27149 8th Avenue South in Des Moines.

3   Q   Is that the property listed on line 8 of Exhibit 1?

4   A   Yes.

5   Q   And, if you know, when was this photograph taken?

6   A   Approximately two to three years ago.

7          MS. VOGEL:  Move the admission of Exhibit 800.

8          THE DEFENDANT:  Same objection again, your Honor.

9          THE COURT:  I will admit the exhibit.

10         (800 admitted.)

11  By Ms. Vogel:

12  Q   Agent Burtt, for each of the properties listed on Exhibit 1

13  that were purchased in the name of Ikilikyan, did you find among

14  the certified public records any corresponding deeds executed by

15  the defendant, Mr. Poff?

16  A   Yes.

17  Q   And what is the nature of those deeds?

18  A   Quitclaim deeds.

19  Q   From whom to whom?

20  A   Mr. Poff to Ms. Ikilikyan.

21  Q   And are those listed as Exhibit 105?

22  A   Yes.

23  Q   This is one of the documents I believe was just admitted as a

24  public record.  What is this?

25  A   That is the quitclaim deed showing Mr. Poff quitclaiming his

1    interest in the property to Ms. Ikilikyan.

2    Q    And for which property does this quitclaim deed pertain?

3    A    Property number one on our chart.

4    Q    One of the duplexes?

5    A    Yes.

6    Q    Can you look at Exhibit 108?  What is this?

7    A    It is also a quitclaim deed.

8    Q    From whom to whom?

9    A    From Mr. Poff to Ms. Ikilikyan.

10   Q    And to which property does this relate?

11   A    Also property number one on our chart, one of the duplexes.

12   Q    And can you look, please, at Exhibit 111?  What is this?

13   A    It is a quitclaim deed from Mr. Poff to Ms. Ikilikyan.

14   Q    For which property?

15   A    For one of the duplexes on the chart for number one.

16   Q    And what is the date that this quitclaim deed was executed?

17   A    April 16th, 2005.

18   Q    Actually, if you look at the top part where you see it was

19   recorded, can you see a recording date with Pierce County?

20   A    April 28th, 2005.

21   Q    Is that the same for all three of the documents or do you

22   know?

23   A    I would have to look.

24   Q    Let's look back at Exhibit 108.  What was the date it was

25   recorded on?

1    A    April 28th, 2005.

2    Q    And let's look back at Exhibit 105.

3    A    Also April 28, 2005.

4    Q    And what was the closing date that was recorded for the

5    properties on line 1 of our chart, Exhibit 1, for those duplex

6    properties?

7    A    April 25th, 2005.

8    Q    And can you look, please, at Exhibit 505?  Also a public

9    record just admitted.

10   A    That is a quitclaim deed.

11   Q    From whom to whom?

12   A    From Mr. Poff to Ms. Ikilikyan.

13   Q    And what property does Exhibit 505 pertain to?

14   A    It pertains to the Yelm property.

15   Q    Is that line 5 on our chart?

16   A    It is.

17   Q    Can you look, please, at Exhibit 605?  What is this?

18   A    It is also a quitclaim deed from Mr. Poff to Ms. Ikilikyan.

19   Q    And which property -- in which property's records did you

20   find this deed?

21   A    In the 9488 Issaquah property.

22   Q    Is that property number six on our chart?

23   A    Yes.

24   Q    And can you look finally at Exhibit 703?  What is this?

25   A    This is also a quitclaim deed from Mr. Poff to Ms. Ikilikyan.

1   Q    And for which property does this -- was this record found

2   then?

3   A    7038 South Puget Sound.

4   Q    Is that property seven on our chart?

5   A    Yes.

6   Q    And were all of these quitclaim deeds executed shortly at or

7   shortly after the time of the statutory warranty deed conveying

8   the property to Ms. Ikilikyan from the seller?

9   A    Yes.

10  Q    Can you look, please, at Exhibit 633 --

11          THE COURT:   Counsel, are we moving on to a different

12  topic?

13          MS. VOGEL:   I only have one question on it and then we

14  are done with this witness.

15          THE COURT:   All right.

16  By Ms. Vogel:

17  Q    This has not been admitted.  Can you tell us what this

18  document is?

19  A    This is a document provided to me from the sellers of 9488

20  199th Avenue Southeast.

21  Q    And that is line 6 on the chart?

22  A    Yes.

23  Q    What was the seller's name that provided this to you?

24  A    Joyce Hsu.

25  Q    Can you spell that last name?

1    A    H-S-U.

2    Q    When did she provide you with this document?

3    A    When I interviewed her probably about a year and a half ago.

4    Q    And based on the information that she told you, did you

5    attempt to subpoena her to appear here in trial today?

6    A    I did.

7    Q    And were you successful?

8    A    No.

9    Q    Why not?

10   A    Ms. Hsu is in Taiwan.

11   Q    What is your understanding of how she got this document?

12   A    She obtained this document --

13          THE DEFENDANT:  Objection.  Hearsay.

14   By Ms. Vogel:

15   Q    What were the other documents that she gave to you that were

16   surrounded by this document?

17   A    She provided other documents relating to her sale of 9488

18   199th Southeast to Ms. Ikilikyan.

19   Q    What were specifically some of the other documents provided

20   along with this document?

21   A    I believe she also --  You know, I just don't remember.

22          MS. VOGEL:  Your Honor, I am moving the admission of

23   Exhibit 633, which I am not offering for the truth.  I am simply

24   offering it as a document provided to the agent by the seller of

25   this property.

1              THE DEFENDANT:  I object for foundation, your Honor.

2              THE COURT:  I will sustain the objection.

3              MS. VOGEL:  May I have a moment?

4              THE DEFENDANT:  I have a question for the court, your

5     Honor.

6              THE COURT:  Hold on.

7              MS. VOGEL:  In order to address the evidentiary issue,

8     the court's ruling right now, it would be helpful if we knew the

9     basis for the sustaining of the foundational objection.  Since we

10    are not offering this for the truth, it is in order to offer more

11    information or a law, we need to know why it was not admitted.

12             THE COURT:  Because it doesn't come in under the rules

13    of evidence.  There is no understanding of what it is.  You don't

14    have a witness who can authenticate it.  If you say it is not

15    coming in for the truth, then why are we offering it?

16             MS. VOGEL:  So the relevance.  Thank you.  No further

17    questions.

18             THE COURT:  All right.  Mr. Poff, we usually break at

19    4:30, so rather than get you up for two minutes, we will let you

20    organize your thoughts and pick it up tomorrow morning at

21    9:00 a.m.  Agent, you can step down.

22        Counsel, let me explore with you one matter, since I'm sure

23    you are all intimately familiar with Federal Rule of Criminal

24    Procedure 23, which is entitled "jury or nonjury trial."  And in

25    particular, 23(c) states:  "In a case tried without a jury," that

 1   would be us, "the court must find the defendant guilty or not
 2   guilty."  I thought that's what they paid us for.  But it then
 3   goes on to say:  "If a party requests before the finding of
 4   guilty or not guilty, the court must state its specific findings
 5   of fact in open court or in a written decision or opinion."

 6      I read that as saying someone has to ask.  And I don't want
 7   to sneak that one up at the end of the trial and blurt out
 8   something, saving you all hundreds of hours of work, but if
 9   someone wants it, preventing them the opportunity to ask.

10      So here is your homework for the evening.  When we resume
11   tomorrow morning I am going to ask you if anyone wants to have
12   written findings and conclusions, so that question doesn't just
13   spring up at some point in the proceeding, and that you have
14   given it some thought.

15      In order to entice you to do this or not do this, I will tell
16   you that I would expect the parties to submit written findings
17   and conclusions, so that it will add to your burden in this.
18   Were you having a jury do this, there wouldn't be written
19   findings and conclusions, they would simply come back with a
20   verdict form that would say guilty or not guilty by count in the
21   superseding indictment, I think is what we are up to this time.
22   So it is up to you.  You have that right if you want to excise
23   it.  I assure you that it will add to your burden in doing so.
24   It is not something you need to agree on.  Either party has the
25   choice.

1    In case someone does want to do it, I wanted to alert you to

2    it early so that you can keep your notes and whatever as we go

3    along.

4    Counsel, anything else that the court should take up at this

5    time?  Ms. Vogel.

6    MS. VOGEL:  Yes, your Honor.  Back on the subject of the

7    defense handwriting expert.  Today when we came to court at 1:30

8    we were given a one-page summary by the defendant of the expert's

9    testimony, which I would be happy to hand up.  But it is our

10   contention this is not sufficient under the rule.  It doesn't

11   state the documents that were examined, it doesn't state the

12   methods that were used, it doesn't state what was the baseline

13   exemplar that was used.  It essentially says --  Actually it says

14   very little.  It doesn't give us any idea of the methods that

15   were used or anything by which we can measure whether this

16   testimony would even be admissible under federal law.  So we

17   respectfully thank him for this, but we respectfully request the

18   actual written report of the handwriting expert or something that

19   complies with the expert witness rules.

20   THE COURT:  All right.  It seems to me you are saying

21   two things, counsel.  First, you are challenging the sufficiency

22   of the report itself, would be one issue.  And, secondly, you are

23   in effect making a Daubert challenge as to the method, because

24   you can't say what the methods are.  And that would be a second

25   issue.

1    Might I suggest, adding to your homework for the evening or

2    the next day or so, if you would like to put in a formal

3    objection, I will hear Mr. Poff in response to it, and then rule

4    on that since we are going to be friends here for at least a

5    little bit of time.

6        Mr. Poff, I will tell you, the point made by the government

7    is well taken, in that it is a fairly clear standard as to what

8    you've got to do.  Since I haven't seen it, I don't know if you

9    have done it or not.  But they are going to help you by telling

10   you what they think you didn't do.  You can either stand pat on

11   your end or you can do something to augment it.  The risk to

12   standing pat is the court may prohibit the witness from

13   testifying.

14       You might want to talk to Mr. Ratner about these two issues.

15   The second of them, the Daubert challenge, is something that

16   comes up not infrequently, and are the subject of a fair amount

17   of fairly precise case law.

18       Counsel, anything else?

19            MS. VOGEL:  No, your Honor.  Thank you.

20            THE COURT:  Mr. Poff, anything from you today?

21            THE DEFENDANT:  Nothing, your Honor.  Thank you.

22            THE COURT:  We will see you at 9:00 tomorrow morning.

23   Thank you, counsel.

24                     (Adjourned for the day)

25

1                        **CERTIFICATE**

2

3

4

5

6

7

8

9          **I, Barry L. Fanning, Official Court Reporter, do hereby
certify that the foregoing transcript is true and correct.**

10

11                                   **S/Barry L. Fanning**

12                          _____

13                                   **Barry L. Fanning**

14

15

16

17

18

19

20

21

22

23

24

25