```
1              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
2                       IN SEATTLE

3    _____

     UNITED STATES OF AMERICA,        )
4                                      )   NO. CR09-160JLR
                     Plaintiff,        )
5                                      )
              vs.                      )
6                                      )
     WILLIAM S. POFF,                  )
7                                      )
                     Defendant.        )
8                                      )
     _____

9

10                         TRIAL

11   _____

12

              BEFORE THE HONORABLE JAMES L. ROBART
13

14                     March 9, 2010

15

     APPEARANCES:
16

     Sarah Vogel
17   Michael Scoville
     Assistant United States Attorneys
18   Representing the Plaintiff

19   William S. Poff
     Pro Se
20   Representing the Defendant

21   Howard Ratner
     Standby Counsel
22   Attorney at Law

23

24

25
```

```
 1                        EXAMINATION INDEX

 2                                                      PAGE
        By the Defendant    CROSS-EXAMINATION            10
 3
        By Ms. Vogel        REDIRECT EXAMINATION         20
 4
        By the Defendant    RECROSS-EXAMINATION          22
 5
                            ALEXIS IKILIKYAN
 6
        By Ms. Vogel        DIRECT EXAMINATION           24
 7

 8

 9

10                        EXHIBIT INDEX
        EXHIBITS ADMITTED                               PAGE
11        117                                             79
          300                                            134
12        524                                            155
          616                                            170
13        633                                            178
          700                                            185
14

15

16

17

18

19

20

21

22

23

24

25
```

1            THE COURT:  We have a couple of preliminary matters that

2  I would like to take up this morning, and then I will ask each

3  counsel if they have anything they want to take up.  The first

4  is, it occurred to me that I covered this in our pretrial

5  conference, but that was some time ago, so let me remind you of

6  the way that I request you do objections to questions or to

7  answers.  And that is, you don't need to rise to do this, unless

8  you want to attract my attention.  Simply say, objection, and

9  then give me a one or two word explanation of what that objection

10  is.  For example, lack of foundation, hearsay.  That way, if I

11  want to know more as to what the objection is, I will ask you.

12  Otherwise, I will rule at that time.  So that's how I would like

13  you to handle objections.

14      Second, I have now had an opportunity to review the motion to

15  dismiss for violation of the Speedy Trial Act, and the

16  government's response to it.  And I will rule on it at this time.

17  It is my intention, as I get through motions and have an

18  opportunity to do the research on them, to basically keep dealing

19  with them as we proceed, so that we don't build up a backlog to

20  them.

21      In Docket 149 is Mr. Poff's motion to dismiss for violation

22  of the Speedy Trial Act.  A careful reading of the pleading

23  indicates that it is both an alleged violation of the Speedy

24  Trial Act and a violation of the Sixth Amendment, quote, right to

25  a speedy and public trial, end quote, requirement.

1          The Speedy Trial Act has a 70-day period for bringing a

2    defendant to trial.  However, it is subject to a series of

3    well-recognized exceptions.  One of which is, the pendency of

4    pretrial motions tolls that 70-day period; and, secondly,

5    continuances to serve, quote, the ends of justice, end quote, are

6    excluded, provided they are reasonable continuances.  And, third,

7    a reasonable continuance as to one defendant is excludable as to

8    the other defendants.

9          The Sixth Amendment standard states that a defendant has a

10   right to a speedy and public trial.  The Court has reviewed the

11   record in this matter, being familiar with it since it is part of

12   the record in this matter, and would note that application of the

13   exceptions found in the Speedy Trial Act, one for pretrial

14   motions, and, secondly, for continuances which were entered to

15   promote the ends of justice, namely the opportunity to prepare a

16   case where there is a great deal of documentary evidence.

17         I am totaling up the time that has been excluded and the

18   total time.  I find that there has not been a violation of the

19   Speedy Trial Act.

20         In regards to the Sixth Amendment, the right to a speedy and

21   public trial, it is not subject to an account by number of days.

22   I would note that in this matter, as best I can tell from the

23   docket, from Mr. Poff's arraignment to trial is about nine

24   months.  That is not an excessively long period of time given the

25   complexities of this case.

1          I would note that most of the motions, if not all of the

2     motions for continuance, came from other defendants, some of whom

3     obviously had different theories on how to prepare for trial, and

4     wanted to concentrate on understanding the various transactions.

5     And, therefore, I find that there has not been a violation of the

6     Sixth Amendment right to a speedy and public trial.

7          As I have found that there is no violation of the Speedy

8     Trial Act or the Sixth Amendment, I will at this time deny the

9     motion to dismiss for violations of the Speedy Trial Act, found

10    at Docket 149.

11         Counsel, I think the other housekeeping that I left you all

12    with was a decision on the question of Findings of Fact and

13    Conclusions of Law.  And I will start with the government.

14         MS. VOGEL:  Your Honor, we will not be requesting

15    specific Findings of Fact and Conclusions of Law.

16         THE COURT:  All right.  Mr. Poff.

17         THE DEFENDANT:  I will not be requesting that either,

18    your Honor.

19         THE COURT:  Then the Court has made the inquiry under

20    Criminal Rule 23, and has been told by both counsel that they do

21    not wish to have Findings of Fact and Conclusions of Law.  So at

22    the conclusion of the trial, or shortly thereafter, after I have

23    had an opportunity to review the record, I will announce my

24    findings as to guilt or innocence.

25         I believe where we left off was with the agent on the stand,

1    but I also promised each of you an opportunity to raise any

2    matters.

3        Ms. Vogel?

4            MS. VOGEL:  Nothing, your Honor.

5            THE COURT:  Mr. Poff.

6            THE DEFENDANT:  Yes, sir.  I have a continued -- just

7    state for the record I have a continuing objection in regards to

8    the U.S. Attorney's not being trustees of the United States'

9    bankruptcy.

10           THE COURT:  Let me ask you --  I started working on that

11   one next.  There is in the record a notice of bankruptcy for the

12   United States, which I am construing as a motion.  And you orally

13   raised this matter yesterday.  Is there anything else in the

14   record that I should be aware of in connection with that

15   contention?

16           THE DEFENDANT:  I submitted an affidavit on this very

17   premise, your Honor.

18           THE COURT:  That was part of your notice, I think.

19           THE DEFENDANT:  Yes, sir.  It is basically the United

20   States has been in a declared state of insolvency since -- I

21   believe it was the Emergency Banking Act, which would be 77 years

22   this month, or House Resolution 192, signed into law June 5th,

23   1933.

24           THE COURT:  Does the government wish to put in a

25   response to that?

```
1              MR. SCOVILLE:  Your Honor, the government's position is
2       that the motion is frivolous.
3              THE COURT:  All right.  Then we will call the agent to
4       the stand and begin with him.
5              THE DEFENDANT:  Sir, may I address two other issues?
6              THE COURT:  Yes.
7              THE DEFENDANT:  I don't want to be disruptive in any
8       way, sir.  I have three other issues.  One was the handwriting
9       expert will have a report to us that we can give to the
10      plaintiffs by Thursday, your Honor.  I want to give notice of
11      that today, so we will be in compliance with the court's orders.
12          Also, I would like to make a motion to compel disclosure of
13      what is the actual entity, United States of America, in all caps,
14      a written response from the plaintiffs on that.
15          Also, I would like the court to compel the plaintiffs to
16      emphatically place and prove the existence of the federal
17      evidence -- federal jurisdiction, the nexus, for William Stuart
18      Poff, the sovereign, in this honorable court, sir.
19             THE COURT:  I tell you what, both of those I will take
20      under advisement.  I think they are capable of being ruled on by
21      the court, which is what you are asking.  And I would hope to
22      have an answer for both of those within the next 24 hours or so.
23      They are also on my list of items to deal with.
24             THE DEFENDANT:  Thank you, sir.
25             THE COURT:  Mr. Poff, I can't find any authority for the
```

1    government printing office style manual carrying over into the

2    judicial system.  If you have authority for that proposition, you

3    might want to submit it to the court.

4         THE DEFENDANT:  I will look for that, sir.  I know -- I

5    don't know everything in this legal arena.  I am definitely not

6    an attorney.  I am kind of catching up here a little bit, so to

7    speak.  I do know everything is very detailed in law, that any

8    time something is capitalized like this it has a specific

9    meaning.  I.e., when I reviewed my -- the offer for settlement --

10   I'm sorry, the pretrial conference --

11        THE COURT:  Judge Martinez.

12        THE DEFENDANT:  The settlement done, for instance, with

13   Judge Martinez, my name was actually spelled correctly at that

14   point.  Whereas before, in all other court documents, my name was

15   spelled in this capitalistic style, which I am led to believe is

16   some sort of trust or corporate fiction of some kind.

17        THE COURT:  What is the basis for that belief?

18        THE DEFENDANT:  The basis for that belief is I believe

19   that everything technically is run by corporation or trust, and I

20   am believing that this entity called United States of America is

21   actually a trust, possibly a Social Security trust.  I don't

22   know.  That's why I am trying to find out the answers to this.

23   The United States of America spelled in proper English

24   grammatical form is the actual de jour America.  Whereas this

25   United States of America is actually a corporate or trust

1  fiction, basically.  I know that basically for a fact.  I am

2  lacking the actual nexus.  That's why I am asking for the

3  information from the plaintiffs on this matter, your Honor.

4        THE COURT:  Here is the difficulty with what you are

5  trying to do, Mr. Poff.  When you say you know something for a

6  fact --

7        THE DEFENDANT:  I know it sounds --

8        THE COURT:  You need to provide me with where I can find

9  that as a fact.  The fact that you know it doesn't mean that it

10  is a fact for everyone else.  You may believe it, and therefore

11  it is a fact.

12    What you need to do is direct me to some authority somewhere

13  where it is written down, for example, in connection -- you said

14  you had a House resolution.  That is something I can look at.

15  Simply to say it is a trust or it is a corporation, and you know

16  that, doesn't help me in terms of understanding what your

17  argument is.  If you have things that you could point me to or

18  submit to the court, that's the kind of material which is

19  admissible and I can then use to help resolve these issues.  Know

20  that's what your burden is when you raise those kinds of issues.

21        THE DEFENDANT:  Duly noted.  Thank you.

22        THE COURT:  Anything else?

23        THE DEFENDANT:  That would be it, sir.

24        THE COURT:  Then you may begin.  Ms. Vogel.

25        MS. VOGEL:  One comment, your Honor.  On the matter of

1    the expert disclosure, I looked forward to receiving the report

2    on Thursday, as promised.  I just want to note I left

3    instructions for our staff to file the motion on the record as

4    instructed by the court.  So that may be filed this morning

5    anyway.

6            THE COURT:  That's fine.

7            MS. VOGEL:  FYI.

8            THE COURT:  Do you know what time on Thursday, Mr. Poff?

9    Mr. Ratner, springing to life.

10           MR. RATNER:  Yes, your Honor.  She is working on the

11   report now.  She said that she would hopefully get it to me by

12   Wednesday by e-mail.  That should be after court on Wednesday,

13   and I should be able to have it by Thursday morning.

14           THE COURT:  The earlier we can get that filed, the

15   earlier I am going to ask each of you how you want to proceed in

16   regards to --  It may be completely satisfactory, and the

17   government will say, fine, and that matter is revolved.  They may

18   wish to have a Daubert challenge to this particular methodology.

19   If that is the case, I need to get that scheduled.

20           MR. RATNER:  Thank you.

21           THE COURT:  All right.  Agent, you are still under oath.

22                         CROSS-EXAMINATION

23   By the Defendant:

24   Q    Good morning, sir.

25   A    Good morning.

Q    Sir, in 2006, you became aware of suspicious activity from transfers of funds between two individuals.  Who were these individuals that you had found these suspicious transfers of funds?

A    I would say in 2006, we began a smuggling investigation.  As part of that investigation we obtained financial records related to that individual, Tony Reyes.  At that point we started looking at his transactions.  And with a combination of that and phone tolls, we were able to link a number of individuals, including Ms. Ikilikyan, with Mr. Reyes.  And then analysis of bank accounts also showed transactions between those individuals.

Q    Okay, sir.  So none of these funds were transferred to a bank account in the name of William Stuart Poff?

A    No.

Q    So at this point there was no William Stuart Poff -- at this point was not a person of interest at this point in the investigation?

A    Not at that time.

Q    At what time and date was William Stuart Poff actually linked to be a person of interest in the investigation?

A    I don't have an exact date.  It became knowledge to investigators over a period of time that Mr. Poff was married to Ms. Ikilikyan.

Q    Was that the nexus that you were looking for in the investigation, was the marriage?

1    A    What do you mean by "looking for"?

2    Q    Just to put it bluntly, is this guilt by association?

3    A    No.  A combination of seeing Mr. Poff's name on a number of

4    documents that we had begun to analyze, in addition to becoming

5    aware that Mr. Poff was married to Ms. Ikilikyan.

6    Q    And some of these documents that you saw William Stuart

7    Poff's name on, quite literally, that name was on documents he

8    had notarized?

9    A    Yes.

10   Q    Did you see his name on any other documents as William Stuart

11   Poff -- William S. Poff?

12   A    I cannot --

13        MS. VOGEL:  Just to clarify, is the question William

14   Stuart Poff or William S. Poff?

15        THE DEFENDANT:  On the documents it would be William S.

16   Poff.  I apologize.

17        THE WITNESS:  I have seen documents with William S. Poff

18   as a notary.

19   By the Defendant:

20   Q    Did you see any other documents with the name William S.

21   Poff -- any other documents besides him performing his role as a

22   notary public?

23   A    I cannot cite any specific document with William S. Poff,

24   without looking at the document first.

25   Q    I'm sorry.  I didn't understand your answer, sir.  Can you

1  repeat it?

2  A    Can you ask the question one more time?

3  Q    Was there any other specific documents that the name William

4  S. Poff was on besides documents which were notarized in his

5  capacity as a notary public?

6  A    Not that I can recall at this time.

7  Q    Was there any infractions that William S. Poff was noted in

8  your investigation in the performance of his role as a notary

9  public?

10  A    Did you say "infractions"?

11  Q    Infractions, breaking the law as a notary public?

12  A    No.

13  Q    Nothing?  Now, William S. Poff was arrested in the State of

14  Michigan on June 3rd?

15  A    Yes.

16  Q    Was that -- where was that at, sir, in Michigan?

17  A    Battle Creek.

18  Q    Was that in some type of federal area, base, national park?

19  A    It was in the State of Michigan.

20  Q    The State of Michigan?

21  A    The State of Michigan.

22  Q    It was in the corporate State of Michigan?

23  A    I do not understand your question.

24  Q    My understanding, the State of Michigan is actually the

25  corporate name of Michigan.  Michigan would be the actual place

1    where the State of Michigan is the actual corporate or government

2    entity for that state.

3    A    I think my answer is going to be the State of Michigan.

4    Q    The State of Michigan.  Okay.  And on these --  Did you have

5    an opportunity to look at these loan applications known as 1003s?

6    Who was actually listed on these loan applications that brought

7    William S. Poff into light as a potential person to be

8    investigated, sir?

9    A    Are you referring to the signature block on the form?

10   Q    The interviewer, loan officer, the signature block on the

11   loan, yes.

12   A    On a number of forms, William S. Poff was listed as the

13   interviewer.

14   Q    William S. Poff was listed as --

15   A    Not on all of the forms, but some of them.

16   Q    On some of the forms?

17   A    Yes.

18   Q    Could I take one second, please?

19   A    Yes.

20            THE COURT:  You need to address that question to me.

21            THE DEFENDANT:  I'm sorry, sir.  I don't have the

22   protocol and procedure down.

23            THE COURT:  Go ahead.

24            THE DEFENDANT:  I would like to actually reserve that

25   question for a later time, because I am going to place into

1  evidence loan applications that have the forged signature of Bill

2  Poff on them, your Honor.  I do not have them in my file right

3  now.  I will locate them and bring them to the court's attention

4  very shortly.

5        THE COURT:  All right.  Normally in an examination of a

6  witness -- cross-examination, which is what you are doing now, it

7  would be limited to the areas that the agent testified.  My usual

8  policy is to permit great latitude in that so that we don't

9  recall witnesses.  If there is an area that you are not prepared

10 to question him, you have the right to recall him if you reserve

11 that right.  I will allow it in regard to this, since the agent

12 is sitting at counsel table.  We will avoid that in the future to

13 the extent we can.  You reserve your right to recall the witness?

14       THE DEFENDANT:  Yes, I would reserve that.  I would like

15 to produce those 1003 loan applications.

16       THE COURT:  That's fine.

17 By the Defendant:

18 Q   Now, yesterday we went over a lot of documents that were

19 subpoenaed from different sources.  Now, a lot of these documents

20 were recorded deeds of trust or -- mostly deeds of trust on these

21 different properties and carryback deeds of trust; is that true,

22 sir?

23 A   Yes.

24 Q   On some of these deeds of trust, William S. Poff was the

25 notary of record on those deeds of trust?

1   A    I believe so, but I would want to look at the document to

2   confirm that.

3   Q    Now, sir, in your investigation, the overtones I saw from the

4   investigation from your report was, William S. Poff was being

5   made out to be some sort of, I don't know, quasi mastermind

6   behind this alleged scheme; is that true?  Is that kind of where

7   the investigation was pointing towards, or is that not true, sir?

8   A    I don't think I would agree with that.

9   Q    You wouldn't agree with that.  Very well, sir.

10       Now, if William S. Poff was a notary public and he is

11   notarizing these deeds of trust, and they are being recorded with

12   the county clerk, they are literally public record; is that not

13   correct, sir?

14   A    Yes.

15   Q    So if William S. Poff in his performance as a notary public

16   is notarizing these documents, he is attesting to the validity of

17   the person before him, their identity only, not to the veracity

18   of the document in any way, and they are being recorded as a

19   public record, wouldn't it stand to reason that he would make

20   sure that he was doing nothing illegal at all?

21       MS. VOGEL:  Objection, your Honor.  This is not a

22   question this witness has any knowledge of.

23       THE COURT:  I will sustain that.  You are asking for the

24   witness' opinion.  Only expert witnesses can give opinions.  He

25   can testify to facts.

1    THE DEFENDANT:  Okay.  Thank you, sir.

2    By the Defendant:

3    Q    So it is a fact then, sir, these documents were recorded and

4    are public record?

5    A    Yes.

6    Q    For anyone in the public to go and see, to investigate if

7    they had a question?  If they had a concern, they could easily go

8    and pull those records from a county clerk, go online a lot of

9    times, and find these records?

10   A    Yes.

11   Q    Now, you said that this is your first case in regards to a

12   mortgage fraud -- I'm sorry, bank fraud, wire fraud or money

13   laundering charges.  You said that you had training before at the

14   academy.  Could you tell me the substance of that training that

15   you had at your academy, please?

16   A    All agents, when they go through the academy in Georgia, go

17   through a financial course that talks about different aspects of

18   money laundering, bank fraud, and for other statutes we have

19   jurisdiction to investigate.

20   Q    Do you remember how many clock hours of training?  Can you go

21   into any detail about that?

22   A    If I recall correctly, it was probably between two and five

23   days of training.

24   Q    Two and five days of training?

25   A    Yes.

1  Q    And that was over five years ago you actually went to the

2  academy, sir?

3  A    2005/2006 timeframe.

4  Q    So approximately four or five years.  And this has been your

5  first case that you have actually investigated in regards to

6  these types of offenses then?

7  A    Yes.

8  Q    Can you tell me a little bit about Operation Malicious, and

9  if that was one of the government task forces that alleged this

10 defendant and co-defendants in this case?

11        MS. VOGEL:  Objection to compound question.  Can we

12 start first with does he know anything?

13        THE COURT:  You will hear me say this periodically,

14 Mr. Poff.  I will say you need to lay a foundation.  You need to

15 ask him, for example, does he know what that particular operation

16 is.

17        THE DEFENDANT:  Okay, sir.  Sorry about that.

18 By the Defendant:

19 Q    Special Agent, do you know what Operation Malicious Mortgage

20 is?

21 A    I do not.

22 Q    Are you aware of any government task force to go out and

23 create a government dragnet to find people in this industry and

24 the violations they committed?

25 A    No.

1    Q    Was this case a part of any type of task force at all?  I'm

2    sorry.  Let me rephrase the question.

3         I will withdraw my question, your Honor.

4         In your investigation, none of the monies went to William S.

5    Poff?

6    A    Are you referring to a bank account?

7    Q    Yes.  We will start with a bank account, yes, sir.

8    A    No.

9    Q    Did any of the monies go to William S. Poff in other ways?

10   A    I have no direct knowledge of that.

11   Q    No direct knowledge.  Okay, sir.  In your investigation did

12   you have to figure out how I directly benefited from this?

13   A    Myself or other investigators?

14   Q    Yourself, sir.

15   A    No.

16   Q    So the original nexus that brought me into this investigation

17   was because I was married to Alexis Ikilikyan?

18   A    No.  I would state the original nexus was seeing your name on

19   numerous real estate documents that were under investigation.

20   Q    And those were the deeds of trust, the different documents

21   that I had notarized, basically?

22   A    That's correct.

23   Q    Now, as an ICE agent you are under the Department of Justice

24   then; is that correct, sir?

25   A    No.  The Department of Homeland Security.

```
 1   Q    You are under the Department of Homeland Security.
 2            THE DEFENDANT:  I believe that is all my questions at
 3   this time, your Honor.
 4            THE COURT:  All right.  Redirect, counsel.
 5                         REDIRECT EXAMINATION
 6   By Ms. Vogel:
 7   Q    Agent, can you look, please, at Exhibit 121?  This is a 1003
 8   form that I believe the defendant just referred to.  How many of
 9   these 1003 forms like this did you review as part of this
10   investigation?  Can you give us an estimate?
11   A    Two or three dozen.
12   Q    Do you remember who was listed as the interviewer on each of
13   them?
14   A    Not exactly.
15   Q    The defendant asked you if William S. Poff or William Poff
16   was listed on certain documents.  Up until the last few days, has
17   that been a focus of your investigation, whether the name was
18   signed William Poff or William S. Poff or some other derivative?
19   A    No.
20   Q    How sure are you, now that you think back and ask yourself
21   that question, on what documents the signature was William Poff
22   and what documents the signature was William S. Poff, and what
23   documents it might have been Bill Poff?  How certain are you in
24   your mind you know which is which on which document?
25   A    I do not know how each document was signed.
```

1  Q    Has that been a focus of your conscious inquiry up until just

2  the last few days?

3  A    No.

4  Q    If you would look, please, at Exhibit 121, which I do believe

5  was admitted yesterday.  If you would look at page 3.  If we

6  could focus in on the bottom half of this 1003.  What is the name

7  that is listed in the interviewer box?

8  A    Bill Poff.

9  Q    Does that also appear to be the name that was signed?

10 A    Yes.

11 Q    So earlier when you testified that there were 1003s with the

12 name William Poff on it, were you referring to other documents

13 other than this, or what documents were you referring to?

14 A    I was referring to the numerous 1003s or loan applications

15 where I had seen the name Bill Poff, or believe I had seen the

16 name William Poff as well.

17 Q    When the defendant asked you about William Poff, was it your

18 understanding that he was referring to Bill Poff as well?

19 A    I understand it to be the same.

20 Q    The defendant asked you about how he came to your attention.

21 You mentioned that there were documents with his name on them,

22 and you specifically mentioned notarized documents.  What other

23 types of documents, in addition to deeds, have you seen the

24 defendant's notarization on?

25 A    On numerous real estate documents contained in lender

1  packages related to particular transactions.

2  Q    Would those also include real estate or loan documents

3  between the buyer and the private seller?

4  A    Yes.

5  Q    It wasn't just original deeds?

6  A    That's correct.

7          MS. VOGEL:  Nothing further.

8          THE COURT:  Recross.

9                      RECROSS-EXAMINATION

10  By the Defendant:

11  Q    You spent four years in the Navy, correct, sir?

12  A    Four years active duty.

13  Q    And then four years Reserve time?

14  A    Yes.

15  Q    A total of eight years serving your country.  Now, the

16  military is pretty specific on how you call your name.  They have

17  something called a payroll signature.  Can you tell me what a

18  payroll signature is?  Are you familiar with that?

19  A    I'm not.

20  Q    I guess it must be an inter-service thing here.  When you go

21  into the military, they tell you to basically sign your full

22  legal name, correct?  You basically use your middle initial.  Is

23  that how you were taught to sign your name in the Navy?

24  A    I do not recall.

25  Q    You do not recall how they required you to sign the contracts

1   and legal forms in the military?

2   A    No.  It has been a while.

3   Q    It must be something between the services, because I know in

4   the Marine Corps we were taught -- I guess we are kind of a

5   different breed, we were taught to always sign our payroll

6   signature, which for me would have been William S. Poff.

7        In the evidence, most of the places where there was a

8   legitimate notary made by William S. Poff, it was that so-called

9   payroll signature that he was told, trained and basically

10  indoctrinated to make.

11       Is that what you have noticed in the evidence, where it was

12  actually my signature?

13  A    I noticed in the evidence, when you are referring to the

14  notaries, William S. Poff.  That sounds familiar.

15  Q    Very well.  Was there -- in your recollection, was there any

16  loan applications with what I call the payroll signature, any

17  applications with the signature of William S. Poff, how he

18  normally signs his name on any of the 1003s you have reviewed, or

19  do you not recall?

20  A    I would answer no to that.  I would like to review the

21  documents to confirm that answer.

22            THE DEFENDANT:  Very well.  Thank you, sir.

23            THE COURT:  Anything further, counsel?

24            MS. VOGEL:  No, your Honor.

25            THE COURT:  You may step down.  The government may call

```
 1    its next witness.
 2              MS. VOGEL:  The United States calls Alexis Ikilikyan.
 3    Whereupon,
 4                          ALEXIS IKILIKYAN
 5    Called as a witness, having been first duly sworn, was examined
 6    and testified as follows:
 7              THE CLERK:  Will you state your name for the record and
 8    spell your last name, please.
 9              THE WITNESS:  Alexis Ikilikyan, I-K-I-L-I-K-Y-A-N.
10              THE COURT:  You may inquire.
11                         DIRECT EXAMINATION
12    By Ms. Vogel:
13    Q   Ms. Ikilikyan, have you ever used a different first name?
14    A   Yes, Haikanush Ikilikyan.
15    Q   Can you spell Haikanush, please?
16    A   H-A-I-K-A-N-U-S-H.
17    Q   Why did you use that other first name?
18    A   Haikanush was my legal name.  Alexis was later -- I added
19    Alexis as a first name.  Haikanush became my legal middle name.
20    Q   At some point did you change your name legally?
21    A   Yes, I did.
22    Q   When was that?
23    A   I don't remember the month.  It was the year 2006, ma'am.
24    Q   In what city do you live?
25    A   Auburn, Washington.
```

1    Q    Are you acquainted with the defendant, William Poff?

2    A    Yes, I am.

3    Q    What name do you know him by?

4    A    Bill Poff.

5    Q    How do you know the defendant, Mr. Poff?

6    A    Bill Poff and I were married.

7    Q    How did your relationship begin?

8    A    Bill Poff and I met online in the year 2000, April.  In the

9    year 2003, December, Bill Poff and I got married.

10   Q    Are you still married?

11   A    No.

12   Q    When did the marriage end?

13   A    August, 2008.

14   Q    And were you separated for some time period before you were

15   divorced?

16   A    Yes, ma'am, the end of April we were separated legally.

17   Q    Of what year?

18   A    2008.

19   Q    Ms. Ikilikyan, how old are you?

20   A    I am 30 years old.

21   Q    How old were you when you got married?

22   A    Twenty-four, ma'am.

23   Q    How old was the defendant, Mr. Poff, when you got married?

24   A    He was eight years older, so 32.  I am speculating, ma'am.

25   About 32, I think.

1    Q    Ms. Ikilikyan, where were you born?

2    A    I was born in Yerevan, Armenia.

3    Q    Can you spell that?

4    A    Y-E-R-E-V-A-N, A-R-M-E-N-I-A.

5    Q    And when did you come to the United States from Armenia?

6    A    In 1993.  April of 1993.

7    Q    So how old were you?

8    A    I was 14 years old.

9    Q    What is your citizenship?

10   A    I am a U.S. citizen.

11   Q    What is your current marital status?

12   A    I am currently married.

13   Q    Do you have any children?

14   A    I have one four-month-old infant.

15   Q    Ms. Ikilikyan, did your relationship with your current

16   husband begin before or after your final divorce from the

17   defendant, Mr. Poff?

18   A    Before, ma'am.

19   Q    How many years of education have you had?

20   A    I have 16 years, ma'am.

21   Q    So you have some college or community college?

22   A    Yes, I do.

23   Q    What area was that in?

24   A    An Associate's degree in criminal justice, public

25   administration and a Bachelor's degree.

1    Q    Do you hold any professional licenses or degrees?

2    A    I used to, ma'am.

3    Q    And what area were those?

4    A    It was mortgage broker and real estate broker.

5    Q    Have you ever served in the United States military?

6    A    Yes, ma'am, from 2001 until 2009.

7    Q    And what branch?

8    A    United States Marine Corps.

9    Q    And was that active duty or reserve duty?

10   A    It was reserve, ma'am.

11   Q    What was your rank in the United States Marine Corps?

12   A    Sergeant, E-5.

13   Q    What was your job description?

14   A    Administration.

15   Q    What is your current military status?

16   A    I am currently out of the military.

17   Q    And what was the nature of your separation?

18   A    Actually this case affected it, ma'am.  And it was time to

19   move on since I had a child.

20   Q    Ms. Ikilikyan, have you ever purchased any real estate?

21   A    Yes, ma'am.

22   Q    How many properties have you purchased?

23   A    Total, with myself and including straw buyers, 27 properties,

24   ma'am.

25   Q    And where were those properties?

```
 1   A    All across King, Pierce, Thurston County.

 2   Q    Were there any that were outside the Western District of

 3   Washington?

 4   A    There was one in Spokane.

 5   Q    And what year did you buy your first property?

 6   A    The first property was November of 2001.

 7   Q    What year did you buy your last property, the most recent?

 8   A    It was January of 2008.

 9   Q    So between November of 2001 and January of 2008, you bought

10   all 27 pieces of real estate?

11   A    Yes, ma'am.

12   Q    And what type of real estate was that?

13   A    All of them were residential properties, ma'am.  There was

14   only one that was considered commercial, an eight-plex.

15   Q    When you say eight-plex, what do you mean?

16   A    Eight units, apartments, a complex.

17   Q    Were all of those properties purchased in your own name?

18   A    No, ma'am.  Most of them were in my name, but the rest of

19   them were in straw buyers' names, including my own mother.

20   Q    Let's look at Exhibit 2, please.  Do you recognize the

21   photograph of your mother on this chart?

22   A    Yes, ma'am.

23   Q    And can you describe which photograph it is?

24               THE COURT:  You can actually touch the screen.

25               MS. VOGEL:  It hasn't been working very well lately.
```

```
1    Top line or bottom line.
2              THE WITNESS:  Bottom line.
3              MS. VOGEL:  I have to --
4              THE COURT:  The features are controlled from your unit.
5    Why don't you describe for us where it is on the page?  We will
6    do it that way.
7              THE WITNESS:  Yes, your Honor.  She is bottom left of
8    the page.
9    By Ms. Vogel:
10   Q    What is your mother's name?
11   A    Armenuhi Harutyunyan, A-R-M-E-N-U-H-I, H-A-R-U-T-Y-U-N-Y-A-N.
12   Q    Were there other people in whose names you bought real
13   estate?
14   A    Yes, ma'am.
15   Q    And how many other people?
16   A    There were three other people.
17   Q    Is one of those people pictured on Exhibit 2?
18   A    Yes, ma'am.
19   Q    And what is that person's name?
20   A    His name is Tony Reyes.
21   Q    You bought property in Tony Reyes' name?
22   A    I'm sorry.  Tim Thomson.  I'm sorry.
23   Q    Did you engage in real estate transactions with Tony Reyes?
24   A    Yes.
25   Q    So the person you engaged in purchasing properties is whom?
```

1   A   Tim Thomson.

2   Q   Is that the person on the bottom right of the screen?

3   A   Yes.

4   Q   And two other people as well you said?

5   A   There were two other people.  Two other people that are not

6   mentioned -- I don't see pictured here.

7   Q   Can you look, please, at Exhibit 1, our property and counts

8   chart?  That is also the large chart that is up on the easel

9   there.  Have you seen that chart before?

10  A   Yes, I have.

11  Q   And are each of the addresses on this chart properties that

12  you purchased, either in your own name or someone else's name?

13  A   Yes, ma'am.

14  Q   So are these eight properties eight of the 27 you mentioned

15  earlier?

16  A   Yes, ma'am.

17  Q   Ms. Ikilikyan, was anyone else involved in the decision to

18  purchase these eight, and the additional properties that you just

19  mentioned?

20  A   Yes, ma'am.

21  Q   Who was that?

22  A   Co-defendant William Poff.

23  Q   At the time that you purchased all of these properties, what

24  was your marital status?

25  A   We were married then.

1    Q    You were married to whom?

2    A    To William Poff.

3    Q    At the time you purchased all of these properties, all 27,

4    what was your living arrangement?

5    A    We were living together.

6    Q    Specifically, Ms. Ikilikyan, whose idea was it to buy all 27

7    of these properties?

8    A    William Poff.

9    Q    What was your understanding of the reason why the defendant,

10   Mr. Poff, wanted to buy all these properties?

11   A    His idea was that if you acquire a lot of properties, and

12   figure out a way to maintain it, as in pay for it and maintain

13   it, it would be a great tax write-off.  In a few years the

14   advantage would be high, where the properties would be worth a

15   lot more.  And it would just be great advantage to -- it is a

16   good way to make money.

17   Q    How many properties did you and the defendant buy that were

18   in the defendant's name, Mr. Poff's name?

19   A    He has no properties in his name.

20   Q    And why is that?

21   A    He told me that he had bad credit, and he also had debt that

22   he didn't want to -- he wouldn't qualify because of the debt.

23   Q    Understanding that you may have used your credit to be the

24   borrower to buy property, was the defendant, Mr. Poff's name ever

25   listed as a co-owner as a result of your marital status?

```
 1   A    Yes, ma'am.  He was 50 percent owner of every property that I
 2   had.
 3   Q    Was his name actually listed on any of the deeds as a
 4   co-owner?
 5   A    There was one very last -- it was a mobile home in Yelm that
 6   he actually signed half -- as a co-borrower.  That is the only
 7   one I remember, ma'am.
 8   Q    So can you explain to us why the defendant, Mr. Poff, if you
 9   know, didn't put his name on the deeds as co-owner if the
10   objection had to do with his lack of credit?
11   A    He also mentioned that there were issues of child discrepancy
12   (sic).  He did not want child support discrepancy (sic).  He did
13   not want his name on the properties.
14   Q    When you mentioned child support, what child does that have
15   to do with, your child or someone else?
16   A    His.
17             THE DEFENDANT:  Object.  Irrelevant, your Honor.
18             THE COURT:  Overruled.
19   By Ms. Vogel:
20   Q    You may answer.
21   A    His previous children.  Him and I didn't ever have children
22   together.
23   Q    How would the defendant, Mr. Poff, keep his name off the
24   title when you would purchase property in your name, since this
25   is a community property state?
```

1    A    Most of the lenders required him to sign a quitclaim deed at

2    escrow quitclaiming his interest off.

3    Q    Despite those quitclaim deeds, what was your understanding as

4    to who really owned all of those houses?

5    A    We both did.

6    Q    And by "we both," who do you mean?

7    A    The defendant William Poff and myself.

8    Q    Ms. Ikilikyan, when you and the defendant, Mr. Poff, bought

9    properties in other people's names, including your mother's, how

10   knowledgeable were those other people about whether their name

11   was being used?

12   A    Other people, other than my mom, they did know that their

13   names were being used.  We did have their permission.  My mother

14   gave us a general permission, as to if we needed her help, she

15   would make herself available.  That meant we had her permission,

16   that not each and every time we didn't have to call and ask her.

17   It was very much understood, anything you guys need, I will help

18   you.

19   Q    Why did you use other people's names?

20   A    The way it was explained to me by my co-defendant, there came

21   a time where you no longer qualify for specific loans.  A lot of

22   banks have limits as to how many properties you are able to

23   borrow money for.  So it was easier.

24   Q    When you purchased properties in other people's names,

25   including your mother's, what was your understanding of who

```
 1   really owned those properties?
 2   A    The co-defendant and myself.
 3   Q    How many of the 27 properties that you and the defendant
 4   purchased do you still own?
 5   A    I believe it is nine, ma'am.
 6   Q    What happened to the properties that you no longer own?
 7   A    Most of them have gone into foreclosure.
 8   Q    And what is happening with the properties that you do still
 9   own?
10   A    They are on the way to being foreclosed upon as well.
11   Q    Were there some that were sold before they went into
12   foreclosure?
13   A    There were a few properties that were sold, yes, ma'am, long
14   before the payments were stopped being made.
15   Q    For the ones that were sold, who got the proceeds from those
16   sales?
17   A    The co-defendant and myself did.
18              THE DEFENDANT:  I object, your Honor.
19              THE COURT:  The basis?
20              THE DEFENDANT:  The basis is that the only time that the
21   alleged co-defendant received any money out of these transactions
22   was as a result of the divorce.  The question makes it sound like
23   I received money --
24              THE COURT:  That's actually --
25              THE DEFENDANT:  I retract that objection, your Honor.
```

By Ms. Vogel:

Q    Generally speaking, Ms. Ikilikyan, how did you and the defendant pay for all these properties?

A    Out of an account -- specific account, what used to be Washington Mutual.  It was a general account that all the loan proceeds went into.  The money came out of that account, ma'am.

Q    Are you talking about the monthly mortgage payment?

A    Yes.

Q    I am asking you more generally, how did you come to be able to afford all these properties?  How did you buy them in the first place?

A    One of the ways that we were able to buy them is, the co-defendant had figured out a way to get money out of each and every -- most each and every loan, and that was the only way we could have acquired this many properties, and keep buying more. So other loans would pay for the other properties.

Q    When you say "the co-defendant," who are you referring to?

A    William Poff.

Q    How were you and the defendant able to obtain all of these loans to buy all of these properties?

A    The co-defendant, he had access to -- he was a loan officer, and he was able to get stated loans with inflated income.  Just different ways that he would qualify me to purchase these properties.

Q    And by "the co-defendant," again, are you talking about

1    Mr. Poff, the defendant, to be clear?

2    A    Yes, definitely.

3    Q    To be blunt, Ms. Ikilikyan, how truthful were you and the

4    defendant when it came to getting these loans?

5    A    Not very.

6    Q    Can you give us generally an idea of what sort of categories

7    or types of untruths you and the defendant used to get these

8    loans?

9    A    Yes, ma'am.  Some of them we applied for the loans as owner

10   occupied, when in fact we didn't intend to occupy that residence.

11   Incomes were inflated, the names of the defendants were

12   disguised, so the bank really truly didn't know who owned it,

13   whether it was the straw buyer or who.  Those were --

14   Q    How truthful were you and the defendant in getting these

15   loans when it came to purchase price?

16   A    Purchase price as well.  The purchase price was also

17   inflated.  It wasn't the actual price.  It was the negotiated,

18   inflated price to make the loan easier to qualify.

19   Q    And how truthful were you and the defendant in getting these

20   loans when it came to representing down payments or sources of

21   down payments?

22   A    That's another area where the banks thought a certain amount

23   was going to be brought in, but in actuality most of the cases no

24   funds were brought in.

25   Q    How truthful were you and the defendant in getting these

1  loans when it came to representing the total number or the total

2  amount of dollars in loans that were being obtained?

3  A    A lot of times it was -- the banks were under the impression

4  that more money was coming in in rents, via inflated lease

5  agreements, to qualify -- to make it easier to qualify for the

6  loan.

7  Q    And what about side seller financing agreements, how truthful

8  were you with the banks about whether those existed?

9  A    Almost never was seller financing disclosed to the bank.

10 Q    How truthful were you with the lenders in getting these loans

11 about where the money went after closing?

12 A    I'm sorry?

13 Q    How truthful were you and the defendant in the process of

14 obtaining these loans on the subject of where the actual money

15 was going after closing?

16 A    Yes, ma'am.  A lot of times the banks were under the

17 impression that certain receipts were getting paid or certain

18 companies were getting paid, and in actuality it was Bill Poff

19 and myself getting paid.

20 Q    Ms. Ikilikyan, specifically for each of the eight properties

21 that are listed on this chart, Exhibit 1 --  I just want to focus

22 you in on these eight properties out of the 27 now.  Who was the

23 person that handled getting the financing for each of those eight

24 properties, or persons if there was more than one?

25 A    The first five was Bill Poff.  Number six was America One

1   Finance.  Number seven did not have a loan.  Number eight, it was

2   America One Finance.

3   Q    And in the instances where financing was handled by America

4   One Financing, who was the person or persons among you and the

5   defendant who provided information to America One Financing?

6   A    For the most part, when it came to income and everything

7   else, it was Bill Poff.

8   Q    What was your role then in these transactions?

9   A    If an e-mail came in where America One Finance needed

10  something faxed or a phone call made or a specific piece of

11  evidence (sic) faxed into us, the clerical duties was something I

12  would take care of.

13  Q    And from whom did you get your directions on what clerical

14  duties you would perform?

15  A    Bill Poff.

16  Q    Now, your role wasn't limited just to clerical duties.  What

17  other roles did you perform on the real estate side?

18  A    On the real estate side, for the most part I was the one who

19  completed the purchase and sale agreements.

20  Q    Ms. Ikilikyan, what was your profession back in the year

21  2000, when you first met the defendant, Mr. Poff?

22  A    I was a full-time student, ma'am.

23  Q    And what was the defendant Mr. Poff's profession when you

24  first met him?

25  A    He was in the United States Marine Corps.

1    Q    Do you know what his job was in the Marine Corps?

2    A    Yes.  At the time he was a journalist, a marketing --

3    Q    Is he still in the United States Marine Corps?

4    A    No, he is not.

5    Q    When approximately did he separate?

6    A    He told me he approximately separated August of 2000.

7    Q    What did the defendant Mr. Poff do for a living immediately

8    after that?

9    A    Immediately after that he worked for a marketing company in

10   Seattle.

11   Q    And how long did that job last?

12   A    I believe a few months.

13   Q    And what did he do for a living after that?

14   A    He started learning loans for a broker in University Place,

15   Washington.  His name was Robert Warnock.

16   Q    When you say "learning loans," what do you mean?

17   A    Robert Warnock had expressed to Bill that Bill would do great

18   in loans and sales.  So he offered him to come in, and he would

19   show him the ropes, so to speak.  He would show him the

20   profession, and in turn he would get half the commission of the

21   loans that he would close with Robert Warnock.

22   Q    Approximately how long did that job last for Mr. Poff?

23   A    I would be speculating, but under a year, ma'am.

24   Q    What did Mr. Poff do for a living after he stopped working

25   doing loans with Robert Warnock?

1    A    He wanted to continue doing loans, so I believe that's when

2    he and I went to Cyber One Mortgage, spoke with a broker and

3    asked them if we could use their license and be loan officers.

4              THE DEFENDANT:  Objection to what she believes.

5              THE WITNESS:  That's what we did.

6              THE COURT:  Why don't you rephrase your question.

7    By Ms. Vogel:

8    Q    Can you give us an approximation of what --  My question I

9    think was, what did Mr. Poff do for a living after he stopped

10   working with Robert Warnock?

11   A    He continued to be a loan officer.

12   Q    And for what company did he work?

13   A    Cyber One Mortgage.

14   Q    And do you know approximately when it was that he went to

15   work there?

16   A    Approximately, I would say --  Can I speculate and say --

17   Q    Give us your best estimation.

18   A    Between 2002 and 2003, ma'am.

19   Q    Did you eventually follow the defendant, Mr. Poff, into the

20   real estate profession?

21   A    Yes, I did, ma'am.

22   Q    And why did you choose to go into real estate as a

23   profession?

24   A    For one thing, he always mentioned that this is a good fit, I

25   could do the real estate and he could do the loans.  It is

```
 1   better -- the money was better essentially.  At first I was not
 2   interested, but I came to be very interested after we closed two
 3   properties that we bought together.
 4   Q    We will talk about that in a second.  When was it that you
 5   decided to go into real estate?
 6   A    I got my first real estate license in August of 2003.
 7   Q    Ms. Ikilikyan, at that time, August of 2003, when you got
 8   your first real estate license, where were you and the defendant
 9   living?
10   A    We were living with my mother in Bellevue, Washington.
11   Q    And what sort of housing were you living in?
12   A    We were living in Section 8 housing.
13   Q    Is that an apartment?
14   A    Yes.
15   Q    And by "Section 8," what do you mean?
16   A    It is government -- I believe it is -- where they held the
17   low income families.
18   Q    How many people, in addition to yourself and the defendant,
19   Mr. Poff, were living in that apartment?
20   A    Two more, ma'am.
21   Q    And who were they?
22   A    My mother and my brother.
23   Q    And when you say "your mother," is that Armenuhi Harutyunyan,
24   the person whose photo we saw?
25   A    Yes, ma'am.
```

1    Q    Does your mother still live in that Section 8 apartment

2    housing in Bellevue?

3    A    Yes, she does, ma'am.

4    Q    At any point between, let's say, 2000 and mid 2008, did your

5    mother move out of that Section 8 housing?

6    A    Not once, ma'am.

7    Q    You mentioned a moment ago that you changed your mind about

8    going into real estate after you bought a house.  Can you explain

9    to us what happened and how that changed your mind?

10   A    Yes, ma'am.  The first two -- I would like to say, not the

11   first two, but the first two investment properties that we

12   actually purchased, I noticed that the commissions were a good

13   amount.  At the time, I personally wasn't too involved in making

14   money, so I thought this is something I could do to help our

15   family.

16   Q    And when was it that you bought those first houses?  Was it

17   before or after you got your real estate license?

18   A    Before.

19   Q    And for those first two investment houses, whose idea was it

20   to buy them?

21   A    It was Bill Poff.

22   Q    Who was the buyer on paper?

23   A    I was.

24   Q    Prior to that, had you ever purchased a house?

25   A    There was another house we actually purchased to live in, to

1    occupy.

2    Q    Where were you working at the time you and the defendant

3    bought those first few houses, before you got the real estate

4    license?

5    A    Well, when we went to Cyber One, I was supposed to be the

6    loan officer officially, but in actuality I was not working.  Oh,

7    just the Marine Corps, I'm sorry.  Just the Reserves.

8    Q    The Marine Corps Reserve?

9    A    Yes.

10   Q    Can you give us an estimate of what your income was from the

11   Marine Corps Reserves?

12   A    Less than $100 a month.

13   Q    Did you have any other sources of income at that time?

14   A    Maybe student loans.

15   Q    How is it you were able to buy two investment homes in your

16   name?

17   A    Since I had very good credit, Bill Poff had found a way where

18   you just state your income -- just inflate your income, and you

19   would qualify for the loan.

20   Q    After you decided to get your real estate license, did you

21   indeed work as a real estate agent?

22   A    Yes, I did.

23   Q    For what agency?

24   A    For Dove Realty.

25   Q    And approximately what dates did you work for Dove Realty?

```
1    A    It was, I believe, 2003 until 2006.
2    Q    During that time period that you worked for Dove Realty, were
3    some of the properties you were involved in -- some of the
4    transactions you were involved in among the 27 that you have
5    described earlier?
6    A    Yes, ma'am.
7    Q    Once you started working at Dove Realty --  I'm sorry.  Let
8    me rephrase that.  You mentioned earlier the defendant was
9    working for Cyber One.  At some point did he switch to another
10   loan brokerage?
11   A    Yes.
12   Q    What was that?
13   A    Victory Home Mortgage.
14   Q    And do you remember approximately when that was?
15   A    That date is unclear, ma'am.  It was after Cyber One.
16   Q    Who owns the business Victory Home Mortgage?
17   A    It is believed Dan Truini.
18   Q    When you say "it is believed" --
19   A    Dan Truini.
20   Q    How do you spell Truini?
21   A    T-R-U-I-N-I.
22   Q    At some point did you seek an additional real estate related
23   license?
24   A    Yes, ma'am.
25   Q    What were those?
```

1   A    That's when I received -- I went to school and got my

2   broker's license, took the test with the State, and also U.S.

3   mortgage license.  The dates were February of 2006 for the

4   mortgage, and April of 2006 for U.S. realty.

5   Q    So there were two licenses.  Can you tell us again what they

6   were?

7   A    Yes.  The mortgage broker's license, which was obtained

8   February of 2006, and the real estate broker's license was

9   obtained April of 2006.

10  Q    And why is it that you decided to go back to school and get

11  these two licenses?

12  A    For the mortgage broker's license, Bill was having a lot of

13  problems with the brokers that he was working with.  Actually,

14  one broker he was working with, Victory Home Mortgage.  Victory

15  Home Mortgage had asked him to stop doing loans in their name.

16  He just thought -- we both thought it would be easier if we just

17  have our own company, then we don't have to answer to anybody

18  else as a broker.

19  Q    So once you obtained your mortgage broker license, what did

20  you do?

21  A    Then we started continuing -- buying properties, except for

22  this time it was in our company's name instead of the other

23  brokers' names.

24  Q    What was the name of the company you and the defendant opened

25  as a mortgage brokerage?

1   A   U.S. Mortgage and Investments, LLC.

2   Q   And after you obtained your real estate broker's license in

3   February of 2006, what company did you open?

4   A   U.S. Realty and Investments, LLC.

5   Q   Did you continue working for Dove Mortgage after that?

6   A   No.  That's when I became -- I moved on from Dove to our own

7   company.

8   Q   Whose name were both of these businesses, U.S. Realty and

9   Investments, and U.S. Mortgage and Investments, in?

10   A   It was solely in my name.

11   Q   And why was that?

12   A   Again, Bill Poff did not want to show income.

13   Q   Who else worked as employees of either of these businesses,

14   U.S. Realty and Investment or U.S. Mortgage and Investment?

15   A   For U.S. Realty and Investments there was -- one of the loan

16   officers expressed an interest to use our license, and he

17   proceeded to fill out the paperwork.  But that's as far as it

18   went.  We told him that it is probably not a good idea, and we

19   are not interested in having loan officers.  So other than that,

20   nobody else.

21   Q   Who was the loan officer then for all the loans brokered

22   through U.S. Mortgage and Investment?

23   A   Bill Poff.

24   Q   Is that the defendant?

25   A   Yes.

Q    And who was the loan processor for all the loans brokered
through U.S. Loan and Investment (sic)?

A    Bill Poff.

Q    What did you pay the defendant as his salary for his work for
U.S. Loan and Investment?

A    Nothing.

Q    What sort of commissions did he earn for his work as a loan
officer with U.S. Loan and Investment?

A    No commissions.

Q    Why didn't you pay him anything?

A    Any and all proceeds from the loans came to that general
account that was -- even though it was solely in my name, that is
the salary that him and I both lived on.

Q    Now, at some point did you and the defendant stop processing
loans through U.S. Loan and Investment?

A    Yes.

Q    Can you tell us approximately when it happened?

A    It was right around the time of 2007, is when the State
required that every loan officer be licensed.  That's when Bill
Poff stopped doing loans all together.

Q    And so after that occurred, where did you start processing
loans through?

A    We started using America One Finance to close the
transactions.

Q    Was either of you registered with America One Finance as a

```
 1   loan officer?

 2   A    Yes, ma'am.

 3   Q    Which of you or who?

 4   A    I was.

 5   Q    And why was that?

 6   A    Again, the same concept, he did not want his name anywhere on

 7   anything, including a person that showed to receive any type of

 8   income.

 9   Q    When you registered as a loan officer with America One

10   Finance, who did you believe was the person who would actually be

11   doing the loan officer work?

12   A    Bill Poff.

13   Q    Can you give us an idea of how many loans, if any, you and

14   the defendant actually obtained through America One Finance?

15   A    I would like to say, speculating, under ten loans.

16   Q    Speculating means you are wildly guessing.  Are you giving us

17   your best estimate, or are you wildly guessing?

18   A    Not too wildly guessing.

19   Q    Can you give us a range you feel confident maybe the number

20   falls within?

21   A    Sure.  There was one, two, three, four -- two in this are

22   coming to mind.  There was a second mortgage, and I believe a

23   refinance.  Those numbers are really -- those properties are

24   coming to me strongly.  The rest of them, I don't want to say

25   four and have it be six or seven.  I do know it didn't exceed
```

```
 1   ten, I don't think.
 2   Q    So maybe somewhere between four and ten; is that fair?
 3   A    Yes, ma'am.
 4   Q    Were some of those loans for purchases of property bought by
 5   yourself and the defendant?
 6   A    Yes, ma'am.
 7   Q    Who was the person you and the defendant primarily dealt with
 8   at America One Finance?
 9   A    It was 50/50, ma'am.  Tony Reyes --  The properties that were
10   purchased for ourselves, Tony Reyes was the loan officer on
11   paper.  But the most person that we really spoke with was Emil
12   Anderson, who was believed to be the processor for America One
13   Finance.
14   Q    How were you first introduced to America One Finance?
15   A    Through Tony Reyes.
16   Q    If we could look at Exhibit 2, please?  Is Mr. Reyes pictured
17   on this chart?
18   A    Yes, ma'am.  The top very right corner.
19   Q    What is your relationship with Mr. Reyes?
20   A    He was co-agent.  All three of us bought properties together,
21   even though straw buyers were being used.  He was a friend and
22   fellow loan officer.
23   Q    When you say "co-agent," what do you mean?
24   A    Sometimes -- like four properties I can think of where my
25   name -- I cannot be the actual agent on paper, but Tony Reyes
```

1    agreed to be the agent.  So he would fulfill the conditions for

2    the banks.  Him and I worked together as agents.

3    Q    Were there also instances where you and Mr. Reyes bought or

4    sold properties to or from each other?

5    A    Yes, ma'am.

6    Q    Can you give us an idea of how many times that happened?

7    A    Five or six properties.

8    Q    During the time period that you and the defendant were

9    getting loans through America One Finance, and for those loans

10   where you were actually the buyer, who would be your loan officer

11   on paper?

12   A    Tony Reyes.

13   Q    And why is that?

14   A    Because I couldn't --  The way it was understood to me, you

15   can't be the buyer -- the person qualifying for the loan and the

16   loan officer on paper.

17   Q    And in those instances where Mr. Reyes was the loan officer

18   on paper, who was it that actually did the loan officer work,

19   such as filling out the application?

20   A    Bill Poff.

21   Q    Are you still working with America One Finance today?

22   A    No, I'm not, ma'am.

23   Q    When did you and the defendant stop working with America One

24   Finance?

25   A    Right after the purchase of 3825 South 345th Street.  I'm

1  sorry.  I take that back.  There was one other loan that was

2  acquired through America One Finance.  I believe it was August

3  of 2008, and after that.

4  Q   So none after 2008?

5  A   No.

6  Q   Ms. Ikilikyan, to your knowledge what professional licenses

7  does the defendant or did the defendant, Mr. Poff, have?

8  A   Bill Poff has -- had a notary license.

9  Q   Are you also a licensed notary in the State of Washington?

10 A   I used to be, ma'am.

11 Q   Can you explain to us what a notary allows you to do -- a

12 notary license allows you to do?

13 A   In my opinion, a notary -- a person who holds the notary

14 license is somebody who watches a third-party sign paperwork, and

15 they acknowledge that they have signed at a specific place and

16 location, and they notarize their signature.

17 Q   Is there some sort of stamp or seal that goes along with

18 that?

19 A   Yes.

20 Q   Did Mr. Poff have one of those?

21 A   Yes, he did.

22 Q   Do you know why the defendant wanted to be a notary?

23 A   A lot of times --  The clients that we had, a lot of times

24 they had specific job schedules where they were off after 5:00,

25 and Great American Escrow and other companies were closed at that

1    time.  So it made it convenient for Bill Poff and myself to meet

2    with the clients to sign them after hours, weekends, whereas

3    companies were limited to -- as to what hours they are open.

4    Q    Was there any way to make money from being a notary?

5    A    Yes, ma'am.  He actually did have a little side job with --

6    he signed -- it was believed -- he signed up with a company

7    online, where he would notarize loan paperwork for different

8    companies.  And he would get a fee for each time that he signed

9    and notarized that paperwork.

10   Q    Can you give us an idea, if you know, how much money Mr. Poff

11   made from this side notary business?

12   A    I would be speculating, and say that it was probably one or

13   $2,000 a year.

14            THE DEFENDANT:  Objection.  Speculation.

15            THE COURT:  Sustained.

16   By Ms. Vogel:

17   Q    Ms. Ikilikyan, I don't want you to speculate.  If you don't

18   know precise figures, it is okay for you to give us your best

19   estimate, if you know?

20   A    Yes, ma'am.  It was approximately up to $100 per signing, and

21   he did one signing every few months.

22   Q    How often did you use your notary license?

23   A    I don't believe I used it very much, but I have used my

24   notary before.

25   Q    Why is it that you didn't use yours?

A    I was namely the purchaser and the buyer of these properties.
There was just no need.

Q    To your knowledge did the defendant, Mr. Poff, ever become a
mortgage loan officer or get a broker license?

A    He did not, ma'am.

Q    Are you aware of whether he ever sought a license?

A    He did not, no.  I started the process for him, but he did
not wish to continue.  The application was made but not followed
up with.

Q    Throughout this entire period that we have been discussing
that you worked with the defendant, Mr. Poff, in the mortgage
loan field, up until you separated, what other jobs or
professions, other than doing loans, did the defendant, Mr. Poff,
engage in?

A    He did not have any other jobs, ma'am.

Q    Other than that side notary business?

A    Yes.  No other jobs.

Q    Ms. Ikilikyan, have you ever personally obtained a business
license in the State of Washington?

A    Me personally?  Applied for?  No.

Q    How familiar are you with the process of registering a
business with the State of Washington?

A    I'm not.

Q    Are you familiar with the name Fidelis Enterprises?

A    Yes, ma'am.

Q    What is that?

A    It is a business licenses that Bill Poff had started for me.

Q    When approximately was that?

A    I would like to say 2002.

Q    And you don't sound entirely sure.  Is that your best estimate?

A    Between 2002 and 2003.

Q    And who owns this business, Fidelis Enterprises?

A    I do, ma'am.

Q    What business has Fidelis Enterprises conducted?

A    No business at all.

Q    What business has Fidelis Enterprises generated?

A    None.

Q    Why was Fidelis Enterprises registered?

A    It was registered to qualify stated loans.

Q    Are you familiar with the name Hay Computer Networking & Consulting?

A    Yes, ma'am.

Q    What is that?

A    The same business license for my mother was created by Bill Poff to qualify for the same type of loans for my mother.

Q    How do you know it was created by the defendant, Mr. Poff?

A    Everything that had to do with loans, for the most part, creating paperwork, businesses, was created by Bill Poff.

Q    Did you ever have any discussions with the defendant,

1   Mr. Poff, about creating Hay Computer Networking and Consulting?

2   A   Yes.

3   Q   Who is the owner of this business?

4   A   It is Armenuhi Harutyunyan, my mother.

5   Q   Why was Hay Computer Networking & Consulting established?

6   A   To qualify for stated loans only.

7   Q   What was the State of Washington told about when Hay Computer

8   Networking & Consulting began doing business?

9   A   Two years prior than the actual date that the license was

10   created.

11   Q   And why is that?

12   A   To backdate the license, because one of the qualifications

13   for the bank was that the business license would have to be two

14   years or older.

15   Q   Let me back up.  What revenue was Hay Computer Networking &

16   Consulting generating?

17   A   No revenue at all.

18   Q   What income did your mother realize from this business?

19   A   She never realized income from it.

20   Q   Why a computer business?

21   A   It was explained to me by Bill Poff that there are certain

22   professions that lenders don't ask any more questions to, such as

23   landscaping or computers.  Otherwise if he would have put general

24   contracting, they would require a professional license and other

25   forms of -- people who vouch for the business.  It was just

1   easier to get and not be asked too many questions.

2   Q    I would ask you to look, please, at Exhibit 13.  I believe

3   this was admitted yesterday as a certified public Department of

4   Revenue record.  Prior to preparation of this trial, had you ever

5   seen this letter before?

6   A    I did not, ma'am.

7   Q    And can you just tell us what it is?

8   A    There appears to be a correction of opening date for the

9   business Hay Computer Networking & Consulting.

10  Q    To whom is this letter addressed?

11  A    It is addressed to the Department of Revenue.

12          THE DEFENDANT:  Objection.  Speaks for itself.

13          THE COURT:  I will permit the question.  The objection

14  is well taken, counsel.  Where are we going with this?

15          MS. VOGEL:  I am just trying to establish for the record

16  what it is, and then I will ask her whether she has ever seen it.

17          THE COURT:  Why don't we ask her if she has ever seen

18  it, and move on from that?

19  By Ms. Vogel:

20  Q    Ms. Ikilikyan, did you write this letter?

21  A    I did not, no.

22  Q    Did you sign this letter?

23  A    I did not.

24  Q    Do you recognize any of the handwriting on this letter?

25  A    Yes, I do.

1   Q      Whose handwriting is above the signature, if you know, on the

2   signature line?

3   A      It is my mother's.

4   Q      And do you recognize the handwriting at the bottom?

5   A      Yes, I do.

6   Q      Can you tell us, in your opinion, whose handwriting that

7   looks like?

8   A      It looks to be Bill Poff's handwriting.

9   Q      Did you write that on there where it says, "Please call

10  Alexis at"?

11  A      I did not.

12  Q      Do you recognize the fax header at the top of the page?

13  A      Yes.

14  Q      It says "Alexis."

15  A      It was our fax machine.  It was registered under my name.

16  Q      When you say "our fax machine," where was that fax machine,

17  physically?

18  A      In Bellevue, Washington, at my mother's house.

19  Q      Who lived there with you?

20  A      Bill Poff, myself, my mother and my brother.

21  Q      When you moved away from that apartment, did you take the fax

22  machine with you?

23  A      Yes, we did.

24  Q      Ms. Ikilikyan, I don't want to ask you about these various

25  real estate transactions that you and the defendant engaged in.

1    I want to ask more specifically, what was the actual work that

2    each of you did?  What was your agreement with the defendant

3    about what role you would perform as a part of each of these

4    purchases?

5    A    Yes, ma'am.  My role solely was to create -- to create the

6    purchase and sale agreements, to negotiate the prices with

7    listing agents.  Mainly to create the paperwork for the real

8    estate purchase and sale agreements.  As soon as we had

9    negotiated a contract on paper, then it would be turned over to

10   Great American Escrow, that directed where the escrow should be

11   started.  So I faxed the paperwork to them and started the escrow

12   process, and also gave a copy of the signed purchase and sale

13   agreement to Bill Poff for him to begin the loan paperwork.

14   Q    So what was your agreement with the defendant about what

15   roles he would perform as part of these purchases?

16   A    As the processor, and the loan officer for most of the

17   transactions.  And he would negotiate rates and things such as

18   that nature with the bank directly.

19   Q    What criteria were you and the defendant looking for when

20   selecting property?

21   A    The first choice would have been a seller financing, seller

22   carryback.  If that was not available, the second --

23   Q    What was the next criteria?

24   A    The next criteria was a property that had a lot more equity

25   than listed, so the purchase and sale price would be inflated to

1   make the loan easier.

2   Q   And why were these factors important in your selection

3   process?

4   A   To get the most amount of loans -- money at closing as

5   possible.

6   Q   When you found a potential property online or on MLS that met

7   these criteria, what would you do?

8   A   I personally would call the listing agent on file and proceed

9   to negotiate these terms, to see if the sellers -- first if they

10  were in a position to do the seller carryback, and, if so, what

11  was the amount they would go up to.  And if they had any more

12  than -- if they had a lot more detailed questions about the loan,

13  then I would have Bill Poff explain the actual terminology to

14  them.  But if they did not have questions, my explanation was

15  good enough, then I would proceed to do the paperwork and they

16  would present exactly what I told them to their clients, and

17  proceed to have a signed purchase and sale.

18  Q   Who actually wrote the information into the purchase and sale

19  agreements?

20  A   I personally did.

21  Q   Was there a special form that you used for that?

22  A   Yes.  It is a contract on Northwest MLS.

23  Q   What about the seller financing that you mentioned, where on

24  the purchase and sale agreement does that get written down?

25  A   There is a specific addendum.  It is called a payment and

```
 1   term addendum that specifies how much seller receives at closing,

 2   and the actual interest rate is listed on there, and amount of

 3   payments.  The payment amount is on there, and commencing on what

 4   day the sellers would receive payments.

 5   Q   When you would submit or transmit purchase and sale

 6   agreements on properties that you had found, what part of that

 7   payment and terms addendum that you just described as containing

 8   that seller and finance agreement would go along with your

 9   original offer?

10   A   It would be sent over to escrow -- the escrow process of the

11   full contract.  And as far as the loan, the bank would never see

12   the payment term addendum.

13   Q   What about the potential seller, what would they get when you

14   would transmit an offer to them?

15   A   They would receive the payment term addendum.

16   Q   Along with the purchase and sale agreement?

17   A   Yes.

18   Q   Can you estimate what percentage of the offers you wrote up

19   for purchases by you and the defendant, including seller

20   financing terms, as part of the original offer?

21   A   I would say, guesstimating, 50/50, maybe more.

22   Q   And who would you consult with prior to filling out this

23   purchase and sale agreement?

24   A   All of the terms were consulted with Bill Poff prior.

25   Q   What would you do once you obtained an acceptance on an
```

1   offer?

2   A    I would take the signed purchase and sale contract, send one

3   copy to escrow to begin to start the escrow process, and the

4   other copy would go to Bill Poff so he could proceed to close the

5   loan.

6   Q    And what involvement did you have in what you just termed

7   closing the loan?

8   A    Very limited, ma'am.  My involvement personally was a lot

9   more clerical than, for example, answering the phones if the bank

10  called, and putting Bill -- connected them together, faxing loan

11  documents to the bank, things of that nature.

12  Q    Ms. Ikilikyan, are you familiar with the 1003 form or loan

13  application form?

14  A    Yes, ma'am.

15  Q    What was your role when it came to putting information into

16  those forms?

17  A    None.

18  Q    So who filled those forms out for the purchases where you

19  were named as the borrower?

20  A    Bill Poff.

21  Q    Who filled those forms out for purchases where your mother

22  was named as the borrower?

23  A    Bill Poff.

24  Q    After the defendant filled out those 1003 loan application

25  packets, what would he do with them?

1  A    He would send the disclosures and that information, a copy of

2  an appraisal and title to the bank to qualify for a specific loan

3  program that he had already negotiated with the bank.

4  Q    Do you know how he sent those to the bank?

5  A    He faxed it.  He typically faxed it or e-mailed it -- faxed

6  it and e-mailed it to his own computer, and sent it via e-mail.

7  Q    What was your primary e-mail address during this time period?

8  A    I didn't have a primary e-mail address.  Bill Poff and I had

9  two e-mail addresses that we both used.

10  Q    And what were those e-mail addresses?

11  A    One was Fidelis WW at MSN dot com, the second one was USMR at

12  Comcast dot net.

13  Q    Was there one that you used more than the other, or one the

14  defendant used more than the other?

15  A    No, ma'am, it was both accounts -- accounts that we both had

16  access to and used.

17  Q    What would happen after the 1003 and other initial loan

18  documents had been sent over to the lender?

19  A    Then we would normally receive either an approval letter with

20  conditions or a denial letter.

21  Q    And if you received an approval letter with conditions, what

22  was your role in fulfilling those conditions?

23  A    Again, they were limited.  If things entailed such as the

24  borrower needs, for example, W-2 forms, then he would ask me,

25  Alexis, can you call the client to get W-2s.

1   Q    Who would ask you?

2   A    Bill Poff would.  It was to that degree.  I never really

3   finished loans.  I never started loans or finished them.  It was

4   really Bill Poff's area of practice.

5   Q    What would happen if or when all the conditions had been

6   fulfilled?

7   A    Then the bank would send out a form that was called the doc

8   request form for the documents to be sent to the escrow office

9   that was agreed by all the parties.  I believe, with limited time

10  later, the documents would be received by an escrow company.

11  Q    And once the final documents had been generated and received,

12  who was in charge of getting all the parties signed?

13  A    For the most part it was Micki Thompson at Great American

14  Escrow.

15  Q    Were there occasions when Micki Thompson was not the person

16  who got the document signed?

17  A    Yes.

18  Q    And on those occasions, who was the person who did that?

19  A    Bill Poff.

20  Q    You mentioned Great American Escrow.  Was there one

21  particular escrow company that you worked with primarily?

22  A    Yes, ma'am.

23  Q    What was it?

24  A    Great American Escrow.

25  Q    Where was it located?

A     In Federal Way, Washington.

Q     Who was the primary escrow closing officer at Great American Escrow?

A     Micki Thompson.

Q     Can you look, please, at Exhibit 2?  Is she on this chart as well?

A     Yes, ma'am, the top third picture, towards the right.

Q     At Great American Escrow, who would prepare the settlement statements?

A     Micki Thompson.

Q     Why did you and the defendant use Micki Thompson at Great American Escrow, primarily?

A     She was very flexible.  She was very familiar with the seller carrybacks.  She helped the process to go a lot smoother.  And she bent the rules.

Q     You said she bent the rules?

A     Yes.

Q     What specifically would she do that was bending the rules that would help you?

A     She would -- she knew that a lot of the seller carryback money would eventually come to Bill Poff and I, so she accepted promissory notes and fictitious receipts when she knew those receipts were not -- they were not legit.

Q     Can you explain to us the purpose of these fictitious notes and receipts?

```
 1   A    Yes, ma'am.  She said that she is a neutral third-party, and
 2   she would have to have a reason why, instead of the seller, who
 3   on paper is supposed to receive the funds -- instead of the
 4   seller, the buyer receiving these funds.  So she would accept
 5   these receipts as a reason why the buyer should receive funds
 6   instead of where it was supposed to go.
 7   Q    Where would she get these receipts?
 8   A    She would get these receipts from Bill Poff.
 9   Q    How do you know that?
10   A    I watched him do it.
11        THE COURT:  Counsel, when you are at a good time for a
12   morning break.
13        MS. VOGEL:  Why don't we do that?
14        THE COURT:  Ladies and gentlemen, we will take our
15   morning break at this time.  We will be back out at 10:45.  We
16   will be at recess.
17   (At this time a short break was taken.)
18        THE COURT:  You may resume, counsel.
19   By Ms. Vogel:
20   Q    Ms. Ikilikyan, at the closing on these transactions,
21   particularly these eight on our chart, would you ever see the
22   HUD-1 settlement statements?
23   A    Yes, ma'am.
24   Q    On any occasion did you see things in those settlement
25   statements that were not true?
```

```
 1   A    Yes, ma'am.

 2   Q    Who put those things in some of those statements?

 3   A    Micki Thompson.

 4   Q    How did Micki Thompson know what to put in the settlement

 5   statements?

 6   A    She was guided by Bill Poff from our end, and also what the

 7   banks directed as well.

 8   Q    How do you know that she was guided by the defendant,

 9   Mr. Poff?

10   A    I was there, ma'am.

11   Q    What did you see or hear?

12   A    A lot of times Bill Poff and myself were in escrow, and a

13   HUD-1 settlement might have stated the seller carrybacks or other

14   things that were not supposed to be there for the bank to see.

15   He would ask her to remove those numbers.

16   Q    Who would ask who?

17   A    Bill Poff would ask Micki Thompson to remove the sums.

18   Q    And you heard this yourself?

19   A    Yes.

20   Q    Physically, where were you when this conversation took place?

21   A    At Great American Escrow in Micki Thompson's office.

22   Q    How long would that type of session take?

23   A    Hours.

24   Q    Who else would be there?

25   A    For the most part, it was Micki Thompson, myself and Bill
```

1    Poff.  Often -- there were seldom times when Tony Reyes was there

2    as well, but not typical.

3    Q    How were you able to persuade Micki Thompson to go along with

4    this?

5    A    After each closing Micki Thompson would receive a small fee

6    from Bill Poff and myself, because she had mentioned numerous

7    times that she works two, three times harder than a regular loan,

8    and she only gets paid a certain amount.  It was almost like sort

9    of a take for each transaction.  I believe that had something to

10   do with it.  There was a lot of working relationship, so she did

11   that.

12   Q    How much money were these tips that you just described, after

13   closing?

14   A    Typically it was one to $200 per transaction.  That was

15   typical.  There were times where --  On one occasion there was an

16   $800 tip, but it totaled over $10,000.

17   Q    And who was it physically that would give her this money?

18   A    I would.

19   Q    And what, if any, was the defendant's involvement in

20   providing these tips?

21   A    He would know the amount, and I would just -- I was the only

22   one on the check -- on the bank account, so I would have.

23   Q    And where would these transfers of these tips take place?

24   A    In the escrow office, in Micki's office.

25   Q    What form would the money be in?

1    A    It was mainly checks.

2    Q    And who wrote the checks?

3    A    I did.

4    Q    Was there any occasion where you and the defendant or you

5    separately provided more than just a few hundred dollars?

6    A    There was one occasion where she got -- I believe it totaled

7    10,000 -- that one time it was $10,000.  Most of it was a check,

8    and the other funds were in cash.

9    Q    And who was involved in the decision to give her that

10   $10,000?

11   A    Bill Poff and myself.

12   Q    On average, Ms. Ikilikyan, how much cash from closing were

13   you and the defendant able to walk away from a transaction with?

14   A    On average, it was 40- to $60,000.  That was an average.

15   Q    Do you remember what the most you ever made from closing on

16   one purchase transaction was?

17   A    Yes, ma'am.  It was $400,000, at one time.

18   Q    Was that one of the properties on our chart?

19   A    Yes, ma'am.

20   Q    Which one?

21   A    Number 6, 9488 199th Avenue South in Issaquah.

22   Q    How would that money be paid to you and the defendant

23   following closing, generally speaking?

24   A    Generally it was wired -- a wire to the bank account.

25   Sometimes it was Micki Thompson that would cut checks.

```
 1   Q    Ms. Ikilikyan, are you still employed in the real estate

 2   field?

 3   A    I am not.

 4   Q    Why not?

 5   A    Shortly after the divorce --  I sold one other house where I

 6   was just the selling agent, not involved with financing at all,

 7   and I lost interest.  Frankly, I don't know how to do the loans

 8   from start to finish, so it was really a team thing with Bill

 9   Poff.  So after that --

10   Q    Are you still licensed as a real estate agent or real estate

11   broker today?

12   A    I am not.

13   Q    Why is that?

14   A    Well, because of this proceedings.  The Department of

15   Licensing seized my license.

16   Q    Is that also true for your mortgage broker's license?

17   A    Yes, ma'am.  I believe that happened February of 2008,

18   earlier than this.  Yes, it's true.

19   Q    So you have lost both of your professional licenses?

20   A    Yes.

21   Q    You mentioned the Department of Licensing.  What Department

22   of Licensing are you talking about?  What state or federal agency

23   are you referring to?

24   A    Washington Department of Licensing.

25   Q    And what is it that they regulate, if you know?
```

1    A    Only real estate agents/brokers.

2    Q    Was there an administrative investigation by the Department

3    of Licensing into your license?

4    A    Yes, ma'am.

5    Q    And what was the result of that investigation?

6    A    I had four months' administrative -- where the broker's

7    license was suspended and a $2500 fee to reinstate the license.

8    Q    And was that a result of the same conduct that is the subject

9    of this trial?  Was that for other stuff other than what we are

10   talking about in this trial, or was it for all the same stuff?

11   A    I believe that was something different than these.   I'm

12   sorry.  I take it back, it was the same, price change.

13   Q    Was there a particular transaction or transactions that was

14   the focus of the administrative Department of Licensing

15   investigation?

16   A    Yes, ma'am.

17   Q    And are any of those transactions on our chart -- our

18   property chart?

19   A    It is not, no.

20   Q    No?

21   A    No.

22   Q    Was it one of those 27 purchases that you mentioned earlier?

23   A    That property did not close, so it was not.

24   Q    Ms. Ikilikyan, during the administrative investigation by the

25   Department of Licensing, were you asked a series of questions or

1  asked to provide answers through your lawyer to the

2  investigation?

3  A   Yes, ma'am.

4  Q   And how honest were you with that investigator?

5  A   I was not very honest with her, ma'am.

6  Q   Can you explain to us why that was?

7  A   I wanted to protect what Bill and I had done.  Also, at the

8  time, I believed that we were the victims.  So I wanted to

9  protect --  I felt very much attacked by the investigator, not

10 knowing that there is a lot deeper things that were happening.  I

11 felt that we were being picked on, so I wanted to defend

12 everything.  So I was afraid to tell the truth, so to speak, to

13 her.

14 Q   Can you describe how your understanding of the conduct that

15 you and the defendant engaged in has changed since the time that

16 you were interviewed by the Department of Licensing?

17         THE DEFENDANT:  Objection to relevance.

18         THE COURT:  I am going to sustain the objection because

19 I don't understand the question.  Why don't we try rephrasing it?

20 By Ms. Vogel:

21 Q   Ms. Ikilikyan, do you have any regrets about having lied to

22 the Department of Licensing investigator?

23 A   Yes, ma'am.

24 Q   And then after that investigation was concluded, were you

25 arrested and charged in this case in June of 2009?

1   A   Yes, ma'am.

2   Q   And have you entered a guilty plea with a cooperation

3   agreement?

4   A   Yes, I have, ma'am.

5   Q   Have you been sentenced yet?

6   A   Not yet, ma'am.

7   Q   I want to direct your attention, Ms. Ikilikyan, to the very

8   first property on Exhibit 1, line 1 there.  There are three

9   addresses on that line.  Are you familiar with the properties --

10  Can we put Exhibit 1 up on the screen?  Are you familiar with the

11  properties described on line 1 of this chart, Exhibit 1?

12          THE COURT:  Counsel, hold on just a second.  Mr. Poff,

13  there is a big television behind you which is intended to allow

14  people in the audience to see what is going on.  Can we move that

15  chair, which is normally occupied by an attorney or a U.S.

16  Marshal, and tilt it so the audience can see.  Thank you, sir.

17  Sorry, Ms. Vogel.  Please continue.

18  By Ms. Vogel:

19  Q   Ms. Ikilikyan, are you familiar with the properties described

20  on line 1 of that chart?

21  A   Yes, I am, ma'am.

22  Q   How are you familiar with it?

23  A   These are properties Bill Poff and I purchased in my name,

24  the duplexes.

25  Q   And when was that, approximately?  Was that on April 25th,

1    2005, as is listed on the chart?

2    A    Yes, ma'am.

3    Q    Is that consistent with your recollection?

4    A    Yes, it is.

5    Q    Whose decision was it to buy these duplexes?

6    A    Bill Poff and myself, ma'am.

7    Q    And there are three duplexes listed here.  Was there a fourth

8    as well?

9    A    Yes, ma'am.

10   Q    Why was that separated from the purchase of these other

11   three?

12   A    I believe the loan was in my name for the fourth one.  I

13   believe there was a typo where it got filed with the title as my

14   mom as the owner.  That was a typo.  That was a mistake.

15   Q    Was there some time period that elapsed between when these

16   three closed and when the fourth one closed?

17   A    Yes, ma'am.

18   Q    Can you look, please, at Exhibit 100?  Do you recognize the

19   home depicted in this exhibit?

20   A    Yes, I do.

21   Q    What is it?

22   A    It is one of the duplexes.

23   Q    And when you say "one of the duplexes," is it one of the

24   three duplexes listed on line 1 of Exhibit 1?

25   A    Yes, it is.

1   Q     Did you actually go out and visit these duplexes prior to

2   purchasing them in April of 2005?

3   A     No.

4   Q     Have you visited them thereafter?

5   A     Yes.

6   Q     And how does this photograph of the duplex compare with the

7   condition they were in when you purchased them?

8   A     They were in a little bit better quality when we purchased

9   them in '05.

10  Q     Going back to Exhibit 1, please.  Ms. Ikilikyan, do you

11  recall any difficulty during the purchase relating to the precise

12  street address of these duplexes?

13  A     Yes, ma'am.

14  Q     Can you explain that?

15  A     The way I remember is, the bank had a specific address

16  because they were going off of the title.  The police and fire

17  department had an address that could actually get them to that

18  property.  It was just there was confusion with the address.

19  Q     What other street names have you seen these addresses --

20  these duplexes use as addresses?

21  A     94th Court East, is another street address I have seen.  To

22  be honest with you, it is still unclear, the address part.

23  Q     Which name did you use when you purchased these properties,

24  Alexis or Haikanush?

25  A     Haikanush at the time.

1   Q    And who did you consider to be the true buyer of these

2   duplexes?

3   A    Bill Poff and myself.

4   Q    Let us look at Exhibit 105, please.  Do you recognize what

5   that is?

6   A    Yes, ma'am.

7   Q    What is it?

8   A    It is a quitclaim deed.

9   Q    From whom to whom?

10  A    From William Poff to myself.

11  Q    And is this a quitclaim deed for one of the duplexes listed

12  on line 1 of the chart?

13  A    Yes, it is, ma'am.

14  Q    You mentioned earlier that the defendant executed quitclaim

15  deeds for all the properties that you purchased.  Is this an

16  example of one of those quitclaim deeds?

17  A    Yes, ma'am, it is.

18  Q    And can you read the signature on the line --

19          THE DEFENDANT:  Objection to foundation, if she doesn't

20  know.

21          THE COURT:  I will overrule the objection.

22  By Ms. Vogel:

23  Q    Where were these quitclaim deeds actually signed?

24  A    They were signed in the escrow office with Micki's presence.

25  Q    And were you present as well?

```
 1   A    Yes, ma'am.
 2   Q    And is that Micki's notary signature at the bottom of this
 3   document?
 4   A    Yes, ma'am.
 5   Q    Can you look at the signature line above the printed
 6   capitalization, William Poff?  Can you read what it says there?
 7   A    "I certify --"
 8   Q    I'm sorry.  Just the name, how the name of the defendant is
 9   signed?
10   A    William Poff.
11   Q    Generally speaking, Ms. Ikilikyan, did the process of how
12   these duplexes were purchased follow the same general process
13   that you have just described earlier this morning before break?
14   A    Yes, ma'am.
15   Q    Why did you select these duplexes to make an offer on them?
16   A    The seller for these four duplexes was offering a seller
17   carryback.
18   Q    And who was the seller?  What was the name?
19   A    The seller was Marijane Anderson.
20   Q    Who was the person you primarily dealt with on behalf of the
21   seller?
22   A    I dealt with the listing agent, and then later the daughter
23   of the seller.
24   Q    Do you recall her name?
25   A    Sarah Anderson.  Sarah -- at the time, it was Anderson.
```

```
1    Q    Would you look, please, at Exhibit 113, previously admitted,
2    I believe, as an Ownit business record.  Do you recognize what
3    this document is, Ms. Ikilikyan?
4    A    Yes.
5    Q    What is it?
6    A    A real estate purchase and sale agreement.
7    Q    Specifically for what property is this?
8    A    9407 90th Avenue East in Seattle.  It is for one of the
9    duplexes.
10   Q    One of the duplexes on our chart?
11   A    Yes, ma'am.
12   Q    Is 90th Avenue East a variation of one of the addresses?
13   A    Yes, ma'am.
14   Q    And is the seller consistent with the seller of those
15   duplexes, Marijane Anderson?
16   A    Yes, ma'am.
17   Q    Who wrote this purchase and sale agreement for one of these
18   duplexes?
19   A    I did, ma'am.
20   Q    And what was the offered purchase price for this duplex?
21   A    It was $325,000.
22   Q    Was that the same price that you offered for all of them?
23   A    Yes, ma'am.  If my memory serves me correct, there was a
24   discrepancy with one of the appraisals, where I believe it came
25   in lower.  The fourth one might be a little bit different.  But
```

1    that was the agreed purchase and sale price.

2    Q    Who acted as your realtor in these transactions?

3    A    I did, ma'am.  Excuse me.  Even though I did at the time, I

4    asked Tony Reyes to assist me on this purchase and sale, since

5    the bank did not want me as a buyer and the selling agent.  So,

6    Tony Reyes.

7    Q    So what involvement did Tony Reyes have in this transaction?

8    A    Just his name.

9    Q    Ms. Ikilikyan, did the agreement to purchase these duplexes

10   from Marijane Anderson include any terms involving seller

11   financing?

12   A    Yes, ma'am.

13   Q    And were those written down?

14   A    Yes, ma'am.

15   Q    Can you look, please, at Exhibit 117, which has not been

16   admitted?  Can you zoom in as much as possible so we can try and

17   read that?  Do you recognize this document, Ms. Ikilikyan?

18   A    Yes, ma'am.

19   Q    What is it?

20   A    It is a payment term addendum for the purchase and sale

21   agreement.

22   Q    Is it also for one of the three duplexes listed on line 1 of

23   this chart?

24   A    Yes.

25   Q    And who prepared this document?

1    A    I did.

2    Q    Does this document encapsulate the seller financing agreement

3    you entered into with the seller, Marijane Anderson, on this

4    transaction?

5    A    Yes, ma'am.

6              MS. VOGEL:  Move the admission of 117.

7              THE COURT:  Any objection?

8              THE DEFENDANT:  No objection, your Honor.

9              THE COURT:  The exhibit is admitted.

10             (117 admitted.)

11   By Ms. Vogel:

12   Q    I want you to look at all three pages of this exhibit.  Let's

13   go back to the first page.  And if you could zoom in on the top

14   paragraph?  What was the original offer for seller financing that

15   you extended in this case?

16   A    It was -- I believe it was around 20 percent carryback for

17   each of the duplexes, the original offer being $325,000.

18   Q    I'm sorry.  I didn't follow your answer.

19   A    Can you rephrase?

20   Q    What is your recollection of what the original offer for

21   seller financing was that you extended to the seller of these

22   duplexes?

23   A    Oh, it was $62,000.

24   Q    What was $62,000?

25   A    It was the portion where the seller would finance it.  They

1    would be in the second position to finance it.

2    Q   So if you look at the first paragraph of this payment terms

3    addendum of the purchase and sale agreement, it says, the buyer

4    agrees to pay a certain amount of money $1,084,800, if I can make

5    it out.  And that the balance will be -- shall be the purchase

6    price and installments of a certain amount per month --

7    A   Yes, ma'am.

8           THE DEFENDANT:  I object to relevance, your Honor.

9           THE COURT:  She has to finish her question.

10   By Ms. Vogel:

11   Q   When you say $62,000, are you referring to the balance?

12   A   I'm sorry.  I was referring to each carryback, the 20 percent

13   of the 325.  I'm sorry.

14          THE DEFENDANT:  I object.

15          THE COURT:  Let's take a time out.  We will get --  She

16   gets to ask the question, and then before the witness answers,

17   which sometimes the witness starts really quickly, then you

18   object, and then I can rule on the objection prior to the time

19   that she answers.

20          THE DEFENDANT:  I am sorry about that.  It really wasn't

21   about the question she just asked.  I was under the assumption

22   Ms. Ikilikyan actually owned the property.  How would this

23   document be relevant, because it is saying this is a contract

24   with Ms. Harutyunyan?  Relevance would be my objection.

25          THE COURT:  The way you need to do that is say,

1    "Objection, relevance."  If I need it explained, I will ask you

2    what the basis of the relevance is.  Thank you.  Ms. Vogel, you

3    may continue.

4    By Ms. Vogel:

5    Q   Ms. Ikilikyan, this payment terms addendum that you said you

6    drafted, was this for all four duplexes, or how many of the

7    duplexes was this to cover?

8    A   This was to cover all four, ma'am.

9    Q   That explains the $1,084,000 figure?

10   A   Yes, ma'am.

11   Q   What is your understanding of whether this payment terms

12   addendum is part of or separate from the purchase and sale

13   agreement?

14   A   This particular addendum is part of the purchase and sale

15   agreement.

16   Q   Now, the buyer is listed on this purchase and sale agreement

17   as Armenuhi Harutyunyan.  Can you explain that?

18   A   Yes, ma'am.  Originally when we submitted the offer -- I

19   would always ask Bill, whose name would this work with, whose

20   name would qualify easier.  At the time it was my mother,

21   Armenuhi Harutyunyan.  So the purchase and sale were signed in

22   her name.  And without going into the entire detail, the loan did

23   not work out.  So we resubmitted another purchase and sale

24   agreement with the same numbers with my name.

25   Q   Was that an uncommon occurrence in the purchases that you and

1   the defendant made?

2   A   No.

3   Q   Let's turn to page 3 of this purchase and sale agreement.

4   This is entitled "counteroffer addendum."  Can you explain how

5   this page operates?

6   A   Yes, ma'am.  Typically a counteroffer addendum is -- they

7   counter what the original offer is.  Sometimes even if it is

8   stated twice.  That is just to reaffirm what it actually says on

9   the contract, just to really specify what the changes they are

10  making to the original offer.

11  Q   "They" being the sellers?

12  A   The sellers, yes.

13  Q   Can you take a moment to look through the terms that are

14  listed on this counteroffer addendum, 117?  After you take a

15  moment to read those, I will ask if those are consistent with

16  your understanding of the agreement you ended up with in this

17  case?

18  A   Yes, ma'am, it is the exact one.

19  Q   I see some handwritten notation on the left that says

20  5.75 percent.  Can you explain that?

21  A   Yes, ma'am.  The interest rate was changed for the payments

22  to be affordable each month.

23  Q   So did you agree to a lower interest rate?

24  A   Yes, ma'am.

25  Q   And the 20 percent seller-carry note you mentioned earlier,

1   that is actually stated in line 3 of those terms, is that

2   correct, where it says 20 percent seller-carried deed of trust?

3   A   Yes, ma'am.

4   Q   Is this consistent with your understanding of the final

5   seller financing agreement you and the defendant entered into

6   with the seller of these duplexes?

7   A   Yes, ma'am.

8   Q   When you said 20 percent earlier, was that for each duplex or

9   just on certain duplexes?

10   A   On each of them.

11   Q   And how much of the principal did you contemplate would be

12   paid back in each monthly payment?

13   A   It was interest only payments, so no principal.

14   Q   Who is it that actually carried out the specific negotiations

15   with the seller, Ms. Anderson, for the seller financing on the

16   duplexes?

17   A   Originally it was myself on the phone with their agent.

18   Q   With their real estate agent?

19   A   With their real estate agent.

20   Q   Did that change?

21   A   At closing Bill Poff was present, and so was the two sellers,

22   Marijane Anderson, Sarah Anderson, as well as the listing agent.

23   Q   What is the relationship, if you know, between Sarah and the

24   seller, Marijane Anderson?

25   A   Mother/daughter.

1    Q    Once you had this accepted offer on these three duplexes,

2    what did you do?

3    A    The signed purchase and sale agreements were forwarded to

4    escrow to start the escrow process, and also it was forwarded to

5    Bill for him to start the loan process.

6    Q    And you said "was forwarded."  Who specifically forwarded

7    them?

8    A    I did.

9    Q    How did you and the defendant pay for this property, do you

10   recall?

11   A    Yes, ma'am.  For the seller carryback, it was a company that

12   collected the payments.

13   Q    And, again, I am not asking so much yet about how you made

14   the monthly payments.  First I want to focus on how did you buy

15   the property, how did you come up with over a million dollars to

16   buy these duplexes?

17   A    I'm sorry.  We obtained loans for all four of them.

18   Q    In addition to the seller-carried financing?

19   A    Yes, ma'am.

20   Q    Do you recall if you or the defendant put any of your own

21   money down?

22   A    No.

23   Q    You don't recall?

24   A    We did not.

25   Q    How much money, if any, did you and the defendant end up

1    getting back after these purchases closed?

2    A    It is believed to be --

3    Q    "It is believed to be" is not very helpful.  Can you be more

4    specific?

5    A    Sure.  Between $120,000 and $130,000.

6    Q    Now, are you talking about all four duplexes, or just the

7    three?

8    A    All four of them.

9    Q    So something less for just the three -- the first three?

10   A    Yes, ma'am.  Around $90,000.

11   Q    What was your role in obtaining the mortgage financing to

12   purchase these duplexes?

13   A    Again, my role was very limited, faxing paperwork to the

14   lender that Bill Poff had prepared, answering phone calls and

15   connecting Bill Poff with the bank.  That's it.

16   Q    Can you look, please, at Exhibit 119, which I believe was

17   admitted yesterday as an Ownit business record?

18   A    Yes, ma'am.

19   Q    Are you familiar with this type of document?

20   A    Yes, I am.

21   Q    What is it?

22   A    It is a cover paper, so to speak, for a loan submission and

23   fee sheet.

24   Q    What is the property address that this particular one

25   pertains to?

1    A    This is for one of the duplexes in question, 9411-9410 90th

2  Avenue East in Puyallup.

3    Q    This lists you as the buyer, Haikanush?

4    A    That's correct.

5    Q    Ms. Ikilikyan, did you fill out this form?

6    A    I did not.

7    Q    Did you sign this form?

8    A    I did not.

9    Q    And at the very top, if you can zoom in on the top third of

10  the form, who does it list as the broker that brokered this

11  submission?

12    A    Victory Home Mortgage.

13    Q    Who does it list as a contact?  Are you familiar with the

14  telephone numbers on the right there?

15    A    Yes, I am.

16    Q    Let's talk about the top phone number.  Whose telephone

17  number was that?

18    A    That was the house slash fax number for my mother, since we

19  lived with her at the time.  It was the home number/business

20  number.

21    Q    And do you recognize the fax header at the top of this sheet?

22    A    Yes, ma'am.

23    Q    What does that indicate to you from reading that fax header,

24  where that document was faxed from?

25    A    It was faxed from 425-643-6107, from the apartment.

1    Q    I think you said after you moved out of that apartment, you

2    brought that fax number with you?

3    A    Yes, ma'am.

4    Q    Do you have any recollection of changing the number that was

5    programmed on it, on the fax machine?

6    A    I don't think so, ma'am.  I don't remember.

7    Q    And can you zoom out?  Can you focus in on the center area of

8    this form?  What is the loan-to-value ratio of the loan requested

9    on this submission form?

10   A    Ninety percent.

11   Q    Based on your own personal involvement in this, was this form

12   submitted before or after you had negotiated the seller financing

13   with Marijane Anderson?

14   A    After.

15   Q    Ms. Ikilikyan, did you fill out two other forms just like

16   this for the other two duplexes as well?

17   A    I did not, ma'am.

18   Q    Did you fax them to Ownit Mortgage Solutions?

19   A    I don't remember faxing this exact one, but it wouldn't be --

20   it would be a normal thing if I did.  But I don't remember each

21   and every time.

22   Q    Do you recognize the handwriting on here?

23   A    Yes, I do.

24   Q    Whose is it?

25   A    Bill Poff's.

1        THE DEFENDANT:  Objection, your Honor.

2        THE COURT:  Overruled.

3   By Ms. Vogel:

4   Q    Now, have you ever seen your husband -- your former husband,

5   all those years you were married, sign his name any way other

6   than William Poff?

7   A    Yes, I do.

8   Q    In what ways have you seen him sign his name?

9   A    Bill Poff.

10  Q    Was there any certain pattern for how he would sign his name?

11  Can you explain any pattern in how he would sign his name

12  differently at certain times?

13  A    Only if it was for loan purposes.  If he signed his name on

14  any loan documentation, he would sign it as Bill Poff.  And also

15  with my loans specifically, he would sign Bill Poff.

16  Q    Will you look at Exhibit 121, please?  I believe this was

17  previously admitted as a business record from Ownit as well.  Are

18  you familiar with this form?

19  A    Yes, I am.

20  Q    What is it?

21  A    It is called a 1003, Uniform Residential Loan Application.

22  Q    Can we zoom in on the top third where it says, "Such a

23  property."  Does this 1003 --  Can we call it a 1003?

24  A    Yes.

25  Q    Does this 1003 correspond to one of the three duplexes on

```
1    line 1 of our chart?

2    A    Yes, ma'am.

3    Q    And who is listed as the borrower?

4    A    Myself.

5    Q    And what is the amount being sought?

6    A    $292,500.

7    Q    Is that consistent with your recollection of the amount of

8    the mortgage that was actually obtained for each of these three

9    duplexes?

10   A    Yes, ma'am.

11   Q    I am going to look at the bottom third, please, where it

12   says, "Borrower employment."  What is listed on this 1003 as the

13   name and address of your employer?

14   A    It is listed Fidelis Enterprises slash Real Estate.

15   Q    What is listed as how many years you have worked there?

16   A    Five years.

17   Q    Ms. Ikilikyan, is it true that you worked at Fidelis

18   Enterprises for five years at the time that this loan was being

19   processed?

20   A    No.

21   Q    Can we turn to page 2, please, top half?  What is listed as

22   your gross monthly income from that self employment?

23   A    $27,000.

24   Q    Ms. Ikilikyan, is it true at the time this loan was being

25   processed you earned $27,000 in gross monthly income from
```

1    Fidelis?

2    A    No.

3    Q    Is it true that you earned $27,000 from any source?

4    A    It is not.

5    Q    Ms. Ikilikyan, in the details of the transaction section on

6    the left-hand side in the center, what does it say online J under

7    subordinate financing?

8    A    There is nothing stated.

9    Q    And is it true that at the time this loan was being processed

10   there was no subordinate financing contemplated?

11   A    There was subordinate financing.

12   Q    And what was that?

13   A    Seller carryback of $65,000.

14   Q    What does this form --  Who does this form indicate was the

15   interviewer?

16   A    Bill Poff.

17   Q    How does it say that that interview was conducted?

18   A    Face-to-face interview.

19   Q    How familiar are you with this form, this 1003 form?

20   A    I am familiar.  I have seen it.

21   Q    Have you ever filled one of these out?

22   A    I did not.

23   Q    Have you ever filled one of these out?

24   A    No, I have not.

25   Q    Were you interviewed by a person named Bill Poff to get the

1    information to put in this particular 1003?

2    A    I was not.

3    Q    What role did you have in supplying this information about

4    your self-employment that you said was false, and about your

5    income that you said was false, and about that subordinate

6    financing that you said was false, to anybody for the purpose of

7    filling out this loan application?

8    A    What was the first part of the question?

9    Q    That was a long question.  I apologize.  What role did you

10   have in filling out this particular 1003?

11   A    I did not.

12   Q    What information did you supply for the purpose of having

13   this 1003 filled out?

14   A    Nothing.

15   Q    Did you sign this 1003?

16   A    Yes, I did.

17   Q    Who asked you to sign it?

18   A    Bill Poff.

19   Q    At the time that you signed it, did you read it?

20   A    No, ma'am, I did not.

21   Q    At the time that you signed it, were you aware that the

22   applications were being submitted for loans in your name that

23   contained statements that were not true?

24   A    Yes, ma'am.

25   Q    How were you aware that was happening if you didn't read the

1   form?

2   A    It was explained to me that the stated income was okay to

3   inflate higher, so I was aware of the income being

4   misrepresented.  And, also, the owner-occupied part of it.  And,

5   also, Bill Poff explained to me the bank would deny the loan if

6   they found out about the carryback -- seller carryback.

7   Q    Can you look, please, at Exhibit 122?  This also was admitted

8   as an Ownit Business Solutions business record.  Can you tell us

9   what this is?

10  A    1003, ma'am.

11  Q    And is this for a second duplex that is also listed on line 1

12  of our chart?

13  A    Yes, it is, ma'am.

14  Q    Let's very quickly look to see whether it contains the same

15  information.  Does this Exhibit 122 contain the same false

16  information as to self-employment?

17  A    Yes, it does.

18  Q    Page 2, please.  Does 122 contain the same false income as to

19  gross monthly income?

20  A    Yes, it does.

21  Q    Does it contain the same information on the details of the

22  transaction, not mentioning the subordinate financing?

23  A    Yes, ma'am, it does.

24  Q    And the bottom third.  Substantially similar signatures; is

25  that correct?

```
 1   A    Yes, ma'am.

 2   Q    What was your role in preparing this particular 1003 for the

 3   second duplex?

 4   A    None.

 5   Q    And can we look, please, at Exhibit 123, which I believe was

 6   also admitted as an Ownit business record yesterday.  Is this

 7   1003 for the third duplex in line 1 of our chart?

 8   A    Yes, it is, ma'am.

 9   Q    And does this contain the same false information as to

10   self-employment?

11   A    Yes, it does, ma'am.

12   Q    Does this contain -- Exhibit 123 contain the same false

13   information as to gross monthly income?

14   A    Yes, it does, ma'am.

15   Q    Does this have the same information as to subordinate

16   financing?

17   A    Yes, ma'am.

18   Q    Do the signatures appear to be the same?

19   A    Yes, ma'am.

20   Q    What was your role in preparing this particular loan

21   application?

22   A    I did not.

23   Q    Can you look, please, at Exhibit 127, which I believe was

24   also admitted as an Ownit business record?  Do you recognize this

25   document?
```

```
1    A    Yes, I do, ma'am.

2    Q    What is it?

3    A    A residential lease agreement.

4    Q    For what property?

5    A    9410 90th Avenue East in Puyallup.

6    Q    Is that one of the duplexes on line 1 of our chart?

7    A    Yes, it is.

8    Q    And for what dates does this lease agreement appear to be

9    valid?

10   A    To April 2005.

11   Q    For one year after that?

12   A    To April 2006.

13   Q    Would that have been exactly the time period you would have

14   been purchasing the property?

15   A    Yes, ma'am.

16   Q    Did you have any role in obtaining this lease agreement,

17   which was ultimately sent on to Ownit Mortgage Solutions?

18   A    I did not.

19   Q    This appears to be the same thing for another duplex.  Did

20   you have any role in preparing or obtaining or transmitting this

21   lease agreement to Ownit Mortgage Solutions?

22   A    I did not, ma'am.

23   Q    Prior to preparation for the trial in this case, had you ever

24   seen this lease agreement or do you have any recollection?

25   A    I do remember lease agreements being created for loan
```

1     purposes, but I don't remember this specific one.

2     Q    When you say "being created," what do you mean?

3     A    Being created to show the bank that this property is actually

4     making more money than it really was in order to qualify for the

5     loan.

6     Q    And who was it that created those?

7     A    Bill Poff.

8     Q    Do you recognize the fax header at the top of this lease

9     agreement?

10    A    Yes, I do.

11    Q    Is that the same one as you described earlier as being your

12    fax machine?

13    A    Yes, ma'am.

14    Q    Can you turn to page 11 of this exhibit, which contains

15    several of these lease agreements?  What is the name of the

16    tenant on page 11 of 127?

17    A    Walter Harris.

18    Q    Do you know a person named Walter Harris?

19    A    Yes, I do.

20    Q    What is his relationship to you?

21    A    He is a tenant in fact.

22    Q    He is a tenant at the property address listed on this

23    document?

24    A    He is not.

25    Q    So at another property?

1    A   Yes, ma'am.

2    Q   To your knowledge, did Walter Harris live at these duplexes

3 at the time you purchased them or at the time stated in this

4 lease agreement?

5    A   He did not.

6    Q   Can you look at Exhibit 128, please, previously admitted as a

7 business record from Ownit Mortgage Solutions?  Also lease

8 agreements, but slightly different.  Can you tell us what these

9 are?

10   A   Lease agreement.

11   Q   For what property?

12   A   For 8906 Colgate Drive West, University Place, Washington

13 98466.

14   Q   Are you familiar with that address?

15   A   Yes, I am.

16   Q   In April of 2005, who owned that property?

17   A   I did.

18   Q   Is that one of the 27 properties that you and the defendant

19 purchased?

20   A   Yes, ma'am.

21   Q   Did you have any involvement in creating, obtaining or

22 transmitting these lease agreements to Ownit Mortgage Solutions?

23   A   If I may see the back of the lease agreement to see if this

24 is the actual one?

25   Q   It might be easier with some of these longer exhibits if the

1    witness had the paper copy.  It is Exhibit 128.  Take a moment to

2    look through those loan agreements to see if you had any role in

3    creating them.

4    A    I did not have any role in creating this lease agreement, no.

5    Q    The first one you are referring to is between Haikanush

6    Ikilikyan and Alice Tyner?

7    A    Yes.

8    Q    Can you explain how this --  Do you know how this lease

9    agreement with your name on it came to be in the possession of

10   Ownit Mortgage Solutions' file on the duplexes?

11   A    Yes, ma'am.  Although there was a lease agreement between

12   ourselves and Alice Tyner, this does not appear to be that one.

13   This has been created to qualify for a loan.

14   Q    If you had a real lease agreement with someone named Alice

15   Tyner, why would you need to create one?

16   A    I don't believe the lease amount was $1,900.  It was lower.

17   Q    When you say "lease amount," are you referring to monthly

18   payments?

19   A    Monthly payments, yes.

20   Q    Would you look, please, at Exhibit 129, also admitted as an

21   Ownit Mortgage Solutions business record?  Whose name is on the

22   top there where it says "from"?

23   A    Haikanush Ikilikyan.

24   Q    Is that you?

25   A    Yes.

```
1   Q    Do you recognize the e-mail next to that?

2   A    Yes.

3   Q    Whose e-mail address is that?

4   A    This is an e-mail address that Bill and I both used and had

5   access to.

6   Q    Look at this e-mail, who it is to and if you wrote it?

7   A    It is Ikilikyan official bank statements and letter.  And it

8   was written by Bill.

9   Q    Ms. Ikilikyan, did you write this e-mail?

10  A    I did not.

11        THE DEFENDANT:  Objection.  She just said that she had

12  wrote it prior to.

13        THE COURT:  That is not my recollection of her

14  testimony.  Do you want to ask a clarifying question?

15  By Ms. Vogel:

16  Q    Ms. Ikilikyan, did you write this e-mail?

17  A    No, I did not.

18  Q    Did you say a moment ago that you did?

19  A    No.

20        THE DEFENDANT:  Can we review the record, your Honor?

21        THE COURT:  That's what I am doing, counsel.  That is

22  not what the record reflects.  I will overrule the objection.

23  By Ms. Vogel:

24  Q    Ms. Ikilikyan, on line 2 for this e-mail it lists the name

25  Senath Sands.  Are you familiar with a person named Senath Sands?
```

```
 1   A    Yes, ma'am.

 2   Q    Where does she work?

 3   A    She used to work for Ownit Mortgage.

 4   Q    Other than yourself, and, as you said, the defendant, who

 5   else used this e-mail address, Fidelis WW at MS dot com?

 6   A    Nobody else.

 7   Q    Can you look, please, at Exhibit 130, also admitted as an

 8   Ownit business record?  Do you recognize this document,

 9   Ms. Ikilikyan?

10   A    Yes, I do.

11   Q    What is it?

12   A    It is a profit and loss statement.

13   Q    For what?

14   A    It is a document that sometimes the bank requests to see what

15   your liabilities are, as well as your income.

16   Q    And does that appear to be your name and signature at the

17   bottom?

18   A    Yes, ma'am.

19   Q    Who prepared this document?

20   A    Bill Poff.

21   Q    How truthful were the income statements in this document at

22   the time period it was signed on April 4th, 2005?

23   A    Not truthful.

24   Q    And the expenses that are listed there, how truthful are

25   those as expenses for Fidelis Enterprises or Dove Realty?  Can
```

1  you read them?

2  A    I'm sorry.  It is not truthful.

3  Q    Can you zoom down to the bottom third, please?  Getting to

4  the bottom line where it says, "Net profit after taxes,

5  $448,834.73."  How truthful is that statement of a net profit for

6  Fidelis Enterprises or Dove Realty income for you on April 7th,

7  2005?

8  A    Not truthful, ma'am.

9  Q    Who prepared this document?

10  A    Bill Poff.

11  Q    What was your role in transmitting this document to where we

12  got it, which was from Ownit Mortgage Solutions?

13  A    Again, I am not sure if I was the one who faxed it or not.  I

14  don't know.

15  Q    For this particular purchase, the duplexes on line 1, who was

16  the escrow company?

17  A    Great American Escrow.

18  Q    And specifically who handled the closings?

19  A    Micki Thompson.

20  Q    Who handled the closings on behalf of the seller -- signing

21  the paperwork on behalf of the seller for this transaction?

22  Ms. Anderson?

23  A    Micki Thompson.

24  Q    And who actually controlled the documents when the seller,

25  Ms. Anderson, signed?

```
 1   A    Bill Poff.

 2   Q    Can you tell us where that occurred?

 3   A    Yes, ma'am.  It was University Place, Washington, in a

 4   restaurant, is where the signing took place.

 5   Q    And who was present at that signing at the restaurant in

 6   University Place?

 7   A    Myself, Bill Poff, Marijane and Sarah Anderson, and the

 8   listing agent.

 9   Q    Who is it that actually had physical control of the

10   documents?

11   A    Bill Poff and I went to pick up the documents.  I don't

12   remember who actually picked it up, but Bill Poff and I both had

13   control of it.

14   Q    And were you present and watching as the documents were being

15   signed?

16   A    Yes, ma'am.

17   Q    Who notarized the seller's documents?

18   A    Bill Poff.

19   Q    Can you look, please, at Exhibit 104?  This is a statutory

20   warranty deed.  Would this have been one of the closing documents

21   that would have been signed at the time of closing that you just

22   described?

23   A    Yes, ma'am.

24   Q    Now, this document is notarized by someone other than William

25   Poff?
```

1    A    Yes, ma'am.

2    Q    Can you explain that?

3    A    Sometimes when either the proper form was not in the file or

4    if Bill overlooked a notary, he would take the file back and

5    Micki would notice that she missed something and she would

6    notarize it for him.

7    Q    What is the date, according to this document, that Marijane

8    Anderson signed it?

9    A    The date of 16 April 2005.

10   Q    Can you look, please, at Exhibit 118?  This, I believe, was

11   admitted yesterday as a business record from Evergreen Escrow.

12   Do you recognize this document?

13   A    Yes, I do.

14   Q    What is it?

15   A    It is a seller financing agreement.

16   Q    And does it relate to one of the properties on our chart,

17   Exhibit 1?

18   A    Yes, it does.

19   Q    Which one?

20   A    9403-9415 94th, Puyallup, Washington.

21   Q    Is that the three duplexes in line 1?

22   A    Yes, it is.

23   Q    Despite the fact that the address is slightly different?

24   A    Yes, ma'am.

25   Q    Who created this document?

1    A    Bill Poff.

2    Q    What is the purpose of this document?

3    A    Originally it was intended to come up with an agreement to

4    keep ourselves in compliance with the bank, as well as the

5    sellers, to separate the purchase and sale agreement -- separate

6    the first and second loan.

7    Q    So when in the process of the sale would this document

8    surface?

9    A    At the end.

10   Q    Can we zoom in, please, on the first paragraph of this

11   document?  It starts, "Note and Deed of Trust."  This

12   contemplates a loan of $260,000 to the buyer.  Can you tell us

13   how many of the duplexes this note covered?

14   A    All four of them.

15   Q    And you said earlier that it was $65,000?

16   A    Yes.

17   Q    And the first few sentences of this note, is that consistent

18   with the agreement that we saw earlier in the purchase and sale

19   addendum and payment terms addendum?

20   A    Yes, ma'am, the terms are the same.

21   Q    And what is the last sentence of this note?  It says:  "This

22   indebtedness shall be evidenced by a promissory note and deed of

23   trust."  Who wrote those words?  Who wrote out those words?

24   A    Bill Poff.

25   Q    What is your understanding of what that means?

1    A    That also, along with this form, a promissory note will be

2    created as well to show it as a loan to the buyer, that these

3    funds would be showed as a loan in the form of a promissory note.

4    Q    Can we look down at the paragraph entitled "Waiver"?  Can you

5    look at the last two sentences of that top paragraph entitled

6    "Waiver"?

7    A    "Both parties understand this is a separate transaction from

8    the purchase and financing of the property described above.

9    Closing will be set for three business days after the acquisition

10   of the property listed herein."

11   Q    Where did that language come from on this form?  Who put that

12   language in this form?

13   A    Bill Poff.

14   Q    How often did that language -- that same language appear on

15   seller financing agreements, in your experience?

16   A    As soon as this was established that this form was needed to

17   keep compliance.  It was intended for it to be every time after

18   that -- after this form was formed.

19   Q    This language that says, "Both parties understand this is a

20   separate transaction from the purchase and financing of the

21   property described above," is that consistent or inconsistent

22   with the way that the original purchase and sale offer was

23   drafted?

24   A    Inconsistent.

25   Q    And at this particular closing, do you remember anybody

1    explaining this to Marijane Anderson, this change in the

2    agreement?

3    A    I don't remember.  I don't think so, no.

4    Q    Do you recall -- do you have any recollection, Ms. Ikilikyan,

5    of this seller financing agreement, this document right here,

6    being presented to Marijane Anderson at the closing that you have

7    described at the restaurant in University Place?

8    A    No.

9    Q    Can we look, please, at the signature and dates at the bottom

10   of the document?  What is the date written next to Marijane

11   Anderson's signature?

12   A    April 4th, 2005.

13   Q    Other than the signing that took place at the restaurant, do

14   you recall any other personal meeting between yourself and

15   Marijane Anderson prior to the closing of the first three

16   duplexes?

17   A    Prior to the closing?  No.

18   Q    And that closing date, again, for those first three duplexes,

19   as illustrated on Exhibit 1, was 4/25/04; is that correct?

20   A    Yes, ma'am.

21   Q    Zoom in on the second page of Exhibit 118.  Who notarized

22   this document?

23   A    William Poff.

24   Q    That is William S. Poff; is that correct?

25   A    Yes, ma'am.

1  Q    And, according to this document, he notarized both the

2  buyer's and seller's signature; is that correct?

3  A    Yes, ma'am.

4  Q    On what date?

5  A    April 4th, 2005, the same day.

6  Q    In this particular transaction of the duplexes, what happened

7  after all the closing documents were signed?

8  A    The file was turned over to Micki Thompson at Great American

9  Escrow.  And I believe then Micki Thompson proceeded to close --

10  finish out the rest of the loan.

11  Q    Do you have any recollection of any issues arising during the

12  disbursement of funds relating to this transaction?

13  A    Yes, ma'am.

14  Q    Can you tell us what those are?

15  A    In order to not bring any funds in to close, seller had been

16  asked if, on paper, they would pay the buyer's closing costs, I

17  believe two percent, even though in actuality they would not.

18  That is not something they would do.  After closing, Micki had

19  disbursed all the funds to Bill Poff and myself, and we returned

20  those funds back to Sarah Anderson.

21  Q    So there was an issue with the earnest money that had to be

22  resolved, is that what you are saying?

23  A    I believe closing costs -- two percent of closing costs, yes.

24  Q    In addition to that --  Let me ask it this way.  Do you

25  recall ever seeing the final HUDs for this transaction?

```
 1   A    If I saw it --  The memory is not too bright on this one.
 2   Q    Do you know whether the seller carrybacks of $65,000 per
 3   duplex, as you described was your deal with the seller, do you
 4   know if that was reflected in the final HUD?
 5   A    No.
 6   Q    No, you don't know?
 7   A    They weren't in there.
 8   Q    How do you know that?
 9   A    It wouldn't have worked.  The financing would not have worked
10   if it was in there.
11   Q    Do you know specifically how the seller carrybacks were
12   concealed on the HUDs in this particular case?
13   A    "How" meaning who took them off?
14   Q    If it didn't say $65,000 in seller carrybacks, do you know
15   what it said?
16   A    It had a different verbiage, if it had anything.  I don't
17   recall exactly what the verbiage was, but it didn't have the
18   seller financing on it.
19              THE DEFENDANT:  I object.  She just testified she didn't
20   see.
21              THE COURT:  The witness can testify as to her knowledge.
22   By Ms. Vogel:
23   Q    Can you look, please, at Exhibit 143, admitted yesterday as a
24   Great American Escrow record.  Have you, prior to your
25   preparation in this trial, seen this document before?
```

1    A    I have not, ma'am.

2    Q    Have you ever heard of a company called PDQ Construction

3    Contracting?

4    A    I did not.

5    Q    Are you familiar with the address underneath the words "PDQ

6    Construction Contracting"?

7    A    Yes, ma'am.

8    Q    Whose address is that?

9    A    My mother's address.

10   Q    Is that the apartment in Bellevue that you and the defendant

11   lived at with your mother?

12   A    Yes, ma'am.

13   Q    And what about the phone number underneath, the same?

14   A    Yes, the same.

15   Q    Does your mother own a business called PDQ Construction

16   Contracting?

17   A    She does not.

18   Q    Does anybody else in your family or that lived at that

19   address own a company called PDQ Construction Contracting?

20   A    No.

21   Q    Are you aware, during the time that you were negotiating to

22   purchase these duplexes from Marijane Anderson, of any repairs or

23   foundation upgrades or roof work or maintenance or anything like

24   that that was part of the purchase agreement?

25   A    None.

1    Q    And on this particular invoice, who does this say this is

2    billed to?

3    A    Billed to Marijane Anderson.

4    Q    Do you know why an invoice for PDQ Construction Contracting

5    bearing your mother's address would be in the Great American

6    Escrow file as a bill to Marijane Anderson?

7    A    Yes, ma'am, to justify why the funds would come to us instead

8    of to Marijane Anderson at closing.

9    Q    And what role did you have in creating this invoice?

10   A    I did not.

11   Q    Ms. Ikilikyan, who made the payments after closing on these

12   loans to both Ownit Mortgage Solutions and Ms. Anderson?

13   A    I did.

14   Q    And what were the monthly payments to Ownit, if you recall?

15   A    It was almost $1,900 for the first --

16   Q    Is that per month?

17   A    Per month.

18   Q    How about the payments to Ms. Anderson?

19   A    Almost $1,300 a month.

20   Q    Per month?

21   A    Per month, yes.

22   Q    How far did you pay those monthly payments?

23   A    Ownit Mortgage, I wrote a check every month to them.  The

24   seller carryback, I paid it to a company -- a note servicing

25   company and they indeed paid the seller themselves.  It was a

1    third-party that collected the funds.

2    Q    Was that Evergreen Escrow?

3    A    Yes, ma'am.

4    Q    What account -- from what account did you take the funds to

5    make those monthly mortgage payments?

6    A    The general account, Washington Mutual, ending in 1315.

7    Q    And why do you call it the general account?

8    A    That's where all the funds from loans, everything, came to,

9    all the loans, the money came to the account, typically.

10   Q    So in this particular transaction, I think you testified

11   earlier that you believed you and the defendant got about $90,000

12   at closing?

13   A    Approximately, for three duplexes.

14   Q    Into what account were those funds deposited?

15   A    Into the general Washington Mutual, ending in 1315, account.

16   Q    Ms. Ikilikyan, what is the status of those loans now?  Did

17   you pay them off?

18   A    I have not.

19   Q    What about the loan to Ms. Anderson, did you pay that off?

20   A    No, ma'am.

21   Q    When did you stop paying?

22   A    April of 2008.

23   Q    To Ms. Anderson?

24   A    Yes.  To Ms. Anderson a few months before that.

25   Q    And why did you stop paying?

1    A    That's when it was becoming difficult to obtain more loans

2    and pay for these properties, so the seller carrybacks

3    unfortunately were the last ones being paid.

4    Q    What is the current status of these duplexes?

5    A    Close to being foreclosed on.

6          MS. VOGEL:  Your Honor, I am about to start a whole new

7    property.  If we are going to take a break, this would be a good

8    time.

9          THE COURT:  We will take our lunch break at this time.

10   I would ask you to be back at 1:30, and we will resume at that

11   time.  Counsel, any matters we should take up at this time, from

12   the government?

13         MS. VOGEL:  No.

14         THE DEFENDANT:  Nothing, your Honor.

15         THE COURT:  I will see you at 1:30.  We will be at

16   recess.

17    (Lunch break)

18         THE COURT:  Ms. Vogel, I think we left off with you.

19   Counsel, I am told the person who could make the touch screen

20   work, made it work, and then left the room, and it stopped

21   working.  We have ordered them back for tomorrow.  As of right

22   now, we are not there.

23         MS. VOGEL:  Thank you.

24    By Ms. Vogel:

25    Q    Ms. Ikilikyan, can I direct your attention, please, to the

1    second line on the big chart there, Exhibit Number 1?  Do you

2    recognize the address of the property listed as number 2 on this

3    chart?  Line 2 on this chart, do you recognize that address?

4    A    Yes, I do.

5    Q    And what is that address?

6    A    31413 50th Avenue South in Federal Way, Washington.

7    Q    What is your connection to that property?

8    A    This is the property that was purchased by a straw buyer for

9    Bill Poff and myself.

10   Q    And in whose name did you and the defendant buy this

11   property?

12   A    Tim Thomson.

13   Q    Who is Tim Thomson?

14   A    Tim Thomson is the son of an old property manager we used to

15   have.  His name was Jim Thomson.

16   Q    Did you ever personally see this property at 31413 50th

17   Avenue South in Federal Way during the time it was purchased in

18   Tim Thomson's name?

19   A    Yes, ma'am.

20   Q    Can you look, please, at Exhibit 200?  Do you recognize the

21   house in that photograph?

22   A    Yes, ma'am.

23   Q    What house is that?

24   A    The address provided online number 2, 31413 50th Avenue

25   South, Federal Way, Washington.

Q    At the time that it was purchased by you and the defendant in the name of Tim Thomson, first of all, did it have a for sale sign in front of it like is depicted here?

A    Yes, ma'am.

Q    Now, how similar did it look to the way it looks in this photograph?

A    Afterwards?

Q    At the time you purchased it, did it look like it does in this photograph?

A    Yes, ma'am.

Q    Did you ever meet Tim Thomson?

A    Yes, ma'am.

Q    And can you explain how it is that Tim Thomson came to you and the defendant's attention as a possible straw buyer?

A    Yes, ma'am.  Jim Thomson many times mentioned to Bill Poff and myself that his son would like to do some form of investing. We had a meeting, the four of us at one time, and out of that meeting it was believed -- out of the meeting he decided that Tim Thomson would be a straw buyer, and for his service he would receive money up front for buying the property.

Q    And who is it that entered into that agreement that you have just described with Tim Thomson?

A    In that meeting it was Bill Poff, myself, Jim Thomson and Tim Thomson.

Q    Was this agreement in writing?

1  A   No, ma'am.

2  Q   What was your understanding of whether Tim Thomson would live

3  in the property or properties purchased in his name?

4  A   The agreement was that he would not live there.

5  Q   And what would happen with the properties?

6  A   It would be rented out and maintained by Bill Poff and

7  myself.

8  Q   Who specifically would be responsible for renting out those

9  properties?

10 A   Bill Poff and myself.

11 Q   Why were you looking to use Tim Thomson's name instead of

12 buying another property in your name, for example?

13 A   The financing would be easier with somebody who doesn't have

14 as many houses on their credit.

15 Q   After entering into this agreement with Mr. Tim Thomson, what

16 did you and the defendant do next towards the purchase of this

17 property?

18 A   It was also agreed that we would take the property -- we

19 proceeded to look for a property that would meet the needs of our

20 investing, which was --

21 Q   Go ahead.

22 A   -- which was the seller carryback.

23 Q   How did you find this property?

24 A   I found it on the MLS, Northwest MLS.

25 Q   And after finding it, what did you do?

```
 1   A    I contacted the listing agent.  I asked if the sellers would
 2   be capable and interested in doing a seller carryback.  She said,
 3   yes, that they would.  If my memory serves me right, I believe it
 4   was listed -- it was already listed they would be interested in
 5   doing that.
 6   Q    And was there then an offer written up and presented?
 7   A    Yes, ma'am.
 8   Q    Who drafted up that offer?
 9   A    I did.
10   Q    Can you look, please, at Exhibit 209, which I believe was
11   admitted yesterday as a Great American business record.  Do you
12   recognize this document?
13   A    Yes, ma'am, I do.
14   Q    What is it?
15   A    It is a purchase and sale agreement.
16   Q    And is that the document you just described writing up?
17   A    Yes, ma'am.
18   Q    And does that pertain to this property, 31413 50th Avenue
19   South?
20   A    Yes, it does.
21   Q    What was the agreed purchase price on this property?
22   A    $279,950.
23   Q    And who is the seller?
24   A    The seller was believed to be a John Andriolo, but he also
25   called himself a trustee.  I knew he had legal power to sell it.
```

1    Q    Who conducted the negotiations with the seller to reach the

2    terms that are laid out in the purchase and sale agreement?

3    A    I did, with the listing agent.

4    Q    What agreement was there with the seller, Mr. Andriolo,

5    regarding seller financing?

6    A    That they would carry back between 20 and 25 percent.

7    Q    And was that agreement written down?

8    A    Yes, ma'am.

9    Q    Can you look, please, at Exhibit 210?  Do you recognize this

10   document?

11   A    Yes, I do.

12   Q    What is it?

13   A    It is a payment terms addendum to purchase and sale

14   agreement.

15   Q    Does it pertain to this particular property on line 2 that we

16   have been discussing?

17   A    Yes, it does.

18   Q    Did you prepare this document?

19   A    Yes, I did.

20   Q    At what point in the process of submitting the original offer

21   that we just saw in Exhibit 209 did you also submit this payment

22   terms addendum?

23   A    Right at the beginning, with the purchase and sale agreement.

24   Q    And was it accepted by the seller, Mr. Andriolo?

25   A    Yes, it was.

1    Q    Can we zoom in on the paragraph that says note and deed of

2    trust?  Can you read that top paragraph there to yourself, and

3    tell us whether that is consistent with your recollection of the

4    agreement you entered into with Andriolo on seller financing?

5    A    Buyer agrees to pay -- I'm sorry, it is difficult to read,

6    200 -- almost 220,000 down, excluding earnest money, at closing,

7    and the balance of the purchase price to seller, two monthly

8    installments of $307 a month.

9    Q    That $307 a month, did that include any amount of principal?

10   A    No.

11   Q    When was the principal of this note to be due to the seller?

12   A    It was --

13   Q    I'm sorry?  What did you say?

14   A    26-month term.

15   Q    Who conducted the negotiations with the seller, Mr. Andriolo,

16   on behalf of Tim Thomson for this note?

17   A    At closing, Bill Poff and myself.

18   Q    Where was Tim Thomson during this entire process that the

19   purchase and sale and this payment terms addendum was being

20   negotiated?

21   A    He was out of the country.

22   Q    Do you know then who it is that signed -- that initialed here

23   on the payment terms addendum and signed on 209 that we saw a

24   moment ago?

25   A    It was his father, Jim Thomson.

1   Q    Who was the loan officer for this transaction on behalf of

2   Tim Thomson?

3   A    On paper it was myself, but the actual loan officer is Bill

4   Poff.

5   Q    Can you look, please, at Exhibit 217?  I believe it is

6   admitted as a Great American Escrow business record.  Do you

7   recognize this document?

8   A    Yes.

9   Q    What is it?

10  A    It is a preapproval letter that is typically submitted with

11  each offer.

12  Q    Who is the loan officer that is listed on this letter?

13  A    William S. Poff.

14  Q    And the address that this letter pertains to?

15  A    Yes, ma'am.

16  Q    Is what?

17  A    31413 50th Avenue Southwest, Federal Way, Washington.

18  Q    And the fax header on the top of this page, do you recognize

19  that one as well?

20  A    Yes, ma'am.  That is our fax number.

21  Q    Can you look, please, at Exhibit 218, also admitted I believe

22  as an Ownit Mortgage Business Solutions record.  We saw this type

23  of form earlier this morning.  Do you recognize this form?

24  A    Yes, I do.

25  Q    And to which property does this form pertain?

1    A    31413 50th Avenue South, Federal Way.

2    Q    And can you remind us what this form is again?

3    A    It is a loan submission form.

4    Q    Ms. Ikilikyan, did you fill in the lines on this form?

5    A    I did not.

6    Q    And where it says on the top third on the left -- where it

7    says, "Contact Bill/Alexis," did you fill that part in?

8    A    I did not.

9    Q    And at the bottom of what we can see here, the top half of

10   this form, what is the total combined loan to value that this

11   submission form requests for mortgages on this property?

12   A    Loan to value, it says 80 percent.

13   Q    And the total combined mortgage value after both mortgages?

14   A    100 percent.

15   Q    Look at the date on the header -- the fax header line.  What

16   is that date?

17   A    December 8th, 2005.

18   Q    And if we could go back, please, to Exhibit 210, that we just

19   looked at, the payment terms addendum, and focus in on the date

20   that that was signed.  What date was that signed?

21   A    December 5th, 2005.

22   Q    Does it look maybe on the right hand side it was signed by

23   the seller on maybe the 6th?  It is hard to tell.

24   A    Yes, ma'am.

25   Q    In any event, would that be before or after the loan

1    submission form was sent to Ownit Mortgage for 100 percent

2    financing?

3    A    The loan submission was after.

4    Q    Can you look, please, at Exhibit 220?  Can you tell us what

5    loan --  This was admitted, again, as an Ownit business record.

6    Can you tell us what loan this application pertains to?

7    A    31413 50th Avenue Southwest, Federal Way.

8    Q    And that is listed as the subject property?

9    A    Yes, ma'am.

10   Q    And who is the borrower in this loan application, 1003?

11   A    Tim Thomson.

12   Q    And what is the amount of the loan requested?

13   A    $223,960.

14   Q    Do you know if that would be the first or the second mortgage

15   on this property?

16   A    First mortgage.

17   Q    And let's look down at the information that was contained in

18   this loan application as per Tim Thomson's employment.  What does

19   it say was the address of the employer -- name and address of the

20   employer of Tim Thomson?

21   A    Tim Thomson Landscaping, 21445 30th Avenue South in Seattle,

22   Washington.

23   Q    How many years does this 1003 say Mr. Thompson was

24   self-employed with that employer?

25   A    It mentioned three years.

1   Q    If we look at page 2, what does this loan application state

2   was the monthly income for Mr. Thompson from that source?

3   A    $9,799.

4   Q    That total you just gave us includes $99 of net rental income

5   as well?

6   A    Yes.

7   Q    Ms. Ikilikyan, what role did you have in preparing or

8   submitting this 1003 to Ownit Mortgage Solutions in the

9   application for the first mortgage on property number two?

10  A    No role at all.

11  Q    Do you know who prepared this application?

12  A    Yes, ma'am.

13  Q    How do you know who prepared this application?

14  A    Bill Poff created all loan applications and documents.

15  Q    Are you familiar with the entity Tim Thomson Landscaping?

16  A    Yes, ma'am.

17  Q    How are you familiar with it?

18  A    It is a business license that Bill Poff created for Tim

19  Thomson in order to qualify for this loan.

20  Q    How do you know that?

21  A    I saw him.

22  Q    When you say you "saw him," what do you mean?

23  A    I saw him fill out the business license application online.

24  Q    To your knowledge, was there ever a business called Tim

25  Thomson Landscaping?

1   A    Yes, ma'am.  I'm sorry.  No, not at all.

2   Q    Other than the one that is on paper, was there ever really a

3   business called Tim Thomson Landscaping that did any landscaping

4   work?

5   A    Not at all, no.

6   Q    And if we could go back to the 1003, Exhibit 220, on page 3.

7   On the details of transaction section on the left-hand side,

8   line J, what does this 1003 convey to Ownit Mortgage Solutions

9   about any subordinate financing?

10  A    That there is no subordinate financing.

11  Q    What does it convey about how much cash the borrower, that

12  would be Mr. Thompson, has to bring to the transaction, if you

13  look down at line T?

14  A    $55,504.35.

15  Q    Can we look briefly, please, at Exhibit 221, also admitted as

16  an Ownit business record.  We will zoom in on the top half.  Is

17  this another 1003 for the same property but for a different loan

18  amount?

19  A    Yes, ma'am.

20  Q    Can you tell us what the amount this 1003 is for?

21  A    $55,990.

22  Q    And does it have the same information --  I'm sorry.  Based

23  on your knowledge of how this property was purchased, would that

24  be the first or the second mortgage?

25  A    This would be for the second mortgage.

1   Q    Let's look briefly to see if it contains the same information

2   as Exhibit 220 that we just saw.  As to employment, does it

3   contain the same information, Tim Thomson Landscaping?

4   A    Yes, ma'am.

5   Q    As to income on page 2, does it contain the exact same

6   information?

7   A    Exact same, yes, ma'am.

8   Q    And on page 3, as to the details of the transaction,

9   subordinate financing, does it contain the same information?

10  A    Yes, ma'am.

11  Q    On the right-hand side of the declaration section there

12  online L, it asks, "Do you intend to occupy the property as your

13  primary residence?"  How is that marked on behalf of Tim Thomson?

14  A    It is marked as "yes."

15  Q    And can you look at the signature on the bottom of this form?

16  Is that your name on the interviewer's block?

17  A    Yes, ma'am.

18  Q    And do you recall signing this document?

19  A    Yes, I do.

20  Q    Who is it that asked you to sign this document?

21  A    Bill Poff.

22  Q    And the one that we looked at previously, was that also one

23  that you signed?  We will go back to 220, third page, please.

24  A    Yes, ma'am, that's my signature.

25  Q    And, again, at whose direction or request did you sign this

1  document?

2  A   Bill Poff's.

3  Q   Will you look, please, at Exhibit 225, also admitted, I

4  believe, as an Ownit business record.  Can we zoom in on the top

5  half of that document?  Are you familiar with what this document

6  is?

7  A   Yes, I am.

8  Q   What is BTA Law Group?

9  A   BTA Law Group, the attorney that works for them also did our

10 taxes --  my taxes, and he verified the self-employment for our

11 clients.

12 Q   When you say he did your taxes, what tax returns did he

13 prepare for you?

14 A   Business and --  Actually --  I'm not sure if it is business

15 and regular.  He prepared the tax returns.

16 Q   Ms. Ikilikyan, what role did you have in soliciting this

17 particular letter that was in the Ownit business record files on

18 behalf of Tim Thomson?

19 A   I was in the room when the question was asked to Mr. Gossing

20 if that would be okay.

21 Q   And who asked Mr. Gossing to do this?

22 A   Bill Poff.

23 Q   Do you know what information Mr. Poff gave to Mr. Gossing on

24 which to base this letter?

25 A   The application for the business license that was printed off

1    after it was filled out.

2    Q    So the solicitation of this letter happened before or after

3    the business was created?

4    A    After.

5    Q    How many loan clients have you or Mr. Poff, the defendant,

6    obtained similar letters like this for?

7    A    I believe that it was less than 15, I am guessing.

8    Q    Can you look, please, at Exhibit 223?  This also was admitted

9    as an Ownit Mortgage Solutions' business record.  In the from

10   line of this e-mail, it has your name; is that correct?

11   A    Yes, ma'am.

12   Q    And the same Fidelis WW e-mail address we saw earlier this

13   morning?

14   A    Yes, ma'am.

15   Q    And who is this e-mail to?

16   A    It is to Senath Sands.

17   Q    You said earlier she worked as an employee at Ownit Mortgage

18   Solutions?

19   A    Yes, she does.

20   Q    Ms. Ikilikyan, did you write this e-mail?

21   A    I did not.

22   Q    Ms. Ikilikyan, once the loans for the purchase of property

23   number two were approved, who handled the closing paperwork?

24   A    Micki Thompson.

25   Q    And physically where did -- let's start with the seller,

1    Mr. Andriolo, where did he sign the paperwork, if you know?

2    A    I think it was in Port Townsend.  I remember it being hours

3    away.

4    Q    Were you present?

5    A    Yes, ma'am.

6    Q    Tell us how that happened.

7    A    Bill Poff and myself met with John Andriolo at his hometown

8    in Port Townsend, and all three of us met at a restaurant to sign

9    the seller's closing costs -- excuse me, seller's paperwork.

10   Q    Was the paperwork notarized at the time it was signed?

11   A    It was signed and notarized.

12   Q    Who notarized it, if you recall?

13   A    I believe it was Bill Poff.

14   Q    Can you look, please, at Exhibit 213?  This was admitted, I

15   believe, as a Great American business record.  Do you recognize

16   this document?

17   A    Yes, ma'am.

18   Q    Now, this looks very similar to a document we just looked at

19   earlier today.  Who drafted this document?

20   A    Bill Poff.

21   Q    Was this one of the closing documents that was presented to

22   the seller, Mr. Andriolo, at the signing you just described?

23   A    Yes, ma'am.

24   Q    And does it have the same language in the waiver paragraph as

25   the one we saw earlier?

1   A   Yes, ma'am.

2   Q   Ms. Ikilikyan, do you recall anybody explaining this document

3   to Mr. Andriolo at the time of signing?

4   A   No, ma'am.

5   Q   Ms. Ikilikyan, do you recall at any time this seller

6   financing agreement being presented to Mr. Andriolo in advance as

7   part of the negotiations?

8   A   No, ma'am.

9   Q   Do you recall any discussions at all with Mr. Andriolo --

10  What do you recall about any discussions at all with

11  Mr. Andriolo, prior to closing, about moving the seller financing

12  agreement from part of the purchase and sale addendum to the

13  seller financing agreement?

14  A   The only thing that was discussed with Mr. Andriolo is that

15  he would be in second position with the seller carryback.

16  Q   And the second position, is that consistent or inconsistent

17  with the number of mortgages that were actually taken out by

18  Ownit Mortgage?

19  A   Inconsistent.

20  Q   And who is it that told Mr. Andriolo that he would be in

21  second position?

22  A   I did.

23  Q   And why did you do that?

24  A   To get as much loans as we possibly could from this property.

25  Q   Can you turn to the second page of Exhibit 215, please?  Were

```
 1   you present when this document was signed and notarized by the

 2   seller -- I mean, by the buyer?

 3   A   Yes, ma'am.

 4   Q   And I think there is another page.  Were you present when

 5   this document was signed and notarized by the seller,

 6   Mr. Andriolo?

 7   A   Yes, ma'am.

 8   Q   And that was at the meeting you just described?

 9   A   Yes, ma'am.

10   Q   How many meeting did you and the defendant have with the

11   seller in this case, Mr. Andriolo?

12   A   Just one, ma'am.

13   Q   Do you know who signed the closing documents on behalf of the

14   buyer, Tim Thomson?

15   A   Yes, ma'am.  It was Jim Thomson, his father.

16   Q   Were you present when those closing documents were signed?

17   A   Yes, I was.

18   Q   Where did that happen?

19   A   It happened in Federal Way, at Starbucks.

20   Q   Who else was present?

21   A   Bill Poff and Jim Thomson.

22   Q   Who handled escrow for this sale?

23   A   Great American Escrow.

24   Q   Can you describe for us what happened after the funds from

25   all these loans came into Great American Escrow on this
```

1   transaction?

2   A    Yes, ma'am.  Then a promissory note was created in order to

3   justify why the excess money should come to Bill Poff and myself.

4   Q    Can you look, please, at Exhibit 214, Great American Escrow

5   business record.  What is this document?

6   A    It is a promissory note.

7   Q    And you said a moment ago, "it was created."  Do you know who

8   created it?

9   A    Bill Poff.

10  Q    How do you know that?

11  A    He created all receipts and promissory notes and loan

12  documents, anything that pertained to that.

13  Q    And were you present at Great American Escrow when this

14  document was provided to the escrow company?

15  A    Yes, ma'am.

16  Q    What is the purpose of this document?

17  A    The way I understand it, this document is created so that,

18  instead of the seller receiving the money, the proceeds, this

19  shows as though that person is lending the buyer the money.  This

20  is just an instrument to let Great American Escrow disburse funds

21  to the buyer instead of the seller.

22  Q    This promissory note is actually, if you look at it, between

23  you, Alexis Ikilikyan, and the buyer, Timothy Thomson; is that

24  correct?

25  A    Yes, ma'am.

1    Q    So you were neither the buyer nor the seller, were you?

2    A    The buyer, just not on paper, ma'am.

3    Q    So with this document, what was Micki -- what did Micki feel

4    like she was able to do?

5              MR. RATNER:  Objection.

6              THE COURT:  Sustained.

7    By Ms. Vogel:

8    Q    What did this document permit Micki to do, as you understand

9    it?

10   A    Instead of disbursing the funds to Tim Thomson, she was able

11   to disburse it to Bill Poff and myself.

12   Q    Is that what happened?

13   A    Yes, ma'am.

14   Q    Was there any indebtedness by you and Tim Thomson as

15   purported by this document?

16   A    No.

17   Q    Did you sign this document?

18   A    Yes, ma'am.

19   Q    And who notarized this document?

20   A    Bill Poff.

21   Q    Do you know who signed this particular document on behalf of

22   Tim Thomson?

23   A    This was signed by Jim Thomson.

24   Q    Tim Thomson's father?

25   A    Yes.

1   Q    Were you and the defendant, Mr. Poff, able to get any cash

2   out of the closing on this property, number two on the chart?

3   A    Yes, ma'am.

4   Q    Do you recall how much?

5   A    Again, within a small range, between 60- and $70,000.  It was

6   closer to $65,000, I believe.

7   Q    And where did that money go?

8   A    It went to Washington Mutual general account ending in 3135.

9   Q    Who made payments, if anyone did, on these loans that Mr. Tim

10  Thomson took out to purchase this property?

11  A    I did.

12  Q    To your knowledge, did Tim Thomson make any payments?

13  A    No.

14  Q    How did you make those payments?  From what account?

15  A    The same general account ending in 3135.  The first mortgage

16  was paid online; the second mortgage, a check was mailed to them;

17  and the third, a check was mailed to John Andriolo.

18  Q    And did you pay off all of those notes?

19  A    No, ma'am.

20  Q    When did you stop making payments to Ownit Mortgage

21  Solutions?

22  A    This property, I believe around June of '08.

23  Q    And when did you stop making payments to Mr. Andriolo?

24  A    Around the same time, June time frame.

25  Q    What did you or the defendant pay Mr. Tim Thomson for his

1   participation in this transaction?

2   A   $1,000.

3   Q   And how was that paid?

4   A   Via check.

5   Q   Who paid him?

6   A   I wrote the check, but the funds came out of that general

7   account ending in 3135.

8   Q   Did you and the defendant attempt to buy any additional

9   properties in Tim Thomson's name?

10  A   Yes, ma'am, attempted, but it did not work out.

11  Q   So what is the status now of property number two on our

12  chart, the house at 31413?

13  A   It has gone into foreclosure.

14  Q   I will direct your attention now to property number three on

15  our chart, 13841 Southeast 180th Street in Renton.  Are you

16  familiar with this property?

17  A   Yes, ma'am.

18  Q   And how is it you are familiar with it?

19  A   This is the property originally --

20  Q   How is it you are familiar with it?

21  A   Originally a gentleman by the name of Sean Warren purchased

22  this property as a straw buyer.  And then eventually, when things

23  did not work out according to plan, we purchased it back from

24  Sean Warren.

25  Q   And "we" is who?

1   A    Bill Poff and myself.

2   Q    And was that on August 1st of 2006, as listed on the first

3   column of line 3 of the chart?

4   A    Yes, ma'am.

5   Q    Let's look at Exhibit 300, please.  Do you recognize the

6   house -

7   A    Yes, ma'am.

8   Q    -- in that photograph?  What is it?

9   A    It is property 13841 at Southeast 180th in Renton,

10  Washington.

11  Q    The house you just mentioned purchasing?

12  A    Yes, ma'am.

13  Q    And how different at the time you purchased it was it from

14  the way it looks in this photograph?

15  A    It was cleaner.

16  Q    By "cleaner," what do you mean?

17  A    There was no garbage outside, the landscaping looked better

18  when we purchased it.

19  Q    So perhaps in slightly better condition than it is in this

20  photograph?

21  A    Yes, ma'am.

22       MS. VOGEL:  Your Honor, with that caveat, I would move

23  the admission -- with that explanation, I move the admission of

24  Exhibit 300.

25       THE COURT:  Any objection?

1          THE DEFENDANT:  No objections, your Honor.

2          THE COURT:  300 is admitted.

3          (300 admitted.)

4    By Ms. Vogel:

5    Q    So you sort of ran through this all very quickly, but I do

6    want to break it down so it is clear.  Who did you buy this

7    property from?

8    A    Sean Warren.

9    Q    And do you know Sean Warren personally?

10   A    Yes, ma'am, briefly.

11   Q    Were you involved at all when Sean Warren bought this

12   property?

13   A    Yes, ma'am.

14   Q    Can you explain that to us?

15   A    Sean Warren was a Marine that moved to the west coast, and he

16   was looking for property to buy for himself.  During that time

17   Tony Reyes contacted Bill Poff and myself and asked if there

18   would be anybody that could be a straw buyer for a client that he

19   has that he is working with, and that they didn't have the best

20   credit.  He was working to fix that for him.  At that time Sean

21   Warren was being prequalified by Bill.  And Bill Poff and myself

22   asked Sean if he would be interested in participating in doing

23   that.  And if so, he would receive a total of $6,000 for that

24   property.  He told us, if he qualifies, he would be interested.

25   So Sean Warren proceeded -- Bill Poff proceeded to close the loan

1    for Sean Warren.  I was the agent for the transaction.  The straw

2    buyers actually moved in and lived on the property.  About a year

3    into it --

4    Q    You said the "straw buyers"?

5    A    The people who were intending to buy the property.  I'm

6    sorry.

7    Q    To your knowledge, did Sean Warren ever live in this

8    property?

9    A    He never did, no.

10   Q    So after Sean Warren purchased the property in the manner you

11   just described, why did you decide to then purchase it from him?

12   A    About a year into it, the people who were making the

13   payments, they were not able to make the payments.  They were

14   defaulting on the loan.  So Sean Warren contacted Bill Poff and

15   myself and told us what is going on, somebody needs to take care

16   of this, so to speak.  That's when Bill Poff and myself contacted

17   Tony Reyes to find out what are we all going to do about this

18   because this wasn't part of the plan.

19   Q    So ultimately what did you and the defendant decide to do to

20   help Mr. Warren?

21   A    Ultimately we took over payments.  And then purchased --

22   actually purchased the property from his name a year later when

23   the prepayment penalty was up.

24   Q    What was your role in the purchase of this property from

25   Mr. Warren?

1     A     Just preparing the purchase and sale agreement.

2     Q     How did you arrive at a purchase and sale agreement?

3     A     Whatever the market value was at the time.  And I did the --

4     I sent the comparable reports to an appraiser to come back with a

5     market value.  And that was my role.

6     Q     Were you negotiating with anyone on the other side?

7     A     No, ma'am.

8     Q     Can you look, please, at Exhibit 308, previously admitted as

9     an Ownit business record?  Is this the purchase and sale

10    agreement that you just described, the purchase from Mr. Warren?

11    A     Yes, ma'am.

12    Q     What was the purchase price that you arrived at?

13    A     $350,000.

14    Q     Who was the buyer in this transaction?

15    A     We are, even though it is in my mother's name.

16    Q     Why is it in your mother's name?  Why is this one in your

17    mother's name?

18    A     This is something Bill Poff did, because he knew the credit

19    for both myself and mom would qualify easier.  It is something he

20    determined.

21    Q     What involvement did your mother have in negotiating the

22    purchase price or any of that process?

23    A     She didn't have any.

24    Q     If you look at the bottom of the first page of Exhibit 308,

25    it lists the real estate agencies involved, U.S. Realty &

1   Investment, LLC.  Is that your company that you and the defendant

2   opened that you described earlier?

3   A   Yes, ma'am.

4   Q   So this would have been during the time period you would have

5   been working under that umbrella?

6   A   Yes, ma'am.

7   Q   Ms. Ikilikyan, was there seller financing on this deal?

8   A   No, there was not.

9   Q   Why not?

10  A   Sean Warren --  It was a straight purchase from him.  There

11  was equity in the property.

12  Q   What did you do in this particular transaction after you had

13  the signed purchase and sale agreement?

14  A   Started escrow, and gave the purchase and sale to Bill Poff

15  so he would start on the loan.

16  Q   Do you know who the lender was for this purchase?

17  A   Ownit Mortgage.

18  Q   Would you look, please, at Exhibit 309, also admitted as an

19  Ownit business record.  This is another submission sheet like the

20  one we have seen before.  Can you tell us what property this one

21  is for?

22  A   13841 Southeast 180th Street, Renton, Washington.

23  Q   Is this for the mortgage in your mother's name to purchase

24  that property?

25  A   Yes, ma'am.

1  Q    On the line that says "loan officer," it says your name,

2  Alexis.   Ms. Ikilikyan, did you fill out this form?

3  A    I did not.

4  Q    Ms. Ikilikyan, do you have any recollection of signing this

5  form?

6  A    I do not.

7  Q    Do you believe that you signed this form?

8  A    I did not.

9  Q    It looks like your signature right there?   Can you explain

10 that?

11 A    Bill signed it for me.

12        THE DEFENDANT:   Objection on foundation, your Honor.

13        THE COURT:   Overruled.

14 By Ms. Vogel:

15 Q    Will you look, please, at Exhibit 310, also admitted as an

16 Ownit business record.   Is this the 1003 -- the same property

17 that we have been looking at, property number three on the chart?

18 A    Yes.

19 Q    And who is the buyer -- borrower?   Excuse me.

20 A    Armenuhi, my mother.

21 Q    And what is the amount being sought?

22 A    $315,000.

23 Q    If we look down at the claims about the borrower's

24 employment, what does it say was Ms. Armenuhi Harutyunyan's

25 employment?

1   A    Hay Computer Networking & Consulting.

2   Q    And how many years does this 1003 say that she had that job?

3   A    Four years on the job.

4   Q    Is that true or false?

5   A    It might have been when the business was opened, but there

6   was no actual business.

7   Q    What was your mother's true employment in August of '06, do

8   you know?

9   A    I know she worked for Work Source.  I don't know her exact

10  job title.  I know she worked for the state.

11  Q    Did she ever own her own business that you know of?

12  A    No, she did not.

13  Q    Let's look at the second page, please, under income.  What

14  does this 1003 claim is your mother's gross monthly income?

15  A    $38,580.

16  Q    Ms. Ikilikyan, do you know whether that was your

17  mother's true income at that time?

18  A    It is not.

19  Q    What role did you have in supplying this information about

20  your mother's employment and income for the purpose of this 1003?

21  A    None.  Zero.

22  Q    What do you recall, Ms. Ikilikyan, about how much money was

23  put down to buy this property?

24  A    No money down.

25  Q    Can you look at Exhibit 315?  This was admitted yesterday, I

1    believe, as an Ownit business record.  Do you recognize this?

2    A    Yes, ma'am.

3    Q    What is it?

4    A    It is a fictitious cashier's check.

5    Q    Where did it come from?

6    A    Bill Poff created it.

7    Q    How do you know that?

8    A    I saw him do it.

9    Q    And do you know for what purpose it was created?

10   A    To avoid bringing actual funds to escrow, and get the same

11   funds back from escrow.

12   Q    Do you know who Mr. Poff gave this to after he created it?

13   A    To Micki Thompson.

14   Q    Do you know how Mr. Poff created it?

15   A    On his computer.

16   Q    Do you know what program he used?

17   A    He used -- if I remember correctly, it was Paint --

18   Q    I don't want you to guess.  Do you know or are you guessing?

19   A    He had copies of cashier's checks and used the numbers from

20   those checks and recreated it.  It was from a simple program, not

21   something that he bought separately.  It was something that

22   regular computers come with.  I believe it is called Paint.

23   Q    After Mr. Poff created this --  Let me clarify.  Did Mr. Poff

24   actually create a check or just a copy of a check?

25   A    A copy of that check.

1  Q    What did he do with that copy of the check?

2  A    The copy of the check was presented to Micki Thompson to show

3  as the down payment.

4  Q    Is this the only time you saw something like this happen?

5  A    No.

6  Q    How many times did you see something like this happen?

7  A    I would like to say under ten.  I don't remember the exact

8  amount.  It wasn't over ten checks.

9  Q    Ms. Ikilikyan, did you and the defendant get any money from

10 this closing, property number three on our chart?

11 A    Yes, ma'am.

12 Q    Do you have any idea how much?

13 A    From memory, I would like to say under $35,000.

14 Q    And where did that money go?

15 A    Into the general fund in the Washington Mutual bank account

16 ending in 3135.

17 Q    Who made the payments on this loan, property number three?

18 A    I did.

19 Q    How many payments did your mother make?

20 A    None.

21 Q    And when you say "I did," what account was used to make the

22 monthly payment?

23 A    The Washington Mutual account ending in 3135.

24 Q    What is the current status of that loan?

25 A    It has gone into foreclosure.

1    Q    I will direct your attention to property number four on our

2    chart, 20613 11th Avenue South, Des Moines, Washington.  Are you

3    familiar with that address?

4    A    Yes.

5    Q    How are you familiar with that property?

6    A    This is a property I found on MLS.

7    Q    Is this a property that you purchased in your mother's name

8    as well?

9    A    Yes, ma'am.

10   Q    Let's look at Exhibit 400, please.  Did you ever visit this

11   property?

12   A    Yes, ma'am.

13   Q    And is that the property that we are talking about in

14   Exhibit 400?

15   A    Yes, ma'am.

16   Q    Now, I want to ask you about the timing.  If you look back at

17   Exhibit Number 1, property number four was purchased about, it

18   looks like, 17 days after property number three.  Can you explain

19   to us, was it unusual to buy more than one property in the same

20   month?

21   A    It was not unusual.

22   Q    What was the reason, if there was one, for buying properties

23   in a short sequence?

24   A    The whole idea was to make it as many properties as possible

25   in order to get the loans out to make the payments for all the

1    rest of them.  If there was another house available, it was not

2    uncommon.

3    Q    Was there any advantage that you are aware of to buying

4    properties and having properties close at the same time?

5    A    Yes, for the owner-occupied status, so it wouldn't show on

6    the credit report as another property.

7    Q    You said you found this particular property, property number

8    four on our chart, on MLS.  Why did you select this particular

9    property?

10   A    They did advertise a carryback on that property.

11   Q    What was your role in preparing the purchase and sale

12   agreement?

13   A    I prepared the purchase and sale agreement, and sent it to

14   the listing agent, Mr. Jenkins.

15   Q    Can we look, please, at Exhibit 409, admitted I believe as a

16   Great American business record.  This has been faxed a few times,

17   so I apologize.  It is difficult to read.  Can you recognize that

18   document?

19   A    Yes, ma'am.

20   Q    What is it?

21   A    It is a purchase and sale agreement for that property.

22   Q    And that is property number four again on our chart?

23   A    Yes, it is.

24   Q    This is the one you prepared?

25   A    Yes, ma'am.

1   Q    What was the sales price for this property?

2   A    $385,500.

3   Q    And who was the ultimate buyer on this property?

4   A    Bill Poff and myself.

5   Q    And who was the buyer on paper?

6   A    Armenuhi Harutyunyan, my mother.

7   Q    And who was the seller for this property?

8   A    Lionel Jenkins.

9   Q    Who did you -- with whom did you negotiate for the purchase

10  and sale of this property?

11  A    Lionel Jenkins.

12  Q    Did the original offer that you conveyed to Mr. Jenkins

13  contain any terms about seller financing?

14  A    Yes, ma'am.

15  Q    And what was the agreement that was reached with Mr. Jenkins

16  about seller financing?

17  A    My memory is not the greatest, ma'am, but I know that typical

18  of owner financing numbers were as much as they were willing to

19  accept.

20          THE DEFENDANT:  Objection.  Nonresponsive.

21          THE COURT:  I am going to sustain that.  Let's ask a

22  question that is more precise.

23  By Ms. Vogel:

24  Q    My question was what was your recollection of the agreement

25  with the seller about seller financing?

1    A    Between 20 and 25 percent.

2    Q    Now, what happened after you entered into that agreement on

3    the subject of seller financing?

4    A    That this signed purchase and sale was turned over to Great

5    American Escrow and to Bill Poff for the loan.

6    Q    Do you know who the lender was on this transaction?

7    A    Ownit Mortgage.

8    Q    Can you look, please, at Exhibit 412, an Ownit Mortgage

9    Solutions business record.  Is this another submission sheet,

10   this time for property four on our chart?

11   A    Yes, ma'am.

12   Q    What role did you have in filling out this submission sheet?

13   A    I did not.

14   Q    Where it says "loan officer," and has your name, did you

15   write that in?

16   A    I did not.

17   Q    Do you have any recollection, Ms. Ikilikyan, of signing this

18   document?

19   A    I do not.

20   Q    Can you look, please, at Exhibit 413?  What property is this

21   a 1003 for?

22   A    20619 11th Avenue South in Seattle.

23   Q    And this was admitted as an Ownit business record as well.

24   What role did you have in preparing this 1003 for the purchase of

25   property number four on our chart?

1    A    I did not have any role.

2    Q    What is the amount of the loan being sought in this one?

3    A    $345,500.

4    Q    If we could back up, please, and look at the borrower

5    information.  First of all, is the name of the borrower being

6    submitted?  The name of the borrower?

7    A    Armenuhi Harutyunyan.

8    Q    That is your mother?

9    A    That is my mother.

10   Q    What information was included in this 1003 for employment?

11   A    Hay Computer Networking & Consulting.

12   Q    Page 2.  What information was included as her gross monthly

13   income?

14   A    $37,000 a month.

15   Q    Can you look, please, at page 3?  What information is

16   conveyed to Ownit Mortgage Solutions about subordinate financing

17   or seller financing?

18   A    None.

19   Q    Ms. Ikilikyan, do you have any recollection of signing this

20   document?

21   A    Yes, ma'am.

22   Q    Who is it that asked you to sign it?

23   A    Bill Poff.

24   Q    What role did your mother have in submitting this information

25   for the preparation of this 1003?

1  A     None.

2  Q     So tell us what happened after the loans were approved at

3  escrow on this particular closing, property number four?

4  A     Yes, ma'am.  Franklin, Bill Poff and myself went to escrow.

5  We all learned that this property was indeed in foreclosure, so

6  the numbers had changed.  The payoff was higher.  Without

7  remembering too much on the details, we had --  And, also, we had

8  learned that Mr. Jenkins himself had a carryback.  So we had to

9  almost recreate the whole transaction to see if it was still

10  going to work.  Upon doing that we --  Mrs. Bourgeois was the

11  seller financier for Mr. Jenkins.  She contacted escrow.  And all

12  of us were at -- she was on speaker phone, and she let us know

13  she has an interest in the property, this is how much her

14  interest is.  And we explained to her that if this property is on

15  its way to being foreclosed on, if we don't close this deal, she

16  may not get too much money out of the deal.  So she agreed to

17  subordinate to Bill Poff and myself.

18  Q     When you are describing this, you are saying, we had these

19  discussions, we negotiated this.  Who is the "we" you are

20  referring to?

21  A     Bill Poff and myself.

22  Q     Can you look, please, at Exhibit 411?  This has not been

23  admitted.  Do you recognize this document?  Take a moment and

24  look at this, and I will ask you if you recognize it.

25  A     Yes, ma'am.

```
 1    Q    What is this?

 2    A    It is a promissory note.

 3    Q    Who wrote this?

 4    A    This looks --

 5    Q    If you know?

 6    A    I don't know.

 7    Q    Who signed this?

 8    A    I don't know.

 9    Q    You said you recognized it.  From where do you recognize it?

10    A    I'm sorry, I do recognize the promissory note, but I don't

11    remember exactly who created this particular one.

12    Q    From where do you recognize it?

13    A    In escrow.

14    Q    For this property, property number four, that we have been

15    talking about?  Let's look back at what it is.  This is a promise

16    to pay what amount of money?

17    A    $58,800.

18    Q    And who is it that is promising to pay that money?

19    A    My mother is promising to pay Emily Bourgeois $58,800.

20    Q    And did this have some relation in your recollection to the

21    purchase of the property located at 20613 11th Avenue South in

22    Des Moines?

23    A    Actually, if I may, this promissory note, even though a lot

24    of the different transactions did include a promissory note that

25    was created by Bill Poff, this one I guess I don't remember.  I
```

```
 1   don't remember seeing this one, this particular one.
 2   Q    You mentioned earlier that in order to close the deal you had
 3   to agree to do something with a note held by Emily Bourgeois?
 4   A    Yes.
 5   Q    Can you explain what it is that you did?
 6   A    Yes.  It was some form of receipt or promissory note that
 7   allowed Micki Thompson to wire the money -- give the funds to
 8   Bill Poff and myself instead of to the seller.
 9   Q    You are telling me, if I understand, there was a promissory
10   note created, but you don't recall ever seeing it?
11   A    This one --  I am just unclear about this particular one
12   being created by Bill Poff or myself.
13   Q    I didn't ask you whether you created it or not.  I asked if
14   you remember seeing it.
15   A    I don't remember seeing it.
16   Q    I will move on.  Can you look, please, at Exhibit 417.  This
17   was previously admitted as an Ownit business record.  Can you
18   look at what appears at line --  First, what property is this
19   related to?
20   A    20613 11th Avenue South in Des Moines.
21   Q    And that is the purchase by your mother from Mr. Jenkins of
22   property number four; is that correct?
23   A    Yes, ma'am.
24   Q    And I just want to direct your attention right to line 505 on
25   this sheet.  This is in the category that says "reductions in
```

1    amount due to seller"?

2    A    Yes.

3    Q    Do you see what it says next to line 505?

4    A    "Pay off second mortgage loan."

5    Q    And what is the amount that it says was paid off for the

6    second mortgage loan?

7    A    $58,800.

8    Q    And if you could turn, please, to page 3 of the settlement

9    statement, where it says "pay off to Emily"?  What is the amount

10   it says was paid off to Emily?

11   A    $58,800.

12   Q    Ms. Ikilikyan, are you aware of whether Emily Bourgeois was

13   ever paid off as it says in this HUD?

14   A    She was not.

15   Q    Where did that $58,800 in money supposedly to pay off Emily

16   go?

17   A    To Bill Poff and myself.

18   Q    Do you know who had put that money had gone to Emily

19   Bourgeois?

20   A    Micki Thompson.

21   Q    And who directed her to do that?

22   A    Bill Poff.

23   Q    How do you know that?

24   A    It was normal escrow practice, where Bill Poff directed Micki

25   with the numbers --

1          THE DEFENDANT:  I object.

2          THE COURT:  You need to let her finish.

3          THE DEFENDANT:  I'm sorry.

4          THE COURT:  Go ahead and answer.

5          THE WITNESS:  It was normal practice, where Bill Poff

6    directed Micki to prepare -- to direct where the numbers went so

7    the bank would approve it.

8          THE DEFENDANT:  I object, your Honor.

9          THE COURT:  On what basis?

10         THE DEFENDANT:  No foundation.  She is speculating on

11   these numbers on this document.

12         THE COURT:  Overruled.

13   By Ms. Vogel:

14   Q    Ms. Ikilikyan, were you and the defendant able to get cash

15   out of this closing?

16   A    Yes, ma'am.

17   Q    Can you give us an idea how much you got out of closing

18   number four on the chart?  How much cash did you get out of it,

19   do you recall?

20   A    It was under $60,000.

21   Q    And where did that money go?

22   A    To the general account ending in 3135.

23   Q    Who made payments on this loan?

24   A    I did.

25   Q    How many payments did your mother ever make?

1    A    None.

2    Q    How did you make the payments, from what account?

3    A    The general account ending in 3135.

4    Q    And were those payments made to both Ownit Mortgage Solutions

5    and Emily Bourgeois?

6    A    Yes, ma'am.

7    Q    What is the current status on both of those accounts?

8    A    The property has gone into foreclosure and loans defaulted.

9    Q    What about the note to Emily Bourgeois, what is the status of

10   that now?

11   A    The property went into foreclosure.  It did not get paid.

12   The last time the property was paid for was April of 2008.

13   Q    I will direct your attention to the next property, property

14   number five on our chart.  This is located at 14062 Yelm Avenue

15   Southwest (sic) in Yelm.  Are you familiar with this property?

16   A    Yes, ma'am.

17   Q    How are you familiar with it?

18   A    This is the property that Tony Reyes introduced to Bill Poff

19   and myself.  He wanted to be half owner of this property with us,

20   as long as one of us would purchase it, meaning my mother or

21   myself.

22   Q    Ultimately, did you purchase this property in your name in

23   February of 2007?

24   A    Yes, ma'am.

25   Q    I'm sorry, in August of 2006?

A    Yes, ma'am.

Q    So that was the same month as the two previous properties

just discussed; is that correct?

A    Yes.

Q    Can you look at Exhibit 500?  Do you recognize this mansion?

A    Yes, ma'am.

Q    Is that the property you just described?

A    Yes.

Q    What kind of residence is this?

A    This is a residential house.  However, one of the rooms gets

rented out for weddings and parties and things like that.

Q    Is there also an amount of land or property associated with

this residence?

A    Yes, ma'am.  There used to be two other properties with this

property, but the third one was subdivided later on.

Q    How was it you came to be interested in this property?

A    Tony Reyes introduced this property to Bill Poff and myself.

And he introduced it as, this is a great opportunity, the

weddings will pay for the mortgage.  And Bill Poff and myself

were very interested.

Q    What did you do next?

A    We submitted an offer.  I wrote the purchase and sale,

submitted the offer to the sellers.

Q    Can we look, please, at Exhibit 515?  Do you recognize 515?

A    Yes, ma'am.

```
1    Q    What is it?

2    A    It is a purchase and sale agreement.

3    Q    For this particular property, property number five, on Yelm

4    Avenue Southwest?

5    A    Yes, ma'am.

6    Q    And is this the one you wrote up?

7    A    Yes, I did.

8    Q    What was the purchase price that you agreed on?

9    A    $1,100,000.

10   Q    And who is the seller of this property?

11   A    Mr. and Mrs. Slopak.

12   Q    Who is it that you conducted the negotiations with to reach

13   this agreement?

14   A    The listing agent.

15   Q    Now, this purchase price, $1.1 million, throughout the

16   negotiation was there a discussion?

17   A    Yes.  Originally the agreed amount was $1.3 million.  When we

18   went to close, the sellers had changed their minds, and they

19   wanted the purchase and sale price based off the actual purchase

20   value, which was 1.1 million.  So it was changed.

21   Q    Would you look at 524, which has not been admitted.  Do you

22   recognize what that is?

23   A    Yes, ma'am.

24   Q    What is it?

25   A    It is an addendum to purchase and sale agreement.
```

1    Q    Is that for the same property on Yelm that we have been

2    talking about?

3    A    Yes, ma'am.

4    Q    Is this something that you prepared?

5    A    Yes, ma'am.

6    Q    And is it something that you signed at the bottom?

7    A    Yes, I did.

8    Q    Was this document prepared as part of the negotiation for the

9    purchase of property number five on our chart?

10   A    Yes, it is, ma'am.

11          MS. VOGEL:  Move the admission of Exhibit 524.

12          THE DEFENDANT:  No objections, your Honor.

13          THE COURT:  524 is admitted.

14          (524 admitted.)

15   By Ms. Vogel:

16   Q    If you could focus in on the center of this addendum to the

17   purchase and sale agreement.  That middle paragraph talks about

18   the purchase price.  Can you read that for me?

19   A    "Buyer and seller agree that the sale price is 1.1 million,

20   but buyer is financing 1.3 million for their own purposes."

21   Q    In the process you have just described, where you agreed to

22   inflate the sales price and then decided not to, was this part of

23   that back and forth agreement?

24   A    It was.  Yes, ma'am.

25   Q    In the end, was the sales price of 1.1 million inflated?

1    A    1.1 million was not inflated.

2    Q    Why was there an attempt to inflate the sales price from

3    1.1 million to 1.3 million?

4    A    To avoid bringing a big down payment to closing.

5    Q    Who did the negotiations on your side?  You said three people

6    were involved.  Who was the negotiator on the buyer's side?

7    A    Even though I negotiated the terms over the phone, all four

8    of us, Bill Poff and myself and the two sellers -- and the agent,

9    so five of us, actually met face to face to negotiate.

10   Q    Was there any discussion --  Can you please tell us of the

11   discussion, if there was any, about seller financing as part of

12   this purchase and sale?

13   A    Yes, ma'am.  I asked the listing agent if the sellers would

14   consider seller financing.  She stated, no, they would not.

15   Q    Was there any seller financing on this deal?

16   A    No, there was not.

17   Q    What involvement did you have in seeking the financing for

18   the purchase of this property?

19   A    Besides giving the purchase and sale to Bill to start on the

20   loan, I did not.

21   Q    Can you look, please, at Exhibit 508, admitted as an Ownit

22   Mortgage Solutions record?  Can you tell us what this pertains

23   to?

24   A    It refers to 14062 Yelm Avenue Highway Southeast in

25   Washington.

1   Q     What was your role in preparing and submitting this and the

2   other loan application documents to Ownit Mortgage Solutions for

3   this Yelm property?

4   A     None.

5   Q     The signature at the bottom of this form, do you have any

6   recollection of signing it?

7   A     I do not.

8   Q     Does that look to you like your own handwriting filling out

9   that form?

10  A     It is not.

11  Q     Do you believe that to be your signature?

12  A     It is not.

13  Q     I'm sorry.  I can't hear you.

14  A     It is not.

15  Q     Can we look, please, at Exhibit 509, another Ownit Mortgage

16  Solutions business record.  What property is this 1003 for?

17  A     14062 Yelm Avenue Southeast in Yelm.

18  Q     Who is the borrower?

19  A     I am.

20  Q     What is the amount being sought?

21  A     $825,000.

22  Q     Can we look, please, at what is stated as the borrower's

23  employment?

24  A     Fidelis Enterprises/Real Estate mortgage broker.

25  Q     Can we look at what is stated for the borrower's income?

1    A    $53,333.

2    Q    Is that gross monthly income?

3    A    It was not.

4    Q    My question is, does that state $53,333?

5    A    Yes.

6    Q    $53,333 per month for gross monthly income?

7    A    Yes.

8    Q    Now, how truthful is that information?

9    A    It was not truthful for income.

10   Q    And is your actual -- was your actual income at the time

11   higher or lower than $53,333 a month?

12   A    Lower.

13   Q    How much money were you making per month from Fidelis

14   Enterprises at that time?

15   A    None.

16   Q    How much money were you making at all in legitimate real

17   estate commissions?

18   A    It averaged much, much less.

19   Q    What was your role in supplying this false information in

20   this 1003 submitted for your mortgage on the purchase of the Yelm

21   Avenue property?

22   A    I did not have any role.

23   Q    Let's look at the next page.  Who was listed as the

24   interviewer?

25   A    Listed here is Bill Poff.

1    Q    Did you -- do you recognize the signature for the borrower?

2    A    Yes, ma'am.

3    Q    Do you believe that he signed that document?

4    A    I do, yes.

5    Q    And at whose request did you sign this document?

6    A    Bill Poff.

7    Q    Let's look at the declaration section.  Online L, "Do you

8    intend to occupy the property as your primary residence?"  What

9    did this 1003 convey to Ownit Mortgage Solutions?

10   A    It is listed yes.

11   Q    What was your intent as to occupation of this property at the

12   time you submitted this -- at the time this was submitted to

13   Ownit Mortgage Solutions?

14   A    We had no intention of living there.

15   Q    What was your intention for this property?  What did you plan

16   to do with it?

17   A    To continue doing the weddings.

18   Q    Can we look, please, at Exhibit 517?  Is this a 1003 for the

19   same property, but for the second mortgage?

20   A    Yes, ma'am.

21   Q    And in what amount is this 1003 requested?

22   A    For $165,000.

23   Q    If we could look briefly whether it contains the same or

24   different information about employment?

25   A    The same information.

1   Q   And about income?

2   A   It is listed here, $67,631.  So it is higher.

3   Q   And, again, was that anywhere near your true income at this

4   time?

5   A   No.

6   Q   If we could look then on the next page, please.  The bottom

7   of this page.  Who does this list as the interviewer?

8   A   Bill Poff.

9   Q   Again, do you recall signing this document?

10  A   Yes, I do.

11  Q   And who is it that asked you to sign it?

12  A   Bill Poff.

13  Q   Ms. Ikilikyan, you admitted you signed these documents full

14  of false statements.  Were you aware that they contained false

15  statements at the time you signed them?

16  A   Yes, ma'am, I was aware of the income and the owner

17  occupation status -- whether or not it was owner occupied or not

18  occupied.

19  Q   Why did you sign documents that you knew contained false

20  statements?

21  A   It was very much described to me, it is not a big deal.  The

22  lenders go off the amount of money that is actually in your bank

23  from loans, and that is considered income.  And the owner

24  occupied --  It was also explained to me when you upgrade -- the

25  property itself qualifies for it to be owner occupied, so the

1   bank had knowledge that there was five, six properties, but since

2   we were upgrading, it would be okay.

3   Q   And who was it that explained all of this to you?

4   A   Bill Poff.

5   Q   After the loans were approved, where were the documents

6   signed?

7   A   In escrow -- Great American Escrow.

8   Q   Do you recall who was present for the signing of these

9   closing documents?

10  A   Yes, ma'am.  In this particular one it was Micki Thompson,

11  Bill Poff, myself and Tony Reyes.

12  Q   Can you look, please, at Exhibit 506?  I will actually move

13  on past that.

14      Ms. Ikilikyan, did you put any money down on this purchase?

15  A   Yes, ma'am.

16  Q   Did you or the buyers put any money down on this purchase?

17  A   Yes, I did.

18  Q   Do you recall how much?

19  A   It was ten percent of 1.1 million, plus closing costs.

20  Q   And where did that money come from that you put down?

21  A   $82,000 was already in escrow from a different transaction.

22  All the commissions went into the properties, as well as the real

23  estate and the mortgage side.  And Tony Reyes brought the rest in

24  order to close.

25  Q   What was your agreement with Tony Reyes about being a

1    co-owner of this property?

2    A    The agreement was any money that comes in from the weddings

3    would go towards the mortgage payments.  If there was a shortage

4    on the money, Tony Reyes, Bill Poff and myself would pay it

5    50/50 percent, all the bills and the mortgages.  And a few years

6    from now, if all three of us decided to sell, if there was any

7    profits to be made, we would be split 50/50.

8    Q    Was any of that revealed to Ownit Mortgage Solutions?

9    A    No.

10   Q    Were you able to walk away with any cash from this

11   transaction?

12   A    No, except for the actual wedding -- the money from the

13   sellers for a couple of weddings that they had collected.  But

14   not from the loan.

15   Q    How much were the monthly payments on this property?

16   A    It was over $7,000 a month.

17   Q    Who made those payments?

18   A    I did.

19   Q    Out of what?

20   A    Out of the general account, ending 3135.

21   Q    And are you current on those loan payments?

22   A    No, ma'am.

23   Q    When did you stop making payments?

24   A    April of 2008.

25   Q    What is the current status of the Yelm property?

1  A    It is on its way to being foreclosed.

2  Q    You said you hadn't made a payment on some of these

3  properties since April of 2008?

4  A    Yes, ma'am.

5  Q    Can you explain how it is that they haven't already been

6  foreclosed upon?

7  A    Yes, ma'am.  The banks received false paperwork for -- orders

8  for being activated in the military.  That was created by me.

9  Q    So what is it that you created and sent to the banks so they

10  wouldn't foreclose?

11  A    Even though I -- there was legitimate active duty time, it

12  was changed for it to be -- the active duty time was one year,

13  instead of a month and a half.

14  Q    Let me break it down.  What did you actually submit to the

15  banks to try to stop or delay foreclosure?

16  A    False military orders.

17  Q    And why did you think that military orders would slow down

18  the foreclosure process?

19  A    I thought -- Bill Poff and I had discussed that would give us

20  time for us to sell all the properties before it would go into

21  foreclosure.

22  Q    And were you on active duty at the time that you submitted

23  those orders?

24  A    I was on active duty.

25  Q    You were on active duty for how long?

1   A   For a month and a half.

2   Q   And how long did the orders that you sent to the lender say

3   you were on active duty?

4   A   For one year.

5   Q   And who is it that falsified those orders?

6   A   I did.

7         MS. VOGEL:  I am about to move to another property.  I

8   am not sure when you take your break.

9         THE COURT:  3:00.

10  By Ms. Vogel:

11  Q   Ms. Ikilikyan, I will direct you now to property number six

12  on our chart, 9488 199th Avenue Southwest in Issaquah.  Do you

13  recognize that property?

14  A   Yes.

15  Q   How so?

16  A   This is a property that Bill Poff and myself met with the

17  seller to negotiate a purchase and sale price.

18  Q   Let me back up.  Did you purchase this property in February

19  of 2007, in your name?

20  A   Yes.

21  Q   And was it one of the 27 properties you mentioned earlier?

22  A   Yes, ma'am.

23  Q   Can you look, please, at Exhibit 600.  What is this house in

24  this photo?

25  A   9488 199th Avenue Southwest in Issaquah.

1    Q    Does it look substantially the same in this photo as it did

2    when you purchased it?

3    A    Looks to be, yes, ma'am.

4    Q    Why did you select this property to make an offer on?

5    A    I believe this property was found by Bill Poff on a list,

6    that he thought it was a beautiful house.

7    Q    Who prepared the purchase and sale?

8    A    I did.

9    Q    Can you look, please, at Exhibit 610, which I believe was

10   admitted as an Ownit business record?  Is this the purchase and

11   sale agreement for the property located at 9488 199th Avenue

12   Southeast in Issaquah?

13   A    Yes, ma'am.

14   Q    Who was the buyer on this purchase and sale agreement?

15   A    In this purchase and sale agreement it is my mother, Armenuhi

16   Harutyunyan.

17   Q    Who is the seller?

18   A    Mr. and Ms. Hsu.

19   Q    H-S-U?

20   A    H-S-U.

21   Q    What was the price that you offered?

22   A    $1.5 million.

23   Q    And is that what it says on this purchase and sale agreement?

24   A    Yes, ma'am.

25   Q    What was the outcome of that offer?

1   A    This offer did not work out.  It did not close.

2   Q    So what happened after the original negotiation -- the

3   original offer for 1.5 million did not close?

4   A    It contained seller carryback, and the sellers refused.

5   Q    So then was there some time period before you started talking

6   again?

7   A    Yes, ma'am.  Some time passed, and Mrs. Hsu gave me a call

8   and said that she had -- she no longer is being represented by an

9   agent and she would like to deal with us directly.

10  Q    What happened after that?

11  A    That's when Bill Poff, myself and Mrs. Hsu met at Barnes and

12  Noble in Seattle at the Starbucks coffee shop to possibly

13  renegotiate the deal.

14  Q    And what was discussed at that meeting?

15  A    A few options were presented to her to see if she would

16  agree.  One of the options was still the carryback.  The second

17  option was lower principal amount, but she would get paid all of

18  it.

19  Q    Are you okay?

20       THE COURT:  I forgot to give my standard warning here.

21  We have automatically adjustable shutters.  And when they move,

22  they move all at the same time, and they make a very large sound.

23  Don't worry, it is not falling down, at least not yet.

24  By Ms. Vogel:

25  Q    You were telling us what was discussed at this meeting with

1    Ms. Hsu about the purchase of property located in Issaquah.

2    A    Yes, ma'am.  A few options were presented to her.  One was a

3    carryback.  The second one was she would get paid off at closing

4    the whole principal, but she would agree to raise the purchase

5    and sale price for it to be an easier financing, but she was

6    going to get a lower amount.

7    Q    Ultimately, did you reach an agreement with Ms. Hsu?

8    A    Yes, ma'am.

9    Q    What was the agreement you reached?

10   A    The actual agreement that all three of us reached was that

11   she would net $1.3 million, minus her closing costs, and we would

12   raise the purchase and sale price to its appraised value versus

13   the actual value.

14   Q    So what was the actual agreed price that you were going to

15   pay for property number six on our chart?

16   A    $1.3 million.

17   Q    And what was the purchase price on all the paperwork?

18   A    It later became $2 million.

19   Q    Can you look, please, at Exhibit 615?  This is not admitted.

20   Do you recognize this document?

21   A    Yes, I do.

22   Q    What is it?

23   A    It is a purchase and sale agreement for the property in

24   Issaquah.

25   Q    And what does --  Did you prepare this document?

1    A    Yes, I did.

2    Q    And did you sign this document?

3    A    Yes, I did.

4    Q    And what does this document say about the price of the

5    property?

6    A    That it is listed for -- we asked $2 million.

7    Q    Was that true?

8    A    No.

9    Q    Now, this document, Exhibit 615, can we zoom in on the name

10   of the buyer and seller?  The buyer's name here is Ikilikyan.

11   Can you explain why that changed?

12   A    Again, it was directed by Bill Poff for reasons for

13   financing.

14   Q    What happened after you reached this agreement the second

15   time around with Ms. Hsu?

16   A    We came to have a signed agreed purchase and sale

17   agreement --  Well, after the meeting, the paperwork followed.

18   Q    Who was the loan officer?

19   A    The loan officer for this was Tony Reyes.

20   Q    And what was the loan broker?

21   A    It was America One Finance that closed it.

22   Q    Do you have any personal knowledge of how the loan

23   information was conveyed to Tony Reyes for the -- to begin the

24   loan process for this particular property?

25   A    Yes, ma'am.  The paperwork was forwarded to America One

1    Finance by Bill.

2    Q    And in what form?

3    A    E-mails.

4    Q    Can you look, please, at Exhibit 616, which is not admitted?

5    Do you recognize what this is?

6    A    Yes, ma'am.

7    Q    What is it?

8    A    It is an e-mail from USMR at Comcast dot net, which is one of

9    the e-mails Bill and I used, to Tony.  It says, "Here is the

10   purchase deal for Alexis.  We need this one done ASAP."

11   Q    Did you write the e-mail in the body here to Tony?

12   A    I did not.

13   Q    The USMR at Comcast dot net e-mail address was used by whom?

14   A    By Bill Poff and myself.

15   Q    Who else had access to that e-mail address?

16   A    Nobody.

17   Q    According to this e-mail, the body of that e-mail, it was

18   then forwarded to somebody in the "to" line, Emil Anderson.  Who

19   is that?

20   A    Emil Anderson was the processor for America One Finance.

21   Q    The title says "attachment."  What was that?

22   A    It looks to be the 1003 for WaMu.  It is titled "Alexis, new

23   credit."

24   Q    And also part of this exhibit --  Do you recognize what this

25   attachment is?

1   A   Yes, ma'am.  It is a 1003.

2   Q   Is that for property number six?

3   A   Yes, ma'am.

4         MS. VOGEL:  Move the admission of Exhibit 616.

5         THE DEFENDANT:  No objection, your Honor.

6         (616 admitted.)

7         THE COURT:  616 is admitted.  Counsel, did you move on

8   615?

9         MS. VOGEL:  I was told it was already admitted.

10  By Ms. Vogel:

11  Q   Let's go back to the first page on Exhibit 616, please.  Can

12  you zoom into the date?

13        THE COURT:  Counsel, are you going to talk about 616 for

14  a while?

15        MS. VOGEL:  For a few minutes, yes.

16        THE COURT:  Let's take our break.  Ladies and gentlemen,

17  we will take our afternoon recess at this time.  Be back around

18  3:15.  We will be in recess.

19  (At this time a short break was taken.)

20        THE COURT:  You are still under oath.  You may resume.

21        THE DEFENDANT:  Sir, I would like to bring up an issue

22  real quick, that I just noticed.

23        THE COURT:  Yes.

24        THE DEFENDANT:  I agreed to admit document 616.  As I

25  was looking at it, sir, it says that this is an e-mail forwarded

from the USMR at Comcast dot net account to Tony Reyes. The actual e-mail is from Tony Reyes to Emil Anderson. It says here under attachments, 1003 for WaMu, which I am assuming would be a loan application for a Washington Mutual loan of some type. And then there is two other attachments, but those are not included with this. And I am looking at the 1003. This doesn't say anything about being a WaMu 1003. As a matter of fact, it has a fax header up at the top that says the document was faxed out three or four days prior to this actual e-mail, sir.

THE COURT: And that is a great topic for cross-examination, counsel.

THE DEFENDANT: I was objecting to the document because of that. It doesn't appear on its face to be the proper attachment to this e-mail. Plus, the other two attachments are not with this e-mail, sir.

THE COURT: That would be the doctrine of completeness. Did you stipulate to this when you did the stipulation on admissibility?

THE DEFENDANT: Was this business records?

MS. VOGEL: No.

THE COURT: All right. Let's do this: I will let you raise this at the end of the day. In the meantime, I am sure the government can scramble around and figure out if they want to resist it or not. Let's move forward with our witness.

THE DEFENDANT: Thank you, sir.

1          THE COURT:  Remind me when it is the end of the day.

2          THE DEFENDANT:  Yes, sir.

3    By Ms. Vogel:

4    Q    Can we please pull up Exhibit 616 again?  Ms. Ikilikyan, what

5    is the date of this e-mail that was sent from your USMR -- you

6    and Mr. Poff's USMR address to Tony Reyes?

7    A    December 23rd, 2006.

8    Q    Do you have any recollection of sending this e-mail?

9    A    I do not.

10   Q    Let's look at the attachment, the 1003.  If you could zoom in

11   on the top half?  What property is this for?

12   A    It is for 9488 199th Avenue Southeast in Issaquah.

13   Q    What is the amount this 1003 says it is requesting?

14   A    It is requesting $1.5 million.

15   Q    And can you scroll down through the rest of the document, of

16   that first page?  Who is listed as the proposed borrower on this

17   1003 that was e-mailed from your e-mail account to Mr. Reyes?

18   A    I am.

19   Q    And did you prepare this 1003?

20   A    I did not.

21          THE DEFENDANT:  Objection, your Honor.  We do not know

22   that.  It has been e-mailed.

23          THE COURT:  I will overrule that objection.

24   By Ms. Vogel:

25   Q    This 1003, does it contain the same false information about

1    your employer that we saw in the earlier ones?

2    A    Yes, ma'am.

3    Q    Can you look at page 2, please?  What does this 1003 state --

4    say was income -- your monthly gross income.

5    A    It states that the companies make $100,126 a month.

6    Q    So if you break that down, does that $100,000 figure actually

7    include some net rental income as well?

8            THE COURT:  Some what?

9            THE WITNESS:  Yes.

10           MS. VOGEL:  The $100,000 figure that she just cited, I

11   am asking if that also includes the base employment income plus

12   some net rental income?

13           THE COURT:  Rental.  All right.  Thank you.

14   By Ms. Vogel:

15   Q    Your answer was?

16   A    Yes, ma'am.

17   Q    And did you have any input into the numbers that are on this

18   document?

19   A    I do not remember having any input on this, no.

20   Q    Can you turn to page 6 of this document, this 1003.  And on

21   the bottom quarter of this document does it say who the

22   interviewer was?

23   A    It says Bill Poff.

24   Q    What is the name of the interviewer's employer, to the right?

25   A    U.S. Mortgage and Investments, LLC.

1  Q   Again, that is your brokerage that you described earlier?

2  A   Yes, ma'am.

3  Q   Who was the loan officer for that mortgage?

4  A   Bill Poff.

5  Q   Do you know how people fill out 1003s?

6  A   I know it is done in a system on the computer.

7  Q   Do you know whether your -- whether any one of your home

8  computers, when you and the defendant were married, had that

9  program on it?

10 A   His computer did, yes.

11 Q   Could you look, please, at Exhibit 621?

12         THE COURT:  Before we move on, I have a question.  Is

13 this form one that can be submitted to any bank or does each bank

14 have its own form?

15         THE WITNESS:  I believe this is a form that can be

16 submitted to any bank, your Honor.

17         THE COURT:  And where would it say the name of the bank

18 that the form is being submitted to?

19         THE WITNESS:  Your Honor, that is a great question.

20 Since I never filled one out, I have no idea.  I don't know where

21 it is.

22         THE COURT:  All right.  Thank you.

23         THE WITNESS:  You're welcome.

24 By Ms. Vogel:

25 Q   Can we look, please, at Exhibit 621?  This was admitted

1  earlier as an Aurora Loan Services record.  Another 1003 form.

2  Does this appear to have your signature in the top left-hand

3  corner?

4  A   Yes, ma'am.

5  Q   And what is the subject property for this 1003?

6  A   9488 199th Avenue Southeast Issaquah.

7  Q   And what is the amount listed as the loan amount in this

8  1003?

9  A   $1,406,250.

10 Q   Is that the same property -- is this 1003 for the same

11 property as the 1003 we just looked at --

12 A   Yes, it is.

13 Q   -- Exhibit 616?

14 A   Yes, ma'am.

15 Q   Do they appear to be different documents?

16 A   The numbers are different on the purchase and sale.

17 Q   What role did you have in the creation of this 1003, the one

18 that was actually sent to the lender?

19 A   None, ma'am.

20 Q   And if we could just scroll down to the borrower again.  Who

21 was the borrower on this one that went to the lender?

22 A   It was me, ma'am.

23 Q   And does it contain the same information as the one we just

24 looked at and the one we had seen earlier about your employment?

25 A   Yes, ma'am.

1  Q    And could we look at the income line on the second page of

2  this 1003 that was obtained from Aurora Loan Services?  What does

3  it say about your income?

4  A    Income is lower.  It is $33,629.50.

5  Q    Again, was that more than your true income?

6  A    Yes, ma'am.

7  Q    And when you say it is lower, what do you mean, lower than

8  what?

9  A    The last 1003 stated that I made $100,000.

10  Q    The one in the e-mail?

11  A    Yes.

12  Q    Turn to the next page, please.  And on this 1003, 621, who is

13  named as the interviewer?

14  A    It is Tony Reyes.

15  Q    And do you recall signing this document?

16  A    Yes, I do.

17  Q    And who is it that asked you to sign this document, do you

18  recall?

19  A    Bill Poff.

20  Q    Mrs. Ikilikyan, did you have any involvement in the creation

21  or submission of a 1003 or loan application for a second mortgage

22  on property number six, the Issaquah property, to National City

23  Bank?

24  A    I did not complete the loan applications.

25  Q    Ms. Ikilikyan, from your recollection, were you able to get

1  cash out of the closing of this property, the Issaquah property,

2  in line number six?

3  A   Yes.

4  Q   Can you give us an idea how much?

5  A   It was approximately $400,000.

6  Q   How much money did you or the defendant put down on this

7  property?

8  A   No down payment.

9  Q   How were you able to hide the fact that you didn't make a

10  down payment?

11  A   It was through -- the sellers were receiving 1.3 million, the

12  purchase and sale price was $2 million.  The rest of it was --

13  There was fictitious receipts created, and also promissory notes

14  created to allow escrow to pay the buyers, meaning Bill Poff and

15  myself, the amount of money.

16  Q   Can you look, please, at Exhibit 633?  Do you recognize this

17  document?

18  A   Yes, ma'am.

19  Q   What is it?

20  A   It is an invoice, a bill to David and Joyce Hsu.

21  Q   Who are they?

22  A   The sellers.

23  Q   Of Issaquah, number six?

24  A   Yes, ma'am.

25  Q   Are you the owner of Fidelis Enterprises?

```
 1   A    Yes, I am.

 2   Q    At least on paper?

 3   A    Yes.

 4   Q    What is the address on this particular invoice where it says

 5   Fidelis Enterprises?  Do you know that address?

 6   A    Yes, ma'am.

 7   Q    Whose home was that address?

 8   A    That was the residence for Bill Poff and myself.

 9   Q    Did you prepare this document?

10   A    I did not.

11   Q    Do you know who did prepare this document?

12   A    Yes, ma'am.  It was Bill Poff.

13   Q    Do you know how this document got into the possession of the

14   seller, Joyce Hsu?

15   A    Yes.  Bill prepared it and delivered it to escrow officer

16   Micki Thompson.

17            MS. VOGEL:  Move the admission of Exhibit 633.

18            THE DEFENDANT:  No objection, your Honor.

19            THE COURT:  633 is admitted.

20            (633 admitted.)

21   By Ms. Vogel:

22   Q    Can we go back up to 633?  In connection with the purchase of

23   the Issaquah property, property number six, did Fidelis

24   Enterprises perform a $600,000 plus remodel?

25   A    No, ma'am.
```

1   Q    Does Fidelis Enterprises perform any remodels?

2   A    No.

3   Q    Let's look at Exhibit 631, which I believe was admitted as a

4   Great American Escrow business record.  Can you tell us what this

5   is?

6   A    It appears to be another fictitious receipt -- bill to Joyce

7   Hsu from -- I don't see the company.

8   Q    Are you aware of any repairs in the nature of upgrade home

9   and change floorings done to this property in connection with the

10  purchase?

11  A    No, ma'am.

12  Q    Do you recognize the e-mail address on the left-hand side of

13  this invoice?

14  A    Yes, ma'am.

15  Q    Whose e-mail address is Tony Homes at Comcast dot net?

16  A    I am assuming it is Tony Reyes'.

17  Q    Do you know whether it is or not?

18  A    I was more familiar with his other e-mail address, more so

19  than this one.

20              THE DEFENDANT:  Objection, your Honor.  She is assuming.

21              THE COURT:  You are moving to strike her answer, I think

22  is what you are saying?

23              THE DEFENDANT:  Yes, sir.

24              THE COURT:  I am going to sustain that.

25  By Ms. Vogel:

1   Q    Can you back up, please?  Ms. Ikilikyan, did you have any

2   role in creating this invoice?

3   A    I did not, no.

4   Q    Can you look, please, at Exhibit 632, also a Great American

5   Escrow business record.  Can you tell us what this is?

6   A    It is another bill to Joyce Hsu in the amount of 119 --

7   almost $119,199.80.

8   Q    Did you have a role in creating this invoice?

9   A    I did not.

10  Q    Do you know the purpose of these documents and why they are

11  in the Great American Escrow file for this transaction?

12  A    Basically all of the receipts were created in order to

13  justify why the buyer should receive funds instead of the seller.

14  Q    Can you look, please, at Exhibit 627?  This I believe was

15  admitted yesterday as a National City Bank business record.  Can

16  I direct your attention --  First of all, is this HUD-1

17  settlement statement for property number six, the Issaquah

18  property?

19  A    Yes, it is.

20  Q    Specifically your purchase of that property?

21  A    Yes, ma'am.

22  Q    I want to direct your attention to line 1305 of this form.  I

23  know it is very hard to read.  I think that is on the second

24  page.  Can you find and read 1305?

25  A    Yes, ma'am.

1  Q   What does it say?

2  A   It looks to be, "redo property, Marquin House Jobs."

3  Q   Can you see the amount of money on that line?

4  A   $539,226.

5  Q   And on the right side of that line, is that deductions from

6  seller proceeds?

7  A   Yes, it is.

8  Q   Can you look back on the bottom third of line 1309?  Can you

9  read that?

10  A   Pay off personal note.

11  Q   What was the amount?

12  A   $120,000.

13  Q   Can you tell us, Ms. Ikilikyan, was there a payment for over

14  $500,000 to Marquin House Jobs in association with your purchase

15  of this property in Issaquah?

16  A   No, there was not.

17  Q   Was there a payment of $120,000 to your mother, Armenuhi

18  Harutyunyan, associated with this property in Issaquah?

19  A   Yes, ma'am.

20  Q   Who got that money that was paid to your mother?

21  A   Bill Poff and myself.

22  Q   Was there an existing debt at the time of the purchase

23  between Armenuhi Harutyunyan and the seller, Joyce Hsu?

24  A   No, ma'am.

25  Q   Can you look, please, at Exhibit 629, which I believe is

1    admitted as a Great American Escrow business record.  Do you

2    recognize this document?

3    A    Yes, ma'am.

4    Q    Have you ever seen this document before?

5    A    Can I take a moment, ma'am?

6    Q    Sure.

7    A    Before the arrest, I did not know about this document.  After

8    the arrest, I did learn that there was a promissory note created

9    between my mom and Joyce Hsu.

10   Q    Did you have any role in creating this document and placing

11   it in the Great American Escrow file?

12   A    No, ma'am.

13   Q    Where was that $400,000 surplus that you described earlier --

14   where was that paid?  Where did it go?

15   A    $100,000 stayed in the Great American Escrow, and the rest of

16   it came to -- went to the general account ending in 3135.

17   Q    And what did you use the $100,000 that stayed in escrow for?

18   A    To purchase the property number seven.

19   Q    Property number seven on Exhibit 1, the big chart?

20   A    Yes, ma'am.

21   Q    Before I get to that, after you purchased property number

22   six, approximately a month later, in March of 2007, what happened

23   with regard to your National City Bank second mortgage?

24   A    Because of the dispute with an appraiser the second mortgage

25   was refinanced to obtain more loan.  And that's what happened

1    after closing the original loan.

2    Q   And what was your role in refinancing that second mortgage?

3    A   I did not have any role in it.

4    Q   Who did it?

5    A   America One Finance.

6    Q   And who got -- who provided the information to America One

7    Finance so they could refinance the loan in your name on property

8    number six?

9    A   Bill Poff.

10   Q   As a result of that refinance one month later, were you and

11   the defendant able to get any more money out of this property?

12   A   Yes, ma'am.

13   Q   Approximately how much?

14   A   For the second mortgage, I don't remember the exact amount,

15   but it was -- I would be speculating.  100,000, I think.

16   Q   Again, I don't want you to speculate.  I know you were

17   involved in this, so what I am asking is, what is your best

18   recollection of the amount of money that you and Mr. Poff were

19   able to get back?  And if you need to give us a range it fell

20   within, that is acceptable.

21   A   I really don't remember.  Sorry.

22   Q   Are you current on your mortgage payments for your first

23   mortgage for this property, 9488?

24   A   No, ma'am.

25   Q   When did you stop making payments on that property?

1    A    April of 2008.

2    Q    And what about the second mortgage to National City Bank?

3    A    April of 2008.

4    Q    So what is the current status of this property?

5    A    It has gone into foreclosure.

6    Q    Let's move to property number seven on our chart,

7    Ms. Ikilikyan.  Are you familiar with that property, 7038 South

8    Puget Sound Avenue in Tacoma, Washington?

9    A    Yes, ma'am.

10   Q    And how is it you are familiar with that property?

11   A    This is a property that Bill Poff's friend was selling.  And

12   Bill Poff negotiated the price with his friend.  And we bought

13   the house.

14   Q    And did you buy it on March 7th, 2007?

15   A    Yes.

16   Q    Who was the buyer on paper?

17   A    On paper it is myself.

18   Q    Let's look at Exhibit Number 700, please.  Do you recognize

19   the house in this photograph?

20   A    Yes, ma'am.

21   Q    Is that the house, property number seven?

22   A    Yes, it is.

23   Q    And the photograph here, does that represent the way the

24   property looked when you purchased it in March of 2007?

25   A    Yes, ma'am.  The doors were boarded up when we purchased it.

1    Yes.

2    Q    Other than that, does it appear to be substantially similar?

3    A    Yes, ma'am.

4         MS. VOGEL:  Move the admission of Exhibit 700.

5         THE DEFENDANT:  No objection, your Honor.

6         THE COURT:  700 is admitted.

7         (700 admitted.)

8    By Ms. Vogel:

9    Q    Who negotiated for the purchase of this property -- for your

10   purchase of this property?

11   A    For this property it was Bill Poff with his friend.

12   Q    And who was the seller?

13   A    His friend, William Stepp.

14   Q    What was the sales price -- agreed sales price?

15   A    The agreed sales price was between 100- and 101,000,

16   somewhere around there.

17   Q    Do you have any knowledge why some of the documents say the

18   sales price was $150,000?

19   A    Yes, ma'am.  When we were in closing, Bill Poff directed

20   Micki to record the deed of trust as $150,000 to help -- to

21   resell the property at a later date.

22   Q    What did the Stepps know about this?

23   A    I'm not sure, ma'am.  I do not recall.

24   Q    Can you look, please, at Exhibit 704, previously admitted as

25   a Great American Escrow business record?  What is this document?

```
 1    A    This is the purchase and sale agreement, ma'am.

 2    Q    What does this say --  I'm sorry.  Is this for property

 3    number seven on our chart?

 4    A    Yes, it is.

 5    Q    What does this say is the purchase price?

 6    A    $150,000.

 7    Q    Did you prepare this document?

 8    A    Yes, I did.

 9    Q    Were you present when this was signed by the sellers or do

10    you recall?

11    A    I don't recall.  I don't think so, ma'am.

12    Q    Can you look, please, at Exhibit 708?  This was previously

13    admitted as a Great American Escrow business record.  Is this the

14    HUD-1 settlement for this property, property number seven?

15    A    Yes, ma'am.

16    Q    And this is for your purchase of this property from

17    Mr. Stepp; is that correct?

18    A    Yes, ma'am.

19    Q    What does this document state was the contract sales price?

20    A    $150,000.

21    Q    What was the real contract sales price?

22    A    Around -- I believe it was $100,000.

23    Q    On the left-hand side of this document, where it says in the

24    200 series, amounts paid by or on behalf of the borrower, line 2

25    of 5.  Can you read that?
```

```
 1    A    Yes, ma'am.

 2    Q    What does that say?

 3    A    Deposit to seller $50,000.

 4    Q    At any point during this transaction did you or the defendant

 5    give the seller, Mr. Stepp, $50,000?

 6    A    No, we did not.

 7    Q    Do you know how the HUD settlement statement came to say

 8    that?

 9    A    It was created, ma'am.

10    Q    By whom?

11    A    By Micki Thompson.

12    Q    Ms. Ikilikyan, did you take out any loans to buy this

13    property, property number seven?

14    A    No, ma'am.

15    Q    Can you look at Exhibit 704?  I apologize.  703.  Can you

16    tell us what this is?

17    A    Yes, ma'am.  It is a quitclaim deed.

18    Q    From whom to whom?

19    A    From William Poff to me.

20    Q    And is that dated approximately the same time that you

21    purchased this property from Mr. Stepp?

22    A    Yes, ma'am.

23    Q    And does this pertain to property number seven on our chart,

24    7038 South Puget Sound Avenue?

25    A    Yes, ma'am.
```

1    Q    Could you explain to us, Ms. Ikilikyan, why Mr. Poff

2    quitclaimed his interest in the property to you for this purchase

3    if there was no loan?

4    A    Yes, ma'am.  Two reasons.  One, Mr. Poff told me he had debt,

5    he did not want the creditors to attach liens to this property,

6    because it was free and clear.  He also told me that he had a

7    dispute with his ex-wife regarding day-care issues.  Until he had

8    resolved that, he did not want anything in his name.  So he would

9    not attach -- so they would not attach any liens to his property.

10   Q    Ms. Ikilikyan, after you had owned this property for a while,

11   do you have any recollection of you or the defendant trying to

12   take out another loan on this property?

13   A    I don't recall any loans being attempted to be taken out on

14   this property.

15   Q    Do you still own this property?

16   A    No.

17   Q    Who did you sell it to?

18   A    Bill Poff and myself sold it to Tony Reyes.

19   Q    Can you look, please, at Exhibit 716, which I hope is the

20   statutory warranty deed for that sale.  Did that sale happen on

21   approximately August 13th of 2008?

22   A    Yes, ma'am.

23   Q    And on this statutory warranty deed, where it says the

24   grantor, who is named here as the grantor?

25   A    I am.

1   Q   And who else?

2   A   Grantor, it says Alexis Ikilikyan.

3   Q   Who took title as a married woman as her separate estate

4   and --

5   A   I'm sorry.  It just says Alexis Ikilikyan, from what I am

6   looking at.

7   Q   I'm sorry.  In the middle of the page, where it says the

8   grantor, Alexis Ikilikyan?

9   A   Yes.  "The grantor, Alexis Ikilikyan, took title as a married

10  woman as her separate estate, and William Poff, husband and wife,

11  for and in consideration of $10 and other goods and valuable

12  consideration."

13  Q   When in relation to your final divorce was the sale of this

14  property?

15  A   This sale closed -- took place during the month -- it was the

16  middle of August when it closed, and the divorce was finalized

17  August 31st.

18  Q   Of 2008?

19  A   2008.

20  Q   How much money did you and the defendant obtain from selling

21  this property to Tony Reyes?

22  A   The purchase and sale to Tony Reyes was between $100- and

23  $110,000, because he came back and wanted it lowered.  So that's

24  why the numbers are unclear.  I believe the net was $102,000,

25  approximately.

```
 1   Q    Can you look at Exhibit 717, the Great American Escrow
 2   business record?  Can you tell us what this is?
 3   A    It is a purchase and sale agreement between myself as the
 4   seller to -- Mario is the buyer.
 5   Q    Is that the person to whom you sold 7038 South Puget Sound
 6   Avenue?
 7   A    Yes.
 8   Q    This lists the purchase price as what?
 9   A    $150,000.
10   Q    Can you explain why you just told us the purchase price was
11   $110,000?
12   A    Yes, ma'am.  The purchase and sale price -- it was agreed
13   that they would inflate the purchase and sale so they would go in
14   and perform a lot of work that needed to be done.  And, also, in
15   addition to that, to net money out of that transaction.
16   Q    How much money did you and the defendant get paid when you
17   sold this property, despite the fact that it says you sold it for
18   $160,000?
19   A    We actually netted around $102,000.
20   Q    Who got that money?
21   A    Bill Poff and myself.
22   Q    What happened to your half?
23   A    My half went into the business account.
24   Q    What account did the money go into, is what I meant to ask.
25   A    I believe that money actually went into a different business
```

1    account, only because the 3135 account was looked at more of a

2    joint account, even though it was in my name.  That actually went

3    into a different account, and then I put it into U.S. Bank, which

4    was my personal account after the divorce.

5    Q    And what happened to the defendant's half of the proceeds

6    from the sale of this property?

7    A    His half went to T&K Investments.

8    Q    Was it exactly half?

9    A    No.

10   Q    Why not?

11   A    During the time we were negotiating the divorce, Mr. Poff

12   wanted all the monies that I had spent during the time he was

13   away in Michigan -- he wanted to be reimbursed for all that, plus

14   a grandfather clock that I had agreed to pay for, just to make

15   things easier for the divorce.  So he got a few thousand more

16   than I did.

17   Q    And where did the rest of the money go, the $102,000 that you

18   and the defendant shared and the purchase price of $150,000?

19   A    The rest of it?

20   Q    Who got that money?

21   A    I know Bill Poff and myself did not.  I don't know how

22   they -- the buying side -- I'm not sure how they did their loan

23   or their numbers.

24   Q    I want to direct your attention now to the last property on

25   the chart, number eight, 27419 8th Avenue South, Des Moines,

1    Washington.  Are you familiar with that property?

2    A    Yes, ma'am.

3    Q    How are you familiar with that property?

4    A    This is the property that Tony Reyes had picked to purchase

5    for himself to live in.  He came to Bill Poff and myself and

6    asked if either my mom or myself could qualify for this loan,

7    because his straw buyers would not qualify for this property.

8    And everybody agreed to the terms he presented, which was 50/50

9    ownership.  He would pay 66 percent of the payments, and Bill

10   Poff and myself would pay 33 percent of it.  All maintenance

11   would be taken care of by Tony Reyes.  In fact, if we sold the

12   property years later, any proceeds that came out of it we would

13   split 50/50 with Tony Reyes.

14   Q    Can you look at Exhibit 800, please?  Do you recognize this

15   house?

16   A    Yes, ma'am.

17   Q    What is it?

18   A    That is the property on the chart, number seven.

19   Q    Seven?

20   A    Eight.

21   Q    Is that a photograph of 27419 8th Avenue?

22   A    Yes.

23   Q    Is that what it looked like when you purchased it in your

24   mother's name?

25   A    Yes, ma'am.

1   Q     Why did you purchase this property in your mother's name?

2   A     Again, this was dictated by Bill Poff, who was doing the

3   finance.  She had less houses on her credit.  It was easier for

4   her to qualify.

5   Q     What role did you have in the purchase of this property,

6   property number eight, by your mother?

7   A     Originally I negotiated the terms with the listing agent, and

8   I prepared the purchase and sale documents, and submitted it to

9   the listing agent for it to be accepted or denied by the seller.

10  Q     What happened?

11  A     The offer did get accepted.

12  Q     And then what happened?

13  A     Escrow proceeded to be started by me.  I sent the paperwork

14  to Bill Poff, and he attempted to get a loan for this property

15  for my mom.  He wanted another loan officer to close this deal,

16  and it did not work out, so that deal fell apart.

17  Q     What happened after that?

18  A     After that Tony Reyes contacted us again and said that

19  America One Finance could in fact close this deal.

20  Q     And you say "contacted us."  Who did Tony Reyes contact?

21  A     Bill Poff and myself.

22  Q     So ultimately for the deal that actually closed, who did the

23  loan officer work?

24  A     America One Finance did.

25  Q     Who at America One Finance?

1   A   Emil Anderson was the processor for this transaction.

2   Q   Can you look at Exhibit 809?  Is this a 1003 --  This was

3   previously admitted.  It is a Just Mortgage business record.  Is

4   this a 1003 for 27419 in your mother's name?

5   A   Yes.

6   Q   What role did you have in this?

7   A   None at all.

8   Q   Let's see what this information contains as to your mother's

9   employment.  I'm sorry, that is her address.  It is on the next

10  page.  What information about employment does this contain per

11  your mother?

12  A   Hay Computer Networking & Consulting.

13  Q   Is that all the same information that we have seen in the

14  previous applications in your mother's name?

15  A   Yes, ma'am.

16  Q   Were you and the defendant able to get cash back from this

17  closing?

18  A   Yes, ma'am.

19  Q   How much?

20  A   I remember it being over $100,000.

21  Q   Are you aware of whether there was a seller financing

22  agreement for the purchase of this property?

23  A   Yes, ma'am.

24  Q   What was your role in negotiating that seller financing

25  agreement?

1    A    The second time I actually was not the agent, it was Tony

2    Reyes.   He negotiated six and a half percent interest only for

3    the second mortgage.

4    Q    And after this closing -- after this property closed, who

5    handled the closing on this property?

6    A    Micki Thompson at Great American Escrow.

7    Q    Were you present when the closing documents were signed?

8    A    I was not.

9    Q    Were you present --

10   A    Excuse me.  Yes.  I'm sorry.

11   Q    Did you actually sign these documents?

12   A    Yes, ma'am.

13   Q    At the time the closing documents were signed, who else was

14   present at Great American Escrow?

15   A    Bill Poff.  I don't recall if Tony Reyes was present.  I

16   don't remember.  If this was his house, I am assuming he had very

17   much knowledge of it.

18   Q    And who else was present besides the defendant?

19   A    Micki Thompson.

20   Q    And were you there as well?

21   A    Yes, I was.

22   Q    And after that closing, what kind of discussion did you and

23   Ms. Thompson and the defendant have about where the money should

24   go from this property and what the HUD should look like?

25   A    I do roughly remember at that time Tony had arrears with Bill

1    Poff and myself.  He hadn't been catching up with his payments

2    for the other properties that we owned together.  It was directed

3    that a certain amount would come to us out of the loan for the

4    debt for the other properties.

5    Q    When you say "it was directed," who did the directing?

6    A    Bill Poff and myself.

7    Q    Where did that money go after this property closed?

8    A    To the general account ending in 3135.

9    Q    And who made monthly payments on the loans for 27419?

10   A    I did.

11   Q    Out of what account?

12   A    Out of the general account, 3135.

13   Q    Did your mother ever move into this property?

14   A    No, ma'am.

15   Q    Are the monthly payments current for this property?

16   A    No, ma'am.

17   Q    When did the payments stop?

18   A    April of 2008.

19   Q    And who made the payments to the sellers on the seller

20   financing agreement?

21   A    I did.

22   Q    Are you current on those?

23   A    No.

24   Q    When did those stop?

25   A    April of 2008, I believe.

1   Q   So what is the current status of this property?

2   A   It has gone into foreclosure.

3           MS. VOGEL:  Just a moment, your Honor.

4   By Ms. Vogel:

5   Q   Just a few more questions, Ms. Ikilikyan.  When you and the

6   defendant got cash from closing from Great American Escrow, who

7   did Great American Escrow make those payments out to?

8   A   On this transaction, ma'am, it is very much unclear, on this

9   house only.  I don't remember if the payments actually went to

10  our account or to Tony, and then later came to our account.

11  Q   As between you and the defendant, were there any occasions

12  when the checks from Great American Escrow were actually made out

13  to the defendant?

14  A   Bill Poff?  No.

15  Q   Who were they made out to?

16  A   Always to me.  Or if it was commissions, to the company.

17  Q   And why is that?

18  A   Bill Poff did not want income in his name.

19  Q   You have talked about this one account.  I think your words

20  were the general account, Washington Mutual, 3135.  What portion

21  of the proceeds from these closings do you estimate went into

22  that one account?

23  A   Overall, approximately --  My calculations is unclear.  I

24  tend to think it was around a million dollars.

25  Q   I apologize if I wasn't clear.  I am trying to get a sense of

1    what percentage, was it 50 percent, 20 percent, 80 percent?  What

2    percentage of the time did you put the money that you got from

3    Great American Escrow into that one bank account?

4    A    It was in the very high 90s, yes, ma'am.

5    Q    At the time that you were using that general account, WaMu,

6    1335, did you also use bank accounts in your name?

7    A    Yes, ma'am.

8    Q    What were those banks?

9    A    Bank of America, Wells Fargo, and a few other banks that were

10   not really being used, such as maybe Navy Federal Credit Union.

11   Q    What did you use those other bank accounts for?

12   A    Originally, when the Navy Federal Credit Union was opened,

13   Bill Poff had advised me that is a very good bank, their rates

14   are very good, and it would be good if we were members.  And that

15   was opened.  We never attempted to do loans with that bank.

16   Q    Was there a reason that you used one bank account for most of

17   the money?

18   A    Yes, ma'am, it is just easier tracking.

19   Q    Who were the signers on that general account, the Washington

20   Mutual 3135 account?

21   A    I was only.

22   Q    Who had access to the money in that account?

23   A    Bill Poff.

24   Q    Anybody else?

25   A    No.

1    Q    How about yourself?

2    A    I'm sorry.  Myself.

3    Q    How did Bill Poff have access to that account if he was not a

4    signer?

5    A    He would have access to the on-line banking, and also there

6    were a few times that he wrote checks in my -- and signed my

7    name, which was authorized by me, except for one time.

8    Q    Did you have a debit card for that WaMu account?

9    A    Yes, ma'am.

10   Q    And how many debit cards were issued for that account?

11   A    Just one.

12   Q    Who carried that debit card?

13   A    I did most of the time.

14   Q    And when you say "most of the time," does that mean there

15   were times that you didn't?

16   A    There were just one time I recall Bill Poff having my card.

17   Q    What did you use the accounts -- the funds deposited into

18   that account for during the time that you two were purchasing all

19   these properties?

20   A    That account was used for personal bills as well as the

21   mortgage payments.

22   Q    What type of personal bills?  Let me break it down for you.

23   How did you pay your rent or your mortgage for your own personal

24   residence?

25   A    That bank account.

1   Q   Was that also the defendant's residence?

2   A   Yes, ma'am.

3   Q   Did the defendant separately contribute any part of the rent

4   or the mortgage for the shared personal residence?

5   A   No, ma'am.

6   Q   How did you pay the mortgage payments and the loan payments

7   on all these other properties you and he had purchased?

8   A   The same account.

9   Q   How did you pay for your utilities at your own personal

10   residence?

11   A   The same account.

12   Q   How did you pay for your groceries and food?

13   A   The same.

14   Q   How did you pay for the defendant's groceries and food?

15   A   It was all the same.

16   Q   How did you pay for your transportation costs?

17   A   The same.

18   Q   How many cars did you and the defendant own during the time

19   period you were married?

20   A   Two vehicles.

21   Q   What were they?

22   A   It was a 2005 F-350 and a 2000 E430 Mercedes.

23   Q   Were there loan payments for both of those vehicles?

24   A   Yes, ma'am.

25   Q   What account were both those vehicles paid out of?

1   A    The general account, 3135.

2   Q    Every month?

3   A    Yes.

4   Q    Who drove which car?

5   A    Bill drove the F-350 if we were at home.  If we were going

6  places together, he drove the Mercedes.

7   Q    How much, roughly, were the loan payments for those two cars

8  per month?

9   A    Approximately 1,200 and something, close to $1,300.

10   Q    How did you pay for restaurant or entertainment expenses?

11   A    The same account number.

12   Q    How was the defendant's restaurant and entertainment expenses

13  paid?

14   A    The same account.

15   Q    How did you pay for your vacations?

16   A    The same account.

17   Q    Where did you go on vacation when you were married?

18   A    To Hawaii for vacation.

19   Q    How many times?

20   A    A few times.

21   Q    Who went with you?

22   A    The defendant and I went a few times alone.  One time the

23  defendant, myself and Tony Reyes and a friend of ours, Kevin

24  Hall, and Kevin Hall's mother.

25   Q    And how was all that paid for?

1    A    It was paid for by that account, and later reimbursed by

2    Kevin and his mother and Tony Reyes back to us.

3    Q    When they reimbursed you, did they reimburse you for your

4    costs and Mr. Poff's costs?

5    A    No, just their own costs.

6    Q    What account did you and the defendant use to pay for the

7    business expenses for U.S. Mortgage and Investment, U.S. Realty

8    and Investment?

9    A    The same account.

10   Q    What about expenses related to your rental properties?

11   A    The same account.

12   Q    What account did you use to make any charitable contributions

13   or donations?

14   A    The same account.

15   Q    You mentioned a couple of times the defendant had child

16   support obligations.  What account was used to pay for some of

17   the defendant's child support payments --

18   A    The same --

19   Q    -- to his former wife?

20   A    Some of them were made by that account.

21   Q    Do you know who Robert Helland is?

22   A    Yes, ma'am.

23   Q    Who is he?

24   A    He was Bill Poff's attorney, representing him in his divorce

25   and child visitation.

1  Q    And what account was used to pay for the defendant's divorce

2  attorney, Robert Helland?

3  A    The account ending in 3135.

4  Q    There are checks written out to Mr. Helland from that

5  account?

6  A    Yes.

7  Q    Who wrote those checks?

8  A    I did.

9  Q    From your perspective, Ms. Ikilikyan, who owned the money

10  deposited into the 3513 account?

11  A    The defendant and myself.

12  Q    Did Mr. Poff have any bank accounts in his name during the

13  time you were married that you are aware of?

14  A    Yes, ma'am, there was one.

15  Q    What bank was that?

16  A    It was another WaMu account.

17  Q    What money, to your knowledge, went into that account?

18  A    One- or $200 a month, ma'am.

19  Q    What was that money used for?

20  A    It was used for the defendant's coffee or lunch money.  Just

21  in case I was doing the reserve duty for the weekend and I was

22  not available, that is the money he would use if I was not

23  available.

24  Q    Where did the money to fund that account come from?

25  A    The 3135 account.

1    Q    To your knowledge, did the defendant have any credit cards in

2    his own name?

3    A    He did not have anything in his name.  He was, however, an

4    authorized user of a credit card that I had.

5    Q    And how would you pay the bill for that card?

6    A    From the 3135 account.

7    Q    Who prepared --  I will skip that.  When you were divorced in

8    the fall of 2008, how did you divide your assets?

9    A    Mr. Poff wanted to have money instead of furniture, except

10   for a few pieces of the furniture.  He wanted the truck.

11   Q    And what about the real estate, how was that divided?

12   A    50/50.

13   Q    And were there properties sold or did you retain them?

14   A    It wasn't sold --

15   Q    Did you sell the properties?

16   A    I was not able to sell any.

17   Q    So the 50/50 division, how did that work for the properties

18   that you still owned?

19   A    Any rents that the properties generated, minus the

20   construction costs -- the remodel costs, Mr. Poff got half of it.

21   Q    Did that division of half of the rental income from

22   properties include properties that he had quitclaimed to you as

23   separate property?

24   A    Yes, ma'am.

25   Q    At some point, Ms. Ikilikyan, did Mr. Poff stop using --

1    drawing on the money in the Washington Mutual 3513 account?

2    A    Towards the very end.   November of 2009 is when he stopped.

3    I am so sorry.   Go ahead.

4    Q    Was it around the time of your divorce?

5    A    Can you --

6    Q    At some point did Mr. Poff -- did you and Mr. Poff stop

7    sharing the account 3135 at Washington Mutual?

8    A    Not until the arrest.   That's when it stopped.

9    Q    When you and Mr. Poff separated, where did he go?

10   A    He went to stay with friends in Michigan.

11   Q    Do you have any knowledge of what he does for a living --

12   what he did for a living after he left?

13   A    He expressed that he had started investing in Michigan.

14        MS. VOGEL:   May I have a moment, your Honor?

15   By Ms. Vogel:

16   Q    I want to ask you one clean-up question back on property

17   number seven on the chart, 7038 South Puget Sound Avenue, Tacoma.

18   I was a bit confused.   You say when you sold this property, you

19   said you sold it to Tony Reyes.

20   A    I'm sorry.   You're right.

21   Q    Let me finish my question.   Who was the actual purchaser on

22   paper when you sold that property?

23   A    At the time when the purchase and sale was completed, there

24   was no buyer's name.   Tony Reyes wasn't sure which one of his

25   investors would qualify for that deal.   So it was left open until

1  there was a buyer.  It was Mr. Henriquez that actually bought the

2  place.

3  Q    When you say it was Mr. Henriquez that actually bought the

4  place, do you know whether it was Mr. Henriquez or whether it was

5  just Mr. Henriquez' name on the paperwork?

6  A    I believe it was just the name.  The true answer would be I

7  truly don't know what interest Tony had.  I don't know their

8  negotiations.

9            MS. VOGEL:  I have no further questions.

10           THE COURT:  Mr. Poff.

11                          CROSS-EXAMINATION

12  By the Defendant:

13  Q    Ms. Ikilikyan, good afternoon.

14  A    Good afternoon.

15  Q    To recap some of the questions I asked earlier, ma'am, how

16  long were you actually in the armed forces?

17  A    I was in the armed forces -- the actual contract, the

18  inactive reserve status actually ended February 9th of 2009.  The

19  contract itself had ended.  I had stopped drilling after the

20  arrest, which was June of 2009.

21  Q    What was your actual date of EAS, meaning end of active

22  service, from the United States Marine Corps?

23  A    The way I understood it, the actual contract was February 9th

24  of 2010.  I had reenlisted in 2000.  I reenlisted for a year

25  after the contract of 2001, a six-year contract, to 2007.  From

1    2007 and 2008, I reenlisted for one more year, even though it

2    wasn't a regular reenlistment, which is for four years.  It was a

3    one-year enlistment to continue drilling.

4    Q    The one date you gave me was February 9th, 2009.  Was that a

5    mistake?

6    A    That is not a mistake.  It is a date --  If there was war

7    right now I would --  There is war.  I would not be reactivated

8    to go overseas.  So I technically became 100 percent civilian in

9    February of 2009.

10   Q    And you had mentioned earlier that you were discharged from

11   the Marine Corps.  You didn't state what type of discharge.  You

12   said that this case had an effect upon that.  What exactly was

13   the type of discharge you received from the United States Marine

14   Corps?

15   A    I am going off of one phone call I made to Kansas City.  And

16   since I was in inactive reserve status at the time of this

17   arrest, since I got out right away, that this case did not affect

18   my military -- anything, so it is understood to be honorable.

19   Q    So you received a certificate of honor discharge?

20   A    I did not receive it.  I heard it takes three months to

21   receive it.

22   Q    Now, you recently --  Let me back up a little bit here.

23   Ms. Ikilikyan, I am looking at your plea agreement.  In your plea

24   agreement you have accepted a charge of Count 1, violation of

25   Title 18, United States Code 1344, 1343 and 1349; is that

1   correct?

2   A   Yes, ma'am --  Yes, Bill.  Sorry.

3   Q   What was the actual element of that?  It was basically that

4   you had committed fraud or you had basically lied; is that

5   correct?

6   A   That I have committed bank fraud and wire fraud.

7   Q   Under the elements of fraud, how would you define fraud?

8   A   Dishonesty to the banks.

9   Q   Lack of integrity?

10  A   Lack of integrity to the banks when applying for a loan,

11  yeah.

12  Q   Would you say that would be your general character overall,

13  would be lack of integrity or lack of honesty?

14  A   General character?  People that I know don't seem to think

15  so.  I don't know.

16  Q   How would you answer that question?

17  A   I have made mistakes, but that's not my character.

18  Q   It is not your character, but you have lied before,

19  basically?  You have lied to investigators, you have lied to

20  lenders and so forth then?

21  A   Since I have never dealt directly with the banks, I did not

22  lie to them directly.  Investigators, yes, I did.

23  Q   You stated you did not lie to the banks directly, but you did

24  admit to signing the loan applications.  Was your actual

25  signature on some of these loan applications?

1   A    Yes, Bill.  The way it was explained to me by you was the

2   income was correct because it was based upon the actual -- the

3   money that was in the bank.  You told me that that was -- the

4   loans were -- consisted of income, and not loans being loans.  So

5   I thought it was okay.

6   Q    Was there information on these loan applications that you

7   knew to be false?

8   A    Such as --  I'm sorry.  Yes.

9   Q    And you did sign these loan applications?

10  A    When we were sitting in escrow to sign all the loan

11  applications and contracts, there was a system of you looking at

12  the entire packet, and I would turn around and sign everything

13  that you had okayed, that there was no mistakes, everything.

14  After you okayed it, I signed it, yes.

15  Q    For the sake of brevity of time, unless I ask you an

16  open-ended question, could you just respond true or false, yes or

17  no?

18  A    No problem.

19  Q    So to restate my question, you did sign these loan

20  applications?

21  A    Yes.

22  Q    And these loan applications you did know contained false or

23  fraudulent statements on them?

24  A    At the time, except for the owner occupied, no, I did not.  I

25  did not know that it contained fraudulent information.

1    Q    I thought you had just said that you knew at the time -- at

2    the time, you knew it contained fraudulent information?

3    A    With the respect of are we actually going to move into this

4    house.

5    Q    In respect to occupancy?

6    A    Yes.

7    Q    But other materials upon those loan applications you knew to

8    be false or fraudulent misrepresentations?

9    A    Not at that time, I did not know.

10   Q    During the time of the alleged conspiracy you were a licensed

11   real estate agent, a licensed real estate broker and a licensed

12   mortgage broker?

13   A    Yes.

14   Q    And you owned two businesses, one by the name of U.S.

15   Mortgage and Investments, which was an LLC, and you also owned

16   another company, U.S. Realty Investments, which was an LLC as

17   well?

18   A    On paper, yes.  We owned it, yes.

19   Q    And in your proffer and in your deal it says that Poff and

20   Ikilikyan were the only employees and/or principal owners or

21   operators of these companies?

22   A    With respect to Mario, who applied to be a loan officer under

23   our license, and he did not complete -- he did not become a loan

24   officer.  With respect to that, yes.

25   Q    So who was the sole owner of these businesses?

1    A    On paper?  I was.

2    Q    You were the owner of these businesses.  Who actually -- in

3    regards to a HUD-1 settlement statement, who actually prepared

4    the HUD-1 settlement statements?

5    A    Micki Thompson.

6    Q    Did you have any system on your computer to create a HUD-1

7    settlement statement?

8    A    I did not.

9    Q    Did Mr. Poff have on his computer any way to create a HUD-1

10   settlement statement?

11   A    I don't think so.

12   Q    In regards to the seller carrybacks, wasn't you advised by

13   licensed professionals and/or attorneys that the system you were

14   using was legal, it was lawful at the time?  Were you advised

15   that at any time?

16   A    The system -- the paperwork that you created, at first Micki

17   Thompson was asked by you to run it by the attorney.  Yes, that

18   did happen.

19   Q    So Micki Thompson told you that everything was legal,

20   everything was in compliance.  And you were the license holder,

21   you were the one with your name on the paper, yours was the name

22   on the wall, you were told this was completely in compliance by a

23   licensed professional?

24   A    You were there the entire time.  In regards to the seller

25   financing agreement, you had asked Micki if she could run it by

1   the attorney to see if that was okay and that was legal.  And she

2   had told you and I that it was fine, that it was legit, yes, on

3   that one aspect.

4   Q    If Mr. Poff was sitting there during the times of these

5   meetings and he was being told this by a licensed professional,

6   that purportedly had run this scenario by attorneys -- real

7   estate attorneys, would he have the assumption that this was a

8   legitimate process?

9            MS. VOGEL:  Objection.

10           THE COURT:  Sustained.

11           THE DEFENDANT:  I mis-asked the question.  I'm sorry,

12   sir.

13           THE COURT:  You can't ask her what you were thinking,

14   which is what the problem is with your question.

15           THE DEFENDANT:  I understand, sir.  I understand.

16           THE COURT:  While I understand you were married at one

17   time, that doesn't qualify her to tell you what you're thinking,

18   contrary to what my wife regularly tells me.

19   By the Defendant:

20   Q    So you were under the impression that is -- because you were

21   the one licensed, you were under the impression that this was

22   legal?

23   A    With respect to the seller financing agreement, and both of

24   us being there, and hearing Micki tell both of us, yes, this is

25   fine, this is okay.  With respect to that one form, yes, I was

1    there.   And, yes, that did happen.

2    Q     Did you ever tell Mr. Poff that everything was above board,

3    that there was nothing done wrong, everything was in compliance?

4    A     It was the other way around.   You had told me that everything

5    was above board, everything technically is correct.

6    Q     You are stating that Mr. Poff was your business, real estate,

7    mortgage, tax consultant in regards to basically -- really

8    everything?

9    A     Yes, I am, truthfully.

10   Q     And what professional licenses did Mr. Poff hold at this

11   time?

12   A     On paper only a notary public.

13   Q     On paper he was a notary public?

14   A     Yes.

15   Q     Why did you take so much stock in the advice of Mr. Poff

16   during this time?

17   A     You are a very intelligent person.   You have always bragged

18   to everybody you know more about real estate than I ever did.

19   You were the one who actually taught me real estate.

20   Q     Mr. Poff is the one who actually taught you real estate?

21   A     Really how to fill out even purchase and sale agreements.

22   Q     Did you go to a school for real estate?

23   A     Yes.   But there was no lesson about how to fill out a

24   purchase and sale agreement.

25   Q     So Mr. Poff, who has no training in real estate, taught you

1    how to do real estate?

2    A    Yes.  I did have professional schooling, but you really --

3    Bill, you -- you are very intelligent, very quick on your feet.

4    You have said so yourself, when there is an obstacle, you either

5    go around it -- you always figure out a way.  That was your

6    strong suit in the relationship regarding everything, including

7    business.

8    Q    More so on the advice of Mr. Poff than licensed professionals

9    or legal counsel, you would take stock of his advice over

10   everyone else?

11   A    The way it was presented to the legal counsel, they said it

12   was fine.  But the way it was presented, I don't think they ever

13   got the full story.  They never really -- they never really got

14   the full story to really fully explain to us.

15   Q    When you refer to "the full story," what are you referring to

16   specifically?

17   A    Meaning --  Let's say the bank is aware of one loan and not

18   the carryback.  The way it was explained to the counsel was,

19   well, there is one loan, and the seller agreed to re-lend the

20   loan a month later.  If you explain it that way, it sounds legal,

21   because somebody can buy a house and then later get a second

22   mortgage.  So that's how it is presented.  But it wasn't

23   presented to them, they are in second position, but really we are

24   aware they are going to be in third.  If they would have had

25   heard the full story, of course they would have said, no, that is

1    not legal, you can't do that.

2    Q    So if you have this seller financing form, you have it

3    notarized, several of them obviously, and Mr. Poff wasn't the

4    licensed professional in the industry, whose responsibility was

5    it to disclose these criteria to lenders, to sellers, to buyers,

6    to whomever?

7    A    You represented --

8            MS. VOGEL:  Your Honor, I will object to the question

9    being compound.  Can he break that down?

10           THE DEFENDANT:  I will break that down.  That is not a

11   problem.

12   By the Defendant:

13   Q    Whose responsibility is it for disclosure -- if you are a

14   licensed real estate agent or a licensed real estate broker,

15   whose responsibility is it for disclosure of the elements of the

16   deal?

17   A    As a licensed real estate agent, I was responsible for

18   preparing and explaining the paperwork, and negotiating the terms

19   for the loan, yes.  That part was me.  When you were the loan

20   officer, you obtained all the information to fulfill the loans.

21   That was your responsibility.  Because up until -- I forget,

22   2007, I believe, it was not required for loan officers to be

23   licensed.  So technically you were practicing as a loan

24   officer and a loan originator at that time, too.

25   Q    Did Mr. Poff have a broker's agreement with you or any other

1   mortgage broker?

2   A    Bill, you hid behind my name.  You did all the loans.

3   Q    I will back up to that later.  When you talk about your

4   Washington Mutual account, the one ending in 3135, you called it

5   a general account?

6   A    "General" meaning -- any money that was ever made, via loans

7   or commissions, eventually that money would end up in that

8   account.  It was a general account.  It was also used for stated

9   programs because it had the most amount of deposits each month.

10  Q    How much deposits would you average each month in your

11  account?

12  A    Bill, I --  Off of memory?  It wouldn't be exact.

13  Q    Could you give an estimation?

14  A    An estimation, off of each loan there was an approximate --

15  It depends which property closed that month.  For example, as

16  soon as the four duplexes closed, I remember around $120,000

17  coming into that bank account.  So that's an example.

18  Q    Isn't it a fact that you bragged to friends you had between

19  40- and anywhere up to $100,000 per month average during certain

20  years in your business?

21  A    Actually, that is something you did.

22  Q    So you never bragged to a friend you had a certain amount of

23  money going through your account?

24  A    You bragged to the friends.  That is something you loved to

25  do.

1  Q    I will retract that.  Did you ever receive any type of

2  treatment for a mental disorder?

3  A    Mental disorder?  What kind?

4  Q    Did you ever receive treatment for post-traumatic stress

5  disorder?

6  A    I have been through a lot of hard times in my life.

7  Q    Could you explain some of those hard times?

8        MS. VOGEL:  Objection, your Honor.  Relevance.  The

9  nature of the hard times?

10       THE COURT:  Why don't you rephrase the question,

11  counsel.  This is not directly relevant.  I will permit you to

12  get into it briefly and then I will close it off.

13       THE DEFENDANT:  Yes, sir.  Would you like me to explain

14  the relevance?

15       THE COURT:  I would like you to rephrase.  If you have

16  specific things in mind, let's use that, as opposed to asking the

17  witness for a narrative.

18       THE DEFENDANT:  Very well.  I will retract that.

19  By the Defendant:

20  Q    Did you endure a major earthquake in Armenia in 1988?

21  A    Yes.

22  Q    Did you lose family members in that earthquake in 1988?

23       MS. VOGEL:  Objection.  Relevance.

24       THE COURT:  I said I will permit it, briefly.

25       MS. VOGEL:  I didn't hear you, your Honor.

```
 1              THE COURT:  I said I would permit it, briefly.
 2              THE WITNESS:  Yes.
 3              THE DEFENDANT:  Do you need a moment?
 4              THE COURT:  Let's move it along, Mr. Poff.  This is
 5    getting pretty far afield.
 6    By the Defendant:
 7    Q    My point I am trying to make, Ms. Ikilikyan, without
 8    upsetting you, you have been through some pretty hard times that
 9    you did go to counseling for PTSD?
10    A    Actually, I went to counseling for -- to cope with the
11    divorce more than the PTSD.
12    Q    And during this time you had a couple of anxiety attacks?
13    A    Panic attacks, when you would yell at me, yes.
14    Q    You had a couple of panic attacks?
15    A    I am not a psychologist.  I can't diagnose myself.  I had
16    physical symptoms -- the way you treated me, yeah.
17    Q    Was there one time where Mr. Poff actually was required to
18    call an ambulance for you because the attack was so severe?
19              MS. VOGEL:  Your Honor, I fail to see the relevance.
20              THE COURT:  I will sustain that.  Let's move along.  Are
21    you going to start a new area, Mr. Poff, because it is 4:30.
22              THE DEFENDANT:  Is it time to adjourn for the day?
23              THE COURT:  Yes.
24              THE DEFENDANT:  Can we leave it here, and I will start
25    tomorrow?
```

1          THE COURT:  If you have one more question in this area,

2     I will permit that.  Otherwise we will stop.

3          THE DEFENDANT:  I will cut this area off right now, sir.

4          THE COURT:  All right.  We will see you tomorrow at

5     9:00, ladies and gentlemen.  Are there any matters that counsel

6     want to deal with today?

7          MS. VOGEL:  No, your Honor.

8          THE COURT:  Mr. Poff?

9          THE DEFENDANT:  No, your Honor.

10          THE COURT:  I will see you at 9:00 tomorrow morning.  We

11     will be in recess.

12                    (Adjourned for the day)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2

3

4

5

6

7

8

        I, Barry L. Fanning, Official Court Reporter, do hereby
9   certify that the foregoing transcript is true and correct.

10

11                              S/Barry L. Fanning

12                              _____

13                              Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25