```
1              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
2                      IN SEATTLE

3  _____

   UNITED STATES OF AMERICA,        )
4                                   )   NO. CR09-160JLR
                    Plaintiff,      )
5                                   )
            vs.                     )
6                                   )
   WILLIAM S. POFF,                 )
7                                   )
                    Defendant.      )
8                                   )
   _____

9  _____

10                     TRIAL

11 _____

12
             BEFORE THE HONORABLE JAMES L. ROBART
13

14               March 10, 2010

15
   APPEARANCES:
16
   Sarah Vogel
17 Michael Scoville
   Assistant United States Attorneys
18 Representing the Plaintiff

19 William S. Poff
   Pro Se
20 Representing the Defendant

21 Howard Ratner
   Standby Counsel
22 Attorney at Law

23

24

25
```

```
 1                        EXAMINATION INDEX

 2   WITNESS                                              PAGE
      ALEXIS IKILIKYAN    (Continued cross-examination)    9
 3                        By the Defendant:
                          REDIRECT EXAMINATION            92
 4                        By Ms. Vogel:
      DAN TRUINI          DIRECT EXAMINATION              95
 5                        By Mr. Scoville:
                          CROSS-EXAMINATION               109
 6                        By the Defendant:
      SARAH GARNER        DIRECT EXAMINATION              119
 7                        By Ms. Vogel:
                          CROSS-EXAMINATION               140
 8                        By the Defendant:
      JAMES THOMSON       DIRECT EXAMINATION              143
 9                        By Ms. Vogel:
                          CROSS-EXAMINATION               154
10                        By the Defendant:
      JOHN ANDRIOLO       DIRECT EXAMINATION              158
11                        By Ms. Vogel:
                          CROSS-EXAMINATION               169
12                        By the Defendant:
      TIMOTHY THOMSON     DIRECT EXAMINATION              171
13                        By Ms. Vogel:
                          CROSS-EXAMINATION               184
14                        By the Defendant:

15

16

17                        EXHIBIT INDEX
      EXHIBITS ADMITTED                                   page
18     154                                                135
       153                                                137
19

20

21

22

23

24

25
```

1      THE COURT:  Good morning, ladies and gentlemen.  I think

2   we only have one housekeeping detail from me, which is that we

3   are going to be breaking a little bit early for the lunch recess,

4   as I need to make it to a meeting outside the courthouse.  So we

5   will quit around a quarter to 12:00 to do that.  I will adjust

6   the morning break, so that it will be more like 10:20, 10:25, as

7   opposed to 10:30.

8      Anything from the government this morning, Ms. Vogel?

9      MS. VOGEL:  No, your Honor.

10      THE COURT:  Mr. Poff, anything?

11      THE DEFENDANT:  Yes, I have something for the court this

12   morning sir.

13      THE COURT:  All right.

14      THE DEFENDANT:  I have a motion for default judgment

15   against the plaintiffs this morning for failure to plead or

16   timely answer in a timely fashion and prove their jurisdiction.

17   One, your Honor, it is not my burden to prove or disprove the

18   jurisdiction of this honorable court, but out of manifest

19   necessity I have to prove the lack of jurisdiction because the

20   plaintiffs simply will not do their duty and cooperate.  They are

21   now in the default position, your Honor.

22      I make a motion to dismiss with prejudice.  I cite McNutt

23   versus General Motors Acceptance Corp., 56 U.S. Supreme Court 502

24   (sic), and Hagans versus Lavine.  All of this is in my briefs,

25   your Honor.  It says the burden is entirely on the plaintiffs to

1    prove their claim.  They automatically waived receipt, which is

2    what happened in this instant case.  They have absolutely failed

3    to do so, your Honor.

4         5 United States Code, 556(d), as in delta, states:

5    "Proponent of a rule or order has the entire burden of proof of

6    all claims."  They haven't proven one thing, your Honor, which is

7    a denial of due process against this alleged defendant.

8         I am claiming that the plaintiffs are in the default position

9    right now for failing to state a cause of action for which relief

10   may be granted, your Honor.

11        Also, I would note to the court that all my briefs are filed

12   as affidavits as well.  It has been way past 30 days.  They are

13   now in default and haven't answered anything.

14        This entire case is now moving forward in what seems to be

15   pretend mode, sir.

16            THE COURT:  Well, since we have raised the subject, let

17   me give you my rulings on it.  Jurisdiction, as Mr. Poff has

18   noted, is required to be proved by the government.  It could be

19   challenged prior to trial by motion.  However, the government's

20   burden is to prove jurisdiction at trial, which they do by

21   pleadings that they file and evidence which is presented.

22        I would note that the deadline for pretrial motions has

23   passed, and also that Mr. Poff's most recent statement, evidence

24   a confusion between some of the standards that are found in the

25   criminal context, which this case is alleged to be, and the civil

1    context, which this case is not alleged to be.

2        Under 18 U.S.C. 3231, the federal district courts, that would

3    be us, have exclusive original jurisdiction over all offenses

4    against the laws of the United States.  The superseding

5    indictment in this matter charges the defendant with violations

6    of 18 U.S.C. 1344, 18 U.S.C. 1343, 18 U.S.C. 1349, 18 U.S.C.

7    1956(h), 18 U.S.C. 1956 and 18 U.S.C. 1957.  Those are offenses

8    against the laws of the United States, as those are laws of the

9    United States.  Therefore, the court finds it has subject matter

10   jurisdiction over this matter.

11       Personal jurisdiction attaches when a defendant has been

12   brought in on a federal indictment charging a violation of

13   federal law.  The court finds it has personal jurisdiction in

14   this matter.

15       I further understand that it is Mr. Poff's view that there

16   are a series of infirmities in the court's jurisdiction in this

17   matter, which I am still trying to sort out from the

18   transcription of the opening statement that I asked our reporter

19   to kindly prepare.

20       Thus far, I think I have figured out that it is Mr. Poff's

21   view that federal law doesn't apply generally, but only in the

22   District of Columbia, maybe in national parks, national forests

23   and military reservations.

24       Also, I don't believe there is any dispute that Mr. Poff is

25   not a resident of the District of Columbia, that he is not an

 1    employee, franchisee or instrumentality of the United States.  I

 2    understand the argument that the court's jurisdiction is limited

 3    to common law and admiralty.  Also, there seems to be a reference

 4    to the contention of the federal laws apply only in the U.S.

 5    territories, and not in the states.

 6        None of those have any validity whatsoever.  They have been

 7    repeatedly rejected by every court that I can find that has

 8    looked at them.

 9        And, finally, in an opinion that the Ninth Circuit, which is

10    what the Western District of Washington is part of, it was

11    described by Judge Fletcher as frivolous, an appellation which

12    the U.S. Attorney has chosen to attach to them also.

13        So, for the reasons that I have just stated, I am going to

14    deny the motion to -- I guess you styled it as a motion for

15    default.  I don't believe there is actually a motion for default

16    in the criminal process.  But I am going to construe it as a

17    motion to dismiss on the basis of jurisdiction.  And I am going

18    to deny it at this time.

19        So that's the court's ruling on that subject.  Anything else,

20    Mr. Poff?

21            THE DEFENDANT:  Yes, sir.  Is that your final appealable

22    ruling then?

23            THE COURT:  It is not appealable at this time.  You need

24    to wait until you win or lose, and then you get to appeal.

25            THE DEFENDANT:  The other issue I have was the affidavit

1   notice that I gave this honorable court about the bankruptcy of

2   the United States.  It is prima facie evidence on its face.  It

3   is self-evident.  And I can provide the information to the court

4   that the U.S. Attorneys are not trustees of the United States

5   bankruptcy.  They technically don't even have a right to speak

6   before this honorable court on this instant matter, sir.

7          THE COURT:  Let me take up that one then.  In

8   paragraph 6 of your affidavit in regards to the bankruptcy of the

9   United States, it stated that you respectfully give notice to

10  this court of the malicious fraud being perpetrated by these

11  plaintiffs.  I am going to quote.  "Since, according to House

12  Joint Resolution 192, signed June 5, 1933, the United States is

13  bankrupt!"  Because I take this job seriously, I went and found

14  House Joint Resolution, which is H.R. Res. 192, which is titled,

15  "To assure uniform value to the coins and currencies of the

16  United States."

17  I read it carefully.  It does not declare the United States

18  bankrupt.  It abolished the gold standard and authorized the

19  issuance of a currency, basically Federal Reserve notes.

20      In the view of some people, taking the United States off of

21  the gold standard apparently would bankrupt the United States.

22  That's not what the resolution says.  And, therefore, I find that

23  there has not been competent evidence presented that the United

24  States is bankrupt.

25          THE DEFENDANT:  Excuse me, sir.

1    THE COURT:  I get to talk and then you get to.  As such,

2  I don't believe that any of the arguments made in regards to the

3  bankruptcy of the United States have validity, and I am denying

4  them.

5    I also would note after paragraph 6 we got into paragraph 8,

6  which starts talking about Interpol, the International Monetary

7  Fund, and the middle temple of the crown, in addition to the Nazi

8  Gestapo colonel Otto Steinhaus, and SS Officer Paul Dickopf,

9  D-I-C-K-O-P-F.

10    The court relies not on the internet for its information.

11  The internet is a powerful tool to point us towards things, but

12  my rulings are based on the statutes and the case law, which is

13  why I went back to find the House joint resolution, which was

14  alleged to be the basis of this.

15    So know that is what the court does take cognizance of, as

16  opposed to some of the arguments, which I understand freely

17  circulate on the internet, and which people are welcome to

18  embrace, but until someone establishes them as the law, they are

19  not going to be persuasive to the court.

20    Mr. Poff, now it is your turn.

21    THE DEFENDANT:  Sorry for interrupting you before.  The

22  one point I want to make was, I have the testimony of the Speaker

23  Representative James Traficant, Jr., from Ohio, in the

24  Congressional Record of March 17th, 1933, where he testifies

25  before Congress that the United States is, in fact, bankrupt,

1    sir.

2        And, also, it goes into an attachment that -- I have

3    something else that I did find on the internet.  I did look at

4    the executive orders and looked at these codes in the statute

5    that basically confirm the fact that the United States is

6    bankrupt.

7        In House Joint Resolution 192, if you have $100 million in

8    contracts payable in gold, and you cancel those contracts, that

9    is bankruptcy, sir.

10            THE COURT:  In your opinion, sir.  Let me tell you -- I

11    don't think he was Speaker of the House.  I think he was just a

12    representative.

13            THE DEFENDANT:  He was a representative.  He was

14    speaking to the Speaker.

15            THE COURT:  That may have been what you meant.  This is

16    going to get me in trouble, because it just opens up a can of

17    worms, but if you recall the more recent state of the union

18    speech, a lawful representative, just like Representative

19    Traficant, announced that the president was lying.  People say

20    stuff all the time on the floor of the House of Representatives

21    or on the floor of the Senate.  That doesn't make it true.  It

22    doesn't make it untrue, it just means that is their opinion.  I

23    have read the gentleman's speech.  He is obviously very upset

24    about going off of the gold standard, but that doesn't mean that

25    we are bankrupt, notwithstanding the fact that I have this

1   wonderful mental impression of him waving his arms and going,

2   "The country is bankrupt."

3        The court, mindful of your arguments, and attempting to be

4   respectful of them, has done its research, and concluded that

5   that's not a legitimate basis for the court to find that the

6   United States is in bankruptcy.  And on that basis, I will

7   decline the motion.

8        Anything else, sir?

9            THE DEFENDANT:  No, sir.  I had one more point, but I

10  will drop it since you have already made your ruling on it.

11           THE COURT:  All right.  Are we ready to proceed then?

12  Mr. Poff, I think you are up.

13           THE DEFENDANT:  Thank you, sir.

14           THE COURT:  The witness is still under oath.

15   (Continued cross-examination)

16  By the Defendant:

17  Q    Good morning, Ms. Ikilikyan.

18  A    Good morning, your Honor.  Good morning, ladies and

19  gentlemen.

20  Q    Ms. Ikilikyan, I will ask you some very simple questions.

21  Unless I ask you to expound on the questions in any way, I would

22  like you to answer in a yes or no format.

23  A    Okay.

24  Q    Question number one:  You pled guilty to fraud?

25  A    Yes.

1  Q   Fraud is lying?

2  A   Is that a question?

3  Q   Yes.  Is fraud lying?

4  A   Yes.

5  Q   In effect, in your plea agreement, you said you knowingly

6  carried out a scheme to obtain money?

7  A   Yes.

8  Q   Isn't it a fact, also, that you said you knew the statements

9  were false?

10  A   Yes.

11       MS. VOGEL:  Your Honor, I am going to ask that if he is

12  going to ask specific questions about the plea agreement, that

13  the witness be allowed to have a copy of that.

14       THE COURT:  Do you have a copy for her?

15       THE DEFENDANT:  Yes, sir.

16       THE COURT:  If the government has a copy --

17       MS. VOGEL:  May I approach?

18       THE COURT:  Yes.

19       MS. VOGEL:  Thank you, your Honor.

20       THE COURT:  You may proceed, Mr. Poff.

21       THE DEFENDANT:  Thank you, sir.

22  By the Defendant:

23  Q   Isn't it a fact, also, that it said you knew the statements

24  were false?

25  A   Yes.

Q    And didn't it also say you acted with the intent to defraud?

A    Yes.

Q    Doesn't it also say you admitted to using straw buyers to buy properties?

A    Yes.

Q    Doesn't it also say you admitted to falsely inflating the value of properties for purchase?

A    Yes.

Q    Doesn't it also say you conducted the real estate negotiations on the purchases?

A    Yes.

Q    Didn't you also testify that you signed loan applications with false information?

A    Yes.

Q    Doesn't it also say --  I'm sorry.  I am moving on.  I am not in the plea agreement anymore.  This is --  I'm sorry.  I do apologize, Ms. Ikilikyan.

     Doesn't it also say you submitted false documentation to title and escrow companies, which would include phony purchase and sale agreements?

A    Yes.

Q    Isn't it a fact you are the sole owner of U.S. Realty & Investments, LLC?

A    Yes.

Q    Isn't it also a fact that you are the sole owner, even to

1    this day, of U.S. Mortgage and Investments, LLC?

2    A    I don't believe I have the license for the mortgage.

3    Q    Up until the time that your license was suspended,

4    Ms. Ikilikyan, were you the sole owner of U.S. Mortgage &

5    Investments, LLC?

6    A    Yes.

7    Q    So, in summation, of those two businesses, in effect, you

8    owned all the stock and/or shares, whatever it was, of both LLCs?

9    A    For the two businesses, yes.

10   Q    Isn't it a fact that Mr. Poff was never placed on either two

11   of those businesses?

12   A    No.   That's correct.

13   Q    Isn't it a fact that you located other people with good

14   credit to invest with you?

15   A    Yes.

16   Q    Isn't it a fact your mother, Armenuhi Harutyunyan, would lie

17   for you on occasion?

18   A    No.

19   Q    Isn't it a fact that you live with your mother in housing who

20   frequently reports to housing only herself and her son live in

21   the unit?

22        Let me rephrase the question for you.   Was there a period of

23   time when you lived in housing with your mom, that your mom would

24   falsify reports to the King County Housing Authority that you did

25   not live in that unit?

1          MS. VOGEL:  Objection, your Honor.

2          THE COURT:  Overruled.

3   By the Defendant:

4   Q   Let me ask you another way, Ms. Ikilikyan.  During the

5   time that you -- for several years you lived with your mother in

6   the King County Housing Authority, and you made some money during

7   that time.  Were you required, as Housing requires, to pay

8   one-third of your money to the King County Housing Authority?

9   A   Yes.

10  Q   You did pay one-third of your money to the King County

11  Housing Authority?

12  A   No.

13  Q   So what you just said before was not true?

14          THE COURT:  What she said before was --  Your question

15  was:  Were you obligated to pay it?  And she said yes.  That

16  doesn't mean that she paid it.

17          THE DEFENDANT:  She did say she was obligated.  I

18  apologize.  I must have misheard.  Could you speak up just a

19  little bit for me?  I think I am a little bit hard of hearing.

20  By the Defendant:

21  Q   Isn't it a fact, Ms. Ikilikyan, your mother would do anything

22  that you had asked her to do?

23  A   As long as it was legal, yes.  As long as it did not

24  interfere with the laws, yeah.

25  Q   But she would on occasion lie for you?

1   A     If she knew it was a lie, she would never, ever do that.

2   Q     Ms. Ikilikyan --

3                THE COURT:  Don't interrupt the witness, counsel.  She

4   gets to talk, you get to talk.  Those are the rules.

5                THE DEFENDANT:  I will make an objection, your Honor.

6                THE COURT:  Let her finish her answer, then you can

7   object.  We are respectful of each other.  She is not

8   interrupting you, you are not going to interrupt her.  You may

9   complete your answer.

10               THE WITNESS:  The answer is, no, my mom did not lie for

11  me --

12               THE DEFENDANT:  Objection.  I had directed the witness

13  to answer the question yes or no.  Could you direct the witness

14  to answer yes or no, unless otherwise asked?

15               THE COURT:  You can direct and she is going to answer.

16  To the extent she follows that, yes, if the answers are not

17  responsive.  But you don't get to cut her off.

18               THE DEFENDANT:  I do apologize for appearing to be rude,

19  your Honor.  Thank you.

20  By the Defendant:

21  Q     Isn't it a fact you sought permission from the management at

22  King County Housing Authority to use your mom to invest in real

23  estate?

24  A     Yes.

25  Q     Wasn't it a fact that Mr. Poff was there when you asked King

1   County Housing Authority to use your mother to invest in real

2   estate?

3   A   Yes.

4   Q   Isn't it a fact, if you didn't ask permission from King

5   County Housing Authority -- if you didn't have this permission,

6   your mom would stand a chance of losing her housing the next time

7   they pulled her credit report, if they found houses on her credit

8   report?

9   A   It was explained to us, as long as she made no money it would

10  not -- she would be okay.  Can you rephrase that question?

11  Q   Yes, I sure will.  If your mom had bought houses without

12  permission from King County Housing Authority, and they had found

13  out, without her not having any kind of permission, she could

14  possibly lose housing, yes or no?

15  A   It was more based off her income.  If she made income from

16  anything and did not report it, not just houses.

17  Q   Thank you for your answer, Ms. Ikilikyan.  Could you please

18  keep the answers to yes or no?

19  A   You are asking me to know the laws in detail from King County

20  Housing.  I can only tell you the way I understood it, the way it

21  was told to both you and I.  That is the best I can do.

22  Q   I was just asking you if King County Housing --

23          THE COURT:  Counsel, move on to your next question.

24  By the Defendant:

25  Q   So it is a fact that you lived at King County Housing

1   Authority for several years, you didn't pay your one-third of the

2   income you had coming in, and the only person that was on the

3   lease at that time was your mother and your brother?  Is that

4   true?

5   A   Yes.

6   Q   Your mom, she is a good woman.  I know she would do anything

7   for you, to help you out.  You are her daughter and she loves

8   you.  Isn't it a fact, by your mother's own example, you are

9   following the same pattern as her at this time, yes or no?

10  A   My mom is not a liar.

11  Q   And isn't it also a fact, Ms. Ikilikyan, being a new mother

12  yourself, you would do absolutely anything you needed to do to

13  minimize your role in the conspiracy that you admitted to in an

14  effort to get a lesser sentence?  Is that true, yes or no?

15  A   As a mother, I have always showed the best example to my

16  child, which is I will take accountability for what I have done.

17  If I am guilty, I will admit it.  And I have.

18  Q   Very well.  Isn't it a fact, Ms. Ikilikyan, that you are

19  receiving a 5K(1) sentence reduction for assisting the government

20  in its case against Mr. Poff?

21          THE COURT:  Mr. Poff, I am the only one that can give a

22  5K(1).  I think you may want to rephrase your question.  The

23  government may propose that.

24  By the Defendant:

25  Q   If I was to rephrase the question --  Isn't it true that they

1   are offering for your assistance in helping to prosecute the case

2   against Mr. Poff, they are offering to submit a 5K(1) to the

3   Honorable Judge Robart, yes or no?

4   A    Only if I testify to the truth, not just if I say anything.

5   It has to be --  The sentence may be reduced if I testify in a

6   truthful and prompt matter.  They didn't offer me anything just

7   for saying anything.  It had to be the truth.

8   Q    Very well.  So it is a fact that you have to tell the truth

9   and be truthful the entire time, not just here in the courtroom,

10  but also in your everyday life dealings outside the courtroom,

11  all the way up until the sentencing?

12  A    The truth is the truth.

13  Q    I agree.  So your answer would be yes?

14  A    To the best of my knowledge and my memory, yes.

15  Q    Isn't it a fact, Ms. Ikilikyan, that you have been continuing

16  to conduct your life in fraud and deceit since arrest?

17  A    No.

18  Q    Isn't it a fact, by your agreement with the government, you

19  are not to sell, disburse or hide any real or personal property?

20  A    Anything that is up to $1,000.  Over a thousand dollars, I am

21  not able to sell property.

22  Q    And, Ms. Ikilikyan, isn't it a fact that Mr. Poff was awarded

23  his separate property in the divorce by court order?

24  A    Yes.

25  Q    Can you see this okay, Ms. Ikilikyan?

1  A    Yes.

2  Q    Can you read line 10 of that order, this agreement that was

3  placed in the order of dissolution in our divorce?

4  A    "William S. Poff will also be entitled to the mantle clock,

5  the sauna, the humidor, his personal DVD collection, the large

6  flat screen television, the two computer systems, and the foam

7  Posturpedic-style mattress."

8  Q    Could you also read line number 11, ma'am?

9  A    "The Ford F350 truck shall be retained by William S. Poff."

10  Q    And also, ma'am, could you read the middle paragraph?  Can

11  you see that okay?

12  A    Yes.

13  Q    Can you read the middle paragraph that starts with "all

14  rents"?

15  A    "All rents will be deposited into an account which will

16  automatically and equally divide the deposited money into

17  prospective accounts that each person of the party will only have

18  access."

19  Q    Isn't it true that you have had sole control and management

20  of the properties?

21  A    Yes.

22  Q    Isn't it also true that you violated this agreement with

23  Mr. Poff for no apparent reason?

24  A    There is a lot of apparent reason involved.  I will not mind

25  working things out with you in a civil matter.  There are things

1  that are not here that are contracted to that you violated as

2  well.

3  Q    Is there another contract with you, Mrs. Ikilikyan, that

4  William S. Poff has violated, yes or no?

5  A    There are different forms of contract.  The one I am

6  referring to is a verbal contract.

7  Q    Was there anything else entered into the dissolution of

8  divorce that Mr. Poff was in violation of?

9  A    No.

10  Q    So, Ms. Ikilikyan, with no authority from the courts at all,

11  you acted in your own form of justice to basically conceal, hide

12  or sell properties and monies that belong legitimately to

13  Mr. Poff?

14  A    I have not sold any of the properties listed.

15  Q    Which would bring me to my next question.  In this agreement

16  for the division of assets --  I will put it back up here for

17  you.  In line number 10 it says there are two computer systems

18  that belong to William S. Poff; is that correct?

19  A    Yes.

20  Q    And that those two computer systems, by agreement, were

21  supposed to be placed in a storage unit in Federal Way,

22  Washington?

23  A    Yes.

24  Q    The problem is, those two computer systems are not in the

25  storage unit in Federal Way, Washington?

A    The storage unit was in my name, and you were not paying for them for a very long time.  I was forced to pay for them out of my pocket because you refused to take it in your name.

Q    Ms. Ikilikyan, the two computer systems that belonged to William S. Poff are supposed to be in the storage unit --  All properties that were contained within this agreement for division of assets, yes or no, was it supposed to be, and was it not told to Mr. Poff, that they were in that storage unit?

A    Your assets were in the storage unit.  The storage unit had contacted me and told me that they were going to take everything out and I had to pay a lot of money to keep that storage unit.

Q    In regards to the storage unit, did you sign the control of the storage unit over to William S. Poff prior to that?

A    I had done my part to sign it over to you, but they couldn't have it automatically put in your name unless you signed it over yourself, and you had refused to do that.

Q    And William S. Poff did go in and sign the storage unit over to his control.  He had been making payments via his debit card for several months prior to this incident --

        MS. VOGEL:  Objection to the form of the question.

        THE COURT:  Why don't you let him finish.  The same rules apply to the government here.  And then I will hear the objection.

        THE DEFENDANT:  Should I rephrase the question somehow, your Honor?

```
1              THE COURT:  Why don't you finish the question and then
2   we will hear the government's objection to it.
3              THE DEFENDANT:  Yes, sir.  Thank you.
4   By the Defendant:
5   Q    I will back up.  Isn't it true that you had signed over
6   custody and control of the storage unit to William S. Poff?
7   A    Yes.
8   Q    Isn't it true that William S. Poff went in and signed an
9   agreement with the storage unit?
10  A    I don't know.
11  Q    Isn't it true that for several months that William S. Poff
12  paid on the storage unit using his debit card?
13  A    After I had signed things over to you, which was a few months
14  ago.  Up until then I was paying for it.
15  Q    So up until the incident -- up until the incident that you
16  are referring to, William S. Poff, in his belief, because he is
17  holding a lease in his hand, a signed lease from the storage
18  unit --
19  A    Dated --
20  Q    Dated several months prior to the incident that you are
21  referring to in December.  That was December of 2009?
22  A    The storage unit officially went into your name a few months
23  ago.  I had signed it over to you a long time ago.  And you
24  officially took it over a month ago.  Until then, I was making
25  payments.
```

Q    If William S. Poff was making payments on the storage unit,
which, even prior to what you are referring to, you would take
proceeds out of Mr. Poff's portion of the rents and make the
payments on the storage unit; is that correct?
A    Yes.
Q    So it was Mr. Poff's understanding this entire time,
regardless of whose name was on it, that his items were in there,
and that was supposed to be under his control per agreement?
            MS. VOGEL:  Objection.
            THE COURT:  Mr. Poff, I am going to sustain the
objection.  You need to move on.  What happened in your divorce
is not before this court.  The point you wanted to make, you have
made.  Let's move on.
            THE DEFENDANT:  Thank you, sir.  That is basically what
I need to know.
By the Defendant:
Q    My entire contention for this line of questioning,
Ms. Ikilikyan, those two computer systems that were in that
storage unit were Mr. Poff's computers, were they not?
            MS. VOGEL:  Objection.  Relevance.
            THE COURT:  Sustained.  You need to move on, counsel.
            THE DEFENDANT:  Yes, sir.
            THE COURT:  Let me offer one more friendly suggestion.
You don't get to testify when you ask questions.  You need to ask
a question.  When you start off by saying, the contention I am

```
 1    trying to prove is such and such, and then you ask the question,
 2    you are inviting the government to object, and I will sustain
 3    those objections.  You need to ask questions.  That's what this
 4    part is about.
 5              THE DEFENDANT:  Okay.  I appreciate your patience as I
 6    sort through this.
 7    By the Defendant:
 8    Q    On those computer systems, Ms. Ikilikyan, isn't these the
 9    computer systems that Mr. Poff would use for his business?
10    A    I don't know.
11    Q    In your testimony before, you claimed to see Mr. Poff produce
12    certain documents or receipts, yes or no?
13    A    Yes.
14    Q    On which computer system was that allegedly performed upon?
15    A    That computer system has disappeared.
16    Q    Do you know what happened to that computer system?
17    A    You did something to it, and you took all the hard drives out
18    of it, and moved out to Michigan.
19    Q    Isn't it true, Ms. Ikilikyan, when you dropped Mr. Poff off
20    at the airport, he basically left Washington with two suitcases?
21    A    I did not drop you off at the airport.
22    Q    You did not drop Mr. Poff off at the airport?
23    A    No.
24    Q    Isn't it true, as a licensed broker, both in real estate and
25    in mortgages, you are required to retain certain business
```

1    records?

2    A    Yes.

3    Q    That would include the purchase and sales on every

4    transaction?

5    A    Yes.

6    Q    And that would include all the loan data applications,

7    appraisals, title, whatever, everything on the loans?

8    A    Yes.

9    Q    And that information hasn't been found, has it?

10   A    I have recently found a lot of the loan paperwork, a lot of

11   the documents.  It has been found.

12   Q    You do have the evidence and have you placed it into evidence

13   with the government?

14   A    Not all of them, but the information, yes.  I have presented

15   what I have found to the government, yes.

16   Q    Now, this Ford F350 truck, Ms. Ikilikyan, was that ever

17   handed over to Mr. Poff's control?

18   A    No.

19   Q    Who has control of that vehicle right now?

20   A    The bank.

21   Q    When was it repossessed by the bank?

22   A    When I could no longer afford the payments for the F350.

23   Q    Can you give me a specific date?

24   A    Two weeks ago.

25   Q    That was two weeks ago.  And up until two weeks ago, that

1  vehicle was under your control?

2  A   You had not -- You did not want the vehicle.  You no longer

3  wanted to pay for it.

4  Q   Up until two weeks ago, that vehicle was in your control?

5  A   Yes.

6  Q   Then under the agreement for distribution of rents,

7  Ms. Ikilikyan, you paid money for these rents all the way up

8  until November; isn't that correct?

9  A   Yes.

10  Q   Then after that time, even though Mr. Poff was trying to

11  coordinate and deal with your new husband, Brandon, there was no

12  fruition on you coming into compliance on this agreement?

13  A   Again, there is other contracts that you were violating as

14  well.  I would not mind working everything out with you.  I am

15  not holding anything against you.  There are things you are

16  holding from me.

17  Q   Ms. Ikilikyan, did Mr. Poff violate a court order in any way?

18  A   Can I look at the --

19  Q   Yes, you may.

20  A   Not a court order.  But there are other things that are in

21  question, that, again, as soon as -- in a different setting, to

22  work everything out, I will do that with you.

23  Q   Excuse me.  Wasn't Mr. William S. Poff restricted or

24  prohibited from contacting you in any way?

25  A   Yes, but you have access to my attorney.

```
 1    Q    So the fact stands that Mr. Poff tried to stay in compliance
 2    with all orders of the court?
 3            MS. VOGEL:  Objection.
 4            THE COURT:  Sustained.  She can't tell you what you did.
 5            THE DEFENDANT:  You're right, sir.  I apologize.
 6    By the Defendant:
 7    Q    Has Mr. Poff done anything to you that would be in violation
 8    of the court's orders?
 9    A    The divorce decree.
10    Q    Any court's --
11            THE WITNESS:  I'm sorry.  Your Honor, can I ask him a
12    question?
13            THE COURT:  No.  He gets to ask the question.
14            MS. VOGEL:  I will object.  He is asking the witness for
15    a legal conclusion.
16            THE COURT:  Why don't we move on, counsel?
17            THE DEFENDANT:  Okay.
18    By the Defendant:
19    Q    Ms. Ikilikyan, isn't it a fact that your Washington Mutual,
20    which is now Chase, bank account ending in 3135 was solely in
21    your name?
22    A    Yes.
23    Q    And that that account was solely in your control?
24    A    Yes.
25    Q    Did Mr. Poff have a debit card for that account?
```

1  A   **No.**

2  Q   **Did Mr. Poff have signatory authority for that account?**

3  A   **No.**

4  Q   **Did he have a checkbook for that account?**

5  A   **No.**

6  Q   **If Mr. Poff needed to borrow money or get any money from you**

7  **during the time of the marriage, he would literally have to come**

8  **to you and ask you?**

9  A   **And sometimes he would also take the debit card and make**

10 **purchases, and sign my name, which was authorized by me.**

11 Q   **Did Mr. Poff have a debit card, Ms. Ikilikyan?**

12 A   **No.**

13 Q   **Was it your choice to say yes or no whenever Mr. Poff came to**

14 **ask for any funds from your account?**

15 A   **We were married.  How would I say no?  It was a joint**

16 **account.  It happened to be in my name.**

17 Q   **Ms. Ikilikyan, what I am trying to ask you right now is, if**

18 **Mr. Poff didn't have access to that account in any way except**

19 **through you, how would it be a joint account?  It is not; is that**

20 **true?**

21        **MS. VOGEL:  Objection.  Argumentative.**

22        **THE COURT:  I will permit the question.**

23        **THE WITNESS:  You wrote checks and signed for me, and**

24 **got money out.  Not often, but you did.  Yes, it was in my name.**

25 **By the Defendant:**

1  Q    And it is your contention that you gave Mr. Poff permission

2  to sign your name?

3  A    Everything but one time, yes.

4  Q    Ms. Ikilikyan, isn't it a fact that Mr. Poff had to go and

5  obtain a restraining order against you?

6  A    You did, yes.

7           THE COURT:  Mr. Poff, before you put things up on the

8  screen, it is usually custom to show them to opposing counsel so

9  they know what it is.

10          MS. VOGEL:  Your Honor, I don't object to the

11 questioning the witness about the restraining order, but I will

12 object to introducing the document in the first instance without

13 having found what the witness' answer is.  I believe this is

14 going into some impeachment by prior bad acts.  My understanding

15 of the law is the defendant needs to ask the question before he

16 can introduce any extrinsic evidence.

17          THE COURT:  Let's put it up on the screen and let's

18 listen to the first question.  Mr. Poff, the government is

19 correctly stating the law, which is, we are here to talk about

20 one case, not what happened somewhere else.  You don't get to

21 impeach the witness by collateral acts.  Let's get it up on the

22 screen, and then let's have you ask your question, and then I

23 will hear the government's objection.

24          THE DEFENDANT:  Yes, sir.

25 By the Defendant:

```
 1    Q    Ms. Ikilikyan, can you read the highlighted --  Can you see
 2    this document okay?
 3    A    Yes.
 4            MR. RATNER:  Can I have a second?
 5            THE COURT:  Yes.
 6    By the Defendant:
 7    Q    First, Ms. Ikilikyan, I would like to show you the entire
 8    document.
 9            THE DEFENDANT:  Should I show it on the viewer, your
10    Honor, or should I bring it forward?
11            THE COURT:  Bring it forward.
12            THE DEFENDANT:  Permission to advance, sir.
13            THE COURT:  Does the government have a copy of this?
14            MS. VOGEL:  No, your Honor.
15            THE COURT:  You need to show the entire document to the
16    government first.
17            MS. VOGEL:  I have seen it.
18            THE COURT:  Then you may approach.
19            THE DEFENDANT:  Thank you, sir.
20    By the Defendant:
21    Q    I would like you to take a look at this, Alexis.  Thank you.
22    Having seen this document, Ms. Ikilikyan, can you tell me what it
23    is?
24    A    It is a petition for order for protection.
25    Q    Do you remember being served this document?
```

```
 1   A    Yes.

 2            MS. VOGEL:  Objection, your Honor.  Can we establish

 3   some relevance?

 4            THE COURT:  Where is this line of questioning going,

 5   counsel?

 6            THE DEFENDANT:  Yes, sir.  What I am trying to establish

 7   here is the conduct and veracity of the defendant that is being

 8   cross-examined right now, your Honor.

 9            THE COURT:  The conduct is irrelevant, unless it is

10   related to the allegations that are in this particular lawsuit.

11            THE DEFENDANT:  It is, your Honor.

12            THE COURT:  Let's ask a question.  I don't think we are

13   going to get there, counsel, but let's hear the question.

14   By the Defendant:

15   Q    Can you see this document okay, Ms. Ikilikyan?

16   A    Yes.

17   Q    Can you read the four highlighted lines under the statement?

18   A    "Harassment, mostly about recent divorce filing she has made.

19   Grabbed my neck and left fingernail marks in an unreported recent

20   incident.  Removed her rifles and pistols from a locked secured

21   area of the home to a pile in the middle of the bedroom in an act

22   of intimidation.  Has been receiving counseling for an

23   undisclosed mental illness, which is undiagnosed, as possibly

24   being PTSD from past events in her life."

25   Q    Thank you.  Isn't it a fact that Mr. Poff later agreed to
```

1    drop this restraining order?

2              MS. VOGEL:  Objection.

3              THE COURT:  Sustained.  This is not relevant, counsel.

4    Let's move on.

5              THE DEFENDANT:  This would have been my point of

6    relevance in this entire thing, your Honor, was the meeting she

7    had with Master Sergeant Sanchez on this point.  May I bring the

8    question up on that?

9              THE COURT:  Counsel, does it deal with one of the

10   properties that is at issue here?

11             THE DEFENDANT:  Not the properties itself.  It deals

12   with the -- it deals with her violations of the Uniform Code of

13   Military Justice under Title 10, where she received counseling

14   from a noncommissioned officer at this point, sir.

15             THE COURT:  That is not in this lawsuit.  It is not

16   relevant to the issues.

17             THE DEFENDANT:  I will move on, sir.  Thank you.

18   By the Defendant:

19   Q   In regards to the agreement that was placed in the divorce,

20   isn't it a fact that that was negotiated and mediated by a mutual

21   friend, Tamara Hall?

22   A   Yes.

23   Q   Isn't it a fact that Tamara Hall was known by us to be a

24   clinical psychologist?

25   A   Licensed therapist, yes.

Q   Going back to the items that were supposed to be in the storage unit, isn't it a fact that those items have a value of nearly $10,000, Ms. Ikilikyan?

A   I don't know.

Q   Isn't it a fact that the sauna -- portable sauna, brand new in the box, was purchased at the Puyallup State Fair for approximately $4,000?

MS. VOGEL:  Objection.  Relevance.

THE COURT:  Sustained.

THE DEFENDANT:  Okay.  Thank you, sir.  I will move on.

THE COURT:  Mr. Poff, stay focused on what we are here for.  And I know it is not often you get your chance to put your former spouse on the stand and ask them questions, but what we are here to talk about are the allegations in the complaint against you.  And those pertain to the property.

THE DEFENDANT:  Yes, sir.  I am not intending to be vexatious.

THE COURT:  I understand.  We need to stay on the subjects which are before the court.  What happened with the storage locker and what happened to the sauna and the antique clock or whatever it was, those are really peripheral.

THE DEFENDANT:  My major point of contention would have been the two computer systems, is what I was getting to.

THE COURT:  I understand.  And that's why I allowed it.

By the Defendant:

1 Q Isn't it true, Ms. Ikilikyan, those two computer systems

2 would have probably contained information about Mr. Poff's

3 business?

4 A I only know about one computer system, yes.

5 Q And on that computer system -- that's the computer that

6 Mr. Poff used for business, that you witnessed him use for

7 business?

8 A That computer I witnessed Mr. Poff play a lot of games on.

9 Q Did he only use that computer to play games on?

10 A At the time that you purchased that computer, you were no

11 longer doing loans.

12 Q So you never witnessed Mr. Poff do any business on his

13 computer?

14 A On that computer.

15 Q Did you witness Mr. Poff perform business on the computer he

16 had prior to that, yes or no?

17 A Yes.

18 Q And that computer was left intact in Washington state?

19 A No.  That computer system you took to Michigan, along with

20 the hard drive.

21 Q I am confused, Ms. Ikilikyan.  In the agreement that was made

22 in August of 2008, which was made while you were in Michigan

23 visiting --  That agreement was made at that time, correct?

24 A Yes.

25 Q And Mr. Poff made sure that he had placed in that agreement

```
1    that he wanted his two computer systems; is that correct?
2    A    The laptop and the computer, yes.
3    Q    And Mr. Poff had left Washington state months prior?
4    A    The laptop and the computer, yes, it was -- it is in the
5    storage unit, except for the one.
6    Q    So when Mr. Poff put in the agreement that he wanted his two
7    computer systems, that's because he knew they were still complete
8    in Washington state, yes or no?
9    A    What you're not saying is there are agreements that you have
10   violated as well.  It is something that needs to be disputed in a
11   different court.  And I am willing to do that.  I will not take
12   your computer and keep it.
13             MR. POFF:  I object, your Honor.  This is irrelevant.  I
14   would direct that the witness answer the questions as asked.
15             THE COURT:  Well, the question as asked was
16   objectionable because it asked her to tell you what you thought.
17   And so I am going to strike both the question and the answer.
18   You know, counsel, the point you want to make in this is there is
19   another computer out there.  You have established that.  What
20   happened to it in the divorce, where it is now, beyond what we
21   have already talked about, really isn't a matter that this court
22   is going to be influenced by.
23             THE DEFENDANT:  I will move on.
24   By the Defendant:
25   Q    Moving right along, isn't it a fact that you either hid,
```

1    concealed or destroyed these computer systems?

2    A    It is not hid.  The computer systems exist, one of them.

3    Q    Isn't it a fact that --  I will retract that and move on.

4        Ms. Ikilikyan, I am looking at a page that details the

5    investigation.  I can't place it up on the viewer until I ask you

6    the question, per plaintiffs.  It says on here that --

7            THE COURT:  Investigation, counsel?

8            THE DEFENDANT:  I will detail it.  It is the

9    investigation -- it is page 2, report number 157 on the 20613

10   11th Avenue South property in Des Moines.

11           THE COURT:  Okay.  That's what I wanted to know.  Please

12   proceed.

13           THE DEFENDANT:  Thank you.

14   By the Defendant:

15   Q    Now, in reference to this transaction, Ms. Ikilikyan, you had

16   stated that the seller carryback on this was not disclosed to the

17   bank.  Is that true or not?

18   A    Yes.  To my knowledge, no, it wouldn't have been disclosed.

19   Q    It wouldn't have been disclosed.  It also says on here --  I

20   will move on.

21       There is also an issue about a check that was received by

22   yourself for $20,000.  Did you receive a check for $20,000 from

23   the escrow closer, Ms. Thompson?

24           THE COURT:  In regards to the Des Moines property?

25           THE DEFENDANT:  It is mentioning it in here.  I don't

1  know why it is in here as regards to this.  It is part of the

2  investigation.  I am asking off of this sheet specifically, sir.

3          THE COURT:  You can answer if you are able to do so.

4          THE WITNESS:  Regarding this property at closing?  I

5  want to establish the question correctly.

6  By the Defendant:

7  Q   Yeah.  It is in regards to the same property.  And the

8  investigation says that you received the check for $20,000 from

9  Ms. Thompson on this transaction?

10  A   At closing or a later time?

11  Q   It does not say.

12          MS. VOGEL:  Your Honor, I will object to asking the

13  witness to answer as to what is in a police report.  I would

14  request that the defendant ask the witness what she knows and

15  doesn't know, not what is written in the report.

16          THE COURT:  That objection is well taken, counsel.

17          THE DEFENDANT:  Thank you.  I am sorry for being so

18  vague.

19  By the Defendant:

20  Q   Then not in regards to this property, Ms. Ikilikyan.  Did you

21  receive a check from Ms. Thompson from escrow for $20,000?

22  A   I received a lot of money from escrow many times.

23  Q   Was there a check that you received from escrow for $20,000

24  where you paid $10,000 back to Ms. Thompson?

25  A   Yes.

Q     What was that money?

A     Micki Thompson had said that there is monies that she had found in the computer system from all the other deals, just money that was found in her system.  She said if she gives that money to you and I, would we give her back $10,000, since there is money that wouldn't have been there if she hadn't helped the situation.  You and I agreed.  And she gave the money from -- my understanding was it was excess money from just many deals that she had closed for us.  She did get money back.  You and I agreed, and gave it back to her, yes.

Q     So it is your contention, Ms. Ikilikyan, Ms. Thompson did you and I a favor, went through and audited all the files and came up with an extra $20,000 for us?

A     Yes, that was my understanding of what happened.

Q     And your contention is, in consideration of her doing this noble deed for you and I, that you and I agreed to give her back $10,000 of that money?

A     Yes.  I remember where we were when this happened.

Q     Ms. Ikilikyan, if that money was lawfully our money, why would we agree to give her $10,000?  Wouldn't that be her job?

A     The phone call came in when we were in Starbucks, Pierce County, and you had agreed.  And as soon as you agreed, I told her --  The way she explained it, if it wasn't for her, that money wouldn't have been found.  And you agreed at the time as well.

Q    Ms. Ikilikyan, who carried the cell phone at that time?

A    The 253-224-5315, it was carried by me and you 50/50.

Q    It was your contention that cell phone was carried 50/50?

A    Bill, you and I were together.  If the cell phone rang, it was either one of us that answered.  I didn't take the phone and leave 9:00 to 5:00 every day.  The phone was with us all the time.

Q    It is your contention before this court, for this noble deed that Ms. Thompson did, that I agreed, and conspired with you, that she should receive $10,000 of money that should have been lawfully ours anyhow?  Is that your answer?

        THE COURT:  Mr. Poff, you are going to draw an objection for noble deed.  Sarcasm --

        THE DEFENDANT:  I am not trying to say it with sarcasm.

        THE COURT:  Let's refer to what it is, and avoid the label being put on it.  Re-ask your question.

        THE DEFENDANT:  That was not intentional.  I apologize, your Honor.

By the Defendant:

Q    So it is your contention, Ms. Ikilikyan, Mr. Poff agreed with you to give back $10,000 of the $20,000 that was supposedly lawfully ours?

A    Yes.

Q    Moving to the next question.

        THE WITNESS:  Can I add one more thing, your Honor?

```
 1              THE COURT:  No.
 2   By the Defendant:
 3   Q   Who wrote the checks to Ms. Thompson --  Let me rephrase
 4   that.  Isn't it true -- isn't it a fact that you were the one
 5   that wrote the checks and paid the cash to Ms. Thompson, yes or
 6   no?
 7   A   That requires a little bit more explanation than yes or no.
 8   Is it okay if I go --
 9   Q   Did William S. Poff sign any checks for the $10,000?
10   A   During our marriage you and I had a rule of anything over
11   $100 it had to be discussed by both of us, any decisions that
12   were made.  So even if I wrote the check --  I never did any
13   transaction over $100 without your knowledge.  So, yes, I wrote
14   the checks.  Correct.  I didn't just go off and write checks.
15   Q   So it is your knowledge and it is your contention you never
16   did anything without Mr. Poff's knowledge?
17   A   Not when it came to money, nothing over $100.  Very true,
18   yes.  I didn't see that as my money.
19   Q   Did that money go into your account, Ms. Ikilikyan --
20   A   Yes.
21   Q   -- yes or no?
22   A   Yes.
23              MS. VOGEL:  Objection, your Honor.  Can we clarify what
24   money we are talking about?
25              THE DEFENDANT:  Yes, sir.  It was the $20,000 check.
```

1    Thank you, sir.

2    By the Defendant:

3    Q    In regards to the 14062 Yelm Highway Southeast property,

4    wasn't it true that during part of the negotiations, yourself,

5    Mr. Poff, the Slopaks, who were the sellers, and both of your

6    attorneys, Jan Gossing and Brian Hallaq, met at Stanley and

7    Seaforts?

8    A    I don't remember Brian being there.  But, yes, Jan Gossing.

9    Q    So your legal counsel was at the meeting during the

10   negotiations for this property?

11   A    Yes.

12   Q    Now, in your statements before, you said that you signed for

13   your mom the preponderance of the time when it came to business?

14   A    Yes.  Most of the time, yes.

15   Q    And that is the only person that you claim that you signed

16   their signature for, was just for your mother?

17   A    That is not what I am claiming.  There have been times for

18   purchase and sale, if it needed an initial, with the client's

19   permission, I have initialed too.  But the phone call was made to

20   that person.

21   Q    Have you ever signed the name William S. Poff or Bill Poff?

22   A    I have tried very hard to think about this.  I don't remember

23   doing it in loan documents or escrow, because, again, you were

24   always next to me, so there would have been no need to do so.  I

25   want to leave myself open and say, never without your knowledge,

1    behind your back.  But I would also like to say I do not remember

2    doing so, no.  And there would have been no reason for me to do

3    so at all.

4    Q   Ms. Ikilikyan, why would the lenders require Mr. Poff to sign

5    a quitclaim deed at closing?

6    A   The way you explained it to me is because properties were

7    bought as a married woman, a separate estate.  It is just

8    something you told me they required.  I don't know why.

9    Q   So it is your contention that Mr. Poff did all these real

10    estate closings for you, and that's why he gave you this advice?

11    A   Bill, you worked directly with the banks, and that is

12    conditions they were telling you to do.  I followed what you

13    said, yeah.

14    Q   Ms. Ikilikyan, that is not really the question I asked.

15    A   I'm sorry.  Go ahead.

16    Q   What does a quitclaim deed do?

17    A   In my opinion, quitclaim is you quit your interest to that

18    property.

19    Q   And if Mr. Poff was signing a quitclaim deed to separate his

20    interest from that property, due to Washington being a community

21    property state, is that a normal requirement of a lender, yes or

22    no?

23    A   That was the requirement that happened for the -- most of the

24    properties that we purchased.  That's all I can speak for.  I

25    don't know what is normal practice everywhere else.

1  Q    Ms. Ikilikyan, did you go to school to become a real estate

2  agent?

3  A    Yes, I did.

4  Q    How many hours approximately, days or weeks, did that take

5  for you to become a real estate agent?

6  A    Sixty hours.

7  Q    And you also did a certain amount of time as a practicing

8  real estate agent before you applied for your broker's license?

9  A    Correct.

10 Q    How much time did you do real estate before you applied for

11 your broker's license?

12 A    Approximately under three years.

13 Q    Now, when you went and got your broker's license for real

14 estate, did you have to go back to school again?

15 A    Yes, I did.

16 Q    Did you have continuing education during that three years

17 between the time you were a real estate agent and you applied for

18 your real estate broker's license?

19 A    Yes.

20 Q    So you went and took -- you went to school to become a real

21 estate broker.  How many hours was that, or days?

22 A    I don't remember right off the top of my head, but it was --

23 there is a requirement for a certain amount of hours to become a

24 broker.  I don't remember.  I do know it is 60 hours.

25 Q    It was an extensive training course then?

```
 1   A   Yeah, it is a good amount, one or two weeks.

 2   Q   Did you pass your broker's test on the first try?

 3   A   Yes.

 4   Q   So you are fairly knowledgeable about real estate?

 5   A   I memorized every answer for the test, yes.  I studied.

 6   Q   I'm sorry, Ms. Ikilikyan, that wasn't the question I had.

 7   Are you knowledgeable about real estate?

 8   A   I thought I was.

 9   Q   Ms. Ikilikyan, did you receive training to become a mortgage

10   broker?

11   A   No.

12   Q   Doesn't the State of Washington require a certain amount of

13   training prior to becoming a mortgage broker?

14   A   You are supposed to be a loan officer for two years, and you

15   would qualify to take the test.

16   Q   Okay.  So one of your credentials is you have to be a loan

17   officer for two years, and then you get to go take the test.  You

18   went and took the test.  Did you pass it the first time?

19   A   No.

20   Q   It took you a couple of attempts before you could pass the

21   test?

22   A   Yes.

23   Q   And you didn't have any training prior to that?  I will

24   retract that.  You didn't have any schooling prior to that to

25   become a mortgage broker?
```

1   A   No.

2   Q   When was the only time that Mr. Poff was paid directly from

3   escrow for any of the properties?

4   A   I don't remember you getting paid ever.

5   Q   Was he paid directly from escrow as a result of the divorce?

6   A   You directed where your portion of the funds would go.

7   Q   Okay.  So I was paid from Great American Escrow on the sale

8   of one property during the divorce?

9   A   Um-hum.

10  Q   Thank you.  And that was wired to Michigan to a friend's

11  account?

12  A   To my knowledge.

13  Q   Did you see the HUD-1 on this transaction?

14  A   I do not recall.

15  Q   You being the seller, are you required to sign a HUD-1 when

16  you sell a property?

17  A   Yes.

18  Q   But you do not recall seeing it?

19  A   I am not denying that it didn't happen, I just don't remember

20  it happening.

21  Q   That is what I wanted to clarify.  Thank you.  During the

22  sale of this property, Mr. Poff was already in Michigan and had

23  been there several months?

24  A   Yes.

25  Q   During this time that Mr. Poff was in Michigan, you typed up

1    fake orders on your computer at home?

2    A    Yes.

3    Q    During this time you sent those orders to lenders, invoking

4    your rights under the Soldiers and Sailors Act?

5    A    With your advice and manipulations to me, yes.

6    Q    Ms. Ikilikyan, it is your contention that Mr. Poff was

7    pulling puppet strings from Michigan during this time, during the

8    divorce?

9    A    Absolutely.

10   Q    I will retract that question.  How did you come up with the

11   price on the sale of that property, the Puget Sound property?

12   A    We negotiated with Tony, and we asked for $110,000.

13   Q    When you say "we," you are saying Mr. Poff was included in

14   the negotiations of the property while he was in Michigan?

15   A    Absolutely.  I believe when the purchase and sale was

16   created, I don't think you were in Michigan at the time.  The

17   property took a few months to close.

18   Q    And what date approximately did that close?  What month

19   approximately?

20   A    August.

21   Q    And Mr. Poff was in August (sic) at that time?

22   A    Michigan?

23   Q    I'm sorry.  He was in Michigan in August at that point?

24   A    Yes.

25   Q    Was Mr. Poff required to sign on the purchase and sale of

1   that property?

2   A   **No.**

3   Q   In your training to be both a mortgage broker and a real

4   estate broker, did any of your training include what disclosures

5   you were required to make as a licensed broker for either of

6   those two professions?

7   A   I do know the disclosures that has to be made in the real

8   estate profession.  The loan profession, again, it was not my

9   area at all.

10  Q   So you passed the mortgage broker's test, which is quite an

11  extensive test, and it has pre-recs, you can't just pop up and

12  become a mortgage broker.  But it is your contention that you

13  really don't know the law about mortgages?

14  A   Truthfully, I memorized a textbook and went and took a test.

15  That's as honest as I can truly be on that area.

16  Q   So anybody can somehow fudge the pre-recs to become a

17  mortgage broker in the State of Washington, memorize a test and

18  go become a licensed mortgage broker?

19  A   I just memorized the test and took the test and passed after

20  three times.

21  Q   You admitted earlier, Ms. Ikilikyan, there are certain

22  pre-recs you have to have before you can go and take a mortgage

23  broker's test; is that true, yes or no?

24  A   Technically, you have to be a loan officer for two years.  It

25  doesn't specify that you have to even close one loan to qualify

1   for the mortgage broker's test.

2   Q    So now you qualified for the pre-recs to take the mortgage

3   broker's test?

4   A    Yes.

5   Q    Thank you.  It is still your contention you don't even know

6   how to fill out a loan application, yes or no?

7   A    I do not.

8   Q    Is it still your contention you do not know how to close a

9   loan, yes or no?

10  A    I do not.  I have never closed a loan.

11  Q    So memorizing the answers on the mortgage broker's test, you

12  know -- you knew that there were certain disclosures that had to

13  be right or verified to on a loan application, but you still

14  signed a loan application anyhow, yes or no?

15  A    I 100 percent trusted your knowledge and judgment when it

16  came to the 1003s and signing.  As soon as you reviewed it, I

17  would sign it.

18  Q    So you, a licensed professional, would trust someone else who

19  was not supposedly licensed who supposedly did the loan, and you

20  would sign it anyhow?

21  A    Bill, you had taught me things that you claimed was not in

22  the textbook, that you knew things that were way above what the

23  actual regular procedures were, that you really knew how to put

24  together deals that nobody else did.  You had me and a lot of

25  people convinced that was a very brilliant thing.  So I trusted

1  everything when it came to loans with you.

2  Q    Now, on the 27419 8th Avenue South, Des Moines property --  I

3  believe that was the waterfront property, correct?

4  A    Correct.

5  Q    And it was -- your testimony was that Poff was unable to

6  close that loan?

7          THE COURT:  You have to answer audibly.

8          THE WITNESS:  Yes, that was my knowledge.

9  By the Defendant:

10 Q    Was it your testimony before that Poff had already --  Let me

11 back up one second.  Since the Issaquah deal closed prior to

12 that, and you said Mr. Poff had already stopped doing loans --

13 A    Um-hum.

14 Q    -- but this deal that happened after the Issaquah deal, Poff,

15 who was, in your own words, very creative, was unable to close

16 this loan --

17 A    Yes.

18 Q    -- and another broker had to close the loan?  Do you remember

19 who the loan officer was on that transaction?

20 A    Yes, I do.

21 Q    Who was that loan officer?

22 A    Tony Reyes.

23 Q    Did Mr. Poff have anything to do with that transaction

24 involving the waterfront deal, yes or no?

25 A    Forwarding the 1003s to America One Financial.

1   Q    The only thing you are claiming he did was forward the
2   information for the broker to use?
3   A    That's correct.
4   Q    From which computer system?
5   A    Whichever computer system was in your office that you would
6   use.
7   Q    And that's the computer system that is not in Mr. Poff's
8   control right now?
9   A    Yes, it is, along with the hard drive.
10  Q    So it is your contention Mr. Poff packed that large tower
11  into his bags and took it to Michigan with him?
12  A    I do not know.  I did not take you to the airport.  I know
13  you took every information regarding business with you.  And I
14  did witness it when I came to Michigan.
15  Q    You witnessed the computer system in Michigan when you went
16  there?
17  A    The hard drive -- the hard drive of the system.
18  Q    You witnessed a hard drive in Mr. Poff's control?
19  A    Yes, I did.  I can tell you where it was.
20  Q    I'm sorry?
21  A    I can --
22  Q    What did you say last?
23  A    I can physically describe where it was.
24  Q    Okay.  Physically describe where this hard drive was.
25  A    Okay.  In Kevin and Tamara's residence, you lived off of the

1    main dwelling in your own room, another separate room, and there

2    was a bed, and right next to the bed there was a container -- not

3    a container but a plastic thing with two drawers.  And it was in

4    the bottom drawer.

5    Q    Was this --  I'm sorry.  I didn't mean to interrupt you.

6    A    In a ziplock bag is where it contained all the information

7    for all the loans, everything, and everything you ever had in the

8    system on the computer was there.

9    Q    Was this an internal or external hard drive?

10   A    I do not know.  It was a hard drive you had.  When you and I

11   were fighting, you had told Tamara for me not to go up --  Excuse

12   me.  I should be careful using other people's names.  I heard

13   that you said, do not let Alexis go near that hard drive.  It is

14   third-party information, but I did see it with my own eyes.

15   Q    Or did he say, do not let her go near his room?

16   A    Near the hard drive.  How would I remember the hard drive?

17   Q    That is exactly what I am trying to find out.

18   A    I want to ask you a question.

19          THE COURT:  Folks, we are talking over each other.

20   Let's ask questions, let's get responses.  How much longer are

21   you going to be with this witness, counsel?

22          THE DEFENDANT:  I have a little bit more material to go

23   through.  I don't have an estimation of time.

24          THE COURT:  Let's finish with the Michigan hard drive,

25   and then we will take our morning break.

1          THE DEFENDANT:   Okay.   I am finished with the hard drive

2     issue.

3          THE COURT:   All right.   We will take our morning break

4     at this time.

5          THE DEFENDANT:   Thank you, sir.

6     (At this time a short break was taken.)

7          THE COURT:   Mr. Poff, please continue.

8     By the Defendant:

9     Q    Ma'am, yesterday you said that you had left the Marine Corps

10    in February of 2009; is that correct?

11    A    That's when my duty and inactive reserve ready status was up.

12    I haven't drilled since April of 2009.   But per contract -- the

13    inactive ready status contract officially was up on February 9th

14    of 2010.

15    Q    So February 2010 is when your actual end of time being a

16    Marine basically ended?

17    A    Yes.

18    Q    Now, you recently had a baby, and your now husband, his

19    divorce wasn't finalized until June of 2009, correct?

20         MS. VOGEL:   Objection.   Relevance.

21         THE COURT:   What is the relevance of this, Mr. Poff?

22         THE DEFENDANT:   The relevance is she was a United States

23    Marine, and she was held to a very high standard, your Honor.

24    She was subject to the Uniform Code of Military Justice.

25    Adultery in the Marine Corps is actually a felony offense under

1    Title 10.

2          THE COURT:  Then the Marine Corps can do something about

3    it.  The objection is sustained.

4          THE DEFENDANT:  Thank you, sir.

5    By the Defendant:

6    Q   When Mr. Poff left Washington, had you begun an adulterous

7    relationship with someone else, Ms. Ikilikyan?

8          MS. VOGEL:  Objection.  Relevance.

9          THE COURT:  The same question, Mr. Poff.

10         THE DEFENDANT:  Okay.  I will retract the question then.

11         THE COURT:  Let's stay --  Remember, we have eight

12   pieces of property that they are charging you with.  That's what

13   we need to concentrate on.

14         THE DEFENDANT:  The reason I was asking that, your

15   Honor --  My question to the court is, am I allowed to ask about

16   past criminal behavior at all?  Would that be relevant to the

17   conduct?

18         THE COURT:  Criminal convictions, yes.  You can't

19   impeach by things that are not involved in this, with certain

20   very limited exceptions.  I need to hear your questions.  You

21   can't just come up with a general rule.  But the fact that

22   someone cheats on their wife, goes out and goes to casinos to

23   gamble, whatever, the court isn't interested in it.

24         THE DEFENDANT:  My entire contention is it was under

25   Title --

1          THE COURT:  Let's move on.

2          THE DEFENDANT:  Yes, sir.

3   By the Defendant:

4   Q   Ms. Ikilikyan, is it true that you were arrested before when

5   you were a teenager?

6   A   Yes.

7   Q   What was that arrest for?

8   A   Shoplifting.

9   Q   And where was this at?

10  A   Tacoma, Washington.

11  Q   Specifically which store?

12          THE COURT:  I don't think we need to go into that in

13  more detail.

14  By the Defendant:

15  Q   When exactly was it that you had shoplifted --

16          THE COURT:  Mr. Poff, I have ruled.

17          THE DEFENDANT:  I apologize.

18          THE COURT:  Let's pay attention to what I say.  When I

19  say, let's move on, let's move on.  That doesn't mean you can ask

20  another question about what I just told you to move on from.

21          THE DEFENDANT:  Yes, sir.  I apologize.

22  By the Defendant:

23  Q   Ms. Ikilikyan, yes or no, did you have a broker's agreement

24  with Allstate Financial?

25  A   I do not remember.  I do not remember.

Q    Did you have a broker's agreement with Cyber One Mortgage?

A    Yes.

Q    And you did not have a broker's agreement with Victory Home Mortgage?

A    No.

Q    Did you have a broker's agreement with America One Finance?

A    Loan officer agreement, yes.

Q    Is that a broker's agreement?

A    No, a licensed loan officer.

Q    You were a licensed loan officer with them?

A    Yes.  Um-hum.

Q    Okay.  When you would negotiate a deal in real estate, you would negotiate the price on the purchase and sales agreement -- Let me make that my first question.  You would negotiate the prices on the purchase and sale agreements?

A    Yes.

Q    You would negotiate the payment and terms addendum?

A    Yes.

Q    And that was for the seller carrybacks?

A    That's correct.

Q    Now, on this --  I will retract my question on that.

     Ms. Ikilikyan, why did you use Great American Escrow as the escrow closer for these transactions?

A    You and I used Great American Escrow because Micki was willing to bend the rules, and she was open to creative ideas,

1    etcetera, to allow these types of schemes to close.

2    Q    Wasn't it presented to Mr. Poff that she had 18 years'

3    experience as a closer?

4    A    Yes.

5    Q    Wasn't it presented to Mr. Poff that this was a real estate

6    attorney's office?

7    A    That's correct.

8    Q    Wasn't it presented to Mr. Poff that Ms. Thompson would

9    answer questions, do anything, to seemingly keep everything

10   within compliance, so nothing would come against her license?

11             MS. VOGEL:  Objection to the question.  I didn't follow.

12             THE DEFENDANT:  I will rephrase the question, your

13   Honor.

14   By the Defendant:

15   Q    Yes or no, was Micki Thompson helpful in insuring that

16   everything was in compliance on her end?

17   A    That's correct.

18   Q    And you had nothing to do with generating HUD-1s?

19   A    No.

20   Q    Did Mr. Poff have anything to do with generating HUD-1

21   settlement statements?

22   A    No.

23   Q    Now, in regards to computer systems that we talked about

24   before, you said that because Mr. Poff had breached some

25   agreement -- that he could still go and get those computer

1    systems?  Is that what you said?

2            MS. VOGEL:  Objection, your Honor.  Haven't we covered

3    the computer systems?

4            THE COURT:  We have.  But I will permit this question.

5            THE DEFENDANT:  Yes, sir.  The reason being --

6            THE COURT:  Don't offer a reason, counsel.  Just ask

7    your questions.  And we don't keep going back over stuff.  One of

8    the things I can do is tell you to sit down at some point.  I am

9    trying very hard to recognize you are a pro se in this, but there

10   are a lot of things that you are inquiring into that just aren't

11   relevant to what we are here to do.  Let's stay on the point.  I

12   didn't mean that in the Marine Corps sense, if there is one.

13           THE DEFENDANT:  In the Marine Corps sense, sir?

14           THE COURT:  Stay on the point is a position in the army

15   where you are under fire --

16           THE DEFENDANT:  I didn't take it like that, sir.  Thank

17   you.

18   By the Defendant:

19   Q   Ms. Ikilikyan, I have a handwriting report that is going to

20   be submitted to the court that shows signatures on the --

21       I will retract that last question.  Ms. Ikilikyan, did you

22   sign any of the signatures on any of the 1003s?

23   A   I don't remember that.

24   Q   That's all I will ask.  I don't want to be out of procedure

25   so I don't get yelled at again.

1          Now, BTA Law Group was your attorney's law office that you

2     had used?

3     A     That's correct.

4     Q     And the owner of that was an attorney by the name of Jan

5     Gossing?

6     A     Correct.

7     Q     And his partner was Brian Hallaq?

8     A     Correct.

9     Q     Did you retain both of these attorneys?

10    A     Yes.

11    Q     And they were both real estate attorneys?

12    A     Jan Gossing is a tax attorney.  Brian Hallaq is a real estate

13    attorney.

14    Q     They would be the attorneys you would go to any time you had

15    a question about anything real estate or anything else,

16    basically?  They were general purpose attorneys?

17    A     Not general.  Jan Gossing specifically always made himself

18    clear that he was a tax attorney, so only tax questions were

19    mainly brought to Jan Gossing.  Brian, however, was a real estate

20    attorney, and he mainly -- they made themselves clear on which

21    area of practice they had.

22    Q     Thank you.  This attorney, Jan Gossing, he helped you set up

23    all the LLCs that you had incorporated in Washington?

24    A     Us, yes.  For us.

25    Q     When you say "us", Mr. Poff's name was shareholder on these

1    LLCs at the time they were incorporated or at the time of the

2    divorce, Ms. Ikilikyan?

3    A    Bill, in the marriage I never went and bought 27 properties

4    by myself just to purchase properties.  It was our decision.

5    Everything that was made was our decision.  I would be lying if I

6    said I did it personally, alone.

7    Q    Was Mr. Poff's name on the LLCs, was my question.

8    A    No.

9    Q    Mr. Poff became half owner of the holdings of the LLC after

10   the divorce, that was the only time his name was placed on the

11   LLC?

12   A    Correct.

13   Q    Thank you.  In regards to the Yelm property, did Mr. Poff

14   state to you what his primary motivation in that or interest in

15   the property was?

16           MS. VOGEL:  Objection.  Calls for hearsay.

17           THE COURT:  I will permit the question.

18           THE WITNESS:  It was discussed that the property would

19   get rented out for parties, weddings and prayer services.

20   By the Defendant:

21   Q    Did Mr. Poff express to you that his primary interest was for

22   the prayer meetings in that property?

23   A    Yes.

24           MS. VOGEL:  Objection, again.

25           THE COURT:  That one is hearsay.

1          THE DEFENDANT:  That one is.  Okay.  Let me rephrase the

2     question, your Honor, please.

3          THE COURT:  It is an unusual rule.  You might want to

4     talk to Mr. Ratner about it.  Things that you say can be used

5     against you, because they are sometimes admissions or other

6     exceptions to the hearsay rule.  There are other times when you

7     are soliciting from a witness statements that are not going to be

8     anything other than hearsay.

9          THE DEFENDANT:  That's fine.  I think I have established

10    the facts.  I will move on, your Honor.  Thank you.

11    By the Defendant:

12    Q    Most of the time after the property was purchased, is it true

13    that yourself and Mr. Poff, the main times that we would go there

14    would be for prayer meetings?

15    A    That's correct.

16    Q    Thank you.  Who was the pastor who started the church out of

17    the property?

18         MS. VOGEL:  Objection.  Relevance.

19         THE DEFENDANT:  I withdraw the question, your Honor.

20    By the Defendant:

21    Q    Now, there was an agreement between yourself and Tony Reyes

22    in regards to this property?

23    A    An agreement between the three of us, correct.

24    Q    Was there a written agreement between the parties?

25    A    No.

```
 1   Q     Tony Reyes, what was his part of the agreement that was made?

 2   A     It was believed that he would pay half the maintenance and

 3   bills all together.  He was a half partner.  So any debt was

 4   divided between Tony and you and I.

 5   Q     Is it a fact that he actually gave you half the payments on

 6   this property?

 7   A     When he did pay, yes, he wrote the check to me.

 8   Q     And isn't it a fact, after our separation, Tony would no

 9   longer deal with Mr. Poff because he didn't have controlling

10   interest in the properties?

11   A     Mr. Reyes told me he was very upset with the way you treated

12   me during the divorce proceedings.  That's why.  He was very

13   protective.  That's why he wouldn't deal with you.

14         THE COURT:  You need to answer the question you were

15   asked.  Do you want to restate it, Mr. Poff?

16         THE DEFENDANT:  Sure.  No problem.

17   By the Defendant:

18   Q     After our split up, Ms. Ikilikyan, Mr. Reyes refused to deal

19   with Mr. Poff in any way.  That's because you had controlling

20   interest over the property; is that true?

21         MS. VOGEL:  Objection.  He is asking the witness why

22   Mr. Reyes did something.

23         THE COURT:  To the extent the witness is aware, I will

24   permit that answer.  Don't speculate.

25         THE WITNESS:  I would be speculating.  That is just
```

```
 1   something he told me.  The way I answered is something he told
 2   me.
 3              THE DEFENDANT:  Very well.
 4   By the Defendant:
 5   Q   Now, you have that property leased out, correct?
 6   A   The Yelm property?
 7   Q   Yes.
 8   A   That's correct.
 9   Q   And you are the one on the lease?
10   A   The tenants are moving out.
11   Q   I didn't ask that, ma'am.
12   A   It is not a lease, it is a contract.  Yes.
13   Q   So you have control.  When was the last time Mr. Poff
14   received any proceeds or any portions or monies from that
15   property?
16   A   November of 2009.
17   Q   And that's because you have sole control of that property and
18   the other properties that are remaining here in Washington?
19   A   That's correct.
20   Q   Thank you.  That's what I wanted to ask.  On the Puget Sound
21   property, when it was purchased from William Stepp, you did the
22   negotiating and filled out the purchase and sale agreement?
23   A   The negotiations took place over the phone with you and your
24   friend Bill Stepp.  And I did fill out the purchase and sale
25   agreement, correct.
```

1   Q   So it is your contention that Mr. Poff did the negotiations?

2   A   Yes, verbally.  And I put everything down on paper, correct.

3   Q   Again, Mr. Poff did a quitclaim deed to separate his

4   interests off of that property at closing?

5   A   Yes.

6   Q   The same as all the other properties?

7   A   That's correct.

8   Q   Thank you.  Now, this purchase and sale was signed --  Can

9   you see that document okay, Ms. Ikilikyan?

10  A   Yes, I can.

11  Q   What date next to the signatures was this document signed?

12  A   '03 --  My signature?  They are different.

13  Q   Yeah, starting with your signature would be fine, ma'am.

14  Thank you.

15  A   03/27/08 was my signature.  The buyer signed 05/28/08.

16  Q   Wasn't this the time that Mr. Poff was in Michigan?

17  A   I do not remember.  I don't remember.

18  Q   When did we separate?  Do you remember when we had separated,

19  Ms. Ikilikyan?

20  A   I remember May 15th is when you went to Michigan; is that

21  correct?  I don't remember the dates, actually.  Our legal

22  separation?

23  Q   Isn't it true we actually separated the beginning of March,

24  Ms. Ikilikyan?

25  A   We separated legally April 30th, is when the divorce was

1    filed.

2    Q    That's not what I am referring to.  Isn't it true that there

3    was -- you had basically told Mr. Poff at the beginning of March

4    that you were done, you were through with him?  Is that the

5    correct time frame?

6    A    That's correct.

7    Q    Thank you.  Ms. Ikilikyan, did you speak to an Officer

8    Labrant (phonetic) in December from the Federal Way Police

9    Department?

10             MS. VOGEL:  Can we clarify when?

11             THE COURT:  December of what year?

12   By the Defendant:

13   Q    December of 2009.  This previous December.

14   A    Federal Way Police Department?

15   Q    In regards to a complaint that was made by Mr. Poff?

16   A    I did not.

17   Q    Was it your counsel who responded to Officer Labrant in

18   regards to that complaint that he had made?

19   A    You should probably talk to my counsel and ask her that

20   question.  I did not speak with him.

21   Q    You did not speak with him.  Thank you.  So Ms. Ikilikyan,

22   you never personally opened a business in the State of

23   Washington?

24   A    You personally, physically opened the business.

25   Q    Ms. Ikilikyan, that is not the question I am asking you.

1   A   Yes, I did.

2   Q   You did open a business?

3   A   I had knowledge of, yes.

4   Q   Ms. Ikilikyan, sorry for the confusion.  I was trying to go

5   over this document with counsel.  Didn't you state before that

6   you never personally opened a business in the State of

7   Washington?

8   A   I would like to clarify.  I knew you were opening a business,

9   Fidelis Enterprises.  I had full knowledge of it.  I just

10  personally --

11  Q   Ms. Ikilikyan --

12          THE COURT:  Don't interrupt, counsel.

13          THE DEFENDANT:  I'm sorry.

14          THE WITNESS:  The business license you were referring

15  to, it really did take place in 2001 or 2002.  So my true

16  knowledge is that I don't remember being the one that opened it.

17  But I don't want to say --  Anything that came to the loans with

18  straw buyers and everything else, I did not open those.  The

19  truth is, I don't remember, but I don't think I did.

20  By the Defendant:

21  Q   Before you got your professional licenses for the mortgage

22  and real estate business, were you self-employed?

23  A   Yes, I worked for Dove Realty then.  Before that license,

24  too?

25  Q   Before that license as well.

1   A    The only other profession I remember is the Marine Corps, and

2   you doing loans, and then myself getting a real estate license to

3   practice real estate.  Was I self-employed?  I don't want to say

4   yes or no, because I don't remember -- I don't know the

5   definition of what I did qualifies as self-employed or not.

6        MR. RATNER:  Could you move the microphone a little

7   closer to you?

8   By the Defendant:

9   Q    Specifically my question, before you became a real estate

10  agent, when you were investing in properties, did you tell people

11  you were self-employed?

12  A    Yes.

13  Q    What was the only business license you had at that time in

14  your name?

15  A    Fidelis Enterprises.

16  Q    Thank you.  Now, in your testimony you said it wasn't a

17  viable business license, but you just told me, before you had

18  your professional license as a real estate agent, the only

19  licensure you had was Fidelis Enterprises; is that correct?

20  A    Fidelis Enterprises itself never generated any income at all.

21  I just learned the definition, if you have a business license,

22  you can consider yourself self-employed.  That doesn't mean you

23  make any money out of it.  That's how I understood it.

24  Q    Did you collect rents from the properties you owned prior to

25  becoming a real estate agent?

1   A    That's correct.

2   Q    And this business license was a sole proprietor business

3   license?

4   A    Yes.

5   Q    Then after that, you incorporated an LLC called Fidelis

6   Holdings?

7   A    We did, yes.

8   Q    When you say "we did," did Mr. Poff consult with attorney Jan

9   Gossing in the creation of this business license?

10  A    The three of us did, yes.

11  Q    So in the creation of this business license, Mr. Poff's name

12  was on it, or was he sitting at the table?

13  A    Yes, you were sitting at the table.

14  Q    Thank you.  And why were the LLCs created by attorney Jan

15  Gossing?

16  A    You and I decided he has a lot of knowledge in that area, and

17  we both retained him.

18  Q    I'm sorry.  I didn't hear.

19  A    You and I decided he had a lot of knowledge in that area,

20  creating LLCs, and it would be good for it to be done by an

21  attorney instead of us from a kit.  So we had discussed and

22  decided we would do that.

23  Q    So Jan Gossing came to us and told us we should protect the

24  assets through the LLC?

25  A    Correct.

1    Q    And then he created the LLCs and placed the individual

2    properties in these LLCs for your asset protection?

3    A    He created the LLCs for us --  For it to be affordable, we

4    decided we would place the properties into an LLC ourselves,

5    because LLCs were very expensive, and we had a lot of properties.

6    He created half --  He created the LLCs.  It was our job to place

7    the properties into an LLC.

8    Q    I don't fully understand that.  The properties were

9    quitclaimed by you into the LLCs?

10   A    Later on, Micki Thompson helped with that process.

11   Q    And Micki helped.  Thank you.  Now, you said that you filled

12   out a loan officer's application for Mr. Poff?

13   A    Yes.

14   Q    Did you sign the application for him?

15   A    Not at all.  It was on-line.

16   Q    It was an on-line application?

17   A    On-line application.

18   Q    Now, your earlier testimony was that Mr. Reyes had taught you

19   and myself how to create a business license?

20   A    Correct.

21   Q    Was this something that he did regularly?

22   A    Based off of that conversation in that meeting, it seemed

23   that way.

24   Q    Thank you.  Now, earlier you said you normally signed for

25   your mom in regards to business.  Did you sign any correspondence

1  with the Washington Department of Revenue in regards to your

2  mother's business license?

3  A    The correspondence that was placed by Ms. Vogel?  Is that

4  what you are referring to?  The letter that was placed on the

5  screen yesterday?

6  Q    Yes.

7  A    That signature looked to be my mom's signature.

8  Q    A lot of times when a loan was closed through Ownit Mortgage,

9  typically the point of contact there was Senath Sands; is that

10  correct?

11  A    That's correct.

12  Q    Did Mr. Poff have a good rapport with Ms. Sands?

13  A    Yes.

14  Q    Isn't it true that you would -- any time Ms. Sands would

15  call, you would have Mr. Poff speak with Ms. Sands, because of

16  that rapport?

17  A    Yes, that's correct.

18  Q    Thank you.  Now, before you had also said in an interview

19  that you knew there were fake lease agreements and you would

20  sometimes sign them yourself; is that true?

21  A    The fake lease agreements that I have seen in this

22  investigation were all signed by you.

23  Q    That's not what I asked you, Ms. Ikilikyan.

24  A    I do not recalling signing fake leases.

25  Q    Did you tell the investigators that you knew there were fake

1    lease agreements?

2    A    Yes.

3    Q    And did you also say that you would sometimes sign them

4    yourself?

5    A    Anything that was required of me, based off of all the trust

6    I had in you, I didn't question, and I signed, such as 1003s.

7    Q    Ms. Ikilikyan, I will ask you again, please keep it to the

8    question at hand.  Did you sign fake lease agreements?  That is

9    all I am asking, yes or no?

10         MS. VOGEL:  Your Honor, I think she has answered this

11    question.

12         THE COURT:  I will permit the question.

13         THE WITNESS:  I don't remember doing so.  But if I

14    did --  I would have done it if I knew -- if it was needed for

15    you to do the loan, I would have done it.  I don't remember doing

16    so, specific ones.

17    By the Defendant:

18    Q    On the 31413 50th Avenue South property in Federal Way, it

19    says in the report that you drafted the purchase and sale

20    agreement on that?

21    A    Correct.

22    Q    And you drafted the seller financing agreement on that?

23    A    That's correct.

24    Q    And you also said before that you knew you could pull out

25    about $60,000 in equity?

1   A   Not at first, but later, yes.

2   Q   And that equity went from escrow to the Washington Mutual

3   bank account ending in 3135?

4   A   Correct.

5   Q   And on that transaction Mr. Poff actually went to the

6   seller's location, I think it was Port Angeles, and notarized the

7   documents for closing?

8   A   Yes.

9   Q   And these documents were recorded with the county clerk?

10  A   I did not do the recording.

11  Q   Normally, when there is a closing, is a deed of trust

12  recorded with the county clerk, in your experience?

13  A   Yes.   That's what happens, yes, typically.

14  Q   And Mr. Poff notarized these documents, and these documents,

15  if everything was done correctly, were recorded, because there

16  was a sale on the property.   So these documents are then public

17  record?

18  A   Yes.

19  Q   Now, in regards to this property, Mr. Poff was with you at

20  the meeting with the Thomsons?

21  A   Jim Thomson, correct.

22  Q   Wasn't there a meeting also with Tim Thomson?

23  A   Yes, earlier.   Correct.

24  Q   And it was presented to them that they could partner and

25  invest in real estate?

1    A    There were a few options mentioned as to what Tim Thomson was

2    interested in.  One was, yes, partnering in real estate.

3    Q    And on that deal the investigation said that a loan was done

4    through Victory Home Mortgage?

5    A    I don't have the exact recollection, but the time frame fits.

6    That was the time we were working with Victory Home Mortgage.

7    Q    And Mr. Truini negotiated a broker's fee for each of the

8    loans on these transactions?

9    A    That's correct.

10   Q    And each of the loans that was closed, you paid the broker's

11   fee on each of the transactions?

12   A    That's correct.

13   Q    At any time, to your knowledge, did Mr. Poff go and find

14   Mr. Tim Thomson and bring him into escrow for any type of

15   paperwork?

16   A    No.

17   Q    According to the seller carryback agreement that Mr. Poff had

18   notarized, in your experience does that separate the deals out

19   into two separate deals?

20   A    At the time, I used to think so.  Now that I really

21   understand the nature of it, I would disagree.

22   Q    You would disagree now?

23   A    Yes.

24   Q    So at the time we were advised, because you said Mr. Poff was

25   sitting right there when Ms. Thompson, who works at Great

1    American Escrow, a real estate attorney's office, said this was

2    all legit, everything was on the up-and-up, in separating these

3    deals out by contract?

4         MS. VOGEL:  Objection, your Honor.  I think we covered

5    this yesterday.

6         THE DEFENDANT:  Okay.  I'm sorry to be redundant.

7         THE COURT:  That's why we are going to move on.

8         THE DEFENDANT:  As I said in my opening statement, I

9    tend to be redundant at times.

10   By the Defendant:

11   Q   And then on this transaction, the lenders did not see the

12   seller carryback on this deal?

13   A   That's correct.

14   Q   Moving on to the 13418 Southeast 180th Street property in

15   Renton.  Sean Warren was someone you had met during some active

16   duty time in the Marine Corps?

17   A   That's correct.

18   Q   And he was approached to partner in investing in real estate?

19   A   Being a straw buyer, correct.

20   Q   It was his understanding he could invest in real estate and

21   make money?

22   A   Correct.

23   Q   And on the subsequent sale of that property, there was a

24   property that your mother had actually purchased?

25   A   Yes.

```
 1   Q     And you signed the loan application on behalf of your mother
 2   on that transaction?  Do you need me to get the document?
 3   A     Yes, please, just so I don't say something that --
 4   Q     It would be Exhibit 310.
 5   A     I don't see a signature on this.
 6   Q     On this document -- did you sign this signature on this
 7   document?
 8   A     Yes, I did.
 9   Q     Did you sign under the interviewer?  Where your name is
10   printed, did you sign underneath that?
11   A     That's correct.
12   Q     Now, you made reference to some fake checks being fabricated,
13   and you said that you witnessed this.  Could you describe how
14   this happened?  What did you actually witness on that?
15   A     When it came time for a down payment to be brought to escrow,
16   you had negotiated with Micki Thompson that a lot of times
17   lenders only ask for a copy of a down payment to be submitted to
18   the bank.  And you had asked, since we don't have the actual
19   funds for the down payment, can I give you a copy of the checks
20   so you can submit it as evidence for it to be a down payment.
21   And when that agreement was in place, you created a copy of a
22   check that really did not exist.
23   Q     Let me ask you more specifically.  You said that you had
24   witnessed these checks being created.  What did you witness, was
25   the actual question?
```

A    I actually witnessed you create the check, the copy of it on the computer.

Q    How does someone create a check on a computer?

A    You had copies of actual cashier's checks on the system, and you also used -- I believe it was Paint, and you created each letter on the computer.

Q    So you witnessed -- you are alleging you witnessed Mr. Poff create these checks on a computer using the program Paint.  Which computer was that on?

A    The computer you used to have in your office.

Q    Is that the computer still here in Washington?

A    I do not know where that computer is.  But you do have the hard drive.

Q    You identified, you said --  Earlier you said that you identified the hard drive, but you didn't know if it was an internal or external hard drive?

A    I don't know anything about computers or hard drives, no.

Q    And you claim to know what the contents of the hard drive are?

        MS. VOGEL:  Objection.  She has no claim to know what the contents are.

        THE DEFENDANT:  She testified earlier she claimed to know the contents of the hard drive.

        THE COURT:  She said she had seen material done using that computer.  Why don't you rephrase your question, sir?

By the Defendant:

Q    This hard drive that you allege seeing in Michigan, did you know the contents on that hard drive?

A    You told me that you were going to take everything off of the computer to put it in a system and take it with you.  And numerous times I wanted a copy of that item, because I did not have all the loan documents, real estate documents to stay in compliance.  So I asked you numerous times, even up until the arrest.

Q    So the only documents you had that you were required to keep was stored electronically?

A    It was stored electronically, correct.  I did have hard copies, just not complete records of it.

Q    It is your contention that Mr. Poff took that away from you and took it to Michigan?

A    That's correct.

Q    If Mr. Poff had had this hard drive, wouldn't he have submitted it into evidence --

        THE COURT:  Sustained.

        THE DEFENDANT:  Sorry, sir.

        MR. RATNER:  Can I have a second?

        THE COURT:  Yes.  Counsel, we need to move this along.

By the Defendant:

Q    So you don't know if that was the hard drive that was on that computer or not?

A    You told me it was.

Q    You were told by Mr. Poff that was the hard drive?

A    You told me that you took everything -- your computer contained all the records of every loan, everything was on your computer.  Every record of everything was stored on your computer.  And when you left, you took everything with you.  And I desperately needed those back to stay in compliance with DOL.

Q    Of course you would, ma'am, if that is what was on there.  That wasn't my question, ma'am.  Did you know what was on that hard drive?

A    You told me everything was on your computer, including a lot of music that was downloaded on the hard drive.  I am going off of what you told me.

Q    Ma'am, isn't it true the hard drive that had music on it was an external hard drive given to you by our son's pastor, Sean?

A    And it was downloaded on the computer.

Q    Is that the hard drive that you are claiming to have seen?

A    Bill, you put a restraining order on me and took a lot of things from the house.  And that was one of them.  You took a lot of things, and you definitely took everything that had to do with loans.

Q    Did you know what was on that hard drive, Ms. Ikilikyan, yourself?

MS. VOGEL:  Your Honor, object to as asked and answered.

THE COURT:  Sustained.

```
 1              THE DEFENDANT:  My contention is she has never answered.
 2    She is only saying what she claims she heard from me.
 3              THE COURT:  And that's the extent of her knowledge,
 4    which is what the court is going to use as the extent of her
 5    knowledge, no more or less than that.
 6    By the Defendant:
 7    Q   Now, did you have a good working relationship with
 8    Mr. Truini?
 9    A   I personally did not work a lot with Mr. Truini myself.  You
10    and I, however, met with Mr. Truini a few times together.
11    Q   Did he have disputes with you about payments on the broker
12    fees?
13    A   He had disputes with both of us regarding -- he had requested
14    for you and I to stop using his license.  He had many disputes.
15    Q   Yes or no, Ms. Ikilikyan, was there disputes with Mr. Truini
16    about the broker fees on the loans?
17    A   There were disputes, correct.
18    Q   And, also, Mr. Truini was requesting all the paperwork from
19    the loans, but they weren't provided to him because a broker's
20    agreement wasn't signed at that time; is that correct?
21    A   That's correct.
22    Q   Who was he seeking to get a broker's agreement from?
23    A   He wanted a broker's --  When we originally met, the way I
24    remember, is you told him if it is okay for it to be in my name,
25    and you would be doing the loans.  That's how I understood it.
```

1    Q    He was signing a broker's agreement with you then,

2    Ms. Ikilikyan?

3    A    He wanted a broker's agreement with one of us.

4    Q    Thank you.  Now, out of all the monies that was paid to

5    Ms. Thompson at Great American Escrow, you said it totaled about

6    $10,000?

7    A    I found out that number off of the investigation.  I never

8    counted the money exactly.

9    Q    But on top of that also was another $10,000 paid from that

10   $20,000?

11   A    That's correct.

12   Q    So the total would be closer to a total of $20,000 then?

13   A    I originally thought the $10,000 was included in that.  But

14   you might be correct.

15   Q    Thank you.  Now, on the Issaquah property, 9488 199th Avenue

16   Southeast in Issaquah, did Mr. Poff make any reservations to you

17   about wanting to move that property, wanting the property --

18   didn't want to have anything to do with the property, anything

19   along that lines?

20   A    I remember you and I briefly described that we intend to

21   actually occupy this property.

22   Q    That was Mr. Poff and yourself, or that you had stated an

23   interest in moving to that property?

24   A    I did.  I wanted to, correct.

25   Q    So primarily it was yourself who wanted the Issaquah property

1   then?

2   A   Yes.

3   Q   And you initially filled out a purchase and sale agreement

4   for your mom through a real estate agent --  Let me back up a

5   second, ma'am.  You filled out a purchase and sale agreement for

6   your mom, which you had signed?

7   A   Again, since I am under oath, I don't want to say yes or no

8   to something I can't look at physically.

9   Q   Let me rephrase the question.  You filled out a purchase and

10  sale agreement with your mom and submitted it to a listing agent?

11  A   Yes.

12  Q   Was that offer accepted or refused?

13  A   That offer was refused.

14  Q   And then a couple of months later down the road, the seller,

15  after the listing had expired, contacted you personally?

16  A   Correct.

17  Q   And Mr. Poff and yourself went and met with her personally?

18  A   Correct.

19  Q   Then who was the real estate agent on that transaction when

20  it actually became a deal?

21  A   I don't remember a brokerage actually being represented, but

22  as a broker, I had to disclose I am a broker.  But I don't

23  remember representing herself and her interest.  So I don't

24  believe there was a brokerage involved.

25  Q   So there was no real estate agent on that transaction?

1   A    Not a listing agent, no.  And I was buying that property as

2   an investment.   I guess technically I was representing myself.

3   Q    You were just representing yourself as a buyer?

4   A    Right, as a buyer.

5   Q    Then who did the financing on the transaction?

6   A    America One Finance.

7   Q    And the loan officer was Tony Reyes, correct?

8   A    Correct.

9   Q    And who did the closing on the transaction?

10  A    Micki Thompson.

11  Q    Micki Thompson did.  Did Mr. Poff do any notary duties at

12  all?

13  A    On this transaction you were in charge of putting the entire

14  deal together mentally, such as advising, well, let's raise the

15  purchase and sale price, let's do the fake receipts, let's pull

16  money out of the deal.  That was your --

17  Q    So it is your contention that Mr. Poff was the one doing all

18  the illegal activity, as far as creating the documents to support

19  closing?

20  A    Correct.

21  Q    And in reality, he had nothing to do with the deal, as far as

22  being the agent, anything to do with escrow, no notary and wasn't

23  the loan officer?

24  A    Not on paper, yes.

25  Q    Thank you.  Isn't it true that you told Mr. Poff that the

1  excess money between -- the differences in the actual purchase

2  price and the purchase price was being covered by a refinance on

3  the second mortgage?

4  A   I'm sorry.  Rephrase the question a little bit.

5  Q   There was a difference between the purchase price of

6  $2 million, and then there was a negotiated price with the Hsus

7  for what, 1.3, correct?

8  A   Correct.

9  Q   Wasn't Mr. Poff told that the disparaging (sic) difference

10  between those numbers was going to be covered by a refinance on a

11  second -- a concurrent closing?

12  A   I do remember originally --  There was $120,000 that came out

13  of the original loan in the form of a promissory note from

14  Mrs. Hsu to my mother.  And then after that, the rest of the

15  funds came in the form of a second loan.

16  Q   So there was a first and second on this transaction,

17  initially?

18  A   That's correct.

19  Q   And then there was a refinance on a second after that?

20  A   That's correct.

21  Q   And that's where more money was pulled out of the

22  transaction?

23  A   Yes.

24  Q   Wasn't it true that Mr. Poff was told the difference between

25  the numbers was being made up by a concurrent closing on a

1  second?

2          MS. VOGEL:  Objection.  Calls for hearsay.

3          THE COURT:  It depends.

4          THE DEFENDANT:  I'm sorry, sir?

5          THE COURT:  It depends.  I will permit the answer.

6          THE WITNESS:  A lot of this creative activity was very

7  vague to me at the time.  And even since then I have been trying

8  to really figure out exactly how it happened.  And that's as

9  honest as I can put it.  I do remember money coming out at first.

10  And then there was --  Again, a refinance happened where more

11  money was pulled out.  Was that your question?  I'm sorry.

12  By the Defendant:

13  Q    Not really.  But I will move on.  I will move on, your Honor.

14      Now, the income on that loan, didn't you state that your

15  gross income in the bank account would substantiate your stated

16  income?  Didn't you always tell people you were on the up-and-up

17  and completely legit about your stated income, even though you

18  couldn't verify it with taxes, correct?

19  A    I would like to clarify something.

20          MS. VOGEL:  I would like to object to that question.

21  There were at least three questions.

22          THE DEFENDANT:  Let me break it down.

23          THE COURT:  Counsel, you have about three minutes and

24  then we will take our lunch break.  How much longer are you going

25  to be with this witness?

1          THE DEFENDANT:  An hour-and-a-half more, sir.

2          THE COURT:  Here is going to be your homework assignment

3     over lunch.  You need to get yourself organized.  The long pauses

4     and the back forth are consuming a lot of time.  Let's get to a

5     point where we can wrap up today.  You have about three or four

6     minutes left, and then work over the lunch hour to try to get

7     this condensed.

8          THE DEFENDANT:  I am trying to keep these questions

9     within the court rules.

10    By the Defendant:

11    Q   Ma'am, before we go to lunch, just a couple more questions

12    for you.  Now, you had firsthand knowledge about these receipts

13    that were in the escrow properties in regards to the Issaquah

14    property?

15    A   I learned of the escrow -- of the receipts, yeah.

16    Q   Then on the resale from the 7038 South Puget Sound, Tacoma

17    property, where did the -- did you know where the promissory note

18    came from that was on that transaction that took care of the

19    excess funds on that transaction?  There was another promissory

20    note in escrow?

21    A   Can I take a look at them?

22          MS. VOGEL:  Objection.  I don't recall any evidence

23    about a promissory note on the resale.

24          THE DEFENDANT:  There was supposed to be a promissory

25    note on the resale on the South Puget Sound property.

By the Defendant:

Q    Can you see that okay, Ms. Ikilikyan?

A    Yes, I can.

Q    Do you know approximately when this promissory note was filled out?

A    I don't remember filling this out.

Q    Is that your signature at the bottom of the promissory note?

A    No.  I didn't sign that.

Q    You didn't sign that promissory note.  Do you know where this promissory note came from?

A    I do not.

Q    Now, have you done several deals with Mr. Reyes --

            THE COURT:  Counsel, are we moving on to a new topic?

            THE DEFENDANT:  Sir?

            THE COURT:  Are you moving on to a new topic?

            THE DEFENDANT:  It appears to be under the same property.  Yeah, I will consider it a new topic.

            THE COURT:  We will take our break.  Ladies and gentlemen, we will be back at 1:30.  Mr. Poff, you have your homework assignment.  It is helpful, I think, if you are going to ask her about documents, that you have that document available to put on the screen.  Otherwise you are going to continue to run into the "I don't remember."  We went through a lot of stuff yesterday.  We will be in recess.

(Lunch break)

1    THE COURT:  Mr. Poff, did you do your homework over

2  lunch?

3    THE DEFENDANT:  Yes, I did.  We have one administrative

4  matter.

5    THE COURT:  Let's take that up.

6    THE DEFENDANT:  Exhibit 116, that e-mail.

7    THE COURT:  Go ahead.

8    THE DEFENDANT:  Yes, sir.  We had reserved this until

9  later.  The issue about this e-mail --

10    THE COURT:  You promised me you would remind me at the

11  end of the day.

12    THE DEFENDANT:  I was not diligent in reminding you.  I

13  do apologize.  On this e-mail, it shows that you have the three

14  attachments to it, but the only thing that is attached to this

15  exhibit is a loan application, 1003.  The attachment says a 1003

16  from WaMu.  It doesn't look like anything --  It looks like a

17  generic loan application.  It was actually something that was

18  faxed three days prior -- four days prior to the original e-mail

19  that was forwarded out.  I am wondering if that is even the right

20  attachment.  And if it is, there is still two other items

21  attached to this e-mail that are not in evidence, sir.

22    THE COURT:  I will hear from the government.

23    MS. VOGEL:  Well, on the matter of the other two

24  attachments, it is true that I did not include the other two

25  attachments because they are very long.  They didn't seem

1    particularly relevant.  The defense has them in evidence and is

2    free to introduce them.  If the court would prefer, I can add

3    those two attachments to this exhibit, although I won't be

4    referring to them.

5              THE COURT:  Are they separately marked as exhibits?

6              MS. VOGEL:  No.

7              THE COURT:  Why don't you go ahead and mark them

8    sometime in the next day or so, and we will deal with the

9    question of completeness at that time.

10       The other objection I hear from Mr. Poff is the description

11   doesn't match the document.  Would you like to respond to that

12   one, since they are consecutively numbered?

13             MS. VOGEL:  I'm having a very hard time hearing the

14   court.

15             THE COURT:  The document is consecutively numbered.  It

16   is 6.1, 02, 03, 04, 05.  I assume this came out of the file all

17   at the same time?

18             MS. VOGEL:  Yes, your Honor.  This all came out of a

19   search warrant of a computer.  I'm not sure what the question is.

20             THE COURT:  I think you just responded to the objection.

21   Mr. Poff, you get the last word on this.

22             THE DEFENDANT:  I am just objecting to it, your Honor,

23   because it doesn't seem to match the amount on its face.

24             THE COURT:  All right.  I am going to provisionally

25   admit the exhibit, with the understanding that the government

1    will mark as additional exhibits the other two attachments, so

2    that we have a complete document.  It would go to the weight

3    rather than the admissibility, the questions that you are

4    raising.

5              THE DEFENDANT:  Thank you, your Honor.

6              THE COURT:  Anything else?

7              THE DEFENDANT:  No, sir.  I am ready to proceed.

8              THE COURT:  All right.  The witness is still under oath.

9    By the Defendant:

10   Q    Good afternoon, Ms. Ikilikyan.

11   A    Good afternoon, your Honor.  Good afternoon, ladies and

12   gentlemen.

13   Q    Ms. Ikilikyan, I really condensed this down so we can proceed

14   through this quickly.  Just a couple of questions for you.  Isn't

15   it a fact that the businesses of record were actually in the

16   personal residence where both parties had lived?

17   A    Yes.

18   Q    Thank you.  Isn't it true that the only 1003s that had the

19   signature Bill Poff on them were those loan applications that

20   were in the name of Ms. Ikilikyan?

21   A    Correct.

22   Q    In your experience, have you seen loans that went above

23   100 percent of the value of a house, a 125 percent loan,

24   something like that?

25   A    You had mentioned briefly that there are second mortgages

1  that could be over 100 percent loan to value, with a different

2  client.

3  Q    I didn't understand your answer, ma'am.

4  A    Not with anything that you and I had purchased or the banks

5  that we dealt with, I don't remember those banks accepting

6  anything like that.

7  Q    Are there loans that are 125 percent?

8  A    Certain percent of home equity line of credits is something

9  you did tell me had existed many years ago.

10 Q    In condensed, you are saying there are loans that are

11 125 percent?

12 A    Yes.

13 Q    Thank you.  In your experience, are zero percent down,

14 meaning zero percent down payment transactions, do they happen

15 all the time?

16 A    I don't know.  I can't honestly answer that.  Does it happen

17 all the time what?  With us?  With these properties?

18 Q    Let me rephrase the question for you.  Is it unlawful -- in

19 the training you received, was it ever conveyed to you it was

20 unlawful to buy a house with zero percent down?

21 A    No.

22 Q    Did you ever receive advice from legal counsel in regards to

23 pulling money out of a property?

24 A    I do not remember.

25 Q    When a person purchases a home, and they go out and apply for

1  secondary financing --  Let me paint the scenario for you so you

2  can answer the question.  If someone gets two loans on the

3  purchase of a home, and they don't like the second, can they

4  apply concurrently with the purchase to refinance the second

5  right away?

6  A   Loans are really not my strong area.  If I answer, it would

7  be remembrances of things you told me.  Can I refinance the loan,

8  is that what you asked me?

9  Q   I will start with that.  Can you refinance a second loan?

10 A   Yes.

11 Q   Can someone who gets a first and second loan apply for a

12 second loan during the purchase process?

13 A   Yes.

14         THE COURT:  Mr. Poff, are you talking about loans or are

15 you talking about mortgages?

16         THE DEFENDANT:  I thought loans and mortgages were the

17 same thing, sir.  Am I under the wrong assumption?

18         THE COURT:  That is not my job.

19         THE DEFENDANT:  Let me specify then.

20 By the Defendant:

21 Q   When I speak about loans, Ms. Ikilikyan, I am specifically

22 referring to mortgages.

23 A   Okay.

24 Q   If someone gets a first and second mortgage, and they don't

25 like the interest rate on the second mortgage, can they apply for

1  another second mortgage while they are in the purchase

2  transaction?

3  A    I think so.

4  Q    Thank you.  Now, if they did apply for that, would they have

5  to disclose that to the lenders?  Let me specify.  Would they

6  have to disclose that second mortgage that they are applying

7  for -- to refinance that second, would they have to disclose that

8  to the lenders that they are receiving the purchase money from?

9  A    If it is not part of the original contract, and the bank has

10  full knowledge of what their intentions would be, from the

11  beginning to the end of that particular loan, I would think -- if

12  it is not part of the original contract, I would think --  No,

13  because at the time, it wouldn't have been negotiated.  There is

14  a difference.  Let me think before I answer.  If it is not part

15  of the original contract then, no, they would not have to

16  disclose to the bank.

17  Q    Thank you.  Two more questions for you, Ms. Ikilikyan.  How

18  many times did you meet with the government in preparation to

19  being a witness today -- yesterday and today?

20  A    Probably less than ten.  I do not know the exact number.

21  Q    Do you have an estimation on how many hours you put in while

22  they prepared you for this trial?

23  A    Again, it is an estimation.

24  Q    Yes, your best estimation.

25  A    Twenty -- about 20 hours.  It is an estimation.

1    Q    Twenty hours is your estimation?

2    A    Many days.  Each week we tried to meet.

3    Q    So your estimation is 20 hours?

4    A    Somewhere along those lines.  I didn't exactly count.

5    Q    Thank you.  Did they coach you on anything that you should

6    say in regards to certain questions?

7    A    Not at all.

8    Q    And that brings up my last question.  Were you told what to

9    say in regards to your Washington Mutual bank account ending in

10   3135?

11   A    Not at all.

12   Q    Specifically refer to it as a general account or general

13   funds?

14   A    I referred to it because it was very important I specified

15   where the funds went.  And instead of just always saying 3135, I

16   came up with the term "general," so it was understood it was the

17   main account.

18   Q    So you came up with that term then?

19   A    Yes, I did.

20          THE DEFENDANT:  Thank you, your Honor.  I am finished

21   for the day.  I would like to reserve the right to recall her

22   when I get the results back from the handwriting expert, sir.

23          THE COURT:  You are restricting it to the question of

24   handwriting?

25          MR. RATNER:  May we speak, your Honor?

1          THE COURT:  Yes.

2     (Off-the-record discussion between standby counsel and the

3     defendant.)

4          THE DEFENDANT:  As far as cross-examination purposes,

5     your Honor, I am restricting it to the handwriting.

6          THE COURT:  I don't want you to have the impression that

7     you get to recall everybody.  That is a different subject, a

8     different question.  You may step down.  The government may call

9     its next witness.  Excuse me.  We have redirect.

10          MS. VOGEL:  Thank you, your Honor.

11                         REDIRECT EXAMINATION

12     By Ms. Vogel:

13     Q    Ms. Ikilikyan, to clear up any possible misconception, I want

14     to bring your attention back to the restraining order, the sheet

15     that the defendant, Mr. Poff, put up in front of us, the language

16     about you taking guns out of drawers and things like that.  Who

17     is the author of that language?

18     A    Bill Poff.

19     Q    That wasn't a police report or some third person writing this

20     down?

21     A    Not at all.

22     Q    Can you look, please, at Exhibit 616, the e-mail that

23     Mr. Poff just asked you about?  Can we look at the first page of

24     the attachment, please?  Specifically the fax header at the top

25     of the page.  Now, you have testified earlier that you recognize

1   that fax header?

2   A   Yes, ma'am.

3   Q   Can you explain to us how you and the defendant used that fax

4   machine in connection with e-mails?

5   A   Yes, ma'am.  This fax machine was used to fax loan documents

6   to ourselves, using Case7, where it would come to our e-mail.

7   And from there, it was easier.  So basically we would scan it and

8   fax it to us, and then we would e-mail whatever documents out

9   instead of faxing that to the clients, what have you.  It would

10   just then be e-mailed, the faxed paperwork.

11   Q   So, for instance, you had a paper document you wanted to

12   e-mail, how would you get it into the system to e-mail it to

13   somebody?

14   A   You would put the form into the fax machine as if you were

15   faxing to some other place.  The phone number would be the fax

16   machine that would go to your e-mail, which in this case was

17   206-339-2478.  It would be faxed, and the e-mail would show up,

18   and you would open it up and it is the exact forms that you faxed

19   and e-mailed.

20   Q   You mentioned Case7.  Is that a subscriber service that you

21   subscribed to, to essentially be able to scan things into e-mail?

22   A   Yes, that's correct.

23   Q   This particular document, Exhibit 616, page 3, the first page

24   of the 1003, is there some handwriting on this document that

25   suggests it was at some point printed out?

```
 1    A    Yes, ma'am, that's correct.
 2    Q    And is that on the front page here, where it says, "Per title
 3    report"?
 4    A    Yes, ma'am, it is.
 5    Q    Does that handwriting look familiar to you?
 6    A    Yes, it does.
 7    Q    Is it your handwriting?
 8    A    It is not.
 9    Q    Have you had much experience with that handwriting?  Have you
10    seen it very often?
11    A    Yes.
12    Q    Whose handwriting is that?
13    A    Bill Poff's.
14    Q    And the date that this document was scanned in was what,
15    according to the fax header at the top?
16    A    According to the fax header it was December 19th, 2006.
17    Q    If we could look back at page 1 of Exhibit 616?  What was the
18    date that the body of the e-mails that is signed Bill and
19    Alexis -- the date that that e-mail was sent to Tony Reyes?
20    A    December 26th, 2006, ma'am.
21    Q    I want to direct your attention down to this part of the
22    e-mail, where the body is, the e-mail comes from U.S.M.R. at
23    Comcast dot net to Tony Reyes?
24    A    It is December 23rd, 2006.
25    Q    So how many days after this document was scanned was it
```

1  e-mailed to Tony Reyes?

2  A    Approximately four days.

3          MS. VOGEL:   Your Honor, I don't have anything further.

4          THE COURT:   Thank you.  Mr. Poff, anything further?

5          THE DEFENDANT:  Nothing, your Honor.

6          THE COURT:   Now you get to step down.

7          THE WITNESS:   Thank you, your Honor.

8          MR. SCOVILLE:   Your Honor, the government calls Dan

9  Truini.

10  Whereupon,

11                     DAN TRUINI

12  Called as a witness, having been first duly sworn, was examined

13  and testified as follows:

14          THE CLERK:   Would you state your name and spell your

15  last name for the record?

16          THE WITNESS:   Dan R. Truini, T-R-U-I-N-I.

17          THE COURT:   You may inquire.

18                  DIRECT EXAMINATION

19  By Mr. Scoville:

20  Q    Good afternoon, Mr. Truini.

21  A    Good afternoon, sir.

22  Q    What city do you live in?

23  A    I live in Bremerton, Washington.

24  Q    At one time did you run a mortgage brokerage firm?

25  A    I did.

1  Q   And what was it called?

2  A   Victory Home Mortgage.

3  Q   How did you get started in the mortgage industry?

4  A   I studied a bit while I was in the Marine Corps.  Towards the

5  end of my tour, I went to a school and studied under Claudia

6  Gillette, a state approved school here, and a couple of other

7  on-line courses also.

8  Q   When did you start Victory Home Mortgage?

9  A   2003, right around April time frame.

10  Q   How long was Victory Home Mortgage in business?

11  A   We were open until about August of 2007.

12  Q   Where were you located?

13  A   I started it in my home in Bremerton.  I also held an office

14  in Belfair, which we eventually moved to Elma, Washington.

15  Q   What kind of work did Victory Home Mortgage do?

16  A   Origination -- loan origination, processing, brokering.

17  Q   What do you mean by "loan origination"?

18  A   Meeting with clients, potential clients, gaining their

19  paperwork and sending that loan in to process, and eventually

20  mortgage.

21  Q   What kind of paperwork would you be getting when you were

22  originating the loan?

23  A   Loan applications, verifications of employment, things of

24  that nature, bank statements.

25  Q   Is there a name in the industry for a loan application?

1    A    A 1003.

2    Q    Now, let's talk about processing.  You mentioned you did that

3    too?

4    A    Yes.

5    Q    What is that?

6    A    Processing is when you take the application and you submit it

7    to a lender, and you follow it along the way from the lender to

8    the underwriter, until eventually you can close that loan or not

9    close the loan.

10   Q    And what kinds of documents are submitted or generated in the

11   processing phase?

12   A    Normally, along with the application, you are going to have

13   some verifications of employment.  You will have some bank

14   statements, normally.  Anything to verify the type of loan you

15   are doing.

16   Q    What lenders did Victory Home Mortgage submit loan

17   applications to?

18   A    We have had a lot of lenders.  Ownit, HMIC, Wells Fargo.  I

19   mean, I was approved with an awful lot of lenders.  There is a

20   lot to go over.  Countrywide was one of my lenders.  I don't know

21   exactly how many you want.  We have had well over 30 approvals.

22   Q    When you say "approvals," do you mean approvals with lenders?

23   A    Yes.

24   Q    How would you get those approvals?

25   A    I have to submit a broker package to them, normally with a

1  credit report also.  And they put it through their process and

2  decide whether you can be a broker or not -- be approved with

3  them to broker loans.

4  Q   How would you decide which loan application package to submit

5  to which lender?

6  A   It depends on the rate, the type of loan it was.  And if I

7  didn't have a lender with that, then I would go to a search

8  engine that would help me sort through the appropriate data, sort

9  through and find me a lender.

10 Q   Mr. Truini, you mentioned that before you were at Victory

11 Home Mortgage, you worked for the Marine Corps?

12 A   Yes, sir, I did.

13 Q   How long did you work for the Marine Corps?

14 A   Twenty years.

15 Q   When did you leave the Marine Corps?

16 A   March 31, 2003.

17 Q   What kind of discharge was it, sir?

18 A   Honorable discharge.

19 Q   Do you recognize the man seated at counsel table to my right?

20 A   I do.

21 Q   And who is he?

22 A   That is Bill Poff.

23 Q   Mr. Truini, I am about to ask you a question about when

24 something happened.  Before I do that, I will ask you, are you

25 very good with dates, sir?

1   A    No.  I think anybody that knows me could probably tell you I

2   am not at all.

3   Q    To the best of your recollection, when did you first meet

4   Mr. Poff?

5   A    I am thinking it was right around the 1997, '98 time frame.

6   He came to headquarters -- was transferred to headquarters here

7   in Seattle, recruiting headquarters here in Washington.

8   Q    Recruiting headquarters for --

9   A    Marine Corps recruiting, Seattle, Washington.

10  Q    And how did you meet?

11  A    Just through our command.  He was the public affairs NCO, and

12  I was an NCOIC, which is the person in charge of recruiting -- a

13  recruiting station.  So he would eventually make it out to

14  different recruiting stations as part of his job.

15  Q    Did you work together with the defendant at that time?

16  A    When I went to the headquarters, we worked in the same

17  office, yes.

18  Q    And what kind of relationship did you have with the defendant

19  at headquarters?

20  A    Good relationship.

21  Q    Do you know a woman by the name of Alexis Ikilikyan?

22  A    I do.

23  Q    How did you first meet her?

24  A    She was actually recruited out of my office by one of my

25  recruiters.  And I was in charge of that office, what is called

1  an NCOIC, noncommissioned officer in charge.  So I meet anybody

2  that is recruited by one of my recruiters.  That is how I met her

3  first.

4  Q   Did she ultimately enlist in the Marine Corps?

5  A   She did.

6  Q   And how long did you continue to work with her in your

7  capacity as a Marine Corps noncommissioned officer?

8  A   You know, the exact amount of months she was in my delayed

9  entry program, I'm not sure.  Over six months.  Over six months.

10 And she would attend what is called our pool function, where

11 everybody waiting to come to boot camp, they will come to a

12 function with us, part of training.  I would see her at least

13 once a month.  Normally two or three times a month.

14 Q   Mr. Truini, after you left the Marine Corps and started your

15 brokerage firm, Victory Home Mortgage, at some point did you

16 begin talking with Mr. Poff about working together in some way?

17 A   I did.

18 Q   And approximately when was that?

19 A   I am going to say right around 2005, April time frame, I

20 believe.

21 Q   How did that come about?

22 A   You know, that's still a little bit undetermined.  We know

23 mutual people.  We have talked to a lot of the same Marines.

24 Through our mutual friendships we just began talking.

25 Q   And when you began talking for the first time, was this in

1  person or was it on the phone?

2  A    I think we talked on the phone first, and then we had a

3  meeting in person.

4  Q    Let's focus first on the phone conversation or phone

5  conversations.  What do you recall the defendant saying to you

6  during the course of those conversations?

7  A    Through our phone conversations we talked about the mortgage

8  business, we talked about different lenders, you know.  He was

9  actually in the mortgage business before me.  I am a guy to pick

10  somebody's brain.  So I talked to him a lot about mortgages.

11  Q    When you say he was into mortgages before you, how did you

12  learn that?

13  A    Again, just through mutual friends at the headquarters.

14  Marines you serve with, you usually stay in touch with, as we

15  both have.

16  Q    During these phone conversations with Mr. Poff, before your

17  in-person meeting, did he say anything about the type of work he

18  was doing at that time?

19  A    Just originating loans, working loans, mortgage type loans.

20  Q    Did he say anything about who he was working with?

21  A    Cyber One is what came up, whether it was on the phone or me

22  in person.  But I recall Cyber One, yes.

23  Q    So at some point did you and the defendant decide to meet in

24  person?

25  A    We did.

```
1    Q    And when was that?

2    A    April time frame, 2005.

3    Q    Where did you meet?

4    A    Aberdeen, Washington.

5    Q    Who else was there?

6    A    My wife, Laura, and Alexis Ikilikyan.

7    Q    How long did your meeting last?

8    A    It was a couple of hours.  We ended up having dinner.

9    Q    And then what happened?

10   A    We actually -- we sat down, we talked about generating loans,

11   and we made a plan that we would actually process their loans for

12   them.

13   Q    What do you remember Mr. Poff saying during that meeting?

14   A    We talked about a lot of things.  Can you narrow it down for

15   me just a little bit?

16   Q    Did he say anything about the reason why he wanted to start

17   working with you?

18   A    The way it was explained to me, I thought he had some

19   problems with Cyber One.  Not specific, but they wanted to charge

20   him a little bit more than he was willing to pay.

21   Q    And did you reach some sort of agreement with Mr. Poff and

22   with Ms. Ikilikyan about what you were going to do going forward

23   at that meeting?

24   A    We did.

25   Q    What kind of agreement did you reach?
```

1   A    We would process their loans for a flat rate, a very low

2   rate, about $500 a loan.

3   Q    And what was your understanding of what Mr. Poff would be

4   doing with respect to those loans?

5   A    He would be submitting the loan papers, the loan documents to

6   the company, and originate the paperwork, and submit them for

7   approval.

8   Q    After that meeting in Aberdeen that you just described, did

9   Mr. Poff and Ms. Ikilikyan submit any loan applications to be

10  processed by Victory Home Mortgage?

11  A    We processed some of theirs, yes.

12  Q    How many, approximately?

13  A    I can recall maybe four.  Four applications I would say all

14  together.

15  Q    How did you communicate with Mr. Poff or Ms. Ikilikyan

16  regarding these loan applications that were being submitted?

17  A    Phone, fax.

18  Q    Who did you communicate more often with, Mr. Poff or

19  Ms. Ikilikyan?

20  A    Bill, as far as the mortgages went.

21  Q    Why?

22  A    Well, he was knowledgeable and that's kind of the arrangement

23  we had.  If I called up there about a loan or something of that

24  nature normally I would be referred to Bill anyway.  Alexis was

25  more of a real estate agent at the time.  So she dealt mainly on

1    the real estate side, as far as properties and things like that

2    are concerned.  The mortgage side, I dealt with Bill mainly.

3    Q    What kind of discussions do you remember having with Mr. Poff

4    about these loan applications that he submitted?

5    A    A little more narrow for me?

6    Q    Sure.  What kind of things did you talk about regarding the

7    loan applications with Mr. Poff?

8    A    Well, normally, just like you would with a loan officer or

9    loan originator, lenders, rates, what's needed, what stipulations

10   to close the loan, anything that had to do with the processing

11   type conversation.

12   Q    What do you mean by "what's needed"?

13   A    Well, documents.  You definitely need the application, you

14   would need some verifications and things of that nature.

15   Q    Did you ever communicate with Mr. Poff by e-mail during this

16   time?

17   A    Sure.

18   Q    And what e-mail address did you use in order to send e-mails

19   to Mr. Poff?

20   A    It would be Fidelis WW, as far as the main IP address, I

21   guess is what you would say.

22   Q    How long did you continue allowing Mr. Poff and Ms. Ikilikyan

23   to process loans through Victory Home Mortgage?

24   A    It was right around October 2005.

25   Q    Why did it stop?

1    A    We were having some problems, communication-wise, between the

2    Poffs, myself and the escrow company.   I had gone to a lenders

3    conference and found out I was approved with lenders that I never

4    put a package in.   And I wasn't getting loan files from them.   I

5    addressed this in an e-mail to them.

6    Q    Let's break this down.   What do you mean approved by lenders

7    you didn't know about?

8    A    Like I said, when you enter the mortgage business, you don't

9    have a lender, so you have to put in their type of approval

10   package.   So that would require my license, it would require

11   documentation from the State be submitted, fill out all their

12   paperwork.   They will approve you to be a broker with them so you

13   can broker loans through them -- or to them.   That's the type of

14   package I am talking about, as far as an approval package.

15   Q    How would it be possible for you to be approved with a lender

16   you didn't know about?

17   A    I am not sure.

18   Q    You also mentioned a problem of not getting paperwork?

19   A    Right.

20   Q    What kind of paperwork are you talking about?

21   A    Well, to stay in compliance with the State you have to have

22   loan files that you are working on on hand.   And so those files,

23   no matter what is in them, everything you do with that loan goes

24   in the file and it is all tracked.   Well, the loan files have to

25   stay in my office.   And I wasn't receiving them.

1   Q   Why did they need to stay in your office?

2   A   To stay in compliance with the State.

3   Q   Who was the person who had the brokerage license?

4   A   The brokerage license?  I did.

5   Q   Did Mr. Poff or Ms. Ikilikyan at that time, to your

6   knowledge, have a broker's license?

7   A   Not to my knowledge, no.

8   Q   How did you attempt to deal with the problem of not getting

9   the paperwork you required?

10  A   E-mails, phone calls, I sent them -- I think the last one I

11  sent was in October, right around the 24th, explaining the whole

12  situation to them.  I told them I was out of compliance, I need

13  to be in compliance.  I also explained that we needed to have a

14  written agreement according to the State.  And so I tried to

15  rectify that situation to stay in compliance, and didn't get a

16  lot of help there.

17  Q   Did you ever talk with Mr. Poff about not receiving the

18  paperwork that you required?

19  A   Yes.

20  Q   And what did he say to you?

21  A   He was getting it together and I would eventually get them.

22  Q   Did you ever get the paperwork you wanted?

23  A   No.

24  Q   Was one of the items of paperwork you needed the settlement

25  statements?

1    A    Yes.

2    Q    Is there another name for that in the brokerage --

3    A    Sure.  You need HUD-1s or the final HUDs.  Normally you can

4    get those through the escrow company.  They hadn't been sent to

5    me.  I needed to see those documents.

6    Q    What kind of information is on those HUD-1s?

7    A    The HUD-1s will break down what is paid, how it is paid out,

8    to whom it is paid to.  So it is a complete breakdown of any

9    monies exchange in the process of doing that mortgage.

10   Q    What did you do to try to get these HUD-1s regarding the

11   loans that Mr. Poff and Ms. Ikilikyan had been working on?

12   A    I called the Poffs first and tried to get it through them.  I

13   also called the escrow company, who still hadn't sent them to me.

14   And so eventually, it was after October I believe, that I finally

15   did get four HUDs.  I believe Alexis sent them.  They weren't

16   final HUDs.  I still received nothing from the escrow company.

17   Q    Do you know whether or not there were other loans that

18   Mr. Poff and Ms. Ikilikyan might have processed using Victory

19   Home Mortgage's name, besides those four?

20   A    I do know one.  There was an issue that came up.  I can't

21   give you a name on the file, as far as my recollection goes.  It

22   was a couple of years ago.  But I was still processing loans

23   mostly through private lenders.  And I processed one through

24   First Bank.  And they told me that they couldn't --

25   Q    I will stop you.  The question was simply, do you know

```
 1   whether there might have been other loans --
 2   A    There was at least one for sure, and I can't give you an
 3   exact number, a total of how many there were.
 4   Q    I want you to look at a document that has already been
 5   admitted into evidence.
 6   A    Can you enlarge that?
 7   Q    This has been admitted into evidence.  Let's zoom in on the
 8   top half of the page.  Mr. Truini, did you create this document?
 9   A    No.
10   Q    Did you authorize its creation?
11   A    No.
12   Q    Did you ever talk with anyone about this document?
13   A    I did.
14   Q    Who did you talk to?
15   A    I talked to Micki Thompson about the document.  I had asked
16   her -- we had a conversation about why I was not receiving final
17   HUDs, and how after the loans were closed, that the money wasn't
18   sent to Victory Home Mortgage, our portion anyway, which is a
19   processing fee sent to us.  She had told me that I sent her a
20   letter that authorized that those funds go to Bill and Alexis.
21   And so I had her send me a document over.  I told her that I
22   never authorized it and I had never sent a document to her.
23   Q    Mr. Truini, in your discussions with Mr. Poff about the
24   mortgage industry, and about submitting loans through Victory
25   Home Mortgage, did you ever tell Mr. Poff that it was okay to
```

1   submit a loan application with inflated income figures?

2   A   **No.**

3   Q   Did you ever tell him it was okay to set up a fictitious

4   business to get a borrower qualified?

5   A   **No.**

6   Q   Did you ever tell him that it was okay to conceal seller

7   financing from lenders?

8   A   **No.**

9   Q   Did you ever tell him it was okay to submit fictitious

10  receipts to escrow?

11  A   **No.**

12  Q   Mr. Truini, did you ever have a conversation with Mr. Poff

13  about getting cash out of closing?

14  A   We have talked about it, sure, I mean, different ways.  I had

15  ordered a course through the television, of all places, just to

16  gain some knowledge.  Sure, we have talked about it.

17  Q   What do you recall Mr. Poff saying about getting cash at

18  closing?

19  A   That he knows how to do it, and he makes cash at closing.

20          MR. SCOVILLE:  No further questions.

21                        CROSS-EXAMINATION

22  By the Defendant:

23  Q   Good afternoon, Mr. Truini.

24  A   Good afternoon.

25  Q   Long time, no see.

1     A     Long time.

2     Q     Mr. Truini, do you have to have an education to get your

3     broker's license?  Did you have to go to classes?

4     A     Did I have to?  I didn't specifically have to.  I did go to

5     classes, though.

6     Q     Is it a requirement for the license?

7     A     You are required to have continued education after you

8     receive your license.  You do have to take a test to get your

9     state exam -- you have to take your state exam to get your

10    license.  I don't think it is written you have to have a certain

11    education from anyplace.

12          THE COURT:  Counsel, let me stop you a minute.  Both of

13    you are going to cut each other off if I don't have a grand rule.

14    He will ask you a question, take a breath and answer.  You really

15    won't get a good transcript if you are talking over each other,

16    which you both have a tendency to do.

17          THE DEFENDANT:  Yes, sir.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Thank you.

20    By the Defendant:

21    Q     Now, is there a requirement on any experience that you have

22    prior to submitting for your broker's license in the state?

23    A     Repeat the question.  Is there a requirement?

24    Q     Would you be required to be a loan officer for two years?

25    A     At that time?  When I received my license?

1   Q   Yes.

2   A   No.

3   Q   Is it a requirement -- have you kept up with the rules and

4   regulations for mortgage brokers subsequent to that?

5   A   As far as I know, yes.

6   Q   After that, was there a time requirement for someone to be a

7   loan officer before getting their broker's license in the State

8   of Washington?

9   A   At that time, I don't believe so.

10  Q   At that time.  Now, can you tell me what a stated loan is?

11  A   Can I respond again?

12  Q   Yes, sir.

13  A   If I recall correctly, there would be, but I went through a

14  course that was state approved, and that allowed me to get my

15  license.

16  Q   Okay.  Now, can you explain to me what a stated loan is?

17  A   Sure.  It is a stated income loan, where you basically are

18  going to state the income that you make.

19  Q   And is there an industry-accepted definition of what that is?

20  A   It depends on the lender that you are working with.  All

21  right.  If you submit the loan --  They are going to come back

22  with some stipulations, too.  They could ask for bank statements.

23  It is also known as a bank statement loan.  It really depends on

24  the lender you are working with, what they require for that.  And

25  lenders will have different requirements at different times.

Q    Now, a lot of the stated loans, is it true, that these were

not any sort of -- any kind of verified income at all?

A    The stated loans that I had done I needed some sort of

verification at some time, whether it be from the employer saying

that they are employed, whether it was a bank statement,

etcetera, normally, through the lenders that I used anyway.  So

normally there was some -- whether it is mild -- there would

normally be some sort of verification to go with that.  Even

though it says stated, sometimes they would want to know, have

some approximate idea of what you're making.

Q    Right.  It depends from lender to lender what they require,

basically?

A    Sure.

Q    Are there loans out there where you don't have to state

income?

A    Not that I have done.  Are there?  There could be.  I have

never done one like that.

Q    And if they don't state the income, is that more based upon

credit or --

A    More than likely credit.  It would be, you know, if a lender

says you have a 720 score or higher, that they wouldn't require

it, then that's up to that lender.

Q    Have you had loan reps come to your office and help you with

their underwriting criteria, depending on the lender?  You would

have people swing by your office?

1   A   You are talking about account executives?

2   Q   Yes.

3   A   Yes.

4   Q   Would they help you with their underwriting criteria that

5   they would have pertaining to their bank or mortgage company that

6   they work for?

7   A   Yes.

8   Q   Would any of them ever sit down and help you fill out loans

9   or teach you how?

10   A   Account executives?

11   Q   The account executives, yes.

12   A   At times.  Not do my paperwork.  For example, if an account

13   executive came in and said, well, this is our system, they might

14   show me how to use the system.  They will look over my paperwork,

15   make sure everything is correct, and even expedite it and get it

16   to the underwriter as quick as possible.

17   Q   Have any of them ever done in-office underwriting, per se, to

18   tell you how to submit a loan?

19   A   Not underwriting, no.  That is definitely submitted to an

20   underwriter.  First off, I didn't have a lot of account

21   executives come into my office.  I was in a small town.  The ones

22   that did, they would look my paperwork over, ask to see what I am

23   working on, if I had any difficulties, and, if so, maybe they

24   could get it approved.  Yeah, they can look over the paperwork.

25   Q   Now, did they help you prequalify some of the clients you

1    might have had?

2    A    Prequalify?  In which way do you mean?

3    Q    Did they review the file and see if they had something that

4    would be able to help you out?

5    A    Sure.

6    Q    And they would give you advice on how to submit it?

7    A    Sure.  Absolutely.

8    Q    Now, you said that you had found out that Alexis and Mr. Poff

9    were doing loans from the headquarters in Seattle?

10   A    No.  Rephrase that.

11            MR. SCOVILLE:  Objection.  That misstates the testimony.

12            THE COURT:  I will sustain the objection, as you are

13   going to ask him a new question.

14            THE DEFENDANT:  He didn't understand the objection, your

15   Honor.

16            THE COURT:  He didn't understand the question.

17   By the Defendant:

18   Q    My question, Mr. Truini, is, you found out that Mr. Poff and

19   Ms. Ikilikyan were doing loans through the RS, the recruiting

20   station, in Seattle for some of the Marine friends that you had

21   there --

22   A    Yes.

23   Q    -- initially?

24   A    Yes.

25   Q    And this was after --  Do you remember approximately what

1  time frame that was?

2  A   Well, I was retired when I found out that you was in the

3  industry -- or you two were in the industry.  It was after 2003,

4  shortly after.  Probably 2004.  Obviously we knew a lot of the

5  same people.

6  Q   Yes.  Now, maybe you would know -- now, Mr. Poff was out of

7  the Marine Corps at that time, he had left the Marine Corps.  Did

8  he leave the Marine Corps prior to you leaving -- you retiring

9  from the Marines?

10 A   Yes.

11 Q   Do you remember approximately when?

12 A   I can't give you a year.

13 Q   A couple of years before you retired?

14 A   I would say somewhere in there.

15 Q   After you retired, and you retired in 2003, you found out

16 through headquarters that Alexis Ikilikyan and William Poff were

17 in the mortgage industry, and you had found out through Marines

18 there?

19 A   I believe that is how it happened, yeah.

20 Q   Very well, sir.  And was this about the same time, if you

21 know, that Alexis Ikilikyan had temporary active duty orders at

22 the headquarters for the recruiting command?

23 A   No.  I was never aware that she was TAD to the headquarters.

24 Do you mean stationed at the headquarters?

25 Q   Temporary active duty.

1   A   TAD?  To the headquarters in Seattle?

2   Q   Yes.

3   A   No, I wasn't aware of that at all.

4   Q   You had stated that you had processed our loans; is that

5   true?

6   A   Well, yeah, helped find lenders, go over rates, things like

7   that.

8   Q   And you said that Mr. Poff submitted loans, or was it that

9   you believe Mr. Poff and Mrs. Ikilikyan submitted loans?

10  A   You --  Repeat that for me.  I guess I am not understanding

11  the question here.

12  Q   More specifically, did you witness either Mr. Poff or

13  Ms. Ikilikyan submit loans?

14  A   Yeah.  Yes.

15  Q   They have a home office, and you witnessed them submit the

16  loans?

17  A   You mean, did I see them do it in their office?

18  Q   Sure.

19  A   No.

20  Q   And did they submit loans from your office?

21  A   To my office.  Not from my office.

22  Q   They submitted loans to your office?

23  A   Yes.

24  Q   Who specifically did it come from?  Could it have come from

25  Mr. Poff or could it have come from Ms. Ikilikyan?  Do you know

1    specifically who it came from?

2    A    Specifically who sent me the -- faxed me over the paperwork?

3    Q    Yes.

4    A    If we had a conversation with it -- normally, Bill, that

5    would be submitted, as far as I know, from you.  But I can't say

6    whether she actually faxed me paperwork or not.  As far as the

7    loans were concerned, as far as I know, they were coming from

8    you.

9    Q    Did you ever deal with Ms. Ikilikyan in regards to real

10   estate?

11   A    As far as a transaction between she and I or me and a buyer

12   and seller?  Can you narrow it down for me a little bit so I

13   understand?

14   Q    Yeah.  Did she ever assist you in filling out a purchase and

15   sale or locating residential property?

16   A    No.  She sent me some listings for commercial properties that

17   never transpired into anything.  I don't have recall of her doing

18   any kind of documentation like that, no.

19   Q    Did she ever speak to you in regards to seller carryback

20   financing?

21   A    No.  No.  Not Alexis, no.

22   Q    Did you receive broker fee payments from Alexis for the

23   transactions?

24   A    Broker fee payments?  No.

25   Q    You didn't receive any broker payments from any of the

1    transactions from any of the loans that closed?

2    A    No broker fees, no origination fees.

3    Q    Neither one of them?

4    A    Not broker or origination fees, no, sir.

5    Q    So that --  My last question was, you didn't get paid from

6    Alexis for any of the deals?

7    A    No.  We did receive some money.

8    Q    You did?

9    A    We did.  And that would be for a processing fee.

10   Q    You got a processing fee?

11   A    Yes.

12   Q    And who paid you this processing fee?

13   A    As far as I know, the check came from a personal account.  It

14   was either yours or hers.  I don't have the check.  I can't

15   recall whose name was on the account.

16   Q    You can't recall that, sir?

17   A    No.

18            THE DEFENDANT:  Thank you.  That's all I have, your

19   Honor.

20            THE COURT:  Redirect, counsel?

21            MR. SCOVILLE:  No further questions, your Honor.

22            THE COURT:  You may step down.  Thank you, sir.

23            MS. VOGEL:  The United States calls Sarah Garner.

24            THE COURT:  Did Mr. Darcy get dropped?

25            MS. VOGEL:  We had to move him back in order to

1  accommodate some witnesses that had traveled from out of town.

2  We took him off the order and we are proceeding through the

3  order.

4  Whereupon,

5                          SARAH GARNER

6  Called as a witness, having been first duly sworn, was examined

7  and testified as follows:

8          THE CLERK:  Will you state your name for the record and

9  spell your last name, please?

10          THE WITNESS:  Sarah Garner, G-A-R-N-E-R.

11          THE COURT:  You may inquire.

12          MS. VOGEL:  Thank you, your Honor.

13                      DIRECT EXAMINATION

14  By Ms. Vogel:

15  Q    Ms. Garner, where do you live?

16  A    Roy, Washington.

17  Q    Where is Roy?

18  A    Fifty-six, 57 miles south of here.

19  Q    How long have you lived in the area of Roy, Washington?

20  A    Coming up on 22 years.

21  Q    And what is your occupation?

22  A    I am a stay-at-home mom, and I provide care for my mother,

23  who lives with us.

24  Q    Are you familiar with some properties located at 9407 to

25  9409, 9411 to 9413 and 9415 to 9417 72nd Avenue East in Puyallup?

1   A   Yes.

2   Q   And those are listed on line one of the chart there, correct?

3   A   Yes.

4   Q   How are you familiar with those properties?

5   A   Those have been in the family since my dad built them in '76,

6   I believe.

7   Q   And can you look, please, at Exhibit 100.  Are those the

8   properties you are referring to?

9   A   Yes.

10  Q   You said your father built those properties.  Is he still the

11  owner of them?

12  A   He passed away.

13  Q   And when did that happen, approximately?

14  A   May of '88.

15  Q   Who owned those properties after your father passed away?

16  A   My mother.

17  Q   And what is your mother's name?

18  A   Marijane Anderson.

19  Q   Ms. Garner, how many duplexes are there in the compound?

20  A   There are four.

21  Q   And what was your role in managing the duplexes prior to

22  selling them?

23  A   I stepped in to help my mother with those in 2000, putting

24  tenants in, having them remodeled, or actually, with my husband,

25  doing the work.  Just basic rental property management.

1   Q   At some point did your mother decide to sell those duplexes?

2   A   Yes.

3   Q   When was that?

4   A   The beginning of 2005.

5   Q   And what was your role in the process of attempting to sell

6   those duplexes?

7   A   I was her POA -- or I still am her POA.

8   Q   Can you tell us what you mean by POA?

9   A   Power of attorney.  To present to her, with our real estate

10  agent, how the market was doing, what we could list them for, and

11  then to get approval on a sale.

12  Q   So are you the one who handled all that?

13  A   Yes.

14  Q   How active was your mother at that time, January of 2005?

15  A   She would drive occasionally, but pretty limited in her

16  activity.  I actually would drive in to her residence and take

17  her to appointments and the like.  And her involvement with the

18  rentals was very limited.

19  Q   Actually, first I want to ask you about the address.

20  A   Um-hum.

21  Q   Are you aware of a dispute around the address at the time the

22  properties were sold?

23  A   Yes.

24  Q   Can you explain that to us?

25  A   The addresses here are what I recognize.  But I did note --

1    the county, back when they implemented the 911 emergency system,

2    they tried to get addresses more accurate to their location.  So

3    they named the private drive 94th Court.  It just never was

4    right.  Then they became 94 --  I don't know if they used the

5    same numbers or not.  I think they are different.  But still in

6    the 94th block of the 94th court when they are in the 72nd block.

7    It just never got remedied.

8    Q    Was that dispute ongoing in early '05, when the properties

9    were up for sale?

10   A    The county still had the properties on 94th Court.  We still

11   used the 72nd Avenue address.

12   Q    After you listed the properties, the duplexes, with the

13   realtor, how long was the property on the market?

14   A    Not long.  Days, actually.  I think --  They went active

15   early March, and we were negotiating within the first week or so.

16   Q    And was that the offer that you were negotiating on within

17   the first week, the offer that ultimately closed for the sale?

18   A    We received an offer, sent a counter back, and then I believe

19   it came back with the acceptance on that.

20   Q    And was that for all four duplexes or some of them?

21   A    It was all four as individual sales.

22   Q    Now, was there some issue with the closing of the fourth

23   duplex?

24   A    It was extended.

25   Q    How many duplexes closed in the first closing?

1    A    **Three.**

2    Q    **Was the offer from the same buyer for all four duplexes?**

3    A    **They all sold --  Well, the offer started out with a**

4    **different individual, the original offer.**

5    Q    **Was it the same person for all four?  Were there multiple**

6    **buyers for all of the duplexes?**

7    A    **No.  It was one, and then it changed.**

8    Q    **Let's start at the beginning.  Who was the first buyer that**

9    **sent you an offer?**

10   A    **I will do my best to pronounce it.  Armenuhi Harutyunyan.**

11   Q    **And from whom did you receive the offer on behalf of**

12   **Ms. Harutyunyan?**

13   A    **Our agent.**

14   Q    **Who did you deal with -- did you deal with anyone other than**

15   **the agent directly negotiating the offer from Ms. Harutyunyan?**

16   A    **No.**

17   Q    **What were the terms of that offer, in terms of price?**

18   A    **$325,000 per duplex.**

19   Q    **And what were the terms of that offer in terms of seller**

20   **financing?**

21   A    **20 percent.**

22   Q    **And can you look, please, at Exhibit 117?  We will try and**

23   **zoom in.  Do you recognize this document?**

24   A    **Yes.**

25   Q    **What is it?**

1    A    The purchase and sale agreement, which indicates the terms of

2    what I consider the carryback.  This actually -- this isn't our

3    final, because it was five percent here.  And that is not how

4    we --

5    Q    Is this the payment terms addendum that was originally

6    presented to you?

7    A    The original, yes.

8    Q    And then if we could look, please, at the third page of this

9    document.  This is entitled, "Counteroffer addendum"?

10   A    Um-hum.

11   Q    It says it relates to 9415, 9417, 94th Street Court in

12   Puyallup.  Is that one of the three duplexes?

13   A    Yes.

14   Q    Can you take a look at this document?  Do you recognize

15   page 3 of Exhibit 117?

16   A    Yes, I do.

17   Q    What is that?

18   A    These are the terms -- this is our counter on the terms of

19   the carryback loan.

20   Q    Is this consistent with the final agreement that you entered

21   into with the buyer, Harutyunyan?

22   A    I believe it is.

23   Q    And you said earlier that it was a 20 percent seller

24   carryback.  Is that listed out in line 3 in the center of this

25   counteroffer addendum?

1    A    Twenty percent seller carry deed of trust.

2    Q    And do you recall signing this document, Ms. Garner?

3    A    Yes.

4    Q    And on the bottom right-hand side there, above the word

5    "signature," do you see that signature?

6    A    I see that.

7    Q    Did you have a certain way that you would sign the name for

8    your mother?

9    A    Yes.

10   Q    And what was that?

11   A    I would sign her name, POA Sarah Garner.

12   Q    And is that how the signature appears on this page?

13   A    That is how it appears.

14   Q    Ms. Garner, when you entered into this agreement, the

15   addendum to the purchase and sale agreement, including the

16   20 percent seller carryback, what was your understanding of why

17   the buyer needed seller financing?

18   A    It is my understanding that was standard lending, the

19   80 percent/20 percent, to come up with a down payment of

20   20 percent.  And in this case we would finance the 20 percent on

21   that note.

22   Q    Now, you mentioned earlier at some point in the process the

23   name of the buyer changed?

24   A    Yes.

25   Q    What did it change to?

1   A    Ikilikyan.   Haikanush Ikilikyan, or otherwise we were

2   introduced as Alexis, or doing business as Alexis.

3   Q    Other than the name of the buyer, what else changed in the

4   deal -- in the agreement that you had already reached?

5   A    I don't understand.

6   Q    Was there anything else in the agreement that you had already

7   negotiated that changed, other than the name of the buyer?

8   A    I don't recall.

9   Q    Let me ask it this way.   Do you have any recollection of

10  renegotiating a new purchase and sale agreement when the name of

11  the buyer was changed from Armenuhi Harutyunyan to Alexis

12  Ikilikyan?

13  A    It is my understanding it was 20 percent loan at five and

14  three-quarters over five years.

15  Q    So it was the same terms?

16  A    The same terms, yes.

17  Q    At any point in the process of the sale, Ms. Garner, were you

18  asked to provide copies of lease agreements that were already in

19  place for the tenants of the duplexes at the Puyallup duplexes to

20  the prospective new owner or buyer?

21  A    The exchange of anything regarding the rentals actually took

22  place after closing, that I can recall.

23  Q    Do you recall providing those documents?

24  A    I recall giving the rents and the security deposits.   Whether

25  I actually provided copies of the rentals, I cannot say for sure.

1   Q    Can you look, please, at Exhibit 127, previously admitted as

2   an Ownit business record?  This appears to be a lease agreement

3   between Marijane Anderson and Robert Norman, I think it is.  The

4   property address listed here, is that an address similar to one

5   of the Puyallup duplexes?

6   A    That might be an address that the county had.  But I am not

7   familiar with this address.

8   Q    What about this lease agreement, are you familiar with this

9   lease agreement?

10  A    No.

11  Q    What involvement in April of '05 did your mother, Marijane

12  Anderson, have in renting out these properties?

13  A    She didn't.

14  Q    Had you been the person -- who was the person who had been

15  handling the lease agreements?

16  A    That would be me.

17  Q    And in whose name did you draft up the lease agreements?

18  A    I signed all the lease agreements.

19  Q    Who was the landlord?

20  A    Marijane Anderson, and I was her agent.

21  Q    Is this the form that you used?

22  A    No.

23  Q    Do you recall at the time you sold this duplex whether you

24  had a tenant named Robert Norman?

25  A    There was no Robert Norman.

1    Q    I will look at the signature page.  Who did you say would

2    have signed the lease agreements entered into for these

3    properties in April of 2005?

4    A    If I had filled the rental in April, it would have been me.

5    Q    In your name or your mother's name?

6    A    I would have signed the rental agreement.

7    Q    In your name?

8    A    In my name.

9    Q    Ms. Garner, have you ever seen this lease agreement?

10   A    No, I haven't.

11   Q    Do you have any explanation for how this lease agreement

12   between your mother and a purported tenant came to be in Ownit

13   Mortgage Solutions' file?

14   A    No.

15   Q    Ms. Garner, did you ever meet the buyer of the duplexes?

16   A    At signing, at closing.

17   Q    Where was that?

18   A    We met at a little restaurant called Steamers in University

19   Place.

20   Q    And who was present at that meeting?

21   A    My mother and I and our agent, Alexis Ikilikyan and William

22   Poff.

23   Q    Do you see William Poff here today?

24   A    Yes.

25   Q    Is he the man sitting here in the suit?

1   A   Yes.

2   Q   Would you look at number two?  Do you recognize

3   Ms. Ikilikyan?

4   A   Yes.

5   Q   Can you describe where?

6   A   Upper left corner.

7   Q   Tell us what happened at this signing session at the

8   restaurant that you described?

9   A   We gathered, and there were lots of documents.  And my mother

10  signed them.

11  Q   Who is it that physically controlled the documents?

12  A   I recall it was Mr. Poff.

13  Q   And what sort of explanation did Mr. Poff or anybody else

14  present give you as the documents were presented for your mother

15  to sign?

16  A   I cannot say for sure.  There might have been instructions

17  with the first set.  I don't know for sure.  But after we got

18  through this first set, it was just basically signing.

19  Q   During that meeting, did you have any discussions with the

20  defendant, Mr. Poff, himself?

21  A   Maybe just casual conversation.

22  Q   Do you recall specifically any conversation about the

23  business or employment that the defendant was in?

24  A   Well, I understand he was there under the capacity as a

25  notary.  And I believe he was also involved on the lending side.

1   Q   Who actually signed the documents on behalf of the seller,

2   your mother, at that closing session at the restaurant?

3   A   These documents were signed by my mother.

4   Q   When your mother signs, how does she sign?

5   A   She signs Marijane Anderson.

6   Q   Can you look, please, at Exhibit 104, the statutory warranty

7   deed?  This is the statutory warranty deed for one of the

8   duplexes.  Do you see the signature above the line "Marijane

9   Anderson"?

10  A   Yes.

11  Q   Can you tell us, is that the way you would sign it or the way

12  your mother would sign it?

13  A   It resembles my mother's signature.  It is how she would

14  sign.

15  Q   After signing, Ms. Garner, were you given a copy of all the

16  documents your mother had signed?

17  A   I had some copies.  I am not sure what we actually received

18  at the time.

19  Q   Can you look, please, at Exhibit 118, which was previously

20  admitted as an Evergreen Escrow business record?  Ms. Garner, do

21  you recall seeing this document among the closing paperwork?

22  A   I am not familiar with this document.

23  Q   And going through your own paperwork that you kept, do you

24  recall finding a copy of this document?

25  A   I could not find this.

1 Q This purports to be a seller financing agreement between

2 Marijane Anderson and Haikanush Ikilikyan.  It lists the four

3 addresses.  Would that be for all four of the addresses in

4 Puyallup?

5 A I have the addresses going to 9417, but the note would have

6 been for all four.

7 Q If we could zoom in on the top half and look at the terms

8 contained in this note.  Do those appear to be consistent with

9 the agreement that you signed that we saw earlier in the account

10 or offer addendum to the purchase and sale agreement?

11 A Yes.

12 Q And that figure, $260,000, for how many duplexes does that

13 include carrybacks on?

14 A Four.

15 Q So was it $65,000 per duplex?

16 A Yes.

17 Q And this payment amount, $1,245.83, how much of the principal

18 did that include per month?

19 A None.  It was interest only.

20 Q And if you can zoom in on the bottom half of this agreement.

21 The paragraph entitled "Waiver," could you look, please, and read

22 the last two sentences of that paragraph?

23 A "Both parties understand this is a separate transaction from

24 the purchase and financing of the property described above.

25 Closing will be set for three business days after the acquisition

1   of the property listed herein."

2   Q   Ms. Garner, do you recall making an agreement like that?

3   A   No.

4   Q   Do you recall ever being asked whether you would agree to

5   terms like that, ever have a discussion about agreeing to terms

6   like that?

7   A   No.

8   Q   What was your understanding about the $260,000 that your

9   mother was carrying back, as to whether it was or was not part of

10  the purchase and sale agreement?

11  A   It was part, and it was to be secured with a deed of trust.

12  Q   Can you look, please, at the signatures on this document?

13  A   Yes.

14  Q   Is this a document you signed as power of attorney for your

15  mother?

16  A   No.

17  Q   Do you recall witnessing your mother sign this document at

18  the restaurant meeting that you described?

19  A   No.

20  Q   How many times during the selling of this property, of the

21  fourth duplex, did your mother get out of the home to go sign

22  documents?

23  A   Once.

24  Q   Just the one --

25  A   Just the one time.

1   Q    Go up to the default interest paragraph.  What does this

2   seller financing agreement state was the default interest under

3   the agreement?

4   A    Nine percent.

5   Q    And what is your understanding of what that was supposed to

6   be?

7   A    We had countered with an 18 percent, as allowed by the State.

8   Q    Can you go back, please, to Exhibit 117, the payment terms

9   addendum that we looked at a moment ago, to the third page?  Is

10  that stated here?

11  A    It is not on this page, it is on the other.  Um-hum.  We made

12  the change and I initialed.

13  Q    And you are referring to the paragraph entitled "Default and

14  default interest"?

15  A    Yes.

16  Q    And are those your initials on the right-hand side?

17  A    Yes.

18  Q    And can we go back, please, to Exhibit 118, the second page

19  of that agreement?  Do you have any recollection of your mother,

20  Marijane Anderson, appearing before Mr. William Poff to notarize

21  this document on April 4th, 2005?

22  A    No.

23  Q    Ms. Garner, what was your expectation as to how your

24  financing would be secured?

25  A    Deed of trust.

1   Q   What was your expectation as to who would record that deed?

2   A   The escrow agent, the closing agent.

3   Q   At some point after the closing of these properties, did you

4   obtain final closing statements or HUD-1s?

5   A   I am trying to visualize the document.  I had settlement

6   statements.  I did come across settlement statements.

7   Q   They were provided to you at some point after this closing?

8   A   At some point.

9   Q   And did you actually provide them to us prior to trial today?

10  A   Yes.

11  Q   And also prior to trial today, did you go back and obtain

12  another set of HUD-1s for the same transactions from another

13  source?

14  A   Yes.

15  Q   Where did you get those?

16  A   Our real estate agent's office.

17  Q   What did you find when you compared those two sets of HUD-1s

18  for the same property transactions?

19  A   They were not the same.

20  Q   Can you look, please, at Exhibit 154?  Based on the note at

21  the top, do you recognize which set -- which HUD-1 this one is?

22  A   This would have been a copy I had.

23  Q   And how is it that you can tell that?

24  A   I indicated it as the Anderson copy.

25  Q   You wrote that on there?

1    A    I did.

2    Q    Before you provided it to the --

3    A    Yes.

4    Q    Do you recall where you got the copy of this settlement

5    statement?

6    A    At closing.

7              MS. VOGEL:  Move the admission of Exhibit 154.

8              THE COURT:  Any objection?

9              THE DEFENDANT:  No objection.

10             THE COURT:  154 is admitted.

11             (154 admitted.)

12   By Ms. Vogel:

13   Q    Let's take a look at the address and see which duplex this is

14   for.  It says this is for 9707 to 9709 90th Avenue East,

15   Puyallup, Washington.  And the buyer is Haikanush Ikilikyan.  The

16   seller is Tax Deferred Exchange Services, Inc.  Can you tell us

17   whether that is one of the three duplexes that you are referring

18   to?

19   A    With the house number, I can say that it is one of the

20   duplexes.

21   Q    Was there some sort of Tax Deferred Exchange that your mother

22   was working with when she sold these properties?

23   A    Yes.

24   Q    And this shows a contract sales price of $325,000 on the

25   right-hand side; is that correct?

1   A   Yes.

2   Q   This document only has the seller's half.  Is it your

3   understanding that this is a copy that would go to the seller?

4   A   I'm not sure.  I am used to seeing numbers on both sides.

5   Q   Let's take a look at the bottom line, the bottom on the

6   right-hand side.  I'm sorry, page 2.  "Deductions from seller

7   proceeds."  On the bottom right-hand side it says, "Total

8   settlement charges, $91,114.38."

9   A   Correct.

10   Q   Is that consistent with approximately the amount of money you

11   recall getting as seller proceeds from the sale of one of these

12   duplexes?

13   A   I believe so.

14   Q   It shows a $65,000 deduction.  What does this HUD-1 note that

15   the seller says -- the $65,000 deduction is for?

16   A   The seller carryback.

17   Q   Is that consistent with your understanding at the

18   transaction?

19   A   Yes.

20   Q   Now, can we look, please, at Exhibit 153?  Is this HUD-1 for

21   the same duplex for the same address?

22   A   Yes.

23   Q   And the same buyer and the same seller listed?

24   A   Yes.

25   Q   And where did you obtain this copy of the HUD-1?

1   A    From Windermere.

2   Q    And did you also provide this to us prior to trial?

3   A    Yes.

4           MS. VOGEL:  Move the admission of Exhibit 153.

5           THE DEFENDANT:  No objection, your Honor.

6           THE COURT:  153 is admitted.

7           (153 admitted.)

8   By Ms. Vogel:

9   Q    This, again, shows the sale price of $325,000; is that

10  correct?

11  A    Correct.

12  Q    If we could look at page 2, and look at the bottom half and

13  compare the deductions.  The bottom line figure is the same; is

14  that correct, $91,114.38?

15  A    Yes.

16  Q    Next to the line that says $65,000 deduction, what is the

17  notation on this version of the HUD-1?

18  A    "Invoice to PDQ Construction."

19  Q    Ms. Garner, do you recall authorizing any payment of $65,000

20  to PDQ Construction?

21  A    No.

22  Q    What repairs or other remodel repair work was necessary for

23  this sale to close?

24  A    Nothing.

25  Q    Generally speaking, what was the condition of the duplexes

1    when you sold them?

2    A    Over the course -- Well, good.  Because over the course of

3    the years that we were involved, we had refurbished every unit.

4    Q    Can you look, please, at Exhibit 143, briefly, submitted as a

5    Great American Escrow record?  This appears to be an invoice to

6    Marijane Anderson from PDQ Construction.  Do you recall ever

7    seeing this invoice at the time of the sale?

8    A    No.

9    Q    And it says it is for foundation upgrade, roof, paint,

10   landscaping.  Do you recall being billed or ordering repairs in

11   the amount of $65,000 for those types of repairs on the duplexes?

12   A    No.

13   Q    Ms. Anderson, when you went back and compared the two sets of

14   HUD-1s for the other duplexes, the one you kept and the one you

15   got from your real estate agent, what did you find for the other

16   ones that we are not going to look at right now?

17   A    That they indicated PDQ on the copies that came from the

18   agent's office.

19   Q    Do you have any explanation for why the HUD-1 said that

20   $65,000 went to PDQ?

21   A    No.

22   Q    In fact, do you know where that $65,000 went?

23   A    No.

24   Q    After the closing, Ms. Garner, where were the loan payments

25   sent for your mother's loan?

1   A    It was set up with Evergreen Contract Services.

2   Q    Who set up that account?

3   A    I believe Alexis did.

4   Q    And how timely were the monthly payments?

5   A    They were pretty consistent in the beginning.  We had a lapse

6   in 2006 due to an issue of who was responsible for property

7   taxes.  That got caught up.  And then payments stopped

8   approximately November 2007.

9   Q    What efforts did you make at that time to try and get

10  payments --

11  A    I put a call in to the number that I had for Alexis and left

12  a message.  I did receive a call back, and had a voicemail from

13  Mr. Poff indicating that Alexis had been called up to active

14  duty, and he didn't realize the payments weren't being made.  He

15  thought they had been set up for automatic payment, that they

16  were closing a deal and they would get caught up.

17  Q    Did you ever get any more payments?

18  A    No.

19  Q    Shortly after that, what did you do by way of research into

20  the county records surrounding the transfer of this property from

21  your mother to Ms. Ikilikyan?

22  A    I started looking for documents, because I wanted to find the

23  note.  One, I wanted Evergreen to be calculating the default

24  interest.  And they said I had to provide them instructions.  I

25  also needed a copy of the deed of trust or the note -- the

1    contract, so that we could move forward.  So I had gone to the

2    county records to find the recorded document, and there wasn't

3    one.

4    Q    Wasn't one what?

5    A    There wasn't a deed of trust or a contract or anything

6    recorded.

7    Q    What is your understanding of what that means for the

8    security interest in the property your mother thought was

9    protecting her $260,000 loan?

10   A    It means there isn't any.

11   Q    How much of the $260,000 principal has your mother been

12   repaid?

13   A    None.

14   Q    And what was that money to be used for?

15   A    That was security and retirement, and just peace of mind, and

16   to provide for her.

17   Q    Where does your mother live now, Ms. Garner?

18   A    She lives with me.

19            MS. VOGEL:  Nothing further.

20            THE COURT:  Mr. Poff.

21                      CROSS-EXAMINATION

22   By the Defendant:

23   Q    Good afternoon, ma'am.  Now, during this time, who did you

24   negotiate this contract and sale price with?  Was it

25   Ms. Ikilikyan?

1    A    It always went through our agents.

2    Q    It was always through your agent.  So you wouldn't have

3    firsthand knowledge who negotiated --

4    A    She would discuss it with Ms. Ikilikyan.

5    Q    With Ms. Ikilikyan.  Okay.  Did you work with Ms. Ikilikyan

6    after the deal, in regards to any type of property management

7    that you had done?  Was it acquiring the leases, the monies, the

8    prorated rents or something like that?  What all transferred

9    after closing?

10   A    After closing she received the rents that the new owner was

11   entitled to, and the security deposits.

12   Q    Thank you.  When we met at the restaurant, and I don't

13   remember, but normally when I do a notary, I would come in with a

14   package; is that true?

15   A    A notary would come in with a package.

16   Q    There was a bundle, a package of paper?

17   A    Yes, a big stack.

18   Q    In front of yourself and your mom, Mr. Poff opened up that

19   package, and we proceeded to sign and notarize the documents?

20   A    Yes.

21   Q    Were you handed a copy of that paperwork?

22   A    I cannot say for sure.  I had some copies.

23   Q    You had some copies.  When everything was done, did Mr. Poff

24   put it back -- put that bundle of paperwork back in a clip or

25   back in an envelope or anything like that?

1    A    I would gather that he did.

2    Q    Now, can you see this, ma'am, this exhibit here?

3    A    As long as I don't have to read the small print.

4    Q    Now, you testified that that looks like your mother's

5    signature on the signature line there?

6    A    It resembles her signature.

7    Q    The only time your mom had met someone to sign paperwork was

8    that day at the restaurant, correct?

9    A    That's correct.

10   Q    Can you see who notarized that document, ma'am?

11   A    Micki Thompson.

12   Q    Micki Thompson did?

13   A    Um-hum.

14   Q    Did she ever meet with Micki Thompson in your knowing or

15   understanding?

16   A    No.

17   Q    Now, you mentioned there was an issue with property taxes

18   with the units out there.  Who did you deal with in regards to

19   this issue of property taxes?  You said there was a lapse in

20   payment.

21   A    Alexis.

22   Q    You dealt with Alexis on that?

23   A    Yes.

24   Q    I am probably going to be taxing your mind a little bit.  Do

25   you remember pretty precisely when the phone call was placed from

```
 1   Mr. Poff to you about getting caught up on the payments?
 2   A    No, I can't recall.
 3            THE DEFENDANT:  That concludes my questions.  Thank you
 4   very much.
 5            THE COURT:  Anything further, counsel?
 6            MS. VOGEL:  No, your Honor.
 7            THE COURT:  You may step down.  Thank you very much for
 8   coming.  We will take our afternoon break at this time.  Ladies
 9   and gentlemen, we will resume at 3:15.  We will take a break in
10   the meantime.
11   (Recess)
12            THE COURT:  The government may call its next witness.
13            MS. VOGEL:  The United States calls James Thomson.
14   Whereupon,
15                          JAMES THOMSON
16   Called as a witness, having been first duly sworn, was examined
17   and testified as follows:
18            THE CLERK:  Will you please state your name and spell
19   your last name.
20            THE WITNESS:  My name is James Thomson, last name is
21   spelled T-H-O-M-S-O-N.
22            THE COURT:  You may inquire.
23                        DIRECT EXAMINATION
24   By Ms. Vogel:
25   Q    Mr. Thomson, in what city do you reside?
```

1    A    SeaTac.

2    Q    What is your occupation?

3    A    Internet marketing specialist.

4    Q    Do you have an adult son named Timothy Thomson?

5    A    Yes, I do.

6    Q    What is his occupation?

7    A    U.S. Army, enlisted.

8    Q    Are you acquainted with the defendant, Mr. Poff?

9    A    Yes, I am.

10   Q    How long have you known him?

11   A    Since 2004.

12   Q    And under what circumstances did you first meet?

13   A    I received a call from his spouse, Alexis, in reference to

14   she was looking for somebody to manage a set of properties for

15   them.

16   Q    And did you, in fact, go to work managing a property for

17   Alexis and her husband?

18   A    Yes, I did.

19   Q    What city was that property located in?

20   A    That was in Des Moines.

21   Q    Was that the only property you worked on for them?

22   A    No, I worked on a couple of other properties over the course.

23   At that time it was just that property.

24   Q    Was one of the properties you worked at a set of duplexes in

25   Puyallup?

```
 1   A    Yes, it was.

 2   Q    What were your responsibilities at the property in Des Moines

 3   that Alexis and her husband, the defendant, asked you to manage?

 4   A    Collect rents, find renters and do emergency maintenance.

 5   Q    In carrying out those duties, specifically who was it that

 6   you communicated with?

 7   A    Alexis.

 8   Q    And were there any occasions when you communicated with the

 9   defendant, Mr. Poff?

10   A    Rare, but, yes.

11   Q    At some point did you have a discussion about the possibility

12   of investing in real estate with the defendant and his wife,

13   Alexis?

14   A    Yes, I did.

15   Q    What was the context of that discussion?  Where did it

16   happen?

17   A    I believe it happened actually at the property in Des Moines.

18   Q    And who was present for that first discussion?

19   A    The first discussion I believe was Alexis, but later on there

20   was another meeting, and Bill was present at that one.

21   Q    And what was your understanding of the opportunity that was

22   available to invest in real estate with the defendant and his

23   wife?

24   A    They were looking for investors to help them acquire more

25   properties.
```

1   Q      What did you do as a result of that discussion?

2   A      I didn't have good enough credit to do it, but I looked for

3   possible investors and mentioned it to my son, who said he was

4   interested.

5   Q      And is that your son, Timothy?

6   A      Yes, it is.

7   Q      Are you aware of whether eventually your son, Timothy, did

8   agree to buy a house in his name with the defendant and his wife?

9   A      Yes, he did.

10  Q      Do you know the address of that property?

11  A      I do not know.  It is in Federal Way.  I can't tell you the

12  exact number, but, yes.

13  Q      If you look at the chart on the -- the big chart there?  I

14  don't know if you can read it, but can you look at line 2?

15  A      That is the address.

16  Q      Was the address 31413?

17  A      The address was 31413 50th Avenue South, Federal Way,

18  Washington.

19  Q      Mr. Thomson, what role did you play in your son Timothy's

20  purchase of that property?

21  A      I signed documents with his power of attorney.

22  Q      And how many signing sessions did you participate in?

23  A      There were two separate signings.  There was one main one,

24  and there was a supplemental to that.

25  Q      And why is it that you had to sign with power of attorney for

1   your son?

2   A   Because my son was in Korea at that time.

3   Q   Let's focus on the first signing session.  You said it was

4   the main one?

5   A   Yes.

6   Q   Where did that signing session take place?

7   A   If I recall, it was like a restaurant or a coffee shop in

8   Federal Way.

9   Q   Who was present?

10  A   That would have been Bill and Alexis.  No, actually it was

11  Bill, I believe, when I signed the paperwork.  I don't recall

12  Alexis being there.

13  Q   Who is it that presented the documents to you for signing?

14  A   Mr. Poff did.

15  Q   Can you look, please, at Exhibit 220?

16  A   I have it in front of me.

17  Q   Do you know what this document is?

18  A   It is a residential loan application.

19  Q   And is this your son Timothy Thomson's loan application for a

20  loan for the 31413 50th Avenue Southwest, Federal Way, property?

21  A   Yes, this would be.

22  Q   Mr. Thomson, do you have any recollection of signing this

23  document?

24  A   Yes.  That would be my signature or representation of the

25  signature of my son.

1   Q   Are you referring to page 3?

2   A   Yes, I am.

3   Q   Who is it that presented this document to you to sign?

4   A   Mr. Poff.

5   Q   And what role did you have in -- what information went into

6   this document, preparing the document?

7   A   I supplied my son's current rank, his LES and Social Security

8   information.

9   Q   What about the information that is under the borrower line,

10  Tim Thomson Landscaping -- borrower's employment information?

11  A   That information was not supplied.

12  Q   Was not supplied by whom?

13  A   By me or Tim.

14  Q   Did you supply any information to Mr. Poff prior to signing

15  this document about your son's income?

16  A   Yeah.  I gave him a pay stub.

17  Q   For Mr. --

18  A   For his military, correct.

19  Q   And do you recall what the amount of income was on that pay

20  stub?

21  A   Not at this time, no.

22  Q   Did you ever represent to the defendant, Mr. Poff, or his

23  wife that your son owned a landscaping business?

24  A   No, I did not.

25  Q   Did you ever represent to the defendant or his wife that your

1  son planned to live at this property?

2  A   No, I did not.

3  Q   Mr. Thomson, did you read this 1003 before you signed it with

4  your son's name?

5  A   No, obviously I didn't do a very good job of that.

6  Q   Mr. Thomson, will you look at Exhibit 213, please?  You are

7  welcome to look at the paper copy.

8  A   The camera is fine.

9  Q   Do you recognize that document?

10  A   No, I don't recognize it.  That would be the signature I

11  would have for it.

12  Q   This appears to be a note.  It is entitled "Seller financing

13  agreement," for the property 31413, in the buyer's name, Tim

14  Thomson --

15  A   Correct.

16  Q   -- for $61,589.  Were you aware there was a seller financing

17  agreement that your son was entering into when he purchased this

18  property?

19  A   I was aware that was a methodology Alexis used from

20  discussions that I have heard.  No, I actually wasn't aware that

21  this was in place.  I was talking to a friend, they were putting

22  the paperwork in front of me and I was just signing it.  I didn't

23  pay enough attention like I should have.

24  Q   Can you look, please, at Exhibit 216?  Do you recall signing

25  this document?  Perhaps we can put both documents up on the

1   screen at the same time, 213 and 216.

2   A   I don't see on Exhibit 213 a signature block.  You said 216,

3   right?

4   Q   213 was the one we just looked at, page 2.  You just looked

5   at the signature.

6   A   Correct.

7   Q   And if you could look at Exhibit 216.  They are both up on

8   the screen.  My question was, do you have any recollection of

9   signing the document in Exhibit 216?

10  A   No, I don't.

11  Q   And could you look, please, at the signature at the bottom of

12  that document?

13  A   That would be representative of what I would have signed.  It

14  does look like the signature that I use for my son.

15  Q   I want to direct your attention to the paragraph that is

16  entitled, "Note and deed of trust."  If you look at that

17  paragraph in Exhibit 216, the final sentence of that paragraph

18  reads, "This indebtedness shall be evidenced by a promissory note

19  and deed of trust;" is that correct?

20  A   That is correct, that is what it does say.

21  Q   And if you look at the final sentence of that same paragraph

22  in Exhibit 213, it actually reads, "This indebtedness shall be

23  evidenced by a promissory note and deed of trust in a position

24  inferior to financing through a traditional lender;" is that

25  correct?

1   A    That is correct.

2   Q    Mr. Thomson, do you have any recollection of signing two

3   different versions of apparently the same document?

4   A    No, I don't.

5   Q    Did you have any discussion that you recall at all with the

6   defendant or his wife about the need to change the terms of the

7   seller financing agreement after it had been signed?

8   A    There was a discussion that took place within a very short

9   time of signing this, but I don't recall the exact content of

10  that discussion.

11  Q    Mr. Thomson, you said after the first signing there was a

12  second signing.

13  A    Correct.

14  Q    How far apart were those two events?

15  A    I thought a week, and it could have been just a very few

16  days.

17  Q    And where did the second signing take place?

18  A    At my house.

19  Q    And who was present for that event?

20  A    Mr. Poff.

21  Q    Was anybody else present?

22  A    No.

23  Q    Did he explain to you why there was a need for you to sign

24  additional documents?

25  A    That there had been a mistake, and it needed to be corrected.

1    Q    Did anybody explain the details of what needed to be

2    corrected?

3    A    No.

4    Q    Mr. Thomson, did you pay any of your own money towards the

5    purchase of this property?

6    A    We wrote a check that was not supposed to be cashed.  My wife

7    actually did.

8    Q    Can you look, please, at Exhibit 211?  It has previously been

9    admitted as a Great American Escrow business record.  On the

10   bottom half of this document, is that the check you are referring

11   to?

12   A    Yes, it is.

13   Q    You say "we wrote it," who is "we"?

14   A    Well, my wife did it at my direction.

15   Q    Why did you direct your wife to write this check?

16   A    They needed it to show earnest money in the record.

17   Q    And who is "they"?

18   A    That would be William Poff and Alexis Ikilikyan.

19   Q    Who actually did you give the check to?

20   A    Alexis.

21   Q    Did you actually give the check or did you give a copy of the

22   check?

23   A    I gave the check.

24   Q    Was that check ever cashed?

25   A    No, it was not.

1   Q    Was it ever explained to you why you needed to write a check
2   that was never going to be cashed?
3   A    Yes.
4   Q    And what was the explanation you were given?
5   A    That they needed to actually fax over a copy of the check to
6   verify that there was earnest money in place.
7   Q    Mr. Thomson, have you ever heard of a business called Tim
8   Thomson Landscaping?  Had you ever heard of a business called Tim
9   Thomson Landscaping?
10  A    Prior to receiving the license in the mail, no.
11  Q    Is that how you first heard about it?
12  A    Yes.
13  Q    What did you do when you first heard about it?
14  A    Contacted my son to find out what that was all about.
15  Q    Was he able to tell you?
16  A    He didn't know anything about it, and asked me to close it
17  down.
18  Q    What did you do after that conversation?
19  A    I don't actually recall.  It has been too long ago.
20  Q    Did you ever have a conversation with the defendant, William
21  Poff, about the business Tim Thomson Landscaping?
22  A    I could have, but I don't recall.
23  Q    Do you recall ever receiving an explanation about why the
24  business Tim Thomson Landscaping was created?
25  A    Yes, I do.

1    Q    From whom did you get that explanation?

2    A    I believe that was from Mr. Poff.

3    Q    And what did he tell you?

4    A    That they needed to show additional income for the loan --

5    purpose of the loan.

6           MS. VOGEL:  No further questions.

7           THE COURT:  Mr. Poff.

8                        CROSS-EXAMINATION

9    By the Defendant:

10   Q    Good afternoon, sir.

11   A    Good afternoon.

12   Q    So you started working with Alexis mostly in managing the

13   properties in Des Moines?

14   A    That is correct.

15   Q    And what had happened with that business arrangement that you

16   had with Ms. Ikilikyan?

17   A    I'm sorry?

18   Q    Maybe I need to speak up a little bit.  What happened with

19   that business arrangement that you had with Ms. Ikilikyan?

20   A    It was dissolved because of a situation with the Puyallup

21   property.

22   Q    Do you remember anything about the details of that situation

23   that you had?

24   A    Yes.  It was dealing with a plumbing issue that I needed to

25   repair, that I was told not to repair correctly, and then when a

1    problem came up with an emergency repair after the fact, I was

2    blamed for it.  It was not the way it was supposed to have been.

3    Q    Who were you dealing with at the time when you were going

4    through this difficulty in this certain deal -- this certain

5    transaction, this maintenance?

6    A    I was dealing with Alexis.  She was on her two-week training

7    for her service.  And then I called Mr. Poff on the phone to

8    clarify a couple of issues, but predominantly with Alexis.

9    Q    Thank you, sir.  Did Ms. Ikilikyan deal with you in an honest

10   and fair regard since you had this working relationship with her?

11   A    I'm not sure I can answer that question correctly.  For the

12   most part -- the first part of it, yes.  Just prior to ending, I

13   would say no.

14   Q    Have you ever personally witnessed Ms. Ikilikyan in any way

15   being dishonest with Mr. Poff in any way or trying to manipulate

16   his situation?

17   A    Yes.

18   Q    Could you please explain?

19   A    She was telling me one set of things or instructions, and the

20   information I was getting back from Mr. Poff or you was

21   completely different than what I had been told.

22   Q    Two questions, sir, about your past experience.  Have you

23   ever originated loans yourself?

24   A    No, I have not.

25   Q    Have you ever been in the real estate industry yourself?

1   A   Yes.

2   Q   Were you licensed as an agent or did you invest?

3   A   No, I was not licensed as an agent.  I was an assistant --

4   like an office assistant to someone.

5   Q   Did Alexis indicate to you that she was either a loan officer

6   or a mortgage broker?

7   A   Yes.

8   Q   Did she demonstrate knowledge in this area, in this business?

9        MS. VOGEL:  Objection.  Clarify which business.  He

10  talked about two.

11       THE DEFENDANT:  I will clarify that question.

12  By the Defendant:

13  Q   Did she possess knowledge in the mortgage industry, as far as

14  loans, when she talked to you about loans?

15  A   I wouldn't classify it that way, no.

16  Q   Okay.  Whenever there was business being talked about, did

17  Ms. Ikilikyan basically act like she was the one in charge,

18  making the marching orders, so to speak, with regard to the

19  business?

20  A   Yes.

21  Q   Mr. Thomson, do you remember -- you probably don't, but I

22  will throw the question out there anyhow.  Do you happen to

23  remember what documents were signed at the second signing that

24  took place?

25  A   I thought there was a promissory note and one other document.

```
 1   I couldn't tell you exactly what it was.
 2   Q    And you have a little bit of experience in the real estate
 3   industry then?
 4   A    Yes, a little bit.
 5   Q    If there is earnest money due on a deal, who typically would
 6   collect the earnest money?
 7   A    The real estate agent.
 8   Q    The real estate agent would.  Okay.  When Mr. Poff came to
 9   you to facilitate the closing on the mortgage, he showed up at
10   the restaurant with a sealed manila envelope from escrow, do you
11   recall?
12   A    I don't recall whether it was a sealed envelope.  It was an
13   envelope.  I couldn't tell you whether it was sealed or not.
14   Q    It was a package of escrow documents, whatever it was, in a
15   sealed envelope.  I will stick with that question.  It was a
16   package from escrow, an envelope?
17   A    I couldn't tell you who it was from.  It was a packet, yes,
18   sir.
19   Q    And at the signing, Mr. Poff sat down, took the documents,
20   and then we proceeded to go through the documents, and you signed
21   by power of attorney for yourself (sic)?
22   A    Correct.
23   Q    When it was done, was a message relayed to you that a copy of
24   these documents would be forwarded to you from escrow?
25   A    No.
```

1    Q    Was there a copy given to you at signing?

2    A    Yes.

3    Q    There was a copy of the documents given to you.  Okay.

4         THE DEFENDANT:  I believe that actually concludes my

5    questions.  Thank you, sir.

6         MS. VOGEL:  No redirect.

7         THE COURT:  You may step down, sir.  Thank you.

8         MS. VOGEL:  The United States calls John Andriolo.  May

9    this witness be permanently excused?

10        THE COURT:  If you are concluded with him.

11        THE DEFENDANT:  No objection to that.

12        THE COURT:  Mr. Thomson is excused.

13        THE DEFENDANT:  Thank you, sir.

14   Whereupon,

15                           JOHN ANDRIOLO

16   Called as a witness, having been first duly sworn, was examined

17   and testified as follows:

18        THE CLERK:  Will you please state your name for the

19   record and spell your last name?

20        THE WITNESS:  John Andriolo, Jr.  That is

21   A-N-D-R-I-O-L-O.

22                        DIRECT EXAMINATION

23   By Ms. Vogel:

24   Q    Mr. Andriolo, where do you live?

25   A    At 528 Farrington Road, Port Angeles, Washington State.

1   Q    What is your occupation, sir?

2   A    I am basically retired, but I do work part-time as a

3   financial consultant.

4   Q    Are you familiar with the residential property that is on the

5   second line of that big chart next to you there located at 31413

6   50th Avenue in Federal Way?

7   A    Yes, I am.

8   Q    How is it you are familiar with that property?

9   A    That particular property I was involved in as a trustee for

10  an investment group that purchased it, and rehabbed it and sold

11  it.  I was the trustee for the trust.

12  Q    And as trustee, what was your role in the sale of that

13  property?

14  A    Well, I was basically in charge of the sale, working with the

15  real estate companies that we listed it with.

16  Q    And was that in approximately late 2005?

17  A    Yes.  Correct.

18  Q    What steps did you take to sell the property on behalf of the

19  trust?

20  A    Basically listing it with the real estate companies that

21  would market it and put it into the Multiple Listing Service.

22  Q    How long was the property on the market before you got an

23  offer that you ultimately accepted?

24  A    It was several months, maybe three or four months,

25  approximately, give or take.

Q    And who was it that brought you the offer?

A    It was an agent.  Her name was Nancy Pepper.

Q    Who was the buyer?

A    The buyer was Tim Thomson.

Q    And who is it that you conducted the negotiations with for that sale?

A    For the sale, basically with the agent of Tim Thomson.  It was Alexis, and I am not sure of the pronunciation of her last name.

Q    What was the agreed price for the sale of that property?

A    Basically $279,950.

Q    Was there any seller financing contemplated as part of the original agreement?

A    Not originally, but then it was offered/requested at the end of it, and accepted.

Q    If you would look, please, at Exhibit 210?  We will zoom in so you can look at it.  This is entitled, "Payment terms addendum to purchase and sale agreement."  Can you tell me first whether this pertains to your property located at 31413?  Would it be easier for you to look at a paper copy?

A    It is kind of distorted.  It basically looks like the contract, yeah.  It does basically look like it on the surface.

Q    And can you tell us what your recollection of the terms of the seller finance or the payment terms addendum were that you came to an agreement with the purchaser of your property?

1   A    That they would come up with conventional financing of I

2   believe it was approximately 218,000 plus.  And then they had

3   asked me to carryback a second note for the difference of the

4   sale price, which was approximately 62-, 63,000.

5   Q    How would that carryback be repaid over time?

6   A    Twenty-six months, interest only, and then a balloon payment

7   of the entire amount due.

8   Q    What was your understanding of why the buyer, Mr. Thomson,

9   needed seller financing to close this deal?

10  A    Basically --  I don't remember specifically.  It was either

11  because he didn't have enough cash or he needed the cash in other

12  deals he was working on.  That is more or less my recollection at

13  this time.

14  Q    Did you have any knowledge at the time that you agreed to

15  this seller carryback of how many mortgages the buyer was going

16  to take out, in terms of conventional financing?

17  A    Basically it would just be the one -- the first mortgage,

18  which would --  The first mortgage he would take out, and then

19  have the second, my carryback.  That was the only information I

20  had.  And that's the way it was finalized.

21  Q    Mr. Andriolo, were you ever asked during the course of the

22  negotiations for the sale of this property to remove that

23  carryback that you have just described --

24  A    No, never.

25  Q    Let me finish my question.

1   A   I'm sorry.

2   Q   -- from being a part of the purchase and sale of the

3   property?

4   A   No, I never was asked.

5   Q   Can you look, please, at Exhibit 212?  This has previously

6   been admitted as a Great American Escrow business record.  Do you

7   recognize this document?

8   A   Specifically it doesn't stand out in my mind like the

9   purchase and sale would.

10  Q   This appears to be an addendum, again, to the same purchase

11  and sale agreement.  And the first line in the body says, "Seller

12  agrees to allow the carryback be taken off this purchase and sale

13  agreement."  Mr. Andriolo, do you ever remember agreeing to that

14  term?

15  A   Absolutely not.

16  Q   Do you dispute what appears to be your signature on the

17  document?

18  A   That does look like my initials.  It does look like it.  I

19  was never specifically asked, to the best of my knowledge, by

20  anybody.

21  Q   Had you been asked to remove your seller carryback from the

22  purchase and sale as it is stated on this agreement, what would

23  you have responded?

24  A   No.  I wouldn't have done it at all.

25  Q   Why is that?

1    A    It would make no sense to me.  It would be taking the equity

2    away from the note.  It would be a very foolish way to do

3    business.  I don't do business that way.  There would be nothing

4    to back up the note.

5    Q    How did you handle closing for this sale?

6    A    Oh, basically --  I believe it was --  Let me take a step

7    backwards.  Normally I would go to the escrow company and sign

8    the papers and close the escrow.  I received a phone call, I

9    believe it was from Alexis, offering to meet me in Port Angeles

10   to make it easier for me so I wouldn't have to travel quite a

11   distance, and that she would bring the papers with her.  She and

12   her husband would meet me there.  She said he was a notary, and

13   he could notarize all the paperwork, my signatures and so forth.

14   I said, well, that was a nice thing to do, and I appreciated it,

15   and I said, fine.

16   Q    Were you given copies of the paperwork to review prior to

17   that?

18   A    Prior?  No.

19   Q    And did you, in fact, meet the real estate agent, Alexis, and

20   her husband to sign this document?

21   A    Yes, I did.

22   Q    And where did that meeting happen?

23   A    It was at the Traylor's Restaurant at the east end of

24   Port Angeles.

25   Q    And who was present at that meeting?

1   A   I was there, Alexis was there, and her husband Bill was

2   there.

3   Q   Do you recognize Bill in the courtroom today?

4   A   Yes, he is sitting right to the left of you there.

5   Q   Was that the first time you had met either Bill or Alexis

6   face to face?

7   A   Yes, I believe it was the first time.

8   Q   And at that closing session, who was it that actually

9   controlled the documents?

10  A   Basically --   It was kind of --   To the best of my

11  recollection it was between Bill and Alexis.

12  Q   Who is it that notarized the documents?

13  A   Bill did.

14  Q   And while you were at the restaurant with the defendant and

15  his wife, did you speak directly to the defendant at all?

16  A   Yes, we spoke with each other.   The three of us were talking

17  back and forth, yes.

18  Q   As a result of those conversations, did you get any sense of

19  the defendant's occupation?

20  A   Yes.   It was brought to my attention that he had newly

21  acquired his license to become a mortgage broker.   I don't

22  remember whether he or Alexis had told me that.   That's what was

23  told to me.

24  Q   Sir, when this sale closed, what was your understanding of

25  the position of your deed of trust that was secured by this

1  property?

2  A   It was my understanding that it would be in second place to

3  the -- on the property.  It was the second.

4  Q   And who is it that led you to believe that?

5  A   I believe it was Alexis.

6  Q   And who is it that you had the --  Were you ever informed

7  that the seller carryback was moved to a separate escrow file?

8  A   No.

9  Q   In the HUD-1s that you were provided after the sale, was

10 there any mention of a second mortgage?

11 A   I have to say, I just don't remember.  At this point I don't

12 remember.

13 Q   Can you look, please, at Exhibit 213?  This is entitled,

14 "Seller financing agreement," for the property 31413 50th Avenue

15 South?

16 A   Yes.

17 Q   Between the seller --  31413 50th Avenue Land Trust, is that

18 the trust for which you were acting as trustee?

19 A   Yes.

20 Q   And the buyer is Tim Thomson?

21 A   Yes.

22 Q   Do you have any recollection of signing this document?  Can

23 we look at the second page?  The third page.

24 A   That does look to be my signature.  I can't remember

25 specifically signing it at this moment.

1    Q    Can we go back to the first page of this exhibit, please,

2    213?  In the bottom half of this page there is a paragraph

3    entitled, "Waiver."  The last two sentences of that paragraph,

4    "Both parties understand, due to financing, this loan may not be

5    in first or second position.  Closing will be set for three

6    business days after the acquisition of the property listed

7    herein."  Just previous to that is the sentence, "Both parties

8    understand this is a separate transaction from the purchase and

9    financing of the property described above."  Mr. Andriolo, did

10   you ever agree to those terms?

11   A    No.

12   Q    And had anyone pointed this out to you, would you have signed

13   this agreement?

14   A    Absolutely not.

15   Q    Let's look at these again as the signature page on 213.  That

16   is page 3.  Who is this notarized by?

17   A    William Poff.  Yes, he is the notary there.

18   Q    Can we look at Exhibit 216?  Do you have any recollection of

19   this document?  It has the same title and similar layout.

20   A    Um-hum.  I don't specifically remember it.  There is no

21   question I signed many documents at closing.  I don't remember

22   specifically this particular -- even though that does appear to

23   be my signature on it.

24   Q    If we could look at the paragraph entitled "Waiver" a little

25   more closely on this version, 216.  The last few sentences, "Both

1     parties understand this is a separate transaction from the

2     purchase and financing of the property described above.  Closing

3     will be set for three business days after the acquisition of the

4     property listed herein."  This version, Exhibit 216, does not

5     appear to include the same language about it being -- the seller

6     financing being inferior to a first or second mortgage.  Do you

7     recall being asked to sign two different versions of the same

8     seller financing agreement?

9     A    That, I definitely don't remember.

10    Q    Can we look at the second page of this document?  Who is this

11    notarized by?

12    A    Also by William Poff.

13    Q    How many occasions did you meet with the defendant, Mr. Poff,

14    to sign and notarize documents?

15    A    Just the one time at the Traylor's Restaurant.

16    Q    Mr. Andriolo, did you have any idea that superior financing

17    on this property might bring the total loans to secure the

18    property to more than the sales price?

19    A    No, never.

20    Q    Did anybody ever ask you whether you would agree to an

21    arrangement like that?

22    A    No.

23    Q    Who did you believe to be the buyer of this property?

24    A    Tim Thomson.

25    Q    And who did you believe at the time the property was sold

1  would be responsible for making the payments to you on this note?

2  A    Initially, Tim Thomson.

3  Q    Did you receive monthly payments as expected?

4  A    I did receive monthly payments.

5  Q    And who made those payments to you?

6  A    I was told right at the beginning when the payments were to

7  be made that -- I was told by Alexis that she and Tim Thomson had

8  come to an agreement amongst themselves that -- for whatever

9  reason I don't know, but that she would be making those payments

10  to me.

11  Q    And so from whom did you receive --

12  A    Directly from Alexis.

13  Q    Were you paid in full as expected?

14  A    The last few payments didn't come through as they were

15  supposed to.  So, no.  And, of course, the balloon was not paid.

16  Q    So how much of that principal loan have you ever been repaid?

17  A    From the principal?  Nothing.  Zero.

18  Q    At some point did you or someone on your behalf research the

19  county records in an effort to enforce your deed of trust?

20  A    We attempted to.  We hired an attorney in Port Angeles,

21  Mr. Dave Neupert.  And initially he went into the records, and it

22  was -- to enforce the -- to find out the status of it and to

23  enforce it.  Yeah, we did.

24  Q    And what did you and he then learn about what position your

25  deed of trust had been recorded in?

1          THE DEFENDANT:  Objection.  Hearsay.  The last question.

2          THE COURT:  I will permit the question.

3   By Ms. Vogel:

4   Q    What did you then learn about the position that your deed of

5   trust had been recorded?

6   A    After he had looked into it, he didn't initially find it.

7   But after deeper investigation, he found out that I was in third

8   position, that there was a second that we were all astonished

9   that it existed.

10  Q    And what is the current status of that property?

11  A    I would say basically it would be in limbo because of

12  everything that has transpired.

13          MS. VOGEL:  Nothing further.

14          THE COURT:  Mr. Poff.

15                    CROSS-EXAMINATION

16  By the Defendant:

17  Q    Good afternoon, sir.

18  A    Good afternoon.

19  Q    Sir, who negotiated the purchase and sale, to include the

20  payment and terms addendum, with you?

21  A    Alexis.

22  Q    Thank you.  When was the only time that you had met Mr. Poff?

23  That was at the signing?

24  A    At the signing, correct.

25  Q    And he acted as a notary at that signing?

1  A   That's correct.

2  Q   When Mr. Poff arrived, he arrived with basically a sealed

3  bundle of paperwork from escrow to be signed?

4  A   He and Alexis were there eating dinner prior to my arriving.

5  So I don't know exactly what he had with him.  I just met them.

6  The escrow papers were already in his possession, yes.

7  Q   Thank you, sir.  Basically Mr. Poff proceeded to pull out the

8  paperwork and let you sign them, and then notarize the required

9  paperwork that was there, correct, sir?

10 A   Basically that is correct.

11 Q   Did you receive a copy of the paperwork at that time?

12 A   At that time, to the best of my knowledge, yes.

13 Q   Exhibit 212.  Is this a standard form --  Do you have any

14 experience in real estate at all, sir?

15 A   A little bit, yes.

16 Q   Is this a standard real estate form that you would expect to

17 see in certain -- in a purchase and sale agreement, what have

18 you?

19 A   This specific one I had not encountered in previous

20 situations.

21 Q   Fair enough.  Does it look like what might be a generic

22 addendum that a real estate agent would use if they had to make

23 changes or provisions to a transaction?

24 A   It could be interpreted that way, yes.

25 Q   And there is what is left of a fax header up at the top of

1    the page.  Can you zoom in on that, please?  It doesn't show very

2    much of the number left.  Can you tell me whose fax machine that

3    looks like?

4    A    The name that seems to appear there is Alexis.

5    Q    And you were told that -- at that meeting that either

6    Mr. Poff or Ms. Ikilikyan had recently become a mortgage broker?

7    A    Yes.

8                THE DEFENDANT:  Thank you, sir.  That's all I have.

9                MS. VOGEL:  No redirect.

10               THE COURT:  You may step down.

11               MS. VOGEL:  The United States calls Timothy Thomson.

12               THE CLERK:  Will you please state your name and spell

13   your last name for the record?

14   Whereupon,

15                             TIMOTHY THOMSON

16   called as a witness, having been first duly sworn, was examined

17   and testified as follows:

18               THE WITNESS:  Timothy Thomson, T-H-O-M-S-O-N, ma'am.

19               THE COURT:  You may inquire.

20                           DIRECT EXAMINATION

21   By Ms. Vogel:

22   Q    Good afternoon, Mr. Thomson.  Do you ever use a nickname?

23   A    I sometimes go by the name of Tim, other than Timothy.

24   Q    What is the city where you now live?

25   A    I live in Augusta, Georgia, ma'am.

| | | |
|---|---|---|
| 1 | Q | And what is your hometown? |
| 2 | A | My hometown is Augusta. |
| 3 | Q | Where are you from originally? |
| 4 | A | I am from Seattle. |
| 5 | Q | What is your occupation? |
| 6 | A | Military, ma'am. |
| 7 | Q | Which branch of the military? |
| 8 | A | United States Army. |
| 9 | Q | How long have you been in the army? |
| 10 | A | Four years, ma'am. |
| 11 | Q | And are you on active duty now? |
| 12 | A | Yes, ma'am. |
| 13 | Q | How long have you been on active duty? |
| 14 | A | Fourteen years, ma'am. |
| 15 | Q | Where are you currently stationed? |
| 16 | A | Augusta, Georgia, ma'am. |
| 17 | Q | Have you ever been deployed overseas? |
| 18 | A | Yes, ma'am. |
| 19 | Q | And specifically in December of 2005, were you deployed |
| 20 | | overseas? |
| 21 | A | I was in Korea, yes, ma'am. |
| 22 | Q | How long did you spend in Korea? |
| 23 | A | At that time I was there for five and a half years. |
| 24 | Q | Have you had any other overseas deployments? |
| 25 | A | Yes, ma'am.  Prior to that, I was in Korea from 1997 to 1999 |

1    for two years.  And then I deployed in Iraq around February, and

2    redeployed -- of 2007, and I redeployed around April of 2008.

3    Q    Mr. Thomson, who is your father?

4    A    James Thomson, ma'am.

5    Q    Mr. Thomson, are you the owner right now of a residence

6    located at 31413 50th Avenue South in Federal Way?

7    A    Yes, ma'am, it is in my name.

8    Q    And is that the property listed on line 2 of our big chart

9    there?

10   A    Yes, ma'am.

11   Q    When did you become the owner of that property?

12   A    Around December of 2005, ma'am.

13   Q    And where were you when that property was purchased in your

14   name?

15   A    Korea, ma'am.

16   Q    Did you make any trips to Seattle during the month of

17   December, 2005?

18   A    No, ma'am.

19   Q    Mr. Thomson, were you aware at that time that this property

20   was being purchased in your name?

21   A    Yes, ma'am.

22   Q    Had you authorized anyone to purchase this property in your

23   name?

24   A    Yes, ma'am.

25   Q    Who did you authorize to purchase this property?

1   A   My father, ma'am, James Thomson.

2   Q   And was there anybody else that your father was going to work

3   with to purchase this property?

4   A   Yes, ma'am.

5   Q   And who was that?

6   A   Alexis Ikilikyan and Will Poff.

7   Q   Can you explain to us how you came to authorize them to buy a

8   property in your name?

9   A   When I was here on vacation in 2005, my father had asked me

10  about real estate, and we had talked about real estate.  He

11  approached me for Alexis and Will, stating that they wanted to

12  know if anybody was interested in investment properties.  And he

13  threw my name out there, and asked if I wanted to meet them while

14  I was here on vacation in December of 2005.

15  Q   And what specifically were you looking for, in terms of

16  investment real estate?

17  A   Just trying to understand my father and get closer to my

18  father, and try to help him out as an entrepreneur and learning

19  about investments.

20  Q   So while you were here on vacation, did you actually have an

21  opportunity to meet with the people that you have just identified

22  as I think you said Alexis and Will?

23  A   Yes, ma'am.

24  Q   And where is it that that meeting took place?

25  A   Red Robin.

Q    Was that here in western Washington?

A    It was in Washington, yes, ma'am.

Q    And who was present at that meeting?

A    It was me, my father, James Thomson, Alexis and Will Poff.

Q    And when you say "Will Poff," do you see the person you are referring to as Will Poff in the courtroom?

A    Yes.

Q    Is that the person seated over here?

A    Yes, ma'am.

Q    What was the purpose of that meeting?

A    To identify whether I would be interested in learning about real estate investment and what it could do for me and my credit.

Q    Just to clarify, when you were here on vacation in 2005, and when this meeting occurred, do you know roughly when during the year 2005 that occurred?

A    No, ma'am.  It was around summer -- around June or July of that summer.

Q    How was the opportunity to invest in real estate at this meeting explained to you?  What was your understanding of what it would involve?

A    That I would authorize them to purchase the property in my name.  They would find the property, they would manage the property, and they assured me that within two years the property would have been sold, and out of my name.  And I was to receive a thousand dollars for each property that they invested in my name.

1   Q    And when you say "they," who were you referring to?

2   A    Will Poff and Alexis Ikilikyan.

3   Q    As a result of that meeting, did you enter into an agreement

4   with the defendant and his wife for them to purchase properties

5   in your name?

6   A    Yes, ma'am.

7   Q    And specifically, what was your agreement with them about who

8   would find the properties?

9   A    They would, ma'am.

10  Q    What was your agreement about who would negotiate the prices?

11  A    They would, ma'am.

12  Q    What was your agreement about who would obtain the necessary

13  financing?

14  A    They would, ma'am.

15  Q    What was your agreement about who would pay any down payment

16  or earnest money?

17  A    They would, ma'am.

18  Q    What was your agreement with the defendant and his wife about

19  who would live at the properties?

20  A    There was no agreement.  They were to take care of all of it,

21  manage the property.

22  Q    At any point did you convey to the defendant and his wife

23  that you wanted to live in any of these properties?

24  A    No, ma'am.

25  Q    What was your agreement with the defendant and his wife about

1   who would pay the monthly mortgage payments on these properties?

2   A    They were to take care of all of it, ma'am.

3   Q    What was your agreement about how long you would own the

4   property?

5   A    Two years, ma'am.

6   Q    And do you know why two years was a significant time period?

7   A    Not exactly.  To my understanding, what they were saying is

8   that is when the value of the property most likely would go back

9   up.  I don't know any other reason as to why.  I can't remember

10   exactly.  It was all a different language to me.

11   Q    And what was your understanding or your agreement about when

12   it came time to sell it, who would be responsible for that?

13   A    They were to take care of that, ma'am.

14   Q    And were all of these topics discussed at the meeting at the

15   Red Robin?

16   A    The only thing that was discussed, ma'am, was what I needed

17   to do, and that was give my father permission using power of

18   attorney in order to sign my name for the property, and that they

19   were to run my credit to see if I qualified, in which they knew I

20   did, because I had recently purchased another house for my

21   parents.  And they were to take care of everything else.

22   Q    How many properties did you agree could be purchased by the

23   defendant and his wife using your identity?

24   A    Originally discussed about three to five, ma'am.

25   Q    And to your knowledge, how many properties actually were

1    purchased in this manner?

2    A    One, ma'am.

3    Q    Mr. Thomson, how much money did you actually obtain from this

4    whole agreement that you entered into?

5    A    A thousand dollars, ma'am.

6    Q    And how was that money paid to you?

7    A    It was put into my bank account.  I don't know exactly by

8    who.

9    Q    After you finished up this meeting, and your vacation was

10   over, where did you go?

11   A    Back to Korea, ma'am.

12   Q    For the purpose of signing documents connected to this

13   purchase, who did you designate power of attorney?

14   A    My father, ma'am, James Thomson.

15   Q    In connection with the purchase of this property, property

16   number two on our chart, what information about yourself did you

17   provide to either the defendant or Alexis about your financial

18   qualifications for a loan?

19   A    That I was in the military, ma'am, and my rank and grade.

20   Q    And why did you provide them with your rank and grade?

21   A    Because that was my actual income that I made.

22   Q    And who did you provide that information to?

23   A    To both Will Poff and Alexis Ikilikyan.  And I gave them a

24   copy of my ID.  And my father worked with them on getting the

25   rest of it done.

1   Q    Mr. Thomson, can you look, please, at Exhibit 220?  This is a

2   loan application that has been admitted as being part of the

3   Ownit Mortgage Solutions file.  And as you can see, under the

4   subject property it states this is for the property at 31413 50th

5   Avenue South, Federal Way, Washington.  The borrower is listed as

6   Tim Thomson.  Have you looked at this document in preparation for

7   your testimony here today?

8   A    Yes, ma'am.

9   Q    Mr. Thomson, did you have any role in preparing this

10  document?

11  A    No, ma'am.

12  Q    And can you look at the third page of this document?  Did you

13  sign this document?

14  A    No, ma'am.

15  Q    Mr. Thomson, at any point prior to the purchase of this

16  property, did you see this document?

17  A    No, ma'am.

18  Q    I will go back to page 1, please.  At the top of this

19  document right here, if you could zoom in on that area, it says

20  "Purpose of loan."  And on the far right-hand side it says,

21  "Property will be," and the box that is checked is "primary

22  residence."  Did you have any role in selecting that box for this

23  loan application?

24  A    No, ma'am.

25  Q    What was your intention with regard to living in this

1    property?

2    A    That they were to manage it, take care of it.

3    Q    And on the bottom of this form in the employment section,

4    under name and address of the borrower's employer, it says "Tim

5    Thomson Landscaping."  Mr. Thomson, did you ever own a

6    landscaping business?

7    A    No, ma'am.

8    Q    Did you ever represent to the defendant or his wife that you

9    owned a landscaping business?

10   A    No, ma'am.

11   Q    And if you look at this, whose address is that under the name

12   Tim Thomson Landscaping?

13   A    That is the address that my parents currently live in.

14   Q    Can you look at the second page, please, under income at the

15   top?  This application states that you earned at that time $9,700

16   in gross monthly income.  Did you supply that information to

17   anybody for the purpose of filling out this loan?

18   A    No, ma'am.

19   Q    What was your true income in December of 2005?

20   A    About $2,000, ma'am.

21   Q    Did you supply that information to anybody for the purpose of

22   filling out this loan?

23   A    Yes, ma'am.  Anybody that ran my credit knew that I was in

24   the military, knew my rank and grade, knew exactly how much money

25   I made.

1  Q    Mr. Thomson, what knowledge did you have that, in order to

2  buy this property, lies would be included in loan applications?

3  A    None, ma'am.

4  Q    Did you authorize anyone to exaggerate your income or

5  employment?

6  A    No, ma'am.

7  Q    I'm sorry?

8  A    No, ma'am.

9  Q    Mr. Thomson, how many mortgages did you think you would be

10 taking out to purchase this property?

11 A    I didn't know any, ma'am.  I knew there was mortgages, but I

12 didn't know how many or exactly how it was going to be done.

13 Q    Would you look, please, at Exhibit 225?  This is a letter we

14 have seen earlier from BTA Law Group.  It is addressed to Mr. Tim

15 Thomson.  Mr. Thomson, have you ever seen this letter before

16 coming to Seattle to testify for this trial?

17 A    Before Seattle?  No, ma'am.

18 Q    Did you ever ask an attorney to write a letter on behalf of

19 you for Tim Thomson Landscaping?

20 A    No, ma'am.

21 Q    Did you submit this letter to Ownit Mortgage Solutions in

22 support of your purchase of this property?

23 A    No, ma'am.

24 Q    Can you look, please, at Exhibit 236?  This is a certified

25 public record, which is an application for, as you can see at the

1    top, Tim Thomson Landscaping.  It says that the owner is Tim

2    Thomson, and the address under business mailing address.  Is that

3    the same address you said earlier was your parents' home?

4    A    Yes.

5    Q    Did you open this business?

6    A    No, ma'am.

7    Q    Who is the person that prepared this document according to

8    the form?

9    A    Will Poff, ma'am.

10   Q    Did you authorize Mr. Poff to open a business in your name in

11   the State of Washington?

12   A    No, ma'am.

13   Q    Mr. Thomson, who signed all the closing documents in your

14   place for this loan?

15   A    To my knowledge, ma'am, it was my father, James Thomson.

16   Q    And how much money did you get back from the purchase of this

17   property?

18   A    $1,000, ma'am.

19   Q    Just the $1,000 we talked about earlier?

20   A    Yes, ma'am.

21   Q    Can we look, please, at Exhibit 238?  This was previously

22   admitted as a Great American business record.  It appears to be a

23   wire transfer verification.  And under the line "pay to," it says

24   "Tim Thomson."  The amount is listed as $54,992.56.  And the date

25   is January 4th, 2006, just a few days after the closing of your

1  purchase of this property.  Mr. Thomson, did you ever receive a
2  wire transfer of $54,992.56 in connection with this purchase?
3  A   No, ma'am.
4  Q   Mr. Thomson, was it ever part of your agreement with the
5  defendant and his wife that they would make over $60,000 at the
6  time of closing on this property?
7  A   No, ma'am.
8  Q   Did you ever make any monthly mortgage payments towards the
9  loans on this property?
10 A   No, ma'am.
11 Q   And do you know the current status of this loan -- of this
12 property?
13 A   Yes, ma'am.
14 Q   And what is it?
15 A   It is in default, ma'am.
16 Q   Are you at this time trying to unload it?
17 A   Yes, ma'am.
18 Q   Mr. Thomson, has this whole exercise adversely affected your
19 credit?
20 A   Yes, ma'am.
21 Q   And has it adversely affected you in other ways as well?
22 A   Yes, ma'am.
23         MS. VOGEL:  Nothing further.
24         THE COURT:  Mr. Poff, how long do you think you will
25 take?

```
 1                 THE DEFENDANT:  Two or three minutes.

 2                 THE COURT:  We will see if we can get you out of here

 3    today.   Please proceed.

 4                            CROSS-EXAMINATION

 5    By the Defendant:

 6    Q    Good afternoon, sir.  Mr. Thomson, can you take a look at the

 7    interviewer's signature?  Can you see this on your screen up

 8    there?

 9    A    Yes, I can.

10    Q    Can you tell me who the interviewer was listed down there?

11    A    What it says?

12    Q    Yes, sir, what does it say?

13    A    I can't read the name.  Haikanush Ikilikyan, whoever that is.

14                 THE DEFENDANT:  That's all I have, your Honor.  No

15    further questions.

16                 THE COURT:  Any redirect?

17                 MS. VOGEL:  None, your Honor.

18                 THE COURT:  Mr. Thomson, you are excused.  Thank you for

19    your service to our country.  Ladies and gentlemen, we will call

20    it quits for the day.  I will see you all at 9:00 tomorrow.  Are

21    there any matters that we should take up before we call it quits?

22                 MR. RATNER:  I do have a sentencing before Judge

23    Coughenour at 8:30.  I am sure I will be here on time.  Just to

24    let the Court know.

25                 THE COURT:  If you aren't here, it will be the first.
```

1    That's an inside joke, Mr. Poff, over the speed of Judge

2    Coughenour's sentencings.

3                MS. VOGEL:  Nothing from the government.

4                THE COURT:  Thank you, counsel.  I appreciate your pace.

5    We have Sands, O'Connell, Harutyunyan lined up for tomorrow?

6                MS. VOGEL:  Sands, O'Connell, and then we will put Darcy

7    back in.  We skipped over him today.

8                          (Adjourned for the day)

1                            **CERTIFICATE**

2

3

4

5

6

7

8

9          I, Barry L. Fanning, Official Court Reporter, do hereby
   certify that the foregoing transcript is true and correct.

10

11                                    S/Barry L. Fanning

12                                    _____

13                                    Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25