```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
        IN SEATTLE
```

UNITED STATES OF AMERICA,            )
                                     )   NO. CR09-160JLR
                 Plaintiff,          )
                                     )
          vs.                        )
                                     )
WILLIAM S. POFF,                     )
                                     )
                 Defendant.          )
                                     )

TRIAL

BEFORE THE HONORABLE JAMES L. ROBART

March 11, 2010

APPEARANCES:

Sarah Vogel
Michael Scoville
Assistant United States Attorneys
Representing the Plaintiff

William S. Poff
Pro Se
Representing the Defendant

Howard Ratner
Standby Counsel
Attorney at Law

```
1                          EXAMINATION INDEX

2    WITNESS                                              PAGE
      JOHN DARCY          DIRECT EXAMINATION               9
3                         By Mr. Scoville:
                          CROSS-EXAMINATION               71
4                         By the Defendant:
                          REDIRECT EXAMINATION            84
5                         By Mr. Scoville:
      SENATH SANDS        DIRECT EXAMINATION              85
6                         By Ms. Vogel:
                          CROSS-EXAMINATION               95
7                         By the Defendant:
      MAUREEN O'CONNELL   DIRECT EXAMINATION              97
8                         By Ms. Vogel:
                          CROSS-EXAMINATION              120
9                         By the Defendant:
      BARBARA TAINTER     DIRECT EXAMINATION             122
10                        By Mr. Scoville:
      ROBERT AMENTA       DIRECT EXAMINATION             128
11                        By Mr. Scoville:
                          CROSS-EXAMINATION             135
12                        By the Defendant:
      LINDA CROCKER       DIRECT EXAMINATION             137
13                        By Mr. Scoville:
                          CROSS-EXAMINATION             147
14                        By the Defendant:
      ARMENUHI            DIRECT EXAMINATION             149
15    HARUTYUNYAN         By Mr. Scoville:
                          CROSS-EXAMINATION             167
16                        By the Defendant:
      WILLIAM STEPP       DIRECT EXAMINATION             169
17                        By Ms. Vogel:
                          CROSS-EXAMINATION             179
18                        By the Defendant:
                          REDIRECT EXAMINATION           184
19                        By Ms. Vogel:
                          RECROSS-EXAMINATION            185
20                        By the Defendant:

21

22

23                         EXHIBIT INDEX
      EXHIBITS ADMITTED                                  page
24     164                                                20
       165 & 166                                          21
25     245 & 246                                          21
       324                                                22
```

```
432                                                        22
527 & 528                                                  23
167                                                        26
101                                                        42
247                                                        46
201                                                        50
301                                                        56
401                                                        59
501                                                        63
247                                                        65
325                                                        66
433                                                        67
529                                                        68
530                                                        71
14                                                        100
707                                                       176
```

1    THE COURT:  Counsel, I don't know what you all have, but
2    Mr. Poff filed a motion last night, which I will address here
3    this morning.  Before I get started on that, anything from the
4    government?
5    MS. VOGEL:  No, your Honor.
6    THE COURT:  Mr. Poff, anything other than the motion you
7    filed?
8    THE DEFENDANT:  No administrative matters, your Honor.
9    THE COURT:  Let me start with a preface.  Mr. Poff, you
10   don't have to be apologetic about filing motions.  This is an
11   extremely serious matter.  I don't know what the potential
12   penalties are for this, because the penalties don't influence the
13   question of guilt or innocence.  But given the charges that are
14   brought against you, there is the potential for serious jail
15   time.  You are respectful to the Court, you have chosen to
16   represent yourself, don't be apologetic about filing motions.  I
17   don't take them personally.  This is what I get paid to do.

18   I normally do not hold oral argument on motions.  We hold
19   oral argument sometimes in connection with hearings where we have
20   live witnesses and whatever.  But I want to make sure that I
21   understand this particular motion.

22   You reference the Fourth, Fifth and Sixth Amendments to the
23   Constitution.  And then you say, "Wanton and deliberate
24   violations of basic constitutional rights."  The first of which
25   is, "blatant violation of due process;" the second, "blatant

1    violations of equal protection;" and, third, "blatant violations
2    to a fair and equitable trial hearing."  You don't inform me as
3    to what the factual basis for each of those are.  So I would ask
4    you to do that for me at this time, please.
5            THE DEFENDANT:  Yes, sir.  A couple items that I had
6    under the denial of due process, would be the denial of discovery
7    to myself.  Also, the equal protection under the law, I wasn't
8    given equal access to the witnesses, as was demonstrated
9    yesterday in the cross-examination of Ms. Ikilikyan.  We have
10   someone on the stand who has admitted to having approximately
11   20 hours of preparation, coaching, whatever you want to call it,
12   for her becoming a witness.  We have a mortgage broker on the
13   stand who claims she can't even do a loan, and can't even
14   basically go to the bathroom without consulting with her
15   ex-husband on the proper use of toilet paper.
16       When the U.S. Attorney got up and asked the questions, she
17   seemed all of a sudden to be knowledgeable about anything and
18   everything that came up.  My access to her was nil prior to.  I
19   tried to stay in compliance with my bond, not contact any
20   witnesses at all, did not harass anyone.
21       In my opportunity to prepare for this --  I was asking
22   questions and being caught off guard, because I obviously didn't
23   know the response, whereas the government did know the response,
24   due to careful response prior to trial.  That's their job.  I
25   know that's what they do.  I wasn't afforded that same type of

1   opportunity to prepare, so to speak.

2       Also, the discovery was denied to me.  There were certain

3   things in discovery that I asked for that would have been crucial

4   to my defense.  I asked for proof that all these lenders were

5   actually the holders in due course, because I know for absolute

6   fact they were not.  They take a promissory note and they turn it

7   into an instrument to pay, thereby voiding the contract, and

8   these loans are void ab initio.

9       They are the ones who actually caused the damage basically

10  when they caused these foreclosures.  There is not one

11  foreclosure in the United States right now from these lenders, by

12  their fraudulent lending practices, except for owner financing,

13  which would be a legal or lawful foreclosure.  Every one of these

14  foreclosures they caused, caused damage to everyone.  Whereas, a

15  lot of this could have been taken care of in a civil matter, it

16  is now a criminal matter because they are the ones who caused the

17  damages.  That would have been part of my defense.

18      I was denied those documents.  I would like every one of

19  these lenders.  I asked them, let's prove it.  Prove you are the

20  lender in due course.  I should change residence to Missouri and

21  claim I am from the Show Me State.  Show me.

22          THE COURT:  Did you ask the government for that

23  information, or the banks?

24          THE DEFENDANT:  I asked the government, sir.  I am

25  outlining some more about what I have that I am going to submit

1   to supplement to what I had filed.  And I am going to proceed

2   forward with this.  I feel that my constitutional rights have

3   been absolutely, 100 percent, violated.

4       I am a United States Marine.  I may not be on active duty

5   anymore, but I am still a Marine, and I still hold to the ethos

6   that I learned in the Marine Corps of honor, courage and

7   commitment.  I stood on the line, ready to go in harm's way,

8   ready to shoulder a rifle and go into combat, if need be, to

9   support and defend our Constitution.  That was my oath, and I

10  took my oath seriously.  Now I feel like I am in a court and I

11  honestly feel my rights are being absolutely and deliberately

12  violated.

13          THE COURT:  The last thing that you mentioned was

14  blatant violations of a fair and equitable trial.  What

15  specifically do you mean by that?

16          THE DEFENDANT:  Part of -- a little bit of what I have

17  already referenced, your Honor, in reference to being able to

18  have equal footing with the plaintiffs in regards to being able

19  to prepare for trial.  You did inform me that I would be a little

20  bit limited on how I could approach witnesses or cross-examine

21  witnesses.  That was never even brought up or afforded to me.  I

22  didn't violate my bond in any way.  I have been trying to stay in

23  compliance.  I have been an absolute courteous gentleman, as I

24  always try to be.  I am left with no recourse except at this time

25  to file this mistrial and to file this notice of lis pendens.

1           THE COURT:  You were drowned out on that last one.

2           THE DEFENDANT:  I apologize.  I said I am without any

3    recourse, your Honor, at this time, but to file for this motion

4    for mistrial and file for this motion of this notice of

5    lis pendens, your Honor.  And I do not mean this personally

6    against anybody.  This is a professional matter.  Everybody has

7    been, on a personal level, very respectful to me, very

8    professional to me.  But it is my absolute honest feeling and

9    belief that my rights are absolutely, deliberately and wantonly

10   being violated in this honorable court, sir.

11          THE COURT:  Lis pendens is a lien against real estate.

12   Is that what you meant to say?

13          THE DEFENDANT:  My constructive notice of lis pendens,

14   sir?

15          THE COURT:  Yes.

16          THE DEFENDANT:  I am about to file a lawsuit.

17          THE COURT:  Now I understand.  This is not something I

18   have already seen, this is something you plan to do in the

19   future?

20          THE DEFENDANT:  I filed a notice of lis pendens,

21   constructive notice, sir.  I gave the honorable court a copy this

22   morning.

23          THE COURT:  I haven't seen anything that got filed this

24   morning.

25          MS. VOGEL:  I have an extra copy.

1    THE COURT:  Apparently so do we.  Let me take a look at

2    that.  Thank you, sir.  I understand better where we are now.

3        Is the government prepared to call its next witness?

4        MR. SCOVILLE:  Yes, your Honor.  At this time the

5    government calls John Darcy to the stand.

6    Whereupon,

7                    JOHN DARCY

8    called as a witness, having been first duly sworn, was examined

9    and testified as follows:

10        THE CLERK:  Will you please state your name for the

11   record and spell your last name?

12        THE WITNESS:  John Darcy, D-A-R-C-Y.

13                    DIRECT EXAMINATION

14   By Mr. Scoville:

15   Q    Good morning, sir.

16   A    Good morning.

17   Q    What city do you live in?

18   A    Shoreline, Washington.

19   Q    Were you previously employed by Ownit Mortgage Solutions?

20   A    Yes, I was.

21   Q    Is Ownit still in business now?

22   A    No, they are not.

23   Q    Are you familiar with Ownit's lending process?

24   A    Yes, I am.

25   Q    Have you reviewed Ownit's files regarding the transactions

1   described in lines 1 through 5 of the chart, Exhibit 1, displayed

2   on the easel in front of you?

3   A   Yes, I have.

4   Q   What kind of records have you reviewed?

5   A   I reviewed the complete loan documents that were presented on

6   the funded loans that were with Ownit Mortgage.

7   Q   I will put up Exhibit 1.  I will zoom in on rows 1 through 5

8   in the first five columns.  Does the information reflected in

9   those rows of Exhibit 1 accurately reflect financing provided by

10  Ownit Mortgage Solutions in connection with these transactions?

11  A   Yes, it does.

12  Q   Were you also the underwriter, sir, for the transactions in

13  rows 2, 3 and 4?

14  A   Yes, I was.

15  Q   Mr. Darcy, let's talk a little bit about your background

16  before we get into specifics.  What kind of education have you

17  received?

18  A   I have a Bachelor of Arts from Washington State University.

19  Q   And what jobs have you had since graduating?

20  A   In the mortgage industry, I was retail branch processor, loan

21  officer, branch manager for AmeriQuest Mortgage.  After that, I

22  worked for Washington Mutual in their wholesale lending division.

23  Then I went to Oakmont Mortgage, which became Ownit Mortgage.

24  From there, I have done underwriting for Wells Fargo and Journey

25  Financial.

1  Q    You said that you went to Oakmont and it became Ownit at some

2  point.  When did you first go to Oakmont Mortgage?

3  A    I believe that was in 2002.

4  Q    And when did it become Ownit?

5  A    It was --  I think it was in 2004.

6  Q    How long did you work at this entity whose name shifted from

7  Oakmont to Ownit?

8  A    It was December of 2006.

9  Q    What kind of business did Ownit have?

10  A    We were a wholesale mortgage lender.

11  Q    What do you mean by that?

12  A    Our clients were the brokers and the loan officers that had

13  an agreement with Ownit Mortgage to submit loans to us.

14  Q    And who was it that was bringing these loans to you for you

15  to process?

16  A    They would have been mortgage brokers or the loan officers

17  that worked for those mortgage brokers.

18  Q    What would the loan officers do that were bringing you the

19  loans?

20  A    They would submit the file to us.  We usually ask for a

21  complete file, which consisted of the application, credit report

22  and supporting documentation.

23  Q    And when you say "the application," what do you mean?

24  A    It was the 1003 application that they took from the borrower.

25  Q    Is that a standard form used in the industry?

1    A    Yes, it is.

2    Q    What was your job at Ownit, Mr. Darcy?

3    A    I was the senior underwriter and operations manager.

4    Q    What were your responsibilities in that job?

5    A    I was responsible for the branch operations for underwriting,

6    for overseeing my underwriters and for training them as well.

7    Q    What does "underwriting" mean?

8    A    It means analyzing the credit documentation and supporting

9    documentation presented in the file to insure that it meets the

10   company and investor guidelines for approval.

11   Q    And what specifically do you do when you are underwriting a

12   loan?

13   A    We will scrutinize all the documentation and make sure that

14   everything matches our guidelines for the qualifications of that

15   borrower.  Part of that is insuring the documents are accurate as

16   well.

17   Q    Mr. Darcy, generally speaking, what kind of information did

18   Ownit require about the proposed borrower in an application for a

19   mortgage loan?

20   A    We required the complete, accurate 1003 completed.  We wanted

21   a credit report provided from the broker, supporting income

22   documentation and an approval and title report.

23   Q    Would you typically request information about where the

24   borrower was employed?

25   A    Yes.  All applications had to have a minimum of a two-year

1    work history on them.

2    Q    Why did you need to know where the borrower was employed?

3    A    We wanted to know that they had the income to support the

4    loan, to repay it.  And part of our investor requirements was

5    that every applicant have a minimum of a two-year work history to

6    show stability.

7    Q    What kind of verification of income would you do?

8    A    That would depend on the type of loan that we were doing,

9    whether it was stated income or it was a full document loan.

10   Q    Can you explain that?

11   A    A full doc loan would, for a W-2 wage earner, consist of pay

12   stubs and W-2s.  We also did a bank statement program, which was

13   also considered full doc.  That was primarily for

14   self-employment.  That would be 12-months of bank statements.

15   And we also had a stated income loan.

16   Q    What was the stated income loan program?

17   A    The stated income loan, it was primarily for self-employed

18   borrowers.  We would want to verify their self-employment for a

19   minimum usually of two years.  And other than that, there was no

20   other documentation required.

21   Q    Did that mean the income the borrower stated didn't matter to

22   your decision?

23   A    No.  They were stating, per the application, what their true

24   income was supposed to be.

25   Q    Would you typically request information about what the

1  borrower planned to do with the property that they wanted to

2  purchase?

3  A    Yes.  That is part of the application.

4  Q    And what types of purposes did you fund mortgage loans for?

5  A    We would fund loans for a primary residence, for investment

6  properties and second homes.

7  Q    Were there different programs, depending on whether it was

8  primary residence or investment property or second home?

9  A    Yes, there were.  It would be limited in the amount of -- the

10  amount of money that we would lend, the loan to value.  It also

11  would affect the interest rate.

12  Q    Why?

13  A    The investment properties and second homes are higher risk.

14  So we would lend less money, and the interest rate would be

15  higher.  It is a riskier loan.

16  Q    Why would you consider an investment home or secondary

17  residence to be a higher risk than a primary residence loan?

18  A    It is easier for borrowers to default on those types of

19  homes, to walk away from them.  They are not living there.

20  Q    Would you typically request information in the course of

21  looking at a loan application being underwritten about the

22  details of the purchase and sale agreement between the borrower

23  and seller?

24  A    Yes.  We would require the complete purchase and sale

25  contract.

Q    And why did you need to get that?

A    There were a number of things.  We wanted to see if there were any concessions the seller was making to the buyer.  That was one of the main things.  Also, to make sure that it was actually for our property, that the seller was vested on title, and they were actually the party that was able to convey the property.

Q    Did you require information about what type of down payment the borrower would be making?

A    Yes.

Q    Why?

A    We wanted to make sure that in all our purchase transactions where -- that the homeowner, the borrower, was bringing in funds that were their own that came from an account listed on the 1003.

Q    Why did the funds need to be the borrower's?

A    We wanted to have the borrowers have a vested interest in the property.  It needed to be their own funds.

Q    Would you request information about whether the borrower was getting any type of subordinate financing, other than the loan they were applying for through you, in connection with the transaction?

A    Yes.  They would need to disclose if there was subordinate financing.

Q    Why?

A    It would affect our lending decision, because some of our

1    programs would be limited to a combined loan to value, and we

2    would need to know what any subordinate financing was.

3    Q    You said "limited to a combined loan to value."  What do you

4    mean by that?

5    A    The combined loan amounts from all mortgages extended in the

6    purchase transaction.  So whether it was first, second, third, or

7    a first and second, we needed to combine those loan amounts.  We

8    could not lend more than 100 percent of the purchase price.

9    Q    When you say "combined loan to value," would that include

10   both financing extended by Ownit as well as, for instance, seller

11   financing?

12   A    Yes, it would.

13   Q    Mr. Darcy, would you also request that a HUD settlement

14   statement be provided in connection with the transactions you

15   were looking at?

16   A    Yes.

17   Q    Why?

18   A    We wanted to know where all the funds were going in the

19   transaction.

20   Q    Why did you need to know that?

21   A    We needed to have that for our investors, and also to make

22   sure all the money went where it was supposed to go.  It is part

23   of the lending process.  It is required.

24   Q    At what point in the transaction would you get a HUD

25   settlement statement?

1   A    We oftentimes would get an estimated HUD prior to closing.

2   We would also get the final HUD from escrow after the transaction

3   is closed.

4   Q    Would that be after the money was already wired?

5   A    Yes.

6   Q    So if you had already wired the money at that point, why did

7   you need to get a final HUD?

8   A    We needed to have it in our file to double-check and make

9   sure everything went to where it was supposed to go to.

10  Q    What recourse would you have if the final HUD showed

11  something that happened that was unexpected?

12  A    We would ask for explanation or we could actually unfund the

13  loan.

14  Q    And have you had experiences in your job at Ownit Mortgage

15  where a loan was unfunded after the fact?

16  A    Yes, we have unfunded loans before.

17  Q    Mr. Darcy, assume that a borrower had agreed to let someone

18  else buy the property in his name, but they had a side agreement

19  that the other person would be responsible for making all the

20  payments and taking care of the property.  Is that arrangement

21  something Ownit would need to know about?

22  A    Yes, we would need to know about that.

23  Q    Why?

24  A    We wouldn't have extended the loan in that case.

25  Q    Why not?

1   A    Because the person making the payments was not actually the

2   one that qualified for the loan.  We had a straw buyer in that

3   case.  We wouldn't have extended lending.

4   Q    Whose creditworthiness would you be looking at in connection

5   with the loan?

6   A    We are looking at the borrower's credit as disclosed to us on

7   the 1003.

8   Q    And if you knew that someone else would actually be the

9   financially responsible party, whose credit would you want to be

10  looking at?

11  A    We would want to look at the credit for the person that is

12  financially responsible.

13  Q    One more question before we get to specific transactions.  Is

14  the net amount of money wired by Ownit in connection with

15  transactions typically the same as the total principal of the

16  loan or is it usually slightly less?

17  A    No, it is going to be less.

18  Q    Why is that?

19  A    Because Ownit Mortgage would withhold from the wire any of

20  our own fees.

21  Q    Let's take a look at Exhibit 164.  This is not yet in

22  evidence.  Mr. Darcy, do you recognize this document?  Can you

23  tell us what it is?

24  A    Yes, I do recognize this document.

25  Q    I can also get you a hard copy.

1   A    It might be easier to read.  This is the wire disbursement

2   form.  This is going to show the total sales price, the loan

3   amount and then the deductions from the wire.

4   Q    And does this relate to one of the duplexes listed in line 1

5   of our chart?

6   A    Yes.

7   Q    Let's zoom in on the bottom of the page.  What's the

8   principal amount of the loan here?

9   A    The loan amount is $292,500.

10  Q    And what deductions are made before arriving at the net wire

11  amount?

12          THE COURT:  Counsel, let me stop you here.  You can't

13  question on the document until you move its admission.

14          MR. SCOVILLE:  Yes, your Honor.

15  By Mr. Scoville:

16  Q    Mr. Darcy, is this the type of record that was made in the

17  course of Ownit's regular business activity as a wholesale

18  mortgage lender?

19  A    Yes.

20  Q    And was it kept in the regular course of its business

21  activity?

22  A    Yes.

23  Q    Was it prepared by an employee of Ownit with knowledge of the

24  transaction?

25  A    Yes.

1          MR. SCOVILLE:  Your Honor, I would move its admission.

2          THE COURT:  Any objection?

3          THE DEFENDANT:  No objection, your Honor.

4          THE COURT:  164 is admitted.

5          (164 admitted.)

6    By Mr. Scoville:

7    Q    So going back to looking at Exhibit 164, on the bottom half

8    of the page.  We established that the loan amount was $292,500.

9    Mr. Darcy, I want to ask you, what amounts were then deducted

10   from that before arriving at the net wire amount?

11   A    We would have deducted the underwriting fee, the admin fee to

12   Ownit, and the wiring fee, as well as any interest and impounds,

13   if we were holding impounds.  And that would all be deducted from

14   the total wire amount.

15   Q    What is the total wire amount listed in this document?

16   A    $290,541.24.

17   Q    Is that the amount found in the lower right-hand corner of

18   the document?

19   A    Yes, it is.

20   Q    Mr. Darcy, I want you to look at the following exhibits.  My

21   question to you is going to be, are those all exhibits that

22   reflect net wires like the ones we just saw?  And the exhibits

23   are -- the numbers are 165 and 166, first.  Let's start with 165

24   and 166.

25        My question to you is, are those similar net wire records for

1   the other two Puyallup duplexes?

2   A   Yes, they are.

3           MR. SCOVILLE:  The government offers 165 and 166.

4           THE DEFENDANT:  No objection.

5           THE COURT:  165 and 166 are admitted.

6           (165 & 166 admitted.)

7   By Mr. Scoville:

8   Q   Let's take a look at the 200 series.  Take a look at 245 and

9   246.  Have you reviewed 245 and 246?

10  A   Yes.

11  Q   Mr. Darcy, are those also net wire records similar to the

12  ones we just saw?

13  A   Yes, they are.

14  Q   And to which transaction do they relate?  You can reference

15  our chart, Exhibit 1.

16  A   These ones are for the transaction number two on the chart.

17          MR. SCOVILLE:  The government offers 245 and 246.

18          THE DEFENDANT:  No objections, your Honor.

19          THE COURT:  245 and 246 are admitted.

20          (245 & 246 admitted.)

21  By Mr. Scoville:

22  Q   324 is the next one on our list, Mr. Darcy.  It will be in

23  the same binder, the 200 series.

24  A   324 is not in this binder.  The page isn't there.

25  Q   We have it on the screen.  Why don't you take a look at it on

1  the screen then?  My question to you, Mr. Darcy, is, is that also

2  an Ownit net wire record, similar to the one we discussed?

3  A   Yes, it is.

4  Q   To which transaction does this relate?

5  A   This is transaction number three.

6          MR. SCOVILLE:  The government offers 324.

7          THE DEFENDANT:  No objection.

8          THE COURT:  324 is admitted.

9          (324 admitted.)

10  By Mr. Scoville:

11  Q   The next is 432.  Is this also an Ownit net wire record?

12  A   Yes, it is.

13  Q   Which transaction does it go to?

14  A   This one is for number four.

15          MR. SCOVILLE:  The government offers 432.

16          THE DEFENDANT:  No objection.

17          THE COURT:  432 is admitted.

18          (432 admitted.)

19  By Mr. Scoville:

20  Q   527 and 528.  527, Mr. Darcy.  Is this also a net wire record

21  similar to the one we discussed?

22  A   Yes, it is.

23  Q   To which transaction?

24  A   Number five.

25  Q   And 528, the same question.

1  A    Yes, that one is for number five as well.

2         MR. SCOVILLE:  The government offers 527 and 528.

3         THE DEFENDANT:  No objection, your Honor.

4         THE COURT:  They are admitted.

5         (527 & 528 admitted.)

6  By Mr. Scoville:

7  Q    Mr. Darcy, let's talk about the particular loans involved in

8  this case.  I want to focus your attention on line 1 of the

9  charts.  I would like to show you a document that is already in

10 evidence, which is Exhibit 119.  What type of document is this,

11 Mr. Darcy?

12 A    This is the loan submission and fee sheet.

13 Q    And how is this used in the Ownit Mortgage process?

14 A    This was the submission form used by the submitting broker or

15 loan officer.

16 Q    What information is reflected in Exhibit 119 regarding the

17 type of loan program being applied for?

18 A    This one is a nonowner-occupied, two-unit purchase

19 transaction, 12-month bank statement program.

20 Q    When you say "nonowner-occupied," are you referring to the

21 box that is checked in the middle of the page?

22 A    Yes.

23 Q    And would Ownit allow 100 percent financing on a

24 nonowner-occupied deal?

25 A    No.

1    Q    Why not?

2    A    It was just a higher risk loan that our investors wouldn't

3    purchase.

4    Q    From looking at the submission form, can you tell what type

5    of verification of income Ownit was going to take?

6    A    This was a 12-month bank statement program, so we would

7    request 12 months of bank statements.

8    Q    Let's take a look at Exhibit 120, also previously admitted as

9    an Ownit business record.  My question to you is, is this a

10   similar loan submission form for another one of the duplexes?

11   A    Yes, it is.

12   Q    Mr. Darcy, now let's take a look at Exhibit 121.  What is

13   this?

14   A    This is a 1003 application.

15   Q    And when in the process would this document typically be

16   signed?

17   A    We usually asked for a signed initial 1003, and then the

18   final 1003 would be signed at closing.

19   Q    Can you tell us whether this is an initial or final?

20   A    This appears to be a final 1003.

21   Q    What information is indicated in this 1003 regarding the

22   details of the transaction?  Let's zoom in on the middle portion

23   of exhibit -- the third page of 121.

24   A    This shows the purchase price, our loan amount and fees.  It

25   also shows the cash that is coming from the borrower for the

1    transaction.

2    Q    And by "cash from the borrower," is that another term for

3    down payment?

4    A    That would be down payment.

5    Q    Is there any mention of seller financing?

6    A    No, there isn't.

7    Q    And let's take a look back at the first page of this

8    Exhibit 121.   Does it reflect any information about the source of

9    the down payment?

10   A    Yes.   It indicates it is coming from a checking or savings

11   account.

12   Q    Back to the third page of 121.   There is an interviewer name

13   and a signature listed at the bottom of the form.   My question to

14   you is, why doesn't the interviewer have to sign the 1003?

15   A    They are signing the 1003 to indicate they took the

16   information from the borrower accurately.

17   Q    You said "accurately."   Why is that important?

18   A    Because we are relying on the 1003 as accurate and true

19   information in the transaction.

20   Q    Let's take a look --   It would probably be easiest if you

21   would just look at it in your binders.   It is Exhibits 122 and

22   123.   My question is going to be, what are those documents?

23   A    These are 1003s.

24   Q    Also for duplexes associated with transaction number one?

25   A    Yes, they are.

1   Q    And do they contain essentially identical information as

2   Exhibit 121?

3   A    Yes.

4   Q    Mr. Darcy, now I would like to have you look at Exhibit 167,

5   which is not yet in evidence.  It is a two-page document.  What

6   is that document?

7   A    This is part of our underwriting approval screen.  This is

8   the income analysis from our underwriting spreadsheet.

9   Q    Who would it be that would prepare this type of document in

10   the course of Ownit's mortgage lending decision?

11   A    This is a tool that would be used by the underwriters in

12   making their underwriting decision.

13   Q    Was it part of Ownit's regular business practice for

14   underwriting worksheets like this to be prepared?

15   A    Yes.

16   Q    And were they kept and maintained in the course of Ownit's

17   regular business as a wholesale mortgage lender?

18   A    Yes.

19           MR. SCOVILLE:  The government offers 167, your Honor.

20           THE DEFENDANT:  No objection, your Honor.

21           THE COURT:  167 is admitted.

22           (167 admitted.)

23   By Mr. Scoville:

24   Q    Mr. Darcy, can you tell us from looking at Exhibit 167 what

25   income figure was used by Ownit in underwriting this transaction?

1   A   We used a base income of $36,089.

2   Q   And are you looking at the second page of Exhibit --

3   A   Yes, I am looking at the second page.

4   Q   Where on the second page?

5   A   It is indicated right at the top of the page, under "Income

6   information for the primary wage earner."

7   Q   In calculating the borrower's total income, did you take

8   account of anything in addition to what was being reported as

9   base employment income?

10  A   Yes.  On this one it appears it was a bank statement program.

11  So we would have used the bank statements to calculate the

12  income.

13  Q   In addition to that --  Let's take a look at the middle of

14  the second page of Exhibit 167.  I want to focus your attention

15  on the lines underneath the printed words "Rental income

16  calculation for other rentals," which I have highlighted now on

17  the screen in front of you.  What information is reflected there?

18  A   Well, we would have used --  That would have been where we

19  entered any rental income on any other nonowner-occupied

20  properties to offset the mortgage payments in our underwriting

21  practice.

22  Q   Why would you do that?

23  A   We would want to essentially show the rent income to offset

24  those payments that would help calculate the debt ratio.

25  Q   What is the debt ratio?

A    The debt to income ratio.  It is a ratio of the debts compared to the overall income.

Q    Is that a ratio that you would calculate in the course of doing your underwriting?

A    Yes.

Q    And did you have guidelines for what types of ratios were allowable?

A    Yes, we did.

Q    And what were they?

A    With most loans we could go up to 50 percent debt to income ratio.

Q    From looking at these worksheets, Exhibit 167, can you tell us what was the calculation that Ownit arrived at regarding the total debt to income ratio for this file?

A    The total debt to income ratio on this one is 48.99 percent.

Q    How does that compare to the maximum allowable debt to income ratio that Ownit would typically extend financing on?

A    This would be less, so we would have approved the borrower based on that.

Q    I want you to assume, Mr. Darcy, that the total base employment income from the borrower was actually half of what was reported and used in this underwriting calculation.  How would that have affected Ownit's underwriting decision?

A    The debt ratio would have been too high to extend financing.

Q    Now, I would like you to assume that at least some of the

1   rental income figures were false and were inflated.  How would

2   that have affected Ownit's underwriting decision with this

3   transaction?

4   A   Again, it would have increased the debt ratio, and we

5   wouldn't have been able to extend credit.

6   Q   Thank you, Mr. Darcy.  Now, let's take a look at Exhibit 124.

7   This has previously been admitted as an Ownit business record.

8   And my question to you is, what is this?

9   A   This is the loan approval page.  This is the actual

10  underwriting approval.

11  Q   And when would this be generated?

12  A   This would have been generated after the underwriter had

13  actually approved the loan and reviewed all the documents.  They

14  would have set conditions.  And this would have been the

15  approval.

16  Q   So this would have been generated after the calculations had

17  been run that we saw in Exhibit 167?

18  A   Yes.

19  Q   Let's take a look at the language in the middle portion of

20  this document, under the typed word "conditions."  What are

21  conditions, generally speaking?

22  A   The conditions --  These would be the conditions that need to

23  be satisfied in order to fund the loan.  We would have had

24  pre-doc conditions, so those would need to be satisfied before we

25  could doc out the loans.  And then funding conditions that need

1    to be satisfied before we could actually fund the loan.

2    Q    You said "doc out the loan."  Can you tell us what that

3    means?

4    A    That means actually generate the loan documents for the

5    borrower to sign and transmit them to escrow.

6    Q    Whose responsibility would it be to make sure these

7    conditions were cleared?

8    A    We would have sent the approval to the loan officer, the

9    broker.  They would have then sent in their conditions.  It would

10   have been cleared by the underwriter.

11   Q    And would some of the conditions have been cleared by the

12   funder?

13   A    Yeah, the funding conditions would be cleared by funders.

14   Q    Let's take a look at condition number two, "Certified copy of

15   purchase agreement and all amendments."  What is the importance

16   of that condition?

17   A    We want to have a complete copy of the purchase and sale

18   agreement, to make sure we knew all the terms of the transaction

19   that were contained in that.

20   Q    And condition number three, "Lease rental agreement for

21   rental properties"?

22   A    That would have been for all nonowner-occupied properties on

23   the 1003.  We would have that condition for all the lease

24   agreements.

25   Q    Let's take a look at condition number seven.  "Proof of

1    self-employed for one year."  What does that mean?

2    A    In this case the underwriter's condition for evidence that

3    the borrower has been self-employed for a minimum of one year.

4    Q    Let's take a look at Exhibit 131, which I am going to display

5    on the right-hand side of the screen in front of you.  I will

6    keep Exhibit 124 up on the left-hand side of the screen.  What is

7    Exhibit 131?

8    A    This is a printout from the Washington State Department of

9    Revenue.  It is a business license record.

10   Q    And is this the type of document that you would usually look

11   at to verify self-employment?

12   A    Yes, this would have been acceptable documentation.

13   Q    Let's take a look at condition number nine in Exhibit 124.

14   What is that condition?

15   A    That is for a year-to-date profit and loss statement.

16   Q    Let's take a look at Exhibit 130, which I will display on the

17   right-hand side of the screen.  This has previously been admitted

18   as an Ownit business record.  What is this document?

19   A    This is a profit and loss statement.

20   Q    And is this the profit and loss statement submitted to clear

21   the condition in question, condition number nine?

22   A    Yes.

23   Q    Mr. Darcy, if information in this profit and loss statement

24   were incorrect, would that have affected Ownit's decision to

25   lend?

1  A   Yes, it would.

2  Q   Why?

3  A   We wanted to make sure that the profit and loss statement was

4  supportive of the documents -- the bank statements that we had.

5  Q   Mr. Darcy, let's take a look back at condition number 12.

6  What is that?

7  A   That is for the final typed and corrected 1008/1003 signed by

8  the borrowers.

9  Q   Is that the 1003 that we have already seen?

10  A   Yes.

11  Q   Specifically Exhibit 121?

12  A   Yes.

13  Q   Mr. Darcy, let's take a look at condition 14, "Satisfactory

14  source of funds to close, a copy of cashier's check to escrow."

15  What does that mean?

16  A   This was the condition that we wanted to make sure that we

17  had a copy of the funds needed for closing from the borrower from

18  an account listed on the 1003.

19  Q   And, finally, let's take a look at condition 15, "Seller

20  contributions limited to two percent recurring and nonrecurring

21  closing costs."  What does that mean?

22  A   The seller would only be allowed to pay for up to two percent

23  of the buyer's closing costs.

24  Q   Why?

25  A   It was one of our investor requirements on an investment

1   property.

2   Q    Now let's take a look at Exhibits 125 and 126, also

3   previously admitted as Ownit business records.  Are these loan

4   approval condition sheets like the ones we just saw in 124?

5   A    Yes.

6   Q    Also for the Puyallup duplex listed in transaction number one

7   of our chart?

8   A    Yes.

9   Q    And do they contain similar conditions to the ones we just

10  went through?

11  A    Yes, they do.

12  Q    Mr. Darcy, take a look at Exhibit 133, please, also

13  previously admitted as an Ownit business record.  What is this?

14  A    This is a fee sheet doc request form.

15  Q    And who would submit such a form to Ownit?

16  A    This would have been submitted by the loan officer or the

17  broker.

18  Q    Why is this form submitted?

19  A    This is essentially the request for documents -- for us to

20  print the loan documents.  But we also need to know the fees that

21  the broker has to charge so that we can have that reported

22  accurately on the HUD as well.

23  Q    Why do you need to know the fees that the broker is charging

24  in connection with the transaction?

25  A    Those actually need to be on the HUD, and we need to report

1  that over to escrow, as far as the doc drawing process.  We would

2  have to redraw docs if this wasn't accurate.

3  Q    If the broker were in fact getting more money in connection

4  with the transaction, would that matter to Ownit?

5  A    Yes, it would.

6  Q    Why?

7  A    It needs to be disclosed to us, what fees they were

8  collecting out of it.

9  Q    And take a look at Exhibits 134 and 135, also previously

10  admitted as Ownit business records.  Mr. Darcy, are those fee

11  sheets from Ownit's files for the other two duplexes?

12  A    Yes, they are.

13  Q    Similar to the ones we just saw in Exhibit 133?

14  A    Yes.

15  Q    Mr. Darcy, now let's take a look at Exhibit 136.  What is

16  this document?

17  A    These would have been the closing instructions to escrow.

18  Q    And what is the role of closing instructions?

19  A    This is how we instruct escrow, as far as what conditions we

20  would have for closing, as well as the loan -- specifics of the

21  loan would be included on this as well.

22  Q    Let's take a look at the bottom half of the first page of

23  Exhibit 136.  What does this closing instruction sheet indicate,

24  as far as the amount of secondary financing approved?

25  A    That there is no secondary financing.

1  Q   Mr. Darcy, now let's take a look at --  I will ask you to

2  take a look at three exhibits, review them, and let me know when

3  you're done.  I will put them on the screen.  It is 113.

4         THE COURT:  Counsel, before we move on, I have a

5  question about 135.  You should put it back up on the screen.

6      Mr. Darcy, will you help me with the form here?  It says,

7  "Account executive, Chase Costello."  I believe the next line is,

8  "Broker:  Victory Home Mortgage, Contact:  Bill."  Would you tell

9  me what those various designations are.

10         THE WITNESS:  Sure.  The account executive was our

11  mortgage rep.  They work for Ownit Mortgage.  So Chase was our

12  rep.  "Broker," that refers to the actual office, the broker that

13  we were working with on this transaction, Victory Home Mortgage.

14  The contact at that office was Bill.

15         THE COURT:  Do we know who Bill is?

16         THE WITNESS:  On this form --  Just by saying "Bill,"

17  no, other than it is signed at the bottom by Bill --

18         THE COURT:  On the bottom it says, "Broker should

19  complete this section."

20         THE WITNESS:  And then the broker signed it down at the

21  bottom.

22         THE COURT:  Do you have any personal dealings with the

23  broker?

24         THE WITNESS:  As far as what I did?

25         THE COURT:  Contacting them, yes.

1    THE WITNESS:  Yeah, at times underwriters would contact

2    the brokers or the loan officers, if needed.

3    THE COURT:  Going back up to the top, it says, "Account

4    manager, Senath Sands."

5    THE WITNESS:  Yes.

6    THE COURT:  Whose employee is that?

7    THE WITNESS:  Senath is an Ownit employee.

8    THE COURT:  And so the account executive is different

9    than the account manager?

10    THE WITNESS:  Yes.  The account executive is our sales

11    rep.  The account manager is essentially the account executive's

12    processor.  She would work inside the office.  The account

13    executive most likely is out in the field most of the time.

14    THE COURT:  I think I understand.  Thank you.

15    MR. SCOVILLE:  Your Honor, I will just note, I think

16    Senath Sands would be the government's next witness.

17    By Mr. Scoville:

18    Q    Mr. Darcy, now I would like you to take a look at

19    Exhibit 113.  It is probably best if you look through it in the

20    binder.  I would also like you to look through Exhibits 114 and

21    115.  I think this is the most efficient way to proceed.

22    My first question is going to be, what are those?

23    A    These are the purchase and sale agreements.

24    Q    And are these the ones that were contained within Ownit's

25    file?

1    A    Yes.

2    Q    For the three duplexes listed in transaction one?

3    A    Yes.

4    Q    Mr. Darcy, do those purchase and sale agreements indicate

5    that the seller was loaning money to the borrower, aside from

6    covering some of the closing costs?

7    A    No, they do not.

8    Q    And, Mr. Darcy, have you, in fact, reviewed the entire Ownit

9    file regarding these three duplexes?

10   A    Yes.

11   Q    And in those files have you found any indication that Ownit

12   was made aware that seller financing, aside from covering some of

13   the closing costs, was being extended in connection with these

14   transactions?

15   A    No, there is no evidence of that.

16   Q    Mr. Darcy, let's assume that, in fact, the seller was giving

17   the borrower a $65,000 loan in connection with each of these

18   three sales.  Is that something Ownit would have wanted to know

19   about?

20   A    Yes.

21   Q    Assuming $65,000 in seller financing, on top of the financing

22   Ownit was extending, what would be the total amount of financing

23   per duplex?

24   A    Each one would have exceeded 100 percent finance.

25   Q    Is that something that would have been acceptable to Ownit?

1   A   No.

2   Q   Why not?

3   A   We did not do any loans that exceeded 100 percent financing.

4   Q   What would be the risk in extending a loan under that type of

5   circumstance?

6   A   If we had to exercise our rights under the deed of trust, we

7   would have lost a considerable amount of money on that.

8   Q   Why?

9   A   We wouldn't have been able to foreclose on the property and

10  sell it for any amount that would cover those loans.

11  Q   Mr. Darcy, what if the seller carrybacks were in second

12  position, and yours was in first, would that still matter to you?

13  A   It would still matter to us.

14  Q   Why?

15  A   Again, we would have exceeded our maximum financing, our

16  maximum loan to value.

17  Q   Would you have wanted to know about any sort of monthly

18  payment associated with seller financing?

19  A   All of the terms of any secondary financing would have

20  affected the terms of our loan, because we would have to account

21  for that payment in our debt ratio.

22  Q   Are you saying then that the seller financing would have been

23  part of the debt ratio calculation that was on the underwriting

24  worksheets?

25  A   Yes.

Q    Mr. Darcy, whose responsibility would it have been to disclose to you that there was some sort of seller financing arrangement?

A    We would have wanted that disclosed to us by the loan officer, the broker.

Q    Why?

A    It is part of the transaction when they submitted it to us.

Q    Mr. Darcy, now let's take a look at Exhibit 140.  Zoom in on the top half of the first page of 140.  I will represent to you this has previously been admitted as an Ownit business record. What is this document, Mr. Darcy?

A    This is a final HUD settlement statement.

Q    For one of the three duplexes listed in line 1?

A    Yes.

Q    And what kind of information does a final HUD settlement statement tell Ownit?

A    This is going to tell us where all the funds went in the transaction.

Q    And does it also tell you something about where they are coming from?

A    It will also tell us where funds are coming from as well, yes.

Q    What would it tell you about where the funds are coming from?

A    If there was any subordinate financing, it would need to be shown on the HUD.

1  Q    Mr. Darcy, let's take a look at the middle third of the first

2  page of Exhibit 140.  What does Exhibit 140 indicate, as far as

3  the money, the cash the borrower was bringing to the closing?

4  A    This shows the borrower is bringing in $31,625.75.

5  Q    Take a look at the right-hand side of this first page of

6  Exhibit 140.  Let's also look at the second page.  I want to ask

7  you, does Exhibit 140 indicate any sort of seller carryback being

8  supplied in connection with the transaction?

9  A    No, it does not.

10  Q    Now, let's take a look at the bottom half, the second page of

11  Exhibit 140.  I want to focus your attention on the line that

12  says, "Bill to Nedd, copy of, for the amount of $65,000."  What

13  does that indicate?

14  A    That indicates that escrow paid out some of the seller's

15  proceeds to a third-party.

16  Q    Some sort of bill?

17  A    It could have been a bill.

18  Q    As long as that money wasn't going back in the pocket of the

19  borrower, would Ownit have cared particularly exactly who that

20  money went to?

21  A    No.  The seller could have spent their proceeds on anything

22  else, as long as it didn't go back to the buyer.

23  Q    But if it was going back to the buyer, how would that have

24  affected Ownit's decision?

25  A    Well, then the funds disclosed wouldn't have been the buyer's

1   own funds as disclosed on the 1003, and, per our guidelines, we

2   wouldn't have funded the loan.

3   Q    Let's take a look at Exhibit 142, also previously admitted as

4   an Ownit business record.  What is this document?

5   A    This is a final HUD settlement statement.

6   Q    And let me ask you, where does it say that it is final as

7   opposed to estimated?

8   A    It says that right in the top part above lines J and K.  It

9   will say the settlement date and then it will say "final."

10  Q    And if it was estimated, would that word be changed?

11  A    It would say "estimated."

12  Q    Is this another HUD for one of the three duplexes?

13  A    Yes, it is.

14  Q    And what does this HUD indicate, as far as funds that the

15  borrower was bringing to close the transaction?

16  A    This shows they are bringing in cash of $32,197.

17  Q    Does this HUD indicate any sort of seller financing, aside

18  from some sort of small contribution towards closing costs?

19  A    No, it does not.

20  Q    Let's take a look at the bottom half of the second page of

21  Exhibit 142.  I will focus your attention on the $65,000 entry

22  regarding notes, under "additional settlement charges."  What

23  does that indicate to Ownit?

24  A    Again, it indicates that part of the seller's proceeds were

25  paid out to a third-party.

1  Q    And as long as it was really a third-party, as opposed to the

2  borrower, would Ownit have cared particularly where that money

3  was going?

4  A    No.

5  Q    But if it were the borrower who was, in fact, getting that

6  $65,000, would that have mattered?

7  A    Yes, it would.

8  Q    Mr. Darcy, now I want you to take a look at Exhibit 101,

9  which is a summary chart that is not yet in evidence.  I will

10  zoom in on the top portion of the page.  Mr. Darcy, do you

11  recognize this document?

12  A    Yes, I do.

13  Q    Have you previously reviewed this summary chart?

14  A    Yes.

15  Q    Does it accurately summarize information reported to Ownit in

16  connection with the loan applications for the three duplexes we

17  have discussed?

18  A    Yes, it does.

19        MR. SCOVILLE:  Your Honor, the government offers

20  Exhibit 101.

21        THE DEFENDANT:  No objection, your Honor.

22        THE COURT:  101 is admitted.

23        (101 admitted.)

24  By Mr. Scoville:

25  Q    Mr. Darcy, let's just take a look at some of the information

1    in Exhibit 101.  First, in the upper left-hand portion of

2    Exhibit 101, we have entries for the loan and for supporting

3    documents, what type of information is reflected there?

4    A    It is showing the employer information, and it is showing the

5    monthly income reported, and the total assets that the borrower

6    had.  The supporting documents -- it is showing the list of

7    documentation that we have to support all that information in the

8    file.

9    Q    Let's go down to the first light green box with lender

10   records on top.  That is immediately to the left of a small

11   diagram of a house.  What information is shown there?

12   A    That is showing our loan number and the loan amount, plus the

13   amount required from the buyer for their down payment.

14   Q    Is that showing information about the funds going into the

15   transaction?

16   A    Yes, it does.

17   Q    As far as what was reported to Ownit?

18   A    Yes.

19   Q    And then let's take a look at the light green rectangle over

20   to the right of the house that we were just discussing.  What

21   information is reflected there?

22   A    That shows where funds went to, out of the transaction.

23   Q    Is that information largely drawn from the final HUDs?

24   A    Yes, it is.

25   Q    Now I want to focus your attention on the transaction

1   described in line 2 of our chart.  Have you reviewed records

2   regarding that transaction?

3   A    Yes, I have.

4   Q    And let's take a look at Exhibit 218.  What is this?

5   A    This is the loan submission sheet.

6   Q    Like the type we just saw?

7   A    Like the other ones, yes.

8   Q    And let's zoom in on the top half of the sheet.  What loan

9   program does it indicate was being applied for here in connection

10  with transaction number two on our chart?

11  A    This submission is for an owner-occupied single-family

12  purchase transaction.  It is stated income with two loans.  It is

13  100 percent finance.

14  Q    Would Ownit extend 100 percent financing for anything other

15  than an owner-occupied loan?

16  A    No, we wouldn't.

17  Q    And what does this submission form indicate was the type of

18  verification of income that Ownit is going to be --

19  A    This was stated income.

20  Q    What type of verification would Ownit request from the

21  borrower regarding income or employment?

22  A    We would have verified the employment.  Usually stated income

23  was for self-employed borrowers, so we would want to have a copy

24  of their business license, most likely, in the file.

25  Q    Let's take a look at Exhibit 220.  What is this?

1    A    This is a final 1003.

2    Q    For transaction number two?

3    A    Yes.

4    Q    And what is listed in the final 1003 regarding the borrower's

5    intended use for the home being purchased?

6    A    This is to be his primary residence.

7    Q    And what's listed regarding the borrower's employment?

8    A    He has been self-employed for three years as an owner of a

9    landscaping business.

10   Q    Let's take a look at the income information.  I am looking at

11   the second page of Exhibit 220.  What income information is

12   reflected?

13   A    This is showing a base income of $9,700 a month.

14   Q    Let's take a look at Exhibit 247, which is not yet in

15   evidence.  It is a two-page document that I will ask you:  What

16   is this?

17   A    This is our income analysis pages from our underwriting

18   spreadsheet.

19   Q    So are these worksheets in Exhibit 247 the same type of

20   documents that we were looking at when we were looking at

21   Exhibit 167 in connection with the duplexes?

22   A    Yes, they are.

23            MR. SCOVILLE:  Your Honor, the government offers 247.

24            THE DEFENDANT:  No objections, your Honor.

25            THE COURT:  247 is admitted.

```
 1              (247 admitted.)
 2    By Mr. Scoville:
 3    Q   Mr. Darcy, let's start with the second page of Exhibit 247.
 4              THE COURT:  Mr. Scoville, before you proceed,
 5    Mr. Ratner, do you have 247?  The Court doesn't.  We don't have
 6    247, 248, 249 and 250.
 7              MR. SCOVILLE:  I think 247 is the last one in the 200
 8    series that is supposed to be in the binder.  It is a recent
 9    addition to the exhibit list.
10        While we are sorting that out, why don't I move on to
11    something else?
12              THE CLERK:  The witness has it.
13              MR. SCOVILLE:  Let's move on to something else.  We will
14    walk through the underwriting calculation when we get the copies
15    in the room.  I apologize for that, your Honor.
16    By Mr. Scoville:
17    Q   Let's take a look at Exhibit 222 in the meantime so as not to
18    waste time.  Mr. Darcy, what is Exhibit 222?
19    A   This is the loan approval screen.
20    Q   And does this contain conditions listed for the approval?
21    A   Yes, it does.
22    Q   And, by the way, at the bottom of the screen, the bottom of
23    Exhibit 222, does it indicate who the underwriter was?
24    A   Yes, it does.
25    Q   Who was it?
```

1    A    I was the underwriter on this one.

2    Q    Mr. Darcy, what conditions do we see in Exhibit 222?

3    A    These would have been all the conditions set for both prior

4    to docs and funding.

5    Q    Take a look at condition number two, "Certified copy of

6    purchase agreement and all amendments."  What is the importance

7    of that condition?

8    A    Again, we wanted to have a complete copy of the purchase

9    contract and all amendments, to make sure it matched our

10   guidelines in the transaction.

11   Q    Let's take a look at the condition regarding seller

12   contributions, condition 17.  What is the importance of that

13   condition?

14   A    Seller contributions were limited to a maximum of six percent

15   recurring/nonrecurring closing costs.

16   Q    There was some sort of 20 percent seller financing agreement

17   negotiated in connection with this transaction.  Would that

18   violate that condition?

19   A    Yes, it would.

20   Q    Mr. Darcy, let's take a look at Exhibit 221.  What is this?

21   A    This is a final 1003 for this transaction.

22   Q    Is this for the first mortgage or the second mortgage?

23   A    This is for the second mortgage.

24   Q    You may want to look through it in your binder to make it

25   easier.  Does it contain information similar to the information

1  we saw in Exhibit 220?

2  A    Yes, it does.

3  Q    The other 1003.  Mr. Darcy, have you reviewed the Ownit

4  file -- the complete Ownit file regarding transaction number two?

5  A    Yes, I have.

6  Q    Did anything in that file indicate that Ownit was made aware

7  that some sort of seller financing was being extended in

8  connection with transaction number two?

9  A    No.

10 Q    If, in fact, the seller had agreed to lend approximately

11 $62,000 to the buyer in connection with this transaction, secured

12 by the property, is that something that would have been important

13 to Ownit?

14 A    Yes, it would.

15 Q    Why?

16 A    Our loans combined were 100 percent.  That would have

17 exceeded our combined loan to value.

18 Q    Now, let's take a look at Exhibit 232.  What is this

19 document?

20 A    This is the final HUD settlement statement.

21 Q    And where did Ownit think, based on this final HUD settlement

22 statement, that this money going into the transaction was coming

23 from?

24 A    This was coming from a second mortgage with Ownit Mortgage.

25 We were 100 percent financed, plus the seller credit to the

1   buyer.

2   Q    Anything aside from that?

3   A    No.  Other than their earnest money down payment that was

4   made.

5   Q    Does the final HUD indicate anything regarding a seller

6   carryback?

7   A    No, it does not.

8   Q    Let's take a look at the second page of Exhibit 232.  In

9   particular, zoom in on the bottom half of the second page.  I

10  want to focus your attention on the entry entitled, "Transfer new

11  purchase to TransNation Escrow," in the amount that appears to be

12  $55,320.  Do you see that entry?

13  A    Yes, I do.

14  Q    What does that indicate to Ownit was happening to that

15  portion of the seller proceeds?

16  A    The seller was buying a new property, and they were

17  transferring that money to TransNation Escrow for that purpose.

18  Q    If, in fact, a substantial portion of that money was going

19  back to the buyer, is that something that would have made a

20  difference to Ownit?

21  A    Yes, it would.

22  Q    Why?

23  A    We wouldn't have extended credit.  If it was a loan that

24  exceeded 100 percent loan to value -- combined loan to value.  If

25  it was done as a credit, it would have exceeded our six percent

1   allowed credit from the seller to the buyer.

2   Q    Mr. Darcy, let's take a look at Exhibit 201, another summary

3   chart.  Have you previously reviewed this summary chart?

4   A    Yes, I have.

5   Q    Does it accurately reflect information communicated to Ownit

6   regarding transaction number two?

7   A    Yes, it does.

8            MR. SCOVILLE:  The government offers Exhibit 201.

9            THE COURT:  Any objection?

10           THE DEFENDANT:  No objection, your Honor.

11           THE COURT:  201 is admitted.

12           (201 admitted.)

13  By Mr. Scoville:

14  Q    Mr. Darcy, take a look at transaction number three on the

15  chart.  Have you reviewed Ownit records regarding that

16  transaction?

17  A    Yes, I have.

18  Q    And were you the underwriter for that transaction?

19  A    Yes, I was.

20  Q    Let's take a look at Exhibit 313.  Is this a loan approval

21  notification?

22  A    Yes.

23  Q    Does it indicate you were the underwriter?

24  A    Yes, it does.

25  Q    And what loan program were we dealing with in transaction

1   number three, according to this loan approval notification?

2   A    This was a nonowner-occupied, single-family purchase

3   transaction, stated income.

4   Q    What would be the allowable combined loan to value in

5   connection with this transaction?

6   A    90 percent.

7   Q    Let's take a look at Exhibit 311.  I want to go to 310 first.

8   This has previously been admitted as an Ownit business record.

9   What is Exhibit 310?

10  A    This is a 1003.

11  Q    Is this an initial or final 1003, can you tell us?

12  A    I believe that was the final 1003.

13  Q    So from the first page of Exhibit 310, can you tell us who

14  did Ownit think was the borrower in connection with this

15  transaction?

16  A    The borrower in this transaction was Armenuhi Harutyunyan.

17  Q    Armenuhi Harutyunyan?

18  A    Yes.

19  Q    What did Ownit think, based on this 1003, was her employment?

20  A    Self-employed at Hay Computer and Consulting.

21  Q    Let's take a look at the second page.  What was Ownit told

22  about her income?

23  A    Her base income was $37,000 a month.

24  Q    What kind of verification would Ownit have done for

25  employment?

1    A    We would have verified that she was self-employed for one or

2    two years, and had a business license in the file.

3    Q    Let's take a look at Exhibit 311.  What is this exhibit?

4    A    This is a verbal verification of employment form.

5    Q    And what does it indicate was done to verify

6    Ms. Harutyunyan's employment?

7    A    There was a business license attached.

8    Q    Let's take a look at the second page of Exhibit 311.  Is that

9    a business license?

10   A    Yes, it is.

11   Q    And what is the significance of this business license to

12   Ownit?

13   A    This would have shown that the borrower was self-employed, a

14   sole proprietorship, and it would list the business name.  This

15   would verify the income.

16   Q    Mr. Darcy, was this a full document loan or a stated income?

17   A    No, this was a stated income loan.

18   Q    So what type of verification of the claimed $37,000 income

19   per month would you have done?

20   A    We would have verified the self-employment.  We also, during

21   the course of underwriting, would have reviewed all the credit

22   documentation, the credit report, the 1003, and we would want to

23   make sure the stated income was reasonable for the employment

24   stated on the application.

25              MR. SCOVILLE:  Your Honor, may I inquire whether the

1    court and opposing counsel have Exhibit 325?  I want to make sure

2    we don't run into the same problem.

3              THE COURT:  I can't speak for Mr. Poff, but I don't have

4    325.

5              MR. RATNER:  We don't have it either.

6              MR. SCOVILLE:  Once again, I am sorry about that.

7    By Mr. Scoville:

8    Q    Mr. Darcy, you said with stated income you had to see that

9    the claim of income was reasonable for the employment?

10   A    Yes.

11   Q    What do you mean by that?

12   A    I guess the only way I can describe it --  As an example,

13   when I was teaching underwriters or coaching them, the example of

14   stated income for somebody who works at a fast food restaurant

15   and stating they make $15,000 a month.  That is not reasonable

16   for that job for them to make that much money.  So it was a

17   reasonableness.  Along with that, we would take a look at the

18   credit report and what they have indicated as their assets, does

19   that make sense as well with what they are stating for the job

20   and the income.

21   Q    Let's take a look at Exhibit 313 again.  And I want to focus

22   your attention on condition number 12, "Satisfactory source of

23   funds to close."  Do you see that condition?

24   A    Yes.

25   Q    And what's indicated to the right where it says, "Copy of

1  cashier's check to escrow from account listed on 1003."  What

2  does that mean?

3  A    That means any funds that the borrower needed to bring in to

4  close, their down payment, would have to come from an account

5  that was listed on the application.

6  Q    Why was that important?

7  A    It was to verify that it was their own funds.

8  Q    Let's take a look at Exhibit 314, also previously admitted as

9  an Ownit business record.  What is this document?

10  A    This is a trailing document transmittal.  This would have

11  been used when we received documents after the loan had been

12  funded and shipped.

13  Q    And, in particular, what trailing document do we have here?

14  A    This is for the final HUD.

15  Q    So let's take a look at the second page of Exhibit 314.  What

16  is this second page?

17  A    This is the final HUD settlement statement.

18  Q    And what does this HUD settlement statement indicate were the

19  funds the borrower was bringing in to close the transaction?

20  A    This shows an additional deposit from the borrower.

21  Q    For how much?

22  A    For $98,000.

23  Q    Is that the writing I have just highlighted in entry 204 of

24  the HUD?

25  A    Yes.

Q    And let's take a look at Exhibit 315, also previously
admitted as an Ownit Mortgage business record.  What is this?

A    This is a copy of an official check from Washington Mutual.

Q    For how much?

A    For $98,000.

Q    The same amount we just saw for the additional deposits
reflected in the final HUD?

A    Yes.

Q    And who is the remitter?

A    It is the borrower.

Q    Mr. Darcy, if this check were a forgery, would that matter to
Ownit?

A    Yes, it would.

Q    Why?

A    It would have affected the funds that the borrower brought
in.  If it was a forgery, they didn't really bring in the
required funds to close.

Q    Why would that matter?

A    We wouldn't be able to close on the transaction.  They
wouldn't have had sufficient funds.  Escrow wouldn't have been
able to disburse funds.

Q    What would that indicate to Ownit about the risk of the loan,
if, in fact, the borrower wasn't bringing in the funds they
claimed?

A    It would have been a higher risk loan.  We wouldn't have

1   funded it.

2   Q    Mr. Darcy, would you take a look at Exhibit 301?  Do you

3   recognize this chart?

4   A    Yes, I do.

5   Q    Have you previously reviewed it?

6   A    Yes.

7   Q    Does it accurately summarize information that Ownit relied on

8   in extending the financing for transaction number three?

9   A    Yes.

10          MR. SCOVILLE:  The government offers 301.

11          THE DEFENDANT:  No objection, your Honor.

12          THE COURT:  301 is admitted.

13          (301 admitted.)

14          MS. VOGEL:  Your Honor, may I address the missing

15   exhibits?

16          THE COURT:  Why don't you wait until around 10:30.

17   By Mr. Scoville:

18   Q    Let's take a look at transaction number four.  Mr. Darcy, are

19   you familiar with Ownit's business records regarding transaction

20   four?

21   A    Yes, I am.

22   Q    Were you the underwriter for that one too?

23   A    Yes, I was.

24   Q    Let's take a look at 412.  What's 412?

25   A    This is the submission sheet for the loan.

Q    I am looking at this submission sheet.  Can you tell us what type of loan was being applied for here?

A    Yes.  This was a loan for a nonowner-occupied single-family residence purchase transaction, stated income, 90 percent loan to value.

Q    Let's take a look at Exhibit 420, also previously admitted as an Ownit business record.  What is this?

A    This is the underwriting approval.

Q    For transaction number four?

A    Yes.

Q    Regarding the conditions, what does it indicate regarding self-employment?

A    We are asking for proof of self-employment for one year.

Q    And what does it indicate regarding the source of funds to close?

A    Asking for a satisfactory source of funds to close, a copy of a cashier's check from an account listed on the 1003.

Q    Does it indicate the approval of any sort of secondary financing above and beyond the financing Ownit was providing in connection with the transaction?

A    No.

Q    Let's take a look at Exhibit 413.  What is this?

A    This is the final 1003.

Q    And who is listed as the borrower?  Is it the same, Ms. Harutyunyan, that we were talking about?

1   A   It is the same borrower.

2   Q   In connection with number three?

3   A   Yes.

4   Q   Does this 1003 indicated the same things about

5   Ms. Harutyunyan's employment income that we saw in connection

6   with the 1003 for transaction number three?

7   A   Yes, it does.

8   Q   Let's take a look at the third page of 413, "Details of

9   transaction."  What does this exhibit list in terms of

10  subordinate financing?

11  A   There is no subordinate financing.

12  Q   Let's take a look at Exhibit 422.  What's this?

13  A   This is the final HUD settlement statement.

14  Q   Does this final HUD settlement statement indicate that the

15  buyer was going to get some second mortgage in connection with

16  the deal?

17  A   No, the buyer is not getting any secondary financing.

18  Q   Now, let's zoom in on the lower right portion of the first

19  page of Exhibit 422.  I want to focus your attention on the line

20  regarding pay off of second mortgage loan, $59,975.80.  What does

21  that indicate to Ownit?

22  A   That we were paying off the second mortgage that was already

23  attached to the property that belonged to the seller.

24  Q   If that existing second mortgage on the property were

25  actually going to be re-subordinated in the deal, re-subordinated

1   to Ownit's new mortgage, would that have mattered to you?

2   A    Yes, it would.

3   Q    Why?

4   A    The property would have been financed higher than our

5   allowable loan to value.  We would also need to know the terms of

6   that loan.  In a transaction like this, it would have to be

7   cleared from title for us to proceed, for the property to be

8   conveyed.

9   Q    Why would you need to know the terms of that loan?

10  A    We would need to make sure it matched our investor and

11  company guidelines for any subordinate financing.

12  Q    If there were monthly payments associated with that loan, is

13  that something that Ownit would have wanted to take into account?

14  A    Yes, we would have that as the debt ratio.

15  Q    Let's take a look at Exhibit 401.  What is this?

16  A    The summary chart of this transaction.

17  Q    Have you previously reviewed it?

18  A    Yes, I have.

19  Q    Does it accurately summarize information that Ownit relied

20  upon in connection with transaction number four?

21  A    Yes.

22          MR. SCOVILLE:  The government offers 401.

23          THE DEFENDANT:  No objections, your Honor.

24          THE COURT:  401 is admitted.

25          (401 admitted.)

By Mr. Scoville:

Q    Transaction number five, are you familiar with that transaction?

A    Yes, I am.

Q    Were you the underwriter?

A    No, I was not.

Q    Have you reviewed Ownit's business records regarding it?

A    Yes.

Q    Let's take a look at Exhibit 512.  What is this?

A    This is the loan approval.

Q    What type of loan do we have here -- or loans?

A    This is for an owner-occupied single-family purchase.  It is a full bank statement -- full doc deal and bank statements.  It is for two loans, with a combined loan to debt value of 90 percent.

Q    You said "owner occupied."  Would it matter if it was being purchased for some other purpose?

A    Yes, it would.

Q    Why?

A    We would not have extended this loan product to them.

Q    And how would the interest rate have compared on any type of financing you might have been able to extend to them if it were other than owner occupied?

A    It would be a higher interest rate as well.

Q    Why?

```
 1   A    It was a higher risk loan, for investments/second homes.
 2   Q    Let's take a look at Exhibit 509.  What is this exhibit?
 3   A    This is the final 1003.
 4   Q    And what does it say about owner occupancy?
 5   A    It shows it is going to be the primary residence.
 6   Q    How about employment, what does it say about the borrower's
 7   employment?
 8   A    The borrower is self-employed as a mortgage broker.
 9   Q    For what company?
10   A    For Fidelis Enterprises.
11   Q    And how about income?  Let's look at the second page of
12   Exhibit 509.  What does it indicate as far as the borrower's
13   income?
14   A    It states a monthly income of $53,333.
15   Q    Mr. Darcy, if the borrower were, in fact, not employed at
16   Fidelis Enterprises, would that have mattered to Ownit?
17   A    Yes, it would.
18   Q    Why?
19   A    It was stated on the 1003 that the borrower is self-employed.
20   Q    How about if the income were less than $53,333, would that
21   have mattered?
22   A    Yes, it would.  It would affect the debt ratio of the
23   transaction.
24   Q    Mr. Darcy, let's take a look at Exhibit 516.  What is this?
25   A    This is the final HUD settlement statement.
```

1   Q    And what does this final settlement statement indicate, as

2   far as where the funds were coming from to close the transaction?

3   A    It is coming from the two Ownit loans, plus an additional

4   deposit from the borrower.

5   Q    I am going to keep that additional deposit entry from the

6   first page of 516 on the left-hand side of the screen.  On the

7   right-hand side of the screen I want to put the second page of

8   Exhibit 516.  I will zoom in on the upper left-hand corner of the

9   document.  Do you see the entries on the second page of

10  Exhibit 516 regarding commissions?

11  A    Yes.

12  Q    In particular, the entry regarding the commission to U.S.

13  Realty and Investments for $22,000?

14  A    Yes.

15  Q    Mr. Darcy, assume for the moment that the additional deposit

16  of $120,000 being brought in to close the transaction was, in

17  fact, made up, at least in part, of the $22,000 commission U.S.

18  Realty and Investments was pulling out of the transaction.  Would

19  that have mattered to Ownit?

20  A    Yes, it would.

21  Q    Why?

22  A    It wasn't the borrower's own funds.  And part of our

23  condition for this was that they bring in money from an account

24  listed on the 1003, from their own funds.

25  Q    Is there any indication that Ownit was made aware that part

```
1    of this additional deposit was coming from the U.S. Realty fee
2    and commission --
3    A    No.
4    Q    -- that it was getting out of the transaction?
5    A    No, there is no indication of that.
6    Q    Mr. Darcy, take a look at Exhibit 501.
7              THE COURT:  Are we moving to a new transaction?
8              MR. SCOVILLE:  No.  We are closing out this transaction.
9    By Mr. Scoville:
10   Q    501, the summary chart for the Yelm transaction.  Have you
11   previously reviewed this summary chart?
12   A    Yes, I have.
13   Q    Does it accurately summarize information communicated to
14   Ownit, and relied on by Ownit, in connection with transaction
15   number five?
16   A    Yes.
17             MR. SCOVILLE:  The government offers 501.
18             THE DEFENDANT:  No objections, your Honor.
19             THE COURT:  501 is admitted.
20             (501 admitted.)
21             MR. SCOVILLE:  Your Honor, this would be a good point to
22   break.
23             THE COURT:  All right.  Ladies and gentlemen, we will
24   take our morning break at this time.  I will see you all back out
25   at 10:45.  We will be in recess.
```

1    (At this time a short break was taken.)

2              THE COURT:  Mr. Scoville.

3              MR. SCOVILLE:  Yes, your Honor.

4    By Mr. Scoville:

5    Q    Mr. Darcy, let's go back to some questions I started asking

6    you about before the problem of the missing exhibits.  First,

7    247, what is this exhibit?

8    A    This is one of the underwriting worksheets.  This is part of

9    the spreadsheet we used to underwrite.

10   Q    Is this for transaction number two?

11   A    Yes, it is.

12   Q    Again, were you the underwriter for that transaction?

13   A    Yes.

14   Q    So from --  First, let me ask you, are these underwriting

15   worksheets documents created by Ownit employees in the course of

16   its business as a wholesale mortgage lender?

17   A    Yes.

18   Q    Were they created by an employee with knowledge of the

19   transaction?

20   A    Yes.

21   Q    And were they kept and maintained in the regular course of

22   business activity?

23   A    Yes.

24             MR. SCOVILLE:  The government offers 247.

25             THE DEFENDANT:  No objection, your Honor.

```
 1              THE COURT:  247 is admitted.

 2              (247 admitted.)

 3   By Mr. Scoville:

 4   Q    Mr. Darcy, from looking at Exhibit 247, can you tell us how

 5   much income you used in your calculation as the borrower's base

 6   employment income?

 7   A    Yeah.  $9,700 a month.

 8   Q    How did that then factor into your debt to income ratio

 9   calculation?

10   A    The debt ratio was at 29.83 percent.

11   Q    Mr. Darcy, if in fact the borrower's income had been

12   approximately $2,000 a month, how would that have affected your

13   calculation?

14   A    It would have changed the debt ratio on this program.

15   Q    And in particular, would the resulting debt ratio, assuming a

16   $2,000 monthly income, have been an acceptable one to Ownit?

17   A    The borrower would not have qualified on that income.

18   Q    Mr. Darcy, let's now take a look at Exhibit 325.  This is not

19   in evidence.  Please look at the document, it is a two-page

20   document, and tell me what it is?

21   A    These are underwriting worksheets.

22   Q    For which property?

23   A    This one is for transaction number three.

24   Q    Again, is this type of underwriting worksheet an Ownit

25   business record?
```

1    A    Yes.

2    Q    Kept and maintained in the course of Ownit's business?

3    A    Yes.

4            MR. SCOVILLE:  The government offers 325.

5            THE DEFENDANT:  No objection, your Honor.

6            THE COURT:  325 is admitted.

7            (325 admitted.)

8    By Mr. Scoville:

9    Q    Mr. Darcy, when we were looking at the 1003 for transaction

10   number three, we saw a figure of $37,000 in monthly income

11   reported.  Can you tell me, did you use that figure or did you

12   use something less in your underwriting calculation for this

13   transaction?

14   A    No, I used the lesser amount of income on this transaction

15   than what is stated on the 1003.

16   Q    How much income did you use?

17   A    I used $20,000 a month.

18   Q    Why did you do that?

19   A    We didn't need to use the full amount to qualify the

20   borrower.  So it is more or less like a compensating factor.

21   Q    So if you didn't actually use the $37,000 figure and plug it

22   into your debt to income calculations, did that $37,000 figure

23   just not matter to you at all?

24   A    No.  It still mattered to us, yes.

25   Q    Why?

1   A    That is what the borrower stated on the 1003 as their income.

2   Q    Mr. Darcy, take a look at the debt to income ratio

3   calculations contained in Exhibit 325, and tell me -- assuming

4   that the borrower was making $2,000 to $3,000 a month, instead of

5   $20,000, which you used, or $37,000 that was reported, would that

6   have affected your decision?

7   A    Yes, it would have.

8   Q    In particular, how?

9   A    The debt ratio would have been too high and I would not have

10  approved the loan.

11  Q    Let's take a look at Exhibit 433.  What is this document?

12  A    This is the underwriting worksheet.

13  Q    For which transaction in particular?

14  A    This one is for transaction number four.

15       MR. SCOVILLE:  The government offers 433.

16       THE DEFENDANT:  No objection, your Honor.

17       THE COURT:  433 is admitted.

18       (433 admitted.)

19  By Mr. Scoville:

20  Q    Let's take a look at the second page of 433.  Mr. Darcy, did

21  you here again use the lower $20,000 figure?

22  A    Yes, I did.

23  Q    And, again, looking at your calculations reflected in this

24  worksheet, assuming that the borrower was, in fact, making more

25  like $3,000 a month, would that have affected your calculation?

1  A    Yes, it would have.

2  Q    How?

3  A    The debt ratio, again, would have been too high, and I would

4  not have approved the loan.

5  Q    Mr. Darcy, let's take a look at Exhibit 529.  What is this?

6  A    This is an underwriting worksheet for transaction number

7  five.

8           MR. SCOVILLE:  The government offers 529.

9           THE DEFENDANT:  No objections, your Honor.

10          THE COURT:  It is admitted.  It may be published.

11          (529 admitted.)

12 By Mr. Scoville:

13 Q    Mr. Darcy, I am looking at 529.  Can you tell us what figure

14 you used for the borrower's income?

15 A    $55,123 a month.

16 Q    Let's assume that the income were half of that figure, would

17 that have affected your calculations?

18 A    It would have affected the debt ratio.  It would have been

19 too high to approve the loan.

20 Q    Mr. Darcy, does your underwriting worksheet contained here in

21 Exhibit 529 contain information about how this borrower was

22 verified?

23 A    This is a bank statement transaction, so the bank statement

24 calculations were completed on this page right here.

25 Q    This is the third page of Exhibit 529?

1    A    Yes.

2    Q    And what kind of bank statement calculations did you do?

3    A    The underwriter on this would have scrutinized the bank

4    statement, the total deposits and the total income, and would

5    have used income, per our guidelines, that was acceptable off the

6    bank statements.

7    Q    Mr. Darcy, if some of those deposits -- or a substantial

8    portion of those deposits in the bank statements were proceeds of

9    borrowed money, other loans, would that have mattered to Ownit?

10   A    If they were unusually high deposits, yes, it would.

11   Q    And why would that matter?

12   A    Because it wouldn't have been income that we would have

13   allowed on this program.

14   Q    Would Ownit have viewed borrowed money that the buyer, in

15   connection with the underlying sale transaction, was obligated to

16   repay as income?

17   A    No.

18   Q    Why not?

19   A    Again, they didn't earn the money, it was borrowed funds.  We

20   couldn't have counted it as income.

21   Q    You said that the underwriter would have looked at the

22   deposits being made into the bank statements.  If the borrower's

23   claimed employment in connection with the transaction was that of

24   a real estate agent, how might that have affected the

25   underwriter's consideration of deposits going into the bank

1   statements?

2   A   The underwriter would have looked at all the deposits coming

3   in.  With a real estate agent, high deposits could easily have

4   been commissions from real estate transactions that they earned.

5   They would have counted it as income.

6   Q   Mr. Darcy, how is it that Ownit actually transmits the loan

7   proceeds when it comes time to fund the loans?

8   A   They wire the funds.

9   Q   And how, in particular, are those funds wired?

10  A   Those funds were wired from our bank to escrow.

11  Q   And where was Ownit's banking facility located?

12  A   Our funding department was out of California, and they would

13  have set up the wires either there or in the branch to come out

14  of our warehouse lines.

15  Q   Mr. Darcy, take a look at Exhibit 530.  My question to you

16  is, what is this document?

17  A   This is an underwriting spreadsheet.

18  Q   To which transactions does it pertain?

19  A   This is for transaction number five.

20  Q   So how does this relate to 529?  What is the difference

21  between 529 and 530?

22  A   The underwriting worksheet could have been generated --

23  Well, this would have been the second right here.

24  Q   So 529 was for which of the two?

25  A   Was for the first mortgage lien, and this would have been for

1   the second lien.

2           MR. SCOVILLE:  The government offers 530.

3           THE DEFENDANT:  No objection, your Honor.

4           THE COURT:  530 is admitted.

5           (530 admitted.)

6   By Mr. Scoville:

7   Q   Mr. Darcy, does 530 reflect the same types of calculations

8   that we saw in 529?

9   A   Yes, it does.  They would be identical.

10          MR. SCOVILLE:  No further questions.

11          THE COURT:  Thank you.  Mr. Poff.

12                      CROSS-EXAMINATION

13  By the Defendant:

14  Q   Good afternoon, sir.

15  A   Good afternoon.

16  Q   Can you explain where your office, where you did your

17  underwriting, was located at?

18  A   We had an office in Kirkland originally, and then we moved to

19  Bellevue towards the end of the company.

20  Q   Thank you.  You talked a little bit about stated loans

21  before.  Was there an industry standard on what a -- a definition

22  on what a stated loan is?  What was the understanding of what it

23  is?

24  A   There wasn't really like an industry standard.  We did have

25  specific guidelines for our company and for our investors for

1   stated income.

2   Q    What were those guidelines, if you recall, sir?

3   A    I don't recall all of them.  But for stated income it was

4   used primarily for self-employed borrowers.

5   Q    In your company was some of the guidelines -- was there a

6   requirement for supporting documentation for a stated income

7   loan?

8   A    I'm sorry?

9   Q    Was there any supporting documentation for a stated income

10   loan?

11   A    We required proof of self-employment for self-employed

12   borrowers.

13   Q    Proof of self-employment.  Thank you.  Why would that be?

14   A    We wanted to verify that they were self-employed for the

15   required amount of time that our guidelines allowed for.

16   Q    Now, you had account reps that went around to different

17   brokerages, and they would what, basically solicit your

18   products -- your line of products that you had?

19   A    The reps were our salespeople, so they were going out to

20   offices, yes.

21   Q    And would they sit down and go through some of the

22   requirements that you as an underwriter would require on each of

23   the loans?

24   A    I don't know what they would have done out in the field.

25   Q    By your understanding, would that be part of their training,

1   or do you know their job?

2   A   I really don't -- can't speak for what the account reps were

3   doing out in the field.

4   Q   Would it be okay if someone got secondary financing after the

5   closing?  Would that affect the decision on a purchase?

6   A   Define "after the closing."  Immediately after closing?

7   Several weeks afterwards?

8   Q   Any time frame after the close of the purchase, would

9   secondary financing violate any of your criteria?

10  A   As long as those funds were not used in the purchase of the

11  home.

12  Q   Okay.  If someone had bought an investment property, would

13  the lender be interested in or did they ever ask if there was a

14  non-borrowing investor associated with them in any way?

15  A   What do you mean?

16  Q   If someone wanted to, say, invest in properties, and they

17  went out and bought the property, but they had a partner that was

18  helping them out, is that something that had to be disclosed if

19  they weren't on the loan?

20  A   Meaning someone else was making the payments?

21  Q   No, not if someone else was making the payments.  If someone

22  invested in a property, and they went and got a partner to help

23  them with that property for the purposes of investment, is that

24  something you would want to know during the purchase transaction?

25  A   If that other party was purchasing the home as well, they

1   would need to be disclosed to us.

2   Q    If they were on the loan or on the title at the same time?

3   A    If they were purchasing the home at the same time, they

4   would -- it would need to be disclosed to us.

5   Q    On Exhibit 164, this form that Ownit uses, who inputs this

6   information into this form, this database?

7   A    This would have been generated as part of our closing doc

8   set.  So it would have been inputted by either the doc drawer or

9   the funder.

10  Q    Is that information input into the sheet based upon

11  documentation that is submitted to you during the submission

12  process?

13  A    No, not during the submission process.

14  Q    How would you get the majority of information on here, such

15  as the borrower, sale price, etcetera?

16  A    That would have been part of the original submission, and

17  during the course of the loan, up until funding.

18  Q    How would you get the contact information of who the

19  representative on the loan was with the brokerage?

20  A    That would have been based on the submission documents and

21  the 1003.

22  Q    Now, on this loan here, you had mentioned before that this

23  was a 12-month bank statement loan; is that correct, sir?

24  A    On this transaction?

25  Q    Was it this transaction that you said that?

1  A    I don't recall.  Are we referring to --  I would have to take

2  a look at the underwriting approval.

3  Q    What type of loan is on this submission sheet here, sir?

4  A    This was submitted as an nonowner, two-unit property

5  purchase, 12-month bank statement.

6  Q    When you received 12 months of bank statements, do you go

7  through item by item on those bank statements, and do you tally

8  them up as an underwriter?

9  A    Yes.

10  Q    So the information you received would be the true

11  information, as far as income on the 1003?  The information

12  that --  Let me rephrase the question.  The information that you

13  actually have on the 1003, that you received on the 1003, would

14  have to match those bank statements?

15  A    The 1003 is what would be stated by the borrower at the time

16  of application to whoever took the application.  The bank

17  statements would be the supporting documentation for that income.

18  Q    Would the bank statements --  Would it be one of your

19  underwriting requirements to verify that income stated by the

20  borrower matched up with the bank statements, if there was

21  supporting documentation?

22  A    With a bank statement loan we would have used the

23  calculations off of the bank statements for qualification.

24  Q    So that would be their actual income then, what was on the

25  1003?

1   A   It may not be the actual income on the 1003 with the bank

2   statement transaction.

3   Q   As far as verified by bank statements?

4          THE COURT:  Mr. Poff, why don't you start with a fresh

5   question where we can pick it up.

6   By the Defendant:

7   Q   Why didn't you request tax returns on this type of loan?

8   A   I don't recall asking for tax returns.

9   Q   Would that be a requirement for this type of loan?

10  A   On a bank statement transaction?  No.

11  Q   Again, this is Exhibit 130, the profit and loss statement.

12  Would the 12 months of bank statements have to correspond with

13  the amount of listed gross income on the profit and loss

14  statement?

15  A   We would want the profit and loss statement to support the

16  bank statements.

17  Q   So they would -- an underwriter criteria would be they would

18  have to match up then, basically?

19  A   They would need to support each other.

20  Q   Then on this property, on this chart right here in

21  Exhibit 101 --  Can you see that okay?

22  A   Yes.

23  Q   It says loan application assets, $111,000 in Washington

24  Mutual bank account.  Would you have verified that amount of

25  money in that bank account for that loan, sir?

A     For the assets, that would have been what was stated on the 1003.

Q     And this loan here, that wasn't verified to be true in fact in any way?

A     The assets, we didn't verify.  They would just need to be stated on the 1003.

Q     And you basically -- Ownit Mortgage --  I retract that. Ownit Mortgage basically sold all of its loans on the secondary market then?

A     I don't know that.

Q     Do you have any idea about how that process would work?  Have you ever had any experience with other companies in that, as far as a lender selling a loan to another investor?

A     Yes, I do know about that process.

Q     Could you explain how that works in regards to the promissory note on those?  Do you know of any certain --  Do they do anything special with the promissory note when they sell the loans to another investor?

A     I don't know.

Q     You do not know.  Okay, sir.  Thank you.  Sir, this is Exhibit 413.  You mentioned earlier that this was the final 1003. Is this something that you have identified before?  How did you know it was the final?

A     On the third page of the application where it is signed, that date corresponded with the closing date of the loan.

```
 1   Q    Okay.  So you could identify --

 2   A    You could identify it.

 3   Q    That answers my question.  Thank you.  Here in Exhibit 501,

 4   it is the same borrower.  And there was -- the previous loan had

 5   12 months of banks statements basically supporting the income.

 6   If I read this correctly, this was a stated loan, is what had

 7   come out during questioning.  Would it be reasonable that

 8   someone's income would have went up between the two periods of

 9   time?

10            MR. SCOVILLE:  Objection.  The question actually does

11   not correctly reflect the testimony.  The testimony was this was

12   also a bank statement.

13            THE DEFENDANT:  This is a bank statement loan.  A

14   correction on my question then.

15            THE COURT:  And I will sustain the objection.

16   By the Defendant:

17   Q    So the income that was stated on this loan, that would have

18   been verified by however many bank statements.  And you guys

19   would tally them up and make sure it reflects --

20   A    Yes, sir.

21   Q    Sir, I was correct that I was wrong.  This is a bank

22   statement loan.  Do you see anywhere on this chart where the

23   supporting documentation would require bank statements?

24   A    Not on this document.

25   Q    Thank you.  On this document, sir, it says that $22,000 was
```

1    disbursed to U.S. Realty and Investments as commission for real

2    estate.  If the borrower was a real estate broker, and she was

3    receiving commissions on this deal, wouldn't that be her income?

4    A   Do you mean the borrower in this transaction was also the

5    agent?

6    Q   Yes, the borrower was also the agent that received, according

7    to this, $22,000.

8    A   Potentially part of that could have been income, yes, but not

9    for this transaction.

10   Q   It couldn't have been income for this transaction.  Do

11   lenders allow agents to put their commissions into closing costs

12   or down payments?

13   A   We didn't allow that.

14   Q   Your company didn't allow that?

15   A   We didn't allow that.

16   Q   Did some companies allow that?

17   A   I don't know.

18   Q   The other companies that you worked with, did they allow

19   that?

20   A   Not in the other companies that I worked for.

21           THE COURT:  When you say to counsel, put up document

22   whatever, that doesn't go into the transcript.  And then you

23   start questioning about the document.  You need to say, referring

24   you to, so that it is in the transcript what the document is.

25           THE DEFENDANT:  Roger that, sir.

1   By the Defendant:

2   Q    On Document 325, Mr. Darcy, is this the document where the

3   underwriter had actually decreased the amount of income?  I don't

4   know how to read it, so I am asking you.  It might be another

5   document, but I want to see if this is the correct one.

6   A    This is the underwriting approval, one of the screens for it.

7   Q    Is this the document where the income was actually reduced

8   for the borrower?

9   A    Not on the screen.

10  Q    Could I see Exhibit 433 -- the second page, I mean.  Would

11  this be the correct document, where the income was reduced?

12  A    This reflects the income that was reduced in qualifying for

13  the loan.

14  Q    But did -- is this a document that reflects where the income

15  was reduced from what was stated on the 1003?

16  A    It reflects what was used during the underwriting.

17  Q    So the client stated they made more income, but the criteria

18  of the lender was that it would be adjusted down based upon

19  guidelines?

20  A    No, we didn't have a guideline for that.

21  Q    My question would be, how was it determined that a person's

22  income that they state -- since it is relevant to this case, how

23  come a lender would adjust down?

24  A    The underwriter adjusted the income down because they didn't

25  need the full amount to qualify based on what was stated.

1   Q    And that would be a determination of the underwriter and not

2   the borrower then?

3   A    The borrower stated their income on the 1003.  The

4   underwriter used less income because it still qualified.

5   Q    So what was --  Was it more based on property value and

6   credit than it was on income?  Income could be arbitrarily

7   adjusted up and down.  What was the major criteria that an

8   underwriter would be looking for?

9            MR. SCOVILLE:  Objection to the form of the question.

10           THE COURT:  I will permit the question.

11           THE WITNESS:  The underwriter is reviewing the entire

12   loan package, all of the documents, to make their underwriting

13   decision.

14   By the Defendant:

15   Q    So if a borrower would state more, but the amount would be

16   reduced, does that mean that the income wasn't taken as heavily

17   in weight as to the other criteria that was submitted?

18   A    No.  The income is still an important factor in underwriting.

19   Q    Because it has to deal with the ratios, correct, sir?

20   A    That's correct.

21   Q    Can I see Exhibit 529.02?  I am assuming it is the same deal,

22   because it is 55,000 income verified by bank statements.  Is that

23   the statement transaction, sir?

24           MR. SCOVILLE:  Objection, vague.  Same as what?

25           THE COURT:  I will overrule the objection.  If you

1    understand the question, you may answer.  If not, ask him to

2    rephrase.

3              THE WITNESS:  I don't understand what you are asking.

4    By the Defendant:

5    Q    Let me rephrase it for you.  Was this another transaction

6    where the borrower, Ikilikyan, purported to make $55,000?

7    A    This page doesn't show what transaction this was for.

8    Q    Sir, does this page show that she is making $55,000?

9    A    This shows that was the income that was used for qualifying,

10   yes.

11   Q    And it is -- this is also a bank statement deal?

12   A    I can't tell that from this page.

13   Q    You can't tell from this page.  Okay.  Can we go back to

14   529.01?  Does this page have the criteria about the bank

15   statements on it, sir?

16   A    This one is hard to read.  This page doesn't show the income

17   doc type it was using.

18   Q    I believe the reason that I asked if it was the bank

19   statement -- this is also on the Yelm property.  We had already

20   asked if the Yelm property -- if that transaction was a bank

21   statement transaction, correct, sir?

22   A    This is a full doc bank statement transaction, yes.

23   Q    That's all I wanted to verify on that.  Now, on this

24   transaction, other than asking for the bank statements and a

25   business license, you don't ask any other questions as to where

1   the source of income and the bank statements come from?

2   A   I don't quite understand what you are asking.

3   Q   If you asked where the deposits come from in the bank

4   statements?

5   A   As far as the source of the deposits?

6   Q   Yes, sir.  If it is not an unusually large amount, like you

7   talked about before, do you ask about the source of each of these

8   deposits in the bank statement?

9   A   No, not if we can see --  We don't ask for the source of

10  those deposits, if they seem reasonable.

11  Q   Okay.  If someone was asking you if the income was half that,

12  it would materially affect this deal?  It doesn't really apply to

13  this, in the sense this is all verified by bank statements as a

14  source of income coming in, correct?

15  A   Can you rephrase that?  I'm not understanding what you are

16  asking.

17  Q   Plaintiffs asked you, sir, if this borrower was making less

18  than half this money on this transaction, would it materially

19  affect this deal, correct?

20  A   Correct.

21  Q   But since the income was listed as -- stated by the borrower

22  as being $55,000, and backed up by bank statements that you had

23  verified, that really becomes a moot point, correct?

24  A   The underwriter would have verified income using the bank

25  statements.

1          THE DEFENDANT:  Thank you, sir.  That's all the

2    questions I have, your Honor.  Thank you.

3          THE COURT:  Mr. Scoville.

4                        REDIRECT EXAMINATION

5    By Mr. Scoville:

6    Q    Mr. Darcy, from your review of the Ownit file regarding

7    transaction number five, are you aware whether bank statements

8    were submitted to Ownit?

9    A    Based upon my review of the file, the bank statements were

10   submitted.

11   Q    Mr. Darcy, let's take a look at the profit and loss

12   statement, which I believe is Exhibit 130.  Mr. Darcy, here on

13   the profit and loss statement we see a total income reported of

14   $698,000, approximately.  Do you see that?

15   A    Yes.

16   Q    From Ownit's perspective, would money that had been borrowed

17   and that someone was obligated to repay qualify as income?

18   A    No.

19          MR. SCOVILLE:  No further questions.

20          THE COURT:  Anything further, counsel?

21          THE DEFENDANT:  I am finished, your Honor.

22          THE COURT:  All right.  You may step down, sir.

23          MS. VOGEL:  The United States calls Senath Sands.

24   Whereupon,

25                        SENATH SANDS

```
 1   Called as a witness, having been first duly sworn, was examined

 2   and testified as follows:

 3            THE CLERK:  Will you state your name for the record and

 4   spell your last name, please?

 5            THE WITNESS:  Senath Sands, S-A-N-D-S.

 6                        DIRECT EXAMINATION

 7   By Ms. Vogel:

 8   Q    How do you spell your first name?

 9   A    S-E-N-A-T-H.

10   Q    In what city do you live?

11   A    Ravensdale, Washington.

12   Q    What is your profession?

13   A    I am a transaction coordinator for a mortgage company.

14   Q    How long have you been in your current job?

15   A    Two years, a little less.

16   Q    Where did you work before your current company?

17   A    First Franklin Mortgage.

18   Q    And where did you work before that?

19   A    Ownit Mortgage Solutions.

20   Q    When did you start working at Ownit Mortgage Solutions?

21   A    June of 2002.

22   Q    And how long did you continue working there?

23   A    I was there until December of 2006.

24   Q    At some point while you were working there, did Ownit

25   Mortgage Solutions go by a different name?
```

1  A    Oakmont Mortgage.

2  Q    Ms. Sands, what was your title at Oakmont/Ownit?

3  A    I was an account manager.

4  Q    Were you an account manager for the entire time that you

5  worked there?

6  A    Yes.

7  Q    Can you tell us what are the responsibilities of an account

8  manager?

9  A    We basically help the file go through the whole process, make

10  sure that it gets underwritten, conditions get cleared, the file

11  goes to docs and then to funding, and that the loan gets funded.

12  Q    When you are talking about "the file" and "the loan," what

13  types of loans did Ownit/Oakmont work on during the time period

14  you were there?

15  A    We were doing mostly re-fis and purchase loans.

16  Q    As part of your job, how much would you interact with the

17  loan brokers or loan officers who submitted loan applications to

18  Ownit?

19  A    Once the loan file was submitted to Ownit, I would be like

20  the direct contact person until the file went to docs.

21  Q    Did you ever work with a person named John Darcy?

22  A    Yes.

23  Q    Ms. Sands, are you acquainted with the defendant, William

24  Poff?

25  A    I recognize him, yes.

1    Q    How did you become acquainted with him?

2    A    He was one of my mortgage brokers that I worked with.

3    Q    When did you first start working with Mr. Poff?

4    A    I am not clear on an exact date.  Probably about 2004.

5    Q    And by what name did you know this gentleman?

6    A    By Bill.

7    Q    Were you also acquainted with his wife?

8    A    Yes.

9    Q    And by what name did you know her?

10   A    I had a hard time with her name.  Alexis.

11   Q    Over what time period did you work with the defendant as a

12   loan officer?

13   A    Probably from roughly around 2004 until when it closed in

14   2006.

15   Q    At Ownit, during the time you worked there, how were account

16   managers, such as yourself, assigned to certain loans?  How did

17   the loans get doled out among account managers?

18   A    Certain loan reps had broker offices that they worked with,

19   and I was assigned to Chase Costello, who was my rep that worked

20   with Bill.

21   Q    So does that mean that all of Chase Costello's clients --

22   loans went through you?

23   A    Yes.

24   Q    And who was the loan rep or the sales rep that Mr. Poff

25   worked with?

1    A    Chase Costello.

2    Q    So what percentage of the loan application packets that were

3    brought in by the defendant went through you personally as an

4    account manager?

5    A    Probably pretty much a hundred percent of them.

6    Q    Do you have any recollection of how many loan application

7    packets were submitted by the defendant, Mr. Poff?

8    A    No.

9    Q    What did you know at the time that you were working with him

10    about Mr. Poff's business?

11    A    Not a whole lot.  I just knew they were a broker shop.  It

12    seemed like they kind of worked out of their home, with his wife

13    Alexis, and they were kind of an independent shop.

14    Q    When you say "they," who are you referring to?

15    A    Bill and Alexis.

16    Q    And when you were working with them on the loans, what sorts

17    of tasks would you perform?

18    A    Once the files were submitted, they would go through

19    underwriting and get approved.  I would get the file back from

20    underwriting.  I would send over the approval or denial to the

21    broker, call it out, let them know what conditions were needed

22    and that their loan -- where it stood, if it was approved or

23    denied.  And I would hold the file until conditions came into our

24    office.

25    Q    And approximately how often during the process of each loan

1    would you have to have direct contact with the loan broker or

2    loan officer that submitted the loan?

3    A    It varied on the complexity of the loan.  Maybe five to six

4    times during the transaction, or more.

5    Q    And primarily how did that communication occur?  In what form

6    was the communication?

7    A    By phone or e-mail.

8    Q    In the case of loans that were submitted by the defendant and

9    his wife, who primarily did you speak with during those

10   communications?

11   A    Primarily with Bill.

12   Q    Did you ever meet the defendant in person?

13   A    Just one time.

14   Q    Where was that meeting?

15   A    In the Ownit office in Kirkland, Washington.

16   Q    And why --  What was the purpose of that meeting?

17   A    I believe they were just bringing in loan documents that had

18   been signed for funding.

19   Q    And when you say "they," who else was present?

20   A    His wife Alexis.

21   Q    Ms. Sands, how well did you interact with the defendant in

22   your dealings with him over this two-year time period?

23   A    Pretty well.

24   Q    Did you have any disputes?

25   A    No.  If there was problems with the file, you know, he would

```
 1    call and we would have to work through it.  He might get fired
 2    up.  That was just part of his job.
 3    Q    When you say "fired up," about what might the defendant have
 4    gotten fired up?  What do you recall him getting fired up about?
 5    A    If the underwriter conditioned for something that he didn't
 6    believe was needed.
 7    Q    So was he calling to complain?
 8    A    Yes.
 9    Q    Did you ever have any similar disputes about conditions with
10    Alexis?
11    A    Not that I recall, no.
12    Q    Specifically what form would a loan broker or loan --
13    mortgage broker or loan officer submit to Ownit to start the
14    process?
15    A    Usually they would send like a 1003 application with a
16    submission form.
17    Q    And can you look, please, at Exhibit 119?  Do you recognize
18    this form?
19    A    Yes.  That is a loan submission form and fee sheet.
20    Q    On the top left-hand corner it says "Oakmont Mortgage."  Is
21    that the company you said later became Ownit?
22    A    Yes.
23    Q    On the top left-hand line, where it says "account exec,
24    Senath," is that you?
25    A    Yes.
```

1    Q    To whom at Ownit Mortgage Solutions would these loan

2   submission sheets be directed?

3    A    Normally they would come directly to me by fax or e-mail, and

4   then I would put them in for submission.

5    Q    And were the documents such as this, such as Exhibit 119,

6   were they completely filled in when you received them?

7    A    Most of the time, yes.

8    Q    For example, would you have signed the broker signature at

9   the bottom if it wasn't signed?

10    A    No.

11    Q    Would you have added other information to this form after you

12   received it?

13    A    If there was a loan program where some additional

14   documents -- if there was something that they needed to know when

15   they were submitting the file into the system, I might add it.

16    Q    Do you recognize, Ms. Sands, from whom this submission form

17   came to you?

18    A    From Bill.

19    Q    And by "Bill," who do you mean?

20    A    Bill Poff.

21    Q    Ms. Sands, after you received a 1003 in part of this initial

22   packet, would you add or change information in that 1003 at any

23   point in the process?

24    A    No.

25    Q    If something needed to be changed or added or removed from a

1   1003, what was the process you would follow to have that happen?

2   A   We would call the broker and ask them to submit a new 1003.

3   Q   And if this was a loan that had been submitted by the

4   defendant or his wife Alexis, who is it that you would call to

5   make that change?

6   A   Bill.

7   Q   Can you look, please, at Exhibit 125?  This has previously

8   been submitted as an Ownit business record.  Do you recognize

9   this form?

10  A   Yes.

11  Q   What is it?

12  A   It is our loan approval notification form.

13  Q   Is this the form you were referring to earlier when you

14  talked about getting an approval?

15  A   Yes.

16  Q   Where would this document come from?

17  A   This would come directly from the underwriter with the file

18  once it had been underwritten.

19  Q   And who would it go to?

20  A   To the contact person listed under the broker.

21  Q   And who is the person who would actually transmit this form

22  to the broker?

23  A   I would fax it to the broker.

24  Q   And in this particular case, to whom did you fax this

25  approval?

1    A    To Bill Poff.

2    Q    For example, if you would look at condition number five,

3    "Need a copy of recent actual bank statement," who is it that

4    would have sent that back to you in this case?

5    A    In this case it should have come from Bill.

6    Q    And do you recall receiving conditions satisfying documents

7    directly from Bill in these loans?

8    A    Not specifically this loan, no.

9    Q    Can you look, please, at Exhibit 129?  Do you recognize this

10   e-mail?

11   A    Yes.

12   Q    To whom is this e-mail addressed?

13   A    To me.

14   Q    And who did you get this e-mail from?

15   A    I don't know.

16   Q    Do you recognize either the name or the e-mail address on the

17   "from" line?

18   A    The name looks familiar, yes.  I think it was the same name

19   on the loan approval.

20   Q    And can you read the body of the loan -- the body of the

21   e-mail?  It says, "Here is the WaMu letter and official bank

22   statements, deposits only.  They can only go back six months.

23   Thanks."  Signed "Bill."

24   A    Yes.

25   Q    Ms. Sands, do you believe that this is an example of

1   receiving conditions for a loan from the defendant, Mr. Poff?

2   A    Yes.

3   Q    Would it be unusual for you to receive those via e-mail?

4   A    No.

5        THE DEFENDANT:  Object, your Honor.  That is leading the

6   witness.  She had already answered.

7        THE COURT:  I think you missed your chance on that one,

8   Mr. Poff.  You might listen to it carefully.  It was a leading

9   question.

10  By Ms. Vogel:

11  Q    Ms. Sands, at the very end of a transaction, what documents

12  would the lender receive back -- would the owner receive back

13  from escrow?

14  A    Normally they would receive back a HUD, and then the signed

15  loan documents -- the signed Ownit loan documents.  I didn't

16  review the funding file, so I'm not sure what else they would

17  receive back from escrow.

18  Q    Who would receive at Ownit the final HUD?

19  A    The lender.

20  Q    That didn't go through your desk?

21  A    No.

22  Q    All of the specific documents that we have looked at here

23  have been for one particular loan.  Do you have any personal,

24  specific recollection of any of the other loans that came through

25  your desk, submitted by the defendant or his wife?

1    A    Nothing specific, no.

2    Q    Ms. Sands, as between the defendant, Mr. Poff, or his wife,

3    who would you contact if there was a problem with the loan

4    application?

5    A    Normally Bill.

6              THE DEFENDANT:  Objection.

7              THE COURT:  Overruled.

8    By Ms. Vogel:

9    Q    Why is that?

10   A    He seemed to always be the main contact person on the files,

11   and like the head person I would call if there was a problem or I

12   needed to talk.

13             MS. VOGEL:  No further questions.

14             THE COURT:  Mr. Poff.

15                    CROSS-EXAMINATION

16   By the Defendant:

17   Q    Good afternoon, ma'am.  Ms. Sands, did you have a good

18   rapport with Mr. Poff?

19   A    I believe so.

20   Q    You said there was no personal disputes or anything that

21   was --  Was there any personal disputes?

22   A    Nothing personal.

23   Q    Was Mr. Poff always kind and courteous to you in relating

24   information to you?

25   A    I'm not sure at this time.  It has been so long.  I don't

1   really recall.

2   Q    Fair enough, ma'am.  Any time that you would call, and if

3   Alexis would answer, would she always refer the phone to myself?

4   A    Once again, it has been so long I don't really recall, but I

5   believe so.

6   Q    On the --  Could you put up Exhibit 119, please?  On these

7   forms, ma'am, were they signed in front of you or were they

8   forwarded to you via fax or some other means?

9   A    They were forwarded.

10  Q    Exhibit 125, please.  Who would fill in the information on

11  the loan approval that would be sent back to the broker?

12  A    I think the broker contact information.  I guess I'm not sure

13  what you're asking me.

14  Q    Sure.  Let's say the broker contact information, who would

15  fill in that blank in there?

16  A    It would normally be generated by the system, by how the loan

17  was set up in the system by what was on the submission form.

18  Q    So the contact person on that is based on what was on the

19  submission form then?

20  A    Yes.

21          THE DEFENDANT:  Thank you.  That's all I have, your

22  Honor.

23          THE COURT:  Any redirect?

24          MS. VOGEL:  No, your Honor.

25          THE COURT:  You may step down.  Thank you very much.

1              MS. VOGEL:  The United States calls Maureen O'Connell.

2     Whereupon,

3                              MAUREEN O'CONNELL

4     Called as a witness, having been first duly sworn, was examined

5     and testified as follows:

6              THE CLERK:  Will you state your name for the record and

7     spell your last name, please?

8              THE WITNESS:  Certainly.  My name is Maureen Lee

9     O'Connell, O-C-O-N-N-E-L-L.

10                            DIRECT EXAMINATION

11    By Ms. Vogel:

12    Q    In what city do you live, ma'am?

13    A    I live in Tacoma.

14    Q    And what is your occupation?

15    A    I am the public records officer for the Department of

16    Revenue.

17    Q    How long have you been with the Department of Revenue?

18    A    Twenty years.

19    Q    And what are the responsibilities of the public records

20    officer?

21    A    They are to respond to the public records request made by the

22    public, and also to deal with the subpoenas that may come into

23    the agency looking for records as well.

24    Q    Have you always been in the same position in your 20 years

25    with the Department of Revenue?

1   A   No, I have not.

2   Q   What previous titles did you hold or positions did you fill

3   within the department?

4   A   Well, I was a Tax Information Specialist III as a supervisor

5   in the telephone information system for the department.  Prior to

6   that I was a Tax Information Specialist II, which was a lead in

7   the telephone information center for the Department of Revenue.

8   I started out as a Tax Service Representative in the telephone

9   information center, which then turned into a Tax Information

10  Specialist I with the telephone information center.

11  Q   And as a result of all this experience with the Department of

12  Revenue, are you familiar with how their records are input and

13  kept and what they mean?

14  A   Very familiar.

15  Q   And when you say "the Department of Revenue," is that the

16  Washington State Department of Revenue?

17  A   It is.

18  Q   What did you do before you joined the Department of Revenue?

19  A   I was with the Employment Security Department.  I was a data

20  entry operator and a job counselor, both positions I have held

21  there.

22  Q   Ms. O'Connell, are you familiar from your jobs with the

23  process that a person needs to go through in order to register a

24  business with the State of Washington?

25  A   I am.

1  Q   Can you explain to us what is that process?

2  A   Well, there is actually three different processes that can be

3  used by individuals.  The first is, they can come in in person to

4  one of the agencies that can accept master business licenses.

5  There are five agencies that you can actually go to and fill them

6  in in person.  The other is that they can go by mail.  They can

7  request a form or they can go on-line and get a blank form and

8  fill it out and mail it to the Department of Licensing.  They can

9  now go on-line, and have been for about the last ten years, and

10 fill out the master business application on-line.

11 Q   And this form that you have referred to, "a master business

12 application," is it the same form no matter which way you

13 actually submit it?

14 A   It is.  The electronic form has the same questions.  It is

15 formatted differently, but it is basically the same form.

16 Q   Can you take a look, please, at Exhibit 14.  It will also

17 come up on the screen.  It might be easier to look at it.  Do you

18 recognize what that is?

19 A   Yes.  That is the paper form for the master business

20 application.

21 Q   And is it just a one-page form?

22 A   No, it is not.  It is roughly about four or five pages.

23 Q   And is this the public document that has been generated by

24 the State of Washington that anybody who wants to register a

25 business in the state has to use?

1    A    It is.

2    Q    Now, this is a completely blank form; is that correct?

3    A    That is correct.

4          MS. VOGEL:  Move the admission of Exhibit 14.

5          THE DEFENDANT:  No objections, your Honor.

6          THE COURT:  14 is admitted.

7          (14 admitted.)

8    By Ms. Vogel:

9    Q    Can you walk us very quickly through the parts of this

10   application that need to be completed in order to register a

11   business with the State of Washington?

12   A    I certainly can.  The first step is that we want to know what

13   you are doing, whether you are opening a new business, whether

14   you are changing a business, whether you are registering a trade

15   name or changing a trade name or hiring employees.  And that's

16   what you will do first, is pick whatever the purpose is of the

17   application.  In the second part you are going to check the boxes

18   that apply to the type of business that you are going to have.

19   And you will check the boxes, whether you need it to be

20   registered with the Department of Revenue, whether you are going

21   to have employees and have to be registered with the Employment

22   Security Department and the Labor and Industries Department.  And

23   then it also goes into whether you are going to be hiring minors

24   or adding a trade name or doing business as a name other than

25   your legal name.

1    Q    On the next page.

2    A    You go to the next page.  This is where it is going to ask

3    basic information as to who is going to be involved with the

4    business.  You are going to check whether you are going to be a

5    sole proprietorship, a partnership, a corporation.  And it does

6    distinguish between a Washington corporation, an out-of-state

7    corporation and a nonprofit corporation, whether you are going to

8    be a limited liability partnership or a limited liability

9    company.  And those are different ownership structures that are

10   recognized by the State of Washington.

11        And then it is going to ask some basic information about who

12   is doing this, the name of the people that are involved.  If it

13   is a sole proprietorship, it is going to be the entities --

14   actually it is going to be the owner of a business, and

15   potentially a spouse, if they are going to be listed as an owner

16   of the business as well.

17        Then it goes on.  If you are going to be a partnership, it

18   asks for all your partners.  If you are going to be a

19   corporation, it asks for the corporate officers.  And it asks for

20   basic information about the name, the address, the Social

21   Security number, telephone numbers, dates of birth, those types

22   of things.

23   Q    And on the next page?

24   A    The next page is more business information.  We are asking

25   you to estimate a gross income that the business is going to do

1    so that we can determine how to place you on a filing status with

2    the Department of Revenue.  We also ask you to kind of give us an

3    idea of what kind of business activity you are going to be doing,

4    whether it is wholesaling, retailing, service.  And then we also

5    ask for a description of what you are doing, so that we can

6    assign you a code that the Department of Revenue uses to peg what

7    kind of business you are.  The North American Industry

8    Classification System is what we use to actually tag a business

9    as being a contractor or doing some other business.

10       It also asks whether you have purchased the business from

11   someone else, and if you have, whether you purchased all of it or

12   just a part of it.  It asks if you purchased equipment from the

13   other business, because then we have to look at potential tax

14   liability of that purchase, and if the business is controlled by

15   any other business entity.

16   Q   And on the next page, what is the general type of

17   information?

18   A   Page 4 is used for defining whether you are going to have

19   employees or not.  This may be a blank page if you are not going

20   to have employees.  If you are, then the Employment Security

21   Department and the Department of Labor and Industries wants to

22   look at some information regarding what kind of employees you

23   have.

24       And then there is the last portion, which is your signature

25   block, where you also declare under penalty of perjury and/or

1    revocation of the license that you have filled this out

2    completely and correctly.

3    Q    And does the on-line form contain the same signature

4    certification?

5    A    It does.  And it will not let you go any further if you don't

6    check the box that they are asking you to check.

7    Q    Is there a place on this master business application to

8    indicate when the business first started operating?

9    A    Yes.  If we go back to I believe it is the third page of the

10   form.  So this is the one under "business information," I

11   believe, is actually where it is.

12   Q    Is that page 2 of Exhibit 14?

13   A    That is correct, page 2.  It is going to ask you in the form

14   when you started business -- the date the business started.

15   Q    Is that at the very top of the form where it says "Business

16   open date"?

17   A    Yes, exactly.  And on the on-line form, it is a little

18   different, but they ask the same question.

19   Q    And from the Department of Revenue's perspective, what does

20   business open date mean?

21   A    That means to us what date they actually started conducting

22   business activity.

23   Q    Ms. O'Connell, how long -- for how many years has this form

24   been substantially the same?

25   A    Well, I have been with the department 20 years, and the form

1    is substantially the same as when I came on, with a few minor

2    details.   They have added e-mail information, because of getting

3    electronically savvy, so we ask other questions that have to do

4    with your e-mail address, if you want to provide it to us, and

5    things along that line.   But the basic concept has been the same

6    for the last 20 years.

7    Q    So what happens after a person submits this master business

8    application to the State of Washington?

9    A    Well, the form is -- it is done in different ways, depending

10   on how they file it.   If they file it in a local office, like if

11   they were to come into my office and file this form, we would

12   start an electronic process of filling out the information

13   electronically into our computer system, and then mail the form

14   to the Department of Licensing to be completed.   If they send it

15   in by mail, it goes to the Department of Licensing first and they

16   start the process, and they send us the information

17   electronically about a new business that has started.

18   Q    And is there a document that is generated and sent back out

19   to the business owner?

20   A    Yes.   The business license is mailed by the Department of

21   Licensing to the owner of the business.   If they are registered

22   with the Department of Revenue, we also send them a letter that

23   welcomes them to doing business in the State of Washington, what

24   their filing frequency is, basically giving them instructions on

25   how to deal with the Department of Revenue.

1  Q     What is the purpose of registering businesses in the State of

2  Washington using this form?

3  A     The purpose is that there are agencies that require taxation,

4  and there are agencies that require registration of business

5  names and business activity.  For the Department of Revenue, this

6  is how we know that businesses are operating and what their

7  potential tax liability is.  It is for us to be able to know what

8  is going on in the business community.

9  Q     Do businesses registered in the State of Washington have an

10 obligation to report taxes to the State, kind of like filing a

11 tax return with the federal government?

12 A     They do.

13 Q     What is that obligation?

14 A     Basically, depending on the business, they are either

15 required to file monthly, quarterly or annual excise tax returns

16 with the Department of Revenue, unless they have been put on an

17 active, nonreporting status by the Department based on the

18 information that they have provided to us that is basically

19 saying they are doing under a certain level of income, and that

20 they have no responsibility to collect sales tax for the

21 activities that they are doing.

22 Q     And, Ms. O'Connell, all of the data that has been collected

23 by the State in these application forms, is that maintained in a

24 publicly accessible database?

25 A     Parts of it are.  Not everything within the master

1    application is public record.  So there is some information that

2    is not included, such as Social Security numbers, bank account

3    numbers and items such as that, birth dates.  But there is an

4    on-line business records database that is maintained through

5    actually the Department of Revenue that inputs the information

6    about the UBI number of the business, the unified business

7    identifier, that has been assigned to the business, the business

8    owner, the business name, their mailing address and a physical

9    location, if they have provided one, when they opened and what

10   kind of structure they opened.

11        Now, additionally the Department of Licensing has an on-line

12   site where you can get some other information, such as governing

13   parties.

14   Q   So if I wanted to check to see whether a business was

15   licensed in the State of Washington, is there a way that I could

16   get on-line and type in the name and pull up a screen shot that

17   gives me some information?

18   A   You would have to go to the Department of Revenue website or

19   the Department of Licensing website, or actually the Secretary of

20   State has a database for corporations as well, that you can go

21   on-line and you can find additional information.  But you would

22   have to go -- access one of those websites to find the

23   information.  But it is available.

24             THE COURT:  Counsel, we are going to take our break at

25   this time.

1          MS. VOGEL:  Can I ask one follow-up question to the

2    question she just answered?

3          THE COURT:  Yes.

4    By Ms. Vogel:

5    Q    On that public database, is the date the business opened, as

6    recorded in the master business application, among the

7    information available?

8    A    Yes, that is a required field.

9          THE COURT:  All right.  Counsel, we will be in recess

10   until 1:30.  When we come back I would like to discuss the

11   question of the expert witness.  The report should have been

12   submitted yesterday.

13         MR. RATNER:  I just received the report, your Honor.  I

14   am going to review it, and I will give it to counsel.  I got it

15   literally five minutes ago.

16         THE COURT:  We can talk about that at 1:30 also.

17         MR. RATNER:  I can either do it now or later, a brief

18   ex parte conference with the court?

19         THE COURT:  Since I am late for the weekly judicial

20   lunch, and if you don't get there on time they assign you things

21   to do, I am going to suggest we take that up at 1:25 or so.

22         MR. RATNER:  That would be fine.

23         THE COURT:  We will be in recess.

24   (At this time a short break was taken.)

25         THE COURT:  Mr. Ratner, I notice the government has

1   conveniently exited.  They are externs from law school.  They are

2   not spies.

3           MR. RATNER:  I wanted to just acquaint the court, my

4   handwriting expert ended up spending a lot more time than we

5   thought she would.  She ended up examining more signatures.  We

6   thought originally she was going to do six.  She did 21

7   questioned signatures and 24 original signatures.  She also spent

8   a half day here with me going through boxes trying to find

9   original documents from this case that they got from Great

10  American Escrow.  So her bill as of right now is something like

11  $5,500.  Originally I think you authorized $1,200.  I wanted to

12  let the Court know.

13          THE COURT:  It won't be a problem.  Send it through.

14          MR. RATNER:  Thank you.  That's it.  I will get them.

15  (At this time the Assistant U.S. Attorneys entered the

16  courtroom.)

17          THE COURT:  You are still under oath, ma'am.  You may

18  resume.

19  By Ms. Vogel:

20  Q   Ms. O'Connell, could you look at Exhibit 11?

21  A   Eleven, you said?

22  Q   It is actually up on the screen in front of you.  Do you

23  recognize this document?

24  A   I do.

25  Q   And could you look through the next few pages of this

1   document?

2   A   I did.

3   Q   Is this a document that was supplied to the government by the

4   Department of Revenue in connection with this case?

5   A   It was not sent to the Department of Revenue, it was actually

6   sent to the Department of Licensing through their website.

7   Q   And what is this document?

8   A   This is the electronic version of a master business

9   application when filed on-line.  This is what shows.

10  Q   And for what business is this the electronic application?

11  A   For which business, did you say?

12  Q   Yes.

13  A   There it is.  Hay Computer Networking and Consulting.

14  Q   And you said you could tell this was an on-line application?

15  A   Yes.

16  Q   Can you explain how you can tell that?

17  A   Well, if you were to see a paper application, it would look

18  just like the return we looked at before.  It would just be a

19  copy of the master business application that was filed.  This is

20  actually what results from the on-line application, the fields

21  that are filled out.  This is what this looks like when they

22  print it out.

23  Q   From this document, this master application record of filing,

24  can you tell when the original application for the business was

25  processed by the State?

1  A    Yes.  If you go up to the top, it shows filing date and time.

2  And it looks like it says 11/30/2004.

3  Q    Who is the person associated with this business, Hay Computer

4  Networking and Consulting?

5  A    It is a sole proprietorship.  The person's name is Armenuhi

6  Harutyunyan.  I probably massacred that.

7  Q    Does it say somewhere on here what is the date that the

8  business was reported to have opened?

9  A    It does.  If you go down toward the bottom where the

10  addresses are located, it says first date of business.  And it

11  shows 7/1/2002.

12  Q    So how far before the date that this application was

13  originally submitted did it represent that Hay Computer

14  Networking and Consulting started doing business?

15  A    Well, based on the start date, we would look at that as

16  being -- the date is July of 2002.

17  Q    So is it possible to submit a business application on

18  11/30/2004, and claim that the business has been opened for two

19  years prior to that?

20  A    It is.  What they are doing is giving a retroactive start

21  date.

22  Q    What would the normal consequences of doing something like

23  that be if this were a business that generated revenue?

24  A    If they had generated revenue, and actually owed tax, they

25  would owe interest on the tax that was due during that period.

1   We would more than likely waive the penalties because they

2   voluntarily registered.  As a voluntary compliance state, we

3   would waive the penalties, but we would still assess interest.

4   Q    What efforts are made by the State to verify the date that is

5   placed into the application for the first date of business?

6   A    None.  The State takes it for what it is.  The only other

7   time would be if the Department of Revenue were to audit the

8   business and actually go into the business itself.

9   Q    And can you --  Let's look now at Exhibit 7.  Do you

10   recognize these documents?

11   A    Yes.  Those are screens from the Department of Revenue

12   website.  It is our internal website we use, not an external one.

13   Q    There are several pages.  Are all the pages in Exhibit 7 what

14   you have just described?

15   A    Yes.

16   Q    And from what agency are these -- were these documents

17   generated?

18   A    They were generated by the Department of Revenue.

19   Q    And are you personally familiar with this type of document?

20   A    Yes.

21   Q    And what type of information is captured in these documents?

22   A    Well, in this particular one it is going to be the basic

23   information about the business, when it opened, the name of the

24   owner, the address that we have for mailing purposes, what date

25   it started, what date it closed, if that is applicable.  It will

1    also show us their e-mail address if they have given it to us.

2    And there are codes that we use to identify what the business is

3    doing, such as the NAICS code that is up there.

4    Q    Within these documents that make up Exhibit 7, is there also

5    a record of the revenue that was reported by a business during

6    the time period that the records cover?

7    A    Yes, there is.

8    Q    And is Exhibit 7, which I believe has previously been

9    admitted as a public record, the Department of Revenue record

10   pertaining to Hay Computer Networking and Consulting, the same

11   business we just saw the application for?

12   A    Yes, it is.

13   Q    First, let me ask you, according to the records that the

14   Department of Revenue has for Hay Computer Networking and

15   Consulting, what is the e-mail associated with that business?

16   A    It is the one showing on this screen, the Fidelis SWW MSN

17   dot com.

18   Q    And for what time period do these particular records cover

19   for the business, Hay Computer?

20   A    Because of the opening date, it would cover July 1, 2002 to

21   current, because the account is still listed as an open account.

22   Q    Ms. O'Connell, during that entire time period, what revenue

23   did Hay Computer Networking and Consulting report to the State of

24   Washington that it had earned?

25   A    Just to make a statement, I can give you this information

1  because I do have a release from the taxpayer to discuss it here.

2  There was no income reported.

3  Q    What other type of information --  Actually, let me narrow it

4  down.  Do these documents also record communications with the

5  taxpayer?

6  A    In the screens that were sent there are communication logs

7  that were a part of what I have sent, yes.

8  Q    Can you look at the second page of Exhibit 7?  Can you tell

9  us what type of information is captured on page 2 of this

10  exhibit?

11  A    This is a notepad screen that, when we make changes to an

12  account, there is a note put in by the person who is making the

13  change so that we know why the change was made.

14  Q    Ma'am, are you familiar with the codes and shorthand that

15  appear to be used in these entries?

16  A    Yes.

17  Q    Can you interpret for us what these notations mean for

18  communications with a person associated with Hay Computer

19  Networking and Consulting?  I would ask you, since they appear to

20  be in the reverse order, to start with the bottom one and work

21  towards the more recent one?

22  A    The very first one they use the code ODC, that is open date

23  change.  PC means phone call.

24  Q    So let's start with the notation that has the date 12/1/04

25  next to it.

1    A    That one came actually from the master business application

2    itself.  We ask for banking information on the master

3    application.  That would have been filled in based on that

4    information.

5    Q    And what about the notation next to the date 12/9/04?

6    A    That was based on a phone call the Department of Revenue

7    received requesting a change to the opening date.

8    Q    Do the notations in this log reveal who is the person or who

9    the person called identified themselves as?

10   A    In this one it does say that he is the son-in-law, and his

11   name is Bill.

12   Q    And what does the notation next to the date 12/10/2004 mean?

13            THE COURT:  Before you leave that one, counsel, may I

14   ask what is R-E-F-L-E-X-T, the last word in that line.

15            THE WITNESS:  I believe what they are trying to say is

16   reflects, but the note is not complete.

17            THE COURT:  What is reflects?

18            THE WITNESS:  That is an issue that it is not in the

19   note itself, unfortunately.  There may be additional notes later

20   on in other notepads.

21            THE COURT:  Thank you.

22   By Ms. Vogel:

23   Q    You said the notation ODC means what?

24   A    Open date change.

25   Q    Other than what is captured here in this one line, 12/9/2004,

1    ODC, to reflect per PC --  PC is phone call you said?

2    A    Yes.

3    Q    Bill, son-in-law, wants to, reflects.  Is there any other

4    information available to you about that contact?

5    A    I did not see any.  I don't believe there are.

6    Q    What does the notation next to the date 12/10/2004 mean, if

7    you know?

8    A    The first one is changing the opening date, so they actually

9    spell it out this time.  And TP is taxpayer.  So it is saying

10   that the TP called, the taxpayer called to request --  Excuse me.

11   I am looking at it incorrectly.  That we received a letter -- a

12   request and letter.  So there was a letter from the taxpayer to

13   change the opening date.

14   Q    And did you find that letter among the records?

15   A    I believe I did.

16   Q    Can you look, please, at Exhibit 13?  Is this the letter you

17   found among the records and sent to the United States?

18   A    It is.

19   Q    Is this something that the Department of Revenue would have

20   kept, along with the taxpayer file?

21   A    Right.  It would be imaged into the taxpayer's file.

22   Q    And what did the Department of Revenue understand this letter

23   to be a request for?

24   A    They were asking that -- basically they were saying that they

25   were meeting with people in July 2004, and that her business

1    associates recommended that she get a license from the date that

2    she developed her business.  I am assuming it is a her.  And that

3    they could amend the tax returns, if any.  And farther down she

4    says she is asking that the license reflect the open date of July

5    1, 2004.  So she is giving us a little information as to what is

6    going on, and then asking us to change the date.

7    Q    So if we go back then to Exhibit 7, page 2, do you believe

8    that is the letter that is referenced in the line next to

9    12/10/04?

10   A    I do.

11   Q    And what is the notation in the line above that, also dated

12   12/10/04?

13   A    That is changing it back to the original, per phone call from

14   the taxpayer.  So real close to each other.  Either we called her

15   or she called us.  It is saying from the taxpayer, so I have to

16   assume they called us.  But they called and changed it back.

17   Q    And then on 12/23/04 was another notation about the opening

18   date?

19   A    That's correct.  Again, they were looking at changing the

20   date.  Now, this may have been a note put in by the person that

21   was actually physically changing the date.

22   Q    That may not have been an additional contact?

23   A    Right.

24   Q    And then on 1/20/05, there is another note with ODC, per

25   daughter.  What does that mean?

1   A    That was a call from someone who said she was her daughter,

2   and asking for an open date change again.

3   Q    Now, do your records record what the previous date -- opening

4   date was once it is changed?

5   A    They do not.

6   Q    Is there any way to go back and say, for example, on

7   12/9/04 -- perhaps 12/10/04 would be a better example, it was

8   changed from this to this?

9   A    The only thing that might give some kind of information on

10  that would be on one of the other screens that talks about the

11  changes that we made internally.  But as far as the actual date

12  itself, when a date is changed, it just overtakes the other date.

13  And that's what we have.  I mean, the only other way to tell is

14  if they had filed tax returns and we could look at the date of

15  when the tax returns were filed.

16  Q    And having looked through all the information that is

17  available to you on this particular business, have you been able

18  to figure out what the dates were changed from on each of these

19  occasions?

20  A    I have not been able to.

21  Q    Can you look, please, at Exhibit 236?  The second page,

22  please.  Is this another master application record of filing for

23  a separate business?

24  A    It is.

25  Q    And what is the business that this application is for?

1   A    This is for a sole proprietorship, Tim Thomson Landscaping,

2   owned by Tim Thomson.

3   Q    Can you tell us from this document when the application was

4   submitted and processed by the State of Washington?

5   A    It is at the top, 12/21 of '05.

6   Q    From this document, what was the first reported date of

7   business for Tim Thomson?

8   A    1/8/2003.

9   Q    So, again, that was approximately two years before the

10  business itself was opened?

11  A    That is correct.

12  Q    And can you look on the second page, please?  Now, all of

13  this information about gross income and banks and so forth

14  appears to be blank.  Can you explain to us why it is blank on

15  the document we are looking at?

16  A    Certainly.  It is blank because it was not filled in on the

17  form itself when it was being filed on-line, and it was not a

18  mandatory field that they fill out.

19  Q    At the very bottom of this form, under the header "License

20  fees," first it says $20 has been billed to your Visa.  Is there

21  a fee associated with registering a business?

22  A    There is a $15 registration fee and a $5 trade name fee.

23  Q    Where it says "Prepared by," on this form the name that is on

24  that line is William Poff.  Who is it that fills in that line?

25  A    It is the person filling out the application.  Most of the

1    time it is actually the owner of the business that is doing that.

2    But they can request that their representative do it as well.

3    Q    Is there any effort made to verify whether --  If a second

4    person's name is used as the preparer, is there any effort made

5    by the State to verify whether that person had the authority to

6    do that?

7    A    No.  We basically take it on face value, because they have

8    attested to the fact that the information is correct and binding.

9    Q    And when you say "attested," are you referring to that

10   certificate above the signature on the master application you

11   looked at before lunch?

12   A    That's correct.

13   Q    The previous page.  Actually, let's look at Exhibit 234.  Do

14   these look like the same types of records, but for a different

15   business; is that true?

16   A    That's correct.

17   Q    So these are Department of Revenue records for the business

18   Tim Thomson Landscaping; is that correct?

19   A    That is correct.

20   Q    And have you looked through all of these records as well?

21   A    I have.

22   Q    Can you tell us what e-mail is associated with the business

23   Tim Thomson Landscaping in the Department of Revenue records?

24   A    Sure.  It is Fidelis SWW at MSN dot com.

25   Q    Is that the same e-mail we saw earlier?

1   A   It is.

2   Q   Ms. O'Connell, what time periods do these records for Tim

3   Thomson Landscaping cover?

4   A   Well, we show that the opening date was 8/1/2003, and closed

5   6/30/2006.  So it would cover that timeframe.

6   Q   I just want to be clear, the opening date was January 8,

7   2003?

8   A   That is correct.

9   Q   And for that time period, what revenue was recorded as having

10  been earned by Tim Thomson Landscaping?

11  A   There was no income reported.

12  Q   What is the current status of the business?

13  A   This status is closed.  It is a closed account.

14          MS. VOGEL:  No further questions.

15          THE COURT:  Mr. Poff.

16                      CROSS-EXAMINATION

17  By the Defendant:

18  Q   Good afternoon, ma'am.

19  A   Hi.

20  Q   To recap what you said before, ma'am, you said people would

21  basically state when they started their business?

22  A   Well, they give us an open date of when they start their

23  business, that's correct.

24  Q   Is profitability a factor.  Do they have to be a viable

25  business to backdate it?  Is there a start up time they can use?

1  How is it --

2  A    It is based on whatever the person gives us as a date.

3  Q    Can I see Exhibit 7.02, please?  Ma'am, under the date,

4  December 1, 2004, what is that code 7399, if you would happen to

5  know?

6  A    That is an employee identifier.  It is what we call a DEOP

7  number, which is attached to us.  So when we go into the computer

8  system, it tracks who is actually doing the changes and working

9  on it.  So it is an employee of the Department of Revenue.

10 Q    Under notes it says, "Bank of America."  Could you explain

11 that?

12 A    Yes.  On the master business application we do ask for

13 banking information.  If it is provided to us, we would then add

14 it to the account, so we would at least know what was given to us

15 initially as their banking information.

16 Q    Is that the person's bank account or the person paying for

17 it?

18 A    It is whatever bank account they put on the form itself, on

19 the application.

20 Q    Okay.  It is not a card or anything that paid for the fee or

21 anything like that?

22 A    No, it is not.

23 Q    Can I see Exhibit 13, please?  At the bottom of the page,

24 could you please read the contact information at the bottom

25 there?

```
 1    A    I can.  You are talking about the handwritten --
 2    Q    It looks like the first part is to a Tom Guiver, and it gives
 3    us a telephone number.  It says to please call Alexis at another
 4    telephone number and fax to another telephone number.
 5              THE DEFENDANT:  Thank you, ma'am.  That's all I have for
 6    you.
 7              MS. VOGEL:  No redirect.
 8              THE COURT:  You may step down.  You are excused.  Thank
 9    you.
10              MR. SCOVILLE:  The government calls Barbara Tainter to
11    the stand.
12              THE COURT:  Did we skip Mr. Harutyunyan?
13              MR. SCOVILLE:  We sent information to the defense that
14    she would be our next witness.  We moved her back, following
15    Ms. Crocker.  So the next four witnesses are projected to be
16    Ms. Tainter, Mr. Amenta, Ms. Crocker and then Mr. Harutyunyan.
17    Whereupon,
18                          BARBARA TAINTER
19    Called as a witness, having been first duly sworn, was examined
20    and testified as follows:
21              THE CLERK:  Will you state your name for the record and
22    spell your last name?
23              THE WITNESS:  Yes.  Barbara J. Tainter, T-A-I-N-T-E-R.
24                         DIRECT EXAMINATION
25    By Mr. Scoville:
```

1    Q    Good afternoon.

2    A    Good afternoon.

3    Q    Where do you live?

4    A    I live in Pierce County.

5    Q    And where do you work?

6    A    I work for J.P. Morgan Chase.

7    Q    What is your job there?

8    A    I am an investigator in the investigations department.

9    Q    At some point in the past were you working at Washington

10   Mutual?

11   A    Yes.

12   Q    When did you begin working there?

13   A    In September of 2008 -- I'm sorry, in 1994.

14   Q    And when did you switch to working at J.P. Morgan Chase?

15   A    In September of 2008.

16   Q    How did that come about?

17   A    It came about with the acquisition of Chase from the FDIC.

18             THE COURT:  We would all like to know the answer to

19   that.

20   By Mr. Scoville:

21   Q    Can you really tell us how that came about?

22   A    That is outside my area of expertise.

23   Q    In your job, are you familiar with cashier's checks issued by

24   the former Washington Mutual?

25   A    I am, yes.

1    Q    Is part of your job to investigate suspicious checks?

2    A    Yes.

3    Q    What do you typically do to investigate suspicious looking

4    checks?

5    A    I will take a look at the documents presented to me, conduct

6    research through bank records to try and verify their

7    authenticity.

8    Q    I am going to show you a check, which is on the second page

9    of Exhibit 319, previously admitted as a Great American Escrow

10   record.  Ms. Tainter, do you see the check on the second page of

11   Exhibit 319?

12   A    Yes.

13   Q    Have you looked at this check before?

14   A    I have, yes.

15   Q    On the face of the check, do you see anything that is

16   suspicious about it right off the bat?

17   A    Yes.

18   Q    And what is that?

19   A    The check number in the upper right-hand corner appears not

20   to match the MICR line on the bottom of the check.

21   Q    Let's unpack that.  By check number in the upper right-

22   corner, do you mean the number 397889377?

23   A    Correct.

24   Q    And then you said something about the MICR line.  What is

25   that?

1  A   That is the numbers on the lower edge of the check, the kind

2  of funny looking numbers on the bottom.

3  Q   And what numbers, in particular, don't appear to match in

4  that line?

5  A   The numbers after the 68000, you have the 397889177.

6  Q   Are those two sets of numbers, the 397889377 in the upper

7  right-hand corner and the numbers you just talked about are

8  supposed to match?

9  A   That's correct.

10  Q   Ms. Tainter, now I want to focus your attention on the

11  numbers 37 and 103 in the bottom right-hand corner of this check.

12  Do you see those numbers?

13  A   I do, yes.

14  Q   What is the significance of those numbers?

15  A   They represent the branch and the teller number.

16  Q   What branch in particular is 37?

17  A   Overlake Park in Bellevue.

18  Q   And 103 would be a particular teller associated with that

19  branch?

20  A   That is a teller number, yes.

21  Q   Ms. Tainter, did you investigate whether this check was

22  actually issued at Branch 37 of Washington Mutual on the date of

23  July 28th, 2006, that is indicated on the face of the check?

24  A   I did, yes.

25  Q   And what did you do to investigate that?

1    A    I pulled the teller journal reports that we have that show

2    the work that a teller does in a particular day, and looked to

3    see if this check was issued.

4    Q    All right.  Ms. Tainter, I am going to ask you to take a look

5    at Exhibit 322, also previously in evidence.  Let's go to the

6    second page.  What are we seeing here on the second page of

7    Exhibit 322?

8    A    This is the teller transaction journal for Branch 37, teller

9    103, for the business date of 7/28/06.

10   Q    And let's go to -- let's focus in on the line that starts out

11   with the numbers 00019.  I will zoom in on it.  And then I would

12   like you to tell us what is the significance of the numbers that

13   are seen there in that line?

14   A    The 00019 is the sequence number of the transaction for that

15   day.  7/28 is the date.  The time is notated there.  To the right

16   of that would be the check number.  And the amount is $1,100.

17   Q    And then there is a 6.00 right underneath the 1100.  What

18   does that mean?

19   A    That would be a fee.

20   Q    Ms. Tainter, have you reviewed the entirety of Exhibit 322?

21   A    Yes.

22   Q    And after reviewing the teller records contained within that

23   exhibit, were you able to determine whether a check in the amount

24   of $98,000 was issued at that branch on July 28th, 2006?

25   A    I could not locate that check.

1    Q    So what have you determined from your review of Exhibit 322

2    and those records about whether the check we saw on the second

3    page of 319 appears to be genuine or not?

4    A    It appears not to be genuine.

5    Q    Ms. Tainter, have you also attempted to find whether WaMu --

6    I will go back to the second page of Exhibit 319.  Have you

7    attempted to find whether WaMu ever issued some sort of monetary

8    instruments containing the numbers 397889377?

9    A    I did, yes.

10   Q    And let's take a look at Exhibit 321, which I will display on

11   the right-hand side of the screen.  What do we see here in

12   Exhibit 321?

13   A    A personal money order issued by Washington Mutual bank.

14   Q    And is this the monetary instrument that you located that

15   contained that same nine digit number?

16   A    Yes.

17   Q    And what is the amount in the one that you were able to

18   locate in Washington Mutual's records?

19   A    $170.

20   Q    And who is the remitter?  Let me ask you this question:  Is

21   it Armenuhi Harutyunyan?

22   A    It does not appear to be, no.

23        MR. SCOVILLE:  No further questions.

24        THE COURT:  Mr. Poff.

25        THE DEFENDANT:  Your Honor, I don't have anything.

1          THE COURT:  You may step down.

2          THE WITNESS:  Thank you.

3          MR. SCOVILLE:  The government calls Robert Amenta of the

4    Federal Reserve Bank to the stand.

5    Whereupon,

6                          ROBERT AMENTA

7    Called as a witness, having been first duly sworn, was examined

8    and testified as follows:

9          THE CLERK:  Will you please state your name and spell

10   your last name, please?

11         THE WITNESS:  It is Robert Amenta, A-M-E-N-T-A.

12                      DIRECT EXAMINATION

13   By Mr. Scoville:

14   Q   Good afternoon, sir.

15   A   Good afternoon.

16   Q   What city do you live in?

17   A   I live in Glendale, Queens, in New York.

18   Q   When did you fly in?

19   A   Yesterday.

20   Q   Where do you work?

21   A   I work at the Federal Reserve Bank of New York.

22   Q   What do you do there?

23   A   I am an investigator in the illegal group.

24   Q   And what kind of responsibilities do you have in that job?

25   A   I have responsibilities for oversight over banks and bankers,

1   and I have responsibility for responding to subpoenas and

2   requests for Fed Wire information.

3   Q   How long have you worked at the Federal Reserve Bank?

4   A   Since November of 1993.

5   Q   You said something about "Fed Wire" in one of your last

6   answers.  What does Fed Wire mean?

7   A   The Federal Reserve, besides being the central bank and doing

8   monetary policy and regulatory work, we also put out financial

9   products to the industry -- the banking industry.  One such

10   financial product is a wire transfer system, which we call Fed

11   Wire.

12   Q   What is a wire transfer?

13   A   A wire transfer is an electronics funds transfer, where one

14   individual can send money to another individual electronically.

15   Q   And what does one have to do to initiate such a wire

16   transfer?

17   A   Well, you can go to a financial institution, make your

18   request to forward funds to an individual in another area, and

19   the financial institution will have access to some type of a wire

20   transfer system and wires will be sent.  For us at Fed Wire it is

21   a realtime settlement, which means once it happens, the payment

22   was made.

23   Q   And how exactly are the signals that are inputted by the

24   initiator of the wire transfer transmitted?

25   A   Electronically.

1   Q    And what do you mean by that?

2   A    Well, you go into a computer and you enter in data, you hit

3   the send button, they travel through state lines.  Our processing

4   facility is located in New Jersey.  It would go there, and then

5   off to the receiving institution.

6   Q    What is it that happens at the Federal Reserve Bank

7   processing facility in New Jersey?

8   A    That's where we centralized our Fed Wire processing facility.

9   And so that wire transfer --  If you are going to initiate a wire

10  transfer and you used the Fed Wire system, it will hit that

11  processing center for a nanosecond before it goes over to the

12  receiving bank.

13  Q    Where might the receiving bank be located?

14  A    Wherever they are.  Anywhere in the United States.

15  Q    Let's take a look now at Exhibit 161, which has previously

16  been admitted as a Federal Reserve record.  Zoom in on the text

17  in the upper left-hand corner of the diagram.  Mr. Amenta, are

18  you familiar with records like this?

19  A    I am.

20  Q    What are they?

21  A    This is a Fed Wire -- this is a Fed Wire.

22  Q    What type of information, generally speaking, do we see on

23  this page?

24  A    You have your originator, your beneficiary.  For us, the most

25  important part is the OMAD, which is tagged 1120.  That is the

1    most important one for us, because it is unique to Fed Wire.  But

2    you have the date, the amount, the sender, the receiver, and then

3    you have this OMAD, which is important to us.

4    Q    We will walk through those things in steps.  First, OMAD, are

5    you referencing the printed letters O-M-A-D on the left of the

6    page?

7    A    I am.

8    Q    What does that mean?

9    A    Outgoing message acceptance date stamp.

10   Q    And you mentioned that that is proprietary to Fed Wire?

11   A    Yeah.  There is competitors to Fed Wire.  There is something

12   called CHPS, which is a clearinghouse.  The big banks got

13   together and made a competitor to Fed Wire.  And Fed Wire is the

14   only wire transfer system that uses a term called the NIMET.  It

15   is our unique way of identifying the specific wire transfer.

16   Q    Now, let's go over from the OMAD word to the digits 1120?

17   A    That is a specific tag assigned to an OMAD field.  You will

18   look at hundreds of wire transfers, anD each one will say 1120

19   where the OMAD is supposed to be.

20   Q    Going over to the right of the 1120, what is the next piece

21   of information that we see in this line?

22   A    Well, it is a year, month, day.  So it is 2005 April 27th.

23   Q    Keep going to the right.  What is the next constellation of

24   numbers and letters?

25   A    That is the most important one to us.  That is what we call

1   an L-term or an end point.  That D1B74P9C identifies a specific

2   terminal that is registered at the Federal Reserve by that

3   financial institution to be able to do the wire transfers.  So

4   that end term is associated to the receiver DI, which is that

5   field 3400, which is Key Bank.

6   Q   Mr. Amenta, have you researched this particular tag,

7   D1B74P9C, to see exactly what institution it belongs to?

8   A   It belongs to Key Bank, and it is processed out of their

9   facilities in Cleveland, Ohio.

10  Q   And what type of facility is that?

11  A   That is their wire facilities.

12  Q   In what state, again?

13  A   In Cleveland, Ohio.

14  Q   All right.  Moving over from that piece of information, what

15  are the next digits we see?

16  A   The next set of numbers is the message --  This is the 898th

17  method of that day for that financial institution, received from

18  that end point.

19  Q   Keeping going to the right?

20  A   Again, April 27th.  And then it is military time, 1531.  And

21  then the FT01 is important also.  The end point means it is

22  coming from Cleveland, Ohio.  And the FT01 means it has been

23  processed by our facility in New Jersey.

24  Q   You said "coming from" in reference to end point.  Do you

25  actually mean going to?

1    A    Going to, correct.

2    Q    So FT01, what does that mean?

3    A    It is a unique identifier for the Federal Reserve Bank in

4    New Jersey.  Our processing facility is in New Jersey.

5    Q    So does this document indicate to you that the wire transfer

6    involved at least two states?

7    A    Yes, it did.  It mentions -- just in that one line it

8    mentions Cleveland, Ohio and New Jersey.

9    Q    And the last part, because of the FT01?

10   A    It is in our East Rutherford processing facility in

11   New Jersey.

12   Q    Now, just briefly, what is in the IMAD line?

13   A    The IMAD is something the sending bank puts in, so it is

14   year, month, day.  Again, there is a very specific end point,

15   that K3QF382C.  We recognize that is an authorized terminal for

16   the wire transfer to go through.  And then that is their 940th

17   message of the day.

18   Q    And by "their 940th," you mean --

19   A    J.P. Morgan, Houston.

20   Q    You have to wait for me to finish asking.  That's fine.  How

21   do you know that is J.P. Morgan?

22   A    We have researched that one also.  And that comes back to

23   J.P. Morgan in Delaware.

24   Q    And by that you mean, K3QF382C?

25   A    Right.  That L term, we call it, that number is directed to a

1   terminal at J.P. Morgan Chase in their Delaware facility.

2   Q   And what information do we see in the line labelled "amount"?

3   A   $290,541.24.

4   Q   And, more generally speaking, what is the type of information

5   that is indicated in the line amount?

6   A   That is the amount that is transferred.

7   Q   Mr. Amenta, have you also reviewed Exhibits 162, 163, 243,

8   244, 323, 427, 525, 526, 646 to 648 and 823 to 824?

9   A   Yes, I have.

10  Q   Are those also Fed Wire records like the ones we see on the

11  screen here?

12  A   They are.

13  Q   From reviewing those exhibits, were you able to determine

14  whether they had any characteristics shared, in common, with this

15  exhibit, 161?

16  A   Yes.  On the OMAD field they will all have that FT01, and all

17  of the wire transfers will have that term -- that end term,

18  D1B74P9C, which is associated to Key Bank, which is a common

19  characteristic of each exhibit.  So you have the Ohio to

20  New Jersey nexus on all of them.

21  Q   On all of those wire transfers --

22  A   Yes.

23  Q   -- in the exhibits I just referenced?

24  A   Yes.

25  Q   And you previously reviewed those --

1  A   I have.

2  Q   -- in order to save some time in court today?

3  A   Yes.

4  Q   And, Mr. Amenta, as far as the originator identifying

5  information, did that differ among some of those Fed Wires?

6  A   They did.

7  Q   And what were some of the states you saw associated with

8  those different --

9  A   Delaware.  There was another, Ohio.  There was one in

10 Washington.  I think that's it.

11        MR. SCOVILLE:  No further questions.  Thank you.

12        THE COURT:  Mr. Poff.

13        THE DEFENDANT:  Thank you, sir.

14                        CROSS-EXAMINATION

15 By the Defendant:

16 Q   Good afternoon, sir.

17 A   Good afternoon.

18 Q   Now, what is the actual address of the Federal Reserve Bank

19 that you work at?

20 A   33 Liberty Street, New York, New York 10045.

21 Q   So, if I understand you correctly, sir, if I have a means of

22 transferring a wire from this room to a room in a building across

23 the street, first it goes to New Jersey and then it comes back

24 here?

25 A   Yes.

1   Q    Can I ask you a hypothetical question, sir?

2   A    Go ahead.

3   Q    If a gentleman goes to a tailor and he orders a suit here in

4   Washington, and the tailor goes out -- I know the judge is

5   laughing at me because he knows where I am going.  May I ask the

6   question, sir?  I know you are already laughing at me.

7        THE COURT:  Go ahead.  The government has to object.  I

8   don't do it sua sponte.

9        MR. SCOVILLE:  I need to hear the question first, your

10  Honor.

11  By the Defendant:

12  Q    If a gentlemen goes to a tailor here in Washington and gets

13  fitted for a suit, wants a suit, the tailor goes and orders a tie

14  from Ohio, a pair of slacks from Florida, and he compiles all

15  this together in the tailor's shop here in Washington, and

16  subsequently somebody goes and steals that suit from his tailor

17  shop, did he steal items here in Washington or did he steal them

18  from Ohio and Florida as well?

19  A    Say that again.

20  Q    I know it is a little bit confusing.  I almost have to draw

21  this out.  Somebody went to a tailor shop here in Washington

22  State and ordered a suit.  The tailor wanted to give him the best

23  suit possible, and he ordered a special pair of trousers for that

24  suit from Florida, and he ordered a special tie from, say, Ohio,

25  and that was all brought here into Washington State.

1    Subsequently, before the client was able to come and pick that

2    suit up, somebody came and stole that suit.  Was there a crime

3    committed here in Washington or was there a theft in Washington,

4    Florida and Ohio?

5            MR. SCOVILLE:  Objection.  Outside the scope, and calls

6    for a legal conclusion.

7            THE COURT:  I will sustain on the basis of calling for a

8    legal conclusion.  You don't have to answer.

9            THE WITNESS:  I don't know.

10           THE DEFENDANT:  Thank you, sir.  I have no questions for

11   you.  Thank you for your time.

12           THE COURT:  Anything further, counsel?

13           MR. SCOVILLE:  Nothing further, your Honor.

14           THE COURT:  You may step down.  Thank you, sir.

15           MR. SCOVILLE:  The government calls to the stand as its

16   next witness, Linda Crocker.

17   Whereupon,

18                           LINDA CROCKER

19   Called as a witness, having been first duly sworn, was examined

20   and testified as follows:

21           THE CLERK:  Will you please state your full name and

22   spell your last name?

23           THE WITNESS:  Linda Crocker, C-R-O-C-K-E-R.

24                        DIRECT EXAMINATION

25   By Mr. Scoville:

1   Q   Good afternoon, Ms. Crocker.

2   A   Good afternoon.

3   Q   What city do you live in?

4   A   Roy.

5   Q   And where is that?

6   A   Washington.

7   Q   What do you do for a living, Ms. Crocker?

8   A   Right now I am a teacher's assistant.

9   Q   Have you ever worked as a real estate agent?

10  A   Yes, I have.

11  Q   And when did you get into the real estate business?

12  A   March 2004.

13  Q   How long were you a real estate agent?

14  A   From 2004 until the end of last year.

15  Q   And where was it that you worked as an agent?

16  A   Crescent Realty in Spanaway.

17  Q   What kind of company is Crescent Realty?

18  A   It is a real estate company, small.

19  Q   And who did you work with there?

20  A   The broker, Larry Bergstrom.

21  Q   What kind of training did you receive as a real estate agent?

22  A   I went to real estate school, and we had Tuesday meetings

23  where they taught us some things, and then we have classes that

24  we have to go to for 30 hours every two years.

25  Q   Thank you, Ms. Crocker.  I would direct your attention to the

```
1    chart that is mounted on the easel in front of you, Exhibit 1.    I
2    will ask if you are familiar with any of the real estate deals
3    described in that chart?
4    A    Number five.
5    Q    How is it that you are familiar with number five?
6    A    I was the realtor for that.
7    Q    For whom were you the realtor?
8    A    Jim and Cheryl Slopak.
9    Q    Were they the sellers or the buyers in that transaction?
10   A    The sellers.
11   Q    Let me show you Exhibit 500.    Do you recognize the property
12   depicted in Exhibit 500?
13   A    Yes, that is their house.
14   Q    Has any members of the Sopranos ever lived at that house?
15   A    No.
16   Q    Inside joke.    Not even Meadow?
17   A    I don't think they can even sing.
18   Q    Fair enough.    Ms. Crocker, when was it that you began working
19   as the Slopak's real estate agent?
20   A    As close as I can recall, I think it was probably in April
21   of 2006.
22   Q    And do you recognize the man who is seated at counsel table
23   immediately to my right --
24   A    Yes.
25   Q    -- wearing an American flag on his lapel?
```

1    A    Yes.

2    Q    How do you recognize him?

3    A    He was the husband of Alexis that was the buyer of the house

4    in Yelm.

5    Q    When did you first meet the defendant?

6    A    When they came to look at the house.

7    Q    You say "they"?

8    A    I'm sorry.  Bill Poff and Alexis.

9    Q    Was anybody else there?

10   A    Tony Reyes, whatever his name was.

11   Q    And when was it that Tony, Alexis and the defendant all came

12   to look at the house?

13   A    I think it was probably the first part of May.

14   Q    Of 2006?

15   A    Yes.

16   Q    And what were the circumstances in which you met them?

17   A    Alexis had called me on the phone and asked to see the house,

18   so we made an appointment to have them look at the house.

19   Q    How long did you show the house to them?

20   A    How long did I show them?

21   Q    Um-hum.

22   A    I don't know.  We were there a while.

23   Q    How big is the house?

24   A    5800 square feet.

25   Q    Did you walk all the way through it?

```
 1   A    I think so.  I don't recall if we touched on all of it.  I am
 2   pretty sure we did, and the outside.
 3   Q    What do you recall the defendant saying during that meeting
 4   when you were showing him and Ms. Ikilikyan and Tony the house?
 5   A    The only thing I specifically recall is that he said that
 6   Alexis had a lot of properties and she could afford the house.
 7   Q    At some point after that first meeting when you showed the
 8   property, did you get an offer?
 9   A    Yes.
10   Q    And in whose name was the offer at first?
11   A    It was in Alexis' mother's name.
12   Q    What name was that, do you remember?
13   A    I don't know how to pronounce her name.  Her first name
14   starts with A, and her last name starts with an H.
15   Q    Ms. Crocker, I would like to show you Exhibit 515, which I
16   will represent to you was obtained from a file of a lender
17   connected to this case.  I will zoom in.  Do you recognize this
18   document?
19   A    Yes.
20   Q    What is this?
21   A    That is the final purchase and sale agreement between Alexis
22   and the Slopaks.
23   Q    The date in the upper left-hand corner appears to say
24   August 24th, of 2006?
25   A    Yeah, but that is not my writing.
```

1  Q    Is that consistent with your recollection about when the

2  final purchase and sale agreement was negotiated?

3  A    Yes.

4  Q    Please wait to answer any question.  That is consistent with

5  the date you remember the closing being executed, the end of

6  August 2006?

7  A    Yeah.

8  Q    And what were the terms of the final deal?

9  A    1.1 million sale price.

10 Q    In the final deal was there any sort of seller carryback?

11 A    No.

12 Q    Any sort of refund of the total sales price going back into

13 the buyer's pocket?

14 A    No.

15 Q    Between May of 2006, when you first showed the property to

16 Mr. Poff and Ms. Ikilikyan and Tony, and the end of August 2006,

17 when this purchase and sale agreement was finalized, at some

18 point did the name change from the mother of Ms. Ikilikyan to

19 Ms. Ikilikyan herself?

20 A    Yes.

21 Q    And do you remember when it was that the name changed?

22 A    I think probably around July, maybe.  I am not positive.

23 Q    Were you given some sort of explanation for why the name

24 changed?

25 A    I was told that Alexis qualified for the loan more than her

1   mother.

2   Q   Who told you that?

3   A   Mr. Poff.

4   Q   Between May of 2006, when you first showed the property and

5   August of 2006, did you talk with Mr. Poff over the phone at any

6   point in time?

7   A   Yes.

8   Q   How many phone conversations did you and Mr. Poff have?

9   A   I would say ten plus.

10  Q   Do you remember what you were talking about during those

11  phone conversations?

12  A   In the beginning it was about the earnest money, and then

13  forms that needed to be signed or returned.  And then it was

14  about when the inspection and appraisal was going to be done.

15  Mr. Slopak was always asking me things to ask him.  They had

16  tables and chairs in the house, and they wanted to know if they

17  wanted to buy them.

18  Q   In the course of your conversations with Mr. Poff, during the

19  negotiation of his purchase and sale, did he ever say anything to

20  you about what his role was in the deal?

21  A   He was the mortgage broker.

22  Q   Did you also speak with Ms. Ikilikyan at times?

23  A   A few, yeah.

24  Q   Who did you speak more with?

25  A   Bill.

1  Q   At any time did you ever meet in person with Mr. Poff and

2  Ms. Ikilikyan after the initial showing of the house in May

3  of 2006?

4  A   We met at the house one time.

5  Q   When was that?

6  A   Maybe the end of July.  It could have been the first of

7  August.  I don't know.  I don't really remember the exact time.

8  Q   Was it in the middle of your negotiations?

9  A   Well, yeah.

10  Q   Who was there at that meeting?

11  A   Mr. Poff, Alexis, the Slopaks, and myself and my husband.

12  Q   And what was the purpose of that meeting?

13  A   As well as I can remember, it was to show them some of the

14  things, the generator, and discuss a few things about the alarm

15  system, and make sure that everybody was on the same page about

16  the $1.1 million.

17  Q   What do you mean by that, make sure everyone was on the same

18  page about the 1.1 million?

19  A   Because it was a little bit messed up.  It had a price at 1.3

20  at one time.

21  Q   And when you say it had a price of 1.3?

22  A   A purchase and sale agreement for 1.3 million.

23  Q   At that point in time, when the sales price was 1.3, was all

24  of that 1.3 supposed to go to the Slopaks?

25  A   No.

1    Q    What was going to happen then?

2    A    They were going to credit them back $200,000 for closing

3    costs, down payment, whatever.

4    Q    And what was the reason for that, as you understood it?

5    A    What was the reason for that?  For closing costs and down

6    payment, because they said they had had to put a big down payment

7    down.

8    Q    And was this $1.1 versus $1.3 million issue discussed at that

9    in-person meeting that you recall happening approximately in July

10   of 2006?

11   A    Yeah.  Yes.

12   Q    And do you recall Mr. Poff saying anything about that issue,

13   the 1.1 million versus 1.3 million issue?

14   A    Well, the Slopaks wanted it to be 1.1 million, because they

15   didn't want to pay the capital gains, the excise tax and all

16   that.  And Bill said, we will pay the excise tax.  Jim said no.

17   Q    When you said that Mr. Poff said, we'll pay the extra excise

18   tax --

19   A    On the $200,000 that was over and above the 1.1 million.  It

20   was messed up.

21   Q    Ultimately, why wasn't the deal put through with the reported

22   price being 1.3, and the Slopaks only getting 1.1, like you were

23   talking about at that meeting?

24   A    For one thing, Jim said he wouldn't sign the papers if all

25   the paperwork didn't say 1.1 million.  And I believe the

1   financing didn't go through.  We had to --  They didn't get the

2   financing on the closing date.

3   Q   You said "Jim"?

4   A   Slopak.

5   Q   Did Mr. Slopak ultimately agree to go through with the

6   reported price of 1.3 --

7   A   No.

8   Q   Just a second now.  Did he ultimately agree to go through

9   with the reported price being 1.3 and the actual price being 1.1?

10  A   Say that one more time.  I'm sorry.

11  Q   Did Mr. Slopak ultimately agree to go through with the plan

12  where the reported price would be 1.3 and the actual price would

13  be 1.1?

14  A   No.

15  Q   Ms. Crocker, over the course of your negotiations, did

16  Mr. Poff ever say what he was going to do with the Yelm property

17  once he acquired it?

18  A   They were going to make it a church.

19  Q   And did you have any understanding of whether Mr. Poff and

20  Ms. Ikilikyan intended to live there in Yelm?

21  A   No.

22  Q   When you say no, do you mean you had no understanding?

23  A   No, they didn't ever say they were going to live in the

24  house.

25  Q   Was it your understanding that they were going to live there?

1    A    No, they weren't going to live there.

2              MR. SCOVILLE:  No further questions.

3              THE COURT:  Mr. Poff.

4                        CROSS-EXAMINATION

5    By the Defendant:

6    Q    Good afternoon, ma'am.

7    A    Good afternoon.

8    Q    Now, who did the negotiating for the property, as far as the

9    purchase and sale on the real estate side?

10   A    Who did the negotiating?

11   Q    Yes.

12   A    You and I mostly, Alexis.

13   Q    Was there -- were you present at a meeting at the restaurant

14   in Tacoma at Stanley and Seaforts?

15   A    No, I wasn't.

16   Q    Did the Slopaks inform you that they had met with attorneys

17   about the price change?

18   A    Their attorney?

19             MR. SCOVILLE:  Objection.  Calls for hearsay.

20             THE COURT:  I will permit the question.

21             THE WITNESS:  Repeat it, please.

22   By the Defendant:

23   Q    Yeah.  Did the Slopaks tell you they had met with Mr. Poff

24   and Ms. Ikilikyan and the attorneys, in regards to the price

25   change, at the restaurant Stanley and Seaforts in Tacoma?

1   A    No.

2   Q    Did you have a good working relationship with Alexis

3   Ikilikyan?

4   A    Alexis was fine.

5   Q    She was responsive to your phone calls?

6   A    No.

7   Q    She wouldn't get back with you in regards to things that you

8   needed?

9   A    No, not normally.

10  Q    Was Mr. Poff fairly responsive if you needed something?

11  A    No, not normally.

12  Q    He wouldn't help you either?

13  A    Nope.

14          THE COURT:  Careful what you ask, counsel.

15          THE DEFENDANT:  I know.  I apparently am terrible on

16  answering the phone.

17  By the Defendant:

18  Q    So you had a decent working relationship with Ms. Ikilikyan

19  regardless of getting materials you needed?

20  A    She was fine.  She never did anything wrong, to me.

21  Q    Did Alexis Ikilikyan present the purchase and sale agreement

22  to you?

23  A    I am assuming she did.  It came over the fax machine.

24  Q    Did she call you to confirm she had sent it?

25  A    I don't recall if it was you or her.

1    Q    You also said you don't remember walking through the property

2    during the initial --

3    A    No, I said we walked around the property.  I don't know if we

4    went through the entire house.

5    Q    Through the entire house.  I wanted to clarify that.  Thank

6    you very much.

7              THE DEFENDANT:  That's all my questions, your Honor.

8              MR. SCOVILLE:  No further questions.

9              THE COURT:  You may step down.  Appreciate you coming.

10             MR. SCOVILLE:  The United States calls to the stand

11   Armenuhi Harutyunyan.

12   Whereupon,

13                        ARMENUHI HARUTYUNYAN

14   Called as a witness, having been first duly sworn, was examined

15   and testified as follows:

16             THE CLERK:  Will you please state your name and spell

17   your last name?

18             THE WITNESS:  Armenuhi Harutyunyan,

19   H-A-R-U-T-Y-U-N-Y-A-N.

20                        DIRECT EXAMINATION

21   By Mr. Scoville:

22   Q    Good afternoon, ma'am.

23   A    Good afternoon.

24   Q    Ms. Harutyunyan, do you recognize the defendant?

25   A    Yes.

```
 1    Q    How do you know him?

 2    A    He is my ex-son-in-law.

 3    Q    Ms. Harutyunyan, where did you grow up?

 4    A    In Armenia.

 5    Q    And when was it that you came to the United States?

 6    A    1992, April.

 7    Q    What kind of education have you received?

 8    A    In Armenia I have Bachelor's.  Here I have ESL with some

 9    bookkeeping classes.

10    Q    Do you have any children, Ms. Harutyunyan?

11    A    Yes.

12    Q    And who are they?

13    A    Daughter and son, and one son in heaven.

14    Q    And what is the name of your daughter?

15    A    My daughter's name is Alexis Ikilikyan.

16    Q    Do you have any grandchildren, Ms. Harutyunyan?

17    A    Yes.

18    Q    How many?

19    A    One.

20    Q    Ms. Harutyunyan, since coming to the United States from

21    Armenia, what kind of jobs have you worked at?

22    A    I start as a laborer, general laborer, file clerk, office

23    assistant.  My last one -- my present one is Work Source

24    Specialist II.

25              THE COURT:  Say again.
```

1          THE WITNESS:   Present one is Work Source Specialist II.

2    By Mr. Scoville:

3    Q    What is the most --  I'm sorry to have to ask about this, but

4    it is relevant to the issues in this trial.  What is the most

5    income you have ever made?

6    A    Now.

7    Q    And how much is that per month?

8    A    $2,400 net.

9    Q    Per month?

10   A    Per month.

11   Q    How about gross?

12   A    About $2,800, about.

13   Q    Have you ever made more than $2,800 of gross income per

14   month?

15   A    I'm sorry?  Say again.

16   Q    Sure.  Have you ever earned more money than you are earning

17   now?

18   A    No.

19   Q    Mr. Harutyunyan, when did you first meet Mr. Poff?

20   A    When my daughter started to have relationship with him.

21   Q    And approximately when was that?

22   A    2000.

23   Q    At some point were Mr. Poff and your daughter married?

24   A    Yes.

25   Q    When did that happen?

1    A    2002.

2    Q    Did Mr. Poff ever live with you, Ms. Harutyunyan?

3    A    Yes.

4    Q    When did he live with you?

5    A    Before marriage and after marriage.

6    Q    And where was it you were living at that time?

7    A    King County Housing.

8    Q    What do you mean by "King County Housing"?

9    A    Government-supported housing program.

10   Q    Are you familiar with the term "Section 8"?

11   A    Yes.

12   Q    And is that the type of housing you were living in?

13   A    Yes.

14   Q    Ms. Harutyunyan, do you continue to live in King County

15   Housing?

16   A    Yes.

17   Q    And where, in particular, are you living?

18   A    Bellevue, Washington.

19   Q    Were you also living in Bellevue, Washington, in King County

20   housing when the defendant lived with you?

21   A    Yes.

22   Q    So how long did Mr. Poff live with you before he got married

23   to your daughter?

24   A    My memory is a little -- not clear, but about a year.

25   Q    Do you remember --

1   A   A little more.

2   Q   Do you remember when that was in relation to when he and your

3   daughter got married?

4   A   Please say again.

5   Q   Sure.  Do you remember when that was, what year that he lived

6   with you before the marriage?

7   A   He lived with me in 2001.  But they move out before marriage.

8   They move out before --

9   Q   Before --

10  A   Yeah, before marriage.

11  Q   Where did they move to when they moved out?

12  A   They bought house in Tacoma.

13  Q   At some point did they move back to live with you after their

14  marriage?

15  A   Yes.  A few months.

16  Q   You said a few months?

17  A   They moved back to live with me for a few months.

18  Q   And when was that, approximately?

19  A   End of 2002, 2003, approximately.  I don't remember exact.

20  Q   Do you know why it was that they stopped living in their

21  first house?

22  A   I don't remember.

23  Q   So after the period of time when they were living with you

24  after they got married, where did they go next?

25  A   If I remember correctly, they bought house in Federal Way,

1   and then moved there.

2   Q    Ms. Harutyunyan, are your daughter and Mr. Poff still married

3   at this time?

4   A    No.

5   Q    Let's move to a different subject.   At some point did you

6   agree to allow Mr. Poff and your daughter to buy houses using

7   your name and credit?

8   A    Yes.

9   Q    When was that?

10  A    When they start to -- when they start to have a business, the

11  type of real estate business they were doing together.

12  Q    Who was there when you first talked about this?

13  A    I don't remember.

14  Q    Were you concerned about letting Mr. Poff and your daughter

15  use your name and credit to buy houses?

16  A    My concern was, and I tell them I live in housing; that was

17  my concern.

18  Q    By "housing," again, you mean the government-subsidized

19  housing?

20  A    Government-subsidized housing, yes.

21  Q    What exactly was the concern you had about how this

22  arrangement with buying houses might affect your

23  government-subsidized housing?   What was that concern?

24  A    Based on my understanding, if you live in housing, your

25  income is limited.

1  Q   Did you express this concern?

2  A   Yes.

3  Q   Was anything done to address your concern?

4  A   Yes.

5  Q   What was done?

6  A   They told me they went to housing, ask housing authority

7  program.  And they say if I won't make any money, I will be okay.

8        THE DEFENDANT:  Objection.  Hearsay.

9        THE COURT:  I will overrule the objection.

10 By Mr. Scoville:

11 Q   Ms. Harutyunyan, in your last answer you said they went to

12 housing?

13 A   Yes.

14 Q   Who is "they"?

15 A   Bill and Alexis.

16 Q   And then you say they told me that as long as -- who is the

17 "they" again?

18 A   Bill and Alexis.

19 Q   Ms. Harutyunyan, setting aside your concern about the

20 Section 8 housing and your eligibility, why was it you agreed to

21 let Mr. Poff and your daughter buy houses in your name?

22 A   As a mom, if I can help with anything for them to get on

23 their feet and make an income, I will do.

24 Q   Were you expecting to get some sort of money as part of this

25 deal?

A    No.

Q    Ms. Harutyunyan, do you know how many houses were purchased in your name?

A    No.

Q    Did you go look at the houses that were being bought in your name?

A    No.

Q    Did you sometimes sign documents for these house purchases?

A    Yes.

Q    Did you ever give permission for others to sign your name?

A    I give permission for my daughter to sign for me.

Q    Are there some house purchases where you didn't sign any documents?

A    Could be.

Q    Ms. Harutyunyan, over the time when you knew Mr. Poff and when he was married to your daughter, did you ever hear him discussing the real estate business with Ms. Ikilikyan?

A    Yes, but I didn't pay too much attention because I don't understand anyway.

Q    Did you see them working when they were living with you?

A    Yes, sometimes.

Q    From your observations and from what you overheard, did you gain some sort of understanding of who did what with respect to the business?

A    Yes.

Q    What was your understanding of what Mr. Poff did with respect to the business?

A    Like in every office there is a manager and workers.  He was the manager of office.

Q    What do you mean by that?

A    For every direction and questions, she will go to him.

Q    Who was the older of the two?

A    Bill.

Q    By how much, do you know?

A    Eight years.

Q    How old was your daughter when she got married to him?

A    When they made -- I guess she was 20.  When she married she was 22.

Q    And how old was Mr. Poff?

A    By the time they -- 28 -- they got married when he was 30.

Q    What was your understanding of the role your daughter had in the business?  What did she do?

A    She was the one who showing houses.  The system, from general observation, how I understand, she was the one who was showing houses.  That's it, showing houses and making -- like show off and show up, that is her role.

Q    Ms. Harutyunyan, did you ever let your daughter and Mr. Poff set up a bank account in your name?

A    My daughter has one in my name, yes.

Q    And why did you let that bank account be set up?

1   A   I guess that was part of the deal.  I don't understand.  They

2   started.

3   Q   Did you track that bank account?  Did you follow what was in

4   it?

5   A   No.

6   Q   All right.  Ms. Harutyunyan, let's talk now about some

7   specific real estate properties.  Let's start by showing you some

8   pictures.  Take a look at the property depicted in Exhibit 300,

9   which is on the screen in front of you.  Do you recognize that

10  house?

11  A   No.

12  Q   Have you ever been there?

13  A   No.

14  Q   To your knowledge, did you ever purchase that house?

15  A   No.

16  Q   Ms. Harutyunyan, I am now going to ask you to take a look at

17  Exhibit 310.  Do you recognize this document?

18          THE COURT:  Hold on, Counsel.

19          THE WITNESS:  One second, please.

20          THE COURT:  Do you want to go back to the last one now

21  that you have your glasses on?

22  By Mr. Scoville:

23  Q   Ms. Harutyunyan, if you wish, you can also refer to the hard

24  copy, which is in one of the binders in front of you.

25  A   No problem.  I see.

1   Q   Can you see it on the screen?

2   A   Yes.

3   Q   Do you recognize this document?

4   A   No.

5   Q   Did you fill this out?

6   A   No.

7   Q   I will go to the third page of the document.  We will zoom in

8   on the bottom half.  Do you see the box entitled "borrower's

9   signature," which I have just highlighted?

10   A   Yes.

11   Q   Is that your signature?

12   A   No.

13   Q   Ms. Harutyunyan, I am now going to show you another house,

14   which is Exhibit 400.  Do you recognize that house?

15   A   No.

16   Q   Have you ever been there?

17   A   No.

18   Q   Did you ever buy it?

19   A   No.

20   Q   I will show you Exhibit 413 on the screen.  I will zoom in on

21   the top half of the first page.  Do you recognize this document?

22   A   No.

23   Q   Did you fill it out?

24   A   No.

25   Q   And we will go to the third page and zoom in on the bottom

1    half.   In the box entitled "borrower's signature," which I have

2    just highlighted, is that your signature?

3    A    No.

4    Q    One more house.   Exhibit 800.   Do you see that house?

5    A    Yes.

6    Q    Do you recognize it?

7    A    No.

8    Q    Have you ever been there?

9    A    No.

10   Q    To your knowledge, did you ever buy that house?

11   A    No.

12   Q    Did you ever intend to live in that house?

13   A    No.

14   Q    Did you ever tell anyone that you intended to live in that

15   house?

16   A    No.

17   Q    Take a look at Exhibit 809, which I will also show on the

18   screen.   Do you recognize this document?

19   A    No.

20   Q    Did you fill it out?

21   A    No.

22   Q    There, at the top of the first page of Exhibit 809, do you

23   see the signature over the word "borrower"?

24   A    Yes.

25   Q    Is that your signature?

A    No.

          MR. SCOVILLE:  Your Honor, this is a good point to break.

          THE COURT:  Ladies and gentlemen, we will take our break.  We will be back out at 3:15.

 (At this time a short break was taken.)

          THE COURT:  Mr. Scoville.

          MR. SCOVILLE:  Thank you, your Honor.

By Mr. Scoville:

Q    Ms. Harutyunyan, let me show you Exhibit 2.  Do you know the gentleman whose photograph appears in the upper right of the exhibit, where I have just pointed the arrow?

A    Tony?  Yes.

Q    Do you know him?

A    I saw him.

Q    When did you see him?

A    A few times in my daughter's house.  We did have dinner together.

Q    And who is he?

A    I don't know.

Q    What kind of relationship did he have with Mr. Poff and your daughter?

A    To the best of my knowledge they are partners.

Q    What kind of partners?

A    In the real estate business.

1  Q    What makes you say that?

2  A    To the best of my knowledge they have house together.  That

3  is to the best of my knowledge.

4  Q    Do you know where that house is?

5  A    No.

6  Q    Did you ever go over to Mr. Reyes' house?

7  A    No.

8  Q    Did you ever go to some sort of house located on the

9  waterfront near Des Moines or SeaTac?

10 A    No.

11 Q    Ms. Harutyunyan, typically when you were dealing with

12 Mr. Poff and Ms. Ikilikyan, and signing any documents that you

13 did sign, who would bring you the documents?

14 A    Can you say again, please?

15 Q    Sure.  Were you ever brought documents to sign in connection

16 with the houses that were being purchased in your name?

17 A    I am kind of not getting question.  Do I need to --  Where I

18 go to sign documents?

19 Q    No.  The question is, did anyone ever bring you papers to

20 sign in connection with these sales?

21 A    Yes.

22 Q    And who was it that brought you papers?

23 A    It could be like the office -- real estate office or bank to

24 sign papers on my name.

25 Q    Did Mr. Poff or Ms. Ikilikyan ever bring you papers to sign?

1    A    I don't remember.  Could be, either/or.

2    Q    Do you have any recollection at all of Mr. Poff bringing you

3    papers to sign?

4    A    He was -- could be he or my daughter, both of them.

5    Q    Did you ever go to an escrow company to sign documents?

6    A    Yes.  I guess they call it escrow or real estate.  I don't

7    know much difference.

8    Q    And where was it?

9    A    I could be wrong, it could be either Tacoma or Federal Way,

10   or someplace like that.

11   Q    Did you pay close attention to the documents you were

12   signing?

13   A    No.

14   Q    Why not?

15   A    I was trusting them.  This is part of my deal, to help them.

16   And if they need my signature, I will sign it.

17   Q    Ms. Harutyunyan, have you ever owned a computer business?

18   A    No.

19   Q    Have you ever owned a business called Hay Computer Networking

20   and Consulting?

21   A    No.

22   Q    Have you ever worked for such a business?

23   A    No.

24   Q    Do you have any training or skills in computer consulting?

25   A    No.

1   Q    Have you ever applied for a license for Hay Computer

2   Networking and Consulting?

3   A    No.

4   Q    I will show you Exhibit 11, the second page.  I will

5   represent to you this document has been obtained from the

6   Department of Revenue.  Ms. Harutyunyan, do you see that it lists

7   your name in the field for business owner?

8   A    Yes.

9   Q    And it lists Hay Computer Networking and Consulting in the

10  field for business firm name?

11  A    Yes.

12  Q    Did you supply this information to the State of Washington?

13  A    No.

14  Q    What's the address listed for the business mailing address?

15  A    That was my housing address and former apartment.  Now I live

16  in different apartment, same building.

17  Q    So is the address listed here on the second page of

18  Exhibit 11 an address that you used to have?

19  A    Yes.

20  Q    How about the telephone number listed on the bottom of this

21  page, 425-643-6107, do you recognize that number?

22  A    Former telephone number.

23  Q    Of whom?

24  A    Mine.

25  Q    Now, let's take a look at Exhibit 13, which I will display on

1    the screen.  I will zoom in on the writing on the top of the

2    page.  Ms. Harutyunyan, do you recognize this letter?

3    A    No.  But this is my signature.

4    Q    So the signature above the printed letters "Armenuhi

5    Harutyunyan," that is your writing?

6    A    Yes.

7    Q    Do you recall where it was that you signed this?

8    A    No.

9    Q    Do you remember who gave it to you?

10   A    No.

11   Q    Did you write this letter?

12   A    No.

13   Q    From looking at the content of the letter, can you tell us

14   anything about who did write it?

15   A    Usually in their business, when it is about letters and

16   writing, that is going to be Bill.

17   Q    Why do you say that?

18   A    From general observation, anything about presentation,

19   letters.  Well, brain of business is Bill.

20   Q    Ms. Harutyunyan, in August of 2006, where were you actually

21   working?

22   A    If I remember correctly, in Safeco Insurance Company, on call

23   for Work Source Redmond.  Part-time Safeco, on call Work Source.

24   Q    And how much were you earning at that point in time, August

25   of 2006?

1    A    Monthly?

2    Q    Yeah.

3    A    Approximately about -- could be 1500 to 2000, could be.

4    Actually not quite 2000, 1500.

5    Q    When you say that, are you saying gross or net?

6    A    Net.

7    Q    So slightly more gross?

8    A    Slightly more gross, yes.

9    Q    More than $3,000 gross?

10   A    No, not 3000.  Not more than two.

11   Q    How about in February and March of 2007, where were you

12   working then?

13   A    Work Source, Redmond office.

14   Q    And how much were you making at that point in time?

15   A    24 to $2,600 gross.

16   Q    Ms. Harutyunyan, at some point did you learn of the existence

17   of this company, Hay Computer Networking and Consulting?

18   A    When I started to receive those letters from Hay Consulting.

19   Q    What letters are you talking about?

20   A    The letters coming to business owner.  I didn't even open it.

21   I just toss it.

22   Q    To the best of your recollection, when was that, that you

23   started getting mail for Hay Computer Networking?

24   A    Could be three years or four years.  I don't remember.

25   Q    Ago?

1    A    Ago, um-hum.

2    Q    Did you ever discuss this mail that you were getting with

3    Mr. Poff?

4    A    I asked.  And the answer was that was part of the deal.  If I

5    need sign the paperwork, I need to have a business.

6              MR. SCOVILLE:  No further questions.

7              THE COURT:  Mr. Poff.

8                          CROSS-EXAMINATION

9    By the Defendant:

10   Q    Good afternoon.

11   A    Hi.

12   Q    Ms. Harutyunyan, you had stated earlier that Mr. Poff and

13   Ms. Ikilikyan had gotten permission from housing to invest in

14   your name, use your credit?

15   A    To sign paperwork to buy houses.

16   Q    Thank you, ma'am.  Did you ever --  You gave your daughter

17   permission to sign your name.  Did you ever give her power of

18   attorney, a document to do that?

19   A    Best of my knowledge, no.

20   Q    Ms. Ikilikyan, did she step up more in the role of being in

21   charge of the family after her father had passed away?  Did she

22   step up more to be in charge of the family and to dictate what

23   was going on?

24   A    Generally?

25   Q    Generally.

1    A    Why you said that?

2    Q    I am asking, did Ms. Ikilikyan, after her father passed away,

3    did she step up more as the person in charge of the family who

4    made most of the decisions?

5    A    I will say no, because she was in Tacoma, I was in Bellevue,

6    and she was in school.

7    Q    During the time that she lived with you, did she make a lot

8    of the decisions around the household?

9    A    Not clear to me.  Lot of decisions to go to store or --  Not

10   clear to me.

11   Q    Okay, ma'am.

12          THE DEFENDANT:  I will hold my questions right there,

13   your Honor.  I am done.

14          THE COURT:  All right.

15          THE DEFENDANT:  Thank you, ma'am.

16          THE WITNESS:  You're welcome.

17          THE COURT:  Any redirect?

18          MR. SCOVILLE:  No, your Honor.

19          THE COURT:  All right.  You may step down.  Thank you.

20   Does the government have another witness to call?

21          MS. VOGEL:  Yes, your Honor.  The United States calls

22   William Stepp.

23   Whereupon,

24                          WILLIAM STEPP

25   Called as a witness, having been first duly sworn, was examined

1   and testified as follows:

2              THE CLERK:  Will you please state your name and spell

3   your last name?

4              THE WITNESS:  William Lee Stepp, last name spelled

5   S-T-E-P-P.

6                        DIRECT EXAMINATION

7   By Ms. Vogel:

8   Q    Mr. Stepp, in what city do you live?

9   A    Tacoma, ma'am.

10  Q    Can you hear me okay?

11  A    No, not really.

12  Q    Can you hear me now?

13  A    Yes, ma'am.

14  Q    You said "Tacoma"?

15  A    Tacoma.

16  Q    How long have you lived in the Tacoma area?

17  A    Most of my life, with the exception of three years in

18  Germany, three years Hawaii and 13 months in Vietnam.

19  Q    Can you move the microphone closer to your mouth so we can

20  hear you?

21  A    With the exception of three years in Germany, three years in

22  Hawaii, and a 13-month tour in Vietnam, all my life.

23  Q    And what is your occupation -- your civilian occupation?

24  A    I am a retired longshoreman.

25  Q    Do you know the defendant, William Poff?

1   A   Yes, ma'am.

2   Q   How long have you known Mr. Poff?

3   A   Roughly about 15 years, ma'am.

4   Q   What is the nature of your relationship?

5   A   We are both high power shooters, good friends, hunters.

6   Q   You said --

7   A   We go hunting together.

8           THE COURT:  High power shooters.

9   By Ms. Vogel:

10  Q   High power shooters.  Thank you.  Are you familiar with the

11  property located at 7038 South Puget Sound Avenue in Tacoma?

12  A   Yes, ma'am.

13  Q   If you look at the big chart on the easel to your right, do

14  you see that address?  Is that the address that is on line 7 of

15  that chart?

16  A   Yes, ma'am.

17  Q   Can you look, please, at Exhibit 700?  Do you recognize the

18  house depicted in this photograph?

19  A   Yes, ma'am.

20  Q   Is that the house we just discussed on South Puget Sound

21  Avenue?

22  A   Yes, ma'am.

23  Q   How did you come to own this property?

24  A   My father left it to me in his will.

25  Q   And when did you inherit it?

1    A    About '71.  Excuse me.   '91.

2    Q    1991?

3    A    Yes, ma'am.

4    Q    Was this your home?

5    A    No, ma'am, it was my father's home.

6    Q    And after you inherited this home, did you reside at the

7    property?

8    A    No, ma'am, my sister did.

9    Q    At some point did you decide to sell this property?

10   A    Yes, ma'am.

11   Q    When approximately was that?

12   A    Right after the county evicted my sister from the house.

13   Q    Can you give us an idea of what year that was?

14   A    That was about '72, '73 -- '92, 93.  Roughly about six months

15   before I sold it.  It would be about --

16   Q    Would that have been --  Look at the date it was sold.

17   A    2007.

18   Q    So in approximately 2007, did you decide to sell that house?

19   A    Yes, ma'am.

20   Q    What efforts did you take to sell that property?

21   A    First of all, we went in and tried to remodel it.  That's

22   about the same thing as having too many Indian chiefs, not enough

23   Indians.

24   Q    What do you mean by that?

25   A    Well, I had a brother working on it, I had a stepbrother

1   working on it, and everybody has a different idea of what should

2   be done and how.  So it is just a major disaster.  The house was

3   basically stripped down from the walls, the flooring, kitchen

4   cabinets were taken out.  They were trying to rebuild the walls

5   and repair everything.  And basically it was a gutted house when

6   I sold it.

7   Q    At some point during the time that you were trying to sell

8   the property, did you have a discussion with the defendant,

9   Mr. Poff, about that?

10   A    Yes, ma'am.

11   Q    Could you tell us about that discussion?

12   A    We were probably on the range talking about it, and I said I

13   needed to get rid of it.  I had one realtor look at it.  All he

14   was doing was running me around trying to jack the price down.

15   Bill said, we can probably take it off your hands.  He talked to

16   Alexis, Alexis got a hold of me, and we set a price on it.

17   Q    And what was the price you agreed to?

18   A    $100,000.

19   Q    At the time that you and the defendant and his wife discussed

20   you selling them this property, were you aware of what the

21   defendant Mr. Poff's employment was?

22   A    Basically he was unemployed, and had the notary for her.

23   Q    Did you have any discussion with the defendant or Alexis

24   about how they were going to pay for the property?

25   A    Not really.  They had the money, and they said they could

1    possibly refinance the house.  Basically she had the money to

2    back it, is what I am trying to say.

3    Q    Do you recall who was the buyer of the house from you?

4    A    Alexis was.

5    Q    Is there some reason that you were given for why the buyer on

6    the paperwork was Alexis after it was the defendant that had

7    offered to buy the house in the first place?

8    A    Alexis had the company and was the realtor.

9    Q    At some point, Mr. Stepp, did you become aware that the sales

10   price had been represented to be higher than $100,000?

11   A    At signing, I asked what it was.  She stated it was to turn

12   around and get the money when she went to refinance the house to

13   fix it up.  That was what her comment was.

14   Q    By "her," who do you mean?

15   A    Alexis.

16   Q    Who else was present at this meeting?

17   A    My brother, Nick, the escrow person, Bill, Alexis and myself.

18   Q    Can you look, please, at Exhibit 704?  Is this the purchase

19   and sale agreement for that property?

20   A    Yes, ma'am.

21   Q    This reflects a purchase price of $150,000.  Was that your

22   understanding of the true purchase price?

23   A    My price -- what I received was $100,000, ma'am.

24   Q    Can you look, please, at Exhibit 706?  Do you recognize this

25   document?

1   A    Yes, ma'am.  It is the power of attorney signed by my sister,

2   Catherine Resop.

3   Q    When was it that your sister signed this document?

4   A    I think it was the night before.

5   Q    Night before what?

6   A    Before we went for the selling of the home, before we met

7   Bill at the real estate office of Chris Benson's.

8   Q    So when you were talking about the signing earlier, that

9   happened at Chris Benson's office?

10  A    Yes, ma'am.

11  Q    Is that an escrow office?

12  A    Yes, ma'am.

13  Q    So how many signing meetings did you have?

14  A    Just that one, ma'am.

15  Q    Was your sister present at that meeting?

16  A    Pardon?

17  Q    Was your sister present at that signing meeting?

18  A    Yes.

19  Q    She was present --

20  A    No, she was not present at that time.  It was my brother and

21  myself.

22  Q    Did you have a power of attorney to sign for your sister?

23  A    Yes, ma'am.

24  Q    Is this the power of attorney that you had?

25  A    Yes, ma'am.

1  Q   Can we look, please, at Exhibit 701 -- 702?  Is this the

2  statutory warranty deed that transferred title of the property

3  from you and your siblings to Ms. Ikilikyan?

4  A   Yes, ma'am.  That is my signature.

5  Q   Go ahead.

6  A   That was my signature, my brother's signature and my signing

7  for my sister.

8  Q   And this document appears to have been signed and notarized

9  on March 7th; is that correct?

10 A   Yes, ma'am.

11 Q   It appears to be signed and notarized by Micki S. Thompson;

12 is that correct?

13 A   Yes, ma'am.

14 Q   Do you know who she is?

15 A   She was working for the escrow company, I think, ma'am.

16 Q   Do you believe this is one of the documents you signed at

17 that closing session at the escrow company that you just

18 described?

19 A   Yes, ma'am.

20 Q   Now, if we could go back to Exhibit 706?  This special power

21 of attorney for your sister, when does this document appear to

22 have been signed and notarized?

23 A   The date of the signing of the contract.

24 Q   The same day?

25 A   Yes, ma'am.

1   Q   Can you look, please, at Exhibit 707, which I believe is not

2   admitted?  Do you recognize this document?

3   A   Yes, ma'am.

4   Q   And the second.  And the next few pages.  And the next page.

5   What is this document, sir?

6   A   That would be the -- basically the closing papers on the

7   house, ma'am.

8   Q   Is this the settlement -- the final settlement statement for

9   your sale of your property on Puget Sound Avenue?

10  A   Yes, ma'am.

11  Q   In fact, is this your copy of this document that you provided

12  to the government?

13  A   I think it is, ma'am.

14  Q   If you look at the contract sales price in the upper

15  right-hand corner, it says $100,000.  Is that consistent with the

16  document you remember getting after closing?

17  A   Yes, ma'am.

18          MS. VOGEL:  Move the admission of Exhibit 707.

19          THE COURT:  Any objection?

20          THE DEFENDANT:  No objection, your Honor.

21          THE COURT:  707 is admitted.

22          (707 admitted.)

23  By Ms. Vogel:

24  Q   Mr. Stepp, on this particular document, on the contract price

25  it says $100,000; is that correct?

 1   A    Yes, ma'am.

 2   Q    And that is consistent with your recollection of the real

 3   price?

 4   A    Yes, ma'am.

 5   Q    And the documents that you remember obtaining, what did they

 6   say about the contract price?

 7   A    It is a hundred thousand, but they put down $150,000, ma'am.

 8   Q    This document --

 9   A    This document is for $100,000, ma'am.

10   Q    Now I want to show you Exhibit 708.  This has previously been

11   admitted as a Great American Escrow business record.  This also

12   says "Final."  If you read the property location, it has the same

13   address as the house you sold; is that correct?

14   A    Yes, ma'am.

15   Q    It has the same buyer and sellers, you and your siblings as

16   the sellers, and Ms. Ikilikyan as the buyer; is that correct?

17   A    Yes.

18   Q    This version of the HUD-1, the final settlement statement,

19   lists the sales price as $150,000.  Is that consistent with your

20   recollection of the true sales price?

21   A    No, ma'am.  I received $100,000 on it, not the 150.

22   Q    Do you recall ever being shown a settlement statement that

23   said that you sold the property for $150,000?

24   A    No, ma'am.

25   Q    And if we look at the bottom half of this first page under

1  the amounts paid by or on behalf of the borrower, on line 205 it

2  says deposit to seller $50,000, on this version of the settlement

3  statement.   Mr. Stepp, did you ever receive $50,000 from either

4  the defendant or his wife in connection with the sale of this

5  property to them?

6  A   No, ma'am.

7  Q   Mr. Stepp, have you ever resided at a property located -- at

8  a duplex -- in a series of duplexes in Puyallup, Washington?

9  A   No, ma'am.

10  Q   Specifically, have you ever resided at the address 9403 94th

11  Street Court East, Puyallup, Washington?

12  A   No, ma'am.

13  Q   Do you have any -- have you ever been asked to sign a lease

14  or any other document suggesting that you lived at that address?

15  A   No, ma'am.

16  Q   In preparation for your testimony today, do you recall being

17  shown a lease agreement with your name on it that purported to be

18  a lease agreement for that property?

19  A   Yes, ma'am.

20  Q   And can you look, please, at Exhibit 160?  And this has not

21  been admitted.   Page 30, please.   When you were shown this

22  document earlier, did you have any idea where it came from?

23  A   No, ma'am.

24  Q   Have you ever seen it before?

25  A   No, ma'am.

1    Q    Is that your name in the tenant line?

2    A    Yes, ma'am.

3    Q    Is that how you spell your name?

4    A    I use the middle initial L for Lee.

5    Q    Is that how you spell your last name?

6    A    S-T-E-P-P, yes, ma'am.

7    Q    Did Mr. Poff ever ask you to sign a lease agreement, or did

8    Ms. Ikilikyan ask you to sign this lease agreement?

9    A    No, ma'am.

10        MS. VOGEL:  Your Honor, I intend to offer this through

11   another witness, but I would like to ask Mr. Stepp about the

12   signature page, which is page 32.

13        THE COURT:  You may do so.

14   By Ms. Vogel:

15   Q    Mr. Stepp, do you have any recollection of signing this

16   document?

17   A    No, ma'am.

18   Q    Do you have any recollection of Mr. Poff notarizing your

19   signature on this document?

20   A    No, ma'am.

21        MS. VOGEL:  No further questions.

22        THE COURT:  Mr. Poff.

23                         CROSS-EXAMINATION

24   By the Defendant:

25   Q    Good evening, sir.

1   A    Good afternoon.

2   Q    So the actual sale price on the Puget Sound property was

3   $100,000 net to you?

4   A    Correct.  That was before the filing fees and odds and ends.

5   Just the paperwork --  I think there was some type --  I would

6   have to look at the paperwork again.  It was $100,000 before

7   everything was taken out.

8   Q    You also had said that it was Alexis that said the price

9   needed to actually say $150,000 for refinance?

10  A    Yes.

11  Q    And that reason was because the property needed to be fixed

12  up?

13  A    Yes.

14  Q    So she needed the deal to have some sort of built in equity

15  at purchase --

16         MS. VOGEL:  Objection.

17         THE COURT:  You have a lack of foundation.  I will

18  sustain the objection.

19         THE DEFENDANT:  I will rephrase it then, sir.

20  By the Defendant:

21  Q    Did she happen to say that she needed that built-in equity to

22  help with the refinance, is why?

23  A    I think she did.

24  Q    How long did you know Ms. Ikilikyan?

25  A    Say again.

Q   How long did you know Ms. Ikilikyan?

A   I think I met her in '93 at the Marines Reserve Center, Fort Lewis, with you.

Q   Would be --

A   You are talking about Alexis, right?

Q   Yeah, talking about Alexis.  Not the first wife.  Would you mean 2003, sir?

A   I think it was.  Let's rephrase that and make it '96, I'm sorry.  That is more closer to the time period.

Q   That you had met myself or Ms. Ikilikyan?

A   When we were coaching at the time.

Q   Okay.  That you met me out at Fort Lewis?

A   Correct.

Q   And do you remember approximately when you had met Alexis?

A   I think it was on the Saturday --  Oh, my.  And she was your inductee to the Marine Corps.

Q   So it has been several years?

A   Yes.

Q   And during that time you got to know her fairly well?

A   Yes.

Q   From your observations, what could you say about her overall demeanor?  Was she kind of the one in charge of the business operations and everything going on?

A   Most definitely.

Q   Would she put on airs or fronts about what she did, what her

1   industry was?

2   A   Well, I will put it this way:  She went from a country

3   bumpkin to a high class lady in a short period of time.

4   Q   Could you define so-called "high class lady" that you are

5   talking about, sir?

6   A   Well, other than the clothes, the vehicle, the ring, she just

7   was more of a business type person from when I first met her.

8   Q   You specifically mentioned something about a ring.  What is

9   that in reference to?

10  A   She was very proud of her diamond ring.

11  Q   Was there something --

12  A   She was very proud of it, like showed it off a lot.

13  Q   Was it rather large?

14  A   Yes.

15  Q   Okay, sir.  That's what I was wondering.  Did she seem to

16  be -- with the dealings you had with her, did she appear to be

17  honest with you?

18  A   As far as I could tell, yes.

19  Q   As far as you could tell.  Just a couple of other questions

20  for you, sir.  Did Ms. Ikilikyan seem really knowledgeable about

21  her trade, her profession?

22  A   Yes.  She went from real estate to broker, so I think she

23  did, yes.

24  Q   And she talked about the business and transactions?

25  A   Quite often.

1  Q    Quite often.  Okay.  And she would basically talk about being

2  blessed in business?

3  A    Yes.

4  Q    And doing quite well financially?

5  A    Yes, very well.

6        THE DEFENDANT:  I think I will leave it at that.  Thank

7  you for your time.  I will ask you one question.

8  By the Defendant:

9  Q    You dealt with her and she seemed quite technically astute,

10  like she always had the top-of-the-line cell phone, nice

11  laptop --

12        MS. VOGEL:  Objection.  Foundation.

13        THE COURT:  I will permit the question.  You can answer.

14  By the Defendant:

15  Q    Let me rephrase the question for you, sir.  Did it seem like

16  she was very technically astute with how she conducted the

17  business, she always had a laptop that she would deal with, she

18  always had a top-of-the-line cell phone, just on top of

19  technology in every way?

20  A    She had everything on top, whatever the expression, to

21  present herself as a very high class, top-notch realtor, yes.

22  Q    Did she seem very competent in how she used -- like when she

23  would use her laptop for business, did she seem to be extremely

24  proficient in the use of her computer?

25  A    As far as I recollect, yes.

1          THE DEFENDANT:  No further questions.  Thank you, sir.

2          THE COURT:  Redirect?

3          MS. VOGEL:  Yes, your Honor.

4                     REDIRECT EXAMINATION

5    By Ms. Vogel:

6    Q    Mr. Stepp, how many times did you see Ms. Ikilikyan use her

7    laptop?

8    A    About three or four times, ma'am.

9    Q    Three or four times total --

10   A    Yes, ma'am.

11   Q    -- in all the years that you knew her?

12   A    Usually when they would be over at the house for dinner or

13   something like that, ma'am.

14   Q    So most of your contact with her was social or business?

15   A    Both.  It would be one social -- one business and the rest

16   would be social, ma'am.  Either on the rifle range or at her home

17   for dinner.

18   Q    When you first met the defendant, Mr. Poff, what was his

19   employment?

20   A    He was a staff sergeant in the United States Marine Corps,

21   ma'am.

22   Q    At some point were you aware that he left the Marines?

23   A    Yes, sir.

24   Q    What was his employment after that?

25   A    I don't think he had a job at that time.

1   Q    What about all the way through until 2007, when you sold this

2   property to them, what was his employment at that time?

3   A    I really don't think he was employed, other than working as

4   the notary for Alexis.

5           MS. VOGEL:   No further questions.

6           THE COURT:   Anything further, Mr. Poff?

7           THE DEFENDANT:   One further question, your Honor.

8           THE COURT:   It needs to be restricted to the areas that

9   she mentioned.

10          THE DEFENDANT:   Yes.  About employment, correct, sir.

11                          RECROSS-EXAMINATION

12  By the Defendant:

13  Q    Yourself being -- receiving disability through the V.A., did

14  Mr. Poff talk to you about the disability he received from the

15  V.A. as well?

16  A    Yes.

17          THE DEFENDANT:   Thank you, sir.

18          THE COURT:   Ms. Vogel, are you done?  Does the

19  government have any further witnesses today?

20          MS. VOGEL:   I am told we have a witness who didn't show

21  up earlier, who is literally parking her car.

22          THE COURT:   Let's do this.  Are there any matters that

23  counsel wishes to discuss with the court before we close for the

24  day?

25          MS. VOGEL:   May we have one moment?

1          THE COURT:  Yes.

2          MS. VOGEL:  For the record, we would like to acknowledge

3    that we did receive the e-mail expert witness report.  It did not

4    include copies of the actual documents that were examined or the

5    exemplars, which I have requested and been told we will be

6    provided.  For the record, I wanted to say where we were on that

7    matter.  We still are not completely there, but we are further

8    along than we were.

9          MR. RATNER:  I have provided them with the exemplars.

10   Actually, I have sent it to them while we have been in here.

11   They haven't gotten it yet.  They haven't gotten the actual

12   documents, and I should be able to provide that.

13         THE COURT:  Mr. Poff, anything on your side?

14         THE DEFENDANT:  Yes, sir.  I would like to address

15   something.  May it please the court, I am finding it extremely

16   difficult under the situation of duress that I am currently in,

17   sir, to properly be able to cross-examine witnesses based upon

18   the issues that I had raised earlier this morning, sir.

19       The state of duress is actually affecting my ability to

20   represent myself.  I am not complaining about my own competence.

21   I am not claiming to be an attorney.  But the state of duress I

22   am in, based on the issues I had raised earlier this morning, has

23   definitely affected my ability to effectively represent myself

24   here today.  I would like to state that on the record.  Thank

25   you, sir.  May it please the court.

1          THE COURT:  All right.  Counsel, what's the report on

2     your witness?

3          MS. VOGEL:  I can see my witness coordinator standing at

4     the window, looking out.  It is my belief that he is not here

5     yet.  He wasn't here two minutes ago when he went out to check.

6          THE COURT:  Is he walking here?

7          MS. VOGEL:  He was driving from Marysville.

8          THE COURT:  All right.  I will address this to counsel

9     for the government.  How are you coming in terms of your timing?

10    I believe you have completed 15 witnesses as of today out of a

11    total witness list of 40.

12         MS. VOGEL:  I believe we have ten remaining witnesses.

13    We were able to cut several.  It is our expectation that we

14    should finish no later than Tuesday of next week.

15         THE COURT:  All right.  Based on that, I am going to

16    give you the afternoon off.  Mr. Poff, there is a great joke I

17    want you to remember.  This goes back to you asking, I believe it

18    was Ms. Crocker what she thought of your former spouse and then

19    you.  It involves a small New England town, and the long-time

20    kindergarten teacher is in court.  One local lawyer stands up and

21    says to her, what do you think of me?  She said, I had you in

22    kindergarten, you are a horrible drunk, you cheat on your wife,

23    you are a great disappointment to me.  He is shocked and

24    dismayed.  He turns and looks at the other counsel and says, what

25    about opposing counsel?  She said, I had him in kindergarten, he

1   is just a horrible person, he is unkind to his sainted mother, he

2   steals from his clients, he is a huge disappointment to me.  The

3   judge calls them both up to the bar and says, if either of you

4   ask her about me, I am holding you in contempt.  I will see you

5   all at 9:00 tomorrow morning.

6                    (Adjourned for the day)

1                              CERTIFICATE

2

3

4

5

6

7

8

         I, Barry L. Fanning, Official Court Reporter, do hereby

9    certify that the foregoing transcript is true and correct.

10

11                                   S/Barry L. Fanning

12                                   _____

13                                   Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25