**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**IN SEATTLE**

_____

UNITED STATES OF AMERICA,          )
                                   )    NO. CR09-160JLR
                Plaintiff,         )
                                   )
            vs.                    )
                                   )
WILLIAM S. POFF,                   )
                                   )
                Defendant.         )
                                   )
_____


**TRIAL**

_____


**BEFORE THE HONORABLE JAMES L. ROBART**


**March 12, 2010**


**APPEARANCES:**

Sarah Vogel
Michael Scoville
Assistant United States Attorneys
Representing the Plaintiff

William S. Poff
Pro Se
Representing the Defendant

Howard Ratner
Standby Counsel
Attorney at Law

```
 1                        EXAMINATION INDEX

 2   WITNESS                                          PAGE
      EMIL ANDERSON        DIRECT EXAMINATION            4
 3                         By Ms. Vogel:
                           CROSS-EXAMINATION            34
 4                         By the Defendant:
      SUSAN DONALDSON      DIRECT EXAMINATION           40
 5                         By Mr. Scoville:
                           CROSS-EXAMINATION            48
 6                         By the Defendant:
      MICHAEL EDWARDS      DIRECT EXAMINATION           50
 7                         By Ms. Vogel:
                           CROSS-EXAMINATION            56
 8                         By the Defendant:
      KIMBERLY GANS        DIRECT EXAMINATION           59
 9                         By Ms. Vogel:
                           CROSS-EXAMINATION            80
10                         By the Defendant:
     MICKI THOMPSON        DIRECT EXAMINATION           81
11                         By Mr. Scoville:
                           CROSS-EXAMINATION           132
12                         By the Defendant:
                           REDIRECT EXAMINATION        148
13                         By Mr. Scoville:
      BECKY CARNELL        DIRECT EXAMINATION          153
14                         By Ms. Vogel:

15

16

17                        EXHIBIT INDEX
     EXHIBITS ADMITTED                                 PAGE
18      617                                              22
        618                                              24
19      619                                              25
        19                                               28
20      15                                               30
        160                                              32
21      601                                              76
        640                                              77
22      102                                             171
        202                                             179
23      302                                             183
        402                                             187
24      914                                             190
        502                                             192
25      916                                             196
        917                                             197
```

918                                                                          198
919                                                                          198

1          THE COURT:  Counsel, any matters to take up before we

2     call our first witness of the day?

3          THE DEFENDANT:  Yes, one administrative matter.  I was

4     speaking with Barry last night.  There was a mistake on the

5     verbatim report of proceedings.  We corrected that.  I haven't

6     had a chance to go through the record yet.  I am planning on

7     reading that this weekend, but there are probably other mistakes.

8     I just wanted to put that on the record today, sir.

9          THE COURT:  Well, if you haven't read it yet, I wouldn't

10    impune the quality of his transcript.  Thank you for putting it

11    on the record.

12         THE DEFENDANT:  Yes, sir.  Thank you.

13         THE COURT:  The government will call its first witness.

14         MS. VOGEL:  The government calls Emil Anderson.

15    Whereupon,

16                          EMIL ANDERSON

17    Called as a witness, having been first duly sworn, was examined

18    and testified as follows:

19         THE CLERK:  Will you state your name for the record and

20    spell your last name?

21         THE WITNESS:  Emil Anderson, A-N-D-E-R-S-O-N.

22                        DIRECT EXAMINATION

23    By Ms. Vogel:

24    Q    Good morning, Mr. Anderson.

25    A    Good morning.

Q    Where do you live, what city?

A    Lynnwood.

Q    And what is your profession?

A    Banker with Chase Bank.

Q    How long have you been with Chase Bank?

A    Since November.

Q    Where did you work before that?

A    Prior to that, I was with Loan Network slash America One
Finance.

Q    When you say "slash," does that mean the company changed
names?

A    They merged early last year.  So kind of one and the same
company, in a manner of speaking.

Q    What were the two names you said?

A    America One Finance and Loan Network.

Q    How long did you work for the combination of those two
companies?

A    It started right about March of 2004.

Q    And what was your position with America One Finance or Loan
Network?

A    I was -- my title was an operations manager.  I essentially
oversaw all the day-to-day operations, from processors to people
answering the phones, dealing with underwriters, making sure --
dealing with loan officers, making sure everything was getting
taken care of, things were getting in and out in a timely manner,

1   those kinds of things.  Managing everything.

2   Q    What kind of business was America One Finance?

3   A    We were a mortgage company.  We did everything from

4   residential to commercial mortgages, home equity loans.

5   Q    When you say you were a mortgage company, were you actually a

6   mortgage lender?

7   A    No, we were not.  We were a broker.

8   Q    What function does a broker serve in the process of a

9   homeowner trying to find a loan?

10  A    Essentially, we take a transaction that a customer may give

11  us --  Since we have relationships with not just -- since we are

12  not a lender, with our pool of rules we have access to multiple

13  lenders from across the country, and all their various guidelines

14  and rules and various products and obviously varying rates as

15  well.  Our job was to find a product that would match our

16  customer up with the best product that would also give them the

17  best rate and term.

18  Q    When you say "Our customer," who are you referring to?

19  A    Borrowers, somebody who may be trying to refinance a home,

20  buy a new home, buy a rental, so forth.

21  Q    Did America One Finance have its own stable of loan officers,

22  or who were the officers that America One Finance actually used

23  to interact with the borrowers?

24  A    At the time, we had probably about 120 or so loan officers

25  with our branch.  As a corporate entity, there was over 2000.  As

1    far as what I saw, there was 120.

2    Q    Were those loan officers employees of America One Finance?

3    A    They were all independent contractors.

4    Q    Did America One Finance have a physical office during the

5    years that you worked there, 2004, to you said the end of --

6    A    I was there to the end of 2008, was where it was before I

7    closed the office.  It was in Mill Creek on Mill Creek Boulevard.

8    Q    How was America One Finance compensated for providing this

9    brokerage service between the independent contract loan officer

10   and the lender?

11   A    Essentially there were two ways we got compensated.  One was

12   through what is commonly referred to through the newspapers these

13   days as yield spread premium or YSP.  Essentially that would be

14   based on the pricing of the product and the particular lender.

15   This would basically give us a back-end compensation.

16   Q    I would ask you to slow down on your answers just a tiny bit.

17   A    Essentially they would give us a back-end compensation for

18   varying reasons, from the loan type to how big of a loan it was.

19   And typically it was a percentage of the loan amount.

20   Q    And would that come from the lender or from the loan officer?

21   A    That would come from the lender.  And then the other way we

22   got compensated is from charging the customer on the front end.

23   Typically that flowed from a good faith estimate on the front

24   end.  They would sign on the top of the good faith estimate, as

25   either an origination fee or a broker fee.  And, again, sometimes

1    we didn't charge that customer, sometimes we did --

2              THE COURT:  Slow down.

3              THE WITNESS:  Okay.

4              THE COURT:  Thank you.

5              THE WITNESS:  You're welcome.  Sometimes we would charge

6    the customers, sometimes we wouldn't.  It really kind of depended

7    on the situation for the customer.

8    By Ms. Vogel:

9    Q    How then would the independent contractor loan officers be

10   compensated for their part in this process?

11   A    Essentially once the money came in from escrow, it would go

12   directly to our payroll office or corporate office.  And then

13   based on whatever agreements we had with our loan officer, we

14   would divvy up the money to the loan officer in our office

15   accordingly.

16   Q    Mr. Anderson, do you know William Poff, the defendant in this

17   case?

18   A    I do.

19   Q    Do you recognize him here in the courtroom?

20   A    I do.

21   Q    How did you first meet Mr. Poff?

22   A    From what I recall, we met -- at least I met him for the

23   first time at a sushi restaurant right below our office.

24   Q    And when approximately was that?

25   A    I want to say it was the end of '06 or the end of '07.  I

1    can't quite remember the year.  It was the end of the year, not

2    too long before Christmas.

3    Q    Who was present at that meeting?

4    A    It was myself, Bill, Alexis, Tony Reyes and Mike Edwards.

5    Q    When you say "Bill," who are you referring to?

6    A    Bill Poff.

7    Q    The defendant here?

8    A    Yes.

9    Q    Did you know him by William or Bill?

10   A    Bill.

11   Q    When you say "Alexis," who are you referring to?

12   A    His wife.

13   Q    And then you mentioned another person named Tony Reyes?

14   A    He was a loan officer with ours.  Essentially we came in

15   contact with Bill and Alexis through Tony.  He was kind of

16   referred to us.

17   Q    You said yourself, Mr. Poff, his wife Alexis, Mr. Reyes.  Was

18   there anybody else present at that meeting?

19   A    Just Mike Edwards as well.

20   Q    Who is Mike Edwards?

21   A    He is my stepdad, and also my boss at the time.

22   Q    He also worked with America One Finance?

23   A    Yes.

24   Q    What was the purpose of that meeting?

25   A    I know Mike really wanted to make sure that he was going to

1    be able to introduce me to Bill and Alexis since they were going

2    to be sending business our way, to process it for them.  He

3    wanted to make sure and make that introduction, put a face to the

4    name, kind of help solidify the relationship, so to speak.

5    Q    And at that meeting, generally, what was the subject of the

6    discussion?

7    A    From what I recall, it was just more about how we operated,

8    how efficient we were, our processes and how we liked to work,

9    and what kind of flow we had, as far as handling transactions and

10   those kinds of things.

11   Q    From what was discussed at that first meeting, Mr. Anderson,

12   what was your understanding of the defendant and his wife's

13   business?

14   A    My understanding is they had a real estate and a mortgage

15   company, that they handled both the real estate and the mortgage

16   side.  My understanding was that Bill kind of handled the back

17   end of the mortgage processing and so forth.  So part of the

18   whole point of them coming to start work with us is so they would

19   have a larger volume of business.  Because they weren't able --

20   as they wanted to grow, they weren't going to be able to handle

21   the volume they wanted.  So they thought by starting to run their

22   business through us, they could essentially handle more volume

23   and thus be more efficient.

24   Q    Sir, what was the outcome of that first meeting at the

25   restaurant?

1  A   As far as I know, they were going to start sending business

2  our way.

3  Q   And did you ever go on to conduct any mortgage business with

4  the defendant and his wife?

5  A   Yes, we did.

6  Q   And what was the nature of the mortgage transactions that you

7  did conduct with them, what type of loans?

8  A   We did refinances, as well as purchases, both for them

9  personally, as well as their customers.

10  Q   Can you give us an idea of approximately how many

11  transactions they brought to you at America One Finance?

12  A   I wanted to say it was approximately about a dozen or so.

13  They probably brought in about 20, 24 transactions, but we only

14  closed probably close to around a dozen.

15  Q   Were there any particular lenders that you used regularly for

16  loans brought to you by the defendant and his wife?

17  A   At the time we were using several lenders, including Just

18  Mortgage, Green Point Mortgage, National City, and a handful of

19  others we were using at the time.

20  Q   Can you explain for us the process by which the defendant and

21  his wife would bring a loan to America One Finance for the

22  purpose of obtaining a loan -- bring an application, excuse me,

23  to America One Finance for the purpose of obtaining a loan?

24  A   Typically they would either send us a full 1003, which is

25  essentially an application form.  That is the nickname for it.

1  Or they would do what we call the 1003 short form, which is kind

2  of a condensed, one-page version of that.  At which point --  So

3  they would give us that information, along with an authorization

4  to pull credit on whoever that borrower may be.

5  Q    And who is it specifically that would send that information

6  over to America One Finance?

7  A    The loan officer, whoever that would be.

8  Q    And with respect to loans from the defendant or his wife, who

9  is it that would send that information over?

10  A    Typically it would be either Alexis, since she was the

11  licensed loan officer, or Tony, if he was acting as a loan

12  officer for their personal transaction.

13  Q    And in what form would that information be transmitted?

14  A    Sometimes it got faxed over, sometimes e-mailed over,

15  sometimes it got hand-delivered by Tony.  It kind of depended on

16  the transaction.

17  Q    Do you have any recollection of receiving 1003s or loan

18  initiation paperwork directly from the defendant, Mr. Poff?

19  A    Yes, I do.

20  Q    And in what form were those applications conveyed to you?

21  A    Typically via e-mail.

22  Q    What would America One Finance then do with the information

23  from that initial application packet?

24  A    Essentially, once we got that, we would then reverify the

25  information and repackage the 1003, so to speak, with our name on

1    it.  Because frequently it would be either incorrect or have

2    another company's name on the 1003.  So from there we would

3    basically redo all the 1003s and the disclosures to make sure it

4    was going to be in compliance.  And then we would send it out,

5    either to the client directly via Fed-Ex or we would get it to

6    the client through the loan officer, whoever that may be on a

7    transaction.

8    Q    Would you also send it to a lender?

9    A    Once we got it back from the customer, yes, we would.  We

10   would submit that to the lender, along with any verifying and

11   accompanying documents.

12   Q    Let me ask you about a 1003.  Is there anywhere on the 1003

13   form that designates to which lender that application is

14   intended?

15   A    No, it does not.

16   Q    In your experience, how common is it for people to send the

17   same 1003 form to multiple lenders?

18   A    I know quite a few companies that did it on a regular basis.

19   We tried not to, as far as our operation was concerned.  But on

20   occasion, it would happen with us as well.

21   Q    So, for example, if you sent an application off to one

22   company and it was not successful --

23   A    Um-hum.  We would then in turn try -- attempt to get the loan

24   elsewhere, by sending it to another lender we thought would meet

25   the criteria for that particular borrower.

Q     After you had submitted a packet to a lender on behalf of one
of your client loan officers, what was the next step in the
process?

A     Well, once it got to the lender, they would then review or
underwrite the transaction, and then send us a conditional
approval, which would essentially spell out any deficient items,
what they consider to be deficient or what they wanted more
evidence or documentation on.

Q     And what would you, as America One Finance, do with that
conditional approval?

A     We would either contact the loan officer or the borrower
directly, or if it was a third-party vendor we needed to work
with.  Our role was to attempt to obtain all the documents to
satisfy those conditions on that approval so we could get it to
closing.

Q     And in the case of loans that had been brought to you by the
defendant and his wife, who is it that you would contact with the
conditions that had been conveyed to you from the lender?

A     We would then contact, like I said a minute ago, either the
customers or the loan officer directly.  I know in the case of
Alexis and Tony, we would typically like to -- or even Bill, we
would contact one of them directly, either e-mail or phone, to
try to convey the things we needed to get from the borrower to
get the loan closed.

Q     Do you have any specific memory or recollection of contacting

1   the defendant about conditions that had come back from lenders on

2   loans that he and his wife had brought to you?

3   A    Yes.  It was not uncommon --  I can't remember any specific

4   instances, per se, with regard to a transaction.  But I know it

5   was a common --  Commonly we would call Alexis first.  If she

6   didn't answer, we would call Bill, or vice versa.  Sometimes Tony

7   would call us and ask us questions, depending on who was involved

8   in the transaction.  Sometimes also --

9   Q    After all of the conditions had been satisfied, what was

10  America One Finance's role?

11  A    We would essentially just make sure that the documents

12  actually made it to escrow via e-mail, make sure that escrow did

13  get the client signed the day and time they needed to get it

14  signed, and we would also try and verify the HUD to make sure the

15  client wasn't getting mischarged or getting overcharged and so

16  forth.  And then essentially make sure we got our money from

17  there.

18  Q    Mr. Anderson, do you recall there ever being a loan that had

19  been brought to you by Alexis Ikilikyan exclusively?

20  A    I can't say any one in particular, it was just Alexis.  Like

21  I said a minute ago, typically Bill would call or Alexis would

22  call, either one of them.  And we called either one of them as

23  well.

24  Q    Now, at some point did you stop doing business with the

25  defendant and his wife?

1    A    Yes.

2    Q    And when was that, approximately, do you remember?

3    A    It was roughly --  I don't remember the date anymore.  I know

4    it was around the time that Bill went to Michigan or so.

5    Q    And at the same time, did you stop doing business with

6    Ms. Ikilikyan as well?

7    A    Yes, we did.

8    Q    Is America One Finance still in business?

9    A    Under the combined ownership of Loan Network, yes.

10   Q    Mr. Anderson, upon receiving a loan application packet from

11   the defendant and his wife, what efforts did you or anyone at

12   America One Finance make to verify the claims of employment?

13   A    That was typically done by the lender.  So we would

14   essentially take the information, pass that along to the lender,

15   and they would -- in 99.9 percent of the cases with the lenders,

16   they would do their own verification of employment.

17   Q    So did America One Finance have any role in verifying those

18   claims?

19   A    Like I said, generally, on almost any transaction we did, we

20   never did.

21   Q    And what effort did America One Finance make to verify claims

22   of down payment?

23   A    We would obtain documentation either from a bank statement or

24   from the bank directly, or sometimes funds would come from other

25   places, for instance an escrow firm from the sale of another

1    property.  So we would sometimes get like a HUD settlement

2    statement from an escrow agency.  I mean, I could go into many

3    different ways, but we would get some sort of verifying document

4    from some institution or third-party.

5    Q    From whom would you get those verifying documents?

6    A    Sometimes they came from the borrower, sometimes the loan

7    officer would get that from the borrower, sometimes we would

8    contact the bank and they would fax us a verification or e-mail

9    us a verification back.  It kind of depended on the transaction,

10   what was going on.  In the case of a HUD statement, that would

11   come from the escrow agency.

12   Q    Focusing now on the loans that were brought to America One

13   Finance by the defendant and his wife, that were for themselves.

14   Who were the borrowers on those transactions?

15   A    Generally it was just Alexis.

16   Q    Do you recall any other family members that were borrowers on

17   transactions?

18   A    Yes.  It would have been Alexis' mom as well.

19   Q    Was the defendant, Mr. Poff, ever a borrower on a loan that

20   you worked on?

21   A    There might have been one in Tacoma that he was going to be

22   the borrower on, but we never actually did that transaction,

23   never actually closed it.

24   Q    How was the defendant Mr. Poff's role in the process that you

25   just described different, if it was, when Alexis Ikilikyan was

1   the borrower?

2   A    It didn't really change.  Sometimes he would call, sometimes

3   she would call, it just kind of depended on any given day what

4   was going on.

5   Q    And what about when the borrower was Alexis Ikilikyan's

6   mother, if it was, how would the defendant's role in the process

7   change?

8   A    The same thing, it would be either him or Alexis.  It is

9   interchangeable sometimes.  We would call either one of them as

10  well.

11  Q    And I want to direct your attention to this big chart over

12  here, Exhibit 1.  You can use that to help refresh your

13  recollection of addresses.  My question is, what is the first

14  loan you recall working on with the defendant and his wife?

15  A    As far as timing is concerned?

16  Q    No.  My question is, what is the first loan you recall

17  working on?

18  A    One of the very first ones I recall was a property out in

19  Issaquah.

20  Q    In Issaquah?

21  A    Yes.

22  Q    And is that the address on line 6 of this chart, 9488 199th

23  Avenue South in Issaquah, Washington?

24  A    I believe it is, yes.

25  Q    Can you recall how the loan process for this particular loan

1   began?

2   A    I believe there was an e-mail sent by Bill to Tony, and then

3   Tony forwarded it along to us, with an application.  And at that

4   point -- that is when the process started from there.

5   Q    Can you look, please, at Exhibit 616?  Is this the e-mail you

6   are referring to, Mr. Anderson?

7   A    It does look like it, yes.

8   Q    If you could just flip through a few pages so he could see

9   the rest of this exhibit?  Does that match your recollection of

10  the attachment that you just referenced?

11  A    Yes, it does.

12  Q    Was it unusual for you to get loan applications by e-mail, if

13  you have e-mail like this, that had been sent to Tony and then

14  forwarded to you?

15  A    In their case, no, it wasn't unusual.

16  Q    On the line that says "To Emil Anderson," is that you?

17  A    Yes, it is.

18  Q    If we could look, please, at the exhibit -- at the first page

19  of the attachment?  Excuse me.  This is a 1003; is that correct?

20  A    Yes, it is.

21  Q    And it is for the same property under the subject property

22  line, 9488 199th Avenue Southeast; is that correct?

23  A    It looks like it, yes.

24  Q    And this seeks 1.5 million in loan proceeds; is that correct?

25  A    That's correct.

Q    And who is the borrower on this 1003?

A    It is Alexis.

Q    Now, why would the attachment title on this e-mail say "1003 for WaMu"?

A    I would assume because they probably attempted to send this transaction to Washington Mutual prior to bringing it to us.

Q    Did America One Finance work with Washington Mutual?

A    They were one of our lenders, yes.

Q    Now, do you recall who the ultimate lender was for this transaction?

A    We did a loan --  The first mortgage with Green Point and the second mortgage with National City.

Q    Now, after receiving this 1003 --  Actually, let's look at the whole page and then the next page.  What is the income for Ms. Ikilikyan that is claimed in this version of the 1003?

A    The base income is $78,000.

Q    And what is the total gross monthly income?

A    $100,126.

Q    In the interview byline at the bottom, please.  Is this a 1003 that your office would have prepared?

A    No, it is not.

Q    After receiving this 1003 via e-mail, the e-mail we have seen, what did you do with it?

A    From what I recall, we would have -- well, as we do with any transaction, we would have regenerated the 1003 with our name and

1    all of our proper disclosures attached to it.  We would have gone

2    through and verified the information, such as the income and

3    assets.  And if it was incorrect, we would adjust it accordingly.

4    Q    Mr. Anderson, do you have any recollection about what type of

5    loan this was?  And by that I mean, the purpose of the loan.

6    A    It was a purchase transaction.

7    Q    And do you recall whether it was for an owner-occupied loan

8    or an investment of some sort?

9    A    It was owner occupied.

10   Q    On the same day that you received this e-mail that we just

11   looked at, Exhibit 616, did you receive several other e-mails

12   that were from the same e-mail address?

13   A    Yes, I did.

14   Q    That also had been sent to Tony Reyes and then forwarded to

15   you?

16   A    Exactly, yes.

17   Q    And have you looked through those just recently prior to your

18   testimony?

19   A    Yes, I have.

20   Q    Can you look, please, at Exhibit 617?  Is this one of those

21   e-mails?

22   A    It appears to be.

23   Q    And, in fact, is this an e-mail that you found in your system

24   and you brought to us prior to this trial?

25   A    I believe it is, yeah.

1          MS. VOGEL:  Move the admission of 617.

2          THE DEFENDANT:  No objections, your Honor.

3          THE COURT:  Admitted.

4          (617 admitted.)

5    By Ms. Vogel:

6    Q    What is the date that this e-mail was originally written and

7    sent to Tony Reyes?

8    A    December 23rd, 2006.

9    Q    And what is your understanding of what is meant by this

10   e-mail?  And I ask that because there seems to be some

11   abbreviations and mortgage jargon.

12   A    He was looking for what we call 80 percent loan to value rate

13   in term refinance, meaning they weren't trying to get any cash

14   out of the transaction, they were just trying to lower the rate

15   or payment on it.  80 percent rate referred to its value compared

16   to what they were borrowing.  So they were borrowing 80 percent

17   of its value.  An investment property would have been a rental

18   property.

19   Q    And what is your understanding, Mr. Anderson, of who wrote

20   this e-mail that was forwarded to you?

21   A    It looks like it was Bill.

22   Q    And by "Bill," do you mean the defendant?

23   A    Yes.

24   Q    And the last line before the closing says, "Closing through

25   Great American."  Do you know what that means?

1    A    Great American Escrow.   They were a closing -- escrow firm.

2    Q    What was the percentage of closings that the defendant and

3    his wife would use Great American Escrow for?

4    A    They tried to use Great American Escrow for everything, was

5    what my instructions were.

6    Q    And the attachment to this e-mail, Exhibit 617, is entitled

7    "Colgate Appraisal."  Is that something that would also be

8    e-mailed to you as part of the loan application process?

9    A    It wasn't uncommon for any loan officer to have to send us an

10   appraisal they may have already had done previously.   In their

11   case, I am pretty certain this would have been done under their

12   mortgage company's name, U.S. Investment.   So that would force us

13   to order an appraisal again in our name.

14   Q    If we could look at the first page of the attachment?   The

15   next page.   Is this, indeed, the first page of an appraisal for a

16   property on Colgate Drive West?

17   A    Yes, it is.

18   Q    Was this a loan --  Do you have any recollection of working

19   on this loan?

20   A    A little bit.

21   Q    Can you look, please, at Exhibit 18?  Is this another e-mail

22   that you received on this same date, December 23rd, 2006, from

23   the same e-mail address, forwarded from you -- to you from Tony

24   Reyes?

25   A    Yes, I got it on the 26th.

Q   And who do you believe to be the author of this e-mail?

A   Bill.

Q   By "Bill," you mean the defendant?

A   Yes.

         MS. VOGEL:  Move the admission of 618.

         THE DEFENDANT:  No objections, your Honor.

         THE COURT:  618 is admitted.

         (618 admitted.)

By Ms. Vogel:

Q   Can you tell us what this e-mail is about?

A   It looks like it is a refinance for yet another rental property, also 80 percent loan to value, and also rate in term, so no cash out.

Q   At the bottom where it says "BTW," is that again a reference to the company?

A   "By the way, all these deals are to close through Great American Escrow."

Q   And the attachment in this case is entitled, "Alexis 8101 re-fi"?

A   That's correct.

Q   Can you look, please, at the first page of the attachment? Is that another appraisal, this time for a property located at 8101 South 19th Street in Tacoma?

A   Yes.

Q   Do you have any recollection of working on this loan?

```
 1    A    I do a little bit, yes.

 2    Q    Can we look, please, at one more, Exhibit 619?  Is this

 3    another e-mail that you were forwarded by Tony Reyes from the

 4    same original e-mail address on the exact same date?

 5    A    Yes, it is.

 6    Q    Who do you believe to be the author of this e-mail to you?

 7    A    Bill.

 8    Q    And by "Bill," do you mean the defendant?

 9    A    Yes.

10         MS. VOGEL:  Move the admission of 619.

11         THE DEFENDANT:  No objections, your Honor.

12         THE COURT:  619 is admitted.

13         (619 admitted.)

14    By Ms. Vogel:

15    Q    Can you interpret this for us?  What does this mean, a 90 to

16    100 NOO?

17    A    They are looking for 90 to 100 percent of value loan based on

18    a rental property they had.  It doesn't say whether it was for

19    cash out or rate in term.  This is a purchase for the deal.  And

20    they were also to close through Great American Escrow.

21    Q    And the attachment is entitled, "Harutyunyan in Tacoma

22    appraisal;" is that correct?

23    A    Yes.

24    Q    Do you know who Harutyunyan is?

25    A    I believe that is Alexis' mom's last name.
```

Q    And, again, is the attachment to this exhibit another appraisal?

A    It would appear so, yes.

Q    And this is for yet a different property in Tacoma; is that correct?

A    Correct.

Q    I want to direct your attention now to property number seven on the chart, 7038 South Puget Sound.  Do you have any recollection, Mr. Anderson, of being involved in a mortgage loan transaction involving that property?

A    We did try to obtain one.  We actually had several attempts, yes.

Q    Tell us what type of loan that was.

A    We originally tried to obtain just a generic, cash-out refinance.  If my memory serves me correctly, it was either mostly or completely free and clear.  That means there was no lien against the property.  And then apparently, in trying to do that we found out the property was in pretty disrepair.  So I attempted to go through a local private money group that funded on homes that were in disrepair.  They were based out of North Seattle.  They sent one of their local guys down there only to find out the property was condemned or something along those lines by the City of Tacoma.  It had a big sticker on the front door, cars piled up in the back, and completely in a nonlivable condition.  And so at that point I found out that they said they

1  were still willing to lend on the transaction, but they were only

2  going to do a third of the original loan amount.

3  Q   You said we were trying to get this loan.  Who is "we" that

4  you were working with?

5  A   I was working with Bill and Tony predominantly on this one.

6  Q   Did you also receive at least one e-mail from the defendant

7  relating to this attempt to get a -- as you call it, a hard money

8  loan out of this transaction?

9  A   Yes.

10  Q   And could you look, please, at Exhibit 19?  Is this an e-mail

11  to you at Emil AT America One Finance dot com?

12  A   Yes, it is.

13  Q   What is the e-mail address you received this from?

14  A   From USMR at Comcast dot net.

15  Q   Who did you believe that e-mail address to have been used by

16  at the time this was sent?

17  A   Bill.

18  Q   By "Bill," do you mean Mr. Poff?

19  A   Yes.

20  Q   Does this e-mail relate to the attempt to get a loan for the

21  house, property number seven, that we just talked about?

22  A   Yes, it was in regard to that.

23         MS. VOGEL:  Move the admission of Exhibit 19.

24         THE DEFENDANT:  No objections, your Honor.

25         THE COURT:  19 is admitted.

```
 1                   (19 admitted.)
 2    By Ms. Vogel:
 3    Q    Can you tell us what this e-mail is about, specifically?
 4    A    As I mentioned before, there -- the property was in great
 5    disrepair.  As I remember, this attachment was in regards to, I
 6    guess, a checklist or something showing that it -- Bill was
 7    supposed to be sending this to me to show that the property
 8    wasn't as bad -- what the issues were at the property.  I don't
 9    remember exactly what it said.  It was something along those
10    lines, from the City of Tacoma.
11    Q    Was Ms. Ikilikyan involved at all in this attempt to get --
12    draw money out of this Puget Sound property?
13    A    She probably was.  I don't recall in what capacity, if she
14    was, or any particular conversations.
15    Q    And ultimately were you able to complete that loan?
16    A    No, we were not.
17    Q    I want to direct your attention now to property number one on
18    this chart, Exhibit 1, the big chart over here, the series of
19    duplexes in Puyallup, Washington?
20    A    Um-hum.
21    Q    Do you have any recollection of attempting to broker a loan
22    for those properties?
23    A    I do.
24    Q    What was the nature of the loan that was sought?
25    A    We were trying to obtain a commercial loan in the form of a
```

1  multifamily commercial loan, by essentially combining them all

2  underneath one loan, treating it much like you would an apartment

3  complex.

4  Q    Commercial loans, are there different verification and

5  financial requirements for lenders?

6  A    Yes, there are.  Essentially for commercial loans, at least

7  the ones we were working on, they essentially require rent rolls,

8  lease agreements.  By rent rolls, it was like a running, yearly,

9  kind of detail showing who their tenants were, when their leases

10  were up, how much their rents were.  And then we would also need

11  tax returns, bank statements.  It was a very detailed process.

12  Q    Do you recall communications with the defendant or his wife

13  about the need for these types of more detailed financial

14  documents in order to get this commercial loan for the Puyallup

15  duplexes?

16  A    Yeah, there were quite a few conversations about that.

17  Q    Did you ultimately obtain the tax information that you

18  needed?

19  A    No, we did not.

20  Q    Can we look, please, at Exhibit 15?  Is this another e-mail

21  that you received from the same e-mail address, USMR at Comcast

22  dot net?

23  A    Yes, it is.

24  Q    This is dated Monday, March 24th, 2008.  Who do you believe

25  this e-mail to be from?

1    A    Bill Poff.

2    Q    And does it pertain to the attempt to refinance the Puyallup

3    duplexes as you have just described?

4    A    Yes, it does.

5            MS. VOGEL:  Move the admission of Exhibit 15.

6            THE DEFENDANT:  No objections, your Honor.

7            THE COURT:  15 is admitted.

8            (15 admitted.)

9    By Ms. Vogel:

10   Q    If we start down at the bottom in the body, can you tell us

11   what you are asking for there?

12   A    I asked Fidelis -- Fidelis, that was their company, that held

13   the title to these properties, for tax returns for 2004, 2005 and

14   2006.  And specifically I needed the K1s.  That was a form that

15   was part of the taxes.

16   Q    And what was the response in this e-mail that is signed

17   "Bill"?

18   A    He said, "Emil, there are no returns for Fidelis.  Everything

19   is in LLCs.  Hence, it is counted as passthrough taxation and

20   listed on Alexis' personal income tax returns."  That didn't

21   really make any sense to me.

22   Q    Were you ever able to obtain the Fidelis tax information that

23   you needed to get this loan through?

24   A    No, I was not.

25   Q    Why are tax returns needed for these types of loans, if you

1    know?

2    A    Tax returns are essentially a way to kind of self check and

3    balance these transactions.  So the tax returns would validate

4    what was on the lease agreements and the rent rolls.  And the

5    rent rolls would validate what was on the tax returns.  As well

6    as the bank statements, would validate that as well.  It was kind

7    of a check and balance system to kind of verify itself.

8    Q    You mentioned "rent rolls" and "lease agreements."  Did you

9    also obtain those for this attempted transaction?

10   A    Yes, I did receive lease agreements.

11   Q    Can you look, please, at Exhibit 160?  Is this another e-mail

12   that you received from the same e-mail address?

13   A    Yes, it is.

14   Q    And approximately the same date and year?

15   A    Yes, it is.

16   Q    Same month anyway?

17   A    Yes.

18   Q    Who do you believe to be the author of this e-mail?

19   A    It looks like it was originally Alexis, or Bill and Alexis,

20   sending it to Tony, and then Tony forwarding it off to me.

21   Q    In your recollection, are the attachments to this e-mail the

22   lease agreements for the Puyallup duplexes that you had been

23   requesting from the defendant in this case?

24   A    Yes.

25           MS. VOGEL:  Move the admission of 160.

1          THE DEFENDANT:  No objections, your Honor.

2          THE COURT:   160 is admitted.

3          (160 admitted.)

4   By Ms. Vogel:

5   Q   I will ask you to jump directly to page 30 of Exhibit 160.

6   Does this appear to be a lease agreement?

7   A   Yes, it does.

8   Q   And does it appear to be a lease agreement for one of the

9   duplexes that were a part of that set of Puyallup duplexes?

10  A   It does appear to be so.

11  Q   And who is the person that is listed as the tenant in this

12  lease agreement?

13  A   It says William Stepp.

14  Q   And if we could move, please, to the third page, the

15  signature page of this lease agreement?  Who is it that notarized

16  this document?

17  A   William S. Poff.

18  Q   And the remainder of the pages for that exhibit, are they

19  similar lease agreements?

20  A   Yes, they are.

21  Q   All for those duplexes?

22  A   Yes, they are.

23  Q   I want to direct your attention now, Mr. Anderson, to

24  property eight on our chart, 27419 8th Avenue South, Des Moines,

25  Washington.  Do you have any recollection of being involved with

1   the defendant or his wife in any loan transactions involving

2   property at that address?

3   A   Yes, I do.   That was gorgeous waterfront property down in

4   Des Moines.   I can't say I remember any specific conversations

5   with Bill or Alexis specifically.   As with all the transactions,

6   I do recall speaking to them on a regular basis.

7   Q   Do you recall who was the buyer in this transaction, 27419?

8   A   This was Alexis' mom.

9   Q   Do you have any recollection about the purpose for which

10  Ms. Ikilikyan's mother wanted to buy this property?

11  A   She wanted to have a nice waterfront property with a view.

12  Q   Did she intend to live --   Were you told that she intended to

13  live in the property, or do you have knowledge?

14  A   She was wanting to live in it.   That's what I recall the --

15  the whole application was based on that.

16  Q   Did you have any specific conversation with the defendant or

17  his wife about Ms. Ikilikyan's mother's intent to live on this

18  property?

19  A   I don't personally recall any conversations.   I know my boss

20  at one point --   I don't recall if it was on this one or another

21  one that they did for Alexis' mom, but he did have a conversation

22  with them in regards to that.

23  Q   Who ultimately was the lender on this transaction, 27419?

24  A   This one was for Just Mortgage.

25  Q   Did that go through America One Finance, your team?

A   Yes, it was.

Q   Were you, as the mortgage broker, aware of any seller financing in connection with the purchase -- with Ms. Harutyunyan's purchase of 27419?

A   No, we were not aware of that.

Q   Is that something you should have known about?

A   Yes, it is.

Q   Why is that?

A   It materially changes how the loan is structured with our lender.  They have certain guidelines that spell out what the loan to value for those first and second mortgages are allowed to be.  If there is seller financing, that materially changes the loan to value, which would then change whether they will even do the loan or not.

          MS. VOGEL:  No further questions.

          THE COURT:  Mr. Poff.

                    CROSS-EXAMINATION

By the Defendant:

Q   Good morning, Mr. Anderson.

A   Good morning.

Q   Now, Mr. Anderson, did you get an opportunity to speak to an investigator that was representing Mr. Poff in relation to this trial?

A   Yes, he called me, I think, last week, the end of last week. Actually I called him in return to a call he gave me.

1    Q    Did you have an opportunity to actually speak with him?

2    A    Very briefly, yes.

3    Q    What did you say during that conversation?

4         MS. VOGEL:  Objection.  Hearsay.

5         THE COURT:  Mr. Poff, the objection is well taken.  You

6    can get the same testimony in if you think about how to rephrase

7    your question.  The record should reflect Mr. Poff is consulting

8    with his standby counsel, Mr. Ratner, who is going to teach him

9    the rules of evidence here briefly.

10   By the Defendant:

11   Q    Sorry, sir.  In regards to how to rephrase it, were you

12   willing to answer questions that he was asking you?

13   A    Not necessarily over the phone.  That is not something I

14   would do over the phone.  He was trying to convince me to come

15   and sit down and meet with your investigator or you.  As I told

16   him several times, it has been extremely busy for me with work

17   and family and church and so forth.

18   Q    You didn't have an opportunity to go and sit down and speak

19   with him then?

20   A    Not in person, no.

21   Q    Thank you, sir.  Did the government have an opportunity to

22   talk to you or interview you prior to trial?

23   A    Yes, they have.

24   Q    And how long was the interview process?

25   A    Hour-and-a-half maybe, two hours, something like that, give

1    or take.  I don't remember exactly how long.

2    Q    So in your recollection they had an hour-and-a-half, two

3    hours to interview you in regards to this trial?

4    A    That's correct.

5    Q    Thank you, sir.  You had mentioned something about 1003s,

6    that the same 1003 wouldn't be sent to different lenders.  Did

7    you have to change the 1003s from the different lenders?

8    A    When I would get one from you guys, I would have to

9    regenerate it, yes, and send it off to the borrow, whoever that

10   may be, either your client or your wife.  We would have to resend

11   that out with our company name on it, and then information that

12   may have been a required change.

13   Q    When you generated your company's 1003, did you have to

14   change it when you sent it to different companies?

15   A    No, we wouldn't.

16   Q    When you contacted either Mr. Poff or Ms. Ikilikyan, was it

17   your understanding that you were calling their personal home when

18   you called them?

19   A    I believe whenever I called the two of you it would be your

20   personal cell phones.

21   Q    It would be on cell phones?

22   A    That is my understanding of what they were, yes.

23   Q    Was it your understanding that Mr. Poff and Ms. Ikilikyan

24   worked out of their house?

25   A    That was my understanding, yes.

Q    At the time of the termination of business with

Ms. Ikilikyan, were there other factors discussed with you in

regards to why Ms. Ikilikyan stopped originating loans with you

at the time Mr. Poff went to Michigan?

        MS. VOGEL:  Objection, to the extent it calls for

hearsay.

        THE COURT:  I will permit the question.

        THE WITNESS:  I don't understand what you are saying,

per se.

By the Defendant:

Q    Was there a time when -- at the time Ms. Ikilikyan stopped

doing loans with your company, was there a divorce with Mr. Poff

and Ms. Ikilikyan?

A    Yes.  You had contacted me and informed me that you were

going to Michigan to get away from Alexis, and you were in the

middle of a divorce.

Q    And was there a major change in the lending industry right

prior to that, six months to a year prior to that?

A    Yes, there was.

Q    Could you explain to me exactly what had happened in the

industry?

A    Well, in general, essentially it was a major shake up, as far

as how guidelines were approached, how loans were underwritten,

the process that had to be done with those loans.  They were

being stricter on documentation, making timelines for how old

1    documentation would be much shorter.  Pretty much anything to

2    make the loan process much more strict, they were doing.

3    Q    Was your company informed that Alexis had lost her license?

4    A    Yes, we were at one point.  I don't recall when or under what

5    circumstances.  But, yeah.

6    Q    Was your company also informed that Alexis was under

7    investigation by the Department of Licensing months before

8    Mr. Poff had left for Michigan?

9    A    I couldn't say the timing on it, but I do recall that was one

10   of the factors in why, I would assume, we weren't doing any

11   business with her.  But I do recall there was some sort of

12   investigation.  By whom and in what regards, again, all I know is

13   her license was suspended.  I don't know in what capacity or for

14   what reason.

15   Q    So there was a lot of factors involving Alexis not

16   originating loans with America One Finance prior to his

17   subsequent leaving to Michigan?

18   A    I could see --  In hindsight, yeah, there were probably a lot

19   of factors, the market, her license, as you say.  Yeah.

20   Q    Thank you.  I believe it was Exhibit 619, it was the e-mail

21   from the Puget Sound property.  I believe it was Exhibit 619.

22   Could you bring it up on the screen, please?

23            MS. VOGEL:  The one with the application, the 1003, on

24   it?

25            THE DEFENDANT:  No.  Let me actually see the e-mail that

1  had the leases attached to it that was sent to Emil.

2          MS. VOGEL:  Tell us which one you want.

3          THE DEFENDANT:  Yes, ma'am.  It is the e-mail sent by

4  Alexis that has the leases attached to it.

5          MS. VOGEL:  I believe it is Exhibit 160.

6  By the Defendant:

7  Q    This Exhibit 160, Mr. Anderson, was the e-mail that you had

8  testified to earlier as receiving from Alexis?

9  A    Yeah.  I think this one was, well, either from Alexis or to

10 Alexis via Tony.

11 Q    The attachment, what was the attachment on this e-mail?

12 A    There were several lease agreements.

13         THE DEFENDANT:  Thank you very much.  That concludes my

14 questions.

15         THE COURT:  Redirect?

16         MS. VOGEL:  None, your Honor.

17         THE COURT:  You may step down.  Thank you, sir.

18         MR. SCOVILLE:  The government calls Susan Donaldson at

19 this time.

20         MS. VOGEL:  Your Honor, may this witness be permanently

21 excused?

22         THE COURT:  Yes.

23         THE DEFENDANT:  No objections, your Honor.

24         MS. VOGEL:  Thank you, your Honor.

25 Whereupon,

```
1                          SUSAN DONALDSON
2    called as a witness, having been first duly sworn, was examined
3    and testified as follows:
4            THE CLERK:  Will you please state your name for the
5    record and spell your last name.
6            THE WITNESS:  Susan Donaldson, D-O-N-A-L-D-S-O-N.
7                          DIRECT EXAMINATION
8    By Mr. Scoville:
9    Q    Good morning.
10   A    Good morning.
11   Q    Where is it that you live?
12   A    In Bellevue, Washington.
13   Q    And what do you do for a living?
14   A    Real estate agent.
15   Q    How long have you been a real estate agent?
16   A    Twelve years.
17   Q    Please take a look at the chart that is mounted on the easel
18   in front of you.  I want to ask you, are you familiar with any of
19   the transactions that are listed there on the chart?
20   A    Yes.
21   Q    Which number?
22   A    Number eight.
23   Q    How are you familiar with that transaction?
24   A    I had the listing for the Kirkdoffers' property in
25   Des Moines.
```

1  Q    By having the listing for them, what do you mean?

2  A    I had the home listed for them for sale.

3  Q    Were you their real estate agent?

4  A    Yes.

5  Q    When did you begin working as their real estate agent in

6  connection with that sale?

7  A    The summer prior to the contract.  So it would have been the

8  summer of '06.

9  Q    At some point did you begin negotiating with Ms. Harutyunyan

10 or an agent of Ms. Harutyunyan regarding that sale?

11 A    Yes.

12 Q    And who was the first agent that you dealt with on behalf of

13 Ms. Harutyunyan?

14 A    Her name was Alexis Ikilikyan.

15 Q    Did you receive an offer through Ms. Ikilikyan at some point

16 in time?

17 A    Yes.

18 Q    When was it that you received the first offer on that

19 property from Ms. Ikilikyan?

20 A    It was sometime before Christmas.  I believe it was around

21 November, sometime in November.

22 Q    And of which year?

23 A    Of '06.

24 Q    Do you recall the terms of the first offer that you received?

25 A    It was a pretty standard purchase and sale agreement.  The

1    price, I'm not quite sure on the price.   It was like 1.2 million

2    something.   I'm not quite sure.

3    Q    Was any seller financing included in that first offer?

4    A    No.

5    Q    Was seller financing discussed at some point during the

6    negotiations?

7    A    When they couldn't produce a letter from the lender in the

8    time frame allotted for financing conditions, they mentioned it.

9    Q    By "they mentioned it," who is it that mentioned it?

10   A    Alexis.

11   Q    And what did she mention was the reason for seller financing?

12   A    That they were having trouble putting the financing together,

13   and would we consider seller financing.

14   Q    What was your response?

15   A    No.

16   Q    Did that deal close?

17   A    No.

18   Q    The one that started with the first offer in the fall of

19   2006?

20   A    No.

21   Q    Why not?

22   A    Financing.

23   Q    Ms. Donaldson, at some point did you receive another offer

24   from an agent of Ms. Harutyunyan regarding that same property?

25   A    Yes.

Q    And what was that second offer that you received?

A    It was from a Tony Reyes.

Q    And when was it that you received it?

A    It was in, I believe, January, February of 2007.

Q    I want to show you a document which is already in evidence. You will be able to see the first page of it on the screen in front of you, Exhibit 811.  Ms. Donaldson, do you recognize this document?

A    Yes.

Q    And what is this?

A    It is a purchase and sale agreement for the Kirkdoffer property.

Q    Is this the purchase and sale agreement relating to the second offer that you received through Tony Reyes?

A    Yes.

Q    Ms. Donaldson, when you received that second offer, did you deal at all with Ms. Ikilikyan?

A    No.  I had spoke to her on the phone, yes.

Q    What did you speak with her on the phone about?

A    She told me that Ms. Harutyunyan was her mother.

Q    And did she say anything about the offer coming through Mr. Reyes?

A    She did.  She said that they had -- her mom and her had some difficulty, and so Mr. Reyes was going to present the offer.

Q    Did she indicate to you that she was aware of the offer being

1   presented through Mr. Reyes?

2   A   Yes.

3   Q   Ms. Donaldson, now I would like to show you another document.

4   It is Exhibit 815.  It has previously been admitted as a

5   Prudential Realty record.  I will zoom in on the text, the upper

6   left portion of the page.  Ms. Donaldson, do you recognize this

7   document?

8   A   Yes.

9   Q   And what is it?

10  A   A counteroffer addendum stating some terms for a seller

11  financing.

12  Q   Ms. Donaldson, was seller financing ultimately included in

13  the deal that you reached to sell the property to

14  Ms. Harutyunyan?

15  A   Yes.

16  Q   Were the terms of the seller financing, that was ultimately

17  included, the terms that are reflected in this Exhibit 815?

18  A   Yes.

19  Q   And what are those terms, Ms. Donaldson?

20  A   Well, that the first mortgage would be for $950,000, and that

21  the Kirkdoffers would carry a note for $305,000, and then the

22  terms of five and a half percent interest.  And we included a

23  clause in there that said default on the second would constitute

24  a default on the first.

25  Q   Do you see the word "Second" to the right of $305,000 on

1    Exhibit 815?

2    A    Yes.

3    Q    And what is that about?  What does that mean?

4    A    $305,000 was the second note to cover the entire part of the

5    purchase and sale agreement, and the agreed-upon price.

6    Q    And based on these negotiations and this document, did you

7    have some sort of understanding that the Kirkdoffers might have

8    been in third position?

9    A    No.

10   Q    You also said the interest rate was five and a half percent?

11   A    It looks like five and a half there.

12   Q    What were the terms of the repayment of the $305,000 note,

13   aside from the interest?

14   A    That it would cash out in five years.

15   Q    And what types of payments would be made in the interim?

16   A    They were interest only payments.

17   Q    Ms. Donaldson, was it ever explained to you why seller

18   financing was required, why it was necessary?

19   A    No.  I mean, because they couldn't come up with the rest of

20   the money from the bank to get the loan for the whole amount.

21   Q    Ms. Donaldson, I would now like you to take a look at

22   Exhibit 814.  This is already in evidence in the Great American

23   Escrow record.  Do you recognize this document?

24   A    No.

25   Q    I am going to zoom in on the paragraph entitled, "Note and

1  deed of trust."  In particular, I want to direct your attention

2  to the language at the end of this paragraph reading, "Seller is

3  aware that two loans may be needed before this loan."

4  Ms. Donaldson, my question to you is, was it your understanding

5  that there would be potentially two loans before the Kirkdoffers'

6  $305,000 carryback?

7  A  No.

8  Q  Was that something that was ever negotiated?

9  A  No.

10  Q  Was that ever something that was explained to you?

11  A  No.

12  Q  Did you accompany the Kirkdoffers to the closing of this

13  case?

14  A  I did.

15  Q  Let's take a look at Exhibit 819, also a Great American

16  Escrow record already in evidence.  Ms. Donaldson, do you

17  recognize this document?

18  A  No.

19  Q  I would direct your attention to the date of 3/13/07 written

20  on the document.  Ms. Donaldson, with respect to closing the

21  second offer that was received from Tony Reyes, and that was

22  finally closed upon, did you accompany the Kirkdoffers to closing

23  once or twice?

24  A  Once.

25  Q  Ms. Donaldson, now I would like you to take a look at

1   Exhibit 816, which is already in evidence as a Prudential Realty

2   record.  Is this the settlement statement that Prudential Realty

3   received in connection with this transaction?

4   A   Yes.

5   Q   Let's take a look at the bottom half of the first page.  What

6   does this settlement statement that Prudential Realty received

7   reflect, in terms of the first mortgage?

8   A   It shows the principal amount of the first loan being

9   $1 million.

10  Q   What does it reflect in terms of secondary financing?

11  A   $305,000.

12  Q   And what was that secondary financing?

13  A   That was the seller's carryback note to the purchaser.

14  Q   Does it reflect any other type of secondary financing?

15  A   No.

16  Q   Ms. Donaldson, based on the settlement statements and the

17  negotiations you had, what was your understanding of the position

18  that the Kirkdoffers' interest would be in after closing?

19  A   Second.

20  Q   Were you ever told that they might actually be in third

21  position?

22  A   No.

23  Q   If you had been made aware that in fact a $200,000 loan was

24  being obtained by the buyers on top of what was represented to

25  you as the $1 million first mortgage, would that have affected

1    negotiations?

2    A    Yes.

3    Q    How?

4    A    Well, to be in a third position, you would wonder why you

5    would even need that if they were able to get another loan.

6             MR. SCOVILLE:  No further questions.

7             THE COURT:  Mr. Poff.

8                        CROSS-EXAMINATION

9    By the Defendant:

10   Q    Good morning, ma'am.

11   A    Good morning.

12   Q    Now, you had stated earlier you were the agent for the

13   Kirkdoffers then?

14   A    Yes.

15   Q    Ms. Donaldson, you had said --  Ms. Donaldson, did Mr. Reyes

16   and Ms. Ikilikyan both try and negotiate a transaction with you,

17   as far as the purchase and sale?

18   A    At the same time?

19   Q    Not at the same time.  Did each of them try to send a

20   purchase and sale to you within the same time period,

21   approximately?

22   A    No.

23   Q    Mrs. Donaldson, did you tell the investigators that both

24   Mr. Reyes and Ms. Ikilikyan requested seller financing?

25   A    Yes, on two separate purchase and sale agreements.

Q   Okay, ma'am.  That's what I was trying to ask.  And you received the offer from Ms. Ikilikyan then?

A   The first offer.  An offer came first from Alexis, yeah.

Q   Okay.  Could I see Exhibit 814?  Are you familiar with the Kirkdoffers' signature, ma'am?

A   No.

Q   You are not familiar.  Was this a form that they had signed at escrow?  Do you remember this form?

A   I do not remember this form.

Q   Could I see the notary section of this form?

THE DEFENDANT:  That concludes my questions.  Thank you very much, ma'am.

THE COURT:  Redirect, Mr. Scoville?

MR. SCOVILLE:  No, your Honor.

THE COURT:  You may step down.  Thank you.

MR. SCOVILLE:  Your Honor, while we are getting our next witness, I wanted to say for the record, we had scheduled Sharon Kirkdoffer to be one of our witnesses, but she and her husband were involved in a car accident on the way in this morning.  We have rescheduled her for Monday.

THE COURT:  All right.  Remember, we are going Monday afternoon, not Monday morning.

MS. VOGEL:  The United States calls Mike Edwards.

Whereupon,

                    MICHAEL EDWARDS

```
 1   Called as a witness, having been first duly sworn, was examined
 2   and testified as follows:
 3            THE CLERK:  Will you please state your name for the
 4   record and spell your last name?
 5            THE WITNESS:  Michael Edwards.
 6                         DIRECT EXAMINATION
 7   By Ms. Vogel:
 8   Q   Good morning, sir.
 9   A   Good morning.
10   Q   Can you tell us what city you live in?
11   A   Bothell, Washington.
12   Q   And what is your occupation?
13   A   I am a corporate consultant.
14   Q   Were you formerly associated with the mortgage lending
15   business?
16   A   I was.
17   Q   And what was your -- what did you do in that regard?
18   A   I had a branch office underneath America One.  So I had --
19   ran a couple of offices.
20   Q   And what dates were you running offices for America One?
21   A   Approximately 2003 to '08.
22   Q   And when you say "America One," is that America One Finance,
23   a mortgage brokerage company?
24   A   Yes.
25   Q   And when you say you "ran offices," what exactly was your
```

1   role?

2   A    My role was to recruit loan officers and set up an operation

3   that actually underwrote -- pre-underwrote loans, and basically

4   staff and things like that.

5   Q    Did you work with a person named Emil Anderson?

6   A    Yes.

7   Q    What was your position with respect to Emil?

8   A    I would be his boss.

9   Q    When did you stop working with America One Financing?

10  A    Around July of '08.

11  Q    In your professional capacity at America One Finance, sir,

12  did you ever meet the defendant, William Poff?

13  A    I did.

14  Q    Did you ever meet his wife?

15  A    Yes.

16  Q    Could you look, please, at Exhibit 2, the photographs.  Do

17  you see a photograph of the defendant's wife in this picture?

18  A    I do.

19  Q    And where is it?

20  A    Top left.

21  Q    And do you see the defendant, Mr. Poff, in the courtroom here

22  today?

23  A    Yes, I do.

24  Q    Is he sitting over here at this time?

25  A    He is.

```
1    Q    And where is it that you first --  Let me ask you first, how

2    many times did you personally meet with the defendant and his

3    wife?

4    A    Twice.

5    Q    Let's focus on the first meeting.  Can you tell us

6    approximately when that was?

7    A    Approximately it would have been 2006.  I'm not sure exactly

8    of the time frame, but somewhere in there.

9    Q    Where was that meeting?

10   A    It was at PF Chang's in Bellevue Square.

11   Q    Is that a restaurant?

12   A    It is.  It was a lunch type meeting.

13   Q    Who was present at that meeting?

14   A    The defendant and his wife, Tony Reyes.

15   Q    And do you see a photograph of Mr. Reyes on Exhibit 2 as

16   well?

17   A    Yes, on the top right corner.

18   Q    Was there anybody else at that meeting?

19   A    Emil Anderson and myself.

20   Q    What was the purpose of that meeting?

21   A    The purpose was to meet the defendant and his wife as

22   potential -- they were interviewing us as a potential mortgage

23   operation to run their investment loans through -- or to process

24   them.

25   Q    What was your understanding as between the two of them, the
```

1  defendant and his wife, who did the actual loan work?

2  A    They weren't doing the loan work.  I'm not sure what you are

3  asking me on this particular --

4  Q    What was your understanding from that meeting of --  Let me

5  back up then a second.  What is it that the defendant and his

6  wife hoped to get out of the meeting at PF Chang's?

7  A    They would understand we would be an operation that would

8  handle their loan processes, without making mistakes, know the

9  proper lender to place the loans with.  It was kind of a due

10 diligence meeting a little bit, to understand we are an operation

11 that is competent.

12 Q    From that meeting, what was your understanding of their

13 business?

14 A    That they were at the beginning of investing in real estate,

15 and was also looking for a firm that would kind of guide them a

16 little bit, as far as financing and whatnot.

17 Q    Following that first meeting at the restaurant, did the

18 defendant and his wife, to your knowledge, then do work

19 through -- send work through America One Finance?

20 A    Yeah, they did send some business to us.

21 Q    Now, tell us about the second meeting that you recall having

22 with the defendant.  Approximately how much -- how far after the

23 first meeting was that, how many months or days, weeks?

24 A    I would imagine a year.

25 Q    Where did the second meeting take place?

1  A   That was a Starbucks down in Federal Way, or somewhere down

2  in the south end.

3  Q   What was the purpose of that meeting?

4  A   That was a meeting where -- I had called that meeting,

5  because of wanting to meet Alexis' mother, who was going to be

6  doing a loan through our office.

7  Q   Why did you want to meet Alexis' mother?

8  A   Well, because she was making a large purchase.  I wanted to

9  make sure that --  She already apparently owned a home, and she

10 was going to be doing a loan where she was going to be owning

11 this new home, which was $1.4 million or something.  I just

12 wanted to have clarity.  The mortgage industry was cracking down,

13 making sure that people were buying a home as an owner occupied

14 and actually living in them, and not getting those special rates.

15 I wanted to make sure that she understood, because I hadn't

16 talked to her directly on the phone or anything, which we usually

17 do communicate with these clients.  I wanted to make sure she

18 understood, yeah, you are buying the home, you are living in it,

19 because the lending institutions do check on this kind of stuff.

20 Q   And, Mr. Edwards, who was present at that meeting?

21 A   The defendant, his wife and Tony Reyes.

22 Q   And was there -- was the buyer also present?

23 A   And the buyer, yes.

24 Q   And you, I assume?

25 A   Myself.

1    Q    Was anybody else there?

2    A    No.

3    Q    Can we look, please, at Exhibit 2?  Do you recognize the

4    buyer on this exhibit?

5    A    Yes.   The bottom left picture.

6    Q    And that is the person that was present with you at the

7    meeting at Starbucks?

8    A    Yes.

9    Q    What happened at that meeting?

10   A    I believe I brought some paperwork down -- loan paperwork

11   with me at that meeting.  I sat down --  I believe Tony Reyes

12   came a little bit late to the meeting.  I asked the buyer, the

13   mother, pretty directly, so you are buying this house, and here

14   is what the terms are going to be, you are going to live in the

15   house.  I believe I might have asked her twice.

16   Q    What was your impression of her level of sophistication about

17   this transaction?

18   A    Below average.  That is probably why I wanted to have some

19   clarity.  I felt maybe she was being -- I don't want to say

20   coached by the defendant and his wife, or being guided into this

21   thing, or they were looking out for her, I'm not sure exactly.  I

22   wanted to make sure she knew what she was signing because she was

23   the one that was responsible for the loan.

24   Q    What role did the defendant, Mr. Poff, play at that meeting,

25   if any?

1   A    Both the defendant and his wife I felt were equally playing a

2   role of assuring myself that everything was above board and she

3   was going to be buying it, this was going to be her house, she

4   was going to be living there.

5   Q    Ultimately what decision did you make about allowing the

6   defendant's wife's mother to go forward with this purchase?

7   A    My decision was -- I felt satisfied at that point that she

8   was legitimately buying this to live in, etcetera.

9   Q    So did you allow the loan to go through?

10  A    Well, then we began to process that loan.  And I believe I

11  may have left the paperwork for them to get filled out.  They

12  also at that point were told what we would need, as far as

13  documentation, to support the requirements of that loan.

14          MS. VOGEL:  Nothing further.

15          THE COURT:  Mr. Poff.

16                   CROSS-EXAMINATION

17  By the Defendant:

18  Q    Good morning, Mr. Edwards.

19  A    Good morning.

20  Q    Now, when you were at this meeting, Mr. Edwards, did it

21  appear that Mr. Poff was taking instructions or directions from

22  Ms. Ikilikyan?

23  A    Which meeting are you referring to?

24  Q    Let's start with the first one, please.

25  A    If there was directions being taken?

Q    Orders, directions.  Was she in charge of the conversation?

A    I don't recollect her being in charge.  It seemed like it was a mutual meeting, I felt.

Q    Mutual meeting.  Did Ms. Ikilikyan possess knowledge about the lending industry?

A    Yes.

Q    She did possess knowledge.  Do you know what -- do you know the criteria that is required to become a mortgage broker?

A    I do.

Q    What are some of the criteria required to become a mortgage broker?

A    You have to pass a state licensing exam for brokers, which was different than for a loan officer.  It was a little more stringent.  I believe at the time that we met her she was already a licensed mortgage broker, and had -- from my knowledge, had already been doing loans on her own.

Q    Thank you.  And is there a certain amount of experience required before a person can become a mortgage broker?

A    I believe two years.

Q    Two years' experience in the loan industry?

A    I believe so.

Q    Thank you.  At the time that Ms. Ikilikyan stopped submitting loans to America One, was there some circumstances that you were aware of during that time?

A    For instance, what?

1    Q    Were you informed that she was going through a divorce at

2    that time?

3    A    During the relationship that both you and her were trying to

4    start with us, at the beginning?

5    Q    No, sir.  Let me rephrase and specify my question.  At the

6    time that Ms. Ikilikyan stopped submitting loans to you to be

7    processed, towards the end of the business relationship, were you

8    informed that Mr. Poff and Ms. Ikilikyan were going through a

9    divorce at that time?

10   A    Yes.

11   Q    Were you also informed that she was going through severe

12   emotional trauma at that time?

13            MS. VOGEL:  Objection.

14            THE COURT:  Sustained.

15            THE DEFENDANT:  I think that concludes my questions.

16   Thank you, your Honor.

17            MS. VOGEL:  No redirect.

18            THE COURT:  Sir, thank you.  You may step down.

19   Mr. Poff, are we releasing Mr. Edwards?

20            THE DEFENDANT:  I am finished, sir.

21            THE COURT:  You don't intend to recall him?

22            THE DEFENDANT:  I do not intend to recall him.  Thank

23   you, sir.

24            MS. VOGEL:  The United States calls Kimberly Gans.

25   Whereupon,

```
 1                          KIMBERLY GANS
 2   Called as a witness, having been first duly sworn, was examined
 3   and testified as follows:
 4           THE CLERK:  Will you please state your name and spell
 5   your last name, please?
 6           THE WITNESS:  Kimberly A. Gans, G-A-N-S.
 7                       DIRECT EXAMINATION
 8   By Ms. Vogel:
 9   Q   Ms. Gans, where do you live, what city?
10   A   Massillon, Ohio.
11   Q   Have you just flown in for this trial?
12   A   Yes, I have.
13   Q   Where do you work?
14   A   I currently work with PNC Bank.
15   Q   And what is your title?
16   A   My title is vice-president, investor reporting consultant.
17   Q   What does that mean?
18   A   I manage home equity lines of loans that we sell to
19   investors.
20   Q   How long have you worked for PNC Bank?
21   A   PNC Bank, since 2009.
22   Q   And did PNC Bank acquire another bank in 2009?
23   A   Yes, they acquired National City Bank.
24   Q   Who did you work for at the time of the acquisition?
25   A   National City Bank.
```

1  Q    When did you first start at National City Bank?

2  A    In 2002.

3  Q    And what was your --  Were you working at National City Bank

4  in 2007?

5  A    Yes, I was.

6  Q    What was your title at National City Bank in 2007?

7  A    I was a regional processing manager in our home equity

8  division.

9  Q    What are the responsibilities of a regional processing

10 manager?

11 A    I managed an entire team that registered, underwrote, closed

12 and funded home equity lines and loans.

13 Q    I think you mentioned National Home Equity?

14 A    Yes.

15 Q    Is that different from National City Bank?

16 A    No, it is what the name of the division was called.

17 Q    Did the National Home Equity division of National City Bank

18 fall under the same FDIC umbrella as National City Bank?

19 A    Yes.

20 Q    Where did the National Home Equity division that you managed

21 operate in 2007?

22 A    In Brecksville, Ohio.

23 Q    And what sort of loans did that division offer at that time?

24 A    We did home equity lines and loans, which are second

25 mortgages.

Q   Now, in preparation for your testimony today, Ms. Gans, have you reviewed some National City Bank records pertaining to loans extended for the purchase of a property located at 9488 199th Avenue South in Issaquah, Washington?

A   Yes, I have.

Q   And is that the address that is listed on line 6 of our big chart there?

A   Yes, it is.

Q   How many loans did National City Bank extend for that property?

A   At various times we had two --  Well, we did two.

Q   What type of loan was the first one?

A   It was a purchase money stated income fixed rate loan.

Q   Was it the first or the second mortgage for the purchase of that property?

A   It would have been the second mortgage.

Q   Now, you said "stated income."  What does that mean to National City Bank?

A   The borrower stated their income on their application, and we just had to verify their employment information.

Q   How would National City Bank go about verifying employment information?

A   Somebody who was self-employed, where they owned their own business, we would obtain a copy of a business license or accept a letter from a CPA or bank statements verifying one-tenth of the

1    annual liquidity.

2    Q    In the event that you used a business license to verify

3    self-employment, was there some time frame that the business had

4    to be open that you were looking for?

5    A    Our minimum requirement was two years.

6    Q    In 2007 what was the maximum amount of money National City

7    Bank would lend on a stated income loan?

8    A    The maximum loan amount would have been $350,000.

9    Q    And what was the maximum loan to value ratio?

10   A    The combined loan to value ratio would have been

11   89.99 percent.

12   Q    And when you say "combined loan to value ratio," what do you

13   mean?

14   A    The first mortgage and the second mortgage divided by the

15   value of the property -- value or purchase price, whichever is

16   lower.

17   Q    And in this case, we said this was a second mortgage.  So

18   would you also factor in the amount of money that was being

19   loaned on the first mortgage when making that calculation by

20   another lender?

21   A    Yes, we would.

22   Q    And you said the maximum was 89.9 percent?

23   A    Yes.

24   Q    What was the maximum combined loan to value ratio that

25   National City Bank would lend in 2007 for a nonowner occupied

1  stated income loan?

2  A    We didn't do stated income for investment type properties.

3  Q    What was the lending model that National Home Equity followed

4  at that time?  For example, by that I mean, did you deal directly

5  with the borrower, or who were your customers?

6  A    We were a wholesale lender, so our direct customers were

7  brokers.

8  Q    How many contacts prior to closing would the National City

9  Bank have with the actual borrower?

10  A    We would not have any contact with the borrower.

11  Q    What about after closing?

12  A    As soon as the funds were closed, that is who became our

13  borrower and our contact, was the person we lent the money to.

14  Q    Does National City Bank -- did National City Bank generally

15  service its own loans?

16  A    Yes.

17  Q    Can you tell us about the application process?  How would a

18  broker begin the process of submitting a loan application to

19  National City Bank?

20  A    We had two different avenues they could do that.  One would

21  be an on-line application, where they went to a website that was

22  secured, that they would fill out the information that we needed,

23  and they could upload documents to support the transaction that

24  they were requesting, or they could fax us the information over

25  with the registration form.

Q    And what types of information was National City Bank

interested in obtaining for making the lending decisions?

A    Name, Social of the borrower, birth date, what type of

property it was going to be, if it was going to be a purchase or

refinance, primary home, a second home, investment property,

where the borrower worked, if they were self-employed, if it was

going to be stated income or income verified, any other

properties that the borrower owned, and if they were rentals.

Q    What about the purchase price of the property, was that

something that National City Bank needed to know?

A    Yes.  If it was a purchase transaction, then they would have

to enter the purchase price.

Q    Can you look, please, at Exhibit 624?  This has previously

been admitted as a National City Bank business record.  Do you

recognize the first page of this form?

A    Yes.  That would have been the first page of the on-line

application.

Q    And does this on-line application request all of the

information that you just summarized was important to National

City Bank?

A    Yes, it does.

Q    And in this particular case, Exhibit 624, is this the on-line

application for the property located --

A    Yes, it is.

Q    -- at 9488 199th Avenue Southeast?

```
1   A    Yes.
2   Q    In this particular case what was National City Bank told was
3   the purchase price of the property located at that address?
4   A    $2 million.
5   Q    And in this particular case what was National City Bank told
6   was the amount the purchaser wanted to borrow?
7   A    $200,000.
8   Q    And what was National City Bank told about the borrower's
9   employment?
10  A    That they wanted a stated income loan, and that the borrower
11  was self-employed.
12  Q    And is that on the next page?
13  A    I believe it would be.  One more page.  That would be the
14  borrower's personal information of where they were currently
15  living.
16  Q    And the information conveyed to National City Bank was that
17  this borrower was employed with Fidelis Enterprises and had been
18  for five years; is that correct?
19  A    Yes.  And that they were the owner.
20  Q    What was National City Bank told about the borrower's income?
21  A    $32,856 a month.
22  Q    And what was National City Bank --  Go back to the first
23  page, please.  What was National City Bank told about this
24  borrower's intent to occupy the property?
25  A    That it was going to be their primary residence.
```

1   Q    And in the middle of the first page --  Ms. Gans, was there

2   any other document containing this type of personal information,

3   other than this type of on-line application that National City

4   Bank relied upon in making its underwriting decision?

5   A    A 1003 or loan application was most often provided by the

6   broker.

7   Q    So in the event that somebody went on-line and filled out an

8   application like this, would you also have a 1003?

9   A    Not necessarily.

10  Q    What would happen with the information after the on-line

11  application was submitted?

12          THE COURT:  Counsel, it sounds like you are moving on a

13  bit.  Why don't we take our morning break at this time.  We will

14  be back out a little bit after a quarter to 11:00.  We will be in

15  recess.

16   (Recess)

17          THE COURT:  Counsel, we are going to go until about five

18  to 12:00.  We will break about five minutes early today.  You may

19  continue.

20          MS. VOGEL:  Thank you, your Honor.

21  By Ms. Vogel:

22  Q    Ms. Gans, in the event that an application is submitted to

23  National City Bank through the use of the on-line form,

24  Exhibit 624 that we just saw, is there also a 1003 that is

25  generated?

| | |
|---|---|
| 1 | A   Yes, at closing. |
| 2 | Q   And who is it that generates the 1003 in that event? |
| 3 | A   National City Bank would generate that 1003. |
| 4 | Q   And where does the information that National City Bank uses |
| 5 | to put in the 1003 come from? |
| 6 | A   It comes from the original on-line application. |
| 7 | Q   Can you look, please, at Exhibit 625?  Is this the 1003 that |
| 8 | would have been generated by National City Bank from the on-line |
| 9 | form that we just looked at? |
| 10 | A   I have colors on my screen.  There we go. |
| 11 | Q   Now can you see Exhibit 625? |
| 12 | A   Yes, I can. |
| 13 | Q   Can you tell us, is this the 1003 that National City Bank |
| 14 | would have generated after receipt of the on-line application |
| 15 | that we just looked at? |
| 16 | A   Yes. |
| 17 | Q   And this is for property number six on our chart, the |
| 18 | Issaquah property; is that correct? |
| 19 | A   Yes, it is. |
| 20 | Q   What is the amount of the loan in this 1003? |
| 21 | A   It is $187,500. |
| 22 | Q   So that is slightly less than the $200,000 that was requested |
| 23 | on the on-line form? |
| 24 | A   Correct. |
| 25 | Q   Can you explain that to us? |

1    A    Depending on either the borrower's request, or underwriting,

2    through the calculations of either a CLTV, or a debt to income

3    ratio, could require that the loan amount have to be taken back.

4    Q    Reduced somehow?

5    A    Reduced, right, to meet the program guidelines.

6    Q    And this document appears to be signed in the top right-hand

7    corner.  Who is it that is supposed to sign this form?

8    A    The borrower.

9    Q    At what point in the process, when you are dealing with an

10    on-line application, would this document have been signed?

11    A    At closing.

12    Q    What happens after the application originally is submitted at

13    National City Bank?

14    A    It gets registered into our system, and then an underwriter

15    will go through and underwrite it, you know, look at credit, see

16    if there are any conditions that need to be requested.

17    Q    And what document is generated at the conclusion of that

18    underwriting analysis?

19    A    We refer to it as a NOLAA, which is notice of loan action

20    approval.

21    Q    Can you look, please, at Exhibit 626, previously admitted as

22    a National City Bank business record?  Do you recognize this

23    document?

24    A    Yes.  That would have been our notice of loan action, the

25    approval that we would have faxed to the broker.

Q   And does Exhibit 626 relate specifically to the loan we have been talking about for the Issaquah property on line number six of our chart?

A   Yes, it does.

Q   What is the amount of money that was approved after the underwriting analysis for this loan?

A   $187,500.

Q   What are the outstanding conditions that were required by National City Bank for funding of this loan?

A   The underwriter still needed to see an appraisal that supported the $2 million purchase price.  They needed to see the first mortgage approval for $1,406,250, and they needed proof of the borrower's self-employment through a valid business license, CPA letter or bank statements that reflected the annual liquidity.

Q   From your review of National City Bank's records for this loan, do you know which of those alternative ways of verifying the business -- the self-employment was used in this case?

A   We had a business license in the file.

Q   Ms. Gans, can you tell us, was this loan actually funded?

A   Yes, it was.

Q   And how would the money have been transmitted?

A   We would have wired it to the settlement agent.

Q   By settlement agent, would that be an escrow company?

A   Yes, it would.

Q    Where would that wire have originated?

A    It would have originated with our bank with our own funds, and we would have sent it through Fed Wire to the escrow company, to their bank.

Q    And where is your bank?

A    It would have come from our Cleveland office.

Q    Now, normally would the amount of funds wired exactly match the principal balance of the loan?

A    Not necessarily.

Q    Can you explain that?

A    Depending on fees that the borrower had to pay for, we might have held back fees that they were required to pay, that we already incurred, and then we would wire the remaining difference.

Q    And following funding, Ms. Gans, what documents would National City Bank receive back from the settlement agent or escrow company?

A    Once it was funded and closed, we would receive a HUD telling us the disbursement of the funds, and we would also receive all of the loan documents, other than the deed that had to go for recording.  We would receive copies of that.  But all of the rest of the original documents back.

Q    Why did National City Bank want a copy of the HUD-1?

A    To see where our funds went to, and to make sure that the fees that were being charged by either the broker or the

1   settlement agent were in line.

2   Q    Why was it important to National City Bank where the funds

3   went?

4   A    In this transaction, it was for the purchase of a property,

5   so we would want to know that those monies went to the seller to

6   help off -- obviously this was an 80 percent CLTV, so we would

7   want to see that the borrower came in with money to purchase this

8   property.

9   Q    Can you look, please, at Exhibit 627, also previously

10  admitted as a National City Bank business record?  Ms. Gans, is

11  this the final HUD-1 for the loan that we have been talking

12  about, for the Issaquah property?

13  A    Yes.

14  Q    And what does this HUD-1 represent was the final purchase

15  price for the property?

16  A    $2 million.

17  Q    What was National City Bank told via this HUD-1 about where

18  the funds had come from to purchase this property?  Can we zoom

19  in on the middle section?

20  A    There was a first mortgage for $1,406,250.

21  Q    And are you looking now here at line 201?

22  A    Yeah, 202.

23  Q    And where did the remainder of the money come from?

24  A    204 would have been from the National City loan.

25  Q    By that you mean line 204?

1   A   Yes.  I'm sorry.  $186,644.72.  I believe that's what that

2   says.

3   Q   What was National City Bank told about where the remainder of

4   the funds came from?

5   A   It would have been from the borrower's personal accounts.

6   Q   And is that the $407,105 that is listed on line 205 under the

7   notation of "additional deposit"?

8   A   Yes.

9   Q   And can you back out and look at the bottom of this form --

10  first page of the form.  What was National City Bank told about

11  how much of this loan money went back to the borrower?

12  A   There would have been no money that went back to the

13  borrower.

14  Q   Is that the zero represented in this bottom line here?

15  A   On 303, yes.

16  Q   Ms. Gans, based on the review of the records that you have

17  performed, did you also find a second loan for the same property?

18  A   Yes, we did.

19  Q   Was that approximately a month later?

20  A   Yes, it was.

21  Q   What type of loan was that?

22  A   It was also a fixed rate loan, stated income.  And that loan

23  amount was for $350,000.

24  Q   Was that a purchase or a refinance?

25  A   It was a refinance.

Q    Did you say earlier that $350,000 was your maximum for this type of loan?

A    Yes.

Q    Can you look, please, at Exhibit 643, also previously admitted as a National City Bank business record?  Take a moment to look at that.  Is this the 1003 for the refinance of the same -- of the second mortgage that you just described, or the same Issaquah property, in the amount of $350,000?

A    Yes, it is.

Q    Have you reviewed this document prior to your testimony today?

A    Yes, I have.

Q    Does it contain the identical borrower, financial and qualification information as the on-line form and the 1003 we just saw from the earlier one?

A    Yes, it does.

Q    What was the stated purpose of this loan, in terms of the property?

A    This loan -- this was a refinance of the primary residence, paying off our first loan that we gave him, allowing the borrower to obtain some cash back from the purchase of the property.

Q    So would this have been an owner-occupied or nonowner-occupied?

A    This would have been the primary owner residence, owner-occupied.

1  Q    If you look at the line that says "present address," what is

2  the claim in this application was the present address of the

3  borrower?

4  A    The same address as the property that we were lending on.

5  Q    And what is the claim as to how long the borrower had lived

6  there?

7  A    For one month.

8  Q    And would that be consistent with what National City Bank

9  knew about the former loan?

10  A    Yes.

11  Q    Ms. Gans, do you know, was this application approved?

12  A    Yes, it was.

13  Q    In what amount?

14  A    For $350,000.

15  Q    And how would those funds, again, have been transmitted?

16  A    We would have kept the amount to pay ourselves off for the

17  first loan, so that we could release that one to put this lien

18  on, and the remainder would have been sent via wire from our

19  Cleveland office to the settlement agent or the escrow company.

20  Q    And when you say "sent via wire," what agency -- what wire

21  transfer agency?

22  A    Fed Wire.

23  Q    Can you tell us first, how is National City Bank's interest

24  in a property, that it has extended a mortgage on, secured?

25  A    By placing a deed on the property.

1    Q    And when you say "deed," is that a deed of trust?

2    A    Deed of trust, mortgage.

3    Q    Can you look, please, at Exhibit 607?  Is this, in fact, a

4    certified copy of the recorded deed of trust for the first loan

5    that National City Bank extended on this property?

6    A    Yes, it is.

7    Q    Look at the second page for the amount, the top half.  That

8    is for $187,500?

9    A    Correct.

10   Q    If you would look at the signature page on page 6, please.

11   This deed of trust appears to be signed by two people, but there

12   was only one borrower listed on the application.  Can you explain

13   that?

14   A    If the borrower is married, then the -- what we consider the

15   non-applicant spouse must sign, stating that they agree that the

16   other party is borrowing money, that they are a co-owner in the

17   property, and they are not going to be on this loan.

18   Q    Why is it that National City Bank requires the non-borrower

19   spouse to acknowledge the loan?

20   A    Those are specific state requirements.

21   Q    Can we look, please, at Exhibit 608?  Is this the recorded

22   deed of trust for the second -- for the refinance second mortgage

23   of $350,000 for the Issaquah property?

24   A    Yes, it is.

25   Q    And, again, can we look at the signature page, page 7 of this

1    deed of trust?  This also appears to be signed -- acknowledged by

2    the non-borrower spouse?

3    A    Correct.

4    Q    Ms. Gans, prior to your testimony today, did you review a

5    summary chart of all the information that had been provided to

6    the lender in connection with these two National City Bank loans?

7    A    Yes, I had.

8    Q    And can you look, please, at Exhibit 601?  Is this the

9    summary chart that you reviewed earlier?

10   A    Yes, it is.

11   Q    And does this chart accurately summarize the information that

12   was provided to National City Bank, and upon which it relied when

13   it loaned the $187,500 for the purchase of this property?

14   A    Yes.

15           MS. VOGEL:  Move the admission of Exhibit 601.

16           THE DEFENDANT:  No objections, your Honor.

17           THE COURT:  601 is admitted.

18           (601 admitted.)

19   By Ms. Vogel:

20   Q    Did you also review a similar summary chart that summarized

21   the information that had been provided in connection with the

22   refinance?

23   A    Yes.

24   Q    And can we look, please, at Exhibit 640?  Take a moment to

25   look at it.  Is this the summary chart that summarizes the

1    information provided to National City Bank upon which it relied

2    when it loaned the $350,000 for the refinance of the loan on this

3    Issaquah property?

4    A    Yes.

5              MS. VOGEL:  Move the admission of Exhibit 640.

6              THE DEFENDANT:  No objections, your Honor.

7              THE COURT:  640 is admitted.

8              (640 admitted.)

9    By Ms. Vogel:

10   Q    If we can go back to 601 for a moment.  Leave that up for a

11   moment.  Ms. Gans, assume for a moment, instead of $2 million, as

12   was stated in the information provided to National City Bank, the

13   true purchase price was really $1.3 million, would National City

14   Bank have extended this same $187,500 loan?

15   A    No, we would not have.

16   Q    And why not?

17   A    Because the first mortgage would have already exceeded the

18   purchase price, and our maximum CLTV would have been 89.9, based

19   on the lesser of the purchase price or the value of the property.

20   Q    So it would have exceeded your permissible lending

21   requirement?

22   A    Correct.

23   Q    And would National City Bank have extended the same $350,000

24   refinance of that second mortgage just one month later had it

25   been told the true purchase price was $1.3 million?

1    A    No, it would not have.

2    Q    For the same reason?

3    A    Yes.

4    Q    Now, assume for a moment that instead of the $407,000 down

5    payment that is represented here, National City Bank had been

6    informed that there was no down payment whatsoever made by the

7    borrower, would the National City Bank have extended the same

8    $107,500 (sic) second mortgage for the purchase this property?

9    A    No, we would not have.

10   Q    Why not?

11   A    Again, the maximum CLTV would have been 89.99, and the

12   borrower would have had to come in with some money down.

13   Q    Would National City Bank have extended the same $350,000

14   refinance of that second mortgage just one month later having --

15   had it known that there had been no $400,000 deposit?

16   A    No.

17   Q    Now, assume for a moment that the borrower never intended to

18   occupy the property, would National City Bank have extended the

19   same $187,500 second mortgage?

20   A    No, we would not have.

21   Q    And why not?

22   A    We wouldn't have done a stated income loan on a

23   nonowner-occupied property.

24   Q    And assume for a moment that the borrower never actually

25   moved into the property, would National City Bank have funded the

1  same $350,000 refinance on that property?

2  A  No, we would not have.

3  Q  And is that for the same reason?

4  A  Exactly.

5  Q  Now, assume for a moment that the borrower's employment was

6  not truthfully stated, and the borrower's income was some amount

7  less than that $38,000, would National City Bank have extended

8  the same $187,500 for the second mortgage?

9  A  Not if it didn't qualify in the debt ratios.

10  Q  Is that also true for the $350,000 refinance?

11  A  Correct.

12      MS. VOGEL:  I am told I misstated on the amount of the

13  income.

14  By Ms. Vogel:

15  Q  Was it 32- or 38,000 that was represented?

16  A  Thirty-two.

17  Q  Had it been less than that amount, would that have changed

18  your lending decision?

19  A  We would have had to look at it much more closely, yes.

20  Q  Ms. Gans, did National City Bank service these loans?

21  A  Yes.

22  Q  Are you aware of the current status of the $350,000 second

23  mortgage?

24  A  It is in default.

25  Q  Are you aware of how much money National City Bank is still

1   owed on this loan?

2   A    In excess of the $350,000, due to interest still accruing on

3   it.

4   Q    And, Ms. Gans, can you tell us whether in 2007, National City

5   Bank was a federally-insured financial institution?

6   A    Yes, we were.

7   Q    During the entire year of 2007?

8   A    Yes, we were.

9            MS. VOGEL:  Nothing further.

10                     CROSS-EXAMINATION

11  By the Defendant:

12  Q    Good morning, ma'am.

13  A    Good morning.

14  Q    Can I see Exhibit 607.06, please?  Ma'am, on this document --

15  I believe it is part of a deed of trust or something like that.

16  If the non-borrowing spouse would not have acknowledged this

17  document, would the loan still have funded?

18  A    No, it shouldn't have.  We would have had specific

19  instructions to the settlement agent -- escrow company that the

20  spouse had to sign, because they were not borrowing the money.

21  Q    Okay.  If the spouse didn't sign this loan, it would not go

22  through?

23  A    Correct.

24           THE DEFENDANT:  Thank you, ma'am.  That is all the

25  questions I have.

1      THE COURT:  Anything further?

2      MR. SCOVILLE:  Your Honor, the government calls Micki

3  Thompson.

4      MS. VOGEL:  No redirect.

5      THE COURT:  Mr. Poff, is this witness released?

6      THE DEFENDANT:  Yes, I am finished.

7      THE COURT:  Thank you for coming, ma'am.

8  Whereupon,

9                        MICKI THOMPSON

10  Called as a witness, having been first duly sworn, was examined

11  and testified as follows:

12      THE CLERK:  Will you please state your name and spell

13  your last name for the record?

14      THE WITNESS:  Micki Sheri Callahan-Thompson,

15  T-H-O-M-P-S-O-N.

16                    DIRECT EXAMINATION

17  By Mr. Scoville:

18  Q   Good morning.  Ms. Thompson, would you please take a look at

19  the chart that is mounted on the easel in front of you.  I would

20  like to ask you, were you the escrow agent that closed any of

21  those deals?

22  A   Yes.

23  Q   And how many of those deals did you close as the escrow

24  agent?

25  A   I believe all of them.  There is one I'm not sure of.

1    Q    Ms. Thompson, which is the one you are not sure of?

2    A    The refinance on the second, the 3-27-07.

3    Q    For transaction number what?

4    A    6a.

5    Q    6a.  Okay.  Ms. Thompson, what city do you live in?

6    A    Tacoma.

7    Q    And where are you from originally?

8    A    Tacoma.

9    Q    What kind of education have you received?

10   A    I went through eleven and a half years of high school.

11   Q    At some point did you begin working for a company called

12   Great American Escrow?

13   A    Yes.

14   Q    When was that?

15   A    1996.

16   Q    And how long did you continue working for Great American

17   Escrow?

18   A    Until June 3rd of this last year.

19   Q    What were your jobs there at Great American Escrow between

20   1996 and 2009?

21   A    I started answering telephones, and I became an assistant,

22   and then a closer.

23   Q    When did you become a closer?

24   A    I believe it was in '97/'98.

25   Q    And what do you mean by "a closer"?

1    A    One that actually draws the documents and puts the file

2    together.

3    Q    What were your responsibilities when you were working as a

4    closer?

5    A    To do all the documents for the lender, for the buyer/seller,

6    to get everybody in to sign the documents, and -- I'm sorry,

7    disburse the transaction.

8    Q    And what do you mean by "disburse the transaction"?

9    A    Print the checks.

10   Q    Ms. Thompson, what kind of training did you receive to be a

11   closing agent?

12   A    None.  It was a hands on.

13   Q    When you say "hands on," what do you mean?

14   A    I basically got told to close a file and I closed a file.

15   Q    Who did you report to when you were working at Great American

16   Escrow?

17   A    Mr. Benson, the owner.

18   Q    And who is that in particular?

19   A    I'm sorry?

20   Q    Who is that?  Who is Mr. Benson?

21   A    The attorney, Mr. Benson, was the owner, my boss.

22   Q    How closely did he supervise your work as a closing agent at

23   Great American Escrow?

24   A    He did not.

25   Q    Please explain.

1   A    He basically -- what he was looking for was how much money I

2   was making, as far as when the file closed, how many files we

3   were closing.

4   Q    And how did Great American make money off the closing files?

5   A    The escrow fee on every file.

6   Q    Ms. Thompson, during real estate deals that you were closing,

7   did Great American Escrow typically receive money from mortgage

8   lenders at some point?

9   A    Yes.

10  Q    And how was it you would receive those monies?

11  A    Wired in.

12  Q    Wired in from where?

13  A    Lenders.

14  Q    And where was it that the money would be wired into?

15  A    Great American trust account.

16  Q    Where was that trust account held?

17  A    Key Bank.

18  Q    And where was the branch of Key Bank located where Great

19  American had its account?

20  A    The main branch was in Tacoma.

21  Q    Would Great American Escrow also wire money out sometimes to

22  other parties?

23  A    Yes.

24  Q    And how would you do that?

25  A    Via telephone.

```
 1   Q   Who would you call?

 2   A   The wire room.

 3   Q   Of what?

 4   A   Key Bank.

 5   Q   And what would happen then?

 6   A   I'm sorry.  I'm not sure somewhat you are asking.

 7   Q   After you placed phone calls to the wire room of Key Bank,

 8   what would happen next in order to get the wire transfer

 9   transferred?

10   A   You would tell where it was going to, the account number,

11   where you are, your account number.

12   Q   And after that, would you see entries on your bank account

13   records indicating that the funds had gone out?

14   A   Yes.

15   Q   Ms. Thompson, why was it that you stopped working for Great

16   American Escrow in June of 2009?

17   A   I was arrested.

18   Q   In connection with this case?

19   A   Definitely.

20   Q   Were you fired after that?

21   A   Yes.

22   Q   Have you pleaded guilty to a crime?

23   A   Yes.

24   Q   What did you plead?

25   A   I'm sorry?
```

```
 1   Q    When did you enter your plea of guilty?

 2   A    November.  I'm sorry, I don't remember the date.

 3   Q    Of last year?

 4   A    Um-hum.

 5   Q    Ms. Thompson, has anyone from the government promised you

 6   what sentence you will receive in this case?

 7   A    Not at all.

 8   Q    Who do you understand will decide your sentence?

 9   A    The judge.

10   Q    How many times have you met with federal prosecutors

11   regarding this case, Ms. Thompson?

12   A    Estimating, five.

13   Q    At times during those meetings, Ms. Thompson, have you

14   withheld information from federal prosecutors?

15   A    Yes.

16   Q    Have you lied to us at times?

17   A    Yes.

18   Q    Why have you done that?

19   A    I'm sorry?  What?

20   Q    Why have you done that, Ms. Thompson?

21   A    I didn't admit to myself what I had become involved in, and

22   scared to death.

23   Q    Why were you scared?

24   A    Because what I did was wrong.

25   Q    Ms. Thompson, do you know the defendant?
```

1   A   Yes, I do.

2   Q   How do you know him?

3   A   Through transactions at Great American.

4   Q   When did you first meet him?

5   A   I want to say it was 2004, for a file.

6   Q   What kind of file are you talking about?

7   A   I'm sorry.  Escrow file.

8   Q   Where did you meet him?

9   A   At Great American Escrow.

10   Q   Did you meet anyone else at that time?

11   A   The very first time I met Mr. Poff he was by himself.

12   Q   At some point in time did you meet Mr. Poff's wife?

13   A   Yes.

14   Q   And who was she?

15   A   Alexis Ikilikyan.  I don't know how to say that.

16   Q   Did you work with Mr. Poff and Ms. Ikilikyan on real estate

17 deals?

18   A   Yes, I did.

19   Q   Approximately when was the first real estate deal that you

20 worked with them on?

21   A   I want to say it was 2004.

22   Q   And approximately when was the last?

23   A   I remember -- I think it was 2008.

24   Q   And what season in 2008, if you can recall, or what time of

25 year?

```
 1   A    I really don't remember.  Spring maybe.  I am guessing.
 2   Q    Between 2004 and 2008, which you have said was approximately
 3   the first deal and approximately the last deal you worked with
 4   Mr. Poff and Ms. Ikilikyan on, how many deals did you work with
 5   them on?
 6   A    Estimating, 50.
 7   Q    And who else was involved in those deals, generally?
 8   A    Could you clarify that?
 9   Q    Sure.  Aside from yourself and Mr. Poff, who else was
10   generally involved in those deals?
11   A    Loan brokers.  Is that what you mean?  Loan agents, loan
12   brokers, sellers, buyers, different real estate agents.
13   Q    Was Ms. Ikilikyan involved as well?
14   A    Oh, yes.
15   Q    Ms. Thompson, what kinds of work did you see Mr. Poff doing
16   on those deals?
17   A    In the beginning he was very involved in helping set up the
18   deals.  He was a loan broker.  I am not sure if he was a broker
19   or not, sir.  He helped work the files out, got the addendums,
20   etcetera.  We would go over figures at the end of a file.
21   Q    When you say he was the loan broker or loan officer, what do
22   you mean by that?
23   A    I'm not sure if he was an officer or broker.  That is the
24   person that would take the buyer's -- the loan -- sorry, I talk
25   with my hands, the loan application, and get all of that
```

1    straightened through the lender.

2    Q    And how did you know that the defendant, Mr. Poff, was

3    performing that work?

4    A    His name was on the 1004, and he told me.

5    Q    After the money came in from mortgage lenders in these deals

6    that you were working with Mr. Poff and Ms. Ikilikyan on, would

7    you typically have some sort of meeting with Mr. Poff and

8    Ms. Ikilikyan?

9    A    Yes.

10   Q    And where would that meeting typically be held?

11   A    My office.

12   Q    What kind of meeting was that?

13   A    You requested after, am I correct?

14   Q    After the money came in.

15   A    Usually it was based on the amount of money that he believed

16   would come back to them, to Mr. Poff and Alexis, and go over the

17   figures, what the sales price was, etcetera.

18   Q    And was there a particular document that you would be working

19   on at those types of meetings?

20   A    HUD-1 settlement statements, and his paperwork.

21   Q    And during those meetings did you discuss what entries should

22   be reflected in the final HUD?

23   A    Yes.

24   Q    And what kinds of discussions did you and Mr. Poff typically

25   have about that?

1    A    Can you clarify your question, please?

2    Q    Sure.  When you were talking about what the final HUD should

3    look like, what kind of talk would you and Mr. Poff have?

4    A    What it would have to say and look like to represent what he

5    was doing, if I understood your question correctly.

6    Q    From working with Mr. Poff and Ms. Ikilikyan, did you gain an

7    understanding of Ms. Ikilikyan's roles in the real estate deals

8    that you were working on?

9    A    Yes.

10   Q    And what was your understanding of her role?

11   A    In the beginning, she was the agent.  Later on, she

12   transferred that to others.  She pretty much would relinquish --

13   Sorry.  If she had a question or if something came up she didn't

14   understand, she would like give the phone to Bill to answer it.

15   I'm sorry.  Did I answer your question?

16   Q    Yes, you did, Ms. Thompson.  Let me ask a followup question.

17   What are you talking about when you say that typically she would

18   hand the phone to Bill to answer questions?

19   A    Would you like me to explain it?

20   Q    Yes?

21   A    If there were questions on a file or if I said I needed an

22   addendum, she would a lot of times try to explain it, what she

23   was telling me.  And if I didn't understand, which was a lot, she

24   would have Bill take the phone and explain it to me.

25   Q    With respect to the deals that you worked with Mr. Poff and

1  Ms. Ikilikyan on, how knowledgeable did Mr. Poff appear to you to

2  be about those deals?

3  A    Actually, I always thought that he knew more about it than

4  Alexis did.   Is that what you mean?

5  Q    Well, that somewhat answers my question.   I am talking more

6  in absolute terms, as opposed to compared to Ms. Ikilikyan.   How

7  knowledgeable did Mr. Poff appear to be --

8  A    Very knowledgeable.

9  Q    You do need to wait until I finish my question before you

10  answer.   We have a court reporter taking things down.   It makes

11  it a lot easier on him.

12      Ms. Thompson, let me ask you this question:   Was seller

13  financing ever involved in the deals that Mr. Poff and

14  Ms. Ikilikyan were working with you on?

15  A    Yes.

16  Q    How often?

17  A    90 percent.   Would that be an okay --   Quite often.

18  Q    The only okay answer is the truth.

19  A    Right.   90 percent of them.

20  Q    Is that to the best of your recollection?

21  A    Yes.

22  Q    Ms. Thompson, did you ever discuss with Mr. Poff and

23  Ms. Ikilikyan why the deals they were working on typically

24  involved seller financing?

25  A    I know they must have, but I don't remember.

1   Q    When seller financing was used in the 90 percent or so of the

2   deals that you worked with them on, was it disclosed to the

3   mortgage lenders?

4   A    No.

5   Q    Why not?

6   A    Because the mortgage lenders would not have allowed the loans

7   to go through.

8   Q    How do you know that?

9   A    Because then they would have -- there wouldn't have been

10  enough equity for the buyers in the house.

11  Q    Ms. Thompson, do you know a man named Tony Reyes?

12  A    Yes, I do.

13  Q    Who is he?

14  A    He is a real estate agent.

15  Q    Did he have any role in the deals that you worked with

16  Mr. Poff and Ms. Ikilikyan on?

17  A    Towards the end, yes.

18  Q    What do you mean by "towards the end"?

19  A    In the very beginning, when I worked with Mr. Poff and

20  Alexis, he wasn't involved.

21  Q    When did he become involved?

22  A    Estimating -- I am estimating 2005, somewhere in there.

23  Q    Do you remember what the first deal was that he became

24  involved in, where he was working with Mr. Poff and

25  Ms. Ikilikyan?

```
 1    A    No, I don't remember.

 2    Q    Generally speaking, after Mr. Reyes became involved, what was

 3    the role that he played?

 4    A    The agent.

 5    Q    What do you mean by "the agent"?

 6    A    The real estate agent, and sometimes the loan officer,

 7    sometimes both.

 8    Q    After Mr. Reyes became involved, was Mr. Poff still involved?

 9    A    Yes.

10    Q    What type of involvement did Mr. Poff have in these deals,

11    generally, after the point where Mr. Reyes became involved?

12    A    Verbal.

13    Q    What do you mean by that?

14    A    He would explain what is going on.

15    Q    To whom would he explain that?

16    A    Me.

17    Q    After the point when Mr. Reyes became involved, would you

18    still have the same types of meetings with Mr. Poff to discuss

19    the final HUD?

20    A    Yes.

21    Q    After Mr. Reyes became involved, how knowledgeable did

22    Mr. Poff appear to you to be about the transactions?

23    A    Just as knowledgeable.

24    Q    Mrs. Thompson, did you have a salary at Great American

25    Escrow?
```

1  A   Yes.

2  Q   Were you paid a commission off deals?

3  A   No.

4  Q   What was your salary during the times in question -- we will

5  take the time reflected by this chart, starting April 2005,

6  ending August 2008?

7  A   $4,200.  $4,200 a month.

8  Q   Gross or net?

9  A   Net.  Gross.  Sorry.

10 Q   $4,200 a month?

11 A   Yes.

12 Q   For the entire time, or was it slightly less at the

13 beginning?

14 A   I believe I might have had a raise in the very beginning of

15 that time scale.  I don't remember exactly when it was.

16 Q   Aside from your salary, Ms. Thompson, did you receive

17 payments from Mr. Poff and his wife?

18 A   Yes.

19 Q   What kind of payments were they?

20 A   Checks or cash.

21 Q   How much money did you receive, over the period of time when

22 you were working with Mr. Poff and Ms. Ikilikyan on real estate

23 deals, from them?

24 A   I am estimating about $25,000.

25 Q   What's the most you ever received at any one point in time

1    from them?

2    A   At one time?  $7,500.  That is to the best of my

3    recollection.

4    Q   Who was it that paid you, Ms. Thompson?

5    A   Alexis paid me that.

6    Q   Was Mr. Poff ever there when these payments were being made

7    to you?

8    A   Not that I remember.

9    Q   Did Mr. Poff ever say anything to you about giving you money?

10    A   I talked to him on the phone, and he actually brought it up

11    at the very beginning.

12    Q   What do you mean by "he actually brought it up at the very

13    beginning"?

14    A   When he first came in to set up the very first file that we

15    ever did, he had at that time volunteered to slip me a couple --

16    slip me a hundred, a couple of hundred, to close these files,

17    because he knew they were going to require a lot of extra work.

18    Q   What do you mean by that?

19    A   In order to --  They had me set up different files in order

20    to accomplish what you wanted.  So there would not be just one

21    file, there would be two or three.  And sometimes I had to sign

22    at night.

23    Q   Why would you have to set up multiple files on deals in which

24    Mr. Poff was involved?

25    A   Because most of the files had like a first and a second.

1    Some of the lenders wanted separate files for those.  And then

2    there would be their third carryback files.  So most of them had

3    to have different HUDs.  Did I answer?

4    Q    Why would there be a third carryback file?

5    A    In order for Mr. Poff and Alexis to get the funds they

6    wanted.  That's how they did it, they did a third deed of trust.

7    Q    What do you mean by "the funds they wanted"?

8    A    When they closed files, they wanted to get funds in their

9    pocket.

10   Q    From the closing?

11   A    Yeah.

12   Q    So cash from the closing?

13   A    Correct.

14   Q    And were the lenders made aware that Mr. Poff and

15   Ms. Ikilikyan were getting this money back from the closing?

16   A    No.

17   Q    Ms. Thompson, did you tell your boss, Mr. Benson, that you

18   got paid $25,000 over the course of working on these deals with

19   Mr. Poff and Ms. Ikilikyan?

20   A    No.

21   Q    Why not?

22   A    Because it was wrong.

23   Q    Ms. Thompson, I want to start talking with you now about some

24   of the specific real estate deals that are described in the

25   chart.  First, let's talk about the transaction involved in

line 1.  Were you the closing agent for that deal?

A    I'm sorry.  Which one?

Q    The one on line 1 of the chart?

A    Yes, I was.

Q    Generally speaking, what do you remember about that deal?

A    The seller's daughter was a power of attorney.  Off the top of my head, that's what I remember right now.

Q    Ms. Thompson, I would like to show you Exhibit 105, which I am displaying on the screen in front of you.  We will zoom in to make it easier to see.  Do you recognize this document?

A    Yes.

Q    What is it?

A    Mr. Poff establishing separate property from Alexis.  It is a quitclaim deed.

Q    Who notarized this document?

A    I did.

Q    Did Mr. Poff ever tell you why he executed quitclaim deeds in connection with the real estate deals where Alexis was buying the property?

A    Yes.

Q    What did he tell you?

A    He couldn't have his name on any of them because -- word-for-word I don't remember the terminology, but he had like child support, etcetera.

Q    Ms. Thompson, let's take a look at Exhibit 118.  Do you

1  recognize this document?

2  A   Yes, I do.

3  Q   Were you aware that there was a seller financing agreement

4  executed in connection with the Puyallup duplexes?

5  A   Off the top of my head, no, I wasn't.

6  Q   Let's take a look at Exhibit 140.  This is a document we

7  received from the mortgage lender's file.  I will zoom in on the

8  top half.  Ms. Thompson, what is this document?

9  A   A HUD-1 settlement statement.

10 Q   Who prepared it?

11 A   I did.

12 Q   Is this an estimated HUD or a final HUD?

13 A   Final.

14 Q   Who did you consult with before preparing this final HUD?

15 A   Buyers, sellers, lenders, and I see the tax deferred

16 exchange.

17 Q   I will take a look at the second page of the final HUD.  And

18 we are going to zoom in on the bottom half.  I want to direct

19 your attention to the words "bill to Ned, copy of," and a

20 corresponding amount for $65,000.  Do you know what that refers

21 to?

22 A   Needed a copy of the bill for $65,000.

23 Q   Do you remember why he needed a copy of the bill for $65,000?

24 A   The $65,000 was to go back to Mr. Poff and Ms. Ikilikyan in

25 the form of showing a paid bill.

1  Q   What kind of bill?

2  A   Something that showed that $65,000 was a bill --  I'm sorry.

3  I don't know how to answer that.

4  Q   Let me show you another document, Ms. Thompson.  Exhibit 143,

5  which is in evidence as a Great American Escrow business record.

6  Do you recognize this document?

7  A   Yes.  It is the bill for that $65,000.

8  Q   And who did you get this bill from?

9  A   Mr. Poff.

10  Q   What do you recall about the circumstances that led to you

11  getting this bill from Mr. Poff?

12  A   I had called him on the telephone and told him I needed a

13  bill.

14  Q   For what?

15  A   I'm sorry?

16  Q   Needed a bill for what?

17  A   For the $65,000.

18  Q   And what did he say?

19  A   This is the bill I got.  I don't remember the exact verbiage.

20  Q   After you got this bill from Mr. Poff, did you talk to him

21  about it?

22  A   Yes.

23  Q   And describe the conversation.

24  A   I was wondering what PDQ stood for.

25  Q   Why were you wondering that?

1    A    Because I made my own words for it.

2    Q    What were those words?

3    A    Pretty damn quick.   Sorry.

4    Q    How did Mr. Poff respond?

5    A    He laughed.

6    Q    Did he give you an answer of what PDQ stood for?

7    A    Not that I remember.

8    Q    Did you think this was a real bill, Ms. Thompson?

9    A    No.

10   Q    Why not?

11   A    Because I couldn't get rid of the PDQ in my mind.  I needed a

12   bill, it came.

13   Q    Why did you accept a bill into your escrow file that you did

14   not think was real, Ms. Thompson?

15   A    I was instructed to, as long as I had a bill, that it was

16   okay.

17   Q    Did you really think it was okay?

18   A    Actually, I did.  I was always told if I had written

19   instructions, it was fine.

20   Q    Ms. Thompson, did you actually pay this money to PDQ

21   Construction?

22   A    To the best of my knowledge, no.

23   Q    What did you actually do with the money?

24   A    I'm sorry.  I don't remember.  I remember wiring it, but I

25   don't remember who to.

1   Q    But you don't think you did it to PDQ, or do you think you

2   did it to PDQ?

3   A    I don't think I did, because I don't think it was real.

4   Q    So where else would you have wired the money?

5   A    I would have to look, but I am assuming --  I am going back

6   on my past knowledge of what I did to files.  I believe it

7   probably would have gone to Alexis.

8   Q    And why would it have gone to Alexis?

9   A    Because that's the funds that Bill and Alexis always used,

10  went to the one Alexis account.

11  Q    When you say that is what would have happened, are you

12  referencing your typical practice over the course of real estate

13  deals like these?

14  A    With Bill and Alexis, yes.

15  Q    Ms. Thompson, I would like to show you Exhibit 146, also

16  previously admitted as a Great American Escrow business record.

17  Do you recognize this document?

18  A    Yes.

19  Q    What is it?

20  A    In order to close a file we have to have something that tells

21  me what to do with the funds.  This is instructions from the

22  owner of Victory Home Mortgage telling me it was okay to pay

23  the -- I'm sorry, I forgot which -- pay part of those bills that

24  should have gone to Victory Home Mortgage, and what to do with

25  them.

1   Q   Who did you receive this letter from?

2   A   Bill.

3   Q   Did you ever have a conversation with Mr. Poff about it?

4   A   After I received a phone call from Mr. Truini, much, much,

5   much later on, a couple of years later, yes, I did.

6   Q   Describe that conversation you had with Mr. Poff?

7   A   I explained to Mr. Poff that Mr. Truini had called and was

8   very, very upset, because he had told me he never signed these

9   documents, he never gave Bill a letter, Bill had no right to do

10  this.  Bill said that he would talk to Mr. Truini and take care

11  of it, because they were friends for a long time.

12  Q   What did you understand to be the relationship between

13  Mr. Poff and Victory Home Mortgage, if any?

14  A   They were very good friends.  Mr. Truini said that he was

15  allowed to use Victory Home Mortgage as a broker's name.

16  Q   Mr. Truini said who was allowed to use Victory Home Mortgage?

17  A   Bill Poff, Mr. Poff.

18  Q   And did Mr. Poff ever say anything to you about what he was

19  doing with Victory Home Mortgage?

20  A   I would only be guessing.  I am not really sure --

21  Q   We don't want you to guess.  Ms. Thompson, I am going to show

22  you now Exhibit 154, which is already in evidence.  What is this?

23  A   The HUD-1 settlement statement.

24  Q   Also for one of the Puyallup duplex transactions?

25  A   Yes.

1    Q    Who prepared it?

2    A    I did.

3    Q    Take a look at the second page of this HUD-1, and at the

4    bottom of the page in particular.  I would direct your attention

5    to the entry regarding, "Note to seller carryback for $65,000."

6    Do you recall what that was about?

7    A    Positively?  No.  I believe I know, but I'm not sure of this.

8    Q    What recollection do you have, Ms. Thompson?

9    A    I believe that was a note to -- a note from Harutyunyan, to

10   be paid off, Alexis' mother.

11   Q    Was she involved in transaction number 1, Ms. Thompson?

12   A    No.

13   Q    Ms. Thompson, let me ask you, generally, were you in the

14   practice of disclosing to the mortgage lenders the seller

15   carrybacks that were negotiated in connection with Mr. Poff and

16   Ms. Ikilikyan's deals?

17   A    No.

18   Q    Let's talk now about transaction number 2.  Were you the

19   closing agent for that transaction?

20   A    Yes.

21   Q    What do you recall about it?

22   A    Bill and Alexis signed the document, took the lender's

23   documents out of my office and had them signed.  That's all I

24   remembered up until more recently.  And then I --  Do you want me

25   to expel on what I remember from recent incidents?

1   Q    Let's take a look at some documents.  First, let's take a

2   look at Exhibit 210.  Do you recognize this document?

3   A    Yes.

4   Q    What is it?

5   A    It is a notification of seller carryback for part of the

6   purchase and sale agreement.

7   Q    Generally speaking, when you saw purchase and sale addenda

8   like these listing seller carrybacks, in connection with the

9   deals you were working on with Mr. Poff and Ms. Ikilikyan, did

10  you send these along to the lenders?

11  A    If they were asked for.  Usually the lenders has the

12  documents already.  I believe on this one I did.  I don't

13  remember.

14  Q    And I want to focus your attention on the writing in the

15  bottom right of this Exhibit 210.  Do you recognize whose writing

16  that is?

17  A    Mine.

18  Q    Can you read for us what it says?

19  A    Senath calls, no, remove, called Alexis.

20  Q    You said Senath called --

21  A    "Senath said no, remove, called Alexis."

22  Q    Do you remember why Senath called?

23  A    Senath worked for Ownit Mortgage.  This went to them, and she

24  said they could not have a carryback.  I don't remember the

25  conversation.

1   Q   Was there ultimately a seller carryback on that deal anyway?

2   A   Yes.

3   Q   Let's take a look at Exhibit 213, previously admitted in

4   evidence.   Do you recognize this document?

5   A   Yes.

6   Q   And what is it?

7   A   The seller financing agreement that Mr. Poff did.

8   Q   Did you have any sort of discussion with Mr. Poff about this

9   seller financing agreement?

10  A   By which you mean?

11  Q   This particular one.   Do you recall Mr. Poff saying anything

12  to you about it?

13  A   Not --   I don't recollect anything right now.

14  Q   Generally speaking, do you know where the language in this

15  seller financing agreement came from?

16  A   Mr. Poff.

17  Q   How do you know that?

18  A   Because he drew it up.

19  Q   And when did Mr. Poff draw this language up?

20  A   I am not sure of the date, but it was between two files.   And

21  I had told him he needed to write something that explained

22  exactly what he was doing.

23  Q   And in response to that, what did he do?

24  A   He wrote this up, brought it in to show me.

25  Q   Ms. Thompson, let's take a look at Exhibit 232, which is a

1    document we received from the lender's file.  What is this

2    document?

3    A    The HUD-1 settlement statement for Tim Thomson.

4    Q    And who prepared it?

5    A    I did.

6    Q    Ms. Thompson, you said that the final deal included a

7    carryback.  Do you see an entry for a seller carryback in this

8    final HUD?

9    A    No, I don't.

10   Q    Why didn't it make it in?

11   A    Because the lender wouldn't have allowed them to go through

12   with it.  I believe we had a separate file for it.

13   Q    And let's take a look at the second page of this Exhibit 232.

14   And we will zoom in on the bottom half of the page.  I want to

15   direct your attention to the entry, "Transfer to new purchase in

16   TransNation Escrow in the amount of $55,320.56."  Do you see that

17   line?

18   A    Yes, I do.

19   Q    Did you actually transfer 55,000 some odd dollars to a new

20   purchase in TransNation Escrow from the seller's funds?

21   A    No, not that I remember.

22   Q    Why did you write that entry if you didn't do it?

23   A    In order to lie to the lender, in order for them to be able

24   to close the deal.

25   Q    Who did you consult with prior to preparing this HUD?

1   A   Mr. Poff.  I'm sure Alexis was there also.

2   Q   Is this entry generally reflective of the types of entries

3   you would put on to come up with HUDs after consulting with

4   Mr. Poff and Ms. Ikilikyan?

5   A   Yes.

6   Q   Now let's take a look at Exhibit 206.  I would focus your

7   attention on the last page of this document.  Do you recognize

8   this document?

9   A   Yes.

10  Q   What is it?

11  A   It is the third page of the deed of trust for Mr. Tim

12  Thomson.

13  Q   And deed of trust for what in particular?

14  A   I'm sorry?  Pardon me?

15  Q   The deed of trust for what in particular?

16  A   That seller carryback we were just talking about.

17  Q   In connection with transaction number 2?

18  A   Yes.

19  Q   Who notarized it?

20  A   I did.

21  Q   It appears to bear a signature of Tim Thomson.  Was he

22  actually there when you notarized this document?

23  A   No, he was not.

24  Q   Who was there?

25  A   Bill and Alexis.

1  Q    Ms. Thompson, at some point did you tell me and Ms. Vogel

2  that Tim Thomson had actually come in and signed that document?

3  A    Yes, I did.

4  Q    And before you told that to us, had you said the same thing

5  to others on other occasions?

6  A    Yes.

7  Q    Why did you lie about that, Ms. Thompson?

8  A    Scared, trying to cover myself.

9  Q    When was it that you first became scared?

10         MR. SCOVILLE:  Actually now is a good time to break,

11  your Honor.

12         THE COURT:  Ladies and gentlemen, we will take our lunch

13  recess at this time.  We will be back at 1:30.  Counsel, how long

14  do you anticipate the witness will go?

15         MR. SCOVILLE:  Probably about 45 minutes more on direct

16  examination.

17         THE COURT:  Mr. Poff, you will need to be ready then

18  this afternoon to cross-examine.  We will be in recess.

19  (Lunch break)

20         THE COURT:  Is the government ready to resume in the

21  afternoon?

22         MR. SCOVILLE:  Yes.

23         THE COURT:  Mr. Poff, any matters from you?

24         THE DEFENDANT:  No matters.

25         THE COURT:  We will resume.  The witness is still under

1    oath.

2    By Mr. Scoville:

3    Q    Ms. Thompson, where we left off, we were talking about this

4    story that you had invented about Tim Thomson actually being

5    before you and signing this Document 206 -- Exhibit 206, which I

6    am displaying.

7         Ms. Thompson, before you made up that story and started

8    telling it to investigators and the prosecutors in this case, did

9    you have a conversation with Mr. Poff?

10   A    Yes.

11   Q    And what were the circumstances leading to the conversation

12   with Mr. Poff?

13   A    I had called him and told him Mr. -- it would be the father

14   of Tim, came into my office and was very, very, very upset that

15   this deed of trust had been done, and that he didn't know about

16   it.  And he started telling me he was the power of attorney for

17   his son, which I didn't know about.  And I called Bill to ask

18   what he was talking about.  During the course of the

19   conversation, Bill said he would figure something out, he would

20   cover for me, because I was really, really upset.

21   Q    And why were you upset?

22   A    Because I had allowed Alexis to sign this, and then I

23   notarized it, because Bill and Alexis sat there at my desk

24   saying, yes, it is true.  They promised me that it was something

25   he was going to do.

1    Q    Why had you allowed them to sign on behalf of Tim Thomson?

2    A    Stupidity.  I didn't think clear.  I know, I know.

3    Q    Did they say anything to try to get you to allow them to sign

4    on behalf of Tim Thomson?

5    A    Just that they promised me that -- because I asking them, are

6    you sure he knows about it?  And both Bill and Alexis said, yes,

7    he does.

8    Q    When you say "about it" --

9    A    I apologize.  About the deed of trust.

10   Q    And in what position were you recording the deed of trust?

11   A    The third.

12   Q    And when Mr. Thomson, the father, came in, was one of his

13   concerns the position in which the deed of trust had been

14   recorded, whether it was third or second, or do you recall?

15   A    I'm not sure he understood the position.

16   Q    So going back to your conversation with Mr. Poff, after Jim

17   Thomson came into your office, when he said he would cover for

18   you, what did you understand that to mean?

19   A    That he would say that he had brought Mr. Thomson.

20   Q    "Mr. Thomson," do you mean the father or the son?

21   A    The son.

22   Q    Have you ever met the son, Tim Thomson?

23   A    No.

24   Q    Has he ever been in the Great American Escrow offices?

25   A    No.

1    Q    Let's talk now about transaction number 3 on the chart.   Were

2    you the closing agent for that transaction?

3    A    Yes.

4    Q    And let's take a look at Exhibit 318, which was previously

5    admitted as a Great American Escrow record.   What is this

6    document, Ms. Thompson?

7    A    Lender instructions.

8    Q    And what do you do with lender instructions in your role as a

9    closing agent?

10   A    Follow them, make sure everything is done correctly.

11   Q    Let's take a look at the last page of these instructions,

12   page 3.   Do you recognize your signature on those closing

13   instructions?

14   A    Yes, I do.

15          THE COURT:   Mr. Ratner, you might want to punch the

16   button on your microphone.   You may continue, Counsel.

17   By Mr. Scoville:

18   Q    Let the record reflect that Mr. Ratner and Mr. Poff appear to

19   be consulting on the matter.

20       Ms. Thompson, let's take a look at the first page of 318

21   now -- I'm sorry, the second page, the closing instructions

22   listed at the top.   I want to direct your attention to closing

23   instruction number 4, which appears to state, "SATIS source of

24   funds to close, copy of cashier's check to escrow from account

25   listed on 1003."

1        Do you see that language?

2    A   Yes, I do.

3    Q   Are you familiar with that type of closing instruction?

4    A   Yes.

5    Q   What does it mean?

6    A   That the money that is brought in to close has to come

7    from --  On the 1003 there is a page that shows checking

8    accounts.  It has to be one of those accounts.

9    Q   What type of documentation is usually provided to insure the

10   lender that this condition has been satisfied?

11   A   A cashier's check, a copy of the bank statement showing it.

12   Q   Let's take a look at Exhibit 319, also a Great American

13   Escrow business record.  The first page.  Do you recognize what

14   this is?

15   A   A fax cover sheet.

16   Q   Who created it?

17   A   I did.

18   Q   And who did you send it to?

19   A   Ownit Mortgage.

20   Q   Let's take a look at the next page of Exhibit 319.  What's

21   this?

22   A   A copy of a check.

23   Q   For how much?

24   A   $98,000.

25   Q   Where did you get this document from, Ms. Thompson?

1  A    Mr. Poff.

2  Q    Do you recall the circumstances leading up to you getting

3  this check from Mr. Poff?

4  A    He needed the check to close.

5  Q    Is that something you let Mr. Poff know?

6  A    I'm sorry.  What?

7  Q    Is that something you let him know, that you needed the check

8  to close?

9  A    Correct.

10  Q    How did he respond?

11  A    He would get me the check.

12  Q    What did he say to you?

13  A    That he would get me the check.

14  Q    Did he then send you something?

15  A    He called and he couldn't get in right away.  He faxed me

16  over a copy of the check and said he would bring it in.

17  Q    Did he then bring the actual check in?

18  A    No, he did not.

19  Q    Did you have a conversation with him about that?

20  A    Yes.  The check was no good.

21  Q    What do you mean "the check was no good"?

22  A    That he would -- it would get something else for this check

23  (sic).  This check, I already faxed it over to the lender.

24  Q    So did Mr. Poff explain to you why he wasn't going to give

25  you the actual $98,000 check?

1   A   I don't remember exactly what he said.

2   Q   Did he ever bring in the actual $98,000 check?

3   A   No.

4   Q   Now, let's take a look at Exhibit 314.  This is an Ownit

5   Mortgage business record previously admitted into evidence.  And

6   we are going to look at the second page.  What is this document,

7   Ms. Thompson?

8   A   The HUD-1 statement.

9   Q   Who prepared it?

10  A   I did.

11  Q   Let's take a look at the bottom half of this second page of

12  Exhibit 314.  Do you see the line entitled "Additional deposits"?

13  A   Yes, sir.

14  Q   For $98,000?

15  A   Correct.

16  Q   Ms. Thompson, did you actually receive funds in the amount of

17  $98,000 --

18  A   No.

19  Q   -- as an additional deposit for this?

20  A   No.

21  Q   This is the final HUD, correct, Ms. Thompson?

22  A   Correct.

23  Q   So why did you send to Ownit a final HUD reflecting a $98,000

24  deposit that you hadn't actually received good funds for?

25  A   It was a requirement of the lender, and it needed to be

1   billed, so I lied.

2   Q    Did you consult with anyone before creating this final HUD?

3   A    Mr. Poff.

4   Q    Let's take a look at the second page of this final HUD, which

5   is actually the third page of Exhibit 314.  And I want to direct

6   your attention to the bottom half of the page, and in particular

7   to the line that reads:  "Transfer to purchase to First American

8   Escrow" in the amount of approximately $100,700.  Do you see that

9   line?

10  A    Yes.

11  Q    Ms. Thompson, in connection with transaction number 3, did

12  you actually disperse approximately $100,000 to a transfer to

13  purchase at First American Escrow?

14  A    To the best of my recollection, no, I did not.

15  Q    Why did you put this entry in the file?

16  A    It had to show -- it was an entry to show something for the

17  money that was in the sellers', that was actually going to Bill

18  and Alexis.

19  Q    Ms. Thompson, let's talk now about transaction number 4.

20  Were you the closing agent for that?

21  A    Yes.

22  Q    And let's take a look at Exhibit 422, which is already in

23  evidence as an Ownit Mortgage business record.  What is this

24  document?

25  A    A HUD-1 settlement statement.

1   Q   Who prepared it?

2   A   I did.

3   Q   I am going to direct your attention to the fourth page.  What

4   are these entries we see labeled as Exhibit A on the fourth page?

5   A   The break down of the payoffs.

6   Q   Let's start with the entry on the bottom, "Payoff to Elaine,"

7   and the last name starts with B.  The total amounts appear to be

8   $59,975.80.  What was the role in this transaction of the lady

9   whose last name starts with B?

10  A   Mrs. B did a reconveyance, which means she gets rid of the

11  deed of the trust that was due from Mr. Jenkins, and put another

12  deed of trust on the property for the buyer.

13  Q   The new buyer?

14  A   Correct.

15  Q   So was Mrs. B's underlying interest, secured by a deed of

16  trust, actually paid off, Mrs. Thompson?

17  A   No.  It was rolled over to the new deed of trust.

18  Q   It was re-subordinated?

19  A   Yes.  Well, it wasn't legally subordinated.  It was done in a

20  new deed of trust.  Does that answer your question?

21  Q   Why did you put in the final HUD then that her interest had

22  been paid off?

23  A   In order to show that her deed of trust -- in order to cover

24  showing the money that was going to Bill and Alexis.

25  Q   Now, let's take a look at the entry right above that, talking

1    about the payoff to Ocwen Financial Corporation?

2    A   Correct.

3    Q   A total amount of $289,885.30.  Do you see that?

4    A   Yes.

5    Q   Did you actually wire that full amount to Ocwen?

6    A   Yes.

7    Q   At some point after the sale closed did some of that money

8    come back?

9    A   Yes.

10   Q   How much?

11   A   $20,000.

12   Q   Why did it come back?

13   A   It was an overpayment at the time we did it.  We didn't know

14   exactly what the payoff was.  Mr. Jenkins kept saying it was in

15   default.  So we sent them--to make sure that we sent them

16   enough--overage.

17   Q   What did you do when you received this $20,000 refund back?

18   A   The first thing I did was wire it out to Alexis' mother, and

19   then I made a phone call to Alexis and Bill and requested funds

20   for me.

21   Q   Let's unpack this.  First you said you wired it out to

22   Alexis' mother's --

23   A   Account.

24   Q   And that was an account held in the name of Ms. Harutyunyan?

25   A   Correct.

1    Q    And after you wired the money into that account, what did you

2    do?

3    A    I called Alexis and told her that I had just done that.  And

4    she said, fine, I can transfer it over to my account.  And I said

5    that I would like ten of it to me.

6    Q    Why were you requesting $10,000 of the money, Ms. Thompson?

7    A    They had --  Selfish reasons.  I wanted some.

8    Q    Why did you feel entitled to $10,000 from this transaction

9    where you were the escrow agent?

10   A    I don't know.

11   Q    How did Alexis, Ms. Ikilikyan, respond when you asked for the

12   $10,000?

13   A    She didn't have a problem.  She said she would talk to Bill

14   and call me back.

15   Q    Did you then have a conversation with Mr. Poff about this?

16   A    Yes, I did.

17   Q    And when was that?

18   A    After the conversation with Alexis.

19   Q    And describe the conversation with Mr. Poff.

20   A    He didn't have a problem with it, he would send Alexis over

21   with it.

22   Q    By "it," what do you mean?

23   A    The money.  I'm sorry.

24   Q    The $10,000?

25   A    Yes.

1  Q    Did you then get $10,000?

2  A    Not at one time.

3  Q    Did you ultimately get $10,000?

4  A    Yes.

5  Q    And in what form did you receive those payments?

6  A    A check for $2,000, cash for $7,500, and then the rest of it

7  the next day.

8  Q    At some point, Ms. Thompson, did you indicate to me and to

9  Ms. Vogel that you had never asked for money?

10  A    Yes, I did.

11  Q    Was that true?

12  A    That I said that to you?

13  Q    Was that true that you never asked for money?

14  A    No, it was not.

15  Q    Why did you lie?

16  A    I was totally humiliated and embarrassed that I had done it,

17  and tried to cover myself.

18  Q    At some point did you indicate to myself and Ms. Vogel that

19  whatever money you got from Mr. Poff and Ms. Ikilikyan went to

20  charity?

21  A    Yes.

22  Q    Is that true?

23  A    Not all of it.

24  Q    About how much of the money you got did go to charity?

25  A    I am estimating, $5,000.  And that is a high estimate.

1    Q   Of the $25,000 total that you received?

2    A   Correct.

3    Q   And where did the rest of the money go?

4    A   I spent it.

5    Q   Ms. Thompson, let's talk now about transaction number 5.

6    Were you the closing agent for that transaction?

7    A   Yes.

8    Q   What do you recall about that?

9    A   There were quite a few parcel numbers to that transaction,

10   that Bill and Alexis were really excited about buying this piece

11   of property.

12   Q   Was it your understanding that Mr. Poff and Ms. Ikilikyan

13   were going to move to Yelm and live there?

14   A   They were going to continue with the wedding chapel business.

15   I'm not sure how to phrase that.  And Bill was going to set up

16   his Bible studies and Bible churches there.

17   Q   Were they going to move to Yelm?  Is that your understanding?

18   A   I'm not sure.  I don't remember.

19   Q   Did they move to Yelm?

20   A   No.

21   Q   Who was at the closing for that Yelm transaction?

22   A   Bill and Alexis.

23   Q   Let's take a look at Exhibit 506.  What is this?

24   A   A deed of trust.

25   Q   I will flip to the 15th and 16th pages of this deed of trust.

1    Do you see the signatures on the 15th page?

2    A    Yes, I do.

3    Q    Now let's look at the 16th page.  Who notarized this?

4    A    I did.

5    Q    When you notarized it, were both Ms. Ikilikyan and Mr. Poff

6    there before you?

7    A    Yes.

8    Q    Transaction number 6, the Issaquah property.  Were you the

9    closing agent for transaction number 6?

10   A    Yes.

11   Q    Let's take a look at Exhibit 627, which is previously in

12   evidence from one of the mortgage lender's files.  Ms. Thompson,

13   what is this document?

14   A    A HUD-1 settlement statement.

15   Q    Who prepared it?

16   A    I did.

17   Q    What does it indicate as the contract sales price?

18   A    I'm sorry.  I can't read it.  $2 million.

19   Q    Ms. Thompson, was that the true sales price for this deal?

20   A    No.

21   Q    What was the true sales price?

22   A    I don't remember.

23   Q    Was it higher or lower than $2 million?

24   A    It would have been lower.

25   Q    How are you aware of that?

A    They raised the sales price in order to get funds back to them, to Bill and Alexis.

Q    Who is the "they"?

A    I apologize for that.  Bill, Alexis and the sellers, the Hsus.

Q    And how are you aware of that, Ms. Thompson?

A    The closing took place, and Bill and Alexis told me.

Q    Let's take a look at the second page of Exhibit 627.  In particular, at the bottom half of the second page.  I will direct your attention first to the entry in line 1305.  Can you read what that says?

A    "Redo property, Marquin House Jobs."

Q    What is the amount.

A    I think it is 539,226 something.

Q    Ms. Thompson, that is a pretty significant repair bill.  Did you ever pay out such a repair bill to anyone in connection with this transaction?

A    No.

Q    Why did you put this on the HUD?

A    It was given to me to show that's where the funds were going to.  It was given to me so that I could show where funds were supposed to have gone to.

Q    Who in particular gave you the Marquin House Jobs bill?

A    I am not real sure which one I got it from.

Q    Who was there when this was discussed?

1  A    Bill and Alexis.

2  Q    Was anyone else there?

3  A    I want to say that Alexis called Tony Reyes, but I don't

4  really remember if that was that occasion or not.

5  Q    Now, let's take a look at the line at the very bottom of this

6  additional settlement charges block, reading:  "Pay off personal

7  notes to --" it looks like "Ms. Harutyunyan"?

8  A    Correct.

9  Q    In the amount of $120,000?

10  A    Correct.

11  Q    What do you recall about this entry in the HUD?

12  A    That I needed to have -- Mrs. H. needed to show where she got

13  the $120,000 from.  So Bill and Alexis brought in a note to show

14  that's where she would have got it for another file.

15  Q    When say "Mrs. H. needed to show," it sounds like you had a

16  conversation with Mrs. Harutyunyan about that?  Is that what you

17  meant to say?

18  A    No, I did not.  I'm sorry.  Mrs. Harutyunyan is Alexis.  I

19  had the conversation with Alexis and Bill regarding they needed

20  that in order to show where the money came from on another file.

21  Q    Can you explain that a little better?

22  A    When we were coming down to disbursing this, Alexis and Bill

23  came in and said that they needed to show that her mother,

24  Mrs. H, for another house, was getting funds out of a file.  So

25  we transferred these funds to the other file.  I said I had to

1    have something that showed that these funds legitimately could

2    come out of this file.  And Bill drew up a note for Alexis' mom

3    and Mrs. Hsu.

4    Q    I just want to make sure I am understanding this.  This other

5    file, that is a separate property purchase?

6    A    Correct.

7    Q    Not the 9488, another one?

8    A    Yes.

9    Q    Do you recall which property purchase you needed to show

10   Mrs. H having $120,000 of funds coming into?

11   A    No, I don't.

12   Q    You don't recall.  Was that supposed to be something like her

13   down payment --

14   A    Yes.

15   Q    -- for the new purchase?

16   A    Yes.

17   Q    Ms. Thompson, let's take a look at Exhibit 629.  It is in

18   evidence as a Great American Escrow record.  What is this?

19   A    That is the note.

20   Q    Do you mean to say that is the $120,000 note you were just

21   referring to?

22   A    Correct.

23   Q    It appears to reflect that Ms. Hsu owed Ms. Harutyunyan

24   money?

25   A    Correct.

1  Q    Did Ms. Hsu really owe Ms. Harutyunyan money?

2  A    No.

3  Q    So why did you accept this fake promissory note?

4  A    In order to show why the funds were going in

5  Ms. Harutyunyan's file.  I had to have something that said that.

6  And that's what we used.

7  Q    And who did you get this promissory note from?

8  A    Bill and Alexis.

9  Q    Ms. Thompson, let's talk now about 6a.  You indicated at the

10  beginning you weren't sure whether you were the escrow agent for

11  6a?

12  A    I could have been, but I don't really remember right at this

13  moment.

14          MR. SCOVILLE:  Your Honor, may the witness be shown

15  Exhibit 608 for purposes of refreshing her recollection?  She

16  testified she doesn't know.

17  By Mr. Scoville:

18  Q    Ms. Thompson, we are going to show you Exhibit 608.  I would

19  like you to look through it.  I will ask you if that refreshes

20  your recollection as to whether you were or were not the closing

21  agent involved with transaction 6a?

22  A    Perfect.

23          THE COURT:  Counsel, while we locate that, the copy of

24  627 that I have doesn't seem to match up with what you have on

25  the screen.  What do you have as Exhibit 627?

1          MR. SCOVILLE:  What we have in our system as 627 is the

2     HUD-1 settlement statement regarding the 9488 Issaquah property

3     purchase.

4          THE COURT:  Why don't you give me your lender number?

5     The one I have is 02540.

6          MR. SCOVILLE:  That's the same lender number we have for

7     the first page, yes.

8          THE COURT:  Thank you.

9          MR. SCOVILLE:  For the second page, may I inquire of the

10    Court, do you have 02451?

11         THE COURT:  Yes.  You may resume, Counsel.

12    By Mr. Scoville:

13    Q   Ms. Thompson, having looked at Exhibit 608, does that refresh

14    your recollection as to whether you were or were not the closing

15    agent involved in transaction 6a?

16    A   I was.  Sorry.

17    Q   Do you recall anything about that particular transaction,

18    that refinance?

19    A   I really don't remember this.

20    Q   Let's talk now about transaction number 7, Ms. Thompson.

21    Were you the closing agent for transaction number 7?

22    A   Yes.

23    Q   Let's take a look at Exhibit 704.  Do you recognize this

24    document?

25    A   Yes, I do.

1   Q   And what is it?

2   A   A purchase and sale agreement.

3   Q   I would direct your attention to the purchase price, which is

4   reflected as $150,000?

5   A   Correct.

6   Q   Was that the actual purchase price?

7   A   No.

8   Q   What was the actual purchase price?

9   A   $100,000, if I remember correctly.

10  Q   How are you aware of that?

11  A   Mr. Stepp came in and signed at $100,000.  Alexis called --

12  Do you want me to go into detail?

13  Q   Yes.

14  A   Alexis called after he had signed and said she was wrong, the

15  sale price was $150,000.  I said, bring me something in writing

16  that shows $150,000.  No problem.  She asked if Mr. Stepp would

17  have to come in and re-sign.  Not if he had this, because he

18  signed an estimated.

19  Q   Were you then brought the $150,000 contract?

20  A   Yes.

21  Q   And who was it that brought it in to you?

22  A   I believe Bill did.

23  Q   Who was there when Bill brought it to you?

24  A   Alexis.

25  Q   And what kind of conversation did you have at that time, if

1  any?

2  A    Bill sat down and explained to me how Mr. Stepp was his good

3  friend, and a lot about Mr. Stepp.  They were going to -- the

4  raise in the sale price, Bill and Alexis were going to pay the

5  difference in all the other fees.

6  Q    What do you mean by that?

7  A    When they raised the sales price from 100 to 150, it raised

8  the cost of excise, cost of taxes, anything, escrow, title fees.

9  Q    Who is it that normally pays those types of fees?

10 A    On a normal file it would be strictly the seller.

11 Q    Here that would be Mr. Stepp?

12 A    Correct.

13 Q    What were Mr. Poff and Ms. Ikilikyan, as they told you, going

14 to do with those fees?

15 A    They were -- to take the difference between the sale price of

16 a hundred and the sales price of 150, and reimburse Mr. Stepp for

17 that.

18 Q    By "that," do you mean the whole $50,000, or do you mean the

19 fees associated with the difference between the $100,000 sales

20 price and the $150,000 sales price?

21 A    Only the fees associated with it.

22 Q    So what was happening with this $50,000 on top of the sales

23 price going to Mr. Stepp?

24 A    I'm sorry?  I don't --

25 Q    The extra $50,000, where was it going?

1    A    I would have to look at the settlement statement or a copy of

2    the checks.  Off the past experience from Bill and Alexis, it

3    would have either gone directly back to Alexis or not come in.

4    I'm not sure what the situation was at this time.

5    Q    Were you concerned about this difference between the $100,000

6    sales price and the $150,000 sales price?

7    A    No, they did it all the time.  It didn't even --

8    Q    Who is "they"?

9    A    I apologize.  Bill and Alexis.

10   Q    Now, let's talk about transaction 7a on the chart.  Were you

11   the closing agent for that transaction?

12   A    Yes, I was.

13   Q    What do you recall about that?

14   A    That Tony Reyes was the agent.  And I don't remember if he

15   was the loan officer or not.  Henriquez is a friend of Tony's.

16   The funds that were in that file were actually wired out to, if

17   my memory serves me correctly, to Bill, Alexis and to someone

18   called Meda (phonetic), which was Tony Reyes' girlfriend.

19   Q    Why were funds going to Tony's girlfriend?

20   A    Alexis and Bill and Tony had made some type of a deal.

21   Q    Speaking about the funds that went to Mr. Poff, what do you

22   recall about that?

23   A    That Alexis had came in -- she came in, and then they

24   actually signed, and then towards disbursement she informed me

25   that Bill was to get half of everything.  So I got an e-mail from

1  Bill telling me, this is how much I am to get.  I sent him an

2  e-mail back saying, that's not half.

3  Q    Ms. Thompson, I would like to show you a document that is

4  already in evidence, Exhibit 722.  Do you recognize this

5  document?

6  A    Yes, it's the e-mail I got from Bill.

7  Q    When you say "it's the e-mail I got from Bill," what part of

8  this document -- the first page of Exhibit 722 are you referring

9  to?

10  A    If you notice, down on the -- it says "Original message

11  from," and shows the e-mail address, "sent," and it is to me,

12  that section right there is the e-mail that told me how much he

13  was to get.

14  Q    From what e-mail address was that sent?

15  A    USMR at Comcast dot net.

16  Q    And whose e-mail did you understand that to be?

17  A    Bill's.

18  Q    After you got this e-mail indicating my half will be $54,924,

19  what did you do?

20  A    I replied -- hit reply and sent it back asking, that is a

21  little over 50 percent, because it was over 50 percent.

22  Q    Is that the e-mail that is right on top of the e-mail we are

23  looking at?

24  A    Yes.

25  Q    Which reads:  "How far can that be if you are getting only

1   50 percent?"

2   A   Correct.

3   Q   Did you and Mr. Poff talk on the phone about that?

4   A   Yes, we did.

5   Q   How long after you sent that e-mail was that?

6   A   Quite shortly.

7   Q   Describe that conversation, please.

8   A   Mr. Poff went into detail with me about how he came up with

9   that amount of money.

10  Q   Without going into too much detail, what did he explain to

11  you?

12  A   That there were personal reasons -- it was half his money,

13  and then Alexis had to pay him back for personal things.

14  Q   So in the end, was it slightly more than half of what

15  Mr. Poff and Alex is were getting, or was it slightly less than

16  half, or half even?  Which was it?

17  A   If I understood you correctly, Mr. Poff got over half.

18  Q   Did Mr. Poff provide you direction as to where to send this

19  money?

20  A   Yes.

21  Q   How did he provide you that direction?

22  A   I believe it was an e-mail or a fax that I received from him.

23  Q   Let's take a look at the second page of Exhibit 722.  Do you

24  recognize this?

25  A   It is the fax that Mr. Poff sent me.

1    Q    For what purpose?

2    A    So that I could wire his funds to him.

3    Q    And is the account indicated on this check, T&K Investments,

4    the account where you wired Mr. Poff his portion of the funds?

5    A    Yes.

6    Q    Ms. Thompson, transaction number 8, the final transaction on

7    the chart, were you the closing agent for that transaction?

8    A    Yes, I was.

9    Q    What do you recall about it?

10   A    I liked the Kirkdoffers.  I thought they were wonderful

11   people.  I thought Ms. Harutyunyan was actually buying it for

12   her.  After the course of the transaction, I found Mr. Reyes was

13   living there.

14   Q    Do you recall the Kirkdoffers coming to close the

15   transaction?

16   A    Yes.

17   Q    At that closing were the Kirkdoffers made aware they might

18   end up in third position?

19   A    I don't believe so.

20            MR. SCOVILLE:  No further questions.

21            THE COURT:  Mr. Poff.

22                         CROSS-EXAMINATION

23   By the Defendant:

24   Q    Good afternoon, Mrs. Thompson.

25   A    Hi.

1           THE DEFENDANT:  The first thing I would like -- I wanted

2 to object.  The plaintiffs were trying to vouch the record,

3 saying that I was asking a question of Mr. Ratner of some sort of

4 legal nature.  I was asking him to grab a document for me.

5           THE COURT:  I think all he said was that you were

6 consulting.  I wouldn't draw any implication or other, but you

7 are on the record with that.

8           THE DEFENDANT:  Thank you.  I wanted to put that on the

9 record.

10 By the Defendant:

11 Q   Ms. Thompson, how much time did you say that you spent with

12 the government when they were preparing you to be a witness

13 today?

14 A   I think I spent five times.  Is that what you are asking me?

15 Q   Yes, ma'am.

16 A   I believe I was there five times.  I am estimating.

17 Q   Yes, I understand.  And how much time, each time that you

18 visited, approximately?

19 A   Each time or all totaled?

20 Q   Let's go with the total.  That would be an easier question to

21 answer, ma'am.

22 A   10, 15 hours.

23 Q   10, 15 hours, ma'am?

24 A   Total estimate.

25 Q   Thank you.

1              THE DEFENDANT:  May it please the Court, I am giving

2    constructive notice for my second motion of mistrial on that as

3    well.  And I will continue on with my questions, your Honor.

4              THE COURT:  All right.

5              THE DEFENDANT:  Thank you, sir.

6    By the Defendant:

7    Q    Ms. Thompson, in your deal with the government, as part of

8    that deal you made, they will submit what is called a 5K1

9    reduction to the judge for consideration and reduction of your

10   sentence?

11   A    I'm sorry.  I don't know what that is.

12   Q    Are you --  Let me rephrase the question for you, ma'am.  Are

13   you being offered a potential reduction at sentencing if you

14   testified today?

15   A    No, I don't believe so.  I am kind of confused.  Could you

16   rephrase it?  I am sorry.

17   Q    That's fine.  If you testify today, was it expressed to you

18   that they will submit something to the judge at sentencing that

19   will possibly give you a lesser sentence?

20   A    No.

21   Q    So you were not offered anything called a 5K1 reduction,

22   ma'am?

23   A    I really don't know what that is.

24   Q    I will move along, your Honor.

25   A    I'm sorry.  I don't know what it is.

```
1   Q    That's okay, ma'am, if you don't remember.  I will be better
2   prepared next time.  I will come back to that after this one
3   other issue.  I will make this quick today.
4        Now, ma'am, you mentioned before that you were pretty scared
5   throughout this entire deal?
6   A    Oh, God, yeah.
7   Q    Are you still scared?
8   A    Not as bad as I was, but, yeah.
9   Q    You are still a little scared.  That's reasonable.
10       Were you informed approximately how much time you might be
11  looking at at sentencing?
12  A    Mr. Vonasch sat and looked at his schedule.  There was like a
13  huge --  How would I put this?  He showed me the different
14  scenarios of what they charge you with, and the hours that it
15  adds up.  No, they never told me what I was going to get.  Is
16  that what you mean?
17  Q    No, ma'am.  That's fine.  He did go through that process with
18  you, showing you the sentencing guidelines, I think it is called?
19  A    Yes.
20  Q    Did he give you a probable range of what you might be looking
21  at, as far as a sentence?
22  A    Anywhere from 16 months to six years, seven years.
23  Q    Ma'am, was there ever any time you ever signed Mr. Poff's
24  signature?
25  A    Not that I remember.
```

1    Q    When Mr. Poff went to Michigan, did you continue to keep in

2    contact with Ms. Ikilikyan?

3    A    Actually I think that it was a while after that, but I had

4    actually talked to you before I talked to her.  I think you were

5    already gone.  I believe that I talked to you, and then I talked

6    to her.  But I hadn't talked to her.  I'm sorry.  Yes.

7    Q    Was there some considerable --  Let me rephrase.  Was there

8    some extraordinary circumstances why Mr. Poff had to go to

9    Michigan in the spring of -- late winter/early spring of 2008?

10   Were you told?

11   A    If I am understanding your question, if I knew why you left?

12   Q    Yes, ma'am.

13   A    I think I do.  I wasn't a witness, but I believe I do.

14   Q    Were you told?

15   A    Yes, by both you and Alexis.

16   Q    Okay.  Ma'am, what did Mr. Poff tell you?

17   A    You told me that Alexis was going through PTS -- TSP -- I'm

18   sorry.  There is a three letter -- TSP.

19   Q    You are pretty close, ma'am.  I don't want to coach her what

20   the --

21             MR. SCOVILLE:  I will object.  This is calling for

22   hearsay.

23             THE COURT:  I will overrule the objection.  You can ask

24   her another question, Counsel.  Use the right term.

25             THE DEFENDANT:  Yes, sir.

1   By the Defendant:

2   Q    Were you told by Mr. Poff, ma'am, that Alexis was suffering

3   with -- potentially suffering with PTSD during the divorce?

4   A    If those are the right initials, yes.

5   Q    Okay, ma'am.  Thank you.  Can you see that okay,

6   Ms. Thompson?

7   A    Yeah, the little words, but I pretty much know what it says.

8   It is kind of blurry.  There you go.  Thank you.

9   Q    The highlighted paragraph, could you read that for the Court,

10  ma'am?

11  A    "In exchange for defendant's cooperation, as described above,

12  and conditioned upon the defendant's fulfillment of all

13  conditions of this plea agreement, the United States Attorney

14  agrees to consider filing a motion pursuant to Section 5K1.1 of

15  the United States Sentencing Guidelines, recommending that the

16  Court sentence defendant to a sentence that reflects defendant's

17  cooperation.  Defendant understands that in the event the United

18  States Attorney files such a sentencing recommendation, that

19  recommendation will be based on the consideration of factors and

20  provisions set forth in the United States Sentencing Guidelines."

21  Q    Thank you, ma'am.  Were you explained what that was?

22  A    I believe I must have been.  I thought that it said that --

23  that they couldn't guarantee anything, that it was up to the

24  Court.

25  Q    Okay, ma'am.  No one had explained to you that you

 1  potentially could get a recommendation for a lesser sentence if

 2  you cooperated with the government today?

 3  A    I think what they told me is they could recommend it, but the

 4  Court did not have to abide by it, that they could only do

 5  recommendations, they couldn't say this is what --

 6  Q    Okay, ma'am.  Not just this part of your agreement, do you

 7  understand the agreement that you entered into with the

 8  government?

 9  A    I would like to say I do.

10  Q    Okay.  Ma'am.  Thank you.  Ma'am, did you ever go to Chris

11  Benson, who is a real estate attorney, or any of the other

12  attorneys in the office there at Great American Escrow, and ask

13  them a legal question in regards to closings?

14  A    I have asked them questions.

15  Q    And have you ever asked the attorneys there a question on how

16  to legally stay in compliance to do a seller carryback?

17  A    Yes, on the Kim transaction.

18  Q    On the Kim's transaction you did, ma'am?

19  A    That very first one, yes.

20  Q    And did you ever give an answer in regards to how to legally

21  have a seller carryback to Mr. Poff or Mrs. Ikilikyan?

22  A    I'm not sure I understand your question.

23  Q    Did you ever convey that information about how to legally do

24  a seller carryback to Mr. Poff?

25  A    I'm sure we did when we discussed the Kim transaction.

1    Q    And basically was part of the advice, to stay in compliance a

2    seller carryback had to be separated from a traditional purchase

3    and sale; to stay in compliance, it had to be a separate

4    transaction from the purchase itself?

5    A    Yes.

6    Q    Thank you.  Can you tell me what this form is, ma'am?

7    A    A quitclaim deed.

8    Q    Is a quitclaim deed typically executed by a non-borrowing

9    spouse on a purchase?

10   A    If there is a lender involved, yes.

11   Q    Normally a lender would require that?

12   A    Yes.

13   Q    Why would that be one of their requirements, ma'am?

14   A    Because, for one reason or another, the spouse is not

15   borrowing, doesn't have the credit to be able to buy a house.

16   Q    Would it also be that they wanted to separate -- like it says

17   on here, separate property?  I am assuming that means community

18   property.

19   A    Correct.

20   Q    Besides the wire that you had sent to Michigan during the

21   divorce of Mrs. Ikilikyan and Mr. Poff, had you ever given any

22   money to Mr. Poff?

23   A    Never directly to him, no.

24   Q    Could I see Exhibit 210, please?  And we had went over this

25   form before -- actually not we, but the plaintiffs and yourself

1    had asked about this (sic).  Now, you said that Senath Sands from

2    Ownit Mortgage had called and left a message for Alexis in regard

3    to financing, saying this was not acceptable?

4    A   That's what my notes say.

5    Q   Okay, ma'am.  Thank you.  In regards to the seller financing

6    agreement that was spoken of earlier --  Do you know which form

7    that is, ma'am, the seller financing agreement?

8    A   Yeah.

9    Q   Did you ever see Mr. Poff draft that form up on a computer?

10    A   Did I visualize you actually doing it?

11    Q   Yes, ma'am.

12    A   No.

13    Q   Can I see Exhibit 232.02, please?  I believe it is the bottom

14    of the page.  Could you blow that portion of the bottom of the

15    page up, please?

16        This wire that is leaving Great American Escrow, you said

17    that you had actually consulted with Mr. Poff about that wire

18    going out and going to another escrow?

19    A   No.  What we put there -- is how I could figure out --

20    Mr. Poff and I discussed different ways to put things on the

21    settlement statement to make it look like it would be legitimate.

22    Q   And, ma'am, did you ever forge anybody's signature in closing

23    any of the transactions at Great American Escrow?

24    A   Probably.

25    Q   Could I see Exhibit 206, please?  Now, this is the deed of

1   trust.  You said Alexis had actually signed this deed of trust

2   for Timothy Thomson?

3   A    Correct.

4   Q    And you stated you remember Mr. Poff being there at escrow at

5   that time?

6   A    Correct.

7   Q    Could I see Exhibit 319.02?  Now, on this official check that

8   is a forgery, you said that you had received a faxed copy in

9   escrow of this check?

10  A    Correct.

11  Q    Is this the faxed copy that you had received?

12  A    To the best of my knowledge.

13  Q    So that is the only way that you remember receiving this

14  check, was via fax?

15  A    I believe so.

16  Q    Now, ma'am, isn't it true that Mr. Poff never knew anything

17  about the $20,000 disbursement to Ms. Ikilikyan?

18  A    No, that's not true.

19  Q    That's not true.  Ma'am, isn't it true that Mr. Poff didn't

20  know anything about $10,000 going back to you?

21  A    No, that is not true.

22  Q    Can I see Exhibit 506.15?  Ma'am, this is the signature page

23  on what looks like to be probably a deed of trust or some

24  document from the lender.  Was this the actual signature of

25  William Poff?

1   A    I believe so.  I don't know.

2   Q    Mr. Poff did notary closings for Great American when there

3   were scheduling conflicts or what have you?

4   A    Correct.

5   Q    When Mr. Poff would sign with his notary, isn't it typical

6   that he would sign William S. Poff?

7   A    No, Mr. Poff didn't always -- never always signed with the

8   middle initial.

9   Q    Can I see Exhibit 627.02?  Can you enlarge line 1305, please?

10  Can you read that line okay, ma'am?

11  A    Are you talking about the highlighted one?

12  Q    Yes.

13  A    "Redo property, Marquin House Jobs, 539,226.12."

14  Q    Did you know who Mr. Marquin was?

15  A    I had seen him off and on for a while.  Did I personally know

16  him?  Is that what you mean?

17  Q    Do you know who he was?  You knew him?  You knew who he was?

18  A    I don't know if I did at the time of this.

19  Q    Okay, ma'am.  And this was a transaction for --  Can we go

20  back to the first page?  Can you see the property address on

21  this, ma'am?

22  A    Yes.  9488.

23  Q    And that was the Issaquah transaction.  Wasn't Mr. Reyes the

24  loan officer on that transaction?

25  A    As I said, I believe so.  I don't know for sure.  Without

1    looking back at documents, I don't know.  I believe so.

2    Q    Okay, ma'am.  But you didn't know Mr. Marquin as a partner

3    with Mr. Reyes at that time, though?

4    A    No.

5    Q    Could I see Exhibit 629, please?  Do you remember this

6    promissory note, ma'am?

7    A    I'm sorry.  Pardon me.

8    Q    Do you remember this promissory note?

9    A    Yes.

10   Q    Could you zoom in on the upper left-hand corner, please?  Is

11   that a standard form that real estate agents would use, ma'am?

12   A    Yes, it is, as far as I know.

13   Q    As far as you know.  Okay.  And you had said earlier this is

14   a promissory note that Mr. Poff had brought into escrow?

15   A    Yes.

16   Q    Didn't you mention earlier that it was your understanding

17   that Ms. Ikilikyan took care of the real estate portion of the

18   transaction --

19   A    I'm sorry.  Could you speak a little louder?

20   Q    Yeah, if you can't hear me, absolutely.  Wasn't it your

21   testimony earlier that you said Ms. Ikilikyan -- it was your

22   understanding that Ms. Ikilikyan took care of the real estate

23   portions of the transactions?

24   A    She did the purchase and sale agreement with Mr. Poff's

25   advice, and your direction -- Mr. Poff's direction.  This would

1   have come more from the lending side of it.  You're right, Alexis

2   always usually wrote the purchase and sale agreement.  Did I

3   answer your question?

4   Q    Pretty much.  Pretty much, ma'am, you did.  I will bring it

5   into the next question, basically.  Now, is the Northwest MLS

6   form something a real estate agent would download off a real

7   estate agent's website?

8   A    I don't know.  I would only guess.

9   Q    Without guessing, MLS is for real estate agents?

10  A    Correct.

11  Q    So if it was a Northwest MLS form, would it not be something

12  that a real estate agent would have?

13  A    Correct.

14        MR. SCOVILLE:  Objection.  Calls for speculation.

15        THE COURT:  Sustained.  Lack of foundation.

16        THE DEFENDANT:  Okay, sir.  I will move it along.

17  By the Defendant:

18  Q    Exhibit 704, please.  And this is the purchase and sale for

19  Mr. Stepp and Ms. Ikilikyan.  On this, you had said the

20  difference between the 100,000 and the 150,000 was done all the

21  time.  You said there was --  What other properties was this done

22  on?

23  A    As far as raising sales prices?

24  Q    Where there would be a contracted price of $150,000, but the

25  actual price was $100,000.  You said they did it all the time.

1    A    I would actually have to see it to be exact on which ones.  I

2    would say the number 5 up here on my board.  I, again, couldn't

3    guarantee which is what without looking at the files.  There were

4    a lot of files, if we were to go back, where the sales price was

5    raised like that.  Maybe not this exact amount, but the sales

6    price was raised.

7    Q    Is raising the sales price standard in the industry?

8    A    Yes, it is.

9    Q    It is standard?

10   A    It was at that time.  I have heard they don't do it so much

11   anymore.

12   Q    Okay, ma'am.  Can I see Exhibit 722, please?  In this e-mail,

13   you said you would remember the conversation with Mr. Poff in

14   regards to getting approximately half the money from this

15   transaction?

16   A    Correct.

17   Q    From your understanding, this was August 18th, 2008.  Was

18   Mr. Poff in Michigan at this time?

19   A    Yes, he was.

20   Q    So during this closing --  Earlier, didn't you say that

21   Mr. Poff had come into the office during closing?

22   A    No.

23   Q    You did not say that?

24   A    No.

25   Q    Can I see Exhibit 722 --

1    A    Because I believe --

2    Q    Go ahead, ma'am, if you have more to answer.

3    A    If I remember correctly, the set of documents went to

4    Michigan, when Alexis was out there with you, to be signed.  I

5    may not be correct, but I think that's when she signed them.

6    Q    So Mr. Poff didn't come into your office then?

7    A    On this particular sale?  No.

8    Q    Okay, ma'am.  That's all I was asking.  Thank you.

9         Can I see Exhibit 722.02?

10        Do you remember the conversation why Mr. Poff wanted his

11   funds sent to T&K Investments, a friend's account?

12   A    I'm sorry, I don't.  I remember talking, but I don't remember

13   what was said.  Could you refresh --

14   Q    Did Mr. Poff ever convey to you he didn't yet have a bank

15   account in Michigan?

16   A    Yes, he did.

17   Q    Is that the reason why he wanted his funds sent to a friend's

18   account, since he was still going through a divorce?

19   A    I believe that's what you said.  But, again, that is

20   speculation.

21   Q    Okay, ma'am.  And on the Kirkdoffer transaction, isn't it

22   true that Mr. Poff never even spoke to you about that transaction

23   at all?

24   A    No.  No, you came in --

25   Q    Go ahead, ma'am.

1    A    I'm sorry.

2    Q    You can answer the question, ma'am.

3    A    You want to know when I remember you coming in?

4    Q    Sure.

5    A    At the end of the file there was a discrepancy in what I

6    thought after fees were paid.  Tony Reyes and I had gotten into

7    an argument.  You and I sat down and went through to figure it

8    out what it was.

9    Q    Which fees were that, ma'am?

10   A    You know how we would discuss the sales price --  Sorry.  You

11   had your way of doing it, and then I had the HUD statement.  Do

12   you remember --

13            THE COURT:  He is not going to answer your questions.

14   Thank you.

15            THE WITNESS:  Okay.  Thank you.  During closing, you

16   would sit down with me and we would go through fees.  And on the

17   Kirkdoffer one there was a few discrepancies, is what I came up

18   with, versus what I was told.  And Tony Reyes and I kind of

19   argued about it.  You sat down with me and explained it out.

20   You, being Mr. Poff.  I apologize.

21   By the Defendant:

22   Q    I understood you, ma'am.  So there was a discrepancy between

23   your numbers and Mr. Reyes' numbers on this transaction?

24   A    Correct.

25   Q    Was he the loan officer on this transaction?

1  A    I don't remember, actually.  I don't know if he was the agent

2  or the loan officer.  I don't remember what he was.  I know he

3  was involved.  I would have to look at the file to see where his

4  name is.

5  Q    I didn't hear your last sentence.

6  A    I am not sure if he was the officer or the real estate agent

7  or what his proclaimed job was.

8  Q    So the substance of the conversation you are claiming is

9  there is a discrepancy with the numbers between Mr. Reyes and

10 yourself?

11 A    Correct.

12        THE DEFENDANT:  Thank you.  That concludes my questions

13 for her.  I reserve the right to bring her back once the

14 handwriting analysis comes back in, your Honor.

15        THE COURT:  She is not on your witness list, Counsel.

16        THE DEFENDANT:  I'm sorry, your Honor?

17        THE COURT:  She is not on your witness list.  Do you

18 want to add her to your witness list?

19        THE DEFENDANT:  Yes, sir.

20        THE COURT:  Remember, you are limited in your witness

21 list.

22        THE DEFENDANT:  That's fine.

23        THE COURT:  You are released at this time.  You are

24 subject to recall.  Excuse me.  Mr. Scoville.

25                         REDIRECT EXAMINATION

1    By Mr. Scoville:

2    Q   Ms. Thompson, please explain everything you remember Mr. Poff

3    saying to you about the Kirkdoffer transaction.

4    A   Mr. Poff --  Everything that I can come up with, even if it

5    is not --

6    Q   Everything.

7    A   Mr. Poff got the seller financing letter for me.  I don't

8    remember if he faxed it or e-mailed it.  We talked about the fact

9    that the figures that I came up with for quite awhile didn't

10   agree with what they were saying.  I am sorry.

11   Q   "With what they were saying," what do you mean?

12   A   I apologize, what Bill and Alexis had come up with, and Tony

13   Reyes' opinion.  And that's what I said for "they."  I apologize.

14   Q   And who was getting money out of the back end of that

15   transaction?

16   A   Bill and Alexis.

17   Q   You also said something about Mr. Poff sending you the seller

18   financing letter in connection with that agreement?

19   A   Correct.

20   Q   The Kirkdoffer transaction, number 8.  What do you mean by

21   that?

22   A   There is a seller financing form that he used -- that they

23   use.  He got that to me.  I am sorry if I am not explaining well.

24   Q   No problem.  I would like to show you Exhibit 814.  By

25   "seller financing letter," in the answer you just gave, were you

1  referring to this type of document --

2  A    Yes.

3  Q    -- in Exhibit 814?

4  A    Yes, I was.

5  Q    You recall Mr. Poff providing you what exactly with regard to

6  the Kirkdoffer transaction?

7  A    To the best of my recollection, I was -- I did not have a

8  seller finance agreement in my file when the file started being

9  worked up, etcetera.  I talked to Mr. Poff about it.  I don't

10 remember if it was faxed or e-mailed over to me.

11 Q    Ms. Thompson, Mr. Poff asked you about money going to him.

12 Aside from the money from transaction 7a, you indicated to

13 Mr. Poff that otherwise you would never directly send money to

14 him.  What did you mean by using the word "directly"?

15 A    The money that went into Alexis' accounts, and Alexis'

16 mother, Ms. Harutyunyan, was actually Bill's money too.

17 Q    How do you know that?

18 A    They took trips together, they planned things together, he

19 told me about spending the money on different things.

20 Q    What types of things did he tell you he spent the money on?

21 A    He went back, I guess it would be called south, to a

22 Christian church meeting.  He went to Alaska with his father.  He

23 went to Hawaii.  He paid $30,000 to--and I remember the figure,

24 because I went, wow--to his name was Jerry.  He was a preacher,

25 but I don't remember his last name.

1   Q    Any other expenditures you remember Mr. Poff telling you

2   about?

3   A    He got his eyes fixed, his truck.

4   Q    What truck did he drive, do you know?

5   A    A black one.   A big one.

6   Q    Ms. Thompson, I would like to ask you about your

7   understanding of the plea agreement that you have reached with

8   the government.   Mr. Poff was asking you some questions about a

9   5K, and the government's recommendation.   Has the government made

10  its recommendation yet?

11  A    No.

12  Q    Has the government told you what recommendation it is going

13  to make?

14  A    No.

15  Q    Has the government ever discussed with you sentencing ranges

16  and sentencing --

17  A    No.

18  Q    Ms. Thompson, you also indicated during your testimony on

19  cross-examination that now you are not as scared as you were?

20  A    Oh, I was petrified.

21  Q    What do you mean by "now you are not as scared as you were"?

22  A    Sitting up here, I am so much more able to talk.

23  Q    Why is that?

24  A    Nobody is attacking me.

25  Q    And when were people attacking you, Ms. Thompson?

1    A    During closings, certain people could get very irate.

2    Q    What do you mean by certain people?

3    A    Mr. Poff and I have argued a few times.

4    Q    And was it in the course of the many real estate dealings

5    that you had that you described earlier?

6    A    Yes.

7    Q    And what types of arguments did you have with Mr. Poff?

8    A    Usually it was about money.

9    Q    Before today were you scared about what might happen when

10   Mr. Poff cross-examined you?

11   A    Yes.

12   Q    Why?

13   A    He is a big man.

14   Q    Ms. Thompson, Mr. Poff also asked you about consulting with

15   Mr. Benson, about separating out the seller financing from some

16   sort of purchase and sale?

17   A    Correct.

18   Q    Do you recall those questions?

19   A    Yes.

20   Q    Did Mr. Benson ever advise you that it was acceptable to take

21   fake receipts into your file?

22   A    Oh, God no.

23   Q    Did Mr. Benson ever advise you that it was acceptable to

24   write fictitious entries into HUD-1 statements?

25   A    No.

1    Q   Did Mr. Benson ever advice you that it was acceptable to take

2    forged checks as proof of down payments and submit them to

3    lenders?

4    A   No.

5          MR. SCOVILLE:  No further questions.

6          THE COURT:  Mr. Poff, recross?

7          THE DEFENDANT:  No cross.

8          THE COURT:  All right.  You may step down.  The

9    government will call its next witness.

10         MS. VOGEL:  The United States calls Becky Carnell.

11         THE COURT:  We will go until 3:00 and we will take our

12    afternoon break.

13    Whereupon,

14                 BECKY CARNELL

15    Called as a witness, having been first duly sworn, was examined

16    and testified as follows:

17          THE CLERK:  Will you please state your full name and

18    spell your last name?

19          THE WITNESS:  Becky Carnell, last name C-A-R-N-E-L-L.

20              DIRECT EXAMINATION

21    By Ms. Vogel:

22    Q   Ms. Carnell, where are you employed?

23    A   I am employed at the U.S. Attorney's Office here in Seattle.

24    Q   What is your title?

25    A   I am an auditor.

1    Q    Is there some specific area in which you perform audits?

2    A    I conduct financial investigations for the office.  I don't

3    specifically audit anything in the office.

4    Q    How long have you been a financial auditor with the U.S.

5    Attorney's Office?

6    A    For approximately four and a half years.

7    Q    What did you do before this job?

8    A    Part of that I was employed at the Washington State

9    Department of Financial Institutions.

10   Q    What was your title there?

11   A    Financial examiner.

12   Q    And what kind of work did a financial examiner do in the

13   Department of Financial Institutions?

14   A    Similar work, conducting financial investigations on cases.

15   Q    How long did you have that position?

16   A    For five years.

17   Q    What did you do before that?

18   A    Prior to that, I worked in a bank in teller operations and

19   new accounts.

20   Q    What is your educational background?

21   A    I have a Bachelor of Arts degree from Evergreen State

22   College, with an emphasis in math.

23   Q    Can you tell us what training you have received in the area

24   of conducting financial investigations?

25   A    Yes.  I received several areas of financial investigation

1    training, including identifying and obtaining financial records,

2    methods of analyzing financial records, as well as different

3    methods of presenting and summarizing my analysis.

4    Q    Who sponsored those training sessions?

5    A    I received trainings from state agencies, such as DFI,

6    Department of Revenue, as well as federal agencies, and private

7    agencies as well, such as the National White Collar Crime Center,

8    and the Association of Certified Fraud Examiners.

9    Q    Do you hold any professional certificates in your field?

10   A    Yes.  I have been a certified fraud examiner since 2003.

11   Q    Do you also act as an instructor for training for similar up

12   and coming financial investigators?

13   A    I do.

14   Q    What topics are covered in the seminars that you act as an

15   instructor?

16   A    Several areas, such as identifying and obtaining financial

17   records, how to analyze those, the best way to organize and then

18   present that data, as well as some legal areas, such as money

19   laundering investigations.

20   Q    Have you previously testified in federal court in the area of

21   financial investigations?

22   A    Yes, I have.

23   Q    Now, Ms. Carnell, have you assisted Special Agent Adam Burtt

24   in the investigation of the defendant, Mr. William Poff, and his

25   associates?

1   A   Yes, I have.

2   Q   And what has been your role in this investigation?

3   A   My role has been to conduct the financial investigation, to

4   identify and obtain all the financial records, and to analyze

5   that data and present it.

6   Q   When did you become involved in this investigation?

7   A   At the beginning of 2007.

8   Q   And what entities or individuals has the financial

9   investigation in this case focused on?

10  A   Several individuals and entities, including but not limited

11  to Mr. Poff, Ms. Ikilikyan, Ms. Harutyunyan, Mr. Reyes, Micki

12  Thompson, Great American Escrow and other businesses and

13  individuals.

14  Q   Can you tell us about the process by which you conduct an

15  investigation?  When you first get assigned to an investigation,

16  what do you do?

17  A   The first thing I do is identify the records that I need to

18  obtain, and then work to obtain those records.  Once I get all

19  the records, I manually enter all that data into a database.

20  Q   And what is your process for entering this information?

21  A   Well, the first thing I do is set up each account.  And that

22  includes entering information, such as the account name or the

23  title of the account, whose name is on the account, the signers,

24  the beginning date for which I am going to conduct the analysis,

25  as well as each beginning/ending date for a monthly statement,

1    and the ending balance for each one of those months.  And then I

2    begin the process of actually entering the data line by line.

3    Q    What sort of database is it that you use?

4    A    It is a Microsoft Access database.

5    Q    And when you said you then "begin the process of actually

6    entering data line by line," what is it that you are actually

7    entering in?

8    A    The information, first, on the statements is captured.  For

9    example, the date -- the transaction date the transaction

10   occurred on, the withdrawal amount or the deposit amount.

11   Usually on the statements you can also see the electronic payee,

12   or if it is a direct deposit you can see where that deposit is

13   from.  Basically any information that is on that statement will

14   be captured and entered.

15   Q    Is there other information in addition to the basic

16   transactional information that also gets put into that database?

17   A    Yes.  Once the statements are entered, then I go and enter

18   the items.  For example, a deposit that would show up as a $100

19   deposit on a statement, I would enter the actual deposit item

20   that was deposited or who the money came from.  I would capture

21   not only who the money came from, but the check number, if it was

22   a check that was deposited, or any notes -- handwritten notations

23   that were written on the check.

24   Q    What steps do you take to insure that the data you enter is

25   entered accurately?

1    A    Once I actually enter the data, the balance is computed based

2    on my entries.   I will then compare that balance with the

3    balances on the statement to make sure that they reconcile.

4    Q    Tell us, what is the advantage to compiling all of these

5    transactions into your own database?

6    A    Once the data is all entered into a database, I can then

7    analyze it much more efficiently than if it was in paper copies.

8    There are numerous paper copies.   You are not able to search the

9    paper copies as efficiently as you are in the database.   For

10   example, once I enter the data, I can search date ranges, if I am

11   looking for a particular date range or a specific date -- a date

12   of a transaction.   I can also search for dollar amount ranges or

13   a specific dollar amount of a transaction, or by payee, if I am

14   looking for a certain payee, or sort alphabetically by payee.

15   Q    So once you input all of this data into your databases, what

16   is your next step in conducting an investigation?

17   A    My next step would then be to generate summary charts and

18   reports based on all the data that I have entered.

19   Q    Have you followed the procedures that you have just described

20   in your financial investigation in this case involving the

21   defendant, Mr. Poff?

22   A    Yes, I have.

23   Q    Specifically in this case, what categories of financial

24   records did you request and obtain?

25   A    I obtained numerous financial records, which include bank

1    statements, bank items, credit card statements, credit reports,

2    as well as State Department of Revenue records, Employment

3    Security records, lender records, such as lender files, real

4    estate files, both from real estate companies and from sellers,

5    federal tax returns, records from the FDIC, Fed Wire records, as

6    well as some public records, such as county deeds or excise tax

7    information.

8    Q    Let's focus on bank accounts for just a moment.  Specifically

9    as to bank accounts, how many did you focus on in this

10   investigation that had pertinent activity for the time period

11   January 1st, 2005 to February of 2009?

12   A    My focus was on 13 bank accounts.

13   Q    Throughout our testimony today can we refer to those 13

14   accounts as the subject accounts of your investigation?

15   A    Correct.

16   Q    Did you obtain records for each of those accounts?

17   A    Yes, I did.

18           MS. VOGEL:  Your Honor, this is a perfect place to stop.

19           THE COURT:  All right.  We will take our afternoon break

20   at this time.  We will be back out at 3:15.  We will be in

21   recess.

22    (Recess)

23           THE COURT:  Counsel, we will go until about 4:20 and

24   have a status conference to see where we are.  I would like to

25   have a report on the handwriting expert, if that motion is still

1   pending, and see where we are with witnesses.  Plan accordingly.

2   You may proceed.

3   By Ms. Vogel:

4   Q   Ms. Carnell, for each of the 13 subject accounts, can you --

5   we are going to go through each of those, and I want to ask

6   you --  Let's start at the beginning.  What is the first of the

7   13 subject accounts?

8   A   The first account is in the name of Alexis Ikilikyan.

9   Q   In what bank is that account held?

10  A   That is at Washington Mutual.  The account ends in 3135.  The

11  account is now owned by JP Morgan Chase.  However, I refer to it

12  as a Washington Mutual account.

13  Q   For what time period did you obtain records for that account?

14  A   January of 2005 through February of 2009.  However, my

15  analysis stopped for that account at August 29th, 2008.

16  Q   And who is the signer or signers on that account?

17  A   Alexis Ikilikyan.

18  Q   What is the second of the 13 subject accounts?

19  A   The second account is a Bank of America account, ending in

20  4089.  That is in the name of Haikanush Ikilikyan.

21  Q   And for what time period did you obtain records for this

22  account?

23  A   March of 2009, and my analysis ended in 2008.

24  Q   Who are the signers on that account?

25  A   Haikanush Ikilikyan.

1    Q    What is the third subject account?

2    A    Third account is Washington Mutual, account ending in 6743.

3    That account is in the name of U.S. Mortgage and Investments.

4    Q    And for what time period did you obtain records for that

5    account?

6    A    From March of 2006, again through August of 2008, is when my

7    analysis ended for that account.

8    Q    And who were the signers on that account?

9    A    Alexis Ikilikyan.

10   Q    What is the next account?

11   A    The next account is a Washington Mutual account, ending in

12   6206, U.S. Realty and Investments.  And Alexis Ikilikyan is the

13   signer on that as well.

14   Q    For what time periods did you obtain those records?

15   A    May of 2006 through my analysis in August of 2008.

16   Q    And what was the next account?

17   A    The next account is Washington Mutual account, ending in

18   1577.  That is in the name of Alexis Ikilikyan, d/b/a Plantation.

19   That account was reviewed from September of 2006 through August

20   of 2008.

21   Q    And what was the next account?

22   A    The final account was Washington Mutual, account 1314.  That

23   is in the name of Plantation, LLC.  That account was reviewed

24   from August of 2007 through August of 2008.

25   Q    When you say "the final account," what do you mean?

1    A    That is the final account of the 13 for which Alexis

2    Ikilikyan is a signer.

3    Q    What is the next set of accounts of the 13 subject accounts?

4    A    The next three accounts are all in the name of Armenuhi

5    Harutyunyan.  The first account with that name would be Bank of

6    America, 6733.

7    Q    And for what dates did you obtain those records?

8    A    January of 2005 through August of 2008.

9    Q    And who was the signer on that account?

10   A    Armenuhi Harutyunyan.

11   Q    What is the second account in that category?

12   A    The next account would be BECU, account ending in 4189, and

13   the records started in November of 2005 and went through August

14   of 2008.

15   Q    And in whose name is that account?

16   A    Again, Armenuhi Harutyunyan.

17   Q    And who is the signer?

18   A    Armenuhi Harutyunyan.

19   Q    And the next account?

20   A    The next account was also in the name of Armenuhi

21   Harutyunyan.  That account was Washington Mutual, 1213.  That

22   account was opened in August of 2007, and reviewed through August

23   of 2008.

24   Q    And is the signer on that account also Ms. Harutyunyan?

25   A    That is correct.

1  Q    What is the next category of accounts among the 13 subject

2  accounts?

3  A    The next two accounts were in the name of William Poff.   The

4  first account was Washington Mutual, account 7986.   And the time

5  period reviewed was January of 2005 through February of 2009.

6  Q    And who was the signer on that account?

7  A    William Poff.

8  Q    And the next account?

9  A    The next account was also in the name of William Poff.   That

10  was National City Bank account, ending in 3440.   The time period

11  reviewed is October of 2008 through February of 2009.

12  Q    And who is the signer on that account?

13  A    William Poff.

14  Q    What is the next subject account that you reviewed?

15  A    The final two accounts are in the name of T&K Investments.

16  The first account is Tamara Hall, d/b/a T&K Investments, Bank of

17  America, account ending in 5416.   This account was formerly a

18  LaSalle Bank Midwest account.   However, Bank of America acquired

19  LaSalle Bank, so I refer to it as a Bank of America account.

20  Q    For what time period did you review records for that account?

21  A    That account was opened in May of 2008 and was analyzed

22  through February of 2009.

23  Q    And who was the signer on that account?

24  A    The signature card was not provided for that particular

25  account.

1   Q    And was there one more account?

2   A    There was one more account.  It is in the name of T&K

3   Investments, Roger Hall.  The time period analyzed is April of

4   2008 through February of 2009.  That is a Bank of America

5   account, ending in 7671, again, formerly a LaSalle Midwest

6   account acquired by Bank of America.

7   Q    And for what time period were records reviewed for that

8   account?

9   A    April of 2008 through February of 2009.

10  Q    And who was the signer?

11  A    Both Roger and Tamara Hall.

12  Q    Specifically as to the Washington Employment Security

13  records, what did you obtain and review?

14  A    I obtained records for individuals, wages reported for those

15  individuals, as well as business records, wages reported by those

16  businesses for their employees.

17  Q    Can you give us an idea, Ms. Carnell, of the volume of all

18  this material you obtained and reviewed?

19  A    Specifically relating to the financial records, it

20  encompassed those five boxes there, which was more than 44,000

21  financial transactions.

22  Q    And did you process and evaluate all that material in the

23  same manner that you just described earlier before our break?

24  A    Yes, I did.

25  Q    And, Ms. Carnell, for every record that you obtained from a

1   bank or another financial institution, do you confirm that you

2   have obtained a written certification that that is a business

3   record of that bank or other financial institution?

4   A   That is correct.

5   Q   Also as part of your investigation, did you undertake to find

6   out whether certain banks and lending institutions involved in

7   financing the purchases in this particular case were federally

8   chartered or insured?

9   A   Yes.

10  Q   How did you go about investigating that?

11  A   The first step was to search through each institution --

12  through the website of the FDIC.  And then I requested certified

13  business records from the FDIC for each institution, and

14  determined was it chartered -- excuse me, was it insured through

15  the FDIC.

16  Q   And for the lender Ownit Mortgage Solutions, what did you

17  learn about any federally insured status?

18  A   That it was not.

19  Q   For the lender Green Point Mortgage, what did you learn?

20  A   That it was not either.

21  Q   And for the lender Just Mortgage, what did you learn?

22  A   That it was not.

23  Q   What about for the lender National City Bank?

24  A   That it was FDIC insured.

25  Q   And were you able to obtain from the FDIC a business record

1  stating its status and dates?

2  A    Yes.

3  Q    For National City Bank?

4  A    That's correct.

5  Q    Could you look, please, at Exhibit 901?  This, I believe, has

6  previously been admitted as an FDIC business record.  Would you

7  page through the certification from the custodian of records and

8  the actual certificate?  Have you reviewed these documents,

9  Ms. Carnell?

10 A    Yes.

11 Q    What does Exhibit 901 establish the date that National City

12 Bank became FDIC insured?

13 A    The beginning date shows here January 1st, 1934.  I believe

14 on page 2 it has the date range.

15 Q    What does Exhibit 901 establish was the most recent date that

16 the FDIC business records have National City Bank as being FDIC

17 insured?

18 A    Through July 30th of 2007.

19 Q    And what are the two dates of the substantive bank fraud

20 accounts alleged in the first superseding indictment that involve

21 loans from National City Bank?

22 A    February 27th, 2007 and March 27th, 2007.

23 Q    Would that be within the range of this FDIC certification?

24 A    Yes, it would.

25 Q    Of your own personal knowledge, do you know what happened to

1    National City Bank after July of 2007?

2    A    It became PNC Bank.

3    Q    And although we won't go into all the details and look at the

4    certificates, were there other lenders you investigated as part

5    of this case that you did find also were federally insured?

6    A    Yes.

7    Q    Did you also undertake to investigate whether the banks or

8    other financial institutions whose records you were analyzing as

9    part of the money laundering investigation in this case were FDIC

10   chartered or insured?

11   A    Yes, I did.

12   Q    How did you go about investigating that?

13   A    The same method, first to search the FDIC website, and then

14   to obtain a certified business record from the FDIC, stating the

15   certificate of insured status for each institution.

16   Q    Would you look, please, at Exhibit 900?  Specifically, what

17   do the certified business records that you obtained from the FDIC

18   tell you with regard to the federally insured status of Bank of

19   America?

20   A    That it is federally insured.  The date range for which the

21   federal insurance is active there is from January 1st, 1934,

22   through August 15th, 2008.

23   Q    And the language, "through and including August 15th, 2008,"

24   that is the end date; is that correct, on this certificate?

25   A    Correct.

1   Q      When you requested the certificate, did you give them a date

2   range that you were interested in getting the certification

3   records for?

4   A      It was through August 15th, 2008.

5   Q      And is that the day after the final transaction on our chart?

6   A      That's correct.

7   Q      What does Exhibit 900 establish, as far as the FDIC insured

8   status of a financial institution called Key Bank?

9   A      That it is federally insured.

10  Q      If you would look at page 6 of Exhibit 900?  What do the FDIC

11  business records indicate are the date range of the federal --

12  FDIC insurance for Key Bank?

13  A      From December 27th, 1955 through August 15th, 2008.

14  Q      And did you also obtain certified business records from the

15  FDIC regarding the insured status of Washington Mutual Bank?

16  A      That's correct.

17  Q      And does that start at page 11 of Exhibit 900?  What do those

18  business records indicate was the federally insured status of

19  Washington Mutual Bank on the dates of the alleged transactions

20  in this case?

21  A      That Washington Mutual Bank was federally insured from

22  August 9th, 1989 through January 3rd, 2007.

23  Q      In preparation for your testimony today, Ms. Carnell, were

24  you asked to take all of this information that you learned from

25  your analysis of all those boxes and records and distill that

1   down to a chart or charts summarizing the flow of money during

2   the purchase and sale of each of the eight properties listed on

3   our chart, Exhibit 1?

4   A   Yes.

5   Q   And did you do that?

6   A   Yes, I did.

7   Q   And can you explain to us what information you relied upon in

8   preparing those summary charts for each property purchase and

9   sale?

10   A   It was an analysis through all of the financial records.

11   However, primarily I relied on the bank records and the wires

12   from the Federal Reserve.

13   Q   We have heard testimony in this case that there are

14   discrepancies between what was stated on a HUD-1, for example,

15   and what actually happened to the money.  Can you explain to us

16   what you relied upon, where there were discrepancies?

17   A   I relied upon the bank records that the transactions included

18   in my charts actually occurred.  There were many discrepancies

19   between the HUDs, Great American Escrow receipts and many other

20   records, between what was stated in those receipts or on those

21   HUDs and the actual financial transactions according to the bank

22   records.  So though I used all the records in my analysis, I

23   relied upon the bank records and the Federal Reserve wire records

24   to determine what actually happened.

25   Q   And is that what you included on your charts?

1    A    That's correct.

2    Q    And also in preparation for your testimony today, were you

3    asked to take all of the information you have learned from your

4    analysis of all these records and prepare charts summarizing the

5    flow of money during each of the subject financial transactions

6    alleged as a substantive money laundering count in this case?

7    A    That's correct.

8    Q    And did you do that?

9    A    Yes, I did.

10   Q    And for each of the money laundering counts listed on

11   Exhibit 1, are there counts and property charts?

12   A    Yes, there is a chart for each one of those.

13   Q    And, again, for those money laundering summary charts, what

14   information did you rely on in preparing them?

15   A    On the financial transactions in the bank accounts and the

16   Federal Reserve wire transfer records.  There is one record where

17   it is an inter-escrow transfer.  For that particular record I

18   relied upon the Great American Escrow records.

19   Q    I want to direct your attention now to the very first

20   property transaction on Exhibit 1, the big chart, the one that is

21   the address that are three duplexes in Puyallup, Washington.  I

22   would like you to look, please, at Exhibit 102.  Is this one of

23   your charts that you prepared, and specifically does it summarize

24   the financial information of the flow of money as to property

25   transaction number one on our chart?

1    A    That's correct.

2    Q    Now, do you believe that it accurately summarizes all of the

3    financial information -- Let me rephrase that.   Does it

4    accurately summarize the financial information and the flow of

5    money that you discovered as part of your investigation?

6    A    Yes, it does.

7    Q    First, can you tell us, did you include every single

8    financial transaction that had anything to do with the property

9    purchase and sale on these charts?

10   A    No, I did not.   There were several fees, procedural and

11   administrative type fees, that I did not include as part of this

12   chart.   Those would include escrow fees, title fees, recording

13   fees for the county, bank fees, such as wire fees or courier

14   fees, or excise tax.   Those fees were consistent amongst each one

15   of the property transactions, and were consistently excluded for

16   each one of these charts.

17            MS. VOGEL:   I will move the admission of Exhibit 102.

18            THE COURT:   Any objection.

19            THE DEFENDANT:   No objections, your Honor.

20            THE COURT:   102 is admitted.

21            (102 admitted.)

22   By Ms. Vogel:

23   Q    We will zoom in on this before we talk about specifics.

24   First, can you just tell us overall how this and the other

25   summary charts we are looking at are laid out?

1    A    They were laid out --  You read them similar to how you would

2    read any document, from left to right and from top to bottom.

3    The title is on the top, summarizing the information surrounding

4    the transaction.  In the middle, in this particular chart, we

5    have three separate transactions.  However, in the middle, in the

6    house, the information pertains to each one of the transactions,

7    such as the property, the date, the buyer, the seller

8    information.  The boxes to the left of the house represent the

9    source of funds used to pay for that house.  The boxes to the

10   right represent the flow of funds out of the escrow account, in

11   other words, where the money went.

12   Q    Excluding the standard fees and expenses that you have just

13   described?

14   A    That's correct.

15   Q    And what about the lines that we see going from the

16   right-hand side back across to the left-hand side, what does that

17   mean in your summaries?

18   A    It is a flow of funds.  The box where it starts on -- in the

19   middle box on the right-hand side, as we go through this chart

20   you will see that we followed those funds to two particular other

21   boxes.  So the lines simply represent a flow of funds from one

22   place to the next.

23   Q    All right.  Let's start in this chart in the middle

24   transaction.  Which duplex is the middle transaction -- a visual

25   representation of the financial transaction?

1    A    This is a duplex with the address of 9411 to 9413 72nd Avenue

2    East in Puyallup.

3    Q    And based upon your review of the financial records,

4    Ms. Carnell, where did the money come from to fund the purchase

5    of this property?

6    A    The first source of funds was one loan through Ownit Mortgage

7    Solutions.  That loan was funded with a wire transfer on

8    April 27th, 2005, from Ownit Mortgage Solutions to the Great

9    American Escrow Key Bank account, ending in 4185.  The wire was

10   in the amount of $290,550.56.

11   Q    And in your review of records, did you also request and

12   obtain wire transfer documents from the Federal Reserve Bank to

13   confirm incoming wires that you found in the Great American

14   Escrow bank records?

15   A    I did.

16   Q    And for this particular wire transfer, did you obtain a

17   printout from the Federal Reserve confirming this wire

18   transaction?

19   A    I did.

20   Q    And can you look, please, at Exhibit 162?  Can you tell us,

21   is that the Federal Reserve printout confirming the wire transfer

22   that you just described?

23   A    Yes, it is.

24   Q    And can you see the amount in the middle, 290,550.66?  Is

25   that where the amount is listed?

1    A    That's correct.

2    Q    How is it that you matched this document to a wire transfer

3    on a certain property?

4    A    In the line just above the amount, the dollar amount line, is

5    a line titled IMAD.  Each particular wire has an IMAD and OMAD

6    number.  When I obtained the Great American Escrow records from

7    Key Bank, I obtained the IMAD numbers for each of the incoming

8    wires into the incoming Great American Escrow Key Bank account.

9    And then when I requested these same wires from the Federal

10   Reserve, I matched the IMAD from the incoming wire to the Key

11   Bank account to the wire I received from the Federal Reserve.

12   Q    And for each of the wires that we are going to be talking

13   about today, were you able to match up the IMADs from the bank

14   records at Great American Escrow to the Federal Reserve records?

15   A    Yes.

16   Q    Is it your understanding, Ms. Carnell, that each of these

17   Federal Reserve wire transfers includes a stop of some amount of

18   time in the state of New Jersey?

19   A    Yes.

20   Q    Let's go back now to Exhibit 102.  If we can look at the

21   center transaction, please.  You have said that the first amount

22   of funds to purchase this property came from the incoming wire

23   transfer from Ownit Mortgage Solutions.  Where did the rest of

24   the funds to purchase this property come from?

25   A    Looking at the left-hand side, the bottom box, there is a

1   Washington Mutual official check in the amount of $32,050.   That

2   check was purchased using funds from the Alexis Ikilikyan

3   Washington Mutual 3135 account, and then deposited to the Great

4   American Escrow account for benefit of this transaction.   There

5   was also a $65,000 seller-carried note for Marijane Anderson.

6   Q    Where did the money then go after all these funds were

7   deposited into the escrow?   Where were the funds disbursed?

8   A    Then we move to the right-hand side of the box labeled

9   "Financial records."   And we will just go down through to see the

10  disbursements.   The first check, we see Great American Escrow

11  check 40309 was paid to Haikanush Ikilikyan in the amount of

12  $9,750.   That check was deposited to Ms. Ikilikyan's Washington

13  Mutual account, 3135.

14      The second check, Great American Escrow check number 40280,

15  was payable to Great American Escrow, LLC, FBO, PDQ Construction,

16  in the amount of $65,000.   That check was redeposited to the

17  Great American Escrow Key Bank account, the same account that it

18  was drawn off of, ending in 4189.   And when we zoom back out in a

19  minute, we will see the disbursement of those particular funds.

20  Q    Before we do that, tell us where the remaining funds went.

21  You don't have to tell us the exact numbers, but summarize where

22  the remaining funds went.

23  A    The remaining funds went to pay off the seller proceeds, the

24  seller real estate commissions and Victory Home Mortgage for the

25  mortgage broker fees.

1    Q    Now, if we can go out to the full page.  Let's look at the

2    top transaction.  Where did the funds come from to purchase the

3    top duplex, 9407 to 9409 72nd Avenue East?

4    A    First, we have one loan from Ownit Mortgage Solutions.  That

5    loan was funded via a wire on April 27, 2005, from Ownit Mortgage

6    Solutions to the Great American Escrow Key Bank account, ending

7    in 4185.  The wire was in the amount of $290,541.24.

8    Q    And can you look briefly at Exhibit 161?  Is this the Federal

9    Reserve wire transfer verification form for that same incoming

10   wire transfer that you just mentioned?

11   A    Yes, it is.

12   Q    Can you go back, please, to Exhibit 102?  And zoom back in on

13   the top half.  Where did the rest of the funds come from to pay

14   for this property?

15   A    Again, in this transaction we have a seller-carried note with

16   Marijane Anderson in the amount of $65,000.  We also see a buyer

17   deposit in the amount of $31,625.75.  After this transaction

18   closed, the check that we previously looked at, check number

19   40280 in the amount of $65,000, that check was redeposited to the

20   Great American Escrow account and split into two different

21   amounts.  One amount was $31,625.75.  It was then credited

22   towards this purchase, 9407 to 9409 at 72nd Avenue East.  The

23   remaining funds, if you follow, will go down to the third

24   transaction down below.

25   Q    And then for this top duplex, 9407 to 9409, after those funds

1   came in to Great American Escrow, where did they go?

2   A    They went out to -- check 40307 was to Haikanush Ikilikyan in

3   the amount of $9,750.  Great American Escrow check 49068, also

4   payable to Haikanush Ikilikyan in the amount of $1,315.  And then

5   a Great American Escrow wire payable to Alexis Ikilikyan in the

6   amount of $64,800.  All of those three items were deposited to

7   Ms. Ikilikyan's Washington Mutual account, 3135.

8   Q    And, again, can you summarize where the remainder of the

9   funds went?

10  A    Yes.  The remainder of the funds went to pay off an existing

11  mortgage, as well as to seller proceeds and the seller real

12  estate commissions.

13  Q    We will look now at the bottom transaction.  And this is,

14  according to your chart, 9415 to 9417 72nd Avenue East, the third

15  duplex.  Can you tell us where the funds came from to purchase

16  this property?

17  A    Yes.  First, we have another loan from Ownit Mortgage

18  Solutions.  This loan was funded via a wire from Ownit Mortgage

19  Solutions to Great American Escrow Key Bank account, ending in

20  4185, on April 27th, 2005.  That wire was in the amount of

21  $290,273.14.

22  Q    And can you look, please, briefly at Exhibit 163?  Is that

23  the Federal Reserve wire transfer record that matches the

24  incoming wire transfer to Great American Escrow that you just

25  mentioned?

1    A    Yes.

2    Q    Back, please.  The bottom.  Where did the remaining funds

3    come from to purchase this duplex?

4    A    Again, we have a seller-carried note in the amount of

5    $65,000.  And then we have another buyer deposit in the amount of

6    $33,374.25.  That is the remaining funds from the $65,000 check

7    that was redeposited into the Great American Escrow account.

8    Q    Following closing, how were these funds disbursed?

9    A    We have check number 40312, payable to Haikanush Ikilikyan,

10   in the amount of $9,750; check number 40310, payable to Haikanush

11   Ikilikyan, in the amount of $1,187.03; Great American Escrow,

12   check number 40967, payable to Haikanush, and then a misspelling

13   of Ikilikyan, in the amount of $1,115; and a Great American

14   Escrow wire to Alexis Ikilikyan, in the amount of $64,800.  All

15   of those four items were deposited to Ms. Ikilikyan's Washington

16   Mutual account, ending in 3135.

17   Q    Ms. Carnell, do you have a total of the amount of proceeds

18   from the purchase of these three duplexes that was deposited into

19   the subject accounts -- all of the subject accounts combined?

20   A    Yes.  Adding up all of the deposited items into the

21   Washington Mutual account, the total is $227,467.03.

22   Q    And, in fact, in this case, did all of those funds go into

23   the same Washington Mutual account?

24   A    No.  One of those checks was redeposited into the Great

25   American Escrow account.

1   Q   How much money did the buyer put into this property?

2   A   A total of $97,050.  That includes the $32,050 that was

3   withdrawn from the Washington Mutual 3135 account, as well as the

4   two amounts, the first in the top box and in the third box below,

5   that made up the $65,000 check.  So all three of those items

6   totaled $97,050.

7   Q   So if you subtract all of the money they put into this

8   transaction from the total proceeds, what was the net profit from

9   the purchase of these three duplexes?

10  A   $130,417.03.

11  Q   Let's look now at property number two on our chart.  Did you

12  also prepare a summary chart pertaining to the financial

13  transactions and flow of money relating to the purchase of 31413

14  50th Avenue South on December 29th, 2005?

15  A   Yes, I did.

16  Q   Can you look, please, at Exhibit 202?  What is this?

17  A   This is another summary chart detailing the financial

18  transactions surrounding the purchase of property number two.

19  Q   Did you prepare this chart using the same criteria and the

20  same basis of information as the one we just looked at?

21  A   I did.

22        MS. VOGEL:  Move the admission of Exhibit 202.

23        THE DEFENDANT:  No objections, your Honor.

24        THE COURT:  202 is admitted.

25        (202 admitted.)

1  By Ms. Vogel:

2  Q    Ms. Carnell, can you tell us where did the money come from to

3  fund the purchase of this property?

4  A    Yes.   Looking at the left-hand box, the left side of the

5  house, we see that there are two loans for this property from

6  Ownit Mortgage Solutions.   The first loan was funded via wire on

7  December 29th, 2005, from Ownit Mortgage Solutions to Great

8  American Escrow's Key Bank account, ending in 4185.   That wire

9  was in the amount of $221,965.97.

10     The second loan, also from Ownit Mortgage Solutions, was

11  funded via wire on the same day, December 29th, 2005.   And the

12  wire amount was $55,604.01.

13  Q    Were you also able to obtain confirming Federal Reserve wire

14  transfer records for these two wire transfers?

15  A    Yes.

16  Q    And can you look, please, at Exhibit 245 -- 246 -- 243.   I

17  apologize.   Is that a Federal Reserve wire transfer record that

18  matches the incoming wire -- the larger of the two incoming wires

19  that you just described?

20  A    That's correct.

21  Q    And can you look, please, at Exhibit 244?   Is that the

22  confirming Federal Reserve record for the smaller of the two

23  wires that you just described?

24  A    That's correct.

25  Q    Let's look back now at Exhibit 202.   Where did the remainder

1    of the funds come from to purchase this property?

2    A    In this transaction we also had a seller-carried note.  This

3    was in the amount of $61,589.  And then we had a $2,000 check,

4    check number 8068, drawn off the Ikilikyan Washington Mutual

5    account, ending in 3135.

6    Q    Following closing of this transaction, how were all those

7    funds disbursed?

8    A    Starting in the top box, we see that Great American Escrow

9    check number 42770, payable to Great American Escrow, FBO trustee

10   of escrow number 0601006CB, was disbursed from the Key Bank

11   account and redeposited to the Great American Escrow account for

12   a different -- for credit to a different escrow number.

13   Q    Can you tell us --  I'm sorry.

14   A    This check was in the amount of $55,320.56.

15   Q    Can you tell us what all that means?

16   A    Yes.  If we can zoom out again to the large chart?  If you

17   see the last line of the title, you see Great American Escrow had

18   three separate files for this particular transaction, file number

19   0512001CB and CBA, related to the first and second mortgages from

20   Ownit Mortgage Solutions.  That last file number, 0610106CB, was

21   a third separate escrow file that actually closed on January 6th,

22   2006.  This particular check that we are looking at for

23   $55,320.56 was disbursed from the CB file, the 0512001CB file,

24   and credited to that third escrow file a couple of weeks later.

25   And then following the escrow -- excuse me, the arrow directly

1   down from that third escrow file, $54,992.56 was wired to Alexis

2   Ikilikyan.

3   Q    And where did the remainder of that $55,320.56 go?

4   A    That was miscellaneous fees applied to the escrow account.

5   Q    How were the rest of the funds disbursed from the sale of

6   this property?

7   A    Moving directly down, Great American Escrow check number

8   42716, payable to Dove Realty, was disbursed for $6,988.75.  Dove

9   Realty then issued check number 6181, payable to Alexis

10  Ikilikyan, in the amount of $6,361.77.  That particular check had

11  written on the memo line "Thompson slash Andriolo."

12  Q    And let me just ask you, when you saw a misspelling or a

13  spelling of a name on a check or some other financial record, how

14  did you represent that in your chart?

15  A    Exactly as I could determine it was written on the check.

16  Q    And please continue with your description of how the

17  remainder of the funds were disbursed?

18  A    Next in the blue we have Great American Escrow check number

19  42769, payable to Alexis Ikilikyan, in the amount of $2,860.  All

20  three of those items were deposited to Ms. Ikilikyan's Washington

21  Mutual account, ending in 3135.

22  Q    And can you summarize where the remaining funds went?

23  A    The remaining funds were paid for seller proceeds, seller

24  real estate commissions and an existing lien on the house.

25  Q    So, Ms. Carnell, do you have a total dollar amount for the

1  proceeds that were disbursed to the subject accounts as a result

2  of this closing?

3  A   $64,214.33.

4  Q   And in this case, all of that money went into a single

5  account; is that correct?

6  A   That's correct.

7  Q   And which account was that?

8  A   That is the Washington Mutual 3135 account.

9  Q   How much money did the borrower put -- or the buyer put into

10 this transaction?

11 A   $2,000.

12 Q   So subtracting that money out, what was the net profit from

13 this transaction?

14 A   $62,214.33.

15 Q   Let's turn now to property number three on our large chart.

16 Did you also prepare a summary chart for the financial

17 transactions surrounding this purchase?

18 A   I did.

19 Q   And can you look, please, at Exhibit 302?  Is this the chart

20 that you prepared?

21 A   Yes, it is.

22          MS. VOGEL:  Move the admission of Exhibit 302.

23          THE DEFENDANT:  No objections, your Honor.

24          THE COURT:  302 is admitted.

25          (302 admitted.)

By Ms. Vogel:

Q    Tell us what this chart summarizes.

A    This, again, is a summary chart, graphically depicting the financial transactions surrounding the purchase of property number three.

Q    And if we focus in and zoom in on the left-hand side of the chart?  Can you please tell us where the money came from to fund the purchase of this property?

A    First, we have one loan from Ownit Mortgage Solutions.  This loan was funded via wire on August 1st, 2006, in the amount of $298,935.52.  The wire was from Ownit Mortgage Solutions to Great American Escrow's Key Bank account, ending in 4185.

Q    Can you look, please, at Exhibit 323?  Is this the corresponding Federal Reserve wire transfer record for that wire transfer that you just described?

A    Yes, it is.

Q    Would you look back, please, to Exhibit 302?  Where did the remaining funds come from to purchase this property?

A    The remaining funds consisted of funds in check number 44353 from Great American Escrow.  That check was payable to Great American Escrow, FBO Harutyunyan and Ikilikyan and William Poff, in the amount of $82,281.22.  This check represented proceeds from the sale of 3821 South 345th Street in Auburn.  And the check was redeposited into Great American Escrow's Key Bank account.

1    Q    It says "For credit to," and it has an escrow file number.

2    Is that the same escrow file number as the purchase of 13841

3    Southeast 180th Street, subject property three?

4    A    Yes.   The escrow file number is 0607011CB for this

5    transaction, property number three.

6    Q    And if we could look at the right-hand side of the chart?   If

7    you describe for us, please, how these funds were then disbursed

8    following closing?

9    A    Yes.   First, we have Great American Escrow check number

10   44533, payable to Great American Escrow, in the amount of

11   $62,000.   That check was redeposited into Great American Escrow's

12   Key Bank account for credit to another escrow file.   If you

13   follow that arrow out, you see that escrow file relates to a

14   property located at 20613 11th Avenue South, which is property

15   number four on our chart.

16        The next check down we see Great American Escrow check number

17   447711, payable to Alexis Ikilikyan, in the amount of $38,658.09.

18   That check was also redeposited into Great American Escrow's Key

19   Bank account, 4185, for credit to another escrow file.   If you

20   keep following the arrow, that escrow file is a property located

21   at 14062 Yelm Avenue Southeast, which is property number five on

22   our chart.

23        The next block down shows Great American Escrow check number

24   44387, payable to Alexis Ikilikyan, in the amount of $25,493.69.

25   That check was deposited into the Washington Mutual 3135 account.

1       Finally, we have Great American Escrow check number 44364,

2  payable to U.S. Mortgage and Investments, in the amount of

3  $4,015.  That check was deposited into U.S. Mortgage and

4  Investments' Washington Mutual 6743.  However, the same day it

5  was deposited, another check was then written to -- transferring

6  those funds to the Washington Mutual 3135 account.

7  Q    And can you summarize for us where the remainder of the funds

8  from this transaction were disbursed?

9  A    Yes, to pay off two existing loans on the property.

10 Q    So, Ms. Carnell, do you have a total for the amount of

11 proceeds that were disbursed to a subject account or for the

12 benefit of a purchase of one of the properties on the chart,

13 Exhibit 1, from this closing?

14 A    $130,166.78.

15 Q    And how much money did the buyer put into this transaction?

16 A    $82,281.22.

17 Q    And that was all in the form of proceeds from another

18 property?

19 A    Correct.

20 Q    So if you subtract out those proceeds that were brought in

21 from another property, what was the net profit from this

22 purchase?

23 A    $47,885.56.

24 Q    Let's look now at property number four on our chart.  Did you

25 also prepare a similar chart for the property located at 20613

1    11th Avenue South, and its purchase on August 18th, 2006?

2    A    I did.

3    Q    Would you look, please, at Exhibit 402?  Is this your chart

4    for that property?

5    A    Yes, it is.

6            MS. VOGEL:  Move the admission of Exhibit 402.

7            THE DEFENDANT:  No objections, your Honor.

8            THE COURT:   402 is admitted.

9            (402 admitted.)

10   By Ms. Vogel:

11   Q    If we could move in on the left-hand side.  Can you tell us

12   where the money came from to fund the purchase of this property?

13   A    Yes.  First, we have a loan from Ownit Mortgage Solutions.

14   That loan was funded via wire from Ownit Mortgage Solutions to

15   Great American Escrow's Key Bank account ending in 4185 on

16   August 18th, 2006.  That wire was in the amount of $342,480.84.

17   Q    And, once more, were you able to obtain and review a Federal

18   Reserve wire transfer verification document that matched up with

19   this incoming wire?

20   A    I did.

21   Q    And can you look, please, at Exhibit 427?  Is that the

22   Federal Reserve document indicating that this wire transfer was

23   made?

24   A    Yes.

25   Q    If we could go back, please, to 402 on the incoming --  Where

1  did the remainder of the funds come for the purchase of this

2  property?

3  A    There was a note between Ms. Harutyunyan and Ms. Bourgeois in

4  the amount of $58,000.  And, finally, we see the Great American

5  Escrow check in the amount of $62,000 that we saw in the previous

6  chart, representing the proceeds of property number three.

7  Q    And how were those funds applied towards the purchase of

8  property number four?

9  A    The fund were disbursed and then redeposited into Great

10  American Escrow's Key Bank account 4185 for credit to this escrow

11  file.

12  Q    Can you look at where the funds went from this purchase?

13  A    Yes.  Emily Bourgeois received $5,000.  Opportunity Knocking

14  received $9,500, which represented the seller commission.  Then

15  there was another check, Great American Escrow check number

16  44549, payable to Ocwen Financial Corporation, in the amount of

17  $289,885.30.  These were funds to pay off the existing

18  mortgage -- the seller mortgage on the property.  However,

19  several months after this check was sent to Ocwen Financial

20  Corporation in May of 2007, Ocwen refunded an amount of

21  $23,302.41 back to Great American Escrow's Key Bank account

22  ending in 4185.  If you follow the arrow down, you will see that

23  those funds, the same amount, was then wired to Armenuhi

24  Harutyunyan's Bank of America account, ending in 6733.

25  Q    And how were the remainder of the funds disbursed from the

1   purchase of this property?

2   A    Great American Escrow check number 44534, payable to U.S.

3   Realty and Investments, for $13,492.50, was deposited into

4   Washington Mutual, 6206.

5       Great American Escrow check 44538, payable to U.S. Mortgage

6   and Investments, in the amount of $2,015, was deposited into

7   Washington Mutual, 6743.

8       Again, we just talked about the wire for $23,302.41 deposited

9   into Bank of America, 6733.

10      There was another wire from Great American Escrow to Alexis

11  Ikilikyan in the amount of $27,865.79.  That was deposited into

12  Washington Mutual, 3135.

13      And, finally, we have Great American Escrow check number

14  44712, payable to Armenuhi Harutyunyan.  Although Harutyunyan is

15  misspelled on the check.  That check is in the amount of

16  $41,447.81.  That check was disbursed and redeposited into Great

17  American Escrow's Key Bank account, ending in 4185, for the

18  credit of 14062 Yelm Avenue Southeast, property number five.

19  Q    Now, back out to the whole page of Exhibit 402.  How much

20  money --  Well, actually, first, do you have a total amount of

21  the proceeds that were disbursed following closing on this

22  transaction to the subject accounts or for the benefit of a

23  purchase -- one of the purchases on Exhibit 1, our big chart?

24  A    The total is $108,123.51.

25  Q    And how much money did the buyer put in?

1    A    $62,000 from the proceeds of the property located at 13841

2    Southeast 180th Street.

3    Q    So subtracting out the credit for that $62,000, what was the

4    net profit from the purchase of this property?

5    A    $46,123.51.

6    Q    Now, I want to focus on that $62,000 that is represented as

7    having come in from the other property.  Did you prepare a

8    specific chart detailing that financial transaction?

9    A    I did.

10   Q    And can you look, please, at Exhibit 914?  Can you tell us

11   what this is?

12   A    This is a summary chart specifically detailing that

13   transaction for $62,000.

14   Q    And does this -- is this $62,000 financial transaction the

15   subject of the substantive money laundering counts 36 and 54 in

16   the first superseding indictment?

17   A    Yes.

18            MS. VOGEL:  Move the admission of Exhibit 914.

19            THE DEFENDANT:  No objections, your Honor.

20            THE COURT:  914 is admitted.

21            (914 admitted.)

22   By Ms. Vogel:

23   Q    Can you explain first for us how these types of charts are

24   laid out?

25   A    These types of charts are read similar to the other types.

1   They are read left to right.  You have the incoming funds from

2   the house on the left, flowing into the actual financial

3   transaction itself, and then flowing out we have where the money

4   has went or were credited to.

5   Q   And can you describe to us, please, the financial transaction

6   that is depicted in this chart?

7   A   Yes.  Great American Escrow check number 44533, in the amount

8   of $62,000, was deposited into that same escrow account, Key

9   Bank, 4185, on August 22nd, 2006.

10  Q   And those funds represent the proceeds from the purchase of

11  the property located at 13841 Southeast 180th Street, Renton,

12  Washington?

13  A   That's correct.

14  Q   And those funds were applied towards the purchase of the

15  20613 11th Avenue South property?

16  A   That's correct.

17  Q   And can you look, please, at Exhibit 915, previously admitted

18  as a Key Bank business record.  Can you tell us what that is?

19  A   Yes.  If we can zoom in on the bottom two items?  When Key

20  Bank provided the items, they provide pages of items, but not

21  every item relates to the same transaction.  Here you see the

22  Bank of America -- excuse me, the Key Bank check for $62,000, and

23  the deposit slip in the same amount, confirming the redepositing

24  of that check into the Great American Escrow Key Bank 4185

25  account.

1   Q    So is this an actual copy that the bank maintains of the

2   check and the deposit slip?

3   A    Yes.

4   Q    And it shows the front and the back?

5   A    That's correct.

6   Q    And for each of the substantive money laundering counts, did

7   you pull and mark the item that confirms the actual financial

8   transaction?

9   A    That's correct.

10  Q    Now let's focus in on property number five on our chart.  Did

11  you also prepare a summary chart summarizing the flow of funds

12  relating to the purchase of that property?

13  A    Yes.

14  Q    And that property is 14062 Yelm Avenue; is that correct?

15  A    That's correct.

16  Q    Would you look, please, at Exhibit 502?  Is this the chart

17  that you prepared for the Yelm property?

18  A    Yes, it is.

19           MS. VOGEL:  Move the admission of 502.

20           THE DEFENDANT:  No objections, your Honor.

21           THE COURT:  502 is admitted.

22           (502 admitted.)

23  By Ms. Vogel:

24  Q    Let's focus in on the left half of this chart.  And can you

25  please explain to us where the funds came from to purchase the

1    Yelm property?

2    A    Yes.  We have two loans to fund this property from Ownit

3    Mortgage Solutions.  The first loan was funded via wire on

4    August 30th, 2006, from Ownit Mortgage Solutions to Great

5    American Escrow's Key Bank account, ending in 4185.  And that

6    loan -- excuse me, that wire was in the amount of $818,228.90.

7    The second loan was funded via wire on the same day in the amount

8    of $164,558.46.

9    Q    And for each of those incoming wire transfers to Great

10   American Escrow's account, were you also able to find confirming

11   Federal Reserve wire transfer verification documents?

12   A    Yes.

13   Q    And are those at Exhibit 525?

14   A    This is the record for the larger of the two loans, yes.

15   Q    And Exhibit 526?

16   A    Yes, this is the record for the second loan.

17   Q    Can we go back to Exhibit 502, please, on the purchase side?

18   Where did the remainder of the funds come from for the purchase

19   of this property?

20   A    There was a $7,000 check for earnest money, check number

21   2334.  This check was drawn off of Mr. Reyes' Washington Mutual

22   account, ending in 4710.  It had a handwritten notation on that

23   check of "Yelm-earnest money."  In the last box we see there was

24   a buyer deposit in the amount of $120,380.51.  Those funds were

25   made out by all of the boxes straight below.

1    First we see check number 44711 in the amount of $38,658.09.

2    We previously saw this on the chart for the property located at

3    13841 Southeast 180th Street.  That check represented proceeds of

4    that transaction.  To the right of that we see Great American

5    Escrow check in the amount of $41,447.81.  That check we

6    previously saw on the chart for 20613 11th Avenue South.  That

7    check represented proceeds of that particular transaction.

8    Directly below in the blue we see two Great American Escrow

9    checks, 44718, in the amount of $9,974.61, and Great American

10   Escrow check 44717, in the amount of $12,025.39.  Those two

11   checks represent the proceeds of this particular transaction.

12   And we will see them again when we go through the flow of funds

13   out of the account -- excuse me, out of this transaction.

14   The remainder of those funds are made up through a Washington

15   Mutual official check in the amount of $18,274.61.  This check

16   was purchased from Mr. Reyes' Washington Mutual account, ending

17   in 8552.  The remitter is listed as Alexis Ikilikyan.

18        MS. VOGEL:  Your Honor, is it time to break?  My watch

19   says 4:20.

20        THE COURT:  Why don't you go ahead and finish up this

21   transaction.

22        MS. VOGEL:  Thank you, your Honor.

23   By Ms. Vogel:

24   Q    Can you tell us then how all those funds were disbursed?

25   A    Yes.  At the top we have the seller proceeds, the monies to

1    pay off the existing loan on the property, and the seller's real

2    estate commissions.

3        In the blue we start with Great American Escrow check 44708,

4    in the amount of $3,400.  That check was deposited into U.S.

5    Realty and Investments' Washington Mutual 6206 account.  The next

6    check, Great American Escrow check number 44679, payable to U.S.

7    Mortgage and Investments, in the amount of $515, was deposited

8    into the Washington Mutual 6743 account.

9        The remaining two checks are the ones that we previously

10   spoke about that consisted of the $9,974.61 check, and the

11   $12,025.39 check.  Those two checks total $22,000.  And once this

12   transaction closed, the checks were redeposited into the Great

13   American Escrow Key Bank account and credited back to make up

14   that buyer deposit of $120,380.51.

15   Q   Ms. Carnell, can you tell us what the total amount of

16   proceeds were that were disbursed to the subject accounts or for

17   the benefit of a purchase -- another purchase on Exhibit 1 from

18   this closing?

19   A   $25,915.

20   Q   Was there any net profit on this transaction?

21   A   No, there was not.

22   Q   I want to focus now on the $38,658.09 that we saw a moment

23   ago that had come out of the 13841 property transaction, the

24   little box on the left-hand side of your chart.  Did you also

25   prepare a money laundering chart or a chart focusing on that

1    financial transaction?

2    A    Yes, I did.

3    Q    And can you look, please, at Exhibit 916?  Is this that

4    chart?

5    A    That's correct.

6            MS. VOGEL:  Move the admission of Exhibit 916.

7            THE DEFENDANT:  No objections, your Honor.

8            THE COURT:  916 is admitted.

9            (916 admitted.)

10   By Ms. Vogel:

11   Q    Can you describe for us this financial transaction that is

12   the basis for the substantive money laundering counts 40 and 57

13   in the first superseding indictment?

14   A    Great American Escrow check number 44711 from Key Bank

15   account 4185 in the amount of $38,658.09, representing the

16   proceeds of the property located at 13841 Southeast 180th Street,

17   was redeposited into the Great American Escrow Key Bank account,

18   4185, on January 3rd, 2007, for a credit to the property located

19   at 14062 Yelm Avenue Southeast.

20   Q    If we focus back on Exhibit 502, the property chart, I now

21   want to focus in on the 41447 -- the money that came out of the

22   20613 property.  Did you also prepare a chart summarizing that

23   financial transaction?

24   A    Yes, I did.

25   Q    And can you look, please, at Exhibit 917?  Is this that

1  chart?

2  A  Yes, it is.

3      MS. VOGEL:  Move the admission of 917.

4      THE DEFENDANT:  No objections, your Honor.

5      THE COURT:  917 is admitted.

6      (917 admitted.)

7  By Ms. Vogel:

8  Q  Can you describe, please, this financial transaction that is

9  the basis for the substantive money laundering counts 41 and 58?

10  A  Yes.  Great American Escrow check number 44712 from Key Bank

11  account 4185 in the amount of $41,447.81, representing proceeds

12  from the transaction at property 20613 11th Avenue South, was

13  redeposited into the Great American Escrow Key Bank account,

14  4185, also on January 3rd, 2007, for a credit to the property

15  located at 14062 Yelm Avenue Southeast.

16  Q  If we could go back to 502 just briefly.  I want to focus

17  your attention now on the two commission checks that you

18  described earlier and their reapplication.  Did you also prepare

19  a financial transaction chart summarizing those transactions?

20  A  Yes, I did.

21  Q  And can you look at Exhibit 918?  Is that the chart that you

22  prepared?

23  A  Yes.

24      MS. VOGEL:  Move the admission of 918.

25      THE DEFENDANT:  No objections, your Honor.

1          THE COURT:  918 is admitted.

2              (918 admitted.)

3    By Ms. Vogel:

4    Q    Can you describe the financial transaction that is the basis

5    for substantive money laundering counts 43 and 60?

6    A    Yes.  Great American check number 44717 from Key Bank account

7    4185 in the amount of $12,025.39, representing the proceeds of

8    14062 Yelm Avenue Southeast, was redeposited into the Great

9    American Escrow Key Bank account 4185 on January 3rd, 2007, for

10   credit to that same property, 14062 Yelm Avenue Southeast.

11   Q    And can you look, please, at Exhibit 919?  Is this a similar

12   chart for the other commission check?

13   A    Yes, it is.

14             MS. VOGEL:  Move the admission of 919.

15             THE DEFENDANT:  No objection, your Honor.

16             THE COURT:  919 is admitted.

17             (919 admitted.)

18   By Ms. Vogel:

19   Q    Can you briefly describe this financial transaction, the

20   subject of substantive money laundering Count 44?

21   A    Yes.  Great American Escrow check 44718 from Key Bank account

22   4185, in the amount of $9,974.61, representing proceeds of 14062

23   Yelm Avenue Southeast.  It was redeposited into the Great

24   American Escrow Key Bank account ending in 4185 on January 3rd,

25   2007, for the credit to the same property, 14062 Yelm Avenue

1   Southeast.

2   Q    And if you look at Exhibit 920, previously admitted as a Key

3   Bank business record.  I believe there is two pages to this

4   exhibit.  Are these the underlying items that you received from

5   Key Bank that show each of those checks and their redepositing

6   that you just referenced?

7   A    That's correct.

8            MS. VOGEL:  I think we will stop here.

9            THE COURT:  You may go ahead and step down.  Counsel,

10  that will constitute the acceptance of testimony and exhibits for

11  today.  It being the end of the week, I would like to know where

12  we are.  First, thank you for all your cooperation this week.  I

13  think we have moved along smartly, and I appreciate that.

14       Whoever is going to speak on behalf of the government, where

15  are you in terms of your witnesses?

16            MS. VOGEL:  Your Honor, following Ms. Carnell, I think

17  we have cut it down to three more witnesses.  I have no doubt

18  that we can finish up on Monday afternoon.

19            THE COURT:  All right.  And who will those witnesses be?

20            MS. VOGEL:  Ms. Sharon Kirkdoffer, who wasn't able to

21  make it today, Virginia Munger, the Green Point representative,

22  and William Kim, the Just Mortgage representative.

23            THE COURT:  The Green Point representative's name again?

24            MS. VOGEL:  Virginia Munger, M-U-N-G-E-R.

25            THE COURT:  All right.  Mr. Poff, once the government

1    rests, you have your opportunity to present your case.  If they

2    do finish on Monday, you need to be ready to go with witnesses at

3    that time.

4         Counsel, where are we in terms of the question of the

5    handwriting expert?  There is a pending motion out there from the

6    government.  You were all exchanging information.  I don't know

7    where that exchange ended up.

8              MR. SCOVILLE:  Yes, your Honor.  After the filing of the

9    government's motion, the government received from Mr. Poff and

10   Mr. Ratner a report of the handwriting expert, and also some

11   additional underlying documentation.

12        The government has also made a request of Mr. Poff and

13   Mr. Ratner that Ms. McFarland be made available to the government

14   for an interview so we can further inquire into some of the bases

15   for her opinions that are not fully described in the reports.

16   When last I checked with Mr. Poff and Mr. Ratner, they were

17   planning to make her available to the government on Monday

18   morning for such an interview.

19        Provided that that interview actually takes place, I think

20   the government will be willing to withdraw its motion on the

21   basis of Rule 16, on the basis of the defense's disclosure.

22        That might still leave, depending on what we find out, the

23   motion to exclude Ms. McFarland's testimony on grounds of Daubert

24   and Kumho.  The government suggests that perhaps the most

25   appropriate way to proceed would be for the Court to hear the

1    testimony, and for points relative to Daubert and Cumo, also be

2    elicited in the course of direct and cross-examination.  And

3    perhaps the Court can reserve ruling on that issue until after

4    the close of testimony.

5            THE COURT:  Mr. Poff, did you understand any of what he

6    said?

7            THE DEFENDANT:  Actually I understood quite a bit of it,

8    yes, sir.

9            THE COURT:  We tend to talk in shorthand.  Daubert means

10   something to us.  It is a prominent Supreme Court case on the

11   question of expert witnesses.  We tend to prejudice pro ses when

12   we get into that shorthand, because they may or may not know what

13   all of those cases stand for.

14      Are you in agreement with what the government just said, that

15   you are going to try to get together on Monday?

16           THE DEFENDANT:  Yes, sir.

17           THE COURT:  And after that, if that goes well, you will

18   be prepared to present your witness on Monday afternoon?

19           THE DEFENDANT:  I'm sorry?

20           THE COURT:  If they finish.

21           THE DEFENDANT:  Yes, sir.

22           MR. RATNER:  Your Honor, can I speak?

23           THE COURT:  Mr. Ratner.

24           MR. RATNER:  I suggest that we call her on Tuesday

25   morning.  We are not sure the government will finish.  It will

1    just make it easier to just have her ready Monday morning at

2    9:00.

3                MR. SCOVILLE:  I will just say for the record, your

4    Honor, it is very unlikely that we would finish with sufficient

5    time on Monday to get anywhere into Ms. McFarland's examination.

6                THE COURT:  Is this Count 68, the conspiracy against the

7    court?

8                MR. SCOVILLE:  Yes, your Honor.

9                THE COURT:  That's fine.  I appreciate you guys working

10   hard on this.

11       I have as outstanding motions at this time:  The motion to

12   compel expert disclosure, which we have just talked about.  I

13   have Mr. Poff's motion for a mistrial.  And I have verbal

14   indications from Mr. Poff that he is either augmenting that

15   motion or filing an additional motion for mistrial.

16       If the government wishes to address the subjects in there,

17   particularly the one of availability -- or opportunity to talk to

18   witnesses, that would be fine.  It is my intention to rule on all

19   of those motions prior to the time that you do your closings.  To

20   the extent you want to add anything to the hopper, you should

21   plan on wasting your weekend doing that, both sides.  The Court

22   will be equally spending the weekend on this matter.  We are all

23   in this together.

24       Other than that, I don't believe that I have any matters that

25   are pending with the Court right now.

1        Is there anything further from the government?

2              MS. VOGEL:  No, your Honor.

3              THE COURT:  Mr. Poff, anything further from you, sir?

4              THE DEFENDANT:  Yes, sir.  Just an administrative

5    question.  Will closing statements be right at the end of my

6    examination -- or the government's cross-examination of the

7    expert handwriting witness?

8              THE COURT:  The answer to that is, it depends.  If we

9    finish early in the day, where we have three or four hours, I

10   might be inclined to do it.  I don't like to split them up.

11   First off, the government has a chance to put on a rebuttal case.

12   They won't know that until they hear what you say, because that's

13   what they are rebutting.  It is like an hour glass, it keeps

14   getting smaller.  That is an open matter.  It is beneficial,

15   particularly to juries, but also for me, to hear both on the same

16   day.

17        The other question is, how long are you going to take?  The

18   government usually is pretty good about not taking more than

19   about an hour, because that's how long television shows take.

20   And when we have juries, that is a pretty good indication of what

21   they have for an attention span.  Hopefully I can do a little bit

22   better than that.  The same thing is true, after a while you can

23   sort of lose track of where you are.  You have a right to speak

24   for as long as you want.  If you start to get redundant, as you

25   warned me about, I will tell you you are being redundant, and ask

```
1    you to move on.
2              THE DEFENDANT:  Very well.
3              THE COURT:  Do you have any idea how long you might
4    take?
5              THE DEFENDANT:  I will have to review the questions I
6    need to qualify the witness.
7              THE COURT:  This is in terms of closing argument.
8              THE DEFENDANT:  As far as closing, your Honor?  It would
9    be probably 45 minutes to an hour closing statement.
10             THE COURT:  If both of you stick with that, there is
11   some chance that we would try and fit it in.  We are finishing
12   early.  I am more inclined to let you all go home.  Winston
13   Churchill once said something to the effect of, the reason it
14   wasn't shorter was I didn't really have enough time to really
15   work on it.  I found that to be true in my own legal practice.  I
16   would rather have you have time to prepare and do a good job than
17   to have you stand up and just wing it.  No promises, but that
18   would tend to be my view.  If you finish on Tuesday, for example,
19   we would do it Wednesday morning when everybody is fresh.
20      Anything else at this time?
21             MS. VOGEL:  No, your Honor.  Thank you.
22             THE COURT:  Mr. Poff?
23             THE DEFENDANT:  No, sir.
24             THE COURT:  I will see you all.  Remember, if any of you
25   want to come and watch sentencings on Monday, you are more than
```

1    welcome.   I think we have three OxyContin dealers who are being

2    sentenced.   Have a good weekend, counsel.   Thank you.

3                    (Adjourned for the day.)

1                              CERTIFICATE

2

3

4

5

6

7

8

           I, Barry L. Fanning, Official Court Reporter, do hereby
9   certify that the foregoing transcript is true and correct.

10

11                                  S/Barry L. Fanning

12                              _____
                                    Barry L. Fanning
13

14

15

16

17

18

19

20

21

22

23

24

25