**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**IN SEATTLE**

---

UNITED STATES OF AMERICA,                    )
                                             )   NO. CR09-160JLR
                      Plaintiff,             )
                                             )
             vs.                             )
                                             )
WILLIAM S. POFF,                             )
                                             )
                      Defendant.             )
                                             )

---

**TRIAL**

---

**BEFORE THE HONORABLE JAMES L. ROBART**


**March 15, 2010**


**APPEARANCES:**

**Sarah Vogel**
**Michael Scoville**
**Assistant United States Attorneys**
**Representing the Plaintiff**

**William S. Poff**
**Pro Se**
**Representing the Defendant**

**Howard Ratner**
**Standby Counsel**
**Attorney at Law**

```
1                        EXAMINATION INDEX

2   WITNESSES              :                        PAGE
     VIRGINIA MUNGER      DIRECT EXAMINATION           7
3                          By Ms. Vogel:
      SHARON KIRKDOFFER   DIRECT EXAMINATION          24
4                          By Mr. Scoville:
     WILLIAM KIM          DIRECT EXAMINATION          36
5                          By Mr. Scoville:
      BECKY CARNELL       (continued direct examination)  49
6                          By Ms. Vogel:                 49
                          CROSS-EXAMINATION          96
7                          By the Defendant:
                          REDIRECT EXAMINATION       105
8                          By Ms. Vogel:

9


10
                          EXHIBIT INDEX
11   EXHIBITS ADMITTED                             page
        601                                          18
12      814a                                         29
        801                                          48
13      924                                          51
        602                                          52
14      925                                          56
        924                                          58
15      641                                          60
        701                                          62
16      930                                          63
        715                                          65
17      802                                          67
        103                                          71
18      203                                          71
        303                                          72
19      403                                          72
        503                                          72
20      603                                          73
        642                                          73
21      803                                          74
        903                                          76
22      904                                          80
        905                                          84
23      906                                          86
        907                                          87
24      908                                          89
        909                                          92
25      910                                          93
        911                                          95
```



1          THE COURT:  Good afternoon, everyone.

2          THE DEFENDANT:  Good afternoon.

3          MS. VOGEL:  Good afternoon.

4          THE COURT:  Housekeeping details.  I am aware of three

5    additional pleadings that were filed over the weekend.  One is

6    Mr. Poff's second motion for mistrial; one is Mr. Poff's motion

7    to strike evidence; and one is the defendant's motion to strike

8    the government's witness testimony.  So I will add those to my

9    list of homework.

10       Mr. Poff, it is still my intention to have a hearing,

11   probably before closing arguments, where we will talk about

12   those.

13          THE DEFENDANT:  Thank you, your Honor.

14          THE COURT:  The government has pending its motion in

15   regards to handwriting experts.  And I don't know what the

16   progress is on that one.

17          MR. SCOVILLE:  There was an interview this morning as

18   scheduled, your Honor.  The government is satisfied with the

19   Rule 16 disclosures that have been made regarding Ms. McFarland.

20          THE COURT:  I will treat that as withdrawn.

21          MR. SCOVILLE:  Yes, your Honor.

22          THE COURT:  I will leave it up to our clerk to figure

23   out which motion that was.  I think it was 167.  It will be

24   deemed to be withdrawn.

25       Mr. Poff, you, in one of your motions, said something that I

1    I am obligated to take up on an interim basis.  It is in

2    defendant's second motion for mistrial.  The way it printed out,

3    it is listed as page 6 of 9.  It is paragraph 3 of the motion.

4    And it reads:  "It has been witnessed by observers in the

5    audience of plaintiffs talking about the confidence they had in

6    claimed alleged defendant's motions being denied."  Since this

7    was before court was in session, it would be logical to deduce

8    there are behind-the-scenes ex parte meetings occurring.  That

9    implicates me as the trial judge, I think.

10        But in that particular paragraph are you alleging that the

11   ex parte meetings are occurring between me and the government?

12            THE DEFENDANT:  I do not know who the meetings are

13   between.  It was my ride that I had that day, who had witnessed

14   plaintiffs speaking about my motions that were pending --

15   previous motions prior to this.  It has been several months back.

16   I don't have the exact date on that, your Honor.  But they

17   witnessed a conversation where there was certain confidence that

18   the motions were not going to go anywhere.  And from what he

19   could deduce, there was some sort of behind-the-scenes talks or

20   meetings, to where they knew in advance what was going to be the

21   outcomes of your ruling on these motions, your Honor.

22            THE COURT:  Okay.  Let me tell you that I don't get to

23   decide my own conduct.  So if you will do me the favor of, if you

24   are going to say I did something, would you make sure that I

25   appreciate that I did it?  Because at that point, I have to refer

1    it to someone else.  But what I hear you saying in regards to

2    paragraph 3 is, you are not alleging you have any evidence that I

3    did it, you just know what your observers observed.

4              THE DEFENDANT:  That's correct, your Honor.

5              THE COURT:  Then let me ask the government, any

6    administrative matters to take up today?

7              MS. VOGEL:  Just the matter of witness order today, your

8    Honor.  We have requested, and the defendant has been kind enough

9    to consent, with the court's permission, to interrupt the

10   testimony of Mr. Carnell in order to put on the three additional

11   brief witnesses, and then finish up with Ms. Carnell's testimony

12   when they are finished.

13             THE COURT:  All right.  Ms. Kirkdoffer is up first?

14             MS. VOGEL:  Your Honor, actually we were going to call

15   Ms. Munger first.

16             THE COURT:  So it will go Munger --

17             MS. VOGEL:  Then Kirkdoffer and then Kim.  And then we

18   will resume with Ms. Carnell.

19             THE COURT:  All right.  Mr. Poff, anything from you,

20   sir?

21             THE DEFENDANT:  The only motion I didn't have a chance

22   to file, and what I am motioning for right now, your Honor, is a

23   complete financial breakdown of this case, an audit of this case,

24   in regards to allocations, how much was spent in regards to

25   plaintiffs and the court, and how much was allocated towards the

1    defense's actual costs, your Honor.

2           THE COURT:  You need to put that one in writing.

3           THE DEFENDANT:  I will.

4           THE COURT:  Then we will hear from Ms. Munger.

5    Whereupon,

6                         VIRGINIA MUNGER

7    Called as a witness, having been first duly sworn, was examined

8    and testified as follows:

9           THE CLERK:  Will you please state your name for the

10   record and spell your last name?

11          THE WITNESS:  Virginia Munger, M-U-N-G-E-R.

12                     DIRECT EXAMINATION

13   By Ms. Vogel:

14   Q    Good afternoon, Ms. Munger.

15   A    Hello.

16   Q    Tell us the city in which you live.

17   A    Woodinville.

18   Q    What is your current occupation?

19   A    I am a homemaker.

20   Q    What was your previous occupation?

21   A    I was the operations manager at Green Point Funding.

22   Q    When did you work for Green Point Funding?

23   A    From April of 2004 until October 2007.  Our Bellevue office

24   closed down, but I was on the payroll until January of '08.

25   Q    And what was Green Point Funding?

1    A    We were a wholesale mortgage lender.

2    Q    What types of mortgages did Green Point Funding extend?

3    A    We did first mortgages and second mortgages, both stated

4    income and full-on documentation, and to nonowners as well as

5    owner-occupied property.

6    Q    And was this primarily residential?

7    A    Yes, it was residential.  Commercial was down out of our

8    Novato, California, office, but not out of Bellevue.

9    Q    Where was Green Point Funding headquartered?

10   A    Novato, California.

11   Q    How many branches did the business have in the western

12   Washington area?

13   A    Only one in Bellevue.

14   Q    Is that the branch that you worked at?

15   A    Yes, it was.

16   Q    Approximately how many employees worked at that branch

17   office?

18   A    Approximately 65.

19   Q    And was Green Point Funding a nationwide business?

20   A    Yes, it was.

21   Q    Why is it that the office in Bellevue closed in October

22   of 2007?

23   A    Capital One actually owned us at that time and chose to close

24   the mortgage division down.

25   Q    Were you the operations manager when you began working at

1    Green Point Funding in 2004?

2    A    Yes, I was.

3    Q    And did you continue in that same job title until the office

4    closed in October of 2007?

5    A    Yes, I did.

6    Q    Can you tell us what the job responsibilities are for an

7    operations manager?

8    A    I was responsible for overseeing all aspects of the loan,

9    from the time the application came into our office, all the way

10    through underwriting, sending the documents to escrow, as well as

11    funding.

12    Q    Did you have any personal participation in the underwriting

13    decisions?

14    A    Typically our underwriters would underwrite the loan.  If it

15    was over their lending authority, it would go to the underwriting

16    manager.  If it was over their money authority, it would come to

17    myself, either for approval or for approval to send it to our

18    corporate underwriting for approval.

19    Q    And who is it that set the underwriting policies for the

20    Bellevue branch of Green Point Funding?

21    A    Novato, California.

22    Q    As a result of this -- your three years of working there, are

23    you familiar with the processes by which Green Point made the

24    decision to fund loans and the information important in that

25    decision in the year 2007?

1    A    Yes, I am.

2    Q    And were there limitations on your personal discretion, as

3    far as how much you could approve?

4    A    I could approve loans up to $1 million.

5    Q    What would happen if there was a loan request for more than

6    $1 million?

7    A    It would go up to either my regional manager, who could

8    approve one and a half million, or to our corporate underwriting

9    department.

10   Q    Now, Ms. Munger, prior to your testimony today, have you

11   reviewed business records that relate to a mortgage made by Green

12   Point Funding for $1,406,250 for the purchase of a property

13   listed at number six on the big chart there, Exhibit 1, the

14   address being 9488 199th Avenue East in Issaquah?

15   A    Yes, I have.

16   Q    What documents have you reviewed?

17   A    I reviewed a HUD-1 settlement statement, a 1003, which is the

18   application, an appraisal report, the review appraisal, the

19   appraisal rebuttal and the mortgage -- excuse me, the deed of

20   trust.

21   Q    And was this loan, for which you reviewed the documents in

22   February of 2007, to a borrower named Alexis Ikilikyan?

23   A    Yes, it was.

24   Q    Now, were you the manager at Green Point in February of 2007?

25   A    Yes, I was.

Q     And based on your review of the documents, what type of loan was this?

A     This was a purchase of an owner-occupied property.

Q     And what degree of documentation was required for this particular loan?

A     Stated income.  So all it was, was they had to list their income on the 1003.

Q     Was this a first mortgage or a second mortgage?

A     It was a first mortgage.

Q     Now, what are Green Point --  You just said list income, but what are some of the actual requirements that Green Point required during that time period for stated income loans?

A     They would have to take in -- if they were a W-2 employee, at that time we would verify they did indeed work for that company. We did not verify income if they were self-employed.  We would have to get a copy of the business license or a letter from a CPA.

Q     And who is it that would get a copy of the business license?

A     Our underwriters would attempt to go onto the Washington State website to print a copy.  If they were unable to do that, the broker would provide it to us.

Q     Were there other requirements for stated income loans besides just verifying employment?

A     They had to have at least two years of self-employment.

Q     What were the limitations on the loan to value ratio that

1   Green Point Funding would extend for stated income loans?

2   A    Owner-occupied properties, we could go up to 80 percent on a

3   loan to value.

4   Q    And what about nonowner-occupied properties?

5   A    Typically 75.

6   Q    Was there a maximum combined loan to value ratio that Green

7   Point lending would never lend above?

8   A    On stated income we would not go above 90 percent.

9   Q    Did Green Point Funding in 2007 offer any residential loan

10  programs where they would knowingly loan more than 100 percent of

11  the value of the property?

12  A    No, we never did that.

13  Q    And why did owner occupancy matter to Green Point Funding?

14  A    Owner-occupied properties tend to be kept in better

15  condition.  Should something happen to it where you had to

16  foreclose on the property, the asset would be kept in better

17  condition.

18  Q    You said earlier that the maximum percentage combined loan to

19  value ratio for stated income loans was 90 percent; is that

20  correct?

21  A    Correct.  Yes.

22  Q    Does that mean that you required a ten percent down payment

23  as a minimum for all stated income loans?

24  A    Correct.

25  Q    Can you look, please, at Exhibit 621, previously admitted as

1   a business record.  Do you recognize this document?

2   A    Yes.  This is a loan application, also referred to as a 1003.

3   Q    Is this the loan application for the property located at

4   9488 199th Avenue Southeast in Issaquah?

5   A    Yes, it is.

6   Q    And you belive this is the loan application submitted to

7   Green Point Funding?

8   A    Yes, I do.

9   Q    What does this 1003 represent to Green Point about the

10  borrower's intentions with regard to occupancy?

11  A    The property will be a primary residence, which means it is

12  owner-occupied.

13  Q    And where is that stated on here?

14  A    On the previous page you were on actually.  It shows the

15  primary residence box is checked.

16  Q    Does it also in the declarations here -- in the third page in

17  the declaration section, where it says line L, "Do you intend to

18  occupy the property as your primary residence"?

19  A    Yes.

20  Q    So it is on there twice?

21  A    Correct.

22  Q    In both instances on this 1003, it says, yes, the borrower

23  does intend to occupy the property?

24  A    Correct.  Yes.

25  Q    What information was provided in this 1003 to Green Point

1    Funding about the borrower's financial qualifications?

2    A    In this case the borrower was a self-employed person for four

3    years and one month.   They had been doing it for five years with

4    a company called Fidelis Enterprises, as well as they were a real

5    state broker.

6    Q    And what information was provided to Green Point Funding in

7    this form about the borrower's income?

8    A    It would actually be on page 2 at the top.   So it looks like

9    $32,856 a month, is what they said they were making for income.

10   Q    And what information was provided to Green Point Funding

11   about the details of the transaction?

12   A    The next page there, it says the purchase price was

13   $2 million; they estimate the closing costs; it would have had a

14   second mortgage for over $187,500.   The seller was contributing

15   $25,000 to them.   And then on line P, it says the borrower was

16   bringing in approximately $407,000.

17   Q    I understand some of those costs are estimates, but how well

18   did Green Point Funding rely on this information about price and

19   down payment when making funding decisions or underwriting

20   calculations?

21   A    Definitely we relied on it heavily, because it told us how

22   much money the borrower was bringing into the property, which

23   shows us their vested interest in the property.

24   Q    Can you look at Exhibit 622, also a previously admitted

25   business record?   Do you recognize this document?

A    Yes.  This would be a copy of the approval that the broker
can print out in their office via the main computer system that
we use.

Q    And when you say "approval," what do you mean?

A    Once the loan application and credit bureau (sic) is
submitted to Green Point, the underwriter would underwrite the
file and issue us an approval -- hopefully approval, subject to
certain conditions that need to be met in order for us to fund
the loan.

Q    And is this the Green Point approval form for the house in
Issaquah, property number six on that chart that we have been
talking about?

A    Yes, it is.

Q    And what does this approval form state was Green Point's
understanding at the time they approved the loan of the price of
the property?

A    The purchase price was $2 million.

Q    What does this approval form indicate was Green Point's
understanding at the time they approved the loan of the
occupancy intent of the borrower?

A    That it would be the primary residence, which, again, is
owner-occupied.

Q    Again, what was Green Point's understanding at the time they
approved the loan of the combined loan to value ratio of all
loans that were to be secured by this property?

1    A    It was 86 percent combined loan value.

2    Q    Does that mean that Green Point Funding then expected a

3    14 percent down payment?

4    A    Correct.

5    Q    And what is approximately 14 percent of $2 million, if you

6    know?

7    A    If I am doing my math correctly, at least $300,000.

8    Q    Now, who would this document have been conveyed to?

9    A    It would have gone to the broker.

10   Q    And who would have been responsible for fulfilling the

11   conditions listed on this document?

12   A    Their broker would.

13   Q    The bottom half of page 1 of Exhibit 622, it says

14   "Outstanding conditions."  What does that mean?

15   A    Outstanding conditions are ones that we need in order to fund

16   the loan.  However, at the time of submission to Green Point, the

17   broker had not provided those conditions to us.

18   Q    And can you tell us what the very first outstanding condition

19   is for this loan?

20   A    Yes.  It is asking for verified assets for six months, PITI,

21   which is principal, interest, taxes and insurance, plus any

22   closing costs and down payment, to provide verification of

23   deposit for two months' current statements for $474,843.  The GPM

24   comment, a broker could click on that and send a specific comment

25   regarding that condition to us.

Q    So what does all of that mean?  What is the condition?

A    The borrower needs to provide proof that they have the money to do the down payment of the $474,000.

Q    Ms. Munger, are you aware of whether this particular loan did fund?

A    It did fund.

Q    Does that indicate to you that someone must have fulfilled this condition, providing proof of 400 and some thousand dollars for a down payment?

A    Yes.  They would have had to do that in order to fund.

Q    Can you look, please, at Exhibit 627?  Do you recognize this document?

A    Yes.  This would be the HUD-1 settlement statement.

Q    And is this the HUD-1 for the same property in Issaquah that we have been talking about?

A    Yes, it is.

Q    Now, why did Green Point Funding get a copy of the HUD-1 settlement statement?

A    Escrow provides us on every loan that we do -- it verifies what the breakdown of what the purchase price is, taxes, insurance that are paid, how much money the borrower needs to bring in and any liens against the house.  It verifies the seller paid off what they needed to do.

Q    And, again, what does this document represent was the purchase price?

1    A    It has a purchase price of $2 million.

2    Q    Ms. Munger, have you, prior to today, reviewed a summary

3    chart that summarizes the information that was submitted to Green

4    Point Funding on which it based its decision to loan this money

5    for property number six on the chart?

6    A    Yes, I have.

7    Q    And can you look, please, at Exhibit 601?  Is this the chart

8    that you reviewed earlier?

9    A    Yes, it is.

10   Q    And does 601 accurately summarize the information from the

11   documents that you have reviewed that Green Point Funding relied

12   upon when making its decision to extend the loan for property

13   number six?

14   A    Yes, we did.

15            MS. VOGEL:  Move the admission of 601.

16            THE DEFENDANT:  No objections, your Honor.

17            THE COURT:   601 is admitted.

18            (601 admitted.)

19   By Ms. Vogel:

20   Q    I want you to look at Exhibit 606.  Can you tell us how a

21   loan by Green Point Funding is secured?

22   A    It is secured by a deed of trust against the property.

23   Q    And is this document, Exhibit 606, in fact the deed of trust

24   that was recorded to secure Green Point's first mortgage extended

25   for this property in Issaquah?

A    Yes, it was.

Q    And if we look on the second page of this document, does it list the amount of the mortgage?

A    Yes, it does.

Q    And that is $1,406,250; is that correct?

A    Correct.

Q    Now, you stated earlier that you required owner occupancy. How does Green Point Funding define owner occupancy?

A    Owner occupancy is actually defined --  It is attached to this mortgage on the occupancy rider.  The person must live in the property, they have to move in within 60 days of taking the loan, and they have to live there for at least one year from that timeframe.

Q    And if you would look, please, at page 22 of this exhibit, the deed of trust.  Is this the occupancy rider that you just referred to?

A    Yes, it is.

Q    And this is actually the one recorded for this Issaquah property, property number six; is that correct?

A    Correct.

Q    And where is it on this rider that defines occupancy or principal residence?

A    Paragraph 1.

Q    Is that where it says, "The above described property will be personally occupied by the borrower as their principal residence

1   within 60 days after execution of the agreement, and shall

2   continue to occupy the property as their principal residence for

3   at least one year"?

4   A   Yes, it is.

5   Q   Let's look at the second page.  Who is it that Green Point

6   Funding requires to sign these occupancy riders?

7   A   Alexis Ikilikyan did because she was the borrower, and

8   William Poff would have had to, as he is her husband -- or was

9   her husband.

10   Q   Now, let's go back to Exhibit 601, please.  Ms. Munger,

11   assume for a moment that instead of the $2 million purchase price

12   that is listed here, as it was listed in the documents provided

13   to Green Point Funding, the real purchase price was only

14   $1.3 million.  Would that have affected Green Point's decision to

15   fund this loan?

16   A   Yes.  Everything would have been based off the lower purchase

17   price.

18   Q   And by "everything," what do you mean?

19   A   We would have lent on a lower loan amount.  We would not have

20   lent on a 2 million value.  We would have lent off the

21   1.3 million value.

22   Q   And if the borrower's employment, finances and assets were

23   inflated or otherwise inaccurate, as listed on the loan

24   application, would that have affected Green Point Funding's

25   decision to fund this loan?

1  A     Yes.   Because that would have changed our decision on their

2  ability to pay back this loan.

3  Q     And if, assume for a moment, there was no $407,105 down

4  payment, and, in fact, no down payment at all, would that have

5  affected Green Point Funding's decision to fund this loan?

6  A     Yes, because, again, we require the borrower to have a vested

7  interest in the property.

8  Q     And if the borrower or her husband, in fact, did not intend

9  to reside there, would that have affected the decision?

10  A     Yes, it would have.

11  Q     And how would that have affected it?

12  A     If they did not intend to live there, this would have been

13  lent on a property as a nonowner-occupied, which would have

14  lowered the loan amount that we would have lent on it.

15  Q     Can you look, please, at Exhibit 609, previously admitted as

16  a public record.  Do you recognize this document?

17  A     This would be a notice of trustee sale on the deed, meaning

18  the property is being foreclosed on.

19  Q     Is that a trustee's notice for the property we have been

20  discussing, 9488 199th Avenue Southeast?

21  A     Yes, it is.

22  Q     And what does this indicate to you?

23  A     That the loan was not paid, so they are taking and

24  foreclosing on the home.

25  Q     And somewhere within this document does it indicate how much

1   was still owed to Green Point Funding or its successor in

2   interest on this $1.4 million loan at the time this notice was

3   filed?

4   A    I believe it is page 2 under paragraph 4.

5   Q    And what is that amount?

6   A    $1,449,688.86.

7   Q    And how is it that can be higher than the original principal

8   balance?

9   A    The type of loan they took out is called a negative

10  amortization loan, so they paid a minimum payment, which did not

11  always cover the amount of interest that was due.  So that was

12  added on to the balance.

13              MS. VOGEL:  No further questions.

14              THE COURT:  Mr. Poff.

15                        CROSS-EXAMINATION

16  By the Defendant:

17  Q    Good afternoon, ma'am.

18  A    Good afternoon.

19  Q    In your stated income program that your company had, they

20  didn't verify any of the income that was stated on the loan

21  applications?

22  A    No.  The stated income means just that, they state what their

23  income is and we just have to verify they actually have that job.

24  Q    Could I see Exhibit 606.23?  Ma'am, on this signature page of

25  the deed of trust, if that was a forged signature, would that

1    substantially affect the proper disclosure of that form as far --

2    in regards to William S. Poff?

3    A    Yes.  Escrow would have been the one to verify who signed

4    that document.

5    Q    Can I see Exhibit 609?  On this notice of trustee sale it

6    says, towards the bottom, "To Rainier Title as trustee to secure

7    an obligation in favor of Mortgage and Electronic Registration

8    Systems, Incorporated as the beneficiary."  Do you have any

9    experience with the MERS system?

10   A    That is actually pretty much almost any deed of trust.  It

11   has to do with when they take and transfer it over to somebody.

12   In this particular case, in a trustee sale, you generally

13   transfer your interest to the people who are doing the actual

14   collecting.

15   Q    To your knowledge, has there been considerable problems with

16   the foreclosure processes in regards to the MERS system?

17   A    I could not speak to that.

18         THE DEFENDANT:  Thank you, ma'am.  That concludes my

19   questions, your Honor.

20         THE COURT:  All right.  Any redirect?

21         MS. VOGEL:  None, your Honor.

22         THE COURT:  You may step down.

23         MS. VOGEL:  May this witness be permanently excused?

24         THE COURT:  Mr. Poff, may we excuse the witness?

25         THE DEFENDANT:  I am finished, your Honor.

| | |
|---|---|
| 1 | THE COURT:  That means you don't have to come back. |
| 2 | MR. SCOVILLE:  The government calls Sharon Kirkdoffer. |
| 3 | Whereupon, |
| 4 | SHARON KIRKDOFFER |
| 5 | Called as a witness, having been first duly sworn, was examined |
| 6 | and testified as follows: |
| 7 | THE CLERK:  Will you please state your full name and |
| 8 | spell your last name for the record? |
| 9 | THE WITNESS:  Sharon Kirkdoffer.  The last name is |
| 10 | spelled K-I-R-K-D-O-F-F-E-R. |
| 11 | DIRECT EXAMINATION |
| 12 | By Mr. Scoville: |
| 13 | Q    Good afternoon. |
| 14 | A    Hello. |
| 15 | Q    Ms. Kirkdoffer, where do you live? |
| 16 | A    4922 North Highland Drive East in Bonnie Lake, Washington. |
| 17 | Q    Take a look at the chart mounted on the easel in front of |
| 18 | you.  Are you familiar with any of the transactions described on |
| 19 | the chart? |
| 20 | A    Yes, number eight. |
| 21 | Q    How are you familiar with that transaction? |
| 22 | A    We built and owned that home. |
| 23 | Q    I want to show you an exhibit that is already in evidence, |
| 24 | Exhibit 800.  Do you recognize that house? |
| 25 | A    Yes, that is the home we built. |

1   Q   **You said you built it?**

2   A   **Yes, we had it built.**

3   Q   **And when did you have it built?**

4   A   **In 1980.**

5   Q   **How long did you live there?**

6   A   **Until -- 24, 25 years.**

7   Q   **Until you sold it?**

8   A   **Correct.**

9   Q   **Who was your real estate agent when you sold it?**

10   A   **Sue Donaldson at Prudential.**

11   Q   **Who did you ultimately sell the house to?**

12   A   **It is a difficult name.  Harutyunyan.**

13   Q   **When did the sale close, Ms. Kirkdoffer?**

14   A   **It closed in early March of 2007.**

15   Q   **Did you ever meet Mrs. Harutyunyan during the negotiations?**

16   A   **No.**

17   Q   **Who was it that you dealt with during those negotiations?**

18   A   **Our real estate agent.**

19   Q   **Mrs. Donaldson?**

20   A   **Yes.**

21   Q   **During the negotiations, did you gain any sort of**

22 **understanding of what Ms. Harutyunyan was planning to do with the**

23 **house?**

24   A   **It was my understanding that she was going to have it as a**

25 **primary residence.**

1  Q   Was that important to you?

2  A   Very much so.

3  Q   Why?

4  A   Because that is a very special area with wonderful neighbors,

5  and I wanted it to go to somebody that would really enjoy being

6  in that neighborhood.

7  Q   Mrs. Kirkdoffer, at some point when you were negotiating this

8  purchase and sale, was Mrs. Harutyunyan's credit run?

9  A   Our realtor did send us some things with a credit score.

10  Q   For Mrs. Harutyunyan?

11  A   Yes.

12  Q   And did you consider that information in deciding whether or

13  not to go forward with the deal?

14  A   Definitely.

15  Q   Why?

16  A   Because it made us feel that she would be able to actually

17  purchase the home.

18  Q   What was it in particular about the credit report that made

19  you feel that way?

20  A   Well, all three agencies, one was over 700 -- the scores, and

21  two were in the high six hundreds.

22  Q   Was there anything you remember about her assets?

23  A   Yes, there was one thing.  We were told that possibly the

24  scores that were in the six hundreds were because she owned

25  several properties.

Q    And how did that make you feel, seeing that she owned several properties?  How did that influence your decision?

A    Well, I felt that she had the finances to do that.

Q    Mrs. Kirkdoffer, was seller financing part of the deal that was negotiated?

A    Yes, it was.

Q    And what were the terms of the seller financing that was negotiated, as you recall them?

A    Well, that a first mortgage would be at a bank, and that we would hold the second for the amount that we did.  Would you like the amount?

Q    Yes.

A    It was for $305,000.

Q    Take a look at Exhibit 815, which is already in evidence.  It is going to magically appear on the screen in front of you.  We will zoom in to make it easier on your eyes.

Do you recognize this document?

A    Yes.

Q    And what is this?

A    It is the counteroffer addendum to the real estate purchase and sale agreement.

Q    Is this something that became part of the final deal?

A    Yes, it was.

Q    What does it indicate, as far as the amounts of the financing that you and your husband were going to give?

1   A   That we would carry the balance of $305,000.

2   Q   And how was that going to be paid?

3   A   That was going to be paid over 60 months or approximately

4   five years.  And we would be paid interest only up until the time

5   of the five years, at which time we would have a balloon payment

6   and it would all be paid off.

7   Q   When did the topic of seller financing first come up in your

8   negotiations?

9   A   Around January, I think.  The end of January.

10  Q   Do you have any understanding of the reason why seller

11  financing was sought?

12  A   Yes.  Because it was my understanding that they were okayed

13  for a loan for the 900 and some thousand, and that the additional

14  we would carry.

15  Q   Ms. Kirkdoffer, I would like you to take a look at

16  Exhibit 814a.

17      Madam Clerk, I would appreciate it if you would show her the

18  original of that document.

19      I am going to ask you to take a look at the original

20  hardcopy.

21  A   What was the number?

22  Q   814a.  First I will ask you to look at it and tell me if you

23  recognize it.

24  A   Yes, I do recognize that.

25  Q   And what is it?

```
 1   A   It is a seller financing agreement.

 2   Q   Is this something that you received in the course of closing

 3   the deal?

 4   A   Yes, it was.

 5   Q   Who did you receive it from?

 6   A   Micki Thompson from escrow.

 7   Q   Did you receive it at the time of closing?

 8   A   Yes.

 9   Q   And is this something that was provided to you, and on which

10   you relied on in closing out the transaction?

11   A   Yes.

12           MR. SCOVILLE:  The government offers Exhibit 814a.

13           THE DEFENDANT:  No objections.

14           THE COURT:  The exhibit is admitted.

15           (814a admitted.)

16   By Mr. Scoville:

17   Q   Ms. Kirkdoffer, I want you to look at the very last paragraph

18   of Exhibit 814a entitled "Waiver."  And I want to direct your

19   attention to the language that states, "Both parties understand

20   this is a separate transaction from the purchase and financing of

21   the property described above."  Do you see that language?

22   A   Yes, I do.

23   Q   Was that your understanding, that this was a separate deal

24   for seller financing?

25   A    I wasn't aware that it was a separate document.
```

1  Q    How did you view the seller financing, as being separate from

2  the purchase and sale or as being part of the purchase and sale?

3  A    Part of the purchase and sale.

4  Q    Was it ever explained to you in your negotiations that you

5  were actually going to separate out the seller financing from the

6  purchase and sale?

7  A    Definitely not.

8  Q    Ms. Kirkdoffer, I am going to keep 814a up on the screen.

9  Next to it I will place 814, which is already in evidence as a

10 Great American Escrow business record.  First let's focus on the

11 paragraph in the two respective documents entitled "Note and deed

12 of trust."  In the exhibit on the right, 814, do you see the

13 language stating, "Seller is aware that two loans may be needed

14 before this loan"?

15 A    I see it.  I hadn't seen it before.

16 Q    Is that language in Exhibit 814a a copy of the seller

17 financing agreement that you took home from escrow?

18 A    No, it was not.

19 Q    Ms. Kirkdoffer, did you sign two seller financing agreements

20 at escrow or did you just sign one?

21 A    One.

22 Q    Ms. Kirkdoffer, were you made aware that two loans might be

23 needed before your seller financing loan?

24 A    Definitely not.

25 Q    What was your understanding your position would be relative

1   to any other financing being in the transaction?

2   A    Second.

3   Q    Was that important to you?

4   A    Yes.

5   Q    Why?

6   A    Because it helped guarantee our loan.

7   Q    Ms. Kirkdoffer, now I would like you to take a look at

8   Exhibit 819, also previously in evidence, a Great American Escrow

9   record.  Do you recognize this document, Ms. Kirkdoffer?

10  A    No.

11  Q    Did you sign this?

12  A    That's my signature, but I didn't -- I wouldn't have signed

13  that.

14  Q    Why do you say you wouldn't have signed it?

15  A    Because it gives them -- we agree to do a loan to her after

16  the purchase was closed.

17  Q    Is that something you remember agreeing to?

18  A    Definitely not.

19  Q    Is it something you would have agreed to?

20  A    No.

21  Q    Let's take a look at the dates in particular,

22  Mrs. Kirkdoffer.  Is that date written in your handwriting?

23  A    No.

24  Q    Are you familiar with your husband's handwriting?

25  A    Very definitely.

1   Q    Is that date written in his handwriting?

2   A    No.

3   Q    This document bears the date of March 13th, 2007.  The seller

4   financing agreements that we previously saw, 814 and 814a, bear

5   the date of March 6th, 2007.  Ms. Kirkdoffer, I want to ask you,

6   in March of 2007, how many times did you go to Great American

7   Escrow to close this deal?

8   A    I believe once.

9   Q    Do you recall any reason why you would have needed to go back

10  a week after you signed the closing documents the first time?

11  A    No.

12  Q    At the time of the closing, Ms. Kirkdoffer, who was there?

13  A    Micki Thompson and my husband and myself.

14  Q    At that time did you express any concern about whether you

15  would be paid back the $305,000 that you were loaning?

16  A    Yes.

17  Q    Do you recall what the escrow agent, Micki Thompson, said in

18  response?

19  A    She set it up so if the payments were late we would

20  receive -- they would pay a penalty for being late.  So she

21  didn't seem to think it was a problem.  She also said that they

22  had other properties, and so we felt fairly secure that we would

23  have that note secured.

24  Q    Did Ms. Thompson say anything to you about the buyer,

25  Ms. Harutyunyan?

1    A    Yes, because I had not yet met her.  Micki assured me she had

2    met her and she was very nice.

3    Q    Mrs. Kirkdoffer, are you still receiving payments on your

4    $305,000 seller-carried note?

5    A    No.

6    Q    When did you stop receiving payments?

7    A    In May of 2007.

8    Q    At some point, Ms. Kirkdoffer, did you become aware that the

9    house had gone into foreclosure?

10   A    Yes, we received information.

11   Q    Did you ever receive any money from the foreclosure sale,

12   Ms. Kirkdoffer?

13   A    No.

14          MR. SCOVILLE:  No further questions.

15          THE COURT:  Mr. Poff.

16                    CROSS-EXAMINATION

17   By the Defendant:

18   Q    Good afternoon, ma'am.

19   A    Hello.

20   Q    Could I see Exhibit 814 and 814 alpha.  814 and 814 alpha,

21   the signature portions.  If you could put them both up and place

22   them side by side?

23          Now, ma'am, you said you only went to escrow once to sign

24   documents at Great American, correct?

25   A    It might have been twice, like the 6th or 7th.  We didn't go

back a week later.

Q    Before, the plaintiffs were discussing with you that these were actually two different documents.  The one didn't have the same disclosures as the other document?

A    I never received the one that had --  Well, you have a copy of the one I received.

Q    I'm sorry, ma'am?

A    I believe you have a copy of the one I received.  It is the one that stated the balance would be paid 60 months from the date of closing.

Q    When you say "you," who are you referring to, ma'am, as far as receiving the document?

A    That's the only one I am aware of.

Q    You said someone had received a document, and you said "you." Who had received the document?  Are you referring to myself, Mr. Poff?  I was confused who that was, that's all.

A    I don't know.

Q    Let me back up one second.  Who was it that you had given the document to before?  Who was that you were referring to?

A    We received this from the escrow agent.  We signed it there.

Q    And that's who you were talking about, escrow had received the document?

A    (Witness nodding.)

Q    Okay, ma'am.  This is obviously two different documents, but it appears to be the exact, to the smallest degree, signatures.

1    Does that look like --

2    A    That is my signature.

3    Q    That is your signature on both documents?

4    A    That's correct.  But I never signed the one that said --

5    Q    Could you put the whole document up?  Does that help, ma'am,

6    right there?

7    A    There is a big difference here that I definitely would have

8    noticed.  On the Exhibit 814a it states, "The entire balance of

9    principal and interest shall be due and payable 60 months from

10   the date of closing."  That's what we agreed to.

11   Q    So these are two different documents?

12   A    I don't know where this one came up with 26 months.  That was

13   never a part of this negotiation.

14   Q    So it would be safe to assume these are two different

15   documents then?

16   A    They are.

17   Q    Could you go back to the signature portion on both of these

18   pages?  Now, on these two different documents, except for the

19   spacing where -- it appears to be your husband, Charles, where he

20   had signed on one document, and he had signed on another.  It

21   appears the spacing was --

22   A    Those appear to be the same signatures.  In looking at them,

23   they are the same signatures, but he signed once.

24   Q    So would it be safe to say that your signature was cut off of

25   one document and probably photocopied onto another?

```
 1    A    I don't know how it got there.  I know which one I signed.
 2              THE DEFENDANT:  Thank you, your Honor.  That's it.
 3              THE COURT:  Thank you, Mr. Poff.  Redirect?
 4              MR. SCOVILLE:  No questions, your Honor.
 5              THE COURT:  You are excused.  Thank you very much.  The
 6    government calls William Kim.
 7    Whereupon,
 8                            WILLIAM KIM
 9    Called as a witness, having been first duly sworn, was examined
10    and testified as follows:
11              THE CLERK:  Will you please state your full name and
12    spell your last name for the record?
13              THE WITNESS:  William Kim, last name K-I-M.
14                         DIRECT EXAMINATION
15    By Mr. Scoville:
16    Q    Good afternoon, sir.
17    A    Good afternoon.
18    Q    What city do you live in?
19    A    I live in Chino Hills, California.
20    Q    And where do you work?
21    A    I work for Just Mortgage located in Rancho Cucamonga,
22    California.
23    Q    How long have you worked for Just Mortgage?
24    A    It has been about seven, eight years so far.
25    Q    What is your job there?
```

```
 1   A    I am the chief credit officer.  Also I am the vice-president
 2   of the company.
 3   Q    And what are your responsibilities as chief credit officer
 4   and vice-president?
 5   A    I am overseeing the operation.  At the same time, I am doing
 6   quality control with the files too.
 7   Q    How long have you held those positions?
 8   A    About four years.
 9   Q    Did you hold those positions in 2007?
10   A    Yes.
11   Q    What are your responsibilities?
12   A    My responsibility is, again, overlooking the whole operation
13   of the company.  But at the same time, if there is any problem
14   with the files and stuff like that, then I do the quality control
15   on the file.
16   Q    Mr. Kim, are you familiar with the types of loans that Just
17   Mortgage offers?
18   A    Yes.
19   Q    And what types of loans are those?
20   A    The ones that relate to the file or pretty much everything we
21   are offering?
22   Q    All together.
23   A    Back then we did paper loans, which the borrower has a good
24   credit score.  We also did outtakes, which has a minimum FICO
25   score between 620 to 680.  We offered different kind of
```

```
 1    documentation type, such as stated income, no ratio.  We also had
 2    a no doc back then.
 3 Q  I want to ask about the no ratio product that you offered.
 4 A  Sure.
 5 Q  Is that a product you offered in 2007?
 6 A  Yes, we did offer no ratio in 2007.
 7 Q  And what is a no ratio loan?
 8 A  No ratio loans -- there is different information the borrower
 9    needs to disclose in order to get the loan.  No ratio --
10    typically no ratio, as long as you have a job and assets, we
11    don't ask for how much income the borrower is making.
12 Q  What do you verify then with respect to a no ratio loan?
13 A  We verify employment, sometimes by calling them or getting
14    information from online.  We also verify asset information, too.
15 Q  Mr. Kim, take a look at the chart that is mounted on the
16    easel in front of you, which we have marked as Exhibit 1 in this
17    trial.  Are you familiar with any of the transactions described
18    in that chart?
19 A  The last one, with the property address located at 27419 8th
20    Avenue South.  I believe that's the loan that we did back in
21    2007.
22 Q  And when you say that is the loan we did, what do you mean?
23 A  We lend them money for the borrower.  As far as I remember,
24    there was a first and second related to that transaction.
25 Q  And do the amounts listed on that chart accurately reflect
```

1   the financing that Just Mortgage extended in 2007 in connection

2   with transaction number eight?

3   A   Yes.

4   Q   Have you reviewed records of Just Mortgage regarding the

5   financing that was extended?

6   A   Yes, I did.

7   Q   Mr. Kim, let's take a look at Exhibit 809, previously

8   admitted as a Just Mortgage business record.  What is this

9   document, sir?

10  A   This is a final application called a 1003.  That is the name

11  of the form.

12  Q   Is this something that Just Mortgage relied upon in deciding

13  to extend the financing?

14  A   Yes, it is.

15  Q   Mr. Kim, what was Just Mortgage told about the identity of

16  the borrower?

17  A   Can you repeat that question again?

18  Q   Sure.  According to Just Mortgage's records, who was the

19  borrower supposed to be?

20  A   The borrower was Armenuhi Harutyunyan.  Sorry about that.

21  Q   Harutyunyan?

22  A   Harutyunyan.

23  Q   Mr. Kim, would it have made a difference to Just Mortgage if

24  someone else had actually agreed to make the payments on behalf

25  of Ms. Harutyunyan, and was merely using her name?

1    A    It does make a big difference.

2    Q    Why does it make a big difference?

3    A    Because we were lending the money to the borrower based upon

4    the borrower's information.  If there was somebody else making

5    payment for the borrower, obviously that is something that we

6    need to consider.  We need to review the entire document with

7    that person at the same time.  Without knowing the information

8    for the people who is actually making borrower (sic), it makes a

9    difference.

10   Q    Mr. Kim, from looking at Exhibit 809, can you tell us what

11   was Just Mortgage told about the borrower's intended use for the

12   property?

13   A    We were doing this loan based on primary residence.

14   Q    What does primary residence mean to Just Mortgage?

15   A    The borrower will occupy the property after the loan get

16   closed.

17   Q    Is that something that is important to Just Mortgage?

18   A    It is very important, because of the different -- based on

19   different types of occupancy, there is a different guideline that

20   we need to follow.  Obviously risk will be a little bit higher

21   than primary, than if somebody is buying a property as a second

22   home or investment.  There is more risk factors if it is not a

23   primary residence.

24   Q    Why is it more risky if someone is buying the home as an

25   investment property as opposed to a primary residence home?

A    There is a tendency if something goes bad, for example, if the borrower lost employment, things like that, it has more tendency that borrower is going to default on the payment for the investment property.  So that's why we need to follow different guidelines, to make sure the borrowers qualify for investment property.

Q    Is there any difference in the interest rates that Just Mortgage required to be paid for primary residence loans as opposed to investment property loans?

A    As I mentioned before, there is more risk factors on investment property.  Obviously risk is going to be higher than primary.

Q    Does that affect then the interest rate as well?

A    Yes.  The rates are higher -- interest rates are higher than primary residence.

Q    For investment property loans, is that what you meant to say?

A    Yes.

Q    Mr. Kim, would it have made a difference to Just Mortgage if you were told that, in fact, Ms. Harutyunyan did not intend to occupy this property as her primary residence?

A    Of course.

Q    And why?

A    If we knew or if the borrower is not going to live at the property as a primary residence, again, there is more risk factors, and we need to follow different guidelines.  The

1   interest rates are going to be higher than normal -- not normal,

2   but primary.  It does make a huge difference.

3   Q    Let's look now at the second page of Exhibit 809.  Looking at

4   that page, can you tell us what Just Mortgage was told about

5   where Ms. Harutyunyan was employed?

6   A    She was self-employed at the company called Hay Computer

7   Networking for four years.

8   Q    Directing your attention further down the page to the income

9   section, which appears to be blank.  Can you tell us why it is

10  blank?

11  A    As I mentioned again -- before, it was a no ratio type

12  documentation loan.  The borrower or broker who actually sent the

13  file to us didn't have to disclose the income on the application.

14  Q    Did you require income to be disclosed in connection with

15  this loan?

16  A    No, we don't require it.

17  Q    Did you require some information to be provided about

18  employment?

19  A    We pull out the public information about the job, making sure

20  that the company belongs to the borrower, for how long.

21  Typically we would be asking for two months of employment history

22  for that.

23  Q    You said "two months"?

24  A    I'm sorry.  Two years.

25  Q    Let's look at Exhibit 810, also previously admitted as a Just

1  Mortgage business record.  What is this?

2  A    This is the information that we retrieved from a database

3  online to make sure that the business is there, and it actually

4  belongs to the borrower.

5  Q    If you weren't requesting any disclosure of income, why did

6  you bother verifying the business?

7  A    Stability of the income.  Just make sure that the borrower

8  owns the business for two years, and making sure that he is --

9  based on information that they are verifying -- or based on

10  information they are giving to us saying that they are

11  self-employed, have a business.  It is very important for us to

12  make sure that there is some kind of income stability.  The

13  borrower has to make a payment on time.

14  Q    Assume that, in fact, Ms. Harutyunyan did not have this

15  business, and that this business, Hay Computer Networking and

16  Consulting, did not exist.  Would that have made a difference to

17  Just Mortgage?

18  A    It does make a big difference.

19  Q    Why?

20  A    We don't have the stability of income now.

21  Q    Mr. Kim, from your review of the file, can you tell us, was

22  Just Mortgage made aware of any separate financing being provided

23  by the seller in connection with the transaction?

24  A    Not that I know of.

25  Q    Take a look at Exhibit 811, also previously admitted as a

1   Just Mortgage business record.  Can you tell us what this is?

2   A    It is a sales contract, the purchase contract between seller

3   and buyer.

4   Q    And have you previously looked through Exhibit 811 --

5   A    Yes, I did.

6   Q    -- to see whether there was any seller financing mentioned in

7   it?

8   A    I couldn't find any other information, as far as the seller

9   financing information, other than seller contribution.

10  Q    What do you mean "other than seller contribution"?

11  A    Well, there is seller contribution.  I guess the borrower and

12  seller agrees that the seller will pay a certain amount of money

13  to the borrower to cover the closing costs.  But there is no

14  supplemental financing or third financing the seller is going to

15  give to the borrower.

16  Q    Let's look at 812.  It was previously admitted as a Great

17  American Escrow record.  Can you tell us what this is, Mr. Kim?

18  A    This is the loan approval that we are sending to the broker

19  and the escrow to let them know that the loan has been approved,

20  and there is a condition prior to doc -- prior to funding

21  condition they need to satisfy in order to complete the

22  transaction.

23  Q    I will zoom in on the bottom half of this approval

24  notification, and direct your attention to condition seven,

25  "Sales contract to be amended to show seller contribution towards

1    buyer cannot exceed NRCC."  Mr. Kim, do you know what NRCC means?

2    A    Not recurring closing costs.

3    Q    What are those?

4    A    Closing costs, that is like title fees, escrow fees, lender

5    fee kind of stuff that is related to the transaction.

6    Q    Assume Just Mortgage had been made aware the seller was

7    agreeing to provide $305,000 in seller financing in connection

8    with this purchase and sale.  Would that have violated condition

9    seven?

10   A    Yes, it does.  Did you say $305,000?

11   Q    Yes.

12   A    Yes, it does.

13   Q    Why is that?

14   A    Because we only allow up to three percent of the seller price

15   or purchase price as a seller contribution.  Or it can be lower

16   if the actual closing cost -- whichever is lower, either three

17   percent of the purchase contract or actual closing costs,

18   whichever is lower.  That is how much we allow seller to pay.

19   Q    What is it that money can be applied towards?

20   A    Less than $40,000, $39,000.

21   Q    Towards what can that be applied?

22   A    Towards the closing costs.

23   Q    Can it be applied towards other things?

24   A    Such as?

25   Q    Or just the closing costs?

1  A   Just the closing costs.

2  Q   Mr. Kim, now I would like you to take a look at 813.  Let's

3  zoom in on the top half of the first page.  This has also been

4  previously admitted as a Just Mortgage business record.  What is

5  this, sir?

6  A   This is called final HUD-1 provided by escrow.

7  Q   Let's take a look at the bottom of this first page.  Do you

8  see the entry entitled "Cash to seller," in the amount of

9  approximately $1,023,000?

10 A   Yes.

11 Q   Assume approximately $300,000 of that was going to the buyer.

12 Would that have affected Just Mortgage's decision?

13 A   One-third of that amount going to the borrower?

14 Q   Yes.  Mr. Kim, I would like you to assume, instead of a

15 million dollars going to the seller, only $700,000 was going to

16 the seller, and $300,000 was going to the buyer.  Would that have

17 affected Just Mortgage's lending decision?

18 A   Of course.

19 Q   Why?

20 A   Because borrower cannot take any money out of the transaction

21 that is coming from the seller.

22 Q   Why is that?

23 A   It is just a guideline that we have in order to make sure

24 there is no relationship or money transaction between seller and

25 buyer other than what we know from the financial -- the final

1    HUD.

2    Q    Why do you care about whether there are hidden side deals

3    between the buyer and seller?

4    A    If there is any kind of side deal or under the table deal,

5    might cause another issue later on, as far as fraud on the loan.

6    So we don't allow those kinds of transactions at all.

7    Q    Finally, Mr. Kim, I would like you to assume that in fact

8    $305,000 was being provided as seller financing on top of the

9    $1 million first loan and $200,000 second loan that Just Mortgage

10   was providing in connection with this purchase and sale for the

11   amount of approximately $1.3 million.  Would that $305,000 amount

12   of seller financing have affected your decision?

13   A    Yes.

14   Q    Why?

15   A    Because it doesn't fit the guideline of how much we can lend

16   to the borrower.

17   Q    Can you explain that?

18   A    There is a certain term that we are using called LTV.  If the

19   loan amount is higher than what the actual purchase price is --

20   Well, it depends on documentation.  But for the typical

21   documentation we don't allow anything more than -- I believe it

22   is either 95 percent or 100 percent of the purchase price.  If

23   there is any kind of sub-financing the buyer is getting from

24   seller, then that makes about 115 percent or 120 percent of loan

25   to value.  That doesn't fit our guideline, and we are not able to

1    lend any money to the borrower if that's the case.

2    Q    Mr. Kim, take a look now at Exhibit 801.  Have you previously

3    reviewed this chart?

4    A    Yes, I did.

5    Q    Does it accurately summarize information on which Just

6    Mortgage relied in making its lending decision?

7    A    Yes.  These are the information that we made the loan.

8              MR. SCOVILLE:  The government offers 801.

9              THE DEFENDANT:  No objections, your Honor.

10             THE COURT:  801 is admitted.

11             (801 admitted.)

12             MR. SCOVILLE:  No further questions.

13             THE COURT:  Mr. Poff, any questions?

14                     CROSS-EXAMINATION

15   By the Defendant:

16   Q    Good afternoon, Mr. Kim.

17   A    Hello.

18   Q    Now, is your company a federally-insured lender?

19   A    We are not.

20   Q    Can I see Exhibit 801, please, the chart?

21             THE DEFENDANT:  My only objection, it says in Count 1,

22   conspiracy to commit bank fraud and wire fraud.  They are not a

23   federally-insured lender.

24             THE COURT:  Didn't we just admit 801 and you agreed to

25   it?

1          THE DEFENDANT:  Yes.  I just noticed that after he said

2     they are not a federally-insured lender, your Honor.

3          THE COURT:  I am not going to change my decision on

4     admission.  It would go to the weight of the document.  Ask your

5     next question.

6          THE DEFENDANT:  That's it.  Thank you, Mr. Kim.

7          THE COURT:  Is the witness excused, Mr. Poff?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  You are excused.  Thank you very much.

10         MR. SCOVILLE:  No redirect, your Honor.

11         THE COURT:  You didn't seem to be springing forth.

12         MS. VOGEL:  At this time we would recall Becky Carnell.

13         THE COURT:  You are still under oath.

14    (BECKY CARNELL)

15    (Continued direct examination)

16    By Ms. Vogel:

17    Q   Ms. Carnell, when we wrapped up on Friday afternoon we had

18    just finished going through the chart -- the summary charts of

19    the financial transactions for property number five on Exhibit 1;

20    is that correct?

21    A   That's correct.

22    Q   And we had looked at individual property summary charts that

23    you had prepared for each of those transactions up through

24    property number five; is that correct?

25    A   That's correct.

1  Q   And could you look, please, just to refresh our recollection,

2  at Exhibit 502?  Is this the summary chart of the financial

3  records for property number five that we looked at at the end of

4  the day on Friday?

5  A   Yes.

6  Q   Also in connection with properties numbers three, four and

7  five on Exhibit 1, did you pare down some of the information in

8  the individual summary charts for those three properties and

9  prepare a chart that focuses in on the interconnectivity of those

10  three transactions?

11  A   Yes.

12  Q   And can you look, please, at Exhibit 924?  Is this that

13  chart?

14  A   Yes, it is.

15  Q   And can you explain to us what is included on this chart and

16  where it came from?

17  A   Yes.  These transactions also show up on the individual

18  charts for 302, 402 and 502.  However, only on this chart is the

19  transactions where the financial relationships between each one

20  of those transactions occur.

21  Q   So this pares down or leaves off a lot of the details for

22  each, and leaves in what?

23  A   I'm sorry?

24  Q   It leaves off a lot of the details, but what is left in for

25  this three-way chart?

1   A    What is left is the interconnectivity showing the financial

2   relationships between all three of those transactions.

3   Q    So are all of the financial transactions listed on

4   Exhibit 924 also listed on the individual property summary charts

5   that we just looked at, 302, 402 and 502?

6   A    Yes, they are.

7           MS. VOGEL:  Move the admission of Exhibit 924.

8           THE DEFENDANT:  No objections, your Honor.

9           THE COURT:   924 is admitted.

10          (924 admitted.)

11  By Ms. Vogel:

12  Q    Ms. Carnell, using this chart, can you explain to us how

13  these three purchases, which all took place in the same month and

14  year, were financially connected?

15  A    Sure.  Starting with property number three, which was the

16  first property in August, on August 1st, 2006 --  If we can zoom

17  in on that section right there.  We can see from the proceeds of

18  the sale of 3821 South 345th partially funded the purchase of

19  property number three at 13841 Southeast 138th Street.  When that

20  transaction closed, two checks were distributed and redeposited

21  from the Great American Escrow account for 62,000 and 38,658.09.

22      If we can zoom back out again?  We see the $62,000 follows up

23  to property number four, 2061 311th Avenue South.  That 62,000

24  was, again, redeposited into the Great American Escrow Key Bank

25  account, and partially funded the purchase of number four.  When

1    that property funded, $41,447.81 was distributed and redeposited

2    into that Great American Escrow Key Bank account for the credit

3    to property number five.

4        If we can zoom out once again?  Zooming in on property number

5    five, we see that the $38,658.09 from property number three and

6    the $41,447.81 from property number four are credited towards the

7    down payment of property number five.  Also credited towards the

8    down payment of property number five are the two checks from that

9    property itself, from $9,974.61 and $12,025.39.

10   Q    Let's move to property number six on Exhibit 1.  Did you also

11   prepare a chart summarizing the financial transactions involved

12   in the purchase and sale of this property at 9488 199th Avenue in

13   Issaquah?

14   A    Yes, I did.

15   Q    Can you look, please, at Exhibit 602?  Is this the chart you

16   prepared based on your review of the financial records?

17   A    Yes, it is.

18           MS. VOGEL:  Move the admission of 602.

19           THE DEFENDANT:  No objections, your Honor.

20           THE COURT:  602 is admitted.

21           (602 admitted.)

22   By Ms. Vogel:

23   Q    Using this chart, Ms. Carnell, can you explain to us where

24   the money came from to fund the purchase of this property by

25   Alexis Ikilikyan from David and Joyce Hsu in February of 2007?

A    Yes.  Directing your attention to this box, which we just

zoomed in on, you can see that this purchase was funded with two

loans, the first one from Green Point Mortgage Funding, and the

second from National City Mortgage Company.  The first loan was

funded via wire on February 27th, 2007, in the amount of

$1,417,004.21.  The second loan from National City Mortgage

Company was funded via wire on the same day in the amount of

$187,422.

Q    And for each of those two wire transfers, Ms. Carnell, did

you obtain a Federal Reserve confirming wire transfer document?

A    Yes, I did.

Q    Can you look, please, at Exhibit 646?  Is this the

Federal Reserve -- Fed Wire receipt for the $1,417,004.21 wire

transfer from Green Point Funding to partially purchase this

property?

A    Yes, it is.

Q    And where was that wire received?

A    That wire was received by the Great American Escrow Key Bank

account, ending in 4185.

Q    And can you look, please, at Exhibit 647?  Is this the

corresponding document for the second mortgage for the purchase

of this same property?

A    Yes, it is.

Q    And, again, it shows an incoming wire of $187,422; is that

correct?

1  A   That's correct.

2  Q   And, again, this was received by the Key Bank Great American

3  Escrow account?

4  A   Yes.

5  Q   Let's go back to Exhibit 602.  Did you find any evidence

6  there were any other funds coming in to purchase the remaining --

7  to fund the rest of the purchase of this property?

8  A   No, I did not.

9  Q   Can you tell us, please, based on your review, how were the

10  funds disbursed?

11  A   Yes.  Beginning at the top, we see Great American Escrow

12  check 4625 paid to Alexis Ikilikyan in the amount of $31,806.79.

13  That check was deposited into Ms. Ikilikyan's Washington Mutual

14  account, ending in 3135.  The next box down shows an inter-escrow

15  transfer out of this transaction for credit to escrow number

16  0703002CB in the amount of $100,078.56.  The inter-escrow

17  transfer document said this was paid to Marquin House Jobs.  It

18  went for credit of 7038 South Puget Sound Avenue, which is

19  property number seven on Exhibit Number 1.  The next box down

20  shows a Great American Escrow wire to Armenuhi Harutyunyan in the

21  amount of $120,000.  That amount was deposited into Harutyunyan's

22  Bank of America account, ending in 6733.

23  Q   Can you summarize how the remaining funds were disbursed?

24  A   Yes.  In the green box we show the check to America One

25  Finance, and then a subsequent check from America One Finance to

1   Mr. Reyes' Washington Mutual account, 2957.  And then we see the

2   payoff to John L. Scott in the amount of $10,000, which is the

3   seller's real estate commission, the seller proceeds to David and

4   Joyce Hsu, and then a payoff to Countrywide Home Loans to pay off

5   the Hsu's existing mortgage on the property.

6   Q   Ms. Carnell, what were the total proceeds disbursed from the

7   purchase of this property by Ms. Ikilikyan to any of the 13

8   subject accounts or for the benefit of another purchase on

9   Exhibit 1?

10  A   The total is $251,885.35.

11  Q   How much money did the buyer put into this transaction?

12  A   None.

13  Q   So subtracting zero from that, what was the net profit?

14  A   $251,885.35.

15  Q   I want to focus now on the $100,000 -- I'm sorry, on the

16  $120,000 payment from Great American Escrow to Ms. Harutyunyan's

17  bank account.  Did you also prepare a summary chart detailing

18  that financial transaction?

19  A   Yes, I did.

20  Q   And can you look, please, at Exhibit 925?  Is that the chart

21  that summarizes this particular financial transaction?

22  A   Yes.

23           MS. VOGEL:  Move the admission of 925.

24           THE DEFENDANT:  No objections, your Honor.

25           THE COURT:   925 is admitted.

```
 1              (925 admitted.)
 2    By Ms. Vogel:
 3    Q    Ms. Carnell, using this chart, can you please describe the
 4    financial transaction that is the basis for the substantive money
 5    laundering counts 46 and 62?
 6    A    Yes.  Starting on the left-hand side you can see the proceeds
 7    of the sale -- excuse me, the purchase of 9488 199th Avenue
 8    Southeast.  As part of that transaction, Great American Escrow
 9    wired $120,000 from its Key Bank account ending in 4185 on
10    March 8th, 2007, to Armenuhi's Bank of America account, ending in
11    6673.
12    Q    Now, who was the buyer of the property?
13    A    Ms. Ikilikyan.
14    Q    Was Ms. Harutyunyan involved in that transaction at all from
15    the documents that you have reviewed?
16    A    Only on the HUD.
17    Q    And when you say "only on the HUD," what do you mean?
18    A    It showed up on the HUD as a payoff of a personal note to
19    Armenuhi Harutyunyan.
20    Q    Can you tell us what happened to this $120,000 after it was
21    deposited into Ms. Harutyunyan's Bank of America account, 6733?
22    A    Yes.  A few days after it was deposited into the Bank of
23    America 6733 account, $118,000 was transferred to Ms. Ikilikyan's
24    Bank of America 4089 account.  A few days after that, it was
25    combined with another sum of money, which we are going to see in
```

1  another property transaction, property number eight.  $313,600

2  was then transferred to Ms. Ikilikyan's Washington Mutual 3135

3  account.

4  Q   And can you look, please, at Exhibit 922 first, previously

5  admitted as a Great American Escrow record.  Is this one of the

6  underlying items that you relied upon in summarizing this

7  financial transaction?

8  A   Yes.  But this corresponded with the bank account as well.

9  Q   And can you look, please, at Exhibit 926?  This is the actual

10  bank record showing the $120,000 wire transfer that you just

11  described?

12  A   Yes.  It is the middle transaction.

13  Q   Ms. Carnell, without digging into these actual financial

14  records, how can a person looking at that property transaction

15  have known that this payment of $120,000 that went to Armenuhi

16  Harutyunyan's bank account actually went to the benefit of the

17  buyer, Ms. Ikilikyan?

18  A   You would have to follow the money.  On its face it appears

19  that the money went to Ms. Harutyunyan's bank account, which

20  indeed it did.  However, without following the money and

21  following it to Ms. Ikilikyan's Bank of America account, and then

22  subsequently to Ms. Ikilikyan's Washington Mutual account, you

23  would not know where those funds ended up.

24  Q   And if we could go back, please, to the summary chart for

25  property number six, 602.  I want to focus in on the second box

1   on the right side, "financial records."  This is the inter-escrow

2   transfer of $100,000 to Marquin House Jobs.  Did you also prepare

3   a summary chart for this financial transaction?

4   A    Yes.

5   Q    Can you look, please, at Exhibit 924?  Is this the chart that

6   details this particular financial transaction?

7   A    Yes, it is.

8           MS. VOGEL:  Move the admission of Exhibit 924.

9           THE DEFENDANT:  No objections, your Honor.

10          THE COURT:  924 is admitted.

11          (924 admitted.)

12  By Ms. Vogel:

13  Q    Ms. Carnell, can you please describe this financial

14  transaction that is the basis for the substantive money

15  laundering counts 47 and 63?

16  A    Yes.  This is the Great American inter-escrow transfer from

17  the property that we just saw, property number six, for credit to

18  the purchase of property number seven, located at 7038 South

19  Puget Sound Avenue, in the amount of $100,078.56.  It was

20  credited to property number seven on March 9th, 2007.

21  Q    And can you look, please, at Exhibit Number 928, previously

22  admitted as a Great American Escrow business record.  Can you

23  tell us what this is?

24  A    This is a wire transfer verification from Great American

25  Escrow records, showing the wire transfer or what is supposed to

1   be a wire transfer to Marquin House Jobs for the amount of

2   $100,078.56 on March 9th, 2007.  It says for the memo, "Redo

3   property."

4   Q    Ms. Carnell, based on your review of these records, did you

5   find any indication that Marquin House Jobs was involved in

6   either the sale or the new purchase this was applied to?

7   A    No, they were not.

8   Q    Who was the buyer of the house from which this money came?

9   A    Ms. Ikilikyan.

10  Q    And who is the buyer of the house that this money was then

11  used to purchase?

12  A    Ms. Ikilikyan.

13  Q    And that's based on who's named on the records?

14  A    That's correct.

15  Q    Now, without digging into the actual financial records and

16  the inter-escrow records for both files, how could a person

17  looking at this property transaction have known that this payment

18  to Marquin House Jobs from the proceeds of the Issaquah property

19  actually went to the benefit of the buyer, Ms. Ikilikyan?

20  A    Again, you would not know.  Looking at either side, either

21  the property of 9488, you would see it as a payment out to

22  Marquin House Jobs; if you were to look at the purchase of 7038,

23  and those documents, you would see it as a credit from Marquin

24  House Jobs.  So without examining both records and comparing the

25  two, you would not know.

1    Q    Did you also prepare a summary chart that reviews the

2    financial transactions involved in the refinance of the Issaquah

3    property, property number six on the chart, approximately one

4    month after the purchase?

5    A    Yes.

6              THE COURT:  Counsel, it is 3:00.  Let's take our

7    afternoon break at this time.  We will be in recess until 3:15.

8    (At this time a short break was taken.)

9    By Ms. Vogel:

10   Q    Ms. Carnell, did you prepare a similar financial summary

11   chart for the refinance that occurred in March of 2007 for

12   property number six on Exhibit Number 1?

13   A    Yes, I did.

14   Q    Can you look, please, at Exhibit 641?  Is that the chart you

15   prepared for the refinance?

16   A    Yes, it is.

17             MS. VOGEL:  Move the admission of Exhibit 641.

18             THE DEFENDANT:  No objections.

19             THE COURT:  Admitted.

20             (641 admitted.)

21   By Ms. Vogel:

22   Q    Can you describe for us, please, where the funds came from --

23   how the funds came in from this refinance?

24   A    Yes.  Focusing in on the left-hand side of the financial

25   records box, you see one loan from National City Mortgage

1    Company.  That loan was funded via wire on March 27th, 2007, in

2    the amount of $163,830.83.

3    Q    And did you find the corresponding Fed Wire or Federal

4    Reserve wire transfer confirmation form?

5    A    Yes.

6    Q    Can you look at Exhibit 648?  Is that the federal wire

7    confirmation form for this particular wire transfer?

8    A    Yes, it is.

9    Q    And that's in the amount of $163,830.83; is that correct?

10   A    Yes.

11   Q    And going back to Exhibit 641, please.  Can you explain to us

12   why the loan amount is $350,000, but the wire amount is

13   significantly less than that?

14   A    Yes.  The original second mortgage was also with National

15   City Mortgage Company.  So instead of National City wiring the

16   entire amount of the loan to Great American Escrow, and then

17   Great American Escrow funding the loan back to National City,

18   National City paid off its own loan first and wired the remaining

19   proceeds to the Great American Escrow Key Bank account.

20   Q    And once the funds came into Great American Escrow, how were

21   they disbursed?

22   A    They were disbursed in two sources that were included on this

23   chart.  First, we see the two checks to Great America One Finance

24   (sic), and then a subsequent check from America One Finance, in

25   the amount of $1,047.57, that was deposited into Mr. Reyes'

1    Washington Mutual account, ending in 2957.  The second is a Great

2    American Escrow wire to Alexis Ikilikyan, in the amount of

3    $159,289.03.  And that was wired to Ikilikyan's Washington Mutual

4    account, 3135.

5    Q    Did you also prepare a summary chart summarizing your

6    findings as to the financial transactions surrounding the

7    purchase of property number seven on our chart, that is 7038

8    South Puget Sound?

9    A    Yes, I did.

10   Q    And could you look, please, at Exhibit 702 -- 701.  Is that

11   the chart you prepared?

12   A    Yes.

13            MS. VOGEL:  Move the admission of 701.

14            THE DEFENDANT:  No objections, your Honor.

15            THE COURT:  701 is admitted.

16            (701 admitted.)

17   By Ms. Vogel:

18   Q    Can you tell us, please, where did the money come from for

19   the purchase of this property by Ms. Ikilikyan from the Stepps on

20   March 7th, 2007?

21   A    Yes.  Focusing on the left-hand side, there were two sources

22   of funds in order to purchase this property.  The first, on the

23   top, we see the amount of $100,078.56.  We previously saw this on

24   property number six, 9488 199th Avenue Southeast.  Those were

25   funds credited for Marquin House Jobs for credit to this purchase

1   right here.  The second amount, the 1,779.77, we will actually

2   see in property number eight, the property located at 27419 8th

3   Avenue South.  Proceeds from that purchase were credited towards

4   this purchase here on March 7th, 2007.

5   Q    And how were the funds disbursed?

6   A    The funds were disbursed all to the sellers, William Stepp,

7   Kathy Resop and Rich Stepp.

8   Q    Now focusing in on the $1,779.77 check that you just

9   discussed, did you also prepare a chart detailing that particular

10  financial transaction?

11  A    Yes.

12  Q    And can you please look at Exhibit 929 -- 930?  Is that the

13  chart that you prepared?

14  A    Yes, it is.

15          MS. VOGEL:  Move the admission of 930.

16          THE DEFENDANT:  No objections, your Honor.

17          THE COURT:  930 is admitted.

18          (930 admitted.)

19  By Ms. Vogel:

20  Q    Can you please describe in more detail this financial

21  transaction that is the basis for the substantive money

22  laundering Count 48?

23  A    Yes.  This is Great American Escrow check 46251 from Key Bank

24  4185, representing the proceeds of property number eight at 27419

25  8th Avenue South.  This check was payable to Great American

1   Escrow, FBO Armenuhi Harutyunyan, and was redeposited into the

2   same Great American Escrow account, Key Bank 4185, on March 13th,

3   2007, for credit to property number seven, located at 7038 South

4   Puget Sound Avenue.

5   Q   And if we could look back, please, at Exhibit 701, the

6   summary chart?  On the top left-hand side we have that $100,000

7   payment to Marquin House Jobs that we just saw before the break.

8   That is the same financial transaction; is that correct?

9   A   Yes, it is.

10  Q   Can you look, please, at Exhibit 929?  These are previously

11  admitted as Great American Escrow business records.  Do you

12  recognize this document?

13  A   Yes.  This is a disbursement worksheet found in the Great

14  American Escrow records.

15  Q   And what does this disbursement worksheet show, as far as

16  where the funds came from to purchase this property?

17  A   The two sums of money that we just looked at on the previous

18  chart, under receipt you see $100,078.56 from Marquin House Jobs,

19  and the $1,779.77 from Alexis Ikilikyan.

20  Q   And anywhere on these receipts, Ms. Carnell, did you find any

21  notations that that $100,000 payment that went to purchase this

22  property came from the previous purchase that Ms. Ikilikyan was

23  the seller?

24  A   No.

25  Q   Did you also prepare a summary chart detailing the resale of

1   this same property, property number seven?

2   A   Yes, I did.

3   Q   And can you look, please, at Exhibit 715?  Is that the chart

4   that you prepared on this subject?

5   A   Yes.

6           MS. VOGEL:  Move the admission of 715.

7           THE DEFENDANT:  No objections, your Honor.

8           THE COURT:  715 is admitted.

9           (715 admitted.)

10  By Ms. Vogel:

11  Q   When was it that this property was sold?

12  A   On August 14th, 2008.

13  Q   And when it was sold, how were the funds disbursed?

14  A   First we have on the top a Great American Escrow wire in the

15  amount of $35,000 payable to Modra.  That was deposited into Ina

16  Delgado-Garcia's Bank of America account, ending in 9575.  Next

17  we have a Great American Escrow check payable to Dove Realty, and

18  the subsequent Dove Realty check payable to Tony Reyes in the

19  amount of $4,122.96.  That was deposited in Mr. Reyes' Washington

20  Mutual 2957 account.  In the orange we see a Great American

21  Escrow wire to T&K Investments in the amount of $54,924.  That

22  was deposited into Investments' Bank of America account, ending

23  in 7671.  And in the blue we have Great American Escrow wire to

24  The Plantation, LLC in the amount of $46,394.32.  That was

25  deposited into The Plantation Washington Mutual account, ending

1   in 1314.

2   Q   Based on your earlier review of the 13 subject bank accounts

3   that you focused on in this part of the investigation, who is the

4   person that is associated with The Plantation Washington Mutual

5   account?

6   A   Alexis Ikilikyan.

7   Q   And based on your review of the financial transactions

8   involving this T&K Investments account, who is the person that

9   was using that account at that time period?

10  A   Well, Roger and Tamara Hall were the signers on the account.

11  In other words, I understood from the records that wire was for

12  the benefit of Mr. Poff.

13  Q   And can you look, please, at Exhibit 933, previously admitted

14  as a Key Bank business record.  Does this exhibit confirm the

15  wire transfers to The Plantation, LLC account, and to the T&K

16  Investments account that you just described?

17  A   Yes.  The T&K Investments wire is the second wire.  And The

18  Plantation, LLC is that wire right there, the $46,394.32.

19  Q   And what is your understanding of where this T&K Investments

20  account was located?

21  A   It is located in Michigan, formerly LaSalle Bank Midwest,

22  however, changed to a Bank of America account.

23  Q   And then based on your review of these documents, would that

24  wire transfer have constituted an interstate wire transfer from

25  the State of Washington to the State of Michigan?

1  A   Yes.

2  Q   Let's focus now on the last property on our chart, Exhibit 1.

3  Did you also prepare a visual summary chart of the financial

4  transactions involved in the purchase of that property?

5  A   Yes.

6  Q   And can you look, please, at Exhibit 802?  Is that the chart

7  that you prepared?

8  A   Yes, it is.

9          MS. VOGEL:  Move the admission of 802.

10          THE DEFENDANT:  No objections, your Honor.

11          THE COURT:  802 is admitted.

12          (802 admitted.)

13  By Ms. Vogel:

14  Q   Can you please tell us, using this chart, where the funds

15  came from for the purchase of this property by Ms. Harutyunyan?

16  A   Yes.  This property was funded with two loans, both from Just

17  Mortgage, Inc.  The first loan was funded via wire on March 12th,

18  2007, in the amount of $999,588.33, into the Great American

19  Escrow Key Bank account, ending in 4185.  The second loan, also

20  from Just Mortgage, Inc., was funded the same day, March 12th,

21  2007, in the amount of $199,705, also into the Great American

22  Escrow Key Bank account, ending in 4185.  There was also a seller

23  credit in the form of a seller-carried note from Charles and

24  Sharon Kirkdoffer in the amount of $305,000.

25  Q   Going back to the wire transfers momentarily.  For those two

1  particular wires, did you obtain and confirm with the Federal

2  Reserve's original bank records that those two wire transfers had

3  occurred?

4  A   Yes.

5  Q   And did you confirm that they were sent through the Federal

6  Reserve Fed Wire system?

7  A   Yes.

8  Q   And can you look, please, at Exhibit 823?  Is that the

9  Federal Reserve confirming wire receipt for the $999,588.33 wire

10  transfer that you just described?

11  A   Yes.

12  Q   And look, please, at Exhibit 824.  Is that the confirming

13  document for the smaller of the two wire transfers that you just

14  described?

15  A   Yes, it is.

16  Q   And were both of those received by the Great American Escrow

17  business account?

18  A   Yes, ending in 4185.

19  Q   Go back, please, to Exhibit 802.  Tell us, please, how these

20  funds were disbursed?

21  A   In the top two green boxes we see the total of $433,248.46

22  distributed to Mr. Reyes.  The top box represents his commission

23  from America One Finance.  The second box represents his

24  commission from Skyline Properties.

25      In the blue we see the Great American Escrow wire to Armenuhi

1    Harutyunyan, first in the amount of $199,404.84, that was wired

2    to Ms. Harutyunyan's Bank of America account, ending in 6733.

3    The second wire, also to Ms. Harutyunyan -- it was payable to

4    Ms. Harutyunyan in the amount of $11,064.29.  However, this was

5    deposited into Ms. Ikilikyan's Washington Mutual account, ending

6    in 3135.

7        Next we have Great American Escrow check number 46251,

8    payable to GAEFBO Armenuhi Harutyunyan in the amount of

9    $1,779.77.  This check we had previously seen as being

10   redeposited into the Great American Escrow Key Bank account for

11   credit to property number seven, located at 7038 South Puget

12   Sound Avenue.

13       Going down, we have the seller proceeds to the Kirkdoffers, a

14   payoff for a Washington Mutual loan, for the Kirkdoffer's loan on

15   the property, and the seller's real estate commission to

16   Prudential Northwest Realty.

17   Q    Can you tell us the total amount of proceeds that were

18   disbursed to the subject account or for the benefit of a purchase

19   on Exhibit 1, our chart, from this closing, property number

20   eight?

21   A    Yes.  $212,248.90.

22   Q    And how much money did the buyer put in?

23   A    None.

24   Q    So what was the total net profit from the purchase of this

25   property?

1    A    $212,248.90.

2    Q    Now, Ms. Carnell, in addition to these summary charts of the

3    financial records, have you also assisted in the preparation of

4    what we call combined summary charts?

5    A    Yes.

6    Q    And what are those?

7    A    Those are combining these summary charts with the financial

8    records with the summary charts with the lender records.

9    Q    And when you say that, those are the documents -- the summary

10   charts that each of the lender representatives has previously

11   testified to and has been admitted in evidence?

12   A    That's correct.  It is just combining the information on

13   those two charts into one.

14   Q    And can we look, please, at Exhibit 103?  Is this the -- in

15   microscopic writing, is this the summary chart -- the combined

16   summary chart for the purchase of the duplexes listed in property

17   one of Exhibit 1?

18   A    Yes, it is.

19   Q    And can you just explain to us what is found where on this

20   chart?

21   A    In the lighter green box you see the lender records.  That's

22   the lighter green box on both sides of the house.  In the darker

23   green box labeled "financial records," those are the financial

24   records that I have just testified about.

25   Q    So, for Exhibit 103, that is the combined chart for the

1  duplexes, is this essentially taking Exhibit 101 and Exhibit 102

2  and putting them on the same page for ease of comparison?

3  A    That's correct.

4         MS. VOGEL:  Move the admission of 102.

5         THE DEFENDANT:  No objections.

6         MS. VOGEL:  I'm sorry, 103.

7         THE DEFENDANT:  No objections, your Honor.

8         THE COURT:  Exhibit 103 is admitted.

9         (103 admitted.)

10 By Ms. Vogel:

11 Q    Have you done the same for all of the properties on the

12 chart, with the exception of property number seven, which did not

13 involve loans?

14 A    Yes, I have.

15 Q    So let's look first --  I will run through them briefly.

16 Exhibit 203, is this the combined summary chart with both the

17 lender and financial records for property number two on

18 Exhibit 1?

19 A    Yes, it is.

20        MS. VOGEL:  Move the admission of 203.

21        THE DEFENDANT:  No objections, your Honor.

22        THE COURT:  203 is admitted.

23        (203 admitted.)

24 By Ms. Vogel:

25 Q    And Exhibit 303, please.  Is this your combined summary chart

1   for property number three on Exhibit 1?

2   A    Yes, it is.

3            MS. VOGEL:  Move the admission of 303.

4            THE DEFENDANT:  No objections, your Honor.

5            THE COURT:  303 is admitted.

6            (303 admitted.)

7   By Ms. Vogel:

8   Q    Will you look, please, at 403?  Is this the same combined

9   summary chart for property number four on Exhibit 1?

10  A    Yes, it is.

11           MS. VOGEL:  Move the admission of 403.

12           THE DEFENDANT:  No objections, your Honor.

13           THE COURT:  403 is admitted.

14           (403 admitted.)

15  By Ms. Vogel:

16  Q    Exhibit 503, please.  Is this the same combined summary chart

17  for property number five on our chart, the Yelm property?

18  A    Yes, it is.

19           MS. VOGEL:  Move the admission of 503.

20           THE DEFENDANT:  No objections, your Honor.

21           THE COURT:  503 is admitted.

22           (503 admitted.)

23  By Ms. Vogel:

24  Q    Look at 603, please.  Is this the combined summary chart that

25  you assisted in preparing, combining the lender and the financial

1   records relating to the purchase of property number six on

2   Exhibit 1?

3   A   Yes, it is.

4         MS. VOGEL:  Move the admission of 603.

5         THE DEFENDANT:  No objections, your Honor.

6         THE COURT:  603 is admitted.

7         (603 admitted.)

8   By Ms. Vogel:

9   Q   Can you look, please, at 642?  Is this the combined summary

10   chart relating to the refinance of property number six on

11   Exhibit 1?

12   A   Yes, it is.

13         MS. VOGEL:  Move the admission of 642.

14         THE DEFENDANT:  No objections, your Honor.

15         THE COURT:  642 is admitted.

16         (642 admitted.)

17   By Ms. Vogel:

18   Q   And, finally, Ms. Carnell, if you look, please, at

19   Exhibit 803.  Is this the combined summary chart, combining the

20   lender information with your financial analysis relating to the

21   purchase of property number eight on Exhibit 1?

22   A   Yes, it is.

23         MS. VOGEL:  Move the admission of 803.

24         THE DEFENDANT:  No objections, your Honor.

25         THE COURT:  803 is admitted.

```
 1              (803 admitted.)
 2   By Ms. Vogel:
 3   Q    Ms. Carnell, during the course of your investigation, did you
 4   review numerous Great American Escrow financial records?
 5   A    Yes.
 6   Q    Are you aware from that review whether Great American Escrow,
 7   the business itself, operates in interstate commerce -- or
 8   operates interstate?
 9   A    Based on my review of the bank records and the numerous
10   Federal Reserve wire records in there, yes.
11   Q    And did you also review bank records from Bank of America,
12   and make any similar observations as to whether Bank of America
13   operates interstate?
14   A    Yes.  Bank of America has several branches.  As well, there
15   were numerous Federal Reserve wire records in the Bank of America
16   records.
17   Q    And, in fact, in this case, a loan to two of the subject
18   accounts associated with Bank of America exist in two different
19   states, Washington and Michigan?
20   A    Yes.
21   Q    And is that also the same for the Washington Mutual accounts
22   that you reviewed?
23   A    Yes, that's correct.  There were numerous Federal Reserve
24   wire records in that account as well -- or numerous accounts.
25   Q    And the Great American Key Bank account, did that also
```

1  indicate from your review that Key Bank is a bank that operates

2  interstate?

3  A  Yes.

4  Q  And, in fact, all of these wire transfer confirmation reports

5  that we have looked at were interstate wires into the Key Bank

6  account, is that correct?

7  A  That's correct.

8  Q  I want to shift focus now and talk about the 13 subject

9  accounts that you described for us on Friday.  Have you analyzed

10  for the relevant time periods, which I will have you define, the

11  sources and the uses of the funds that were deposited into those

12  accounts?

13  A  Yes, I have.

14  Q  Have you also prepared summary charts for us for those?

15  A  Yes, I have.

16  Q  Let's look first, please, at Exhibit 903.  Can you tell us

17  what this is?

18  A  Yes.  This is a summary chart that graphically depicts the

19  sources into Ms. Ikilikyan's bank accounts or accounts controlled

20  by Ms. Ikilikyan for the time period January 1st, 2005, through

21  August 29th, 2008.  These are the six Ms. Ikilikyan accounts that

22  I spoke of on Friday.  They are listed down in the lower

23  left-hand corner.

24  Q  Does this include accounts that are held in her name and also

25  accounts that are held in the business names, such as Plantation

1  and U.S. Mortgage and Investment and U.S. Realty and Investment?

2  A    That's correct.

3  Q    And, Ms. Carnell, this visual representation, is this an

4  accurate representation of your review of those six boxes of

5  financial records that were here in court with us on Friday?

6  A    Yes.

7         MS. VOGEL:  Move the admission of Exhibit 903.

8         THE DEFENDANT:  No objections, your Honor.

9         THE COURT:   903 is admitted.

10        (903 admitted.)

11  By Ms. Vogel:

12  Q    Ms. Carnell, I am not going to go through every single line

13  on this chart.  Can you just tell us, generally, and using the

14  chart as a guide, where did the money come from that was

15  deposited into these accounts during this time period that you

16  reviewed?

17  A    Yes.  The chart lists the source as well as the dollar amount

18  of all of the deposits.  So starting with the largest, we see

19  Great American Escrow represented 38 percent of the funds into

20  Ms. Ikilikyan's account.  That accounted for $1,294,953.24.

21       Moving around to the left, we have the category "Other

22  mortgage proceeds," which was $214,283.33.  These are other

23  proceeds from loans or home equity lines of credit taken and

24  deposited into this account -- or one of these six accounts,

25  however, not from Great American Escrow.  The major sources were

1    two lines of credit, one taken on a property that we have not

2    spoken of today, another, a home equity line of credit on

3    property number five.

4         Next up we see a source of Armenuhi Harutyunyan in the amount

5    of $568,427.  These are deposits from the accounts controlled by

6    Ms. Harutyunyan into Ms. Ikilikyan's account.  So transfers from

7    Ms. Harutyunyan directly to Ms. Ikilikyan.

8    Q    And when you say "transfers from Ms. Harutyunyan directly to

9    Ms. Ikilikyan," are you really just talking about from an account

10   in the name of Harutyunyan to this account in the name of

11   Ms. Ikilikyan?

12   A    That's correct.  We will see a uses chart soon for

13   Ms. Harutyunyan's bank accounts.  On the uses chart we will see

14   this number as funds coming out of the two accounts -- excuse me,

15   three accounts, controlled by or in the name of Ms. Harutyunyan,

16   as going out of those accounts.  Here we see it represented as

17   funds coming into Ms. Ikilikyan's accounts.

18   Q    And the next category, "rental income," what does that

19   include?

20   A    That includes anything that I could determine would be rental

21   income.  That would be checks coming in that would signify rent

22   or have a memo "rent," some sort of rent memo on the check

23   itself.  Perhaps the address on the check was one that was owned

24   by Ms. Ikilikyan or in Ms. Ikilikyan's name, or it may have been

25   regular deposits from the same individual for the same amount,

1    recurring deposits that I could determine to be rental income.

2    Q    And as we work our way across the top, I see a category that

3    says Reyes/Delgado.   What does that mean?

4    A    That is a series of either Mr. Reyes or Ms. Delgado.   There

5    is 27,000 of that that comes from Ms. Delgado.   25 of that

6    represents proceeds of another property purchased in January of

7    2008, where funds were distributed from that property to

8    Mr. Marquin, and then from Mr. Marquin to Ms. Delgado, and

9    subsequently from Ms. Delgado to one of these accounts here.

10   Q    And what does U.S.M.C. payroll mean?

11   A    That is U.S. Marine Corps payroll that was direct deposited

12   into the 2135 account during this relevant time period.

13   Q    What is that, about a three-and-a-half-year time period, the

14   total U.S. Marine Corps payroll that was deposited was only

15   slightly more than $24,000?

16   A    That's correct.

17   Q    And Dove Realty commissions, what does that mean?

18   A    That is commissions from Dove Realty or Dove Realty checks

19   that were deposited into one of these accounts.

20   Q    What was the total amount of Dove Realty commissions?

21   A    $29,620.28.

22   Q    And then the next category is "cash in."   That is pretty

23   self-explanatory.   What is cash advances?

24   A    Cash advances are cash advances from credit cards, where it

25   was either directly transferred from a credit card or a check

1   written off of a credit card, and then subsequently deposited

2   into one of these accounts.

3   Q    And the next category, "Mutual of Enumclaw Insurance."  Is

4   that payment of some sort from an insurance company?

5   A    Yes.  That mostly represents one large payment, which was a

6   claim -- an insurance claim on a Ford F150 truck in 2005.

7   Q    And what is the large category of items that is titled "items

8   not provided by bank."  What does that mean?

9   A    That's items not provided by the bank.  Even though I would

10  repeatedly ask the banks, especially Washington Mutual, for

11  follow up on items that they did not provide, when I requested

12  the items, they still did not provide all the items by the time

13  that I prepared these charts.

14  Q    So you just don't know what the source of that half million

15  plus dollars was; is that correct?

16  A    That's correct.  I can see the dollar amounts on the

17  statements.  So, for example, it may show up as a deposit of a

18  thousand dollars or a check going out for a thousand dollars,

19  however, I do not know what those funds were.

20  Q    So what was the total amount of funds that was deposited into

21  all of these combined bank accounts in the name of Alexis

22  Ikilikyan between January 1st, 2005 and August 29th, 2008?

23  A    $3,409,320.09.

24  Q    And if you would look, please, at Exhibit 904?  Tell us what

25  this chart is.

1    A    This is a summary chart graphically depicting the uses of

2    funds for those same six Ikilikyan accounts during that same time

3    period.

4          MS. VOGEL:  Move the admission of 904.

5          THE DEFENDANT:  No objections, your Honor.

6          THE COURT:  904 is admitted.

7          (904 admitted.)

8    By Ms. Vogel:

9    Q    Please tell us the categories of places where all this money

10    went to.

11    A    Starting with the largest category, we can see that mortgage

12    payments made up the most -- the largest percentage of use of

13    funds for these accounts.  That amount was $1,923,417.29.

14    Q    And where did the rest of the money go?

15    A    Moving up to the left, we see "miscellaneous expenses and

16    credit card payments."  Credit card payments are exactly that,

17    payments to credit cards.  Miscellaneous expenses are made up of

18    miscellaneous expenses, which may include travel, gas purchases,

19    restaurant purchases, such as Starbucks, any sort of

20    miscellaneous expenses.

21    Q    On the subject of travel, did you find any expenses that

22    related to trips to Hawaii, for example.

23    A    There were trips to Hawaii -- or expenses related to trips to

24    Hawaii on a credit card.  That credit card was paid using the

25    funds from the 3135 account.  So the funds to pay that credit

1  card would show up here in this expense, the credit card payment.

2  Q   And where did the remainder of the funds go?

3  A   Moving around to the left, we see the utilities, phone and

4  property tax category, in the amount of $98,615.53.  Again, that

5  was utility payments, Puget Sound Energy, Lemay Garbage, anything

6  associated with those, as well as property taxes and phone

7  expenses.  Auto loan payments in the amount of $49,343.23

8  consisted of payments to Prime Source Credit Union.

9  Q   Could you tell from reviewing the documents how many distinct

10  auto loans were being paid out of this account?

11  A   There were two.

12  Q   Do you know what -- could you tell from the documents what

13  vehicles those were?

14  A   According to the Prime Source Credit Union documents it was

15  for a Mercedes and a Ford F150 pickup.

16  Q   And when you say "there were two," were there two auto loans

17  being paid at the same time or were those sequential?

18  A   There were two auto loans, but there was one payment made

19  which combined the payments on those two loans.

20  Q   In the same month, two auto payments being made?

21  A   Yes.

22  Q   We see the charitable contributions for over $90,000.  We see

23  the transfers out to Ms. Harutyunyan and to Mr. Reyes.  What

24  about the top category that talks about these funds going to

25  Mr. Poff or T&K Investments?

1  A    That is a combined category for $57,800.  $6,800 of that went

2  directly to Mr. Poff's two accounts.  The remaining funds went to

3  the T&K Investments account.

4  Q    And that is the Michigan account that we just saw a separate

5  payment coming from Great American Escrow towards; is that

6  correct?

7  A    That's correct.  There are two T&K Investments accounts.

8  Q    Does this include the $54,000 transfer from Great American

9  Escrow that we just saw?

10 A    No.  That would be a source from Great American Escrow to the

11 T&K Investments account.  This would show up directly as a source

12 from Ms. Ikilikyan to T&K Investments.

13 Q    Moving over to the other individuals, Robert Heland slash

14 attorney fees.  Can you tell us what that is?

15 A    These are payments payable to Robert Heland, who I understand

16 is an attorney.

17 Q    And in what form are these payments?

18 A    These are checks written out of the 3135 account.

19 Q    Is that one big payment or multiple payments?

20 A    There is multiple.  I believe there is six.

21 Q    And then the next category over, "transfer to open," what is

22 that?

23 A    That is a transfer to open a U.S. Bank account in the amount

24 of $46,380, just in the name of Ms. Ikilikyan.  That was opened

25 on August 24th, 2008.  So that account was not included in these

1    six accounts.

2    Q    And that opening was essentially five days before the

3    relevant time period that you were examining closed; is that

4    correct?

5    A    Yes.  That was the funds we saw in property number 7A, when

6    7038 was sold, and the monies were transferred to The

7    Plantation, LLC.  $46,380 of those were transferred to the new

8    U.S. Bank account.

9    Q    The next category down says "earnest money down payments."

10   Can you explain that?

11   A    Those were payments either to Great American Escrow or other

12   escrow title companies for earnest money or down payments on

13   properties.

14   Q    And the next two categories, "cash," "ATM withdrawals," and

15   "items not provided."

16   A    Correct.

17   Q    Does "items not provided" in this context mean the same as it

18   did in the last?

19   A    It means the exact same thing, yes.

20   Q    Can you look, please, at Exhibit 905?  Is this the sources

21   chart for the combined accounts held in the name of Armenuhi

22   Harutyunyan?

23   A    Yes, it is.

24            MS. VOGEL:  Move the admission of 905.

25            THE DEFENDANT:  No objections, your Honor.

```
 1              THE COURT:  905 is admitted.
 2              (905 admitted.)
 3   By Ms. Vogel:
 4   Q    Can you tell us, Ms. Carnell, where the funds came from that
 5   were deposited into this account?
 6   A    Starting at the bottom --
 7   Q    I said "this account."  This is really three accounts; is
 8   that correct?
 9   A    That's correct.
10   Q    Please continue.  Sorry.
11   A    The Great American Escrow in the amount of 58 percent --
12   represents 58 percent, in the amount of $424,741.80.  Those are
13   funds that came directly from Great American Escrow to one of the
14   three bank accounts in the name of Armenuhi Harutyunyan.  Moving
15   up to the left, we see payroll in the amount of $75,821.02.
16   Those were from two sources.  Mostly from the Washington State
17   treasurer, but also from a company called Volt Management.
18   Q    And those represent payroll payments to Ms. Harutyunyan over
19   a period of three and a half years; is that correct?
20   A    That's correct.
21   Q    And please continue with the sources of the funds.
22   A    Next we see Alexis Ikilikyan accounts in the amount of
23   $54,918.  Those are funds directly transferred from accounts in
24   the name of Alexis Ikilikyan to these Harutyunyan accounts.  We
25   also saw that on the uses of funds for the Alexis Ikilikyan
```

1    chart.

2    Q    So that is money moving back and forth between

3    Ms. Ikilikyan -- the accounts in Ms. Ikilikyan's name and the

4    accounts in her mother's name?

5    A    That's correct.

6    Q    And skipping over the self-explanatory "other tax return" and

7    "items not provided," what is that final category that represents

8    22 percent of the funds deposited?

9    A    That is other mortgage proceeds in the amount of $160,986.03.

10   That represents mostly the funds from two lines of credit, one

11   taken on a property located at 4014 52nd Street Northeast in

12   Tacoma; the other located -- a home equity line of

13   credit located -- on property number eight, 27419 8th Avenue

14   South.

15   Q    The address that you just recited in Tacoma, 4014, is that

16   actually one of the subscriber addresses associated with several

17   of the subject accounts that you reviewed?

18   A    That is the address associated with all the Washington Mutual

19   accounts that Ms. Ikilikyan controls.

20   Q    What is the total amount of funds that were deposited into

21   these Armenuhi Harutyunyan-named accounts during the time period

22   that you reviewed?

23   A    $730,967.37.

24   Q    Can we look, please, at Exhibit 906?  Is this the uses

25   summary for the same three accounts?

1    A    Yes, it is.

2              MS. VOGEL:  Move the admission of 906.

3              THE DEFENDANT:  No objections, your Honor.

4              THE COURT:  906 is admitted.

5              (906 admitted.)

6    By Ms. Vogel:

7    Q    Ms. Carnell, where did the vast majority of the funds

8    deposited into the accounts in the name of Armenuhi Harutyunyan

9    go?

10   A    Seventy-eight percent of the funds went to one of the six

11   accounts controlled by Ms. Ikilikyan.  We saw this on

12   Ms. Ikilikyan's source chart as a source from Ms. Harutyunyan.

13   Q    And what's the next category up, if you go around the circle

14   to the left?

15   A    $2,000 for child support for Mr. Poff.  That consisted of

16   four $500 payments payable to WSSR.  And on the memo line was

17   written "William S. Poff" and his Social Security number.

18   Q    I think I will skip over the remaining categories.  They are

19   relatively self-explanatory.  Was the total amount of funds

20   expended from this account essentially equal to the amount that

21   went in?

22   A    Very close, yes.

23   Q    Let's move on to Exhibit 907.  Can you tell us what this is?

24   A    Yes.  These are two charts, the source of funds into the two

25   William Poff bank accounts for the time period January 1st, 2005

1    through August 29th, 2008, the top chart.  The bottom charts

2    follows from August 30th, 2008 to February 28th, 2009.

3    Q    And what is the significance of that cut off date,

4    August 29th, 2008?

5    A    August 29th is the date of the final divorce between Mr. Poff

6    and Ms. Ikilikyan.

7    Q    So the top half of this chart looks at --  It looks like just

8    one account; is that correct?

9    A    There is only one account.  The second account, National City

10   Bank, did not open until October of 2008.

11   Q    So if I understand what you just said, the top half of this

12   chart summarizes the sources of funds into accounts held in the

13   name of Mr. Poff during the time period of the conspiracy that he

14   was married to Ms. Ikilikyan; and the bottom half summarizes the

15   sources of funds into the accounts, now there is two, during that

16   time period in his name after the divorce, up until the end of

17   the charged conspiracy; is that correct?

18   A    That's correct.

19            MS. VOGEL:  Move the admission of 907.

20            THE DEFENDANT:  No objections, your Honor.

21            THE COURT:  907 is admitted.

22            (907 admitted.)

23   By Ms. Vogel:

24   Q    Let's focus on the top of the chart first, the time period

25   January 1, 2005 to August 29th, 2008.  What is the total amount

1    of funds deposited into this Washington Mutual account held in

2    the name of Mr. Poff?

3    A    During that time period the total amount deposited was

4    $10,145.

5    Q    And that is over a three-and-a-half-year time period?

6    A    Yes, 44 months.

7    Q    And where did those funds come from?

8    A    Thirty percent came from accounts controlled by Alexis

9    Ikilikyan, in the amount of $3,000.  Moving up and around we see

10   that $2,836 came in in the form of V.A. compensation.

11   Q    Let me ask you a question about that.  Were those in the form

12   of direct deposits or checks?

13   A    Checks.

14   Q    And approximately how much per check?

15   A    It varied between $548 to $578.

16   Q    And please continue with the sources of funds.

17   A    $300 in cash, and the remaining 39 percent were not provided

18   by the bank.

19   Q    And let's look now at the bottom half of Exhibit 907.  This

20   is the summary for the William Poff-named accounts during the

21   time period after the final divorce up through February 28th,

22   2009.  How many months does this time period cover?

23   A    I believe six.

24   Q    And what were the total amount of funds deposited into these

25   accounts during that six-month period?

1    A    $74,417.69.

2    Q    Where did those funds come from?

3    A    Looking at the bottom, the 62 percent representing the

4    largest deposit represented the proceeds from a sale located at

5    104 Taft Street, Battle Creek, Michigan, to Amy Nelson-Long.

6    This was sold in August of 2008.  It was a property purchased by

7    Mr. Poff in September of 2008.

8    Q    Where did the remaining funds come from?

9    A    Moving up and around to the left, you see ten percent of the

10   funds were not provided by the bank.  The remaining three percent

11   came from Alexis Ikilikyan accounts.  We have one payment during

12   this time period which represented V.A. compensation.  And

13   24 percent of the funds was cash.

14   Q    And now if you could look, please, at Exhibit 908?  Is this

15   the uses chart representing the same accounts and the same time

16   period as the sources chart we just looked at, Exhibit 907?

17   A    Yes.

18         MS. VOGEL:  Move the admission of Exhibit 908.

19         THE DEFENDANT:  No objections, your Honor.

20         THE COURT:  908 is admitted.

21         (908 admitted.)

22   By Ms. Vogel:

23   Q    Let me just clarify one of your answers a moment ago.  The

24   property in Michigan that we just saw, the proceeds that came

25   into the Poff account --

1    THE COURT:  That was remarkable, that it was sold before
2    it was purchased.
3    MS. VOGEL:  I apologize.  I didn't catch it either.  Can
4    you clarify when the property was purchased and then when it was
5    sold?
6  A   It was purchased in September of 2008 and sold in October
7    of 2008.
8  Q   Now, looking at Exhibit 908.  Can you tell us, focusing on
9    the top first, the three-and-a-half-year time period, with the
10   single Washington Mutual account, where did those funds go?
11 A   Sixty-four percent went out in the form of miscellaneous
12   expenses.  Again, this is miscellaneous meals or perhaps gas
13   expenses, restaurants, entertainment type expenses.  Moving up
14   and around to the left, 1,250 went out to child support.  Again,
15   these were checks payable to WSSR.  $181.03 represents funds
16   going out in bank fees.  Four percent were items not provided by
17   the bank.  And 16 percent were cash or ATM draws.
18 Q   Among the miscellaneous expenses that you have listed there,
19   Ms. Carnell, did you find any payments to make mortgage payments?
20 A   No.
21 Q   Did you find any payments that could be identifiable as
22   payments for rents or living type expenses?
23 A   Other than restaurant or entertainment, no.
24 Q   I suppose I meant housing expenses.
25 A   Housing, no.

1    Q    How about utility payments?

2    A    No.

3    Q    Did you find any payments out of that account for the auto

4    loans on the truck or the Mercedes that we discussed earlier?

5    A    No.   Those all came out of Ms. Ikilikyan's 3135 account.

6    Q    Now, focusing in on the bottom half, the six-month time

7    period after the divorce, the two Mr. Poff accounts, can you tell

8    us, please, where those funds primarily went?

9    A    Starting in the bottom 33 percent, again, we have

10   miscellaneous expenses.   This is the same, restaurants,

11   entertainment type expenses.   Moving up and around to the left,

12   we have $18,298 payable to Amy Nelson-Long.   Ms. Long is the

13   individual who purchased the property located at 104 Taft Street.

14   It was sold in October of 2008.   Three percent, or $2,200, was

15   one payment for child support.   Two percent went out in bank

16   fees.   Nineteen percent were items not provided by the bank.   And

17   another 19 percent represented cash or ATM withdrawals.

18   Q    And, finally, I want to ask you about the T&K account that we

19   have heard about.   Did you also prepare sources and uses charts

20   for the same time period for that account?

21   A    For a different time period, but, yes.

22   Q    Can you explain that to us?   Exhibit 909.   Is this the

23   sources chart for the T&K account?

24   A    Yes, it is.

25   Q    What is the time period this chart covers?

A    This chart covers April 28th, 2008 through February 28th, 2009.

Q    And why April 28, 2008 as the start date?

A    April 28th is the date that Mr. Poff and Ms. Ikilikyan's divorce was filed with Pierce County.  It was also the approximate time period during which it appears, based on the financial records, that Mr. Poff began living out in Michigan.

   MS. VOGEL:  Move the admission of Exhibit 909.

   THE DEFENDANT:  No objections, your Honor.

   THE COURT:  909 is admitted.

   (909 admitted.)

By Ms. Vogel:

Q    Can you tell us briefly, Ms. Carnell, where the funds came from that were deposited into this T&K account during this time period?

A    Yes.  Starting on the far left, we see $60,995 from accounts in the name of or controlled by Alexis Ikilikyan.  Moving up, we see $12,000 from other accounts in Roger and Tamara Hall's name.  Those are other accounts, not the two T&K Investments accounts we see here.  "Other" includes just other items that I could not associate with any other category here.  Those were mostly small, miscellaneous deposits for which I could not determine what the intended purpose was.  Again, we see three percent of items not provided by the bank.  Six percent of cash.  And the $54,924 from Great American Escrow, representing the sale of property number

1    seven.

2    Q    And can we look at Exhibit 910?  Is this the uses chart for

3    that same account and that same time period?

4    A    Yes, it is.

5            MS. VOGEL:  Move the admission of 910.

6            THE DEFENDANT:  No objections, your Honor.

7            THE COURT:  910 is admitted.

8            (910 admitted.)

9    By Ms. Vogel:

10   Q    How is it that the funds that have been deposited into these

11   accounts during the relevant time period were expended?

12   A    Twenty-six percent went out in the form of cash.  Moving up

13   and around to the left, we see 17 percent went out to mortgage

14   payments.  Three percent went out to the other account of Roger

15   and Tamara Hall.  Two percent, or $2,900, went out to child

16   support.  Ten percent, "other," again, miscellaneous items.

17   Eight percent, items not provided by the bank.  And $53,253.29

18   for property purchases.  Those were three property purchases.

19   First, June of 2006 (sic) for $12,000, a property purchased by

20   Mr. Poff, a property located at 119 Greenville --

21   Q    You said what year?  When was the property purchased?

22   A    June of 2008.  The second property was in September of 2008,

23   located at 104 Taft Street.  That was for $20,000.  We previously

24   testified about that.  And then we have a third property, 41

25   Bryant Street, for approximately $21,000.  All of those three

1    properties are what makes up this property purchase amount.

2    Q    So on this particular chart, where it says the time period is

3    4/28/09 to 2/28/09 (sic); is that accurate?

4    A    No.  I'm sorry.  That should be 4/28/08.

5    Q    Can we look back at 909 and clarify that?  It is correct on

6    909 and just incorrect on 910; is that correct?

7    A    That's correct.

8    Q    To clarify, chart number 910 -- Exhibit 910, the relevant

9    time period is 4/28/08 to 2/28/09; is that correct?

10   A    That's correct.

11   Q    Now, Ms. Carnell, after reviewing all of these accounts and

12   looking at the relative uses and expenditures and deposits of the

13   accounts, particularly accounts in the name of Mr. Poff, did you

14   prepare a timeline in an attempt to visually depict how these

15   accounts were used?

16   A    I created a timeline that visually depicted the average

17   deposits.

18   Q    And can you look, please, at Exhibit 911?  Is this the

19   timeline that you prepared?

20   A    Yes.

21   Q    Which accounts are covered by this timeline?

22   A    Only the two in the name of Mr. Poff.  That includes the

23   Washington Mutual, 7986, and National City Bank, 3440.

24            MS. VOGEL:  Move Exhibit 911.

25            THE DEFENDANT:  No objections, your Honor.

```
1              THE COURT:   911 is admitted.

2              (911 admitted.)

3   By Ms. Vogel:

4   Q    Towards the right-hand side of this chart we see a big red

5   line for the date 8/29/08.  Again, is that the date that the

6   divorce became final?

7   A    That's correct.

8   Q    Can you explain how this chart is laid out for us?

9   A    Yes.  On the left-hand side, going up, we see the total

10  dollars.  That would be the dollar amount of the total deposits.

11  Going across the bottom in the red is the time period.  This is

12  broken down by quarter or a three-month time period during each

13  year.  The blue line represents the total deposits during each

14  quarter of each year.

15  Q    And what was the average monthly deposit for the accounts in

16  the name of Mr. Poff for the time period prior to the divorce?

17  A    The average monthly deposit was $230.57.

18  Q    What was the average monthly deposit for that time period

19  following the divorce that is included on this chart?

20  A    $12,402.95.

21  Q    Ms. Carnell, also as part of this investigation, did you

22  retain and review employment security records that would have

23  recorded wages paid to Mr. Poff during the time period of the

24  charged conspiracy?

25  A    Yes.
```

1  Q    And were there any employment security wage reports for

2  Mr. Poff during that time period?

3  A    There were no wages reported for Mr. Poff.

4  Q    Ms. Carnell, I want to ask you a couple of total amounts.

5  Actually, just one total amount.  We saw all of the source charts

6  for the various bank accounts in the name of Ms. Ikilikyan, in

7  the name of her mother, and in the name of the defendant, or T&K.

8  Did you have an opportunity to add up the total amount of funds

9  that were deposited from Great American Escrow into those

10 accounts -- all of these accounts --

11 A    Yes.

12 Q    -- during the time period you reviewed?

13 A    That's correct.

14 Q    What was that total amount of money, just from Great American

15 Escrow?

16 A    $1,774,619.04.

17        MS. VOGEL:  May I have a moment, your Honor?  No further

18 questions.

19                        CROSS-EXAMINATION

20 By the Defendant:

21 Q    Good afternoon, ma'am.

22 A    Good afternoon.

23 Q    Now, ma'am, you spent a lot of time preparing a lot of

24 different charts and graphs, and you tracked a lot of funds going

25 from transaction to transaction.  Did you prepare something that

1    showed the actual profits and not the proceeds of money that was

2    going from transaction to transaction, from bank account to bank

3    account?

4    A    I prepared a summary chart which does show the proceeds.

5    But, also, I believe I testified, subtracting out the monies into

6    the profits.

7    Q    Did you come up with a net profit over that timeframe that

8    you developed these charts and graphs?  Have you come up with a

9    net profit that shows, after expenses, mortgage payments, and all

10   that, how much was profit from all these deposits that went into

11   the bank?

12   A    I do not have a total, no.

13   Q    What instructions were you given when you were told to

14   prepare these charts and graphs and investigate the financial

15   matters of these accounts?

16   A    I'm sorry?  Can you repeat that?

17   Q    Yes, ma'am.  I will rephrase for you.  What instructions were

18   you given to prepare for these charts and graphs?

19   A    Actually, I prepared the charts and then presented them to

20   both attorneys.

21   Q    Were you given instructions as to what in particular they

22   were looking for?

23   A    An accurate representation of the financial records.

24   Q    They didn't ask anything in detail or in particular of what

25   was required for them to show or anything like that?

1    A    My job is to follow the money.  In this particular

2    investigation that included following the money both into the

3    property transactions and out of the property transactions.  So

4    into the property transactions would be the source of down

5    payment or loans that would fund the transaction.  It would also

6    include payments made on those properties.  Funds out of the

7    property transaction would be disbursements from escrow.  And

8    that was what was depicted on the charts.

9    Q    Thank you, ma'am.  You have made your charts and graphs in

10   reference to --  You had already talked about the divorce that

11   Mr. Poff had went through.  Does any of these charts and graphs

12   take into account anything that didn't go through a bank account

13   or escrow or anything like that?

14   A    I'm not quite sure what you are asking.

15   Q    I will break it down like this.  Have you heard of the old

16   term in computing, garbage in/garbage out?

17   A    I have heard of that term, yes.

18   Q    Does this take into account if someone was going through a

19   battle with, say, an ex-wife with child support, and they weren't

20   showing a lot of money going through your bank account because it

21   was garnished, does your charts and graph show the cash

22   transaction that particular individual made?

23   A    It shows cash that would have been affected by a bank

24   account.  It does not show, for example, if you were to take $20

25   and go to Starbucks.

1  Q    Exactly.

2  A    That's correct.

3  Q    The only relevance that this really has is to what money

4  actually went into -- let's say in the case of Mr. Poff, the only

5  money that went into and went out of, trackable by his bank

6  accounts -- his two bank accounts that he has?

7  A    I have no way to track actual cash, unless it were to go into

8  or out of a bank account, that's correct.

9  Q    In essence, your charts and graphs would be, with the

10  information you know, possibly somewhat prejudicial to Mr. Poff

11  if he is dealing a lot of times in cash?

12  A    I don't think I would categorize them as prejudicial.  I

13  believe I would categorize them as an accurate reflection of your

14  two bank accounts.

15  Q    The bank accounts only?

16  A    That's correct.

17  Q    That would only tell possibly one side of the story from your

18  standpoint?

19  A    I don't know how many other sides there are.  It would not

20  depict cash transactions.

21  Q    Exactly.  You answered my question.  Thank you, ma'am.  So in

22  regards to coming up with an actual net profit, have you come up

23  with a percentage of the total benefit that these profits had out

24  of the total amounts deposited?  There seemed to be quite a bit

25  of expenditures in the graphs and charts.

```
 1   A    I was unable to determine an exact amount that you directly
 2   benefited from.  I can tell you that there were 1,495
 3   transactions in your two particular bank accounts.  However, as
 4   far as the Ms. Ikilikyan accounts, and the Ms. Harutyunyan
 5   accounts, and the T&K Investments account, there were several
 6   expenditures out of there which I am unable to determine exactly
 7   who benefitted from those transactions.  For example, a purchase
 8   at a gas station, I don't know if that filled up your truck or
 9   Ms. Ikilikyan's car.  Or, for example, a restaurant purchase, I
10   do not have firsthand knowledge of who ate that meal.
11   Q    Exactly.  Thank you.  That is kind of what I was asking.
12   Now, there was what appears to be incidental use or benefit to
13   Mr. Poff from Ms. Ikilikyan's account that you had noted?
14   A    That's correct.
15   Q    I forget the total number it was, $3.4 million over the
16   timeframe that your charts and graphs cover?  Is that
17   approximately what it was, $3.4 million?
18   A    In total deposits, correct.
19   Q    Did you come up with an analysis of what percentage of that
20   Mr. Poff benefited from those accounts during that time period?
21   A    No.  Again, my source funds -- the categorizations were
22   simply what they were.  They were depicted as cash transactions
23   or child support payments on behalf of yourself or miscellaneous
24   expenditures.  It did not depict if they were for Ms. Ikilikyan's
25   benefit or your benefit.
```

1   Q    There were some checks that you found that appeared to

2   directly benefit Mr. Poff, though, out of all the transactions

3   that you had analyzed, correct?

4   A    Based on my analysis, there were some child support payments

5   for your benefit, as well as to Mr. Heland for your benefit,

6   that's correct.

7   Q    And do you know approximately how much that adds up to,

8   ma'am?

9   A    I would have to look at the use chart for Ms. Ikilikyan, if

10   we can look at that again.

11   Q    Yes, ma'am.

12   A    The Robert Heland attorney fees total $11,800 out of this

13   account -- these six accounts.  And then there was $6,800 of the

14   two percent that is categorized William Poff, T&K Investments.

15   So 6,800 went directly to one of your two accounts.

16   Q    And do you have a total percentage of what -- out of all of

17   this money, that would have benefited Mr. Poff, that was

18   trackable in your analysis?

19   A    Again, most of these transactions I cannot determine whether

20   they were for Ms. Ikilikyan's benefit or for your benefit.  They

21   are simply uses of funds out of these accounts, and categorized

22   as such.

23   Q    Can I see Exhibit 907, please?  Actually, let me go to 911.

24   Ma'am, here we have a summary chart, total deposits to William

25   Poff bank accounts by quarter.  In your analysis, did you see at

1   any point where Mr. Poff's account was garnished by the State of

2   Washington?

3   A   I don't recall one, no.

4   Q   It might have happened before this chart.  I just wanted to

5   know if you happened to see that.  If someone was going through a

6   child support debate with his ex-wife, and his account had been

7   garnished, wouldn't it be prudent of that individual to keep the

8   minimum amount of usable money in that account until he had some

9   sort of resolution?

10  A   Are you asking for my opinion?

11  Q   In your financial analysis, would it be financially prudent

12  of a person to keep the minimal amount in their bank if they

13  thought someone was going to garnish that money?

14  A   I am unsure if you are asking for my opinion or something

15  else.  I can offer my opinion on your question.  However, I don't

16  know that I can answer based on my financial analysis.

17  Q   Let me back the train up just a little bit.  You are a

18  financial analysis expert, right?

19  A   My title is auditor, and I conduct financial analysis, yes.

20  Q   Okay.  I guess I have to establish some sort of foundation

21  before I ask these questions.  Would it be a wise financial move

22  for someone to keep a lot of money in their bank account if they

23  thought it was going to be garnished?

24  A   Again, are you asking for my opinion?

25  Q   Your professional financial opinion on that.  Would someone

1  keep a lot of money in their account if they had experience of a

2  state entity garnisheeing the money?

3  A    In my opinion, if a debt was owed, you would pay that money

4  regardless if it is through a garnishment of your bank account or

5  simply paying the money.

6  Q    I am not sure I understood your answer.  Are you saying there

7  is a moral obligation to do that?

8  A    I am saying you have a financial obligation to pay a debt.

9  Q    Absolutely.  So if that debt was in dispute, per se, over a

10  period of time, and during that period of time that that debt was

11  in dispute, no one is arguing it is owed, nothing like that, but

12  if it was in dispute, and someone was going to have money

13  garnished from their account, would they not keep money in their

14  account -- excessive money?

15  A    As I understand all the documents, you still had a financial

16  obligation regardless of whether you disputed the debt.  So in my

17  opinion you would pay the debt if you had the obligation.

18  Q    Now, someone who goes through a divorce with someone who just

19  had three and a half million dollars go through their account

20  over the past, what was it, three and a half years, would this

21  amount of money being deposited in Mr. Poff's bank account be an

22  outrageous amount?

23        THE COURT:  Mr. Poff, I don't even understand that one.

24  Why don't you try rephrasing that?

25        THE DEFENDANT:  Yes, sir.

1          THE COURT:  Compared to my salary, three and a half

2   million dollars sounds pretty good.  But I don't think that's

3   what you are asking.

4          THE DEFENDANT:  It's not.

5   By the Defendant:

6   Q   The $60,000 in chart number 911, that was over a two-quarter

7   period of time, where it spiked, correct?

8   A   $60,000 was the total deposit during the quarter which

9   consisted of three months.

10  Q   During one quarter.  Correction.  During that one quarter,

11  which was basically directly after Mr. Poff's divorce, would that

12  be unreasonable for there to be a spike from a dissolution of

13  marriage, from funds that would come from the ex-wife?

14  A   Well, the majority of those funds came from proceeds from

15  your sale of a property, $45,898.69.  That represents the

16  majority of those $60,000 in the three-month deposit time period.

17  However, there is a significant increase in your deposits after

18  the divorce.

19  Q   Yes, there is, ma'am.  I will move on.

20      Now, in your analysis of Mr. Poff's accounts after the

21  divorce, how much money went out to auto loan payments subsequent

22  to the divorce?

23  A   I don't recall.

24  Q   Did your charts and graphs show that, after the divorce, how

25  the usage of money had changed?

1    A    It would have.  I don't recall any transactions, though.

2             THE DEFENDANT:  Thank you.  I will leave it at that.

3    Thank you for your time, ma'am.

4             THE COURT:  Redirect.

5                         REDIRECT EXAMINATION

6    By Ms. Vogel:

7    Q    Ms. Carnell, if a person was trying to avoid paying child

8    support, is a good way to do that to put your money in an account

9    under someone else's name?

10   A    Yes.

11            MS. VOGEL:  Nothing further.

12            THE COURT:  Does the government have additional

13   witnesses?

14            MS. VOGEL:  May we have a moment to confer, your Honor?

15   The United States rests, your Honor.

16            THE COURT:  All right.  Mr. Poff, this would be a very

17   good time for you to talk to Mr. Ratner about what happens next.

18   Let me give you a homework assignment.  And I suspect,

19   Mr. Ratner, you may be the best person to do this.  In your

20   proposed exhibit in regards to the handwriting expert, tab 20 is

21   her report, there is a category of documents listed as Bill Poff

22   questioned signatures that runs 1 through 10.  And then there is

23   an explanation of why they are of concern.  Then on the third

24   page there is a group called William Poff questioned signatures,

25   1 through 5, and an explanation of why there is a concern.  And

1    then on the fourth page there is a William S. Poff questioned

2    signatures, 1 through 6.  It would be helpful to the court if we

3    could relate those back to the exhibits that have been admitted.

4    As it is right now, I think I can follow them, but it is going to

5    be a lot of work.

6              MR. RATNER:  Your Honor, they will be related through

7    the exhibits and testimony.  If you want, we can cross-reference

8    this.

9              THE COURT:  That would be helpful.  That will speed up

10   me finding them as we go along.

11       Mr. Poff, who are you calling for witnesses tomorrow?

12             THE DEFENDANT:  It will be Ms. McFarland, your Honor,

13   the handwriting expert.

14             THE COURT:  It is customary for me to ask you the

15   following question:  If you don't want to answer it until later,

16   you can answer it tomorrow morning.  Do you understand as a

17   criminal defendant in this matter you have a right to testify or

18   not testify?  No one can compel you to testify, and I will draw

19   no adverse implication from you not testifying.  There are at

20   least three double negatives in that.  It basically says you can

21   or you can't, and nothing bad happens to you if you don't.  If

22   you are prepared to do either today or tomorrow, I would like to

23   know if you intend to testify, and if you understand your right

24   to testify, and your right not to testify.

25             THE DEFENDANT:  Yes, sir, I understand.

1          THE COURT:  Do you want to think about that one or do

2    you know already?  You are welcome to think about it.

3          THE DEFENDANT:  I have mostly made up my mind.  I would

4    like to confer about it.

5      I would like to bring a motion under Rule 29, your Honor,

6    since the plaintiffs have rested, a motion for acquittal for

7    insufficient evidence to sustain a conviction in light of the

8    recent motions that I have submitted to the court.

9          THE COURT:  That one I will take under advisement.  Now,

10   you won't talk to Mr. Ratner, because you just did what I was

11   hoping you were going to do.

12         MR. RATNER:  Occasionally we can anticipate the court.

13         THE COURT:  I am happy to see you using your little red

14   book.  Anything from the government at this time?

15         MS. VOGEL:  No, your Honor.

16         THE COURT:  All right.  Anything further from Mr. Poff?

17         THE DEFENDANT:  Nothing, sir.

18         THE COURT:  If you call the handwriting expert tomorrow,

19   any guess how long -- I stress guess, I will not hold you to it,

20   how long that testimony will take?

21         THE DEFENDANT:  From reviewing the questions today, it

22   looks like it will probably take me an hour, hour-and-a-half to

23   qualify and lay the foundation for her testimony that I will be

24   asking her.

25         THE COURT:  And the government anticipates what in terms

1    of cross-examination?

2            MR. SCOVILLE:  Probably no more than a half hour.

3            THE COURT:  Counsel, let me ask your guidance then on

4    what you would like to do.  I would be inclined to allow you to

5    finish the testimony tomorrow, I don't know if the government

6    will plan any rebuttal case or not, and then hold a short hearing

7    so that we have clearly on the record the basis for Mr. Poff's

8    various motions, and then have you do closing arguments on

9    Wednesday when you have had the chance to spend some time and

10   sharpen those up.

11       Mr. Poff, I will start with you, any observations on how you

12   would like to proceed?

13           THE DEFENDANT:  I think the recommendation you just made

14   would be quite favorable, yes, sir.

15           THE COURT:  Okay.  Ms. Vogel.

16           MS. VOGEL:  That sounds like a fine plan, your Honor.  I

17   did want to represent that we are preparing, as we can, a

18   response to the mistrial motion filed last week.  We hope to get

19   that filed tonight or first thing tomorrow morning.

20           THE COURT:  As long as you get it done before noon

21   tomorrow.  I will be happy to read it over my lunch hour.  That

22   seems like the most efficient use of your time, as opposed to

23   trying to shoehorn everything in tomorrow.  We will proceed with

24   that as our tentative plan of action.

25       Counsel, anything further at this point in time?

1          MS. VOGEL:  Will we be beginning at 9:00 tomorrow?

2          THE COURT:  We will begin at 9:00.

3          MS. VOGEL:  Thank you.

4          THE DEFENDANT:  Nothing, your Honor.  Thank you.

5          THE COURT:  All right.  We will see you all at 9:00

6    tomorrow.

7                    (Adjourned for the day)

**CERTIFICATE**

I, Barry L. Fanning, Official Court Reporter, do hereby certify that the foregoing transcript is true and correct.


S/Barry L. Fanning

_____

Barry L. Fanning