```
            UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
                    IN SEATTLE
_____

UNITED STATES OF AMERICA,          )
                                   )  NO. CR09-160JLR
               Plaintiff,          )
                                   )
          vs.                      )
                                   )
WILLIAM S. POFF,                   )
                                   )
               Defendant.          )
                                   )
_____


                     TRIAL

_____


        BEFORE THE HONORABLE JAMES L. ROBART


                March 16, 2010


APPEARANCES:

Sarah Vogel
Michael Scoville
Assistant United States Attorneys
Representing the Plaintiff

William S. Poff
Pro Se
Representing the Defendant

Howard Ratner
Standby Counsel
Attorney at Law
```

```
 1                          EXAMINATION INDEX

 2                                                          PAGE
       HANNAH McFARLAND       CROSS-EXAMINATION              56
 3                            By Mr. Scoville:
                              REDIRECT EXAMINATION           71
 4                            By the Defendant:

 5

 6

 7                           EXHIBIT INDEX
       EXHIBITS ADMITTED                                    PAGE
 8      A-19                                                   9
        A-1 through A-18                                      14
 9      A-20                                                  53
        A, B, C, D & E Demonstrative                          77
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Good morning, ladies and gentlemen.  I,

2    usually when I come in in the morning, print off whatever has

3    been filed the night before, and then I come out here and I find

4    another copy of it.  I am never sure if it is the same document

5    or a new one.  I think I see what it is you want.

6       I believe when we left off the government had rested,

7    Mr. Poff made, what I get in trouble for as referring to as half

8    time motions, since my wife tells me it is bad to use my sports

9    analogies, which I have taken under advisement.  And we are

10   prepared to begin the defense case, which I believe was going to

11   have the document examiner as the first witness.

12      Before we do that, I will ask my customary question, are

13   there any matters we need to take up on behalf of the government?

14          MS. VOGEL:  No, your Honor.

15          THE COURT:  Mr. Poff, any matters on behalf of you?

16          THE DEFENDANT:  Nothing, your Honor.

17          THE COURT:  Please begin your defense case.

18          THE DEFENDANT:  Your Honor, the defense calls Ms. Hannah

19   McFarland.

20   Whereupon,

21                          HANNAH McFARLAND

22   Called as a witness, having been first duly sworn, was examined

23   and testified as follows:

24          THE CLERK:  Will you please state your full name and

25   spell your last name for the record?

1     THE WITNESS:  Hannah McFarland, M-C-F-A-R-L-A-N-D.

2                   DIRECT EXAMINATION

3  By the Defendant:

4  Q    Good morning, Ms. McFarland.

5  A    Good morning.

6  Q    And you have already stated your name for the court.  Could

7  you please state your business address?

8  A    2023 East Sims Way, Number 263, Port Townsend, Washington

9  98368.

10  Q    Thank you.  Ma'am, could you please tell me what forensic

11  document examination is?

12  A    In most cases forensic document examination refers to the

13  field of determining who did or did not write or print a given

14  handwriting or hand printing sample, often signatures.

15  Q    And what is your full-time profession?

16  A    I am a document examiner.

17  Q    And, ma'am, what is your training?

18  A    I studied personally with two established examiners, Roger

19  Rubin out of New York City, as well as Andrew Bradley.

20  Q    Could you describe the substance of your training?

21  A    I was provided sample cases to work on.  Yes, that's what the

22  training was, as well as studying the authorities in the field.

23  Q    And how long was your training?

24  A    It was -- I consider it ongoing, but the main body of it was

25  two years.

1  Q   And when was the major portion of your training, even though

2  you consider it ongoing?

3  A   1995 to 1997 -- through 1997.

4  Q   Are you affiliated with a professional organization of

5  document examiners?

6  A   Yes, I belong to the National Association of Document

7  Examiners.

8  Q   And are you certified?

9  A   Yes.  I was first certified by the National Association of

10 Document Examiners in 2002, and I was recertified in 2007.

11 Q   And the affiliation you have, what is that organization?

12 A   It is an organization of professional document examiners.

13 Q   And what are the certification requirements?

14 A   It is a three-step process.  The first step is a written

15 exam; the second step is providing documentation of having

16 testified five times; and the third step is an oral exam.

17 Q   Thank you, ma'am.  How many times have you testified before?

18 A   I have testified 35 times before.

19 Q   In which courts?

20 A   In Washington state superior courts in Cowlitz County, King

21 County, Lewis County, Pierce County, Snohomish County, Spokane

22 County, Thurston County, Mason County.

23         THE COURT:  You need to slow down.

24         THE WITNESS:  And then in Alaska Superior Court in the

25 Third Judicial District at Anchorage, at the Matanuska-Susina

1    Borough, as well as Oregon state circuit court in Multnomah

2    County.

3    By the Defendant:

4    Q    Thank you, ma'am.  Have you testified in federal court

5    before?

6    A    No.

7    Q    And have you been retained in federal cases but did not

8    testify?

9    A    Yes.

10   Q    When you have been retained in criminal cases, for which side

11   were you retained?

12   A    By the defense.

13   Q    And do you know why you have not been retained by the

14   prosecution?

15   A    I would expect because --

16          MR. SCOVILLE:  Object.  Calls for speculation.

17          THE COURT:  It is speculating, but I will permit the

18   answer.

19          THE WITNESS:  I would expect because the government has

20   their own document examiners in the FBI or the crime lab.

21   By the Defendant:

22   Q    Is that a fairly well-known fact within the industry as to

23   that?

24   A    Yes.

25   Q    And have you been retained in civil cases?

1   A   **Yes.**

2   Q   **How many?**

3   A   **Hundreds.**

4   Q   **And for which party have you been retained?**

5   A   **By both parties.**

6   Q   **Now, ma'am, have you taught document examination?**

7   A   **Yes.  I was an instructor for the PanAmerican Institute of**

8   **Forensic Science and Technology out of Monterey, Mexico, from**

9   **2002 to 2005.  I have also taught continuing legal education for**

10   **the Washington State Bar Association, as well as for different**

11   **public defense organizations.**

12   Q   **And how do you keep current in your field?**

13   A   **I attend at least one conference a year, as well as reading**

14   **current publications.  I have also participated in proficiency**

15   **testing through the Handwriting Identification Proficiency**

16   **testing program at the forensic expertise profiling laboratory at**

17   **Latrobe University out of Australia.**

18   Q   **And you have participated in proficiency testing as part of**

19   **your continuing education?**

20   A   **Yes.**

21   Q   **When?**

22   A   **That was in 2004 and 2005.**

23   Q   **Has the Washington State legislature utilized your**

24   **specialized knowledge?**

25   A   **Yes.  In 2005 I was a consultant for the Washington State**

1  legislature regarding Election Reform Bill 5499.  My work shaped

2  the section regarding comparing signatures on ballots.

3  Q    Have you held any special offices?

4  A    Yes.  I was on the board of directors for the National

5  Association of Document Examiners, as well as serving on the

6  executive board of directors for that organization.

7  Q    Ma'am, are you familiar with this document?

8  A    Yes.

9  Q    Could you describe that document?

10  A    That is my CV.

11  Q    Ma'am, does this document summarize your training and

12  experience as a document examiner?

13  A    Yes.

14  Q    Here is the second page of that document.  Do you recognize

15  the second page of that document?

16  A    Yes, that is the second page my CV.

17  Q    Thank you.

18       THE DEFENDANT:  Your Honor, the defense moves to admit

19  Defense Exhibit 19.

20       MR. SCOVILLE:  No objection, your Honor.

21       THE COURT:  We use the following as the way to do this,

22  Mr. Poff.  The government's exhibits just have numbers.  Yours

23  have the really confusing system of capital letter A and then the

24  number.  So appropriately you should say Defense Exhibit A-19.

25  That way it will distinguish between 19 offered by the government

1   and 19 offered by you.  When it gets labeled by the clerk it will

2   get labeled as A19.

3              THE DEFENDANT:  Thank you.  I will make a note of

4   putting A in front of each of my exhibits.

5        The defense moves to admit Defense Exhibit A-19, your Honor.

6              MR. SCOVILLE:  No objection.

7              THE COURT:  A-19 is admitted.

8              THE DEFENDANT:  Thank you, your Honor.

9              (A-19 admitted.)

10  By the Defendant:

11  Q   Ma'am, could you tell me what is graphology?

12  A   Graphology has to do with studying handwriting for the

13  purpose of assessing the writer's personality.

14  Q   Was that part of your forensic examination in this case?

15  A   No.

16  Q   Were you asked to make a character handwriting analysis in

17  this case, and did you make a character or graphological

18  examination in this case?

19  A   No.

20  Q   Did you rely solely on recognized methods of forensic

21  document examination?

22  A   Yes.

23  Q   Is there a standard nomenclature in the field of forensic

24  document examination for stating your conclusions when examining

25  questioned documents?

1  A   Yes.

2  Q   Can you describe that nomenclature and the definition of each

3  type of conclusion?

4  A   It is called standardized handwriting opinion terminology.

5  And the strongest opinion that can be given is called

6  identification.  And this is the highest degree of confidence

7  expressed by document examination -- by document examiners in

8  handwriting comparisons.

9      The next weaker opinion is called strong probability or

10  highly probable.  And in this case the evidence is very

11  persuasive, yet some critical feature or quality is missing, so

12  that an identification is not in order.  However, the examiner is

13  virtually certain that the questioned and known writings were

14  written by the same person.

15      The next weaker opinion is probable.  It indicates that the

16  evidence contained in the handwriting points rather strongly

17  toward the questioned and known writings, having been written by

18  the same individual.  However, it falls short of the virtually

19  certain degree of confidence.

20      The next weaker opinion is indications or evidence to

21  suggest.  And this indicates a body of writing has few features

22  which are of significance for handwriting comparison, but those

23  features are in agreement with another body of writing.

24      And then the next opinion is no conclusion or inconclusive.

25  And this is that there is a zero point of confidence scale.  It

1    is used when there are significant limiting factors, such as

2    disguise in questioned or known writing, or a lack of comparable

3    writing, and the examiner does not have a leaning one way or

4    another.

5    Q    Is there a particular organization that proscribes these

6    standards?

7    A    Yes.  The American Society for Testing and Materials, the

8    questioned document section.

9    Q    Are there some types of documents that are better in your

10   analysis than other renditions of documents?  An example would be

11   originals versus copies of certain documents.

12   A    Yes.  Originals are preferred.

13   Q    Ma'am, were you able to make a conclusive opinion as to any

14   of the signatures that you examined?

15   A    No.

16   Q    And why is that?

17   A    Because I didn't have any original questioned documents to

18   examine.

19   Q    If you had access to documents containing original

20   signatures, rather than copies, would your conclusions have been

21   different?

22   A    Possibly.

23   Q    Did you and Mr. Ratner visit the U.S. Attorney's Office to

24   review documents?

25   A    Yes.

Q    What was the purpose of that examination?

A    The purpose was to find original documents, and absent that, find the best quality copy documents.

Q    Now, you found scanned documents?

A    Correct.

Q    But you did not find any originals?

A    Correct.

Q    Were you able to get better copies of the documents with the signatures that you examined?

A    Yes.

Q    Did you use those documents in your analysis?

A    Yes.

Q    How did they aid your analysis and affect your conclusions?

A    Because the copies were of a better quality, I was able to give a stronger opinion in some cases.

Q    Were you able to locate any original signatures?

A    No.

Q    How about color copies?

A    There were some color copies, yes.

Q    Ma'am, did you examine handwriting exemplars?

A    Yes.

Q    What are exemplars and what role do they play in your analysis?

A    Exemplars in this case are signatures where the identity of the writer is known.

1    Q    Who furnished the exemplars to you?

2    A    Mr. Michael Ratner (sic).

3    Q    How about the questioned documents?

4    A    Also were furnished by Mr. Michael Ratner.  Excuse me, Howard

5    Ratner.

6         THE DEFENDANT:  Also, your Honor, I would like to note

7    the parties have filed a stipulation that Defense Exhibits A-1

8    through A-18 are admissible under Federal Rule of Evidence

9    902(11).  I move for their admission.

10        MR. SCOVILLE:  It is a stipulation.  No objection, your

11   Honor.

12        THE COURT:  They are admitted.

13        THE DEFENDANT:  Thank you, your Honor.

14        THE COURT:  Mr. Poff those will be A-1 through A-10?

15        THE DEFENDANT:  You said A-1 through A-10, your Honor?

16        THE COURT:  Are those the ten you are moving?

17        THE DEFENDANT:  There is 18, your Honor.

18        THE COURT:  On my list of the exhibits, your exemplars

19   are A-1 through A-10.  Is that what you are moving for admission

20   at this time?

21        THE DEFENDANT:  Yes.  My list said 18, but there is ten,

22   your Honor.  Sorry.  Hang on one second, your Honor.  You are

23   correct, there are ten of the exemplars, but we are moving A-1

24   through A-18 since that was part of the stipulation.  That would

25   include the documents she examined.  That would have been the

```
 1   confusion.
 2           MR. SCOVILLE:  Again, no objection.
 3           THE COURT:  Then the court will admit A-1 through A-10,
 4   which are the exemplars, and A-11 through A-18, which were the
 5   documents examined.
 6           THE DEFENDANT:  Thank you, your Honor.  I apologize for
 7   the confusion.
 8           (A-1 through A-18 admitted.)
 9   By the Defendant:
10   Q   Ma'am, looking at Defense Exhibit A-1, do you recognize that
11   document?
12   A   Yes.
13   Q   What is it?
14   A   It is Poff 000085, dated January 28th, 1998.
15   Q   Ma'am, what did you examine on this document?
16   A   I examined a William S. Poff signature.
17   Q   Ma'am, looking at Defense Exhibit A-2.  Do you recognize that
18   document?
19   A   Yes.  That is Poff 000029, dated July 7th, 1998.
20   Q   Since you already identified the document, what did you
21   examine on this document, ma'am?
22   A   I examined the William S. Poff signature.
23   Q   Ma'am, looking at Defense Exhibit A-3.  Do you recognize that
24   document and what is it?
25   A   Yes.  That is Poff 000054, dated July 7th, 1998.  And it has
```

1    a William S. Poff signature.

2    Q    So that is what you examined on this document as a signature?

3    A    Yes.

4    Q    Looking at Defense Exhibit A-4.  Do you recognize that

5    document?

6    A    Yes.  That is Poff 000153, it is both sections, dated

7    August 10th, '99.  And it has two William Stuart Poff signatures

8    on it.

9    Q    And is that what you examined on this document?

10   A    Yes.

11   Q    This next document, ma'am, is a two-page document.  I will

12   show you the first page so you can identify it, and then I will

13   show you the second page.  Looking at Defense Exhibit A-5, do you

14   recognize that document?

15   A    Yes.  That has a Bates number of MISC 011699, and it is dated

16   February 3rd, 2004.

17   Q    And what is this document?

18   A    It is a notary license application.

19   Q    And what did you examine on this document?

20   A    I examined the William S. Poff signature.

21   Q    Ma'am, looking at Defense Exhibit A-6.  Do you recognize that

22   document?

23   A    Yes.

24   Q    And what is it?

25   A    It is a formal appearance.  And it is dated June 15th, 2009.

1   And it has a William S. Poff signature on it that I examined.

2   Q   So it is a signature that you examined on this document?

3   A   Yes.

4   Q   Ma'am, looking at Defense Exhibit A-7, do you recognize this

5   document?

6   A   Yes.  It is a certificate of service, dated June 15th, 2009.

7   And it has a William S. Poff signature on it that I examined.

8   Q   Thank you.  Ma'am, looking at Defense Exhibit A-8, do you

9   recognize this document?

10  A   This is an appearance bond.  It is dated June 17th, 2009.

11  And it has a William S. Poff signature that I examined.

12  Q   Ma'am, looking at Defense Exhibit A-9, this is the first

13  page, this is the second.  Can you identify this document?

14  A   I need to see the other pages, please.

15  Q   That's the first page right there, ma'am.  It doesn't have a

16  whole lot on it.  This is the second page.  It has the title on

17  it.

18  A   Where is the signature?  Is this the jury waiver?

19  Q   The signature is on the third page, ma'am.

20  A   That is an order.  It is page 14 of an order, dated

21  July 24th, '09.

22  Q   And can you read the portion at the top?

23  A   It is the alleged defendant's answer to the plaintiff's

24  Faretta motions.  And, further, the alleged defendant's motion to

25  quash, dismiss, or in the alternative, summary judgment, the

1    plaintiff's Faretta motion for all good, just and lawful cause

2    being clearly shown on the record.

3    Q    Have you seen this document before, ma'am?

4    A    Yes.

5    Q    What is it you examined on this document?

6    A    I examined the William S. Poff signature on it.

7    Q    Ma'am, looking at Defense Exhibit A-10, can you identify that

8    document?

9    A    Yes.  That's a jury waiver, dated March 8th, 2010.

10   Q    Here is the second page of that document.  What is it that

11   you examined on this document?

12   A    I examined the William S. Poff signature on it.

13   Q    Ma'am, I am going to put up Defense Exhibit A-11.  It is a

14   four-page document.  I will hold those, ma'am, because I will get

15   to each of these exhibits in cross-examination -- not cross, but

16   in the examination.

17        Ma'am, do some people's signatures vary over time?

18   A    Yes.

19   Q    Is there a particular time period when the exemplars are

20   written that you look for?

21   A    It is preferred that at least some of the exemplars be

22   written about the same time as the questioned signatures.

23   Q    Were you able to make any conclusion under a reasonable

24   degree of certainty in accordance with the accepted principles

25   and guidelines of forensic document examiners on whether

1   Mr. Poff's signatures varied over time?

2   A   Yes.

3   Q   Were you able to determine whether or not all of the

4   exemplars of Mr. Poff's signatures that you examined were written

5   by the same person?

6   A   Yes.

7   Q   Was Mr. Poff's signature very consistent over the time period

8   that you observed?

9          MR. SCOVILLE:   Objection.   Leading.

10         THE COURT:   I will permit the question.   Mr. Poff, when

11  you are examining a witness that you called, you can't ask

12  leading questions.   You need to say --

13         THE DEFENDANT:   I will rephrase the question, your

14  Honor.

15         THE COURT:   Thank you.

16  By the Defendant:

17  Q   What was the consistency of the signatures of Mr. Poff over

18  the time period that you examined?

19  A   I found his signatures to be very consistent over a long

20  period of time.

21  Q   Thank you, ma'am.   Were some of those signatures that you

22  examined written during the time period as the questioned

23  signatures?

24  A   Yes.

25         THE DEFENDANT:   Your Honor, I would like this honorable

1  court to take judicial notice under Federal Rule of Evidence 201,

2  Defendant's Exhibits A-8 and A-10 were signed in open court by

3  Mr. Poff.

4         MR. SCOVILLE:  No objection to the court taking judicial

5  notice, your Honor.

6         THE COURT:  They are both pleadings in connection with

7  this matter, and I will so take note of it.

8         THE DEFENDANT:  Thank you, your Honor.

9  By the Defendant:

10  Q   Ma'am, in the exhibits you are about to see, did you examine

11  the signature Bill Poff as questioned?

12  A   Yes.

13  Q   Did you find that there were multiple copies of some

14  documents with different Bates numbers?

15  A   Yes.

16  Q   In your report you indicate, under number one of Bill Poff

17  requested documents, that SWGAE 00535 is similar to escrow

18  002200?

19  A   Yes.

20  Q   You have reviewed those documents?  You have been --

21         THE COURT:  Mr. Poff, let me stop you for a second.  You

22  said Exhibit 1.  Did you mean Defense Exhibit A-11?

23         THE DEFENDANT:  Let me pull up that document.  I believe

24  it is actually a different exhibit number, your Honor.

25  By the Defendant:

Q    When I refer to number one, ma'am, am I referring to number one on your report of the Bill Poff questioned signatures?

A    Yes.

Q    That would actually be government Exhibit 123 --  Disregard that.  It is actually Defense Exhibit A-23.  I do apologize for the confusion.

THE COURT:  Counsel, I don't have a Defense Exhibit A-23.

MR. SCOVILLE:  Nor does the government, your Honor.

THE DEFENDANT:  That was actually A-20.  I apologize again, your Honor, for the confusion on that.

THE COURT:  You are referring to Ms. McFarland's report.

THE DEFENDANT:  Her report, yes, your Honor.  I do apologize.

By the Defendant:

Q    Ma'am, were you --

THE COURT:  Before you get started again, I requested yesterday that you relate back the questioned documents which are identified by a Bates number to an exhibit number.  And I think that Mr. Ratner did that.

THE DEFENDANT:  Yes, sir.

THE COURT:  Would you identify questioned document number one by its exhibit number?

THE DEFENDANT:  That would be Exhibit Number 123, your Honor.

 1         THE COURT:  Thank you.

 2   By the Defendant:

 3   Q   Ma'am, were you initially given just the signature pages of

 4   those documents bearing different Bates numbers?

 5   A   Yes.

 6   Q   And, ma'am, after you examined each entire document, were you

 7   able to determine whether or not they were identical documents or

 8   similar documents?

 9   A   Yes.

10   Q   Were you also able to determine whether or not the signatures

11   were the same on documents that appeared similar?

12   A   Yes.

13   Q   And, ma'am, if you look at --  Can I have government

14   Exhibit 123?

15       Ma'am, is that the same document as SWGAE 00535 that you

16   referenced in your number one detail on your report of Bill Poff

17   questioned signatures?

18   A   I don't know.

19   Q   I will grab that for you, ma'am, so you can see it.

20         THE COURT:  Mr. Poff, let's give the witness the hard

21   copy of this.  It is going to be hard for her to read it.  They

22   are in six different volumes, so you will end up with a pile of

23   them in front of you.

24       Please continue.

25   By the Defendant:

1    Q    Would you like me to restate the question for you, ma'am?

2    A    Yes.

3    Q    Looking at government Exhibit 123, previously admitted, is

4    that the same document as SWGAE 00535 that you referenced in the

5    first Bill Poff questioned signature on your report?

6    A    Yes.

7    Q    And what property is that document in reference to?

8    A    That is in reference to 9415 to 9417 90th Avenue East in

9    Puyallup.

10   Q    And what is that document?

11   A    It is a uniform residential loan application.

12   Q    Ma'am, if you look at this exhibit, government Exhibit 121,

13   previously admitted, is that the same document as SWGAE 00535?

14   A    Yes.

15   Q    And what property is that document in reference to?

16   A    Isn't that the same document we just went over?

17   Q    Yes.  I am trying to establish if there are multiple copies

18   under different Bates numbers of the same document?

19   A    Certainly.  That is for the property at 9415 to 9417 90th

20   Avenue East in Puyallup.

21           MR. SCOVILLE:  Your Honor, may I voir dire briefly?

22           THE COURT:  Yes.

23           MR. SCOVILLE:  Ms. McFarland, take a look at the screen

24   in front of you and please read the property address associated

25   with Exhibit 121.

1          THE WITNESS:  Excuse me.  I'm sorry, it is 9707 to 9709

2    90th Avenue East in Puyallup.

3    By the Defendant:

4    Q    So this is not one of the documents that was a copy with

5    different Bates numbers?  It is not the same document with

6    different Bates numbers then?

7          MR. SCOVILLE:  Your Honor, my voir dire is over.

8          THE DEFENDANT:  I apologize.  I didn't interrupt him,

9    did I?

10         THE COURT:  That's all right.  When he voir dires, you

11   need to let him finish.

12       Do you remember his question?

13         THE WITNESS:  No.  Could you repeat it, please?

14   By the Defendant:

15   Q    This document that I previously asked you about was not one

16   of the copies of the same documents with different Bates numbers?

17   A    It is, I believe.

18   Q    Ma'am, is this a different document than government

19   Exhibit 123 that you just looked at?  Could you put both 123 and

20   121 up on the screen, please?  I think that would be the easiest

21   way to clarify confusion.

22       Could you read the address on each of those documents?

23   A    9707 to 9706 90th Avenue East (sic).  And then the other

24   document is 9416 to 9417 99th Avenue East.

25   Q    It is probably my fault, but to clarify the confusion, ma'am,

1   are these two different documents?

2   A   Yes.

3   Q   I apologize for any confusion.  Were the addresses accurate

4   on number one and number two under the Bill Poff signatures in

5   your report?

6   A   No.  I accidentally reversed them for number one and number

7   two.

8   Q   So it was just a typographical error?

9   A   Yes.

10  Q   Ma'am, this is -- Ma'am, looking at Defense Exhibit A-11, is

11  that document identical to the document escrow 004661, dated

12  11/14/05, that you examined as the number three Bill Poff of the

13  questioned signatures?

14  A   I am not seeing it on the screen.

15  Q   Would you like to see the actual signature page, ma'am?

16  A   Yes.  Yes, that is the number three in my report.

17  Q   Thank you, ma'am.  Ma'am, can you read that -- can you read

18  which property that documents makes reference to?

19  A   That is in reference to 12323 Sandpoint Way Northeast in

20  Seattle.

21  Q   Which makes these documents easier to read, with the lamp or

22  without the lamp?

23  A   With the lamp is helpful.

24  Q   And what is the title of that document right there?

25  A   It is a uniform residential loan application.

1          THE COURT:  Mr. Poff, the same request.  Identify it by

2     exhibit number, please.

3          MR. SCOVILLE:  Your Honor, there are no exhibit numbers,

4     other than A-11.

5          THE DEFENDANT:  Defense Exhibit A-11, your Honor.

6          THE COURT:  All right.  I am not acquainted with 12323

7     Sandpoint Way as having been in this litigation.

8          THE DEFENDANT:  It was one of the documents that was

9     presented to her for --

10          MR. RATNER:  Can I have a second, your Honor?

11          THE DEFENDANT:  It was one of the properties that was

12     part of the conspiracy counts originally.

13          THE COURT:  Is it continued in the trial?  You are going

14     to be able to admit it, I just want to know why we are looking at

15     it.  Are you telling me it is merely for purposes of examining

16     the signature?  It is not one of the substantive counts?

17          THE DEFENDANT:  It is not one of the eight properties on

18     the board now.

19          THE COURT:  I understand.

20          MR. SCOVILLE:  Your Honor, may the record reflect that

21     Mr. Poff consulted with Mr. Ratner before answering the court's

22     last question.

23          THE COURT:  The record will so reflect.  You may

24     continue, sir.

25     By the Defendant:

Q    In number four of your report it references the same document, 004661, with a different date of 2/9/06.  Why is that, ma'am, the document that has the two signatures on it?

A    Because this document has two different signatures with two different dates.

Q    Ma'am, did you analyze each of the signatures separately?

A    Yes.

Q    Ma'am, can you look at Defense Exhibit A-12?  Does that exhibit contain document escrow 004902?

A    No.  Yes.

Q    Dated 11/14/05, you examined as number six of the Bill Poff questioned signatures?

A    Yes.

Q    How many questioned signatures does escrow 004902 contain?

A    It has two questioned signatures.

Q    And is that document also in reference to the Sandpoint property?

A    Yes.

Q    And do you recognize this document as -- do you recognize the title of this document you examined?

A    Yes.

Q    And what is the name of that document, ma'am?

A    It is a uniform residential loan application.

Q    Do numbers seven and eight reference the same document?  I'm sorry, ma'am.  Let me back up.  Your report references escrow

1    004902 and 004906 under seven, with the date of 2/9/06; is that

2    true?

3    A    Yes.

4    Q    It also references 004906, dated 2/9/06, under number eight?

5    A    Yes.

6    Q    Do number seven and number eight reference the same document?

7    A    Yes.

8    Q    Can you explain why 4906 is listed twice?

9    A    Because it has two different signatures on it.

10   Q    Thank you.  Escrow 004902 has handwritten numbers six and

11   seven in the margin.  Did you write those numbers?

12   A    Yes.

13   Q    What do those numbers refer to?

14   A    It refers to the list of questioned signatures I examined in

15   my report.

16   Q    Thank you.  Can I see government Exhibit 519, please?  Does

17   that exhibit contain document lender 022738, dated 8/29/06, that

18   you examined as number nine of the Bill Poff questioned

19   signatures?

20   A    Yes.

21   Q    And what is the title to that document, ma'am?

22   A    It is a balloon payment disclosure, adjustable rate.

23   Q    Can I see government Exhibit 517, please?  Does that exhibit

24   contain --  Can I see the bottom of the page?  Can you identify

25   this document, ma'am?

1    A    This is a uniform residential loan application.

2    Q    And is this a document you examined as number ten of the Bill

3    Poff signatures?

4    A    Yes.

5    Q    And could you go back to the front page, please?

6    A    It is a uniform residential loan application.

7    Q    And what property does that document involve?

8    A    It is related to 14062 Yelm Avenue Southeast in Yelm.

9    Q    Thank you.  And what are the characteristics of the

10   questioned signatures that are different from the exemplars of

11   William S. Poff?

12   A    I have some exhibits that I prepared.  I would like to start

13   with the enlarged exhibit over here, if I may?

14         MR. SCOVILLE:  Your Honor, may the government be shown a

15   copy of the enlarged signatures?

16         THE COURT:  I'm not sure where we are going with these.

17   Counsel, your witness has used the phrase "exhibits."  Are these

18   exhibits found in the exhibit book?

19         THE DEFENDANT:  No, they are not, your Honor.  These are

20   the actual signatures that she is referencing in her analysis,

21   your Honor, that she is putting up and testifying to.  They are

22   for demonstrative purposes only.

23         MR. SCOVILLE:  Your Honor, there is not a set of copies

24   of these documents for the government.  Would it be possible to

25   take a short recess to make copies?

1      THE DEFENDANT:  No objection, your Honor.

2      THE COURT:  We will take a short recess.  Mr. Poff, if

3  you are going to use anything in here, you need a copy for them,

4  you need a copy for me, and you need an original.  This is not

5  how we run the railroad.  We will be in recess for five minutes.

6  (At this time a short break was taken.)

7      THE COURT:  You may continue, Mr. Poff.

8      THE DEFENDANT:  Thank you, sir.

9  By the Defendant:

10 Q   Ma'am, what are the characteristics of the questioned

11 signatures that are different from the exemplars of

12 William S. Poff?

13 A   I prepared some enlargements in order to help illustrate my

14 opinion.  I would like to refer first to this blowup here.

15 Before I start talking specifically about this signature, I would

16 like to explain a little bit about the principles of handwriting

17 identification.  We all learn the same or very similar system of

18 handwriting in school, but no one adheres exactly to that system

19 we were taught.  Everyone develops a unique set of handwriting

20 features in their handwriting.  And the combination of these

21 characteristics are very useful for determining who did or did

22 not write or print a given signature or writing.

23     In this instance I found that Mr. Poff has a very consistent

24 signature from the exemplars I examined.  The differences I

25 noticed in regards to the Bill Poff questioned signature --  This

1    is a blowup --

2            MR. SCOVILLE:  Your Honor, may the record reflect more

3    clearly somehow which exhibit is being referred to?

4            THE COURT:  You need identify when you say "this

5    signature."  You need to identify it as the signature of the jury

6    waiver.  Otherwise the record will simply hear you talking about

7    things that exist in the cyberspace and not in hard copy.

8            THE WITNESS:  Thank you.  There are two exemplars here.

9    One is from the appearance bond, and the other is from the jury

10   waiver.  And then in reference to what we are talking about right

11   now, this is one of the questioned Bill Poff signatures from

12   lender 002738.

13       The differences that I noticed were that in Mr. Poff's

14   exemplars he always uses a middle initial or his middle name.  He

15   never eliminates his middle initial or middle name.  And here we

16   don't have a middle initial or middle name.  He always signs his

17   name William.  Here it is Bill.  The slant in his exemplars is

18   all very consistent to the right to the same degree.  And here,

19   the slant is inconsistent, the B slants to the left, and this is

20   vertical, whereas the rest of the signature is slanted slightly

21   to the right, having an inconsistent slant.  Here, the I dot is

22   placed to the left of the stem in Bill, and he never -- he

23   doesn't do that.  His I dots are to the right of the stem.  The

24   connecting stroke in Poff from O to F is concaved.  It is almost

25   like a letter U.  In the exemplars -- excuse me, in the

1   questions, Bill Poff, the stroke, does not have a concave or

2   U-like shape.  The shape of the capital P is different.  It is

3   made with two strokes.  Here it is made with one stroke, and it

4   starts with an initial stroke on the left.  The lower loops --

5   In one of the other questioned signatures the lower loops are

6   longer.  That is not true on here.  And the upper loops are often

7   wider in the questioned signature than in the exemplars.

8       And I also have prepared an exhibit showing all the

9   questioned signatures.  If you would like to put on exhibit -- my

10  Exhibit B.  So this shows all of the questioned Bill Poff

11  signatures, showing many of the features I have already pointed

12  out.  In the second Bill Poff questioned signature, the P is made

13  differently than the other -- than many of the other questioned

14  signatures.  It is made with one stroke, but still the shape of

15  it is quite different from the exemplars.  And, also in that same

16  signature, the questioned signature, the second one, the letter O

17  does not connect to the next letter F, which is different from

18  the exemplars.

19  By the Defendant:

20  Q   Also, ma'am, can you point at the screen and show which one

21  it is?  You can actually touch the screen and highlight which

22  ones you are talking about, if you would like to talk about it.

23  A   Like this one I am touching now?

24  Q   It is not working.  We have had technical problems with that

25  screen.  It might not have that option.  Normally you can.

1    A    So that helps illustrate the differences I noticed between

2    the questioned Bill Poff signatures and the exemplars.  One or

3    two of these differences isn't real significant, but the

4    combination of the many differences I noticed I found very

5    compelling, indicating that I felt it is highly probable that

6    these Bill Poff signatures are not genuine.

7    Q    This question kind of recaps that last statement.  Were you

8    able to reach an opinion under a reasonable degree of certainty

9    in accordance with the accepted principles and guidelines of

10   forensic document examiners on whether or not the Bill Poff

11   signatures were genuine?

12   A    Yes.  I concluded that these Bill Poff signatures, it is

13   highly probable that they are not genuine.

14   Q    And why was it, ma'am, that your opinion was not conclusive?

15   A    Because I did not have the original questioned documents to

16   examine.

17   Q    Thank you, ma'am.

18            THE COURT:  Counsel, before we move on, I want to make

19   sure I understand.  The opinion that you have just given relates

20   to what you listed in your report on page 2 as items 1 through

21   10?

22            THE WITNESS:  Yes.

23            THE COURT:  You were given the exemplars to use as the

24   basis for your comparison; is that correct?

25            THE WITNESS:  Correct.

1          THE COURT:  And those came from?

2          THE WITNESS:  Mr. Ratner.

3          THE COURT:  Did you request a copy of the Bill Poff

4    signature?

5          THE WITNESS:  It was given to me.

6          THE COURT:  Where in the material that you have given to

7    me is an example of an exemplar for Bill Poff?

8          THE WITNESS:  Oh, there were no --  Excuse me.  I'm

9    sorry.  I misheard you.  I received no exemplars showing Bill

10   Poff.

11         THE COURT:  Were you told that Mr. Poff ever signed his

12   name Bill Poff?

13         THE WITNESS:  It became apparent to me that he didn't.

14         THE COURT:  From the universe of documents that you

15   examined?

16         THE WITNESS:  Yes.

17         THE COURT:  Wouldn't it strengthen your opinion if you

18   had compared a Bill Poff to a Bill Poff as opposed to a William

19   S. Poff to a Bill Poff?

20         THE WITNESS:  Except it is my understanding he never

21   signs that way, because these exemplars were not selected by

22   Mr. Poff.

23         THE COURT:  They were selected by Mr. Poff's lawyer?

24         THE WITNESS:  Yes.

25         THE COURT:  Thank you.

By the Defendant:

Q    Can we see government Exhibit 105, please?  Ma'am, does this exhibit contain document CERTREC 000852, dated 4/16/05, that you examined as your number one example of William Poff questioned signatures?

A    Yes.

Q    And what property does that document involve?

A    It relates to lot two in Pierce County.

Q    What is the title to that document?

A    It is a quitclaim deed.

Q    Can we look at government exhibit -- actually, what did you examine on this page?

A    I examined the William Poff signature.

Q    Thank you.  Can we look at government Exhibit 108, please?  Does that exhibit contain -- is it document CERTREC 00880, dated 4/16, 2005, that you examined as the number two William Poff questioned signatures?

A    Yes.

Q    And what property does that document involve?

A    It involves lot nine in Pierce County.

Q    And what is it that you examined on that document?

A    I examined the William Poff signature.

Q    Can we look at government exhibit --

            THE COURT:  Mr. Poff, before you move on, lot nine in Pierce County would have what as a street address?

1          THE DEFENDANT:  The exhibit, the one prior to that,

2     Exhibit 105 --  I guess these don't have actual addresses.  That

3     is actually the 9407 to 9409 72nd Avenue property.  I think it

4     was number one of the properties of the eight, your Honor.  I

5     think it is number one.

6          THE COURT:  It's transaction one?

7          THE DEFENDANT:  Transaction one, yes.  I guess the

8     quitclaim deeds don't have the physical address on them.

9     By the Defendant:

10    Q   If I could follow up on the judge's question he has for you

11    prior to that.  If you had had Mr. Poff write the Bill Poff

12    signature for your analysis, would that have been helpful?

13    A   Possibly.  Except when a person writes for the purpose of a

14    handwriting comparison, it is a very artificial environment,

15    where the person can intentionally change their handwriting.  So

16    it is of limited usefulness.

17    Q   Also, if someone isn't used to writing -- signing their name

18    a certain way, would that also affect them?

19    A   It could.

20    Q   Thank you, ma'am.  I wanted to clarify that.

21         THE DEFENDANT:  And then in answer to your other

22    question, your Honor, on government Exhibit 108, that was

23    actually the 9411 to 9413 72nd Avenue, also in transaction number

24    one, your Honor.

25         THE COURT:  Thank you.

1   By the Defendant:

2   Q   And what is it you had examined on that document, ma'am,

3   Exhibit 108?

4   A   I am not seeing it on the screen.  The William Poff

5   signature.

6   Q   Thank you, ma'am.  Could I see government Exhibit 111,

7   please?  And, ma'am, is that exhibit, CERTREC 000907, dated

8   4/16/05, that you examined as the number three William Poff

9   questioned signatures?

10  A   Yes.

11  Q   And what is it that you examined on this document?

12  A   The William Poff signature.

13  Q   And what document is this?  Can you identify it?

14  A   It is a quitclaim deed.

15  Q   And what property does that say that it is?

16  A   It is for lot four in Pierce County.

17          THE DEFENDANT:  On that one, your Honor, that would be

18  the 9415-9417 72nd Avenue property.

19          THE COURT:  Thank you.

20  By the Defendant:

21  Q   I will put up Defense Exhibit A-12.  You already have that.

22  Does that exhibit contain document escrow number 001952, dated

23  4/26/05, that you examined as number four of the William Poff

24  questioned signatures?

25  A   I don't see it on my screen.

```
 1   Q   I am looking for it right now.  This is a big exhibit.  I am

 2   trying to find the right Bates number.

 3           THE COURT:  Counsel, 812 is the HUD 1003 for the

 4   Sandpoint Way property.  There are multiple copies, if that's

 5   what you are looking for.

 6           THE DEFENDANT:  My sheet has the wrong Bates number on

 7   it, your Honor.  It says it is Defense Exhibit A-12, but it is

 8   actually 9411 through 9410 94th Avenue property (sic).  We will

 9   skip that exhibit, your Honor.

10   By the Defendant:

11   Q   Can we see government Exhibit 505, please?  Can you identify

12   that document, ma'am.

13   A   That is CERTREC 001108, with a William Poff signature on it.

14   Q   And was that the number five William Poff signature that you

15   had examined?

16   A   Yes.

17   Q   And which property does that involve, ma'am?

18   A   That involves parcel A and B.

19           THE DEFENDANT:  That is actually the Yelm property, your

20   Honor.

21   By the Defendant:

22   Q   And so you examined the William Poff signature on this

23   document then?

24   A   Yes.

25   Q   And, ma'am, under -- what are the characteristics of the
```

1  questioned William Poff signatures that are different from the
2  exemplars of William S. Poff?
3  A    I would like to first refer to the blowup.  Here, there is
4  two exemplars, one from the appearance bond and one from the jury
5  waiver.  And then there is a William Poff questioned signature
6  from CERTREC 001108.  The differences I noticed is that there is
7  no middle initial or middle name in the questioned signature.
8  The connecting stroke between the O and the F is not as concave.
9  The initial stroke of the capital letter W is different.
10 Mr. Poff has a long loop on the left side of the W as an initial
11 stroke, whereas here you don't see that, it is just a curved
12 initial stroke.  Mr. Poff typically writes his capital letter P
13 with an initial stroke coming from the left.  In the questioned
14 signature, we don't see that.  The shape of the body of the
15 capital P is different.  This is more oval, whereas this is more
16 circular.  The questioned ones are more circular.  The lower
17 loops in Mr. Poff's exemplars are often much shorter than what we
18 see in the questioned signature.  These lower loops are much
19 longer in the questioned signature.  The amount of space between
20 the words is average to even narrow in Mr. Poff's exemplars.
21 Here it is very wide.  There were two of the questioned William
22 Poff signatures that had very wide spacing.  And this is a
23 characteristic that is especially significant, because people
24 don't often think about the amount of space they put between
25 words.  In the questioned signature the I has no I dot, whereas

1   Mr. Poff always uses an I dot in his name.  The initial stroke of

2   the lower case I in the exemplars always begins at the baseline.

3   And here it begins at the top of the stem of the I.  So I felt

4   that the combination of these characteristics indicated to me

5   that these questioned William Poff signatures probably weren't

6   genuine.

7       I made an illustration showing all of the questioned William

8   Poff signatures.  That's my Exhibit C, if we would like to look

9   at that.  I would like to refer to it.  So here are all of the

10  questioned William Poff signatures I examined, with three

11  exemplars of Mr. Poff on the top.  The signature affidavit for

12  Homer Sanchez, and the signature affidavit for Jennifer Sanchez

13  are exemplars, and the third exemplar is Poff 16.  And below that

14  are the six questioned signatures.  And it shows many of the

15  differences I described with the big blowup, where the style of

16  the capital W is different, there is no initial stroke on the I,

17  the space between the word is very wide in CERTREC 000880, as

18  well as the CERTREC 001108.  And so I felt the combination of

19  these many differences indicated to me these signatures probably

20  were not genuine.

21              THE DEFENDANT:  Thank you, ma'am.

22              THE COURT:  Mr. Poff, is this a good time to take a

23  break?

24              THE DEFENDANT:  Yes.

25              THE COURT:  It sounds like you are moving on to the

1    third category.

2              THE DEFENDANT:  The next question, yes.

3              THE COURT:  We will be in recess.

4    (At this time a short break was taken.)

5              THE COURT:  You may continue, Mr. Poff.

6    By the Defendant:

7    Q    Ms. McFarland, we had left off with you speaking about some

8    of the characteristics of the questioned William Poff signatures

9    that were different from the exemplars of William S. Poff.  You

10   had showed us some charts on that.  That brings me to my next

11   question.  Were you able to reach an opinion under a reasonable

12   degree of certainty in accordance with the accepted principles

13   and guidelines of forensic document examiners on whether or not

14   the William Poff signatures were genuine?

15   A    Yes.  I concluded that these William Poff signatures, that it

16   is highly probable that they are not genuine.

17   Q    And what level was the opinion that you placed on your -- on

18   that?  What level was that opinion that you placed on that?

19   A    Highly probable.

20   Q    Why wasn't your opinion conclusive, ma'am?

21   A    Because I did not have the original questioned documents to

22   examine.

23   Q    If it wasn't clear from the original questions, what was the

24   difference between conclusive and highly probable?

25   A    Conclusive is the strongest opinion that a document examiner

1   can give, and highly probable is the strongest opinion that can

2   be given when examining nonoriginal questioned documents.

3   Q    Thank you, ma'am.  Can I see government Exhibit 229?

4           THE COURT:  Are you moving on to William S. Poff now?

5           THE DEFENDANT:  I am.

6           THE COURT:  Before we go on, I want to make sure we have

7   a clear record.  The questions that you just answered pertaining

8   to the William Poff signatures are in your report found on

9   page 3, and it is items 1, 2, 3 and 5; is that correct?

10          THE WITNESS:  Yes.

11          THE COURT:  Thank you.

12  By the Defendant:

13  Q    Now moving on to the William S. Poff questioned signatures,

14  ma'am.  Can we have government Exhibit 229, please?  Can you

15  identify that document, ma'am?

16  A    That is a customer identification verification, which is

17  escrow -- here it is shown as lender 0022079.  It is also

18  identified as escrow 017824 in my report.

19  Q    This is one of those documents, ma'am, where the same

20  document might have different Bates numbers from the government

21  because it came -- the same document came from two different

22  sources?

23  A    Yes.

24  Q    And which property does this document involve?

25  A    This relates to 31413 50th Southwest in Federal Way.

Q     Thank you, ma'am.  And what is it that you examined on this document?

A     I examined the William S. Poff signature.

Q     Thank you, ma'am.

THE COURT:  Ma'am, I am confused again.  Where is Exhibit 229, which bears the lender number of 079, located among the six items that pertain to the William S. Poff signature?

THE WITNESS:  It is the first one.

THE COURT:  And it says on my copy that is escrow 824.

THE WITNESS:  My copy shows it is 017824.

THE COURT:  Yes.  And you are telling me that that is the same as lender 079?

THE WITNESS:  Yes.

THE COURT:  All right.  Thank you.

MR. SCOVILLE:  May I question her in voir dire briefly?

THE COURT:  Yes.

MR. SCOVILLE:  Ms. McFarland, do you know how the copy in Exhibit 229 got into the hands of the lender from the escrow company?

THE WITNESS:  No.

MR. SCOVILLE:  You don't know whether it was by fax or mail; is that correct?

THE WITNESS:  Well, it wouldn't be a fax.

MR. SCOVILLE:  How would you know that, ma'am?

THE WITNESS:  It doesn't have the physical appearance of

1    a fax.

2            MR. SCOVILLE:  You wouldn't know how the lender

3    photocopied it, correct?

4            THE WITNESS:  No.

5            MR. SCOVILLE:  So if the lender copied it in a way that

6    removed fax markings, you wouldn't know that, would you?

7            THE WITNESS:  The quality of the reproduction would be

8    compromised overall if it was a fax.

9            MR. SCOVILLE:  You don't know how many times the lender

10   copied it before placing this file copy in the records, do you?

11           THE WITNESS:  No.

12           MR. SCOVILLE:  You don't know how many times the escrow

13   company copied it before placing their copy in their records, do

14   you?

15           THE WITNESS:  No.

16           MR. SCOVILLE:  No further questions, your Honor.  Thank

17   you.

18           THE COURT:  You may continue, Mr. Poff.

19   By the Defendant:

20   Q   On this document, ma'am, what is it that you had actually

21   examined?

22   A   I examined the William S. Poff signature.

23   Q   Thank you, ma'am.  Then on Defense Exhibit A-13, can you tell

24   me what this document is, ma'am?

25   A   I can't see the entire document.  Can you raise it up

1   slightly?

2   Q   Absolutely.

3   A   I need to see the signature page.

4   Q   Could you zoom in on the top portion of this?  I have to do

5   it.  Sorry.  Let me zoom in on this, ma'am, so you can read the

6   top portion.  Can you see the title?

7   A   It says "settlement statement."

8        THE COURT:  Mr. Poff, while you are still up there, what

9   address does this pertain to?

10  By the Defendant:

11  Q   Ma'am, could you read the address?

12  A   It is 3821 South 345th.

13       THE COURT:  Is that one of the eight transactions?

14       THE DEFENDANT:  No, that is not, your Honor.

15       THE COURT:  So this has not been marked as an exhibit?

16       THE DEFENDANT:  It has been marked as a defense exhibit,

17  your Honor, but not as --

18       THE COURT:  Right.  That was a better phrasing of the

19  question.

20  By the Defendant:

21  Q   Here is the signature page of that document, ma'am.  What is

22  it you had examined on this document?

23  A   I examined the William S. Poff signature.

24  Q   Can you identify this document?

25  A   Yes.  That is escrow 11036, which is a request for change to

1   flood certification.

2   Q    What is it that you examined on this document?

3   A    The William S. Poff signature.

4   Q    And can you read the address to this property?

5   A    Yes.  It is 9488 199th Avenue Southeast in Issaquah.

6   Q    Where are you reading that on here?

7          THE COURT:  We are in Defense Exhibit A-14?

8          THE DEFENDANT:  Yes, Defense Exhibit A-14.

9   By the Defendant:

10  Q    Do you have Defense Exhibit A-14?

11         THE COURT:  The one I have says the address is 11016

12  60th Street Northeast, Lake Stevens, Washington 98258.

13         THE WITNESS:  Yes, that is correct.

14  By the Defendant:

15  Q    Were you looking --

16  A    I was looking at the one below.

17  Q    I just wanted to verify that.  What is it that you examined

18  on this document?

19  A    I examined the William S. Poff signature.

20  Q    Ma'am, I am going to place Defense Exhibit A-15 up here.  Can

21  you identify what this document is?

22  A    That is an adjustable rate rider.

23  Q    Going to the signature page of this document, what is it that

24  you actually examined on this document?

25  A    I examined the William S. Poff signature.

Q    Now, going back to the first page, ma'am.  It might be a
little bit hard to read.  I will zoom in a little bit.  Can you
read the address on that document?

A    Yes.  It is 9488 199th Avenue Southeast in Issaquah.

THE DEFENDANT:  That is one of the eight properties on
the chart, your Honor.

THE COURT:  Does this bear a government exhibit number,
so I can cross-reference between the two?  Is it admitted by the
government?

THE DEFENDANT:  I don't have the admission number, but I
have the escrow Bates number on the document, if you would like
that.  That's all I have.

THE COURT:  Mr. Scoville, is this a government exhibit
also?

MR. SCOVILLE:  Let me check, your Honor.

THE COURT:  While he is checking --

MR. RATNER:  Your Honor, if I might?  All of the defense
exhibits I don't believe were government exhibits also.  I can't
say that for certain, but that was my --  The reason we created
the defense exhibits is because there weren't government exhibits
that correspond.

THE COURT:  All right.  Thank you.

By the Defendant:

Q    Moving along.  Defense Exhibit A-16.  Can you identify that
document, ma'am?

1    A    Yes.  It is an occupancy rider to mortgage deed of trust

2    security deed.

3    Q    And can you read the address on that form?

4    A    It is 9488 199th Avenue Southeast in Issaquah.

5    Q    Thank you, ma'am.  Here is page 2 of that exhibit.  Can you

6    tell the court what you actually examined on that document,

7    ma'am?

8    A    Yes, I examined the William S. Poff signature.

9         MR. SCOVILLE:  Your Honor, we have an answer to the

10   court's question.  Both Exhibit A-15 and Exhibit A-16 are

11   included within the document that the government has marked as

12   Exhibit 606.  The signature page within Exhibit A-15 is found on

13   the 21st page of government Exhibit 606.  The signature page in

14   Defense Exhibit A-16 is found on the 23rd page of government's

15   Exhibit 606.  So that's the correspondence.

16        THE DEFENDANT:  I believe the absence of those exhibit

17   numbers were due to the fact that these were given to

18   Ms. McFarland prior to the exhibit list, your Honor.  That is

19   probably why they are not on there.

20   By the Defendant:

21   Q    Ma'am, here we have Defense Exhibit A-17.  Can you identify

22   that document, please?

23   A    It is a real estate excise tax affidavit.

24   Q    Can you read a little bit of the address which looks to be

25   just --  The address is up at the top.  Can you read the address

1    on the top?

2    A    Yes.  It is 9488 199th Avenue Southeast, Issaquah.  Excuse

3    me.  Excuse me.  It is 7038 South Puget Sound Avenue in Tacoma.

4    Q    That's the address on the real estate excise tax affidavit

5    here?

6    A    Yes.

7    Q    And what is it on this document that you had examined?

8    A    I examined the William S. Poff signature.

9    Q    Thank you, ma'am.  Ma'am, what are the characteristics of the

10   questioned William S. Poff signatures that are different from the

11   exemplars of William S. Poff?

12   A    I would like to start first with this blowup, and then I go

13   to my exhibit D.  Here in the blowup there are two exemplar

14   signatures, the appearance bond and the jury waiver.  And then

15   there is a questioned signature, William S. Poff, which is escrow

16   011038.  And the differences I noticed is that in the

17   questioned -- excuse me, in the exemplar signatures, he always --

18   Mr. Poff always puts a period after his middle initial.  And it

19   is absent here.  The lower loops are longer in the questioned

20   signature than in the exemplar.  The shape of the capital W is

21   different.  In this particular case, the middle portion of the W

22   is the highest portion of the letter, whereas Mr. Poff never does

23   that in his exemplars.  And the initial stroke is different.  The

24   initial stroke in the exemplars has a long, narrow loop on it,

25   whereas here it is not as narrow and it is not as long.  The

1    circle portion of the letter A is always closed in the exemplars

2    of Mr. Poff.  Here, it is slightly open.  But in some of the

3    other questioned signatures, the A is more open.  Mr. Poff always

4    starts his lower case I at the bottom, at the baseline of the

5    signature, but in the questioned signature the I begins at the

6    top of the stem of the I.  The connecting stroke between the O

7    and the F is concaved in the exemplars, but in the question

8    signature this connecting stroke goes straight up.  The upper

9    loops are very narrow in the exemplars often.  In some of the

10   other questioned signatures they are more wide.

11        And now I would like to refer to my exhibit D, where it shows

12   all of the questioned signatures.  And in some of these

13   questioned signatures we see some awkward movements.  When a

14   person is writing their signature, it is a very habitual process,

15   the person doesn't think about the -- how they are moving their

16   hand in order to execute the letters.  It is an automatic

17   process.  And so when we see awkward movements in questioned

18   signatures, it is a pretty good red flag.  When someone tries to

19   write someone else's signature it is an unnatural movement, and

20   so you often see tremor.  And in the questioned signature escrow

21   009965, number two in my exhibit, in the capital W there is a

22   tremor at the ending stroke.  And the same thing with my number

23   three questioned signature, there is a tremor on the ending

24   stroke of the capital W.

25        And, again, we see that there is no period after the middle

initial S.  Some of these questioned signatures don't have I dots
at all.  The first and second don't have I dots, as well as the
lender 00102, which doesn't have I dots either.  The lower loops
are often longer in the questioned signatures than in the
exemplars.  Again, the initial stroke of the capital W is
different.  The loop is not as long and it often is wider.  And
if you look at some of the lower case As in the questioned
signature in my second one, which is escrow 009965, the A is
open.  And we see the same thing in the signature below that,
escrow 0011036, the A is open.  And also in escrow --  Excuse me.
In the exemplars, Mr. Poff always -- the letter A is always
closed.  It is a complete circle.  In lender 00102, the middle
initial is printed rather than cursive S.  And also in that same
signature the capital letter P is illegible.  And so the
combination of these characteristics caused me to conclude that
these signatures are probably not genuine.

Q    I will ask you a question that kind of sums up your opinion
on that.  Were you able to reach an opinion under a reasonable
degree of certainty, in accordance with the accepted principles
and guidelines of forensic document examiners, on whether or not
the William S. Poff signatures were genuine?

A    I could conclude they probably were not genuine.

Q    And why wasn't your opinion conclusive on the signatures?

A    Because I didn't have the original questioned documents to
examine, as well as some of the quality of the copies was not

1    real good.

2    Q    Thank you.  Moving along to the William Poff and

3    William S. Poff printed names.  I will place on here Defense

4    Exhibit A-18.  Can you identify that document, ma'am?

5    A    Yes.  That is a customer identification verification.

6    Q    And what is it on this document that you had examined?

7    A    I examined the signature and the printed William Poff below

8    the signature.

9    Q    Let me zoom this in a little bit.  Perhaps you will be able

10   to read the address on that.

11   A    The address is 11016 60th Street Northeast in Lake Stevens.

12   Q    Thank you.  In that document you examined, was that the

13   number one William Poff or William S. Poff printed signatures

14   that you examined?

15   A    Yes.

16   Q    I actually have another question about Defense Exhibit A-18,

17   escrow 09876.  Like you said before, you had examined the William

18   Poff printed and William S. Poff signed signatures on that?

19   A    Yes.

20   Q    And moving along to the William Poff and William S. Poff

21   printed name inclusion, what did you use for an exemplar of

22   William S. Poff's printing?

23   A    I used MISC 011699, page 1 and page 2.

24   Q    Was that the document that you used as the exemplar for the

25   printing, ma'am?

A    Yes.

Q    And what are the characteristics of the questioned William
Poff and William S. Poff printed name that are different from the
exemplars of William S. Poff printing?

A    I would like to refer to the enlarged blowup that I have over
here.  This is the -- the top is the exemplar MISC 011699, page 1
and page 2, which has exemplar printing of William S. Poff.  And
below that on this blowup is the printed name William Poff and
William S. Poff from escrow 009875 and escrow 9876.  And some of
the differences I noticed is that, in the exemplars, there is I
dots, and here the I dots are missing.  The capital --  In the
questioned William Poff escrow 9876, the Ls in William are
capital Ls rather than what you would expect to be lower case.
And Mr. Poff just uses the lower case, like most people do.  The
initial stroke in W -- the W in the questioned signatures is
curved, whereas here, in the printed form of the W, Mr. Poff
doesn't have an initial stroke at all.  The cross bars in Poff in
the questioned printing are connected.  It is one continuous
stroke, crossing the two Fs.  And in the exemplars Mr. Poff
crosses each F individually.  And in the questioned printing,
these letters at the end of William, the AM get smaller in size.
And here, the letters stay the same size.  There isn't like a
diminuendo, like we have in the questioned.  The characteristics
caused me to conclude that Mr. Poff probably didn't hand print
these two names.

1    Q    I will recap your last statement with this next question.

2    You were able to reach an opinion under a reasonable degree of

3    certainty in accordance with the accepted principles and

4    guidelines of forensic document examiners on whether or not the

5    William S. Poff printed names were genuine?

6    A    Yes.

7    Q    And why was it that your opinion wasn't conclusive on that?

8    A    There were two reasons.  One, because I didn't have the

9    original questioned documents to examine, and also because of the

10   very limited amount of exemplar printing I had of Mr. Poff.

11   Q    Ma'am, does your report contain a summary of the signatures

12   that you examined and the opinions that you reached?

13   A    Yes.

14              THE DEFENDANT:  The defense moves to admit Exhibit A-20,

15   your Honor.

16              THE COURT:  I believe it was admitted, counsel.

17              MR. SCOVILLE:  A-20 was not part of the stipulation.

18   The government has no objection.

19              THE COURT:  A-20 is admitted.

20              (A-20 admitted.)

21              MR. RATNER:  Can we have a second, your Honor?

22   By the Defendant:

23   Q    In Exhibit A-20, it contains five pages.  Did you supplement

24   your report with the printing --  The full report actually

25   contains six pages, ma'am?

A    Yes.

THE DEFENDANT:  Your Honor, we inadvertently included the fifth page of the report.  I would like to substitute the sixth page of the report, and would move to admit that correct report, your Honor.

THE COURT:  The copy that I have is five pages long.  I don't have a copy of a six-page report.  I don't know what original exhibit is contained in it.

THE DEFENDANT:  Let me find that for you real quick.

THE COURT:  Is the one you submitted as the original exhibit five pages or six pages?

THE DEFENDANT:  It was originally five, your Honor.

THE COURT:  Do you have a copy of the six-page report?

THE DEFENDANT:  Yes.  Ms. McFarland has one, your Honor.

THE COURT:  Has the government seen it?

MR. SCOVILLE:  The government has a six-page report.  We have also seen the five-page report.  We have seen the two copies of this report.

THE COURT:  I would request that the witness then provide to the clerk the six-page report.  I believe what you want to ask, Mr. Poff, is if the government has any objection to switching the six-page report for the five-page report as the original exhibit.

THE DEFENDANT:  Precisely, your Honor.

MR. SCOVILLE:  May I examine the six-page report to make

1    sure it is the same six-page report that I have?

2          THE COURT:  Yes, you may.  You may approach.

3          MR. SCOVILLE:  Your Honor, I would note for the record

4    there are two handwritten insertions in the copy that

5    Ms. McFarland is providing to the court that were not present in

6    the government's initial copy.  In particular, on the fifth page

7    of the copy that Ms. McFarland is proposing to submit to the

8    court, there is a handwritten notation which appears to read

9    "slants."  That was not in the government's copy.  On the sixth

10   page, and this is perhaps the most material of the differences,

11   there is a handwritten insertion of the word "probably" in the

12   conclusion.  That was not in the copy previously provided to the

13   government.

14       The government would object to Ms. McFarland providing a copy

15   that is not the same as the copy previously provided to the

16   government.

17          THE COURT:  I am going to overrule the objection and

18   admit the exhibit.  But I would like the government to have the

19   opportunity to examine the revised report before it conducts its

20   cross-examination.

21       Ms. McFarland, why don't you provide that copy of the report

22   to Mr. Scoville right now so that he can conform his copy of it.

23   And we are going to need to mark that copy as an original.

24   By the Defendant:

25   Q    Ms. McFarland, those corrections of your handwritten notes,

1    were they corrections of errors?

2    A    One of them was.

3    Q    And I want to make sure we have Defense Exhibit A-19

4    admitted.

5              THE COURT:  I believe it is.

6              THE DEFENDANT:  You believe it is, Your Honor?  I wanted

7    to verify it.

8              THE COURT:  Yes.

9              THE DEFENDANT:  Thank you.  Defense Exhibit A-20 is

10   admitted then?

11             THE COURT:  Yes.  The six-page version.

12             THE DEFENDANT:  Yes, your Honor.  Thank you.  That is

13   the end of my questions, your Honor.

14             THE COURT:  Mr. Scoville.

15             MR. SCOVILLE:  Yes, your Honor.

16             THE COURT:  Mr. Scoville, if you need additional time to

17   examine the revised report, why don't you go ahead and ask the

18   questions you have now, and we will break for lunch and let you

19   resume after lunch, if you need to.

20             MR. SCOVILLE:  Yes, your Honor.  Thank you.

21                          CROSS-EXAMINATION

22   By Mr. Scoville:

23   Q    Good morning, Ms. McFarland.

24   A    Good morning.

25   Q    Ms. McFarland, first I would like you to take a look at

1   Exhibit 215, which I am going to display on the screen in front

2   of you.  We will zoom in on this exhibit.  Ms. McFarland, this

3   exhibit is also one of the exemplars provided to you by

4   Mr. Ratner, correct?

5   A   Yes.

6   Q   And Mr. Ratner represented to you that the first page of

7   Exhibit 215 contained a genuine signature of Mr. Poff, correct?

8   A   Yes.

9   Q   Namely the signature at the bottom of the page, the first

10   page of Exhibit 215?

11   A   Yes.

12   Q   And then on the second page --  The document that you

13   examined as an exemplar also had a second page to it; is that

14   correct?

15   A   Yes.

16   Q   That is the document that I am displaying on the screen,

17   correct?

18   A   Yes.

19   Q   And this document, the second page of what we had as

20   Exhibit 215 in the government's exhibits, was also represented to

21   you as containing original signatures of William S. Poff; is that

22   correct?

23   A   No.

24         MR. SCOVILLE:  Permission to approach, your Honor?

25         THE COURT:  Yes.

By Mr. Scoville:

Q   Ms. McFarland, I am showing you a copy of Exhibit A-20, which is your report, correct?

A   Yes.

Q   And on the second page of your report, at the top, you were listing the exemplars that were provided to you, correct?

A   Correct.

Q   Items 11 and 12 are signatures on a promissory note, dated 12/27/05, correct?

A   Yes.

Q   In fact, the second of those two signatures, item 12, is the signature from the promissory note, dated 12/28, 2005, correct?

A   Correct.

Q   Take a look at Exhibit X23, the screen, Ms. McFarland.  Those are the signatures that you reference in lines 11 and 12 in your report, are they not?

A   Yes.

Q   And they were represented to you as containing genuine signatures of William Poff, correct?

A   Yes.

Q   So earlier you misspoke; is that right?

A   No.

Q   But these are genuine signatures of William S. Poff?

A   Yes.  But they are not original signatures.

Q   I'm sorry.  Mr. Ratner represented them to you as genuine

1   signatures of William Poff; is that correct?

2   A   Yes.

3   Q   Now let's take a look at Exhibit 605.  Ms. McFarland,

4   Exhibit 605 was also a document provided to you as an exemplar,

5   correct?

6   A   Yes.

7   Q   And Mr. Ratner represented to you that the William S. Poff

8   signature was genuine, correct?

9   A   Yes.

10  Q   And Exhibit 650 is the quitclaim deed for property number

11  six, correct?

12  A   It is a quitclaim deed, but I'm not seeing the property

13  number.

14  Q   Executed on or about February 23rd, 2007, correct?

15  A   Yes.

16  Q   Ms. McFarland, you would agree that nobody writes exactly the

17  same way twice, correct?

18  A   Yes.

19  Q   And so when starting your analysis of whether a person wrote

20  something, you need to determine how much the person varies his

21  or her handwriting; is that correct?

22  A   Yes.

23  Q   To do that, you need a sufficient amount of known writing,

24  called exemplars, which are used to compare against the

25  questioned writing, correct?

1   A   Yes.

2   Q   And in this case, to use the exemplars, you have a set of

3  documents mailed to you by Mr. Ratner, correct?

4   A   Yes.

5   Q   And Mr. Ratner represented them to you as containing genuine

6  signatures of Mr. Poff, correct?

7   A   Yes.

8   Q   You did not select the set of exemplars to use, did you?

9   A   No.

10   Q   Mr. Ratner did, correct?

11   A   Yes.

12   Q   All of the exemplars that you got with signatures had

13  Mr. Poff's name signed as William S, period, Poff, correct?

14   A   Yes.

15   Q   You didn't get any exemplars of what it would look like if

16  Mr. Poff signed Bill Poff, correct?

17   A   Correct.

18   Q   And you didn't get any exemplars if William Poff signed his

19  name William space Poff without the S, correct?

20   A   Correct.

21   Q   And one of the bases for your conclusions, with regard to the

22  Bill Poff and William Poff questioned signatures, is that those

23  signatures lack the middle initial S, correct?

24   A   Yes.

25   Q   Your exemplars also have very few examples of how Mr. Poff

1   writes the letter B, correct?

2   A   **Yes.**

3   Q   **And there is a number of other letters in the alphabet of**

4   **which the sample size in your exemplars was limited, correct?**

5   A   **Yes.**

6   Q   **Now, Ms. McFarland, I would like you to look at Exhibits 108**

7   **and 111.  I will put them on the screen in front of you.  108**

8   **will be on the left, 111 will be on the right.  We will zoom in**

9   **on the signature portions of these documents.  You previously**

10   **testified that these signatures were questioned signatures**

11   **presented to you, correct?**

12   A   **Yes.**

13   Q   **And you concluded that Mr. Poff may not have written these**

14   **signatures, correct?**

15   A   **Correct.**

16   Q   **Ms. McFarland, when Mr. Ratner provided these signatures to**

17   **you to examine, did he let you know that Mr. Poff had attached**

18   **these same quitclaim deeds to a court filing he submitted in**

19   **April 2007 --**

20   A   **No.**

21   Q   **-- in Pierce County --**

22   A   **No.**

23   Q   **-- as evidence that he had quitclaimed his interest in these**

24   **properties?**

25   A   **No.**

Q    Did he let you know that in that court filing submitted in Pierce County, Mr. Poff stated that he had, quote, been required by the funding agent to sign a release of any presumptive interest in the properties?

A    No.

Q    If you had had to include these two signatures in the sample of genuine William S. Poff signatures, that would surely have altered your analysis, correct?

A    Possibly.

Q    Ms. McFarland, you prefer to examine original documents, right?

A    Yes.

Q    That's because photocopies do not reproduce the finer features of handwriting, do they?

A    Correct.

Q    Such as pressure, correct?

A    Yes.

Q    Another finer feature that is not reproduced is line crossing, correct?

A    Sometimes.

Q    And a photocopy can also be distorted by the photocopy machine, correct?

A    Somewhat.

Q    If it jams, for instance?

A    Yes.

1  Q     The photocopy might not capture something that is written
2  faintly, correct?
3  A     Correct.
4  Q     For instance, a dot above an I might not always show up in a
5  photocopy, correct?
6  A     Possibly.
7  Q     Especially if the dot was faint to begin with, correct?
8  A     Yes.
9  Q     A photocopy also makes it hard to determine what kind of
10 writing instrument was used; isn't that right?
11 A     Yes.
12 Q     Such as a ball point pen, right?
13 A     Yes.
14 Q     Or a pencil, correct?
15 A     Correct.
16 Q     Or some other writing tool?
17 A     Correct.
18 Q     And the writing instrument itself can affect what the
19 handwriting looks like; isn't that right?
20 A     Possibly.
21 Q     It could affect how dark the ink appears, right?
22 A     Yes.
23 Q     For instance, if the pen is running dry, that can affect how
24 faint or dark the line is, correct?
25 A     Yes.

Q    All of the exemplars provided to you were photocopies,
correct?

A    Yes.

Q    And all of the questioned documents you analyzed were also
photocopies, correct?

A    Yes.

Q    And you don't know how many times the documents were
photocopied before they got to you?

A    No.

Q    Ms. McFarland, you agree that there might be differences
between a person's signature and his normal cursive, correct?

A    Yes.

Q    Often a person's writing may change and develop while their
signature remains constant, correct?

A    Correct.

Q    You have seen that phenomenon in your own work, correct?

A    Yes.

Q    Ms. McFarland, as far as the printing in this case,
Exhibit A-5 contains the sum total of the hand printing of
William Poff that you examined in the exemplar, correct?

A    Which specific document?

Q    I will show it to you.  A-5, the notary license application.

A    Yes.

Q    Let's make sure we are on the same page.  Showing you A-5
using the document camera --  Do you see document A-5?

1  A   Yes.

2  Q   This two-page document contains the sum total of the hand

3  printing that you used as an exemplar, correct?

4  A   Yes.

5  Q   And this is a notary license application, correct?

6  A   Yes.

7  Q   Which is a formal application for a license to exercise state

8  power, correct?

9  A   Yes.

10  Q   And, Ms. McFarland, isn't it true that sometimes when people

11  are signing momentous or important documents, they will slow

12  down?  Isn't that true?

13  A   Yes.

14  Q   And sometimes when they are doing that, they will print more

15  neatly than they might in other circumstances, correct?

16  A   Yes.

17  Q   Now, you agree, don't you, that it is important to have good

18  quality exemplars to get an accurate representation of how a

19  person genuinely writes or prints?

20  A   Yes.

21  Q   And you admit in your report -- in fact, you admitted just

22  now you received a very limited amount of exemplar printing of

23  Mr. Poff, correct?

24  A   Yes.

25  Q   Indeed, only what we saw in that two-page notary license

1    application, correct?

2    A    Yes.

3    Q    And aside from exemplars represented to you as being

4    Mr. Poff's genuine signature, you did not receive exemplars of

5    his nonsignature cursive writing, correct?

6    A    Yes.

7    Q    Sometimes a document examiner with a limited set of exemplars

8    will have a person provide a writing sample, correct?

9    A    Sometimes.

10   Q    You are familiar with that, right?

11   A    Yes.

12   Q    In fact, you refer to it on your website, don't you?

13   A    Yes.

14   Q    And that process is also known as request writing, correct?

15   A    Yes.

16   Q    That involves having the person come in, correct?

17   A    Yes.

18   Q    And write out a number of different things in front of you,

19   right?

20   A    Yes.

21   Q    You can have the person write on a number of different

22   documents, right?

23   A    Yes.

24   Q    One by one, right?

25   A    Yes.

1  Q    You try to recreate the circumstances in which the person

2  wrote or may not have written the questioned document, correct?

3  A    Yes.

4  Q    As exactly as possible, right?

5  A    Yes.

6  Q    And you dictate to the person at different speeds, right?

7  A    Correct.

8  Q    To make it hard for them to disguise their writing, correct?

9  A    Yes.

10 Q    And also so you get a sense of what their writing looks like

11 when it is fast, right?

12 A    Yes.

13 Q    And what their writing looks like when it is slow, right?

14 A    Yes.

15 Q    You did not have Mr. Poff provide an in-person request

16 writing sample in this case, did you?

17 A    No.

18 Q    And you have been working on this case since at least January

19 of this year, correct?

20 A    Yes.

21 Q    You never even met Mr. Poff until yesterday, correct?

22 A    Correct.

23 Q    When you met to go over the testimony that would be provided

24 today, correct?

25 A    Correct.

Q    Ms. McFarland, let's take a look at Exhibit A-18.  I will
display it on the document camera.  This is the first page.  You
analyzed the printed writing, William Poff, at the bottom right
of this page, correct?

A    Yes.

Q    And you concluded there were indications it may not be
genuine, correct?

A    I concluded it was probably not written by Mr. Poff.

Q    Wasn't your original conclusion that there were indications
it may not be genuine?

A    No.

Q    The word probably is something that you hand wrote into your
report recently, correct?

A    Yes.

Q    The signature above that printed writing was represented to
you as containing the genuine signature of William Poff, correct?

A    No.

Q    Ms. McFarland, do you recall speaking to me in a telephone
interview yesterday?

A    Yes.

Q    And I advised you that special Agent Burtt and AUSA Vogel
were on the line with me, correct?

A    Correct.

Q    And Mr. Ratner was there with you, correct?

A    Yes.

```
 1   Q    And Mr. Poff was also there, correct?

 2   A    Correct.

 3   Q    And in the presence of all of these witnesses on the

 4   telephone conference, you told me that this William S. Poff

 5   signature had been represented to you as being the genuine

 6   signature of William Poff, correct?

 7   A    I misspoke, Mr. Scoville.

 8   Q    First --

 9            THE COURT:  Don't interrupt the witness.

10            THE WITNESS:  I misspoke when I answered that question

11   yesterday on the phone.

12   By Mr. Scoville:

13   Q    First let's establish --  Yesterday you did tell me that this

14   William S. Poff signature had been represented to you as genuine,

15   correct?

16   A    Yes.

17   Q    You also told me yesterday on the phone that there were two

18   signatures of William Poff that you were asked to look at as

19   questioned documents, and that you concluded probably were

20   genuine, correct?

21   A    Yes.

22   Q    But you couldn't tell me what those were?

23   A    I can now.

24   Q    Can you?

25   A    Yes.  It is this one, and the other --
```

1    Q    The next page of this document?

2    A    I believe it is a very similar document.

3    Q    Let's look at the next page.  I am showing you the second

4    page of Exhibit A-18.  Is this the document you were just

5    referring to?

6    A    Yes.

7    Q    So with both of the pages of Exhibit A-18, you concluded that

8    the signatures were genuine?

9    A    Probably, yes.

10   Q    But the printed writing probably wasn't genuine, correct?

11   A    Was probably not by Mr. Poff.

12   Q    Thank you, Ms. McFarland.  Ms. McFarland, you have testified

13   before in criminal cases, correct?

14   A    Yes.

15   Q    Approximately 20 of them?

16   A    Yes.

17   Q    And each time you have testified at the request of the

18   defense?

19   A    Yes.

20   Q    Never at the request of the prosecution?

21   A    Right.

22        MR. SCOVILLE:  No further questions, your Honor.

23        THE COURT:  Mr. Poff.

24        THE DEFENDANT:  Yes, sir.

25        THE COURT:  It is known in the trade as redirect, is

1    what you get to do.

2          THE DEFENDANT:  Yes, sir.

3

4                    REDIRECT EXAMINATION

5    By the Defendant:

6    Q    Ma'am, did you request examples of the signature William Poff

7    or Bill Poff?

8    A    No.

9    Q    Did you request either one specifically, though?

10   A    Not that I recall.

11   Q    Why not?

12   A    Because the exemplars I had were all formal documents, and in

13   many cases court documents, which were the same type of documents

14   as the questioned documents.  If the exemplars I had were

15   informal, personal letters or something like that, or if the

16   questioned documents were informal personal letters, then I would

17   have requested the same type of document.  If a person is going

18   to use a less formal name, meaning Bill instead of William, or

19   eliminate their middle initial, they will tend to do it in more

20   informal communications, and not do it in court documents and

21   legal documents, like in this case, the exemplars and the

22   questioned documents.

23   Q    Is it common in the field of document examination to only

24   have copies and not originals?

25   A    Yes.

1  Q    And have you testified in this case based only on seeing

2  copies?

3  A    Yes.

4  Q    In the printing section of the report did you add the word --

5  add the printed word "probably" in that report?

6  A    Yes.

7  Q    Why did you do that?

8  A    Because I had made a typo in the -- when I printed it out on

9  the printer.  I had eliminated the word probably by mistake.

10 Q    So in your original -- your original conclusion was probably?

11 A    Yes.

12 Q    If someone, as in this instance, signs their name William S.

13 Poff, and you would have them sign it Bill Poff, would that

14 possibly create any problems or interference in your analysis?

15 A    Well, it would be somewhat artificial, because I still

16 wouldn't know if that person ever used the word Bill in their

17 signature, since I would have dictated it.

18 Q    And, ma'am, did you have a proper number of exemplars to make

19 an accurate opinion in this case?

20 A    Yes.

21 Q    And can I see -- I believe it was government Exhibits 108 and

22 111, side by side, please?  Ma'am, these documents that

23 Mr. Scoville was referring to earlier, that he alleged Mr. Poff

24 had submitted them --  Was it April, sir?  In April.  If those

25 were actually submitted for him by escrow in another case that he

1    had involving a domestic -- not domestic, but a civil matter,

2    wouldn't that still -- would that have any bearing on your

3    conclusion on whether these signatures were valid or not?

4    A    Could you repeat the question?

5    Q    Yes, ma'am.  It was alleged that these signatures -- it was

6    alleged that these signatures were submitted by Mr. Poff in, I

7    believe, another matter.  But if they were not submitted by

8    Mr. Poff in this other matter, but by escrow, who was the

9    custodial record keeper of these documents, would that have had

10   any bearing at all on your determination of these two William

11   Poff signatures?

12   A    Possibly, yes.

13   Q    In what way, ma'am?

14   A    Well, they look -- if I compare all the exemplars with each

15   other, they are very consistent.  And these two signatures are

16   very -- are dramatically different from the exemplars.

17   Q    So your opinion really remains the same, regardless of who or

18   where they supposedly were submitted and when?

19   A    Yes.

20   Q    That's what I am trying to ask in a roundabout way, ma'am.

21   Thank you, ma'am.

22        And this is Defense Exhibit A-5, ma'am.  Was that an adequate

23   sample for you to do the analysis that you needed to do on the

24   printing portion of your analysis?

25   A    I would have preferred more, yes.  So, no, it was not --  I

1    mean, I did the analysis with what I had.  And I asked Mr. Ratner

2    if there was any more.  He said there wasn't.

3    Q    Okay, ma'am.  Thank you.  Ma'am, was an in-person writing

4    sample required for your determinations?  In person, where

5    Mr. Poff would come before you and write in cursive or write his

6    name in front of you, was that required for this analysis in this

7    case?

8    A    No.

9              THE DEFENDANT:  That's it, your Honor.

10             THE COURT:  Recross?

11             MR. SCOVILLE:  Yes, your Honor.

12                          RECROSS-EXAMINATION

13   By Mr. Scoville:

14   Q    Ms. McFarland, at a real estate closing there is typically a

15   large number of documents to sign, correct?

16   A    Yes.

17   Q    Ms. McFarland, referring you to Exhibits 108 and 111, which

18   should probably be fresh in your mind.  Are they?  Do you want me

19   to show them to you again?  I will put them back up.  Here they

20   are.

21   A    Yes.

22   Q    108 and 111.  If Mr. Poff told you that those were his

23   signatures, that would cause you to change your analysis,

24   correct?

25   A    I would have to evaluate.

Q    That would cause you to make some changes, wouldn't it,
Ms. McFarland?

A    I would have to reevaluate it.

        MR. SCOVILLE:  No further questions.

        THE COURT:  Mr. Poff, anything further?

        THE DEFENDANT:  Nothing further, your Honor.  Thank you.

        THE COURT:  I have one last question I am still
struggling with here.  Do you have Defense Exhibit A-11 in your
small notebook?  Am I correct, Ms. McFarland, that what we are
dealing with is the signature which is found on page 4 of that
document?

        THE WITNESS:  Yes, two signatures.

        THE COURT:  And it appears to be in a section of the
document that deals with the interviewer.  Immediately above the
signature it says, interviewer's name, print or type.  And that
looks like it is typed in "Bill Poff."

        THE WITNESS:  I don't see that.  I just see "Poff."  Oh,
Bill.  I see.  Yeah, okay.  That is very small.

        THE COURT:  We are very experienced with very small over
the last several days.  Immediately underneath it, that is the
signature that you're saying are the ones that you examined?

        THE WITNESS:  Yes.

        THE COURT:  Would it be unusual, in your experience, for
someone who has listed their name or had their name listed as
Bill Poff to then write William S. Poff, as opposed to Bill Poff,

1    as it has been described?

2              THE WITNESS:  No.

3              THE COURT:  It would be usual?

4              THE WITNESS:  Yes.

5              THE COURT:  I understand what your testimony is.  Thank

6    you.  Counsel, anyone want to clear up the mess the court

7    created?

8              THE DEFENDANT:  Nothing here, your Honor.

9              MR. SCOVILLE:  No further questions, your Honor.

10             THE COURT:  You may step down.  Thank you.

11        Mr. Poff, we have Exhibits A, B, C, D and E, which the

12   witness used for illustrative purposes.  That means they don't

13   become part of the formal record and wouldn't be included in

14   anything reviewed by another court.  Do you understand, unless

15   you move the admission of them as demonstrative exhibits, they

16   will not be included in the record?

17             THE DEFENDANT:  Since that was brought up as an issue by

18   the plaintiffs, your Honor, I would actually like to enter them

19   into the record at this point.

20             THE COURT:  Does the government have any objection to

21   them as illustrative exhibits?

22             MR. SCOVILLE:  Not as illustrative exhibits, your Honor.

23             THE COURT:  I will direct the clerk to include as what

24   is found as Exhibits A, B, C, D and E to Ms. McFarland's

25   testimony.

```
 1            (A, B, C, D & E Demonstrative admitted.)
 2            THE COURT:  Mr. Poff, any further witnesses?
 3            THE DEFENDANT:  No further witnesses, your Honor.  I
 4  would like to make a quick motion, and then I will conclude my
 5  defense, your Honor.
 6            THE COURT:  You have to first tell me if you are going
 7  to testify or not.
 8            THE DEFENDANT:  No, I am not, your Honor.
 9            THE COURT:  You recall our discussion yesterday
10  afternoon?  You know it is your right to testify if you want to?
11            THE DEFENDANT:  Yes, sir.
12            THE COURT:  You know it is your right not to testify if
13  you do not want to, and that the court draws no implication from
14  you either doing so or not doing so?
15            THE DEFENDANT:  Precisely.  I understand, sir.
16            THE COURT:  Your motion.
17            THE DEFENDANT:  Your Honor, may it please the court, for
18  the record, it is really obvious there are forged signatures of
19  the claimed alleged defendant throughout the government's
20  evidence.  It is also apparent there are documents that have --
21  Let me slow down a little bit.  I tend to run away a little bit.
22  I apologize.  It is also apparent there are documents that were
23  manufactured.  The government apparently doesn't have any
24  original documents, if any, at all.  I am calling all documents
25  purporting to have William S. Poff or Bill Poff, or whatever
```

1    appellation, form of name on them, as being forged, as there is

2    at least reasonable doubt as to the veracity of these documents.

3    There is absolute reasonable doubt as to any documents having the

4    name Poff on them.

5        I motion for this honorable court to only admit original

6    documents into the evidence, and motion for the original -- for

7    the original documents in this instant case only be used for the

8    determination of this Court.  This is one of the reasons why I

9    requested the originals in discovery, and make the lenders prove

10   they are holders in due course.  In asking that, your Honor, they

11   would have to produce original documents, specifically the note,

12   on all of these loans.  And that is something I asked in

13   discovery.  May it please the court, your Honor.

14            THE COURT:  All right.  I will add it to my list, sir.

15            THE DEFENDANT:  Thank you, sir.

16            THE COURT:  At this time, does the defense rest?

17            THE DEFENDANT:  The defense rests, your Honor.

18            THE COURT:  All right.  Does the government wish to put

19   on any rebuttal case?

20            MS. VOGEL:  May we have one moment, your Honor?

21            MR. SCOVILLE:  Your Honor, may the government have an

22   opportunity to consider the question of a rebuttal witness over

23   the lunch hour, and then inform the court after the lunch hour is

24   over?

25            THE COURT:  If you need to.  I intend to schedule

1    argument on the various pending motions -- actually less argument

2    than explanation, so that the record is clear as to why Mr. Poff

3    has filed the motion.  And I was going to do that before we went

4    to lunch, so that you all would have a chance to prepare.  Now

5    that you are telling me that you need some time to think about

6    this, I will try and accommodate you, just like I tried to

7    accommodate Mr. Poff.

8             MR. SCOVILLE:  Yes, your Honor.

9             THE COURT:  You are telling me you need time?

10            MR. SCOVILLE:  We would like to advise the court of our

11   answer on the rebuttal question after the lunch break, your

12   Honor.

13            THE COURT:  All right.  I will see you all at 1:30.  We

14   will be in recess.

15   (Lunch recess)

16            THE COURT:  Mr. Scoville, when we left off you were

17   debating the issue of a rebuttal case.  What has the government

18   decided?

19            MR. SCOVILLE:  Yes, your Honor.  The parties have met

20   and conferred, and pursuant to a stipulation of the parties, we

21   would like to offer one further exhibit, which we have marked as

22   Exhibit 26, which the parties will stipulate is an authentic

23   Pierce County Superior Court record.  And I have marked copies to

24   hand up to the court, if I have permission to approach.

25            THE COURT:  You do.  This is the strict reply to the

1   declaration of Mr. Poff?

2           MR. SCOVILLE:  That's correct.  I believe the copy that

3   is in the court's notebook does not have the exhibit number on

4   it.  So we have copies that have the exhibit number.  We have

5   corrected that mistake.

6           THE COURT:  That's all right.  Mr. Poff, a stipulation

7   means an agreement between both sides.  Is that something you

8   have agreed to?

9           THE DEFENDANT:  Yes, sir.  I agreed to the stipulation

10  in this form.  I am not objecting to it entering into the court

11  record at all.  I would like to state for the record that it does

12  have two of the claimed forged documents admitted by Great

13  American Escrow.  I think it was government Exhibits 108 and 111.

14  That was admitted to my family law practice attorney by Great

15  American Escrow as exhibits in there.  That seemed to have passed

16  my attention at the time when those were admitted.

17          THE COURT:  All right.

18          MR. SCOVILLE:  Your Honor, if I may?

19          THE COURT:  Yes.

20          MR. SCOVILLE:  The government would simply note for the

21  record that Mr. Poff's comments on the documents are not

22  evidence.  The only stipulation between the parties is the

23  stipulation that the document is an authentic Pierce County

24  record.

25          THE DEFENDANT:  I have no objections to that, your

1   Honor.

2          THE COURT:  All right.  Does the government have any

3   other evidence that it wishes to present at this time?

4          MS. VOGEL:  No, your Honor.

5          THE COURT:  Does the government then rest?

6          MS. VOGEL:  Yes, your Honor.

7          THE COURT:  Have both parties then completed their

8   presentation of evidence and testimony?  On behalf of the

9   government?

10         MS. VOGEL:  I'm sorry, your Honor?

11         THE COURT:  Has the government completed its

12   presentation of evidence and testimony?

13         MS. VOGEL:  Yes.

14         THE COURT:  Mr. Poff, have you completed your

15   presentation of evidence and testimony?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Counsel, in keeping then with what I told

18   you the other day, at this time I would like to take up, there

19   may be seven of them at this time, motions.

20      Mr. Poff, I am doing this mostly for your benefit.  One of

21   the things that is hard in this process is --  We have all spent

22   several days now in the courtroom and have a fairly good sense of

23   what the issues are.  The Ninth Circuit Court of Appeals, if

24   someone decides to appeal this matter, only gets the transcript

25   and the exhibits.  And, therefore, if it isn't in the transcripts

1    and the exhibits, the pleadings that are in the case, they don't

2    have any context for what people are arguing.  One of the things

3    that you say, for example, in one of your motions is violation of

4    my Fourth Amendment rights.  I want to make sure they understand

5    what it is that you think was violated, because they may not

6    understand by simply saying Fourth Amendment rights what action

7    it is that you are complaining about.

8        These are your motions.  You can either stay at counsel table

9    and slide the microphone over and we will do this somewhat

10   informally, or if you want to go up to the podium, we can do it

11   from there.  But I have --  I am going to ask a series of

12   questions that pertain to, for example, when you say Fourth

13   Amendment, what you are referring to.  So that's what we will be

14   doing.

15       The government has, I believe, at this time, responded to the

16   motion for a mistrial, which is largely, again, repeated in the

17   second motion for mistrial.  I believe that it would be a fair

18   assumption, although they can speak for themselves, that since

19   the argument that is the basis for defendant's motion to strike

20   the witnesses, and the defendant's motion to strike the evidence,

21   arises out of conduct --  They may feel they have also responded

22   to that.

23       Then there is the motion for a full accounting.  I'm not sure

24   precisely what to call your oral motion this morning, a motion to

25   discredit evidence for lack of originals filed.  You can describe

 1     it when we get to that one.  But that is the seventh motion that

 2     I have on my list.

 3          If everyone has before them docket 171, which is defendant's

 4     motion for a mistrial?  Mr. Poff, do you have that one?

 5               THE DEFENDANT:  Yes, sir.

 6               THE COURT:  It says on page 3 that you are the

 7     beneficiary of the Fourth, Fifth and Sixth amendments.  And then

 8     it says at the bottom of page 3 that you believe that those

 9     rights have been violated.  The first of which is blatant

10     violations of due process of law.  And when we talked about this

11     earlier, you said that was a denial of discovery.  Why don't you

12     tell me in your own words, you don't need to try to dress this up

13     in legalese, what documents you requested, when you requested

14     them, from whom you requested them, that is the basis of your

15     belief that you were denied discovery?

16               THE DEFENDANT:  Okay, sir.  If I recall correctly from

17     my motion for discovery, I believe there was 21 to 23 different

18     items that I had requested in discovery that actually were

19     subsequently denied.  The motion was denied.

20          One thing I was asking for specifically in there that I can

21     recall that would have definitely benefited the defense of my

22     case would have been --  As I was saying earlier, if these

23     lenders would have been compelled to hand over the original

24     documents on all of these loans, one, as we have seen today, I

25     would have been able to get a more conclusive analysis of the

1  handwriting report from the handwriting expert, Ms. McFarland.  I

2  also would have been able to show that there was --  Because a

3  lot of these damages are going to come down, unfortunately, upon

4  the defendant on the damages on this, because these lenders went

5  and seized these properties in foreclosure fraudulently.  There

6  is huge turmoil right now about these lenders not being the

7  holders in due course because of the issue with the note.

8  President Obama even come on the TV and said these lenders can't

9  produce the original note because they bundled them up in trust,

10  and they sell them on the secondary market, and for whatever

11  reason, they can't break this trust, can't produce the original

12  note.  They stamp on the note --  They alter the document

13  actually after the fact.  And I have seen this myself before with

14  a real estate investment buddy back in Battle Creek.  These

15  lenders are changing the note after the fact, thereby changing it

16  from a note to a debt payable -- a negotiable instrument.  It is

17  almost like they endorse the back of the note like a check.  And

18  all of this is undisclosed to the borrower at closing, which is a

19  violation of the Truth in Lending Act, regulation Z.  So a lot of

20  these foreclosures which subsequently caused a lot of damages in

21  this case was actually done by these lenders who fraudulently

22  foreclosed upon these properties.

23          THE COURT:  Go ahead.  I don't want to cut you off.

24          THE DEFENDANT:  Did you have a question?

25          THE COURT:  My question is, do you think the government

1   has that document, the original, and didn't turn it over to you,

2   or did you think it was their obligation that the government --

3   your belief that the government has an obligation to go get it?

4        THE DEFENDANT:  I believe it is the entire obligation of

5   the government to prove their case.  One thing they should do is

6   get the original document.  Under the best evidence rule, that

7   would be the proper way to proceed, is to go and get all the

8   original documents.  Ms. McFarland this morning had a scanned

9   copy of an original document.  She testified she didn't have

10   access to any of the original documents.  Where they are at, I do

11   not know, your Honor.  I was requesting this before, because that

12   would have been a critical part of my defense, to show that there

13   was not this contributory negligence on the part of the lenders,

14   but there was absolute fraud on the part of the lenders in how

15   they damaged these people.  There is people who have lost

16   substantial amounts of money by the unscrupulous dealings of

17   these lenders.  Most of it comes from the foreclosure of

18   properties.  Otherwise their interest would still be secured on

19   that property to date.

20        THE COURT:  What steps did you and Mr. Ratner take in

21   order to obtain these documents?

22        THE DEFENDANT:  To answer that I will say one thing I

23   didn't do.  I did not contact any of the lenders, any of the

24   custodial record holders of any type of documents or evidence.  I

25   relied solely upon the government and their sources and the

1   warrants and subpoenas they had sent out for these documents.

2   Other than that, I requested discovery.  I brought it up as an

3   issue before, your Honor, before this honorable court.  This is

4   stuff that I absolutely needed in this trial.  And it became

5   brutally apparent today that I needed original documents,

6   especially those that purport to have my signature on them.  I am

7   claiming that everything is suspect right now, with as much

8   forgeries as I have seen, and even with the testimony of the

9   seller yesterday --

10          THE COURT:  Ms. Kirkdoffer.

11          THE DEFENDANT:  Ms. Kirkdoffer, yes, sir.  It was

12   apparent one of the documents she had supposedly signed, it

13   looked like the signatory portion of the document was cut off and

14   Xeroxed on another document that she didn't even recognize.

15   There is documents in there.  What is my signature?  What isn't?

16   If nothing is original, I am claiming that everything is

17   suspicious at this point.  There is forgeries, there is

18   manufactured documents.  Unless I can see an original and verify

19   it with a conclusive analysis by the experts on this, I am being

20   severely prejudiced in this regard.

21          THE COURT:  Mr. Poff, I don't want to put words in your

22   mouth.  I want to make sure I summarize this.  Are you aware of

23   anything other than the procedures that are found in the criminal

24   rules that would have required the government to go and get

25   originals in response to your request to them for something they

1    didn't have?

2              THE DEFENDANT:  My only understanding, your Honor, is

3    that if there is originals available, that would be the best --

4    under the best evidence rule, that would be the proper documents

5    to have in evidence.  I believe it has been fairly well proven

6    throughout this case that there have been forgeries and documents

7    manufactured.  And without those original documents for my

8    review, I am claiming anything and everything that purports to

9    have my name on it, even if it was original, is suspicious to me

10   at this point.

11             THE COURT:  I understand that is your position.

12             THE DEFENDANT:  Yes, sir.  To answer your question, sir,

13   I do not know of what other procedure or rule that I should be

14   aware of.

15             THE COURT:  And other than making those requests to the

16   government, which is what your motion is, make the government get

17   this stuff, am I correct that you didn't undertake any actions on

18   your own, as the defendant in this matter, or Mr. Ratner as your

19   standby counsel, to get those originals?

20             THE DEFENDANT:  No, sir.  I did not want to be in

21   violation of the bond in any way.

22             THE COURT:  Anything else under due process of law,

23   other than the denial of discovery?

24             THE DEFENDANT:  I believe there was certain prejudice

25   toward being a person that is representing himself.  I believe

1　the disadvantages that I had, such as --  I asked Mr. Ratner a

2　couple of questions during the trial, but I definitely wasn't

3　afforded the same luxury as, say, the plaintiffs, who tag-teamed,

4　would go back and forth, you cross-examine, and then you do this

5　with this next witness.  I wasn't afforded that kind of luxury,

6　or to have a staff available to do anything and everything that

7　needed to be done.  I believe there is a huge disparity between

8　the amount of access that I had to the court as a pro per versus

9　being a government plaintiff.

10　　　　　THE COURT:  When you say "access to the court," I don't

11　know what that means.

12　　　　　THE DEFENDANT:  Having equal access to the court, as far

13　as --  Being a defendant and being a pro per litigant coming

14　before the court, there appears to be a huge disparity between

15　the type of access that I would have here in regards to just the

16　very nature of me being a defendant, myself representing myself.

17　Whereas the plaintiffs are here, they work here, they work with

18　the court every day, filing papers, even pass each other in the

19　hallway.  I do not know.  I believe that I am at a definite

20　disadvantage trying to exercise my right to represent myself.

21　　　　　THE COURT:  Originally we had a hearing --

22　Ms. McFarland had a lot of concerns about how to pronounce it.

23　We had a hearing here where I asked you a whole bunch of really

24　penetrating questions that had to do with, did you understand

25　that if you are going to represent yourself, one of the things

1     you were going to be up against was the fact that the government

2     has full-time professional prosecutors, this is what they do all

3     the time, whereas you are not experienced in trials, and that was

4     going to be a heavy burden.  Did you understand that at the time?

5          THE DEFENDANT:  Yes, sir.  I walked into this, like I

6     said before, with my eyes wide open.  What I am really trying to

7     say is, it seems like there could have been -- especially on the

8     part of certain technical matters that come to my pleadings or

9     motions, it doesn't seem there was given due consideration of

10    that very fact that Mr. Poff was warned about in the very

11    beginning.  I understand that you run your court under a very

12    high standard.  I have nothing negative to say about that.  I

13    believe there could have been greater consideration afforded to

14    the alleged defendant in light of those warnings, your Honor.

15          THE COURT:  Okay.  Anything else?  I think the next

16    thing you ticked off was equal access to witnesses.

17          THE DEFENDANT:  Yes, sir.  I absolutely did not --  Now,

18    there was a couple of witnesses that we had an investigator, over

19    the past couple of weeks --  Now, half the people we were trying

20    to get a hold of, one, wouldn't speak with our investigator, or

21    they could not be reached or attained for whatever reason.  As

22    far as the other co-defendants that were witnesses, I had not

23    tried to access them at all.  I hadn't tried to contact them in

24    any way, talk to them about the case in any way.  When I would

25    get up there --  One of the forms of prejudice I would have, when

1    I would get up there and ask questions based upon the personal

2    knowledge that I would have, and I would be expecting a certain

3    answer, I would get kind of sideswiped and get an answer that

4    absolutely wasn't expected based upon my recollection of what I

5    know is true.  If I would have had access to these witnesses

6    prior to -- had equal access --  I mean, they testified they had

7    15 to 20 hours of examination or coaching or whatever prior to

8    the trial.  I was afforded none.  I didn't even try to contact

9    them because I didn't want to be in violation of any bond.

10              THE COURT:  Have you read the -- I'm not sure if they

11   are declarations or affidavits put in by Ms. Vogel and

12   Mr. Scoville?

13              THE DEFENDANT:  Yes, sir.

14              THE COURT:  Is there anything in there that you believe

15   is factually not true?

16              THE DEFENDANT:  I read it briefly, your Honor.  There is

17   nothing that seemed to glare about not being factually true.  I

18   have a neutral opinion on their affidavits, actually.

19              THE COURT:  Mr. Poff, my observation is, you get

20   indicted in Seattle, the trial is going to be in Seattle, you are

21   in Battle Creek, Michigan.  That's going to put you at an

22   inherent disadvantage.  I don't know very much about this because

23   it is not something that comes before me, but it sounds like you

24   decided a couple of weeks ago, or Mr. Ratner, because I am still

25   not clear who the investigator is, but someone on your behalf a

couple of weeks ago thought, well, we need to go out and talk to

these witnesses, and that's when you started that lent fore.  Is

that accurate?

THE DEFENDANT:  I don't know the exact time the

investigator started contacting the witnesses actually, your

Honor.

THE COURT:  You understand as a witness they may choose

not to talk to the government, they may choose not to talk to

you, they may choose not to come to court and I have to send the

marshal after them.  That is a right that the witness has, and

frequently exercises.

THE DEFENDANT:  Let's put it this way, your Honor.  I

wasn't in a position to negotiate anything favorable to the

alleged co-defendant witnesses that would be beneficial for them

to testify for me anyhow.

THE COURT:  All right.  In the second motion for a

mistrial you added an allegation of ex parte communications.

Once again, I don't want to put words in your mouth.  You said

that arose some months ago, and it was people who were in the

audience who were confident that your motion was going to be

denied.  And you assumed that had to be based on ex parte

communications, but you didn't know with whom.  Would you like to

flesh that one out a bit?

THE DEFENDANT:  I reverified --  It is actually the

gentleman I am staying with while I'm here, your Honor.  He drove

me to court that day.  He was sitting in the audience.

Mr. Scoville told me it might have been a remark about the

plaintiff's confidence that my motion would be denied.  But that

wasn't his understanding from what he heard.  He had mentioned it

was his understanding that the plaintiffs were confident beyond a

reasonable level of just relying upon their expertise, I guess

you could say, as to these motions not going anywhere.  It was

like a moot point.

       THE COURT:  Do you remember which motions they were?

       THE DEFENDANT:  I believe it was one of the motions to

dismiss.  I do not remember which ones it was, your Honor.

       THE COURT:  Anything else you want to say about that

particular one?

       THE DEFENDANT:  No, sir, not about the ex parte.

       THE COURT:  Then one that was also added in the second

motion to dismiss was the request to submit financial information

you felt was a violation of your right against

self-incrimination.

       THE DEFENDANT:  Yes, sir.  This wasn't in Washington,

this was actually the probation officer I had in Michigan.  But

it was at the request of the office here in Washington, the

probation -- Pretrial Services here in Washington, that I was to

provide this.  I was getting information together.  It really

turned into a fiasco to where, if I didn't provide this

information, there was going to be a hearing on my noncompliance

1    to the bond.  So I was being compelled to produce information

2    under duress, basically.  My understanding is that would be

3    against my right of self-incrimination.

4           THE COURT:  Help me with that last part.  If I go to the

5    bank, and they make me fill out a financial statement, that

6    doesn't invoke my Fifth Amendment rights against

7    self-incrimination.  Self-incrimination has to do with being

8    forced to admit you committed a crime.  That link between crime

9    and testifying that you don't have enough assets, and you are

10   entitled to a CJA lawyer, I see as a different issue.  Help me

11   understand that one.

12          THE DEFENDANT:  I don't even know if that was the same

13   affidavit I did in reference to getting a CJA lawyer.  I could be

14   wrong on that point.  This turned into an absolute fiasco

15   where there was --  If you go to the bank and you fill out some

16   paperwork, that is voluntary.  You go there and do that.  If

17   someone is telling you, you are about to be in violation against

18   your bond and incarcerated unless you comply, that would be a

19   completely different story.  I have no problems complying with

20   the court and remaining within the requirements my bond.  This is

21   just something that pretrial required of me.  It was threats and

22   duress, we are going to put you in front of the judge, and that

23   is going to be it.

24          THE COURT:  Mr. Ratner, no helping the students with

25   their examination now.

1          MR. RATNER:  Isn't that my role, your Honor?

2          THE DEFENDANT:  He was actually telling me what I really

3     already said, about Pretrial Services requiring info.  May I add

4     something else, your Honor?

5          THE COURT:  Absolutely.

6          THE DEFENDANT:  I also went to Pretrial Services here, I

7     believe it was back in November.  It was during Mr. Newman's

8     deposition.  I met with Pretrial Services, and I was talking

9     about inappropriate conduct of another alleged co-defendant.  I

10    was trying to seek relief from the court in regards to her being

11    in violation of another court order.  That's something that

12    basically financially affected me in being able to prepare for my

13    case, because I was stuck out here for two months, eating peanut

14    butter and jelly sandwiches until I could find out a way to get

15    back to Michigan and take care of the business I needed to.  This

16    complaint was brought against Ms. Ikilikyan, and actually a

17    complaint was brought against Ms. Padula as well for

18    inappropriate conduct by counsel during that time.

19          THE COURT:  Who is Ms. Padula?

20          THE DEFENDANT:  Ms. Padula is Ms. Ikilikyan's attorney,

21    Liz Anne Padula.

22          THE COURT:  All right.  That is not a name I have heard

23    before.  I am informed she was here during her testimony.

24          THE DEFENDANT:  Yes, she was in the audience.  Yes, your

25    Honor.

1          THE COURT:  As I previously advised you, I have a very

2     thick skin.  You can be candid on this.  In paragraph 10 of the

3     motion it says, "There has been obvious advocating for the

4     plaintiffs from the bench."  I take it that would be me, since I

5     am the only one sitting up here.  "The unequal consideration and

6     rulings that have been administered from the bench constitute a

7     major breach of judicial impartiality."  Why don't you put on the

8     record what you mean by that?

9          THE DEFENDANT:  From what I have seen in open court,

10    your Honor, it would appear -- no offense directed towards you at

11    all, it would appear when the motions -- when my motions would

12    come in, and I guess it is protocol for yourself, you don't

13    usually allow oral argument.

14         THE COURT:  That's correct.

15         THE DEFENDANT:  A lot of times there seems to be the

16    appearance of your openly advocating for the plaintiffs, from

17    what I see.  It seems like you openly advocate for the plaintiffs

18    often.

19         THE COURT:  Are you talking about my rulings on

20    objections or --  I try very hard not to make comments during the

21    trial.  It is a little easier because we don't have a jury here.

22    But tell me what you mean by that.

23         THE DEFENDANT:  It is just like some of the motions I

24    put in, some of the answers I would get from the plaintiffs are

25    really kind of sham answers.  They really haven't properly

1 answered any of my pleadings.  I did everything in affidavit

2 format.  I was never responded to in affidavit format, which I

3 believe is required.  Some of the answered -- some of the

4 questions or topics I brought up were never answered.  It seemed

5 that this didn't seem to matter when it comes down to the time of

6 rulings.  That's how it appeared from where I am sitting, your

7 Honor.  It appeared, if there was any inference to the plaintiffs

8 being right at all, that is kind of what the direction the court

9 went, unfortunately.

10    THE COURT:  Would you say --  I don't want to put words

11 in your mouth.  Is that mostly my evidence rulings that you are

12 talking about, or rulings on motions?  I don't believe we have

13 had any rulings on motions during the trial, other than the

14 government withdrew its objection to your handwriting expert.

15    THE DEFENDANT:  Not so much during trial.  There was the

16 ruling on jurisdiction.  There was very minimal commentary on the

17 court's position, from what I heard, as far as the jurisdictional

18 issue I keep bringing forward.  Then there was the motions that

19 were filed previous to the trial itself, your Honor.  That is

20 really what -- the bulk of that argument is what I was referring

21 to.

22    THE COURT:  Okay.  We have talked already about denial

23 of access to witnesses.  Anything you want to add on that one?

24    THE DEFENDANT:  Not at this time, your Honor.

25    THE COURT:  I couldn't tell if you were advocating for

1    the position that, if the government took 15 hours of meetings

2    with the witness, that you were entitled to 15 hours?

3              THE DEFENDANT:  No, sir.

4              THE COURT:  That would have been one interpretation of

5    what you wrote.

6              THE DEFENDANT:  No, sir.  The fact of the matter is,

7    they had 15 to 20 hours to interview these adverse witnesses,

8    whereas I had zero, zilch.

9              THE COURT:  This is in your motion to strike evidence.

10   It is on page 4, paragraph 4.  And it says that you have been

11   irreparably harmed by the prosecutorial misconduct of the

12   plaintiffs.  And then it goes on to say, "Coaching a witness who

13   has a plea agreement is fraud."  Would you care to expand on that

14   one?

15             THE DEFENDANT:  Yeah.  Absolutely, sir.  I believe that

16   with the incident with Ms. Padula, that I -- myself and

17   Mr. Ratner actually encountered back in November, where there was

18   a blatant attempt to entrap me into bringing firearms to her

19   office, which would have been a violation of my bond and her

20   bond.  It was my understanding we were not supposed to dispose of

21   any properties.  She was volunteering to do it since

22   Ms. Ikilikyan couldn't do it.  Coupled with that fact, and the

23   fact that these witnesses were interviewed so extensively, and

24   then possibly coached prior to the trial itself, and the fact

25   that Ms. Ikilikyan, for whatever arbitrary reason, decided to

1    violate a previous divorce judgment back in November -- early
2    November, it seemed like there was a concerted effort to try to
3    bring out the absolute most negative material any which way you
4    can get it to come to the surface type of fraudulent format you
5    do.  Like I said before, your Honor, I asked questions based upon
6    my knowledge of what the situation was, and I am getting answers
7    that are totally contrary, unless I have developed amnesia over
8    the past couple of years.  These answers are totally contrary to
9    what I remember.  I was totally blindsided by the lack of good
10   information.
11        THE COURT:  The only time that I recall you asking a
12   question was addressed to Ms. Ikilikyan about, did the government
13   tell you to describe the checking account as a common account.
14   And her answer was, no, I came up with it myself.  That's the
15   only recollection that I have of a time during the trial when you
16   basically inquired of a witness regarding coaching by the
17   government.  Is my memory faulty on that one or were there other
18   examples?
19        THE DEFENDANT:  I believe there were other examples.
20   There wasn't one question that could be asked by myself --  If I
21   would have asked if the sky was blue, per se, as a totally off
22   the wall example, she would say, of course the sky is blue,
23   because you told me you could do more loans on a blue, sunshiny
24   day.  We laugh about it now.  It is kind of funny in one respect,
25   but these are serious charges against me that you have to decide,

1    your Honor.  It is so much misconduct and it is so blatant.  She

2    was lying on the stand.  She honestly should be charged with

3    Title 18, Section 1746, for her felony perjury on the stand.  It

4    is absolutely ridiculousness.  We have a mortgage broker that

5    claims she doesn't even know how to fill out a loan application.

6    I mean, this stuff is so off-the-wall ridiculous that nothing

7    should even be given serious credit or consideration.

8        Where did she get this information?  Did she choose this on

9    her own?  Was this during the 15 to 20 hours of pretrial

10    preparation that the plaintiffs had?  Was this on the part of

11    Ms. Padula, or was this all together?  I do not know.  All I know

12    is what happened on that stand when Ms. Ikilikyan was on that

13    stand was an absolute tragedy to the truth.

14          THE COURT:  The other -- I guess there are technically

15    three, or at least three areas.  One is the motion for judgment

16    of acquittal.  The second would be for the full accounting.  And

17    then the third would be to disregard the testimony and exhibits

18    based on the question of authenticity.  Let me stop at this

19    point.  Is there anything else you would like to add to the

20    motions, the first of those four motions, that you want to make

21    sure there is a full record on your concerns in regards to those

22    areas?

23          THE DEFENDANT:  Nothing at this time, your Honor.

24          THE COURT:  Okay.  The motion for judgment of acquittal

25    that was made at the end of the government's case is to be

1   granted when the evidence, viewed in the light most favorable to

2   the government, is such that a fact finder must have a reasonable

3   doubt as to the existence of any essential element of the causes

4   of action.  I have taken that one under advisement.  You are

5   likely not to get a ruling from me until I have heard closing

6   argument, because I want to make sure I have given everyone the

7   opportunity to argue everything that they think is important.

8   Don't hold your breath on that one.

9       The next one is for a full accounting.  Mr. Poff, I'm not

10  sure I understand this one.  Let me tell you what my thinking on

11  it is, and then I would like to hear yours.  It seems to me any

12  time the United States sues someone, they are going to have more

13  resources.  If they sue Bill Gates, the government is still going

14  to have more resources.  And, therefore, doing an accounting,

15  particularly given that --  I suppose we could figure out what

16  the prosecutors' salaries are and divide them by 365 and

17  calculate some daily cost.  The real issue is not how much did

18  the government spend, because they are entitled to prepare their

19  case in the manner that they want.  Likewise, you are entitled to

20  prepare your case in the manner that you want.  But what would be

21  of concern to me is if there were things that you asked for

22  finances to do and they were denied.  Since, as the trial judge,

23  I am responsible for approving those requests, and in particular

24  one of your co-defendants found it extremely important to

25  understand how computers work, and the voluminous computer

 1   discovery that was done on this, I don't believe I have ever

 2   approved greater expenses than there were.  I guess it is not a

 3   secret at this point, as she testified, I approved the

 4   handwriting expert.  I approved some other expenses in this

 5   matter.  Is there anything that you are aware of that you asked

 6   for that was not approved?

 7           THE DEFENDANT:  Nothing that I asked for, your Honor.

 8           THE COURT:  Tell me why you think a full accounting

 9   would be beneficial.  I have given you my world view of this.  I

10   would like to hear yours.

11           THE DEFENDANT:  Especially if this is a matter I have to

12   take up on appeal, I would like to get a full record of

13   everything that happened.  I believe if I had a full accounting

14   of the entire case, with the expenditures on both sides, both

15   plaintiffs and defendants, that might be able to cast a better

16   picture or light on exactly what I was trying to deal with as a

17   pro per litigant here in this honorable court, sir.

18           THE COURT:  Let's assume hypothetically you didn't do

19   anything, you went back to Battle Creek, and you show up here on

20   the first day of trial, there are no expenditures.  What would be

21   the relevance of what the government spent versus what you have

22   spent?

23           THE DEFENDANT:  I believe as an illustration of the

24   disparity between -- the prejudice that is shown towards a

25   pro per, especially when someone like myself is trying to seek

1    relief from Pretrial Services, from the court, about how he is

2    continually being frauded by the conduct of other alleged

3    co-defendants, the actual amount of assets that he was able to

4    contribute himself towards this, and the amount of assets the

5    court was able to assist in, versus the -- like you said, the

6    plaintiffs almost have nearly what seems like an unlimited budget

7    to prove their case.  There could be some prejudice there towards

8    a pro per in regards to how he is allowed to prepare his case

9    versus how the plaintiffs are allowed to prepare their case, your

10   Honor.

11              THE COURT:  Anything you want to add on that one?

12              THE DEFENDANT:  Nothing, your Honor.

13              THE COURT:  I think the only other one that is out there

14   is the motion to disregard or strike the government's evidence on

15   the basis of the testimony of the handwriting person allegedly

16   showing that there has been forgeries.  The same sort of purpose

17   for this, I want to make sure there is a clear record of what

18   your theory is and how you would support it.

19              THE DEFENDANT:  Yes, sir.  Not just the handwriting

20   analysis of Ms. McFarland.  But like the testimony with

21   Ms. Kirkdoffer yesterday, like I was saying earlier, it seemed

22   like there was a tremendous amount of manufactured documents,

23   forged signatures, multiple documents that seemed to be the same

24   but are not.  I am claiming suspicion on all of them unless I can

25   see the original document so that I can get a conclusive analysis

on that document.  I was prejudiced in the fact that there wasn't
one document that the handwriting analysis we retained was able
to come back conclusive.  And that was based upon her testimony,
totally upon the fact that there were no originals.  Now, she did
have some copies of scanned original documents, but she was never
given access to the original documents.  I don't know where she
got the scans from.  I do not know where the original documents
are that she received those scans from.  But from her testimony,
she received no access to any original documents.  Thus, it
inhibited her from giving her highest rating of being conclusive,
whereas she would have been able to if she would have had that
access.

        THE COURT:  Okay.  Any other motions that I missed?

        THE DEFENDANT:  You do have the two motions, one for
striking the testimony of the two --

        THE COURT:  Yes.

        THE DEFENDANT:  And the evidence, the motion to strike?

        THE COURT:  Yes.

        THE DEFENDANT:  That's it.

        THE COURT:  I have listed those as three and four.  Who
wishes to speak on behalf of the government?

        MS. VOGEL:  I will, your Honor.

        THE COURT:  Would you like to do it seated?  We are
doing this informally.

        MS. VOGEL:  Does the court wish that I address all of

1   these?

2           THE COURT:  It is up to you.

3           MS. VOGEL:  Thank you, your Honor.  With regard to the

4   claims of discovery violations, I would like to clarify that the

5   motion the defendant is referring to, at least the only discovery

6   motion I am aware of, that I can recall at this time, was a

7   motion for the government to produce documents in its possession.

8   There was not a motion seeking an order compelling the government

9   to obtain originals.  I just want to clarify the distinction

10  there.

11      Throughout this case we have made it very clear we have

12  produced everything we have.  By and large, because of the nature

13  of the case, those are copies.  They are the original documents

14  by and large that were submitted to the lenders.  They are the

15  faxed 1003s, and the e-mailed 1003s, and the scanned documents

16  that were submitted to the lenders.  The documents that are of

17  importance for proving the government's case are the ones that

18  were in the file of the lenders.  And they don't have the

19  originals.  And they wouldn't be expected to have the originals

20  in most instances.

21      Federal Rule of Criminal Procedure 1003 makes it very clear

22  that duplicates are admissible to the same extent as originals,

23  unless there is a genuine question raised as to the authenticity

24  of the original.  Now, from what I understand the defendant's

25  expert testimony to have established, is that the defendant

1    questions whether the signature was genuine.  But I did not

2    understand any of that testimony to establish that the signature

3    on the original document was somehow different than the signature

4    that we saw on the duplicate copy that was admitted.

5        So I don't believe that any of that testimony has raised a

6    question -- a genuine question as to whether the signature on the

7    original, wherever it may be, is different from the signature

8    that is on the copy that has been introduced here today.

9        And I also assert, your Honor, the defendant has not

10   established under the circumstances it is unfair to admit the

11   duplicate, since it is the duplicate itself that was provided to

12   the lender.  And that is the crux of the entire case, what was

13   the lender given.

14       With regard an unequal access to witnesses, your Honor, I

15   think our written reply states our position on that matter.  We

16   have heard from numerous witnesses that they have been contacted

17   by defense investigators or interviewed by the defense -- standby

18   counsel.  We have never done anything to interfere with that.  We

19   have yet to hear any allegation that we have done anything to

20   interfere with that.

21       Counsel for both of the cooperating co-conspirators confirmed

22   they were never approached by standby counsel or an investigator

23   or the defendant for an interview.  Of course, we had no

24   knowledge of whether they had or not until we went and asked them

25   yesterday.  So on that matter, your Honor, I would simply refer

1   to our written response.

2       A lot of the allegations the defendant raises, especially in

3   his second motion for mistrial, are things entirely outside the

4   realm of the government's knowledge.  We have no idea what

5   disputes the defendant might have had with his Pretrial Services

6   officer about complying with his bond.  I have noted that in his

7   appearance bond that he accepted, and he signed, and he agreed

8   to, does include a financial disclosure condition.  But as I'm

9   sure the court is aware, disputes -- internal disputes between a

10  Pretrial Services officer and a defendant about compliance that

11  don't result in a violation petition are not something the

12  government has any knowledge about.

13      I simply can't respond to many of the allegations in the

14  second motion for mistrial.  This allegation about the attorney

15  for the cooperating co-defendant, what she may or may not have

16  done, is something outside our knowledge altogether.  I would

17  simply point out a dispute between the defendant and a

18  co-conspirator's attorney is not prosecutorial misconduct, in the

19  way that it has been alleged.

20      If I could have a moment to review my notes to see if there

21  are any other points I want to make?

22      As to the motion for a full accounting, your Honor, obviously

23  the government has the burden of proof, it is our responsibility

24  to put on all the evidence, and it is not surprising that takes

25  people and it takes time and it takes money.  But as the court

1   pointed out, we have yet to hear anything that the defendant

2   requested that he was denied.  Under the law governing CJA

3   expenditures, I don't think there has been any showing whatsoever

4   of any kind of denial of access.

5       I would also point out, your Honor, throughout the seven days

6   that we have been in trial, Mr. Ratner sat at counsel table, he

7   has conferred on every single break with the defendant, he has

8   conferred repeatedly with the defendant when the defendant was at

9   the podium and at the table.  He has been very involved with us

10  in negotiations as to stipulations, stipulations that were

11  rejected, exhibits, witnesses, everything.  Every part of the

12  defense we have worked jointly with the defendant and with his

13  standby counsel.  So when it comes to claims that he has been

14  denied access to an attorney, despite having opted to proceed

15  pro se, I think there is no basis on the record for that

16  allegation.

17      I'm sure it doesn't need to be said, your Honor, but I would

18  also point out there is just no evidence of any improper or

19  ex parte contact.  That simply has not occurred.  I think

20  everybody involved, from standby counsel to our staff, has bent

21  over backwards to try and assist Mr. Poff through this lent fore,

22  which we can't deny is difficult for a pro se defendant.

23          THE DEFENDANT:  Can we reflect the record that we did

24  consult with each other, your Honor?

25          THE COURT:  I think it did.  But I will also note it on

1    the record.

2        Mr. Poff, you are going to get the last word.  Let me say

3    this, sitting out here, if I am raised three feet off the floor,

4    is an intense experience.  It is not tedious in the sense of

5    boring or uncomfortable or whatever, but it requires a great deal

6    of concentration, because I take these responsibilities as

7    seriously as I do.  I know I get in trouble for my sense of humor

8    on occasion.  But if anyone has been offended by my feeble

9    efforts to inject some note of levity into this, I will

10   apologize.

11       Mr. Poff, you get the last word, and then we will take our

12   break.  I want to go over a couple of cases on 1003, and I will

13   be back out to rule.  These are your motions and you get the last

14   word.

15           THE DEFENDANT:  Yes, sir.  Note that your sense of humor

16   does not offend me in any way.

17       In response to what the plaintiffs just said, it was the

18   expert witness that gave her testimony about needing original

19   documents on that.

20       Also, one of my contentions was, as I said before, it has

21   been blatantly obvious that some of these documents were

22   manufactured, cut and pasted, modified in some way.  So if they

23   are sent in as copies or faxes or sent electronically, I would

24   assume that at any one of those steps there could be some sort of

25   alteration to the document somehow.  That is part of my basis for

1   this argument that anything that can be counted against me, since

2   there has been established that there is forged documents, forged

3   signatures, that we really need to take in light of is there

4   anything that is real or anything that is original before any

5   type of decision is passed down.

6        Also, on the contention --  I didn't mention that I was

7   denied any access to an attorney.  I did ask Mr. Ratner a couple

8   of questions.  Not as many as I thought I'd need, but I did ask

9   him a few questions procedural-wise, because I am not versed on

10  courtroom procedure.  I believe --  My contention is if I needed

11  Mr. Ratner to take over and do the cross-examination, I didn't

12  have a team, it was me, I was a one-man band.  I would have to

13  ask a question once in a while, and it was all on me.  That was

14  something I took up.  I wasn't given the same opportunity that

15  the plaintiffs were.  I mean, they had Mr. Parrent on the case

16  for a while, now we have Mr. Scoville on the case.  It is like

17  they have this whole team to prove their case, whereas myself as

18  a pro per, I got me, myself and I to wage my defense.  And that

19  was the only other point I wanted to add, your Honor.

20            THE COURT:  Counsel, why don't we assume I will be back

21  out at about a quarter to 3:00.  In the meantime, I am going to

22  look at a couple of cases.  We will be in recess.

23  (At this time a short break was taken.)

24            THE COURT:  Counsel, as I indicated, it is my intention

25  to at this time rule on the various pending motions, with the

1   exception of the motion for judgment of acquittal.  I guess we do

2   not yet have a docket number for that, but it was made yesterday.

3        I am going to begin with Faretta versus the State of

4   California, not because it is directly relevant to this case,

5   having already ruled on the motion by Mr. Poff to represent

6   himself, but simply because I think the language of Justice

7   Stewart in that case continues to resonate, even though it was

8   decided in 1975.  Sounding not unlike this court, although that's

9   a comparison that I would certainly be pleased to have made,

10  Justice Stewart said, "It is undeniable in most criminal

11  prosecutions defendants could better defend with counsel's

12  guidance than by their own unskilled efforts.  But where the

13  defendant will not voluntarily accept representation by counsel,

14  the potential advantage of a lawyer's training and experience can

15  be realized, if at all, only imperfectly.  To force a lawyer on

16  the defendant can only lead him to believe that the law contrives

17  against him.  Moreover, it is not inconceivable that in some rare

18  instances the defendant might, in fact, present his case more

19  effectively by conducting his own defense.  Personal liberties

20  are not rooted in the law of averages.  The right to defend is

21  personal.  The defendant, and not his lawyer or the state, will

22  bear the personal consequences of a conviction.  It is the

23  defendant, therefore, who must be free personally to decide

24  whether in his particular case counsel is to his advantage.  And

25  although he may conduct his own defense, ultimately to his own

1    detriment, his choice must be honored out of that respect for the

2    individual, which is the life blood of the law."  Citing Illinois

3    versus Allen.

4        Perhaps my favorite part of this is the footnote that

5    accompanies that, which concludes in the following:  "The right

6    of self-representation is not a license to abuse the dignity of

7    the courtroom.  Neither is it a license not to comply with

8    relevant rules of procedure and substantive law.  Thus, whatever

9    else may or may not be open to him on appeal, a defendant who

10   elects to represent himself cannot thereafter complain that the

11   quality of his own defense amounted to the denial of effective

12   assistance of counsel."  I guess there is some humor in the law.

13       Mr. Ratner, I would offer my commendation to the fact that I

14   think you have performed your responsibilities as standby counsel

15   very appropriately.  It is not an easy job.  You winced when I

16   made you do it.  I am not aware of the relationship between you

17   and Mr. Poff, but you have certainly worked well in the courtroom

18   here together.  And I appreciate your service.  I know there are

19   many things you would rather be doing, including standing up.

20       MR. RATNER:  Thank you for giving me permission to stand

21   up.

22       THE COURT:  Judge Coughenour, who has been taking his

23   nephew around to various courts today, thought it was unusual

24   that you would be sitting on a rubber ball.

25       Mr. Poff, I thought you have done a nice job of representing

1   yourself.  I judge that not from would I make the same arguments
2   that you would make.  We have some obviously pretty different
3   views of what the Constitution requires and doesn't require.  But
4   I judge it from the fact that you understood what the government
5   was trying to get out of the witnesses, and you went after them
6   to undermine those facts.  And that's what lawyers do.
7   Regardless of how this turns out, you did a better job than many
8   who are in here.
9            THE DEFENDANT:  Thank you, your Honor.
10           THE COURT:  I would say, some licensed and some not.
11      Let me then turn to the motions that are pending before the
12   Court, in which I need to do these one at a time.  The first
13   motion is defendant's motion for mistrial, found in the record at
14   docket 171.  The particular facts that give rise to that motion
15   have to do with really two major areas, the first of which is
16   what the defendant characterizes as a denial of discovery, in
17   which I understand to be the fact that the motion which was filed
18   to require the government to get the originals of these documents
19   was denied by the court, and that the defense feels that the
20   original documents are essential to its case.
21      I would reaffirm my denial of the discovery, in that it is
22   not the government's job to go out and get material to then
23   supply to the defense.  The defense has an obligation to conduct
24   its own discovery.  The government's obligation is to come in
25   here and put on its case.  And if it doesn't do it right, the

1   defendant wins.  The defendant bears no obligation to defeat the

2   government's charges.  It doesn't have to put on any evidence.

3   But if it wishes to mount a defense by contending that there is a

4   problem somewhere, it has an obligation to prepare that defense.

5         The second issue raised in this particular motion was a claim

6   of unequal access to witnesses.  And I am persuaded between

7   Mr. Poff's candor to the court, in discussing this matter, and

8   the declarations that were submitted by the government, that

9   there has not been a violation of the rule that the government

10  cannot impede access to a witness; nor must the government allow

11  access to a witness, overriding the witness' desire to be either

12  interviewed or not interviewed.

13        I think Mr. Poff is absolutely right that, if you go to

14  someone like Ms. Kirkdoffer, who is still waiting to be paid for

15  her $304,000, she is probably happier to talk to the government,

16  who is suing someone in connection with that transaction, than

17  she is to an individual who she may assume somehow is responsible

18  in part for the money that she and her husband have not received.

19  That, however, does not arise to a violation of a constitutional

20  right.

21        The next motion followed chronologically was docket 176,

22  which was the second motion for mistrial.  It, once again, raises

23  the issue of equal access to the witnesses which I have already

24  spoken to.  It speaks to a denial of equal access to the court,

25  which I have probed fairly deeply with Mr. Poff, because it

1    implicates my handling of the trial.

2        I do not hear facts which cause me to believe that there has

3    been some wrong committed, other than the inherent inequality

4    that comes with having two paid prosecutors, who are talented at

5    what they do, versus a well-intentioned defendant who may well be

6    conducting his first trial.

7        There is an allegation in the second motion of ex parte

8    meetings.  I am unaware of any conduct to support that.  I will

9    say that, having read Mr. Poff's motions, which have been filed,

10   they have gotten better over time.  Snipping together pieces of

11   material found on the internet is a dangerous way to practice

12   law.  Snipping together pieces of material from the internet that

13   look like they may well have come from various chatrooms or

14   websites is a really dangerous way to practice law.  Some of the

15   arguments that are made in those have been described by the Ninth

16   Circuit in a very shorthand term as simply frivolous.

17       The other particular question that is raised in that motion

18   was in regard to a financial worksheet.  Like the U.S. Attorney,

19   I am not in contact with Pretrial Services.  I know nothing about

20   Mr. Poff's performance during Pretrial Services, other than he

21   has been able to do it from out of state.  If this was a

22   compelled disclosure, I don't think that it has in any manner

23   impacted the trial lent fore.

24       The last thing that is in the second motion is the

25   defendant's belief that my rulings constitute a major breach of

1    judicial impartiality.  On that, I simply respectfully disagree.

2    I have ruled on objections to evidence, on motions that have been

3    made, and done a fair amount of coaching from the bench, but all

4    to Mr. Poff's benefit, I hope, in trying to get him to put on the

5    best case that he could.

6        Docket 177 is the motion to strike the government's witness

7    testimony that arises from the fact that the witnesses,

8    particularly Ms. Ikilikyan and Ms. Thompson, had met with the

9    government and were coached, combined with Mr. Poff's view that

10   their testimony on the stand was simply not believable.

11       The second of those goes to the weight that the court gives

12   that testimony.  The first of it is something that doesn't

13   implicate any violation of the law.  The government has an

14   advantage, in that a person with pending criminal charges may

15   well be more willing to please the government than to please, in

16   this instance, an ex-husband, or a co-defendant.  But as Mr. Poff

17   brought out in his cross-examination, that's something that the

18   court takes into account in evaluating the testimony,

19   particularly in regards to people who have pending criminal

20   charges.

21       And then finally docket 178, the defendant's motion to strike

22   the evidence, which basically repeats the arguments in regards to

23   misconduct by the United States in meeting with a witness and in

24   coaching a witness.  That's been discussed by the court.

25       I will at this time deny the motion for a mistrial, deny the

 1    second motion for a mistrial, deny the motion to strike the

 2    government's witnesses' testimony, and deny the motion to strike

 3    the evidence.

 4        There was next filed the motion for a full accounting.  In my

 5    discussions with counsel, I explained my concern that this

 6    motion, frankly, does not make a lot of sense in the relief that

 7    it asks, in that the government bearing the burden of proof will

 8    do what it needs to do in order to prepare the case, and a

 9    defendant, who has no burden in this courtroom, may choose to do

10    nothing.  And, therefore, I think the question that really is

11    determinative in this, in terms of showing some inherent

12    prejudice or misconduct, is the question of:  Did the defendant

13    request any assistance with the preparation of their case which

14    was denied?  And the answer to that is no.  And, therefore, I am

15    going to deny docket 185, which is a motion for a full accounting

16    in the case.

17        I have already advised you that I am taking under advisement

18    the motion for judgment of acquittal until I hear the argument

19    tomorrow.  And that leaves me then with the motion to strike

20    evidence for lack of originals, an oral motion made this morning

21    by Mr. Poff, but which I will take as a valid, pending motion and

22    deal with it at this time.

23        Mr. Poff, you have raised an interesting question.  Without

24    getting into my rulings, which I am still working on, I would

25    agree with you that certain of the signatures challenged by

1   Ms. McFarland appear to the court not to have been signed by you.

2   Having said that, does it follow that the court needs to strike

3   the evidence for lack of originals?

4        There are several problems with that argument, the first of

5   which is that there was no objection to the admission of the

6   document.  And that, in some of the cases, is the beginning and

7   the end of the story, in that once you have agreed to, or not

8   opposed or objected to an admission, you waive that right.

9        I think, out of fairness, the issue requires a somewhat

10  deeper analysis than that.  I believe this to be controlled by

11  Evidence Rule 1003, which really states an exception to what

12  Mr. Poff has called the best evidence rule, what we would be

13  trained to call Evidence Rule 102, which requires introduction of

14  the original of a writing, recording or photograph to prove its

15  contents.  Rule 1003 states that a duplicate is admissible to the

16  same extent as an original, and then provides two exceptions, the

17  first of which is somewhat counterintuitive, but was articulated

18  by Ms. Vogel.  It states, "A duplicate is not admissible where

19  there is a genuine question as to the authenticity of the

20  original."  And by the use of the word "original," meaning the

21  one that was on file.  If you read the case law under that, it

22  does not speak to the question of was the document which was

23  executed in the transaction fraudulent or not, it speaks to the

24  question of:  Is the copy which is being introduced in court

25  identical to the copy in the files of the insurance company, the

1   bank, or whatever?

2      The evidence which is been presented does not speak to that

3   question.  Rather, it speaks to the question that Mr. Poff is on

4   trial for here in this matter, which is, was his signature forged

5   on those transactional documents.

6      And then there is the second exception in 1003, which has

7   somewhat of a catchall:  Would it be unfair to admit the

8   duplicate in lieu of that original?  I would answer that by

9   saying, when there is not a challenge that the document that is

10   on file with the escrow agent, bank, repository, is the same as

11   the document that is here, then it is not unfair.

12      The real battleground in this, and where the court would have

13   expected it to have been intensely litigated, would be in the

14   execution of those documents.  And, indeed, I think it is true

15   that the two longest witnesses that we had, not surprisingly,

16   were Ms. Ikilikyan and Ms. Thompson, who were the two people most

17   intimately involved in those executions, followed by

18   Ms. Harutyunyan, who was certainly used in connection with the

19   execution of those documents, and certainly the transactions.

20      Therefore, I am going to deny the motion to strike the

21   evidence for lack of originals as documents admissible under

22   Evidence Rule 1003 for purposes of this trial.

23      That leaves pending the motion for judgment of acquittal.  I

24   told you yesterday that we would do closing arguments tomorrow.

25   I am going to stay with that.  I would urge counsel to be quite

 1    precise in their statements to the court.  There is a temptation

 2    to be very general in this.  We have eight transactions.  We have

 3    30 causes of action.  Many of those are tied to a particular wire

 4    or message or routing slip.  The court has quite extensive notes

 5    that it has been able to maintain up here as to what exhibits go

 6    to which of those.  And my efforts this evening will be to go

 7    back and look at the elements of the transaction -- of the

 8    charged offense, and see if the facts have been introduced into

 9    the record that support them.  There are some of them where I

10    have questions.  If you don't answer them, I will probe you on

11    them, thereby showing that meanness is alive and well among

12    federal judges.

13        Counsel, anything further at this time?  From the government?

14            MS. VOGEL:  No, your Honor.

15            THE COURT:  Mr. Poff.

16            THE DEFENDANT:  No, sir.

17            THE COURT:  We will see you at 9:00 tomorrow morning.

18    Mr. Poff, the order will be, the government goes first, you go

19    next, and then they get a rebuttal.  Mr. Scoville, I think you

20    gave the opening, so I am assuming Ms. Vogel is giving closing?

21            MS. VOGEL:  Yes, your Honor.

22            THE COURT:  We will see you all at 9:00 tomorrow

23    morning.

24                    (Adjourned for the day)

25

1                              **CERTIFICATE**

2

3

4

5

6

7

8

9          I, Barry L. Fanning, Official Court Reporter, do hereby
       certify that the foregoing transcript is true and correct.

10

11                                   S/Barry L. Fanning

12                                   _____

13                                   Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25