```
1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
2                            IN SEATTLE

3      _____

    UNITED STATES OF AMERICA,        )
4                                     )   NO. CR09-160JLR
                     Plaintiff,       )
5                                     )
            vs.                       )
6                                     )
    WILLIAM S. POFF,                  )
7                                     )
                     Defendant.       )
8                                     )
       _____

9

10                               TRIAL

11     _____

12

                    BEFORE THE HONORABLE JAMES L. ROBART
13

14                          March 17, 2010

15
       APPEARANCES:
16
    Sarah Vogel
17  Michael Scoville
    Assistant United States Attorneys
18  Representing the Plaintiff

19  William S. Poff
    Pro Se
20  Representing the Defendant

21  Howard Ratner
    Standby Counsel
22  Attorney at Law

23

24

25
```

1            THE COURT:  We have resumed this morning for purposes of

2    hearing closing argument in this matter.  Anything to take up on

3    behalf of the government before we do so?

4            MS. VOGEL:  No, your Honor.

5            THE COURT:  Mr. Poff, anything to take up on behalf of

6    the defense?

7            THE DEFENDANT:  Nothing, your Honor.

8            THE COURT:  Then we will hear from the government first,

9    please.  Mr. Poff, do you remember my description of how this is

10   going to go today?  They get the first word, the last word, you

11   get sandwiched in the middle.

12           THE DEFENDANT:  Yes, sir, I remember your instructions.

13           MS. VOGEL:  May it please the Court, counsel, Mr. Poff.

14   Your Honor, for a period of at least four years, beginning in

15   2004 until 2008, this defendant, Mr. Poff, and his former wife,

16   Alexis Ikilikyan, made a very good living investing in real

17   estate.  Only they turned the whole concept upside down.  Instead

18   of investing their own money and buying properties, with the hope

19   that it might appreciate in value, and might earn a profit when

20   resold eventually over time, they figured out a way to make the

21   profit up front at the time of purchase, eliminating both the

22   wait and the risk.  Using their method, they got the properties

23   and they walked away with cash, cash from the closings.

24       How did they do it?  Put simply, they lied.  To obtain the

25   properties, the defendant lied on loan applications.  Every

1    single loan application we have seen in this case, in fact, had

2    at least one material false statement, and most had multiple

3    false statements.  With these lies, the defendant intentionally

4    deceived the lenders into loaning money that they never would

5    have loaned had they not been lied to, loans to borrowers who

6    didn't qualify financially, loans that fell well outside the

7    lender's permissible loan parameters.  In this manner, the

8    defendant and his wife were able to bypass the lenders'

9    underwriting guidelines and fraudulently amass a portfolio of

10   more than two dozen investment properties.

11       It didn't stop there, because owning all these properties

12   meant making very large mortgage payments, way more than the

13   properties could generate in rent.  So in addition to lying to

14   buy the properties in the first place, the defendant lied some

15   more.  He and his wife came up with a very clever scheme to get

16   the banks and other lenders to lend them more money for their

17   purchases than they were really paying for the properties,

18   generating a surplus in escrow following the funding.  And we are

19   not talking about a few thousand dollars to help pay for closing

20   costs, we are talking tens of thousands to hundreds of thousands

21   of dollars, money that was supposed to go to buy the properties,

22   and instead went straight to the defendant and his wife.

23       How did they pull this off?  Once again, they lied.  They

24   intentionally and consistently made false statements to the

25   lenders about the details of the transaction.  These false

1   statements, including inflated purchase prices and concealed

2   subordinate financing, were designed specifically to deceive the

3   lenders and the private sellers into thinking they were lending

4   no more than a combined 80 or 90 or even 100 percent of the

5   market value of the property, when in fact, unbeknownst to them,

6   those lenders were deceived by the defendant into loaning a

7   combined amount of funds worth well over 100 percent of the

8   purchase price.  And those lies worked.  All that extra money

9   came into Great American Escrow, and was disbursed out to the

10  benefit of the defendant and his wife.

11      Of course, that disbursement process required that they tell

12  even more lies, because lenders and sellers had a habit of

13  keeping track of where their money went.  They actually read

14  those HUD-1 settlement statements.  And, of course, they couldn't

15  be told the truth about where the funds came from or didn't come

16  from, as the case may be, and how the proceeds were disbursed.

17      So the HUD-1 settlement statements had to be doctored too,

18  they had to be sanitized so it looked like the defendant and his

19  wife were not actually getting money they were getting.  To that

20  end they recruited Micki Thompson into the scheme.  With her

21  participation they could easily represent the deposits had been

22  made when they hadn't, and that the money had gone to someone

23  else besides themselves.  All Micki Thompson needed was a fake

24  repair invoice or a false promissory note to stick in her escrow

25  file at Great American Escrow, and they were home free.

1    Home free, that is, until the end of 2007, beginning of 2008

2    when the credit market tightened, property values dropped, the

3    defendant and his wife couldn't get any more loans to cover the

4    cost of the mortgages they already had, and they stopped making

5    payments.  The defendant left for Michigan and the whole scheme

6    came crashing down to the ground, leaving a trail of debt in its

7    wake in the form of bank foreclosures and defaulting private

8    loans secured with worthless deeds of trust.

9    The eight property transactions listed in Exhibit 1 that we

10   focused on throughout this trial are representative examples of

11   how the defendant and his criminal associates employed five

12   deceptive devices in varying combination to maximize their

13   property.

14   These five deceptive devices, as we heard in Mr. Scoville's

15   opening statement, are the use of straw buyers, lies on loan

16   applications and supporting documents and verifications, inflated

17   sales prices, undisclosed seller financing and false HUD-1

18   settlement statements.  The evidence we heard establishes the

19   defendant employed at least one, and usually multiple, of these

20   deceptive devices in connection with the purchase of each of the

21   eight properties in Exhibit 1.

22   We also heard representatives of each of the lenders involved

23   in these eight properties explain how and why every one of these

24   five deceptive devices, these categories of false statements,

25   were material to their underwriting decisions, and their

1    decisions to fund these loans.  In fact, every lender

2    representative testified that if they had known the truth they

3    would not have loaned the same amount of money, would not have

4    loaned it at the same interest rate or, in many instances, would

5    not have loaned the money at all.

6         So what is the evidence that we heard that establishes that

7    this defendant agreed and conspired with at least one other

8    person to commit bank and wire fraud, proving that he committed

9    Count 1?  Well, first and most comprehensive, we heard from the

10   defendant's former partner, his co-conspirator in this fraud

11   scheme, Alexis Ikilikyan.  She testified and outlined her

12   agreements with the defendant from roughly 2004 to 2008, the

13   object of which was to buy as many properties as they could, with

14   little or no money down, and pull as much money out for

15   themselves as possible.

16        She outlined exactly how the defendant and she knowingly made

17   false statements in their purchases and in the loan applications,

18   and how they lied to cover it up.  She told us that she and the

19   defendant were partners in the scheme.  She was the real estate

20   agent and he was the loan officer.  She told us how they went

21   looking for properties that were specifically attractive because

22   they were likely to bring them cash at closing, and how they

23   deceived the lenders and the sellers so they could get as much

24   out as possible from each purchase.

25        But, your Honor, we don't have to take Ms. Ikilikyan's word

1    for it, because her testimony about the defendant's agreements,

2    the defendant's conspiracy, and his role in these fraud schemes,

3    was corroborated by other ample evidence.

4        First, it was corroborated by the testimony from the mortgage

5    brokers and the lender representatives who worked directly with

6    the defendant when he was obtaining these eight loans.  We heard

7    from Dan Truini, the owner of Victory Home Mortgage.  The first

8    few transactions on property number eight involved Victory Home

9    Mortgage submitted loans.  He told us that the defendant was

10   doing loans when he left the United States Marine Corps.

11   Mr. Truini confirmed that it was the defendant who submitted the

12   loan paperwork that was processed through Victory Home Mortgage.

13       Senath Sands told us when she worked at Ownit Mortgage

14   Solutions it was the defendant himself that she talked to, that

15   she went to when she had questions about the loans that had been

16   submitted to Ownit.  Your Honor, the first five properties on our

17   chart all involve loans from Ownit.  Indeed the defendant's name

18   is listed on many of the submissions forms, which is consistent

19   with her recollection.  I think the figure she used was, over

20   90 percent of the time it was the defendant that she talked to

21   about these loans.  And we even saw e-mails from the defendant to

22   Ms. Sands forwarding documents specifically to fulfill loan

23   conditions.

24       We also heard from Emil Anderson from America One Finance.

25   The last few transactions were processed through America One

1    Finance.  Mr. Anderson told us that the defendant, Mr. Poff

2    himself, submitted applications and other loan documents to

3    Mr. Anderson at America One Finance, including in the form of

4    several e-mails that we saw.  Mr. Anderson testified that he

5    never worked on a loan that was processed through America One

6    Finance, submitted by this couple, without the defendant being

7    involved.

8        Ms. Ikilikyan's testimony is also corroborated by the

9    testimony of the straw buyers.  Jim Thomson and his son Tim

10   Thomson confirmed that Tim Thomson was recruited by both the

11   defendant and his wife, and that Tim Thomson's agreement to be a

12   straw buyer was not with Alexis Ikilikyan alone, it was with them

13   both.

14       The other straw buyer for three of these transactions,

15   Ms. Harutyunyan, confirmed the same.  She testified that the

16   defendant and her daughter worked as partners in their real

17   estate business, and that her agreement to allow them to use her

18   identity to help their business was with them both.

19       Ms. Ikilikyan's testimony was also corroborated by the

20   sellers, and the seller's realtors.  Some of them remembered that

21   it was the defendant who actually handled the closing paperwork

22   when they closed their transaction.  All of them that extended

23   seller financing testified that they had been deceived in that

24   process about their seller carrybacks through the use of at least

25   one deceptive seller finance agreement.  Two witnesses testified

1   it was drafted by the defendant.

2       Ms. Ikilikyan's testimony was also corroborated by the

3   testimony of Micki Thompson, who admitted that she conspired with

4   both of them to deceive the lenders and hide the money trail.

5       Ms. Ikilikyan's testimony was corroborated by the paperwork,

6   the loan paperwork showing the defendant's name, the deeds

7   showing that the defendant quitclaimed his interest in the

8   property at the time of closing back to Ms. Ikilikyan, when

9   applicable, e-mails from the defendant to the lenders, to the

10  mortgage representatives, initiating loans, including 1003s or

11  fulfilling conditions.

12      We saw paperwork in the form of State of Washington business

13  records, the Department of Licensing and Department of Revenue

14  records for the fictitious business Hay Computer Networking and

15  Consulting used in connection with three of the purchases on the

16  chart, and Tim Thomson Landscaping.  Both fictitious businesses.

17  Both listed the defendant's e-mail associated with it, and one

18  with the defendant's name on the application.

19      And, finally, your Honor, we saw financial records showing in

20  each and every case the net proceeds went right from escrow back

21  to the benefit of the defendant and his wife.  For three and a

22  half years, all shared living expenses for this married couple

23  were paid from the accounts in Ms. Ikilikyan's name that all the

24  fraud proceeds went into, over $1.2 million deposited from Great

25  American Escrow alone.

 1    In contrast, during that same three-and-a-half-year time

 2    period, the defendant's bank account paid no living expenses

 3    other than miscellaneous coffee and restaurant expenses, and had

 4    a total of only $10,000 deposited into it.

 5    Your Honor, whether the defendant signed his name as William

 6    S. Poff, William Poff, or Bill Poff, or whether he sat at that

 7    table at Great American Escrow during one of these heated

 8    discussions with Ms. Ikilikyan and Ms. Thompson, and told someone

 9    else to sign his name for him, this independent testimony and the

10    independent evidence from people who have no real interest in the

11    outcome of this trial --  Senath Sands doesn't care about the

12    outcome of this trial.  Emil Anderson doesn't care about the

13    outcome of this trial.  They testified that the defendant himself

14    prepared the loan documents, submitted them, and was involved in

15    every detail of these fraudulent loan transactions.

16    This evidence establishes beyond a reasonable doubt the

17    defendant conspired with Alexis Ikilikyan, Micki Thompson and

18    others to commit bank and wire fraud, and that he is guilty of

19    Count 1.

20    I now want to talk more specifically about the eight property

21    transactions on our chart that we focused on throughout this

22    trial.  I want to clarify the substantive counts arising from

23    each of the property transactions and highlight just a couple of

24    additional examples of specific evidence, in addition to what I

25    have just outlined, establishing beyond a reasonable doubt that

 1    the defendant, Mr. Poff, committed each of the alleged

 2    substantive crimes, as well as the money laundering conspiracy.

 3    Of course, the activities taken in connection with each of the

 4    substantive counts also constitutes overt acts committed in

 5    furtherance of the two conspiracies.

 6        So we will start with property number one.  In connection

 7    with property number one, which is the purchase in

 8    Ms. Ikilikyan's name from Marijane Anderson of the three Puyallup

 9    duplexes, the defendant is charged with three substantive counts

10    of wire fraud, counts 11, 12 and 13.  These three counts arise

11    from --  I'm sorry.  These three substantive counts correspond to

12    the three mortgages that the defendant and his criminal

13    associates obtained from Ownit Mortgage Solutions, that they

14    deceived Ownit into lending, the proceeds of which were wire

15    transferred from Ownit interstate for the benefit of the

16    defendant and his associates.

17        Count 11 arises from the purchase of the top duplex and

18    involves this wire transfer.  Count 12 arises from the middle

19    duplex and involves this wire transfer.  And Count 13, wire

20    fraud, involves the bottom duplex and involves this wire

21    transfer.

22        The fraud involved in property transaction number one

23    included lies on loan applications and supporting documents,

24    specifically having to do with Ms. Ikilikyan's employment at

25    Fidelis Enterprises, which she testified didn't exist, and

1    income.

2         The fraud in this transaction also involved undisclosed

3    seller financing, in the form of $65,000 in undisclosed seller

4    proceeds in connection with each duplex, negotiated, as we saw

5    from the paperwork, well before the loan applications were ever

6    submitted to Ownit.  But, of course, they didn't mention that.

7         And we also had the false HUD-1s, hiding the seller

8    carrybacks, and hiding the fact that the down payment didn't

9    actually come from the buyer in two of the three duplexes, rather

10   the first seller carryback was split in order to fund the down

11   payments on the other two.

12        So was Mr. Poff involved in this fraud surrounding the

13   purchase of property number one?  Well, in addition to the

14   testimony from Ms. Ikilikyan and Ms. Thompson, and from Senath

15   Sands at Ownit, and from Dan Truini at Victory Home Mortgage,

16   that I just outlined, we saw specifically Exhibit 29, an e-mail

17   from the defendant to Senath Sands specifically relating to this

18   loan, fulfilling a lender condition for bank statements.

19        We also heard Sarah Garner's testimony.  Sarah Garner,

20   remember, was the daughter of Marijane Anderson, who held power

21   of attorney and handled the negotiations for the transaction.

22   Ms. Garner testified that the defendant himself handled the

23   closing paperwork, and was personally involved in the

24   transaction, and that she had been completely deceived into

25   lending 20 percent of the purchase price, because she believed

1    the buyer needed that in order to close the deal.  She also

2    testified about her discovery of the two conflicting HUD-1s, one

3    showing the seller carryback, which she expected, and the one

4    that had been given to her real estate agent, showing a payment

5    to PDQ Construction.

6        Micki Thompson testified that this PDQ Construction

7    contracting invoice that was found in the Great American Escrow

8    file had indeed come directly from the defendant, and even

9    remembered the conversation that she had with the defendant about

10   what PDQ meant.  And, remember, the address at the top of this

11   invoice is actually the address that the defendant and his wife

12   lived at with Ms. Ikilikyan's mother in Bellevue.

13       The financial evidence in this case, your Honor, the surplus

14   that came out of the two seller carrybacks that didn't get plowed

15   back into down payments, those funds went right into the

16   defendant and Ms. Ikilikyan's Washington Mutual account.

17       All of this evidence establishes that the defendant and his

18   associates deceived Ownit into lending this money, and that in

19   addition to the conspiracy in Count 1, he is guilty of wire fraud

20   as charged in counts 11, 12 and 13.

21       Turning to property transaction number two.  In connection

22   with this transaction the defendant is charged with one

23   substantive count of wire fraud, in addition to the conspiracy in

24   Count 1.  That's Count 15.  And Count 15 corresponds to the

25   purchase loan that the defendant and his associates deceived

1   Ownit Mortgage Solutions into lending, the proceeds of which were

2   then wire transferred interstate from Ownit to Great American

3   Escrow for the benefit of the defendant.  That's these two wire

4   transfers right here.

5       This particular property transaction involved four different

6   types of deceptive devices, the straw buyer Tim Thomson, the lies

7   in the loan applications up here about Mr. Thompson's intent to

8   occupy the property, about his employment with Tim Thomson

9   Landscaping, and about his income of over $9,000 gross per month.

10  This transaction also involved undisclosed seller financing, that

11  is, the $61,589 seller-carried note extended by Mr. Andriolo.

12  And it involved false statements in the HUD-1.

13      Specifically right here, a transfer -- a deduction from the

14  seller proceeds that was marked "transfer to new purchase

15  TransNation Escrow," another escrow company altogether.  In fact,

16  what we see is that same amount of money was actually transferred

17  by Micki Thompson to a third escrow file, and then wire

18  transferred right back to the account in the name of

19  Ms. Ikilikyan.

20      So what is some additional specific evidence of Mr. Poff's

21  participation in this fraud, in addition to what I have already

22  mentioned?  Well, in this one we saw the Ownit business records

23  showing this defendant submitted the loan request for a hundred

24  percent financing, despite the preexisting agreement with

25  Mr. Andriolo for a carryback.

1    We saw in Exhibit 223 another e-mail from the defendant to

2    Senath Sands for this particular loan, confirming not only that

3    he was the loan officer on this one, but talking specifically

4    about the condition on the 1003 not being marked "owner occupied"

5    is wrong.  The defendant is representing to Ms. Sands that Tim

6    Thomson intended to reside in this property, which of course was

7    never the case.

8    We know it was never the case because Tim Thomson testified

9    he had a meeting prior to the purchase of this property with

10   Ms. Ikilikyan and the defendant, at which they hammered out the

11   details of this straw buyer agreement.  And he testified that it

12   was very clear from the beginning that he never intended to

13   occupy the property.  He lived in Korea.  The defendant and his

14   wife were going to be in charge of that property.

15   In fact, Tim Thomson testified that he gave the defendant his

16   Social Security number, his rank and his pay grade information,

17   so the defendant knew that Mr. Thomson earned no more than $2,000

18   per month.  And yet, as the loan officer on this transaction, he

19   submitted to Senath Sands at Ownit Mortgage Solutions the 1003

20   that we saw with all those false claims as to Tim Thomson's

21   financing qualifications.  Jim Thomson testified that the

22   defendant admitted to him that the defendant had created Tim

23   Thomson Landscaping in order to qualify his son for loans.

24   We also saw in Exhibit 236 the Tim Thomson Landscaping master

25   business application.  And if you look at page 2, you can see

1    that it was created just a few days before closing on this

2    transaction, yet it was backdated almost two years to meet the

3    Ownit self-employment business requirements.  On the next page of

4    236 you will see the defendant's name is listed as the preparer

5    of this document.  Tim Thomson, of course, confirms he never

6    heard of it until after the fact.

7         And, finally, on this transaction we heard from Mr. Andriolo,

8    the trustee for the seller of the property, that it was the

9    defendant and his wife who handled the paperwork.  They even

10   offered to drive all the way to Port Angeles to help him sign

11   that paperwork; that the defendant represented himself to be a

12   mortgage lender; and, like Sarah Garner, he never agreed to

13   remove the seller carryback from the purchase and sale.

14        Finally, we have the financial evidence in this case, which

15   once again proves that that surplus, roughly equal to the

16   undisclosed seller carryback, went straight back to the benefit

17   of the defendant and his wife.

18        All of this, your Honor, establishes that the defendant and

19   his associates deceived Ownit into lending this money, and that

20   in addition to the conspiracy charged in Count 1, the defendant

21   is guilty of wire fraud as charged in Count 15.

22        Moving to property number three.  In connection with this

23   real estate transaction, the defendant is charged with one

24   substantive count, and that is wire fraud, as alleged in

25   Count 20.

1      Now, this transaction involved the purchase by Armenuhi

2  Harutyunyan from Sean Warren.  The fraud involved in this

3  transaction included the straw buyer, Ms. Harutyunyan, lies in

4  the loan applications as to Ms. Harutyunyan's financial

5  qualifications, including this Hay Computer and Consulting

6  business, and $37,000 a month in income, as well as the false

7  HUD-1 settlement statements.  Another example of a deduction from

8  seller proceeds supposedly to be transferred to another escrow

9  company for another purchase, when in fact that money went right

10 back to the defendant and his wife.

11     Specific evidence establishing the defendant's participation

12 in this deception, in addition to what I have already mentioned,

13 includes yet another e-mail from the defendant to Senath Sands at

14 Ownit in connection with this particular transaction, this one

15 forwarding the fake lease agreements and requesting a doc order

16 form.

17     We also heard Ms. Harutyunyan's testimony that she agreed to

18 be a straw buyer for the defendant and for her daughter, and that

19 the defendant -- when she found out about Hay Computer Networking

20 and Consulting after the fact, the defendant told her it was part

21 of the deal.

22     In addition, the Department of Revenue records for Hay

23 Computer Networking and Consulting recorded contact from a person

24 who identified himself as Bill, the son-in-law of the owner,

25 Ms. Harutyunyan.  This person contacted the Department of Revenue

specifically about the opening date of the business, which, like
Tim Thomson Landscaping, had been two years backdated.

And, your Honor, this particular transaction involved -- is
the one that involved that fake $98,000 cashier's check.  Now,
Ms. Ikilikyan testified she remembered Bill preparing this fake
check.  Barbara Tainter testified this is a forgery.  And Micki
Thompson testified she remembered getting it from the defendant.
And, your Honor, after all that, it is no coincidence that if you
look at the final HUD-1 sent to Ownit, and you zoom in on the
middle on the deposits, it shows a fake $98,000 seller deposit
that never existed.

Once again, the financial records from this case show that
that surplus, this time in an amount of over $100,000, went
straight to the benefit of the defendant and his wife.  All of
this evidence establishes that the defendant and his associates
deceived Ownit into lending this money, which was wire
transferred interstate, and that in addition to the conspiracy in
Count 1, he is guilty of wire fraud as charged in Count 20.

Turning to property number four.  This purchase involved,
again, Armenuhi Harutyunyan as the buyer, buying a property from
Lionel Jenkins.

In connection with this property, the defendant is charged
with three substantive counts, in addition to the two
conspiracies.  He is charged with one count of wire fraud.  And
this corresponds to the purchase loan that the defendant and his

1    associates deceived Ownit Mortgage Solutions into lending, the
2    proceeds of which were, again, wire transferred interstate from
3    Ownit to Great American Escrow for the benefit of the defendant.
4    This wire transfer right here.
5        Also in connection with this transaction, the defendant is
6    charged with two counts of money laundering, Count 36 and
7    Count 54.  Both of these counts center around this transaction
8    right here.  This is the financial transaction involving $62,000,
9    which were profits from the purchase of property number three.
10   That $62,000 was issued in the form of a check, and then
11   redeposited into Great American Escrow to be applied towards the
12   purchase of property number four.
13       And as I will cover in a moment, property number four -- the
14   purchased property number four, also involved fraud.  Count 54
15   centers around that same $62,000 financial transaction, and
16   charges the defendant with knowingly conducting a monetary
17   transaction involving those same proceeds in an amount of over
18   $10,000.  And I will come back to the wire fraud transactions in
19   more detail in a moment.
20       First, what was the fraud involved in this property
21   transaction?  This one involved a straw buyer, Ms. Harutyunyan,
22   again.  It involved lies in the loan application, the same lies
23   about Hay Computer Networking and Consulting.  It involved
24   undisclosed seller financing, that is the $58,000 note that had
25   been a preexisting lien that the seller owned, which was then

1    renegotiated with Ms. Harutyunyan, and was concealed from the

2    lender.  And it involved the false HUD-1 statements,

3    representing, among other things, that Ms. Bourgeois' note had

4    been paid off, when it hadn't.  Instead, that money went back to

5    the defendant and his wife.

6         Specific proof of the defendant's participation in this

7    deception, in addition to what I have already mentioned, is that,

8    again, this is Ms. Harutyunyan, we have the same business created

9    by the defendant, Hay Computer Networking and Consulting, the

10   same straw buyer with the same agreement, with both the defendant

11   and her daughter.  This is yet another loan submission by the

12   defendant to Senath Sands at Ownit.  And Ms. Sands was very

13   clear, the defendant was the person she dealt with the vast

14   majority of the time for all of the loans submitted by the

15   couple.

16        This, your Honor, is the transaction that involved that

17   $20,000 overpayment discussed over here; $20,000 more than was

18   necessary was paid by Great American Escrow to pay off the

19   seller's preexisting mortgage.  It was rebated or refunded back

20   to Great American Escrow when the error was discovered.  Well, in

21   a normal escrow universe you would think that that money would go

22   to the seller.  It was his mortgage that got overpaid.  But in

23   this escrow universe created by the defendant and Ms. Ikilikyan

24   and Micki Thompson, instead, that money got wired directly from

25   Great American Escrow to Ms. Harutyunyan's bank account.  Micki

1    Thompson testified that the defendant was involved in the

2    decision to share half that money with her, which Ms. Ikilikyan

3    confirmed.

4         And finally, your Honor, we have the HUD-1 settlement

5    statement.  This is the final page of it.  As Micki Thompson

6    testified, following closing, she and the defendant would sit

7    down and argue about what these HUDs should say.

8         This one says that Elaine Bourgeois, presumably Emily

9    Bourgeois, had been paid $59,975.80 to pay off that preexisting

10   note, when in fact that money did not go to Emily Bourgeois, it

11   went to the defendant and his wife.

12        All of this evidence establishes that the defendant and his

13   associates, again, deceived Ownit Mortgage Solutions into lending

14   this money, and that in addition to the conspiracy, he is guilty

15   of the wire fraud charged in Count 1.

16        Now, this property transaction also involves the $62,000

17   money laundering financial transaction that I mentioned earlier.

18   And this slide details that financial transaction.  $62,000,

19   which represented net profits from the purchase by

20   Ms. Harutyunyan of property number three, was issued in the form

21   of a check and then redeposited back to Great American Escrow and

22   applied towards the purchase of property number four, the

23   property that I have just covered.  This constitutes the use of

24   proceeds in a financial transaction to promote new fraud, to

25   promote further fraud, as alleged in Count 36.  It also

1    constitutes spending of more than $10,000, knowing they are

2    proceeds of fraud, and constitutes a spending violation or a 1957

3    violation charged in Count 54.

4         Your Honor, the items underlying that $62,000 financial

5    transaction are found in Exhibit 915.

6         Turning to property number five.  This is the purchase by

7    Ms. Ikilikyan of the Yelm Plantation property from

8    Mr. and Mrs. Slopak for $1.1 million.  In connection with this

9    property transaction, the defendant is charged with eight

10   substantive counts, in addition to both conspiracies.

11        First, the defendant is charged with Count 23, wire fraud.

12   Again, this wire fraud count corresponds to the two purchase

13   loans that the defendant and his associates deceived Ownit

14   Mortgage Solutions into lending, the proceeds of which were wire

15   transferred interstate from Ownit Mortgage Solutions to Great

16   American Escrow for the benefit of the defendant.  The wire

17   transfers that are highlighted, the arrow on our chart, that is

18   Count 23.

19        In addition, there are seven counts of money laundering

20   associated with this property transaction, each of which involve

21   applying profits from other fraudulently obtained properties

22   towards the purchase of this property.  And I will go through

23   each of those in a moment.

24        First, what was the fraud that was involved in this

25   transaction?  This one involved lies on loan applications

1   specifically, and most blatantly, about Ms. Ikilikyan's intent to

2   occupy the property, but also about her income and her assets.

3   In addition, this transaction involved false HUD-1 settlement

4   statements.  For example, the source of the down payments, which

5   were represented on the settlement statement to be the proceeds

6   from the sale of a property located at 3821 South 345th Street,

7   where actually the combined proceeds from various other

8   properties.

9        The proof of the defendant's participation in this particular

10  property transaction comes in the form, again, of Exhibit 512.

11  This is another submission form by the defendant, listing the

12  defendant as the contact to Senath Sands at Ownit Mortgage

13  Solutions.

14       We also heard in this case, your Honor, from Linda Crocker.

15  Linda Crocker was the real estate agent representing the sellers

16  on this transaction.  She testified that she remembered speaking

17  to the defendant, Mr. Poff, throughout this transaction, both in

18  person and on the phone.  She remembered that the defendant told

19  her he was a mortgage broker.  She remembered the defendant

20  encouraging the sellers, the Slopaks, to do the deal with an

21  inflated sales price, and offering to pay the excise tax on the

22  difference between the real purchase price of $1.1 million and

23  the inflated reported sales price of 1.3 million.

24       And even Ms. Crocker, who represented the sellers, knew that

25  Ms. Ikilikyan didn't plan to live in the property.  They told her

1    that they were buying the place to use as a church.  Yet Ownit

2    Mortgage Solutions was told in the 1003 that this was to be her

3    primary residence.  Micki Thompson confirmed the defendant,

4    Mr. Poff, was present at the closing of this transaction, and

5    even Micki Thompson knew they never intended to live there.

6        All of this evidence establishes that the defendant and his

7    associates deceived Ownit into lending this money, and that in

8    addition to this conspiracy in Count 1, they are guilty of wire

9    fraud.  He is guilty of wire fraud as charged in Count 23.

10       Now, let's look in a little more detail at the money

11   laundering transactions arising from this property.  The first

12   involves this $38,658 check.  This check was issued as part of

13   the net profits from the purchase by Ms. Harutyunyan of property

14   number three.  It was redeposited into Great American Escrow's

15   Key Bank account and applied toward the purchase of property

16   number five, the property I have just discussed.

17       This $38,658 represents proceeds from the fraudulent purchase

18   of property three, which was used to promote the fraudulent

19   purchase of property number five, constituting promotion money

20   laundering as charged in Count 34.  The same financial

21   transaction also involved the knowing transfer of $10,000 in

22   fraud proceeds, and constitutes a spending or 1957 violation as

23   charged in Count 57.

24       Also in connection with the purchase of this property, we

25   have the $41,447 check.  This also represents proceeds from the

1   purchase of property from a fraudulently obtained property, and

2   that is property number four.  This check represented net profits

3   from Ms. Harutyunyan's purchase of property number four, which

4   she bought from Mr. Jenkins, that we just covered.  The check was

5   issued and then redeposited into Great American Escrow's Key Bank

6   account, and applied by the defendant and his wife towards

7   Ms. Ikilikyan's purchase of property number five, the Yelm

8   property, the one we just discussed.  Hence, this financial

9   transaction constitutes the use of proceeds to promote new and

10  further fraud, a violation of money laundering as charged in

11  Count 41.

12      And because the amount of proceeds involved in this

13  transaction exceeds $10,000, it also constitutes the transfer of

14  funds -- or a monetary transaction involving the transfer of

15  funds representing proceeds in an amount of more than $10,000, as

16  charged in Count 58.

17      We have a couple of additional money laundering counts that

18  arise from property number five as well.  The $12,025 check was a

19  commission check that was cut after funding property number five.

20  It represents the commission paid to U.S. Realty and Investments

21  from the fraudulently obtained purchases obtained after closing

22  on property number five.  As we saw earlier, that check was

23  actually redeposited back into the Great American Escrow account,

24  and was credited towards the buyer deposit of $120,000 that

25  supposedly had already been collected before the purchase

1     transaction.

2          The use of these proceeds to promote fraud constitutes

3     promotion money laundering, and hence a violation of Count 43,

4     because it involves more than $10,000.  Regardless of whether it

5     is promoting new fraud, it also constitutes a violation of the

6     1957 statute, that is, a monetary transaction involving fraud in

7     an amount of more than $10,000, as charged in Count 60.

8          And, finally, your Honor, in the next slide we have the

9     details of the final money laundering count arising from property

10    number five.  This is another commission check, this one in the

11    amount of $9,974.61.  This, again, was a commission paid

12    following funding as a profit from this purchase, which was then

13    redeposited and used essentially to cover up the fraud that the

14    down payment hadn't included the amount of money that it was

15    supposed to have.

16         Your Honor, the items supporting each of those money

17    laundering counts were introduced as Exhibit 920 during our

18    trial.

19         Turning now to property number six.  In connection with

20    property number six, which was the purchase by Ms. Ikilikyan of

21    the Issaquah property from Mr. and Mrs. Hsu, the defendant is

22    charged with six substantive counts, in addition to the two

23    conspiracies.

24         The first is a count of bank fraud.  This corresponds to the

25    second mortgage here, extended by National City Bank, which we

1    heard and saw evidence was an FDIC insured lender at that time.

2        The second is --  There is also two counts of wire fraud.

3    These correspond to the two mortgages, the first being the Green

4    Point Mortgage Funding loan for $1,406,250, and the second being

5    the same National City Mortgage loan in the smaller amount, both

6    of which were wire transferred interstate for the benefit of the

7    defendant and his associates as a result of the fraud.

8        In addition, your Honor, this count gives rise to three

9    substantive money laundering counts, each of which involve the

10   application of profits from this property towards another

11   purchase, with the intent to conceal and disguise the ownership

12   of those proceeds and their illegal source.

13       So what was the fraud involved in this transaction?  Well,

14   this one involved lies on loan applications, again,

15   misstatements -- false statements as to Ms. Ikilikyan's intent to

16   reside in the property, as well as her employment and her monthly

17   income.

18       It also involved an inflated purchase price.  We heard

19   evidence from Ms. Ikilikyan, and we saw from the financial

20   analysis that the true purchase price was not $2 million, as was

21   represented in the paperwork, and was told to the lenders, but in

22   fact it was only $1.3 million.

23       And, your Honor, this transaction involved false HUD-1

24   settlement statements, specifically in this case showing a buyer

25   deposit of 401,105 that simply never existed.

1          The proof of the defendant's participation and intent to

2    deceive in connection with this specific transaction includes

3    Ms. Ikilikyan's testimony about the meeting at the bookstore.

4    Ms. Ikilikyan testified that she and the defendant met Joyce Hsu

5    at the bookstore after the first deal had fallen through, and

6    Ms. Hsu recontacted her.  And she described this meeting where

7    the defendant and Ms. Ikilikyan offered alternatives to the

8    seller, Ms. Hsu, either seller financing or an inflated sales

9    price, either of which would allow the defendant and his wife to

10   walk away with cash.  This is significant because it is

11   reminiscent of exactly what Linda Crocker described happened in

12   connection with the Yelm property, property number five, although

13   in that particular case the Slopak's were not persuaded to

14   participate in the fraud.

15         In connection with this transaction we also saw Exhibit 616.

16   This is the e-mail the defendant sent to Tony Reyes, and then

17   Tony Reyes forwarded to Emil Anderson.  Attached to this e-mail,

18   if you recall, was the draft 1003 for the purchase of the

19   Issaquah property, property number six.  This draft 1003 from the

20   defendant to Emil Anderson --  And Emil Anderson testified he

21   remembered getting this, and he remembered getting it from the

22   defendant.

23         This 1003 claims that the property will be Ms. Ikilikyan's

24   primary residence, and includes the same false information about

25   her employment and her income that shows up on the final 1003

1    submitted to the lenders.  Except in the final 1003, America One

2    Finance actually toned down the income claims.  Instead of

3    claiming $100,000, as is listed on this draft 1003, the one that

4    was actually submitted to Green Point Funding, for example,

5    contained a lower figure.  And, again, if you look at the

6    signature on the third page of this draft 1003 that the defendant

7    e-mailed, while not signed, as you would expect in an e-mail

8    document, it has the defendant's name and phone number on it.

9        We also heard in connection with this transaction Micki

10   Thompson's testimony about that fake promissory note,

11   Exhibit 629, and the fake Fidelis Enterprises invoice, which

12   Agent Burtt obtained from the seller, Ms. Hsu, both of which

13   Micki Thompson testified came to her directly from the defendant.

14       All of this evidence, along with the fact that once again the

15   surplus -- $250,000 worth of surplus in this case, went directly

16   to the benefit of the defendant and his wife, establishes that

17   the defendant and his associates deceived Green Point Funding and

18   National City Bank into lending this money.  In addition to the

19   conspiracy in Count 1, he is guilty of bank fraud as charged in

20   Count 3, and wire fraud as charged in Counts 25 and 26.

21            THE COURT:  Counsel, let's go to Count 47 for a moment.

22   What is the underlying transaction?

23            MS. VOGEL:  I am about to get there, your Honor.

24            THE COURT:  All right.

25            MS. VOGEL:  Looking at the money laundering transactions

1    then from this, we could look first at this $120,000 transaction.

2    And this forms the basis for Counts 46 and 62.  This is the

3    $120,000 that was net profit from Ms. Ikilikyan's purchase of

4    this Issaquah property, but which was concealed by the fake

5    promissory note we just saw.  The money, instead of going to the

6    seller, was wire transferred by Great American Escrow to

7    Ms. Harutyunyan's bank account.  As Ms. Carnell testified, if you

8    followed that money, it went through a third account, and then

9    right back to the defendant's Washington Mutual general account.

10        The transfer of this $120,000 in proceeds from property six

11   to Ms. Harutyunyan's account was clearly done to conceal

12   Ms. Ikilikyan's receipt of these proceeds, and to conceal the

13   illegal source of these proceeds, constituting a violation of

14   Count 46, concealment of money laundering.  Because it also

15   involved more than $10,000, it also constituted a violation of

16   Count 62.

17            THE COURT:  Is it the government's position that merely

18   being the beneficiary of the funds is sufficient to support the

19   money laundering concealment?

20            MS. VOGEL:  No, your Honor.  It is the government's

21   position that providing the false promissory note and directing

22   that the false statements on the HUD-1, saying that the money was

23   going to be transferred to Ms. Harutyunyan in order to conceal

24   from the lender, that it was actually going to Ms. Ikilikyan, and

25   then having the money transferred to Ms. Harutyunyan, and then

1    transferring it from Ms. Harutyunyan back to Ms. Ikilikyan's

2    account through a third account, constitutes concealment and

3    money laundering.

4                THE COURT:  I understand your theory.

5                MS. VOGEL:  Looking at Count 47, the count that the

6    Court asked about, this count focuses in on the $100,078 payment

7    representing proceeds from the purchase by Ms. Ikilikyan of this

8    Issaquah property.

9         Now, again, this payment was supposed to be made, if you look

10   at all the paperwork that was submitted to the lenders, to

11   Marquin House Jobs.  Marquin House Jobs, we have heard, didn't

12   perform any work in connection with this property.  But if you

13   look at all the paperwork, this was an inter-escrow transfer of

14   seller proceeds that should have gone to Ms. Hsu, which instead

15   went to Marquin House Jobs.

16        We know from looking at the financial trail that money didn't

17   go to Marquin House Jobs and it didn't go to Ms. Hsu.  Instead,

18   it was transferred inter-escrow for the benefit of the defendant

19   and his wife for the purchase of property number seven.  And it

20   involved -- it is over $100,000 of profits from the purchase of

21   property six, which was used to promote the purchase of property

22   number seven, and which was done in a manner specifically

23   designed to conceal the fact that the money went to

24   Ms. Ikilikyan.  And then if you look at the purchase documents

25   for property number seven, the money came from property number

1    six.

2            THE COURT:  Let's deconstruct this particular

3    transaction, because the only testimony in regard to the

4    underlying source of this was Micki Thompson, who said there was

5    an invoice presented from a construction company.  You then, the

6    government, specifically asked, did it come from Mr. Poff?  And

7    her answer was, I don't know.  How then is Mr. Poff implicated in

8    the creation of that particular document?

9            MS. VOGEL:  Are you talking about the invoice?

10           THE COURT:  Yes.

11           MS. VOGEL:  The invoice from Marquin House Jobs, I

12   believe Ms. Thompson testified came from either the defendant or

13   his wife.

14           THE COURT:  That is not what she said.  She said, I

15   don't remember.

16           MS. VOGEL:  Well, your Honor, I think that there is a

17   fair implication that because the lenders were deceived as to

18   where this money was really going --  The money really went to

19   the benefit of the defendant and his wife.  That fact had to be

20   deceived from the lenders.  In order to do that, Micki Thompson

21   testified she had to get false invoices and repair receipts.

22   That money was then transferred inter-escrow for the benefit of

23   Ms. Ikilikyan and the defendant for the purchase of property

24   number seven, which we will talk about in a moment, the defendant

25   was directly involved in.  Now, if the defendant did not actually

1    himself cause this financial transaction by pushing the transfer

2    button, certainly he aided and abetted this financial

3    transaction.

4           THE COURT:  What is troublesome here is your indictment

5    charges an inter-escrow transfer by Great American of funds

6    payable to Marquin House Jobs to this particular purpose, which

7    is the purchase and sale of 9488 Issaquah or 72703 South Puget

8    Sound.  And I will agree with you that Ms. Thompson testified

9    that invoice was false.  But if she doesn't know where she got

10   it, then how does that tie it to Mr. Poff, as opposed to anyone

11   else in the universe?  He is a beneficiary of it, I agree.  Under

12   what you just told me, you need to tie his contact -- his

13   involvement to that invoice.

14          MS. VOGEL:  Your Honor, I respectfully suggest that what

15   we need to do is, we need to prove that the defendant or one of

16   his co-conspirators or co-schemers caused Micki Thompson to

17   transfer the money from one property towards the other.

18     Micki Thompson testified that she got her directions,

19   generally speaking, about how to move this money from the

20   defendant.  She testified about meetings after closing where the

21   defendant would tell her what to do with the money.

22     We also had testimony from Ms. Ikilikyan, who specifically

23   remembered that some of the proceeds from the purchase of

24   property number six were used by she and the defendant to

25   purchase property number seven.

1    The universe of individuals, given all of that, who could

2    have possibly told Micki Thompson to transfer this money?  And

3    that is the financial transaction, not the actual creation of the

4    invoice, which was just stuck in the file to make Micki

5    Thompson's books balance.  It is the ordering of that financial

6    transaction, which came from Ms. Ikilikyan and this defendant,

7    and was used to purchase another property in their name.  That is

8    committing or aiding and abetting the financial institution --

9    the financial transaction in question.

10          THE COURT:  Does being in the universe of potential

11    people who are responsible satisfy your burden of proof?

12          MS. VOGEL:  Your Honor, I think the testimony we have

13    heard that says, this is what they did, generally, and

14    specifically Ms. Ikilikyan saying, this is what we did to move

15    money from number six to number seven, does constitute -- does

16    meet our burden of proof.  In addition to the fact that we

17    show --  Not only did Ms. Ikilikyan testify they did it, but the

18    financial investigation shows that is exactly what happened.

19          THE COURT:  All right.  I understand your theory.

20          MS. VOGEL:  Finally, your Honor, the next money

21    laundering chart.  We have, again, the $1,779 check.  This one

22    came from the purchase of property number eight by

23    Ms. Harutyunyan, and was credited towards the same property.

24          Property number six, as we have heard, was then refinanced

25    one month later.  This involved this refinance.  In connection

1   with this refinance, the defendant is charged with two

2   substantive counts, Count 4, bank fraud, and Count 28, wire

3   fraud, both of which correspond to the loan that the defendant

4   and his associates deceived National City Mortgage Company and

5   National City Bank, an FDIC-insured lender at the time, into

6   wiring interstate from National City Bank to Great American

7   Escrow for the benefit of the defendant.

8       And if you recall, this refinance was obtained through the

9   same lies on the loan applications as were in the original 1003

10  submitted to National City Bank in connection with the original

11  second mortgage on this property, specifically, and most notably,

12  including the defendant's intent to occupy the property and her

13  inflated income.

14      In fact, in connection with this one, if you recall, it

15  said that she had actually -- the 1003 said that Ms. Ikilikyan

16  had actually moved into the Issaquah property for a month before

17  applying for this refinance, which we know from the testimony

18  never happened.

19      Moving on to property number seven.  In connection with this

20  property transaction, the defendant is charged with three

21  substantive counts of money laundering in addition to the

22  conspiracy.  Now, these I think we have just covered, Counts 47

23  and 63.  It is, again, the $100,078 that was supposedly paid to

24  Marquin House Jobs, coming out of property number six, which is

25  applied towards the purchase of property number seven.  That is

47 for promotion and 63 spending.  Count 48, again, the smaller check that came from property number eight and was applied towards property seven.

The proof that the defendant committed these counts of money laundering, in addition to what I just mention earlier, are, first of all, the testimony of Ms. Ikilikyan that the defendant directed this purchase.  She testified we took that money from Issaquah and we used it to buy Puget Sound.

We also have the testimony from William Stepp that it was the defendant, I think he said when they were at the rifle range shooting, who offered to take this property off his hands for $100,000.

Ms. Ikilikyan testified that the defendant came up with this novel idea to increase the price in order to set up a resale, artificially building equity into the property that actually wasn't supported.

Finally, your Honor, we heard the testimony of Emil Anderson, who testified it was the defendant, Mr. Poff, and Mr. Reyes that he worked with, who were trying to refinance this property on South Puget Sound Avenue in Tacoma.  They were trying to get a hard money loan out of it, but simply couldn't do it because Mr. Poff couldn't come up with tax returns for Fidelis Enterprises that were necessary.

Finally, this property was resold, as we see in property transaction 7(a).  This was resold to Tony Reyes' buyer for

1    $60,000 more than they purchased it for.  And those proceeds

2    which flowed into the property from the previous transaction then

3    flowed back out of the property when this property was resold.

4    And Mr. Poff's split was $54,924.  It was then wired interstate

5    from Great American Escrow at his request to the T&K Investments

6    account in Michigan.

7        It is that wire transfer of $54,000 plus in proceeds

8    originating from the Issaquah transaction and flowing through

9    property number seven that constitutes money laundering Count 67,

10   a spending violation, representing the transfer of more than

11   $10,000 in proceeds.

12       Finally, your Honor, property number eight.  In connection

13   with property number eight, the defendant is charged with two

14   substantive counts, in addition to the conspiracies.  Count 1 --

15   Excuse me.  The first is one count of wire fraud, that is

16   Count 27.

17       This, again, corresponds to the two purchase loans the

18   defendant and his associates deceived Just Mortgage into lending,

19   the proceeds of which were wire transferred interstate to Great

20   American Escrow, to the benefit of the defendant and his

21   associates.

22       The second substantive count arising from this transaction is

23   Count 48.  That, again, is that check for $1,779.77, that was

24   applied toward the purchase of property number seven.

25       The fraud involved in this purchase, your Honor, included the

1   use of a straw buyer, once again, Ms. Harutyunyan, included lies

2   on loan applications, the same lies about Ms. Harutyunyan's

3   self-employment with Hay Computer Networking and Consulting, lies

4   about her assets, and specifically, more importantly, about her

5   intent to occupy the property.

6      This one also involved undisclosed seller financing, that is,

7   the $305,000 note by the Kirkdoffers, and involves false HUD-1

8   settlement statements.  For example, here, showing a $120,000

9   buyer deposit that didn't exist.

10      The proof of the defendant's participation and intent to

11   deceive in connection with this transaction included

12   Ms. Ikilikyan's testimony that she and the defendant agreed to

13   buy this house because Tony Reyes wanted to live there.

14   Ms. Harutyunyan, of course, testified she had no idea about this

15   house, had never been there.  And Micki Thompson corroborated

16   that it was Reyes who moved into this house.

17      In fact, Micki Thompson also testified to something

18   interesting, which is that she remembered using the $120,000 that

19   came out of property number six, the Issaquah property, and

20   applying that $120,000 towards the purchase of this property.  Of

21   course, that $120,000 was never actually applied to this

22   property, but she remembers the instructions, I think she

23   testified, instructing her to do so.

24      This loan, your Honor, was processed through America One

25   Finance.  We heard from Emil Anderson, who told us the defendant

1    was always involved in the loans that this couple submitted

2    through America One Finance.

3         And we saw the seller financing agreements in this case, two

4    of them -- two different ones, in fact.  Micki Thompson testified

5    that she got the seller financing agreement, or at least one of

6    them, from the defendant.  And, of course, the seller carryback

7    was never disclosed to Just Mortgage.  Micki Thompson further

8    testified that she and the defendant had a heated discussion

9    following this particular closing about where the money was

10   supposed to go.

11        And, your Honor, don't forget the testimony of Mike Edwards,

12   the supervisor at America One Finance.  He testified that he had

13   a meeting with the defendant, Ms. Ikilikyan and Ms. Harutyunyan

14   specifically for the purpose of making sure that Ms. Harutyunyan

15   really was buying the property for her private residence.  Now,

16   Ms. Edwards could not remember which property transaction that

17   had to do with, but he remembered it was a big one.  He

18   remembered the defendant was actually and actively involved in

19   trying to convince him that Ms. Harutyunyan wasn't a straw buyer,

20   and that this was really going to be her house.

21        And, finally, in connection with this transaction, the

22   financial records show that the surplus in this case, which

23   amounted to more than $212,000, went straight back to the benefit

24   of the defendant and his wife.

25        All of this fraud, your Honor, translated to a lot of money,

1   more than $1.7 million we heard in deposits from Great American

2   Escrow alone, to accounts held by the defendant, his wife or her

3   mother.  And that doesn't include all the funds that weren't

4   disbursed but were held in escrow and then applied towards other

5   purchases.

6        All that money paid for the defendant's housing, paid for his

7   nice truck, paid his utility bills and living expenses for three

8   and a half years, funded his charitable contributions, vacations

9   to Hawaii and even his child support obligations to his former

10   wife, despite his best efforts.  The defendant didn't have

11   another job during this entire period.  This was his job.  This

12   was his livelihood.  And it was good while it lasted.

13        Your Honor, it may well be that the defendant believed that

14   what he had stumbled across, this method for making a living off

15   buying properties, getting cash from closings, wasn't going to

16   cause any harm.  It may well be that the defendant didn't intend

17   that these properties go into foreclosure, and didn't intend that

18   Mrs. Anderson and Ms. Kirkdoffer would lose hundreds of thousands

19   of dollars in their retirement.  It may well be that the

20   defendant never considered that his quest for cash might ruin the

21   hard-earned credit for Tim Thomson.

22        The intent to deceive that is required here does not require

23   the intent to harm.  Rather, it means the intent to use lies and

24   deception to obtain money or property.  And clearly, in

25   connection with these eight property transactions, the evidence

has established the defendant and his associates acted over and over again with exactly that intent.

Your Honor, I submit that the evidence introduced at trial has established beyond a reasonable doubt that the defendant conspired and schemed to defraud the lenders out of these loan proceeds, used interstate wire to accomplish that scheme, and then used some of the profits from that scheme to commit new and further fraud, and specifically designed some of those transactions to conceal their illegal source and ownership. Accordingly, we ask that the Court find the defendant guilty on all 30 counts.

THE COURT:  Thank you.  Mr. Poff, do you want to take a short break, or do you want to get started?

THE DEFENDANT:  We can take a short break, your Honor.

THE COURT:  Ladies and gentlemen, we usually take our break at 10:30, but we will take it a little earlier, since this is a convenient time to do so.  We will be in recess for 10, 12 minutes, and be back out at that time.

(At this time a short break was taken.)

THE COURT:  Mr. Poff.

THE DEFENDANT:  Good morning, your Honor.

THE COURT:  Good morning.

THE DEFENDANT:  I am William Stuart Poff, claimed alleged defendant.  This is my closing statement to this honorable court.

1   The evidence did show there was a conspiracy to commit fraud.

2   The evidence did show that William S. Poff was a victim of that

3   fraud.  There is enough reasonable doubt in this instant case to

4   sink a battleship.

5       The evidence did show that William S. Poff was not a part of

6   said conspiracy to commit fraud.

7       The evidence did show that William S. Poff was advised by

8   legal counsel, and licensed professionals, every step of the way,

9   and that everything was legitimate and above board.

10      The evidence did show that William S. Poff was not a licensed

11  real estate agent, licensed real estate broker, nor was he a

12  licensed loan officer or mortgage broker.

13      The evidence did show that William S. Poff, prior to his

14  divorce, did not ever receive funds from any of the listed

15  transactions.

16      The evidence did show that Poff was not on the Washington

17  Mutual bank account ending in 3135, which belonged to

18  Ms. Ikilikyan.

19      The evidence did show that Poff did not have an ATM card, a

20  debit card, a checkbook or signatory authority on the

21  aforementioned Washington Mutual account belonging to

22  Ms. Ikilikyan.

23      The evidence did show that Poff did not directly benefit from

24  Ms. Ikilikyan's WaMu account.  There have been a few checks, at

25  best, which would be a total of .64 percent of the total funds

1   which were deposited in that account over a three and

2   three-quarters year's period.  The chart doesn't even show the

3   cash that was paid back for those accounts.

4        The evidence did show that Poff was a notary, who often

5   authenticated signatures on documents recorded into public

6   records for the entire world to see.

7        The evidence did show Ikilikyan had her office in her private

8   home.

9        The evidence did show that the personal phone lines of that

10  home were used for personal and private use.

11       The evidence did show that Poff, trying to be a helpful

12  husband, would assist Ms. Ikilikyan around the home in business,

13  faxing documents, couriering documents, forwarding e-mails and

14  whatever else was needed to lawfully help his wife at the time.

15       The evidence did show that Poff's name was repeatedly forged,

16  and that documents were fabricated purporting to have Mr. Poff's

17  name on them.  Ms. Ikilikyan and William S. Poff sought

18  permission from Section 8 housing for Ikilikyan's mother,

19  Armenuhi Harutyunyan, to buy houses using her credit.

20       The evidence did show Ms. Ikilikyan negotiated the real

21  estate transactions for nearly all the properties.

22       The evidence did show that Ikilikyan did, in fact, lie on the

23  stand in regards to her level of understanding in the mortgage

24  industry.

25       The evidence did show that Ikilikyan distanced herself from

the financial side of the transactions due to gross negligence
and fraud within the loan paperwork.

The evidence did show that Ikilikyan again lied on the stand
and totally blamed William S. Poff for all the mortgage
transactions.

The evidence did show that all 1003 loan applications had her
as the loan officer, except for her own loans, where the 1003s
had the forged signature of Bill Poff on them.  And that is the
only place where Bill Poff appears in the evidence on the loan
applications.

The evidence did show that Poff was never contracted by any
mortgage or real estate broker.

The evidence did show that Ikilikyan testified to filling out
a loan officer application to the State of Washington for William
S. Poff to continue using his name.

The evidence did show that Ms. Ikilikyan gave up on the idea
of getting Poff licensed, and continued using his name, so she
subcontracted with America One Financing shortly thereafter.

The evidence did show there is an assumption of guilt by
association by the mere fact of William S. Poff being previously
married to Ms. Ikilikyan.

The evidence did show Ms. Ikilikyan continued
self-sufficiently in the fraud after Poff had left for Michigan.

The evidence did show that Ikilikyan had experience and
formal training in the real estate and lending industry, whereas

1   William S. Poff did not.

2        The evidence did show the tragic loss of sellers holding a

3   secured interest in a seller carryback, were severely damaged by

4   banks and mortgage companies stealing the subject properties in

5   fraudulent foreclosure processes.

6        The evidence did show that Ikilikyan and Micki Thompson pled

7   guilty to fraud.  Fraud equates to lying.  Both individuals lied

8   on the stand in an attempt to appease the plaintiffs for a

9   possible reduced sentence.  Ms. Thompson acted like she didn't

10  even know why she was on the stand, or about any 5K reduction --

11  possible reduction.  Perhaps she was trying to be the proverbial

12  Good Samaritan.  We will never know since she did not testify to

13  that fact.

14       The evidence did show that William S. Poff was never on the

15  real estate or loan, LLC companies, and was only on the property

16  holdings LLC as a result of a divorce order.

17       The evidence did show that Ms. Ikilikyan did locate other

18  prospective investors with good credit.

19       The evidence did show that Ms. Ikilikyan concealed her

20  business records that she was required to keep by state law from

21  the government, and Ms. Ikilikyan also had several computer

22  systems which would have had exculpatory evidence towards

23  William S. Poff as reported to the Federal Way Police Department.

24       The evidence did show William S. Poff did not receive money

25  of the items -- I'm sorry, did not receive many of the items

1  ordered from his dissolution from Ms. Ikilikyan, including the

2  F350 truck.

3      The evidence did show that Ms. Ikilikyan did have sole

4  control of all property, accounts and vehicles in her name, and

5  exemplified by the deceit of noncompliance with another court.

6      The evidence did show that William S. Poff left Washington

7  State with only what he could carry on a plane, and that he

8  hadn't been back to the state until the June 17th arraignment in

9  this instant case.

10     The evidence did show that Poff literally lives in a spare

11 room of his friend's house, all while Ikilikyan lives in a

12 6000-square-foot lakefront property.  The disparity between the

13 unequal situation needs little more comment.

14     The evidence did show that Ikilikyan was very much coached by

15 the government, and had a near perfect knowledge on how to answer

16 their questions, while when questioned by the defense did not

17 know how to fill out a loan application as a licensed loan

18 officer and a licensed mortgage broker, and seemingly did not

19 have the personal authority or knowledge to tie her own shoes

20 without Poff's consultation and permission.  Then she again goes

21 back to answering the government questions with a great degree of

22 knowledge base when she was cross-examined by the plaintiffs

23 again.

24     The evidence did show Ms. Ikilikyan is in fact a bad actor

25 and a liar.

1    The evidence did show that Ms. Ikilikyan admitted to forging

2    her mother's name repeatedly.

3    The evidence did show that the filings, motions and pleadings

4    of William S. Poff were filed as affidavits.  These affidavits

5    were never actually answered via an affidavit, in a

6    point-for-point controverted format, and are deemed true and

7    correct, admitted into the record as evidence.  It is a legal

8    impossibility for the plaintiffs to prevail on any merit, if all

9    my pleadings are by default true and correct on the record.

10    The evidence did show Ms. Ikilikyan had access to her

11    attorneys, January Gossing and Brian Hallaq, at all times for

12    guidance.

13    The evidence did show at the first breach of due process all

14    jurisdiction should have ceased.  The first incident was the

15    magistrate practicing law from the bench at the June 17th

16    arraignment, where a plea of not guilty was entered on behalf of

17    William S. Poff, when in fact William S. Poff had given no one

18    permission to speak on his behalf.

19    The evidence did show that Dan Truini assumed Poff did loans,

20    but never actually witnessed him submit or process one, or even

21    close a loan.  The evidence did show that Mr. Truini was paid for

22    his broker fee by Ms. Ikilikyan.

23    The evidence did show that Ms. Ikilikyan had control of the

24    loan files, and still does, and would not hand over the files to

25    Mr. Truini until she had a brokers agreement with him.

1    The evidence did show that Ms. Ikilikyan possessed knowledge

2  about the mortgage industry when she spoke with James Thomson.

3  The evidence did show that Mr. Thomson believed Ms. Ikilikyan to

4  be in charge.

5    The evidence did show some lenders had little concern over

6  what was stated for income, and one lender even changed the

7  income to suit their criteria for sale on the secondary market.

8    The evidence did show that the only lender/account rep that

9  Poff had a good rapport with was called as a witness, which was

10  Ms. Senath Sands, who was often put on the phone with Mr. Poff to

11  get things sped up, due to the good rapport between Ms. Sands and

12  Mr. Poff.

13    The evidence did show that Emil Anderson stated Ikilikyan was

14  the one who mostly sent in the loans.

15    The evidence did show that Mike Edwards stated Ikilikyan did

16  seem very knowledgeable about the mortgage industry.

17    The evidence did show the testimony of Ms. Becky Carnell only

18  took into account the banks and the documents given to her by the

19  government, and does not reflect any cash transactions that

20  Mr. William S. Poff may have been involved in.

21    The evidence did show Ikilikyan's total deposits from

22  January 1st, 2005 to August 29th, 2008, to be $3,409,320.09.

23  Nowhere was her income overstated from what was placed into

24  evidence.   The average of those funds over that three and

25  three-quarter year period would average to $75,000 per month.

1    The evidence did show Ms. Carnell's financial analysis did

2  not show actual profits, as the term is needed by the U.S.

3  Supreme Court in a money laundering charge.

4    The evidence did show that Ms. Carnell's charts and graphs do

5  not show what is being alleged as a meaningful benefit to William

6  S. Poff.  On the contrary, Poff purports to have an approximate

7  $20,000 incidental benefit over the three and three-quarter year

8  period.

9    The evidence did show that Ms. Carnell did not do a cash

10  analysis to see if those incidental funds going to Mr. Poff were

11  paid back into the Washington Mutual account.

12    The evidence did show a pro per litigant does not have equal

13  footing in this court.

14    The evidence did show that Mr. Poff was not a part of the

15  scheme or conspiracy.  The only thing Poff is guilty of is being

16  married to an adulterous woman, who routinely uses deception,

17  lies and fraud to get what she wants.

18    The evidence did show the required elements to sustain a

19  victory on conspiracy were not met.  Only the untrue testimony of

20  alleged co-defendants claimed Poff had anything to do with the

21  proposed scheme.

22    The evidence did show the plaintiff's theory alleging Poff's

23  involvement has many serious flaws on its face.  Their theory is

24  unable to overcome the untrue testimony of witnesses whom lied

25  when they alleged to verify the veracity of copied documents.

1    The evidence did show nonoriginal documents are being allowed

2    into evidence to determine the outcome of this case.  Such

3    documentation is extremely prejudicial, when it was proven in

4    open court that many signatures of William S. Poff were forged,

5    and many documents were utterly manufactured.  That brings

6    reasonable doubt upon anything entered into evidence that is not

7    original.

8    The evidence did show that the legal maxim, Ex dolo malo non

9    oritur actio, that I had spoke about in my opening statements,

10   out of fraud arises no action, still holds true.  The fraud

11   perpetrated against William S. Poff in this instant case cannot

12   sustain a conviction in this honorable court.

13   The evidence did show none of the specific crimes enumerated

14   in the Constitution that Congress has a right to prosecute were

15   ever violated.  This is highlighted by Supreme Court Judge John

16   Marshall in Cohens v. Virginia, that Congress cannot punish

17   felonies generally.

18   The evidence did show that Rule 1003, in regards to the

19   documents, a copy should not be admitted if it would be deemed

20   unfair.  It would also stand to reason, any copies in question

21   should not be given any weight in favor of the plaintiff's

22   arguments, specifically after the discovery of fraud and

23   forgeries in the documentation during the trial.

24   The evidence did show that profits need to be calculated and

25   applied to this case according to the Supreme Court case in

1   Santos.

2       The evidence did show the presumed interstate commerce and

3   the wire transfers most of the times went from one point in

4   Washington State to another point in Washington State.

5       The evidence did show that the presumed e-mails, alleging

6   Poff to have sent them to different people, was a shared account

7   in Ms. Ikilikyan's name, with no way to verify who sent anything,

8   regardless of the e-mails themselves.

9       The evidence did show that William S. Poff did nothing wrong

10  to his knowledge, and had no knowledge of any criminal

11  conspiracy.

12      The evidence did show that Ikilikyan and Thompson had direct

13  contact with each other during the one-and-a-half years that

14  Mr. William S. Poff was out of state.  They obviously conspired

15  and fabricated a story to minimize their involvement, and direct

16  the blame towards other alleged co-defendants.

17      The evidence did show, out of the many transactions listed in

18  the original indictment, the government only chose to pursue

19  those counts that had an incidental occurrence of Mr. William S.

20  Poff's name, in both evidence and the witnesses.

21      The evidence did show that few witnesses specified who they

22  dealt with.  Much of the testimony from witnesses would be, Bill

23  and Alexis this, or Bill and Alexis that, "them" or "they."  This

24  would not be abnormal for someone who has a home office.

25      The evidence did show several transactions occurred after

1   Mr. Poff left Washington to live in Michigan, particularly the

2   Puget Sound property, which is on the chart.

3       The evidence did show, just because the name William S. Poff

4   is typed on a document doesn't mean he had anything to do with

5   the document or that he did anything purporting to be illegal.

6       The evidence did show the government witnesses always said

7   "them" or "they" or "Bill and Alexis."

8       The evidence did show that the monies from the divorce were

9   awarded by a court order.  There was not just a division of

10  community property, but also personal property in the dissolution

11  before that court.

12      Your Honor, I am a Marine veteran who took an oath to support

13  and defend the Constitution of this great country.  I have had

14  friends, who are better men than I, who gave the ultimate

15  sacrifice to uphold that same oath that we had both took.  I am

16  the belligerent claimant in personam, who is respectfully

17  demanding his constitutional rights be honored in their entirety.

18      The only thing that makes that Constitution a valuable

19  document is an American, such as I, standing here demanding his

20  rights.  It also takes an honorable judge, which is you, who is

21  willing to uphold his oath of office and drop that hammer in

22  favor of my constitutional rights.  Without either one of those

23  two elements, that document isn't worth spit, and all the

24  sacrifice through America's generations of brave men was in vain.

25  Thank you, your Honor.

1          THE COURT:  Thank you, Mr. Poff.  Rebuttal from the

2    government.

3          MS. VOGEL:  Your Honor, the defendant argues that he was

4    advised by legal professionals that everything was, I think the

5    words he used, "above board."  There are several problems with

6    that argument.  First, there is very little actually in evidence

7    about this, notwithstanding the defendant's argument.

8        There was some testimony on cross-examination that somebody

9    at Great American Escrow might have looked at one of these seller

10   financing agreements, and might have said, yes, you could

11   separate out these two transactions if you waited a few days.

12   But whoever that person was, was not given the full picture, as

13   Ms. Ikilikyan clearly testified.  Whoever that person was, wasn't

14   told about the fake entries in the HUD-1s to disguise the money

15   that didn't exist, as seller deposits, or that was going back out

16   to the defendant and his wife.  He wasn't told that the sellers

17   who were extending the carrybacks were deceived about the nature

18   of their note.  He wasn't given the full picture, if he was given

19   any picture at all.  Plainly, because the people who consulted

20   with him, if they did, knew that it wouldn't pass muster, the

21   full picture wouldn't.

22       The defendant also pointed to this conversation with the King

23   County Housing Authority as some sort of authority for using

24   Ms. Harutyunyan as a straw buyer.  While the King County Housing

25   Authority may have said, well, if she doesn't earn any income, we

1   are not going to kick her out of housing, this isn't obtaining

2   consent from the lenders to falsely represent that

3   Ms. Harutyunyan was the borrower when she wasn't.  This isn't the

4   equivalent of obtaining permission from the lenders to lie about

5   Ms. Harutyunyan's financial qualifications and intent to occupy

6   the property.

7       And all of this is irrelevant anyway, because the law does

8   not require the government to prove that the defendant willfully

9   deceived.  We don't have to prove that he violated known legal

10  duties.  We simply have to prove that he intended to defraud,

11  that he used lies and deceit to obtain money and property.

12      And we have shown, regardless of what was told to him, if it

13  was told to him, about this seller financing agreement, the

14  things that he and his conspirators caused the lenders to

15  believe, for example, Tim Thomson having a landscaping business

16  that never existed, Armenuhi Harutyunyan owning a very profitable

17  computer company, were simply not true.  And that's how the

18  defendant obtained the money.

19      Can we put up Exhibit 229?  215.  I apologize.  Yesterday in

20  connection with the handwriting expert we heard testimony that

21  this very document had been submitted by the defense to

22  Ms. McFarland as an exemplar, an example of the defendant's

23  genuine signature.  This genuine signature purports to certify a

24  promissory note between Ms. Ikilikyan and Tim Thomson that

25  Ms. Ikilikyan testified never existed, and which Tim Thomson

1      testified never existed.

2           There are a lot of forgeries apparently in this case, your

3      Honor.  It is the government's position that the defendant and

4      his associates were responsible for these forgeries, and used

5      these forgeries, like this promissory note here, to hide the

6      trail of the proceeds and to deceive the lenders and the sellers.

7           The defendant also argued that these statements about

8      Ms. Ikilikyan's income from Fidelis Enterprises wasn't a false

9      statement.  And I would just point out Ms. Ikilikyan herself

10     testified that she did have some legitimate commissions that

11     could have been included as her legitimate income on those 1003s

12     in her name.  But we know from the financial analysis that that

13     was a pittance.  I think there was less than $30,000 over three

14     and a half years that came in from Dove Realty in the form of

15     commissions that were deposited into Ms. Ikilikyan's accounts.

16          Fidelis, on the other hand, was a straw company set up for

17     the specific purpose to support stated income loans.  And as John

18     Darcy from Ownit made clear, taking money that you borrow from

19     one lender, depositing it into your account and claiming it as

20     income, is not income in the way that the lenders see it.

21          Your Honor, the defendant has testified -- has argued that

22     everybody that says he did it was lying.  Now, obviously

23     Ms. Ikilikyan and Ms. Thompson have an incentive to testify.

24     Certainly it was not fun for either of them.  Obviously the Court

25     has to look at their testimony carefully.  But I would first

1    point out there were several people who testified the defendant

2    himself was involved in these transactions who have no such

3    incentive to lie, and whose testimony the defendant appears to

4    have completely overlooked.

5        With regard to Ms. Ikilikyan, she admitted she conducted this

6    fraud.  She admitted she lied.  She admitted being a full

7    participant.  She knew the details of the real estate side in and

8    out, and she admitted all that.  Having admitted all that, what

9    is the point of pretending, if Mr. Poff's argument is to be taken

10   seriously, that she didn't understand the money?  If you have

11   admitted you have already done it all, why pretend or feign

12   complete lack of sophistication when it comes to how the money

13   was transferred around, and how the loans were obtained?  It

14   simply doesn't make sense.

15       Similarly with Micki Thompson.  Micki Thompson was not a

16   particularly good witness.  She didn't remember half the things

17   we hoped she would remember.  She didn't get any money out of

18   this.  She got maybe a total of $20,000, total.  Having done all

19   this, and being convicted of a crime for a total of $20,000, is

20   it really the defendant's contention that she is in a conspiracy

21   with Ms. Ikilikyan after the fact to frame Mr. Poff?  It just

22   doesn't make sense.

23       Your Honor, the government contends, just as the defendant

24   worked very hard to hide assets from his former wife, he is now

25   trying very hard to hide what he did with his second wife.  In

1   particular, he is trying to hide behind his ex-wife's licenses,

2   he is trying to hide behind his ex-wife's bank account, and he is

3   trying to hide behind his ex-wife's mother-in-law.

4        The United States submits he is guilty of these offenses and

5   should so be convicted.

6            THE COURT:  Thank you, counsel.  Counsel, over the last

7   eight days I have tried to keep extensive notes.  I have

8   certainly had occasion to plow through the five notebooks of

9   exhibits.

10       As I suspect was evidenced in my questions of the government

11   as part of their closing argument, I have taken the elements of

12   each of the alleged violations and matched them against the

13   testimony that I have heard.  In doing that, I have multiple

14   checklists of proof of various elements.  I have worked on that

15   further this morning as a consequence of listening to your

16   closing arguments.  And, therefore, it is my intention to at this

17   time give you the opinion of the Court in this matter.

18       The Court asked both parties if they wish to exercise their

19   rights under Federal Rule of Criminal Procedure 23(c), to require

20   specific Findings of Fact in a criminal trial conducted to the

21   court.  On the record, neither party requested such specific

22   findings.  Therefore, remarks today will be more general than

23   specific to each element in each transaction.

24       When I wrote this out last night, little did I know that I

25   would find myself quoting Mr. Poff this morning.  What I wrote

1    was, "The Court finds there is, at most, a limited dispute that

2    in the eight transactions at issue in this lawsuit, there was

3    conduct constituting bank fraud, wire fraud, money laundering and

4    conspiracy to commit these crimes."  What is more at issue is the

5    question of Defendant Poff's role in the transactions.  I guess I

6    am happy to know I got at least that issue right.

7         Mr. Poff portrays himself as a largely uninvolved individual,

8    who was acting at the instruction of his former spouse, Alexis

9    Ikilikyan.  Ms. Ikilikyan and other defendants in this matter

10   allege that Mr. Poff played a substantial role in the

11   transactions.

12        The Court find that Mr. Poff understates his role in the

13   transactions, and that Ms. Ikilikyan overstates Mr. Poff's role,

14   and understates her role.

15        It is a dilemma for any fact finder to attempt to examine

16   events which occurred in the past, when the testimony of the

17   parties, or in this instance the testimony of the government's

18   witnesses, and the questions asked by Mr. Poff, and the positions

19   taken by Mr. Poff in his pleadings, sharply contradict each

20   other.  Customarily, at least in my experience, fact finders tend

21   to base their determinations on the testimony of independent

22   witnesses who have no financial or liberty interest at stake.

23        The court has engaged in the same analysis, and the court

24   bases its determinations on the testimony and the exhibits

25   admitted during the multi-day trial.  The court principally

1  relies on the testimony of the non-party witnesses, and the

2  exhibits executed contemporaneously with the transactions at

3  issue.

4      I will tell you that, in particular, I found the testimony of

5  the following witnesses to be notable:  That would include Dan

6  Truini, John Darcy, Sarah Garner, Jim Thomson, Tim Thomson, John

7  Andriolo, Senath Sands, Maureen O'Connell, Linda Crocker, Emil

8  Anderson, Susan Donaldson, Mike Edwards, Kimberly Gans, Virginia

9  Munger, Sharon Kirkdoffer and William Kim.

10     There were other witnesses who were directly involved in the

11  transactions, and the court credits some of their testimony, and

12  finds other parts of their testimony not persuasive.

13     In addition, there were some witnesses called who examined

14  facts that occurred or issues that were not contemporaneous, and

15  I credited some of their testimony, and found other parts of it

16  less persuasive.

17     As its only witness the defense called Hannah McFarland as a

18  handwriting expert.  The defense in this criminal trial is under

19  no obligation to prove anything; it is the government that bears

20  the burden of proof.

21     Ms. McFarland examined ten exemplars of various forms of

22  Mr. Poff's signature, and compared them to what I think were 21

23  alleged signatures of Mr. Poff.  While the court expresses some

24  skepticism concerning the decision not to provide Ms. McFarland

25  any examples of Bill Poff, or to explore the legal consequences

of signing a document in a form different than the document has been filled out, the decision to provide no samples of Bill Poff, as opposed to what Mr. Poff described as his, quote, payroll signature, William S. Poff, the court is persuaded that some of the challenged signatures are not genuine.

The issue, however, is if the forged signatures affect any of the documents supporting the criminal charges in this action. The defense had the opportunity, and received funds to support the investigation, to look at other documents that do support the criminal charges, and determine if those signatures were false.

The court finds that the forged signatures do not affect the documents supporting the criminal charges.  Some of the exhibits pertain to transactions not at issue in the trial.  I believe one of those is the Sandpoint Way property.

Other exhibits pertain to quitclaims of property from Mr. Poff to Ms. Ikilikyan, which occurred after the conduct that supports the criminal charges in this matter.

The court is unwilling to discredit all of the signatures presented at trial on the basis of the limited number of signatures challenged at trial.

The court also reaffirms its ruling under Evidence Rule 1003 in regards to the use of copies of documents.

Having given weight to those witnesses and exhibits, which the court finds to be credible, and having heard all of the testimony in this matter, and read all of the pleadings, and

1    having listened to now eight days of trial, the court finds

2    defendant, William S. Poff, guilty beyond a reasonable doubt of

3    the following counts charged in the first superseding indictment:

4    Conspiracy counts of 1 and 31, the bank fraud counts of 3 and 4,

5    the wire fraud counts of 11, 12, 13, 15, 20, 21, 23, 25, 26, 27

6    and 28.

7         The area of money laundering is subject to a conundrum that

8    only a law professor could love.  The unclear majority opinion in

9    Santos has been interpreted by the Ninth Circuit.  I believe that

10   the original jury instruction that sets forth the elements of

11   money laundering correctly states the law.

12        While I do not believe in Count 47 there was testimony that

13   Mr. Poff was the source of that particular invoice, I do believe

14   that the conduct of the entire transaction does support the money

15   laundering charge, and, therefore, I find Mr. Poff guilty beyond

16   a reasonable doubt in money laundering charges of 36 -- contained

17   in the indictment as Counts 36, 40, 41, 43, 44, 46, 47, 48, 54,

18   57, 58, 60, 62, 63 and 67.

19        Mr. Poff shall remain on supervised release subject to the

20   current terms of his bond.

21        Madam Clerk, do we have a date for sentencing?

22             THE CLERK:  Monday, June 14th at 9:45.

23             THE COURT:  At this time I will ask each counsel if they

24   have anything further before we recess?  Anything from the

25   government?

 1          MS. VOGEL:  No, your Honor.

 2          THE COURT:  Mr. Poff?

 3          THE DEFENDANT:  Nothing, your Honor.

 4          THE COURT:  All right.  Counsel, thank you.  I

 5   appreciate the courtesy with which this matter has proceeded.

 6   Mr. Poff, you are to be congratulated on being able to constrain

 7   your very strong feelings.  I had some concerns when Tim Thomson

 8   was testifying that he was not going to follow that same

 9   standard, but I am glad to see that he was able to get it under

10   control.

11      Counsel, we will be in recess.

12                      (Adjourned)

1                              CERTIFICATE

2

3

4

5

6

7

8

        I, Barry L. Fanning, Official Court Reporter, do hereby
9   certify that the foregoing transcript is true and correct.

10

11                              S/Barry L. Fanning

12                              _____

13                              Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25